Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
  declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
  gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice* forthcoming)
  opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
  peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
  jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
  awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
  mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
  slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
  jreisberg@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
  peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>Plaintiffs,<br><br>v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

1   Additional Counsel of Record for Plaintiffs:

2

3   Carol A. Sobel, Esq. (SBN: 84483)
        carolsobellaw@gmail.com
4   Weston Rowland, Esq. (SBN: 327599)
        rowland.weston@gmail.com
5   Law Office of Carol A. Sobel
6   2632 Wilshire Boulevard, #552
7   Santa Monica, CA 90403
    Telephone: (310) 393-3055
8
9   Paul Hoffman, Esq. (SBN: 71244)
        hoffpaul@aol.com
10  Michael Seplow, Esq. (SBN: 150183)
11      mseplow@sshhzlaw.com
    John Washington, Esq. (SBN 315991)
12      jwashington@sshhzlaw.com
13  Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
    200 Pier Avenue #226
14  Hermosa Beach, CA 90254
    Telephone: (310) 717-7373
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda bring this action for injunctive against Defendant Kristi Noem, in her official capacity as Secretary of Homeland Security, and the United States Department of Homeland Security ("Defendants") and allege as follows:

## **INTRODUCTION**

1.      Plaintiffs are reporters, legal observers and protesters, who seek injunctive relief to prevent Defendant Department of Homeland Security ("DHS") from using unnecessary and excessive violence to prevent them from exercising their First Amendment rights to report on, observe, and protest government actions. From Thomas Paine's handing out pamphlets, to the Boston Tea Party, to the Women's Suffrage Movement, to the Civil Rights Movement, to the Black Lives Matter movement, the cornerstone of this country's public discourse for nearly 250 years has been the right to protest, to report on it, to challenge the government's portrayal of events, and to publicly debate those issues. Without the right to engage in that discourse, the United States loses critical checks on government power that are essential to our constitutional democracy. Suppressing the rights of the free press and protesters is the calling card of cowardly dictators and threatens to destroy our nation.

2.      On June 6, 2025, the Trump administration began an ongoing series of indiscriminate and terrifying immigration raids across Southern California. DHS officers have come in masks, wearing heavy paramilitary gear and without visible identifying information, brandishing rifles, and abducting community members from churches, local business, and courthouses where they seek their constitutionally protected right to due process.

3.      Protests began almost immediately. Californians concerned about their families, congregation members, fellow workers, and neighbors showed up at sites of

reported raids to peacefully protest the federal government's invasion of their neighborhoods and violent separation of their families, to remind targeted community members of their legal rights, and to document how the government was mistreating those exercising their First Amendment rights.

4.    At each protest, DHS officers have unnecessarily and indiscriminately targeted, assaulted, tear-gassed, pepper-sprayed, and shot protesters exercising their right to assemble to voice their disagreement with the government, reporters covering these events, and legal observers seeking to document the government's conduct. DHS is abusing militarized weapons in ways that needlessly imperil everyone present—and that federal courts have repeatedly prohibited—to deter people from reporting, observing, and protesting. As promised by Secretary of DHS, Kristi Noem, and President Trump, they have used the violent spectacle created by DHS as a reason to commandeer the National Guard and send the United States Marines into California, which in turn has generated more widespread protests.

5.    While trying to suppress protected speech about DHS's unnecessary and excessive use of force, the government is broadcasting its own messages about the protests and immigration raids. Its ongoing effort to monopolize the marketplace of ideas through violence violates the First, Fourth, and Fifth Amendments, is chilling people from exercising their rights to peacefully report, observe, and protest, has needlessly caused violence, is harming the public, and is irreparably injuring Plaintiffs.

**THE PARTIES**

6.    Plaintiff Los Angeles Press Club ("LA Press Club") is a nonprofit organization dedicated to supporting, promoting, and defending quality journalism in Southern California. Its core mission is to encourage journalists and involve the public in recognizing outstanding journalism, based on the belief that free press is crucial to a free society. The LA Press Club has more than 1,000 journalists members throughout Southern California. During June 2025 at protests in the Los Angeles

COMPLAINT

area, multiple members of the LA Press Club have been subject to use of force or
suffered serious violations of press rights by federal officers. As a result, the LA
Press Club has had to divert hundreds of staff hours and significant resources from
other Club activities, including working on the details, logistics, and fundraising for
its largest annual fundraising and awards program, to address press rights violations
by DHS officials. The Los Angeles Press Club's headquarters is in Los Angeles.

7.     Plaintiff NewsGuild - Communications Workers of America ("CWA") is
the largest labor union representing journalists and media professionals in North
America, including workers in California and the Central District of California. CWA
is dedicated to supporting quality journalism, defending democracy, and improving
workplace conditions for workers in the news industry. In reporting on the protest of
ICE raids in the Los Angeles area, multiple members of CWA were injured by the
indiscriminate and improper use of militarized weapons aimed at journalists. As a
result of the violence perpetrated by DHS agents, several staffers have had to cancel
scheduled meetings and postponed both National Labor Relations Act representative
responsibilities and administrative operations to focus their time on supporting
members who have been injured while reporting on the protests in the Los Angeles
area. CWA's headquarters is in Washington, DC.

8.     Plaintiff Sean Beckner-Carmitchel is a California resident, who lives in
Los Angeles. He is a freelance journalist, who has produced video news stories in
international, national, and local media outlets, including *The New York Times*, CNN,
Good Morning America, and Al Jazeera. Sean has also authored stories for a variety
of media outlets, including Cal Matters and *The Beverly Hills Courier*. In his six-year
career, Mr. Beckner-Carmitchel has covered many protests. On June 7, 2025, Mr.
Beckner-Carmitchel was injured by DHS while covering the aftermath of the
Immigration and Customs Enforcement immigration raid at the Home Depot in
Paramount. And, on June 8, 2025, Mr. Beckner-Carmitchel was injured by DHS
while covering a protest of the immigration raids in the Boyle Heights community.

9.      Plaintiff Ryanne Mena is a California resident, who lives in Los Angeles. She has covered crime and public safety for the Southern California Newsgroup, which includes *The Orange County Register*, *The Riverside Press-Enterprise*, *Los Angele Daily News*, and other local publications. Ms. Mena is a member of CWA. As a professional and student journalist, Ryanne has attended dozens of protests. On June 6, 2025, Ms. Mena was injured by DHS while covering the protest outside of the Metropolitan Detention Center in downtown Los Angeles. And, on June 7, 2025, Ms. Mena was injured by DHS while covering the aftermath of the Immigration and Customs Enforcement raid at the Home Depot in Paramount.

10.      Plaintiff Lexis-Olivier Ray is a California resident, who lives in Los Angeles. He is a staff investigative reporter for L.A. TACO, an independent media platform founded in 2006, where he focuses on crime, homelessness, and the Los Angeles Police Department. He was named a "distinguished journalist" by the Society of Professional Journalists' Los Angeles chapter in 2022. His work has appeared in the L.A. Times, Men's Health Magazine, KCET, and SFGATE.  He is a member of the Los Angeles Press Club. On June 7, 2025, Mr. Ray was subjected to tear gas and shot with pepperballs by DHS while covering the protest outside of the Metropolitan Detention Center in downtown Los Angeles.

11.      Plaintiff Charles Xu is a California resident, who lives in Los Angeles County. Mr. Xu is a Legal Observer on behalf of the National Lawyers Guild of Los Angeles. As a Legal Observer, Mr. Xu helps to observe and document the behavior of law enforcement officials, including their weaponry, arrest tactics, and use of force at various protests and direct actions. He started legal observing in early November of 2020 and has observed more than 200 protests in Southern California. On June 7, 2025, Mr. Xu was injured by DHS while attending the protest at the Home Depot in Paramount near the intersection of Alondra Boulevard and Atlantic Place as a Legal Observer.

12.     Plaintiff Benjamin Adam Climer is a California resident, who lives in Los Angeles County. Mr. Climer is a trained Emergency Medical Technician and is the training director for the Unarmed Model of Crisis Response, which is an alternative to law enforcement crisis response program within the City of Los Angeles. He has participated in numerous protests. On June 7, 2025, Mr. Climer was injured by DHS while attending the protest at the Home Depot in Paramount near the intersection of Alondra Boulevard and Atlantic Place.

13.     Plaintiff Abigail Olmeda is a California resident, who lives in Anaheim. Ms. Olmeda was born and raised in Anaheim, is the mother of two children, previously worked for the City of Santa Ana, and is currently a student at Cypress College. On June 9, 2025, she attended the protests at the Federal Building in Santa Ana, at 34 Civic Center Plaza. Ms. Olmeda was injured by DHS while attending the protest with her spouse and sister, motivated by concerns over ICE actions in her community and a belief in peaceful protest to protect people's rights.

14.     Defendant U.S. Department of Homeland Security ("DHS") is a department of the executive branch of the United States government, responsible for coordinating immigration enforcement actions. Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and the DHS Management Directorate are component agencies within the Department of Homeland Security. Homeland Security Investigations ("HSI") is a subordinate agency housed within ICE, while the Federal Protective Service ("FPS") is a subordinate agency housed within the DHS Management Directorate. Upon information and belief, the Los Angeles Field Office for ICE manages that agency's operations throughout the Central District of California. The Chief Patrol Agent for the El Centro Sector of CBP is and has been, at all times relevant to this action, the lead federal coordinator of CBP entities in Los Angeles. Region 9 of FPS manages operations throughout California, Nevada, and Arizona.

15.    Defendant Kristi Noem is the Secretary of Homeland Security and head of the Department of Homeland Security. Starting June 6, 2025, Secretary Noem directed ICE, CBP, and HSI to engage in enforcement actions in the Los Angeles area and authorized agents to use dangerous militarized methods that have targeted protesters and journalists exercising their First Amendment rights.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' causes of action arise under the United States Constitution and 28 U.S.C. §§ 2201 and 2202.

17.    Venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Central District of California and because Defendants are officers or employees a U.S. agency acting in their official capacities or under color of the legal authority of those agencies.

## FACTUAL ALLEGATIONS

**I.    THE FEDERAL GOVERNMENT BEGINS A DEEPLY UNPOPULAR IMMIGRATION ENFORCEMENT OPERATION IN SOUTHERN CALIFORNIA IN JUNE 2025.**

18.    Donald Trump's second presidential term has seen a dramatic and unprecedented escalation in immigration arrests and detention efforts. Upon returning to power, the Trump Administration began to intensify and expand its domestic immigration enforcement, setting new sky-high targets for daily immigration arrests and expanding the scope of its operations far beyond immigrants with criminal histories.

19.    By June 2025, ICE had detained more than 100,000 people in just over five months, with arrests spiking to more than 2,000 people per day.

20.     This new dragnet enforcement program—combined with the Trump Administration's vitriol against immigrants and vows to target sanctuary cities, including Los Angeles—created a perfect storm for conflict.

21.     DHS set out on a sustained effort to carry out thousands of field arrests in this judicial district. Starting on June 3, 2025, ICE began arresting immigrants lawfully appearing for routine check-in appointments with the agency at the Federal Building in downtown Los Angeles. The individuals were taken to the adjacent Roybal Federal Building, where they were locked up in the basement, conference rooms, and outdoor tents. There, ICE detained people—asylum seekers, young children, and pregnant people—in rooms without beds, with limited access to food and water, and in complete darkness overnight.

22.     Then, on June 6, 2025, DHS agents launched a series of operations throughout Southern California, invading homes, schools, churches, workplaces, hospitals, and courthouses.

23.     On June 6, 2025, ICE began carrying out enforcement actions at local businesses, including a clothing wholesaler called Ambiance Apparel, a doughnut shop in the Fashion District of downtown Los Angeles, and two Home Depot stores in the Westlake District in Los Angeles, which has continued in the following days.

24.     On June 7, 2025, ICE raided a Best Buy in Thousand Oaks, a supermarket in Inglewood, and a Target parking lot in Rosemead.

25.     On June 8, 2025, ICE raided a Chase Bank in Santa Maria, a neighborhood in Hawthorne, a 99 Cents Store in Hawthorne, and various locations in Fontana, Westchester, and Culver City.

26.     On June 9, 2025, ICE expanded its operations to neighboring Orange County, conducting raids in Santa Ana, Fountain Valley, and Whittier.

27.     On June 10, 2025, ICE operations began north of Los Angeles, in Ventura County, where agents detained farm workers as they labored in fields.

COMPLAINT

28.    On June 11, 2025, ICE raids continued with multiple raids throughout Ventura County in the City of Downey at a car wash, Home Depot, and LA Fitness.

29.    As a result of these immigration raids, ICE arrested dozens of parents, caregivers, and elderly members of the community while detaining dozens more in the process.

30.    In a news conference on June 12, 2025, Secretary Noem pledged to continue these immigration raids in Los Angeles when she said: "We are not going away. We are staying here to liberate this city from the socialist and burdensome leadership that this Governor Newsom and this mayor placed on this country and what they have tried to insert into this city."

31.    Consistent with this directive, immigration raids in Southern California are ongoing, with ICE and supporting officers from other DHS agencies taking temporary residence in the region as they continue to expand their operations.

## II. THE LOCAL COMMUNITY RALLIES TO PROTEST THE INCREASING VIOLENCE AND FREQUENCY OF IMMIGRATION RAIDS

32.    Accounts of indiscriminate arrests and deplorable conditions for detainees in Los Angeles rapidly spread online and in the traditional press. The lawlessness sparked outrage among impacted family members, concerned citizens, immigrant rights advocates, local officials, and the broader community.

33.    Local elected officials, civic leaders, clergy members, and stakeholders from a vast swath of California civic society swiftly condemned the escalation in immigration enforcement operations within Los Angeles. In a statement, Los Angeles Mayor Karen Bass expressed that she was "deeply angered by what has taken place" because "[t]hese tactics sow terror in our communities and disrupt basic principles of safety in our city." The Los Angeles Area Chamber of Commerce made what the Los Angeles Times called "an unusually pointed statement" criticizing the operation, stating "We are deeply concerned by recent enforcement actions that have disrupted

COMPLAINT

the well-being of our communities, compromised public safety, and threatened the stability of our local economy."

34.    The condemnations and outrage from local civil society mirrored the organic growth of a grassroots protest movement in the area. Almost immediately after the first raids began, small demonstrations and protests grew organically as local community members coalesced in the locations throughout Southern California where immigration raids took place to protest the actions of ICE and call for an end to immigration raids. Protesters gathered to express solidarity with those who had been detained, concern for the tactics used by the federal government, and opposition to the way federal agents threatened and intimidated the community in executing the immigration raids.

35.    In addition to the sites of immigration raids and arrests, protestors also singled out Downtown Los Angeles as a particularly important site for their demonstrations. Community members and advocates horrified by reports of people being detained in the dark basement rooms inside the downtown Federal Building and Roybal gathered outside to demand the release of the people locked inside, to protest their unjust detentions, and to demand an end to the mass immigration raids.

### III.    DHS RESPONDS TO PROTESTS WITH OVERWHELMING AND ILLEGAL VIOLENCE

36.    Each time the community rises in protest, DHS retaliates with sweeping, excessive force. Federal agents in fatigues and paramilitary gear recklessly shoot pepper balls and rubber bullets at peaceful protestors, inflicting traumatic injuries. They have launched volleys of tear gas and flash-bang grenades at groups of demonstrators that included children and elders, clergy, and elected officials.

37.    On June 6, federal agents brutalized and arrested a union leader protesting an immigration raid at Ambiance Apparel, and used tear gas, batons, and flash-bang grenades against a group of concerned family, clergy, and community members protesting the raid, injuring people in the neighborhood.



38.    Later on June 6, DHS agents fired pepper balls and tear gas into a crowd of protestors, legal observers, and reporters who had gathered for a press conference and demonstration against ICE in the area around the Los Angeles Federal Building. DHS agents in riot gear shot pepper balls directly at protestors, causing them to yell and scream in pain. This use of force was retaliatory, indiscriminate, and needless. DHS faced no threat when it launched its violent assault, nor did DHS agents give any audible warning or instruction to disperse in advance.



COMPLAINT

39.     On the morning of June 7, at the Los Angeles Federal Building, DHS deployed a chemical weapon against a small group of protestors, concerned family members of people detained in the building, and advocates chanting legal advice towards detained people whom ICE was moving from the building into unmarked vans. U.S. Congress members Jimmy Gomez and Norma Torres—who were present to raise concerns about ICE detaining people in the building's basement holding cells without food, water, or sunlight—were also subjected to this chemical weapon multiple times. The chemical weapon DHS sprayed into the air caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. DHS faced no threat from the people gathered when it sprayed this weapon into the air, nor did DHS agents give any audible warning or instruction to disperse in advance. On the contrary, federal officials instructed the Congress members to wait in the area where DHS released the chemical agent. On information and belief, DHS deliberately released chemical weapons into the air to deter protestors, advocates, and elected officials from exercising their First Amendment rights.

40.     In a livestream from the Federal Building, Representative Torres began to state: "If this is how violently they are pushing against members of Congress who are wanting to have some oversight as to how many people are detained . . ."— then was stopped by a coughing fit. Video of this event is accessible at https://www.instagram.com/reel/DKm_YT7P2Ph/?igsh=MWg2ejZvcTFja3lrdQ==

41.     On June 7, in the Los Angeles County city of Paramount, CBP and HSI agents also shot volleys of rubber bullets and tear gas canisters at protestors, journalists, legal observers, local elected officials, advocates, and concerned community members who had gathered in response to reports of immigration enforcement activity in the area.

42.     DHS agents launched a sweeping, violent attack on protesters and community members gathered in a grassy area across the street. The community members gathered had been playing music and chanting at immigration enforcement

11

COMPLAINT

1 to get out of their community; they included local families and people of all ages,

2 including children and elders. Though they had stayed across the street from where

3 DHS agents lined up, federal agents advanced on them without warning, shooting

4 tear gas and rubber bullets.

5      43.   DHS agents did not target their assault towards people posing a threat in

6 any way. Rather, they fired their weapons indiscriminately and at every angle in front

7 of them in the direction of the gathered community, hitting people in the head with

8 projectiles and choking them with tear gas. Some agents shot tear gas canisters and

9 rubber bullets directly at people as they did this.

10      44.   DHS agents shot tear gas canisters at people across the street, even

11 though there was still moving traffic in the street. On several occasions, DHS agents

12 fired tear gas canisters directly at or into vehicles, including one car that had an

13 incredibly young child in the backseat—forcing people to abandon their cars and

14 flee.

15      45.   DHS agents launched so much tear gas that they created a thick and

16 inescapable fog of harmful chemicals covering a broad swath of the area, which

17 reached nearby residences and the Home Depot. The tear gas was so thick that

18 people in the area had difficulty breathing. People were coughing, squinting, weeping

19 in pain, and pouring water into their eyes. Some people began vomiting.

20      46.   After this barrage of attacks, the assembled DHS agents departed from

21 the area.

22      47.   That afternoon, on June 7, 2025, Kristi Noem stated in a post on X: "A

23 message to the LA rioters: you will not stop us or slow us down."

24

25

26

27

28

## IV.    DHS ESCALATES TENSIONS WITH THE USE OF BRUTAL FORCE AGAINST DEMONSTRATORS, THEN USES THOSE TENSIONS TO JUSTIFY DEPLOYING THE MILITARY DOMESTICALLY AGAINST PROTESTERS

48.    On June 7, 2025, over the objection of state and local officials, Donald Trump signed a presidential memorandum to deploy 2,000 members of the California National Guard to Los Angeles to quell protests. Video available here:

https://www.youtube.com/shorts/sR--by8iMws

49.    One June 8, 2025, Governor Newsom formally requested that the Trump administration rescind its deployment of the National Guard in and around Los Angeles. The administration refused to do so.

50.    Instead, on June 8, 2025, President Donald Trump stated in a post on Truth Social:



**Donald J. Trump** ✅
@realDonaldTrump

A once great American City, Los Angeles, has been invaded and occupied by Illegal Aliens and Criminals.  Now violent, insurrectionist mobs are swarming and attacking our Federal Agents to try and stop our deportation operations — But these lawless riots only strengthen our resolve. I am directing Secretary of Homeland Security Kristi Noem, Secretary of Defense Pete Hegseth, and Attorney General Pam Bondi, in coordination with all other relevant Departments and Agencies, to take all such action necessary to liberate Los Angeles from the Migrant Invasion, and put an end to these Migrant riots. Order will be restored, the Illegals will be expelled, and Los Angeles will be set free. Thank you for your attention to this matter!

**19.9k** ReTruths  **84.6k** Likes                    Jun 08, 2025, 2:06 PM

51.    President Donald Trump's deployment of National Guard soldiers to Los Angeles over the objections of California Governor Gavin Newsom and city leaders further escalated tensions.

13
COMPLAINT



52.     On June 8, 2025, the National Guard joined DHS agents to confront a group of demonstrators participating in an organized march from the neighborhood of Boyle Heights towards the Los Angeles Federal Building to protest immigration raids tearing apart families in the Boyle Heights community. From behind a line of National Guard shields, DHS agents continuously launched volleys of tear gas, pepper balls, chemical spray, and rubber bullets at the protesters. Members of the press and a 10-year-old boy holding a protest sign were among those that DHS agents tear-gassed. The demonstrators had not yet reached the intended destination for their protest when they were forced to turn around by DHS's attack.

53.     The same day, Secretary Kristi Noem asked Defense Secretary Pete Hegseth to support ICE, CBP, and FPS agents with military weaponry; to direct the military to help arrest "rioters;" and to deploy military drone surveillance at protests.

54.     On June 9, 2025, Donald Trump further escalated the tensions by deploying 700 marines to contain protests.

55.     Solidarity protests of the federal government's militarized aggression against Los Angeles were held in cities across the country, including San Francisco, New York, Atlanta, Philadelphia, Cleveland, Dallas, San Jose, and Santa Ana.



56.     At the Santa Ana protest on June 9, DHS agents deployed tear gas, pepper balls and rubber bullets against peaceful protesters holding signs. As a Santa Ana councilmember described: "Everything was peaceful and then the federal agents started shooting at the crowd." DHS agents did not announce a warning before they started firing projectiles at protesters who were standing at a distance. The agents shot pepper balls at protestors, with some people being shot in the head with rubber bullets, causing dangerous and traumatic injuries.

57.     In an interview with "Face the Nation" on June 8, 2025, Secretary Noem stated, "[w]e're not going to let a repeat of 2020 happen," referencing the groundswell of protests against police brutality following the killing of George Floyd in 2020.

58.     On June 10, 2025, Sean Parnell, Chief Spokesperson for the Department of Defense and Senior Advisor to Secretary Hegseth, stated that President Trump ordered that an additional 2,000 California National Guard be called into federal service to support ICE and other federal law enforcement officers.

59.     On June 10, 2025, Donald Trump told reporters at the White House that Los Angeles protesters "were met with very strong force." He stated that the federal

actions in Southern California were "the first, perhaps, of many" federal efforts to suppress protesters and that future protests were "going to be met with equal or greater force."

60.    In an interview with Fox News on June 10, 2025, Secretary Noem stated, of Los Angeles residents: "They're not a city of immigrants, they're a city of criminals . . . The more that they protest . . . the harder ICE is going to come after them."

61.    At a press conference on June 12, 2025, the lead federal coordinator of CBP entities in Los Angeles addressed the agency's response to the Paramount protest and stated: "We are here, and we are not going away." He further stated, "You'll continue to see us in Los Angeles. Not going anywhere soon."

## V.    DHS ENGAGES IN A PATTERN OF USING UNNECESSARY, EXCESSIVE AND INDISCRIMINATE FORCE AGAINST JOURNALISTS, PROTESTERS, AND LEGAL OBSERVERS

62.    Since the protests began, DHS officers have been intentionally and indiscriminately misusing militarized weapons and unnecessarily attacking protesters and members of the press.

63.    Across multiple protests, DHS has deployed chemical agents and projectiles against people without warning; without giving people a reasonable opportunity to disperse; without attempting less harmful alternatives; and without reasonably attempting to target any people engaged in violent acts. DHS agents have consistently used these weapons to suppress First Amendment protected activity when they faced no meaningful threat of violence at all.

64.    On multiple occasions, DHS has specifically directed its force at people easily identifiable—and, on information and belief, actually identified by DHS agents—as peaceful protestors, legal advocates, and members of the press.

65.    Despite common perceptions that alleged "crowd control" weapons are harmless, each of these weapons—including, and especially, chemical weapons and projectiles—can cause significant and long-lasting health harms. When launched or

16

COMPLAINT

fired from afar, these weapons are inaccurate and strike vulnerable body parts, as well as cause unintended injuries to bystanders. There are significant doubts that these weapons can be used in a manner that is simultaneously safe and effective.

66.    Specific law enforcement practices significantly increase the risk and severity of injuries. Research consistently shows that misuse of force and crowd-control weapons—including firing projectiles directly at individuals, targeting peaceful demonstrators, deploying chemical agents in confined spaces, using excessive quantities, and deploying such weapons in the presence of vulnerable individuals, can dramatically escalate both the frequency and severity of harm.

67.    Misuse of militarized weapons can result in increased injury severity and greater frequency of injuries. Research on the matter has documented five critical misuse categories of militarized weapons, each contributing to increased morbidity and mortality and violating international standards. These categories of misuse include directly firing canisters at individuals or dense crowds, which can cause severe injury or death. The inappropriate use of militarized weapons against peaceful demonstrators violates the principle that force may only be deployed when necessary and can expose greater numbers of people to militarized weapons. Deployment in confined spaces exacerbates harmful effects by increasing the chemical's concentration. Using excessive quantities constitutes a disproportionate use of force, increasing exposure and injuries. Finally, using militarized weapons in the presence of vulnerable individuals, such as children and the elderly, amplifies harm due to the weapon's indiscriminate nature and these individuals' greater injury risk.

68.    This conduct has intimidated journalists and reduced the number of media members who are willing or physically able to observe and document the protests. Likewise, this conduct has intimidated protestors to reduce the number of people who can freely exercise their constitutional right to protest the government action. The conduct by federal law enforcement is part of a longstanding pattern

using physical assault and threats of violence to limit the number of dissenting viewpoints against government actions while simultaneously preventing the press from telling the public about the officer's conduct.

**A.** **On June 7 and 8, 2025, DHS Agents Shot Plaintiff Sean Beckner-Carmitchel with Projectiles While He Covered Los Angeles Area Protests for The Los Angeles Public Press**

69.    For the last six years, Plaintiff Sean Beckner-Carmitchel has produced video news stories in international, national, and local media outlets, including *The New York Times*, CNN, Good Morning America, and Al Jazeera. Sean has also authored stories for a variety of media outlets, including Cal Matters and *The Beverly Hills Courier*.

70.    On June 7, 2025, federal agents, who identified themselves as Homeland Security Investigators, shot Mr. Beckner-Carmitchel in the head with a rubber bullet in Paramount. And, on June 8, 2025, Mr. Beckner-Carmitchel was shot with a pepper ball in his press pass as he observed DHS officers indiscriminately shoot tear gas and pepper balls into a group of press and protesters.

**1.** **On June 7, 2025, a DHS Agent Shot Mr. Beckner-Carmitchel in the Head with a Tear Gas Canister**

71.    On Saturday June 7, 2025, Sean Beckner-Carmitchel received a tip about a potential immigration raid at the Home Depot in Paramount. At the time, Mr. Beckner-Carmitchel was on assignment for the LA Public Press, which is an online news outlet.

72.    To prepare to cover the story, Mr. Beckner Carmitchel brought a helmet, respirator, and a lanyard with his press credential that he wore around his neck.

73.    During his coverage of the immigration raid, Mr. Beckner-Carmitchel was able to access an area near the Home Depot that the Los Angeles Sheriff's Department had closed to the public by showing local officers his press pass. Mr. Beckner-Carmitchel spent several hours on the scene.

COMPLAINT

74.    Towards the end of the day, Mr. Beckner-Carmitchel walked towards the Home Depot with another reporter when he observed Department of Homeland Security Investigators, who were identifiable by the HSI letters on their attire, deploy stun grenades, tear gas canisters, and kinetic munitions at protestors.

75.    To observe and better capture photographs of the use of force on the protesters, Mr. Beckner-Carmitchel positioned himself at least 20 feet away from the main group of protestors, alongside another reporter, to safely document the situation.

76.    While filming the encounter between federal agents and protesters, Beckner-Carmitchel was struck in the head by a tear gas canister, which he believes was shot by an HSI officer given the force of impact and his distance from the officers. The canister caused a large hematoma above Mr. Beckner-Carmitchel's right eye, which caused significant pain.



77.    Because Mr. Beckner-Carmitchel was 20 or more feet away from the protesters and canisters are not intended to be used as a projectile weapon, DHS agents—who undergo extensive marksmanship training—either deliberately aimed at him as a member of the press or were engaged in indiscriminate acts of violence against everyone present.

78.    In addition to being shot in the head, Mr. Beckner-Carmitchel's exposure to tear gas was the worst he has experienced and caused severe eye pain and coughing.

79.    Despite his pain, Mr. Beckner-Carmitchel assisted a fellow reporter who could not open her eyes because of gas exposure.

80.    When they had retreated to a safer area, Mr. Beckner-Carmitchel was treated by a street medic and then went to the emergency room at St. Francis Hospital to treat his head injury.

81.    Federal agents shooting Mr. Beckner-Carmitchel in the head with a tear gas canister is a clear misuse of militarized weapons, which are supposed to be shot at the ground. The way federal agents used tear gas canisters here is known to cause significant and serious harm.

### 2.    On June 8, 2025, a DHS Agent Shot Mr. Beckner-Carmitchel in His Press Pass with a Pepper Ball

82.    On June 8, 2025, Mr. Beckner-Carmitchel was on assignment for LA Public Press to cover a protest against immigration enforcement actions in the Boyle Heights community of Los Angeles.

83.    Mr. Beckner-Carmitchel observed approximately 100 protesters march from Boyle Heights toward the Metropolitan Detention Center in downtown Los Angeles, where immigrant detainees are held.

84.    As the march approached the detention center, DHS officers, accompanied by National Guard personnel, deployed tear gas and pepper balls into the crowd, which included both demonstrators and the press. Among those affected by the tear gas was a 10-year-old child holding a protest sign.

85.    Mr. Beckner-Carmitchel documented this incident on video, noting that the journalists and news media were targeted by DHS while being clearly identifiable by their bright vests labeled "News Media" or "Press" and by their professional

camera equipment. The video of the event is accessible at:

https://bsky.app/profile/acatwithnews.bsky.social/post/3lr4pqjfdks22.

86.    Despite being clearly identified as a member of the press, Mr. Beckner-Carmitchel was struck by a pepper ball in his press pass.

87.    Although he believes that federal officers are targeting the press and being struck by a pepper ball has him concerned for his safety, Mr. Beckner-Carmitchel continued to cover these events because he believes what is going on in Los Angeles is an important story.

88.    Federal agents shooting Mr. Beckner-Carmitchel in the upper body with a pepper ball is a misuse of pepper balls, which are supposed to be shot at the ground, not directly at people. The way federal agents used pepper balls here can cause significant and serious harm.

**B.    On June 6 and 7, 2025, DHS Agents Shot Plaintiff Ryanne Mena with Projectiles While She Covered Los Angeles Area Protests for The Southern California Newsgroup**

89.    For the last nine months, Plaintiff Ryanne Mena has worked as a journalist with the Southern California Newsgroup, which includes *The Orange County Register*, *The Riverside Press-Enterprise*, *Los Angeles Daily News*, and other local publications. Ms. Mena is a member of CWA.

90.    On June 6, 2025, federal agents, who identified themselves as Department of Homeland Security and Homeland Security Investigators, shot Ms. Mena in the left thigh with a pepper ball in Los Angeles. And, on June 7, 2025, federal agents, who identified themselves as Homeland Security Investigators, shot Ms. Mena in the head with a rubber bullet in Paramount.

**1.    On June 6, 2025, a DHS Agent Shot Ryanne Mena in the Thigh with a Rubber Bullet while she was covering Protests in Downtown Los Angeles**

91.    On June 6, 2025, Ms. Mena covered the ICE raid at a clothing shop before moving to the Metropolitan Detention Center to cover protests—both locations were in downtown Los Angeles. While covering the events in Los Angeles,

Ms. Mena wore two different press credentials around her neck, which clearly identified her as a journalist: one was from the California Newsgroup and the other was from the Los Angeles County Sheriff's Department. Ms. Mena was also carrying a pen and notepad that she used to routinely take notes during the day's events.

92. When Ms. Mena arrived at the protests, there was a crowd of about two dozen people. After an hour, the crowd grew to approximately 200 people to observe a press conference at the Federal Building. After leaving the Federal Building, Ms. Mena walked to the Metropolitan Detention Center where there were approximately 50 protesters where there was a growing number of protesters.

93. There were about 100 protesters, and Ms. Mena did not observe any protesters physically engage officers.

94. After observing the interactions for a period, a single protester, who was clearly identifiable among the crowd, threw a desk chair toward the driveway next to the building. The chair hit no one and landed a few yards away from the federal officers guarding the building.

95. Approximately one to two minutes after the protester threw the chair, about 12 federal officers in riot gear with Department of Homeland Security and Homeland Security Investigators patches emerged and began firing pepper balls at the protesters, who were approximately 6-20 feet away from officers.

96. After the officers fired at protestors for about 5 seconds, Ms. Mena backed further away from the group to avoid getting hit and to get a different vantage point of the evolving events and was approximately 20 feet behind the main group of protesters.

97. At approximately 6:15 p.m., Ms. Mena was shot in the left thigh with a pepper ball while observing the federal agents engage the protesters.

98. Because of the shot, Ms. Mena immediately screamed, experienced significant pain, observed a white residue on her pants, and later documented her injury with photographs.



99.    Although she was in pain, Ms. Mena called her editor and was determined to stay at the scene because she felt it was an important story to cover. She remained at the scene until about 9:00 p.m. despite her injury.

100.    Later that evening, Ms. Mena witnessed law enforcement use flash-bangs to clear the area, including one that landed near her. She observed no provocation from protesters at that time.

101.    A few days later, Ms. Mena photographed the wound caused by the pepper ball.



102.    Because she was clearly identifiable as a journalist with two press credentials, was routinely writing notes with a pen and notebook, and not close to a concentration of protesters, Ms. Mena was either targeted by DHS or subjected to reckless, indiscriminate violence.

103.    Federal agents shooting at Ms. Mena with pepper balls was a misuse of militarized weapons; pepper balls are supposed to be shot at the ground, not directly at people. The way federal agents are using pepper balls can cause significant and serious harm.

**2.    On June 7, 2025, a DHS Agent Shot Ryanne Mena in the Head While She Covered Protests in Paramount**

104.    On June 7, 2025, Ms. Mena was assigned to the 2:00 p.m. shift covering to cover protests in Paramount related to another ICE raid. She arrived at the scene at about 3:30 p.m.

105.    Once on the scene, Ms. Mena talked to a series of protesters over the course of 45 minutes, including multiple people who were shot with rubber bullets by the Los Angeles Sheriff's Department. Because the scene was relatively calm, Ms. Mena considered leaving the area.

106.    As she walked toward the Home Depot where the ICE raids took place, Ms. Mena encountered a line of 3-4 dozen federal agents, who had HSI initials on their uniforms indicating that they were Homeland Security Investigators.

107.    A group of about a dozen protesters were 50-70 feet away and across the street from the federal agents. And Ms. Mena was about 30-50 feet away from the protesters. She did not witness any aggressive actions from them.

108.    The federal officers began firing rubber bullets and tear gas canisters directly at the protesters for approximately ten seconds.

109.    As Ms. Mena and her colleagues observed federal agents firing at onlookers, she and another reporter were both struck by projectiles.

110.   Ms. Mena was hit about an inch above her right ear with a rubber bullet, causing significant pain. And Ms. Mena saw another reporter, Plaintiff Beckner-Carmitchel, was hit above the eye by a tear gas canister.

111.   Shortly after being hit with projectiles, Ms. Mena and her colleague were both exposed to heavy tear gas, which aggravated her asthma and led to severe difficulty breathing. Ms. Mena also experienced intense eye pain and took a photo of her bloodshot eyes.



112.   Ms. Mena took her colleague to the Emergency Room at St. Francis Hospital to treat an enormous lump on his head where he had been hit with a tear gas canister.

113.   Ms. Mena later experienced vomiting, a severe headache, and neck pain, which led her to seek treatment at an urgent care where she was diagnosed with a concussion.

114.   As a result of her injuries, Ms. Mena was required to take time off work.

115.   Federal agents shooting Ms. Mena in the head with a rubber bullet is a misuse of militarized weapons; rubber bullets are not supposed to be shot above

1    waist-level absent an imminent threat of death or serious bodily injury. The way

2    federal agents used rubber bullets here can cause significant and serious harm.

3    **C.    On June 8, and 9, 2025, DHS Agents Shot Ted Soqui in the Head and Back While He Covered the Protests in Downtown Los Angeles**

4    116.    Ted Soqui is a veteran photojournalist, with more than 40 years of

5    experience. Throughout his career, Mr. Soqui has covered protests and major public

6    demonstrations, including the 1992 Los Angeles riots. Mr. Soqui has also received

7    formal riot and conflict-zone training for journalists through Reuters and is

8    experienced in maintaining safety and distance during such events.

9    117.    Since the Los Angeles protests started in June 2025, Mr. Soqui has spent

10    every day photographing the protests at the Federal Building in downtown Los

11    Angeles. Each morning, he arrives at around 11:00 a.m. and remains until early

12    evening.

13    118.    On June 8, 2025, DHS officers shot Mr. Soqui with a pepper ball in the

14    head and with a rubber bullet in the right shin while covering protests at the Federal

15    Building in downtown Los Angeles. And, on June 9, 2025, DHS shot Mr. Soqui in

16    the back with three rubber bullets in rapid succession while covering protests at the

17    Federal Building in downtown Los Angeles.

18    **1.    On June 7, 2025, DHS Agents Shot Mr. Soqui in the Head with a Pepper Ball and in the Leg with a Rubber Bullet**

19

20    119.    On June 8, 2025, Mr. Soqui was positioned outside of the Federal

21    Building in downtown Los Angeles alongside multiple journalists and photographers.

22    Mr. Soqui estimates that he was approximately 15 feet from both protesters and law

23    enforcement. He also noted that there was no marked perimeter, audible dispersal

24    order, or warning that DHS agents would use force.

25    120.    At the time, Mr. Soqui observed a protest that was tense but did not feel

26    unsafe. He saw nothing to suggest escalation was imminent. Had there been any

27    indication that a confrontation was about to occur, Mr. Soqui would have moved

28    away, but there was no indication the protesters or law enforcement were in conflict

1  nor was he obstructing the views of law enforcement. Mr. Soqui was standing far to

2  the side in an area with other members of the press.

3      121.   As he was photographing protesters and DHS agents, Mr. Soqui was

4  struck in the left cheekbone by a pepper ball and almost immediately afterward in the

5  right shin by a rubber bullet. Both impacts caused sudden pain and stunned Mr.

6  Soqui because he had never provoked DHS.

7      122.   Mr. Soqui left soon after being struck with projectiles and felt shaken

8  and upset. He nevertheless returned the next day to continue documenting the events.

9      123.   Federal agents shooting Mr. Soqui in the head with a pepper ball and in

10  the shin rubber with a bullet are misuses of militarized weapons The way federal

11  agents used pepper balls here can cause significant and serious harm.

12              **2.    On June 9, 2025, DHS Agents Shot Mr. Soqui in the Back Three Times
                        with Rubber Bullets as He Prepared to Leave the Area**

13      124.   On June 9, 2025, at 11:00 a.m., Mr. Soqui returned to the Federal

14  Building in downtown Los Angeles. Out of caution, Mr. Soqui wore personal

15  protective equipment, positioned himself 50 to 100 feet from the officers and

16  protesters, and only used his long lens to photograph from a distance.

17      125.   When preparing to leave for the day, and approximately 50 feet away

18  from the officers, Mr. Soqui was struck in the back three times in rapid succession by

19  rubber bullets.

20      126.   Mr. Soqui is certain that the officers who shot him were with either ICE

21  or DHS because he saw department patches identifying the departments on their

22  arms, chests, and backs. He also observed that LAPD officers remained on city

23  streets and perimeter positions and did not enter the grounds of the Federal Building.

24      127.   After the initial shock of being shot in the back, Mr. Soqui left the area

25  and had to adjust his car seat to avoid more pain as he drove home.

26

27

28

128.    Federal agents shooting Mr. Soqui in the back with rubber bullets is a misuse of militarized weapons. The way federal agents used rubber bullets here can cause significant and serious harm.

**D.    On June 7, 2025, DHS Agents Shot Lexis-Olivier Ray Multiple Times in the Hand and Back While He Covered Protests for L.A. TACO**

129.    Lexis-Olivier Ray is a staff investigative reporter for L.A. TACO, an independent media platform, where he focuses on crime, homelessness, and the Los Angeles Police Department. Mr. Ray has as a reporter since 2018. His work has appeared in *The Los Angeles Times*, Men's Health Magazine, KCET, and *SFGATE*. Mr. Ray is also a photographer, who records events with a large camera that he wears around his neck. In his time as a reporter, Mr. Ray has covered dozens of protests and is accustomed to dealing with law enforcement in the field and distinguishing himself as a member of the press by searing a lanyard that says "PRESS" in large white letters, wearing an L.A. TACO shirt that says "PRESS" in large letters on the back, carrying his camera around his neck, and standing physically separate from protesters near other reporters. He is a member of the Los Angeles Press Club.

130.    On June 7, 2025, Mr. Ray covered a protest outside the Metropolitan Detention Center in downtown Los Angeles, which was in response to immigration raids by ICE. At the time, Mr. Ray was wearing his camera and press pass. He also believes that he was wearing both an L.A. TACO shirt with "PRESS" on the back and a baseball hat with an L.A. TACO logo in front and "PRESS" on the back in letters designed to be visible from a distance.

131.    A group of about 100 protesters were initially peaceful, with families present, with music playing, and protesters cheering for vehicles that honked in support. Mr. Ray observed vandalism or violence.

132.    Federal officers, who were identified as DHS and ICE personnel, including Special Response Team members, in tactical gear and periodically emerged from the MDC garage to clear paths for vehicles.

COMPLAINT

133.   Around 8:00 p.m., federal officers began mobilizing with gas masks and tactical formations, despite the protest remaining largely peaceful. Approximately 10 minutes later, protesters engaged officers when they noticed officers had started to mobilize. Mr. Ray approached the gate to observe and video the interactions between officers and protesters.

134.   Sometime later, Mr. Ray heard an officer order people to leave the area, but the message was not projected loudly. And only those close to the gate heard the messages. However, some protesters standing near the front of the gate told other protesters to move back. Because Mr. Ray was near the gate at the time, he heard the command.

135.   At approximately 8:29 p.m., as the crowd was moving back as ordered to distance themselves from the officers, someone threw a firework at the gate that went off with a loud bang followed by crackling. Other protesters immediately admonished the person who threw the fireworks. Video of the event can be seen here: https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3cvaukxs2p

136.   Within a few seconds of the fireworks being thrown, Mr. Ray observed that most of the protesters complied with the orders and were at least 50 feet or so away from the gate, and none of the protesters seemed to pose any threat to federal officers.

137.   At approximately 8:33 p.m., and without further audible warnings, federal officers stormed out of the garage, firing pepper balls, tear gas, and flash-bang grenades toward the crowd, which included journalists. The video that Mr. Ray took of federal officers exiting the gate can be found here: https://bsky.app/profile/shoton35mm.bsky.social/post/3lr2zgrr6oc2p

138.   While some tear gas canisters were fired at the ground, others were fired higher and exploded over the heads of protesters.

139.   Mr. Ray saw protesters quickly flee the area as the street became thick with tear gas.

COMPLAINT

140.    When officers exited the gate, they began shooting pepper balls at Mr. Ray, which caused him to run away from the area to seek refuge behind a parked car.

141.    After the shots paused, Mr. Ray walked across the street to stand near the press.

142.    Although most protesters had already left the area and were several hundred feet away, Mr. Ray then saw federal officers form a skirmish line. The few remaining protesters, approximately 20 in total, were spread across the street and approximately 50 feet away.

143.    At about 8:53 p.m., the officers in the skirmish line advanced, but Mr. Ray did not hear them provide any clear orders or instructions. At the time, Mr. Ray was standing at least 50 feet away from the skirmish line by the television trucks along with about half a dozen other journalists, some of whom were TV crews with large cameras and bright film lights.

144.    Almost as soon as officers began to move, they targeted firing an enormous volley of pepper balls and tear gas at the journalists and remaining protesters. Television news crew members stayed for a brief period to film, but they ran to take cover behind press vans as the federal officers advanced. A video of the skirmish line beginning to move can be found here:

https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dkkvqak2p

145.    Within a few seconds, offers came around to the side of the van to shoot at the journalists—despite Mr. Ray's shouting "Press! We're all press!"

146.    One officer shot Mr. Ray in his left hand from approximately 10 feet away, which caused him extreme pain.

147.    As Mr. Ray retreated from the scene, officers shot him with multiple pepper balls that hit his finger along with his upper and lower back. Based on where he was hit and the position of the officers at the time, they must have shot him directly.

COMPLAINT

148.   Mr. Ray observed federal officers continue to target protesters and other journalists, including a Univision TV crew, as they attempted to move away from the advancing officers. A video of this encounter can be found here:

https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dvqv4j22p

149.   There was no reason for the officers to use their weapons in the manner that they did because most of the protesters had left the area.

150.   Officers appeared to be targeting journalists and never explained to the press that they had to move.

151.   Although Mr. Ray plans to continue reporting on protests as part of his job, he is concerned that federal officers appear to use force for no reason and target people who are obviously journalists. He noted that this was the first time in his career he had been struck by less-lethal munitions, despite covering numerous tense and high-conflict events.

152.   The incident has caused Mr. Ray to reconsider his proximity to protests policed by federal officers, and he will likely stay further back to cover events, which will potentially impact the quality and immediacy of his reporting.

153.   Federal agents shooting at Mr. Ray with pepper balls was a misuse of militarized weapons, which are supposed to be used only against someone who poses a threat, and even then only shot at the ground. The way federal agents used pepper balls here can cause significant and serious harm.

**E.    On June 7, 2025, a DHS Agent Shot Jonathan Alcorn While He Was Covering an ICE Raid in Paramount for the Zuma Press**

154.   Jonathan Alcorn has worked as a photojournalist for almost forty years doing contract and freelance work. His work has been published in the *Pasadena Star News*, the *Los Angeles Times*, *Reuters*, *The New York Times*, and *The Washington Post*, among other publications.

155.   On June 7, 2025, Mr. Alcorn was covering a suspected ICE raid of the Home Depot in Paramount for Zuma Press as a photojournalist. While covering the

scene, Mr. Alcorn had a Press Photographers Association of Greater LA media placard on his car, wore a press pass, and carried professional camera equipment throughout the day.

156.    Upon arrival, Mr. Alcorn encountered difficulty accessing the area due to law enforcement roadblocks. Mr. Alcorn did not arrive at the scene until about noon.

157.    Almost as soon as he parked his car, Mr. Alcorn saw a woman who was bleeding and was taken to a street medic.

158.    Shortly after entering the area, Mr. Alcorn heard a series of explosions, which sounded like less lethal munitions.

159.    As Mr. Alcorn walked towards the sounds, he observed a chaotic scene. U.S. Customs and Border Protection agents, whom he identified using his camera and long zoom lens, were firing a large volume of less-lethal munitions, including tear gas canisters, at protestors. Most protestors were positioned probably 150-200 feet away from the Border Protection officers while a small number were as close as 15-20 feet away from the officers. Mr. Alcorn saw no threatening behavior from the protesters, but he did see some distant protesters throwing firecrackers in the direction of Border Protection agents.

COMPLAINT

160.   Mr. Alcorn continued to capture images at the scene, including the Customs and Border Protection agents:



161.   While documenting the event, Alcorn was shrouded by a barrage of munitions when federal officers fired gas canisters indiscriminately at the crowds. Because of the limited visibility due to gas, Mr. Alcorn retreated to about 100 yards away from the Border Patrol officers.

162.   As Border Patrol officers continued to fire at the fleeing protesters and reporters, agents were shooting a barrage of gas canisters that limited visibility. Mr. Alcorn also heard the whizzing of rubber bullets being shot by federal agents. To avoid danger, Mr. Alcorn sought cover behind an SUV.

163.   When he peeked above the SUV, Mr. Alcorn was targeted by CBP officers, who fired tear gas canisters that rolled under the vehicle. Officers were targeting him because he was the only person behind the vehicle.

COMPLAINT

164.   At about 2:00 p.m., while fleeing the area due to the intensity of the gas, Border Protection officers shot Mr. Alcorn near his elbow with a munition, likely a tear gas canister, which caused a significant wound. Despite the intense pain, Mr. Alcorn had to continue running until he was able to take cover behind a wall.

 

165.   Despite his injury, Alcorn continued taking pictures because he believed it was important to cover the unfolding events.

166.   Mr. Alcorn was, on information and belief, targeted by Border Patrol because he was a clearly identifiable photojournalist. Even through he posed no threat to officers, they nonetheless shot multiple tear gas canisters at him.

167.   Over the next few days, Mr. Alcorn continued to cover the unfolding events in Los Angeles.

168.   Days later, he sought medical attention, and doctors diagnosed him with a hematoma and burn on his arm.

169.   Although he is afraid of again being targeted and injured by federal officials, Mr. Alcorn will continue to cover what is happening in Los Angeles.

170.   Federal agents shooting Mr. Alcorn in the arm with a tear gas canister is a clear misuse of militarized weapons, which are supposed to be shot at the ground

1    and only in response to a threat, which Mr. Alcorn did not pose. The way federal

2    agents used tear gas canisters here can cause significant and serious harm.

3          **F.    On June 7, 2025, Michael Horowicz Witnessed DHS Agents**
           **Indiscriminately Shoot a Barrage of Tear Gas at Members of the**
4          **Press After Protesters Had Fled the Area**

5          171.    Michael Horowicz is a veteran journalist and news producer, who had a

6    firsthand account of DHS officers targeting the press even after protesters fled the

7    area.

8          172.    On the evening of June 7, 2025, Mr. Horowicz observed approximately

9    100 individuals peacefully protesting near the back of the Roybal Federal Building.

10          173.    Across from the protest, Mr. Horowicz saw five live news trucks, which

11    were identifiable based on the news entity written on the side of the truck or because

12    they had microwave antennas on top that distinguished them as news trucks.

13          174.    Mr. Horowicz observed journalists and media crews set up outside of

14    the news trucks with large TV cameras on tripods preparing to report on the event.

15          175.    As protesters began engaging the officers, who were behind a heavy

16    ground-to-ceiling metal gate, Mr. Horowicz crossed the street to observe and record

17    the scene near the news trucks.

18          176.    Without any audible warning, the gate lifted and federal officers

19    stormed out from the building and deployed tear gas canisters at the protestors at the

20    Federal Building in downtown Los Angeles, which caused them to disperse rapidly.

21          177.    Despite the protestors fleeing the area, Mr. Horowicz observed federal

22    officers continued to fire tear gas canisters at the area where the news trucks and

23    media personnel were located for approximately 20 minutes.

24          178.    Because of the amount of tear gas in the area, Mr. Horowicz had to

25    leave the area to receive help from a bystander.

26          179.    Video of the event can be found here:

27    https://www.youtube.com/watch?v=E6qK7AIjUC0

28

180.   After the tear gas barrage ended, the incident concluded with federal officers forming a skirmish line and pushing all remaining individuals, including about 20 journalists and media crew members, back to Temple Street. The news trucks could not be moved during this time.

181.   Because the protestors were either gone or fleeing when the officers started firing tear gas at the news trucks, Mr. Horowicz questions the justification for the continued use of tear gas against media personnel and believes that the action was intended to punish or deter media coverage of the ICE raids and federal response.

**G.    On June 7, 2025, DHS Agents Shot Tear Gas at Diya Cruz Three Time Within 15 Minutes While She Protested ICE Raids in Paramount**

182.   On June 7, 2025, Diya Cruz, a 52-year-old Los Angeles resident, attended a protest against ICE raids in Paramount, California.

183.   On the morning of June 7, 2025, Ms. Cruz attended the protest outside of the Home Depot in Paramount after learning about it on social media because she was outraged by ICE kidnapping families and ripping children from their parents.

184.   At around 11:00 a.m., Ms. Cruz arrived near the Home Depot in Paramount and saw approximately 100 participants spread out along Alondra Boulevard and Hunsaker Avenue.

185.   As the protest moved toward Home Depot, Ms. Cruz observed approximately 30 agents in green camouflage uniforms and gas masks, believed to be ICE or the National Guard, in front of gates leading to local businesses and factories positioned at the intersection of Alondra Boulevard and Atlantic Place.

186.   While the protesters chanted in the direction of federal officers, Ms. Cruz noted the protest remained peaceful throughout and she saw no violent or provocative behavior. Ms. Cruz specifically notes that she was always at least 50 feet away from the agents and never crossed the median island on the street. She also saw

1  journalists with professional cameras, microphones, and press badges covering the

2  protests.

3       187.    Without warning or provocation, the federal began deploying tear gas at

4  the protesters. Mr. Cruz heard no announcement or order to disperse prior to the use

5  of tear gas.

6       188.    Ms. Cruz recalls tear gas was being shot at her on three separate

7  occasions, approximately 15 minutes apart, while Cruz remained 50 feet from the

8  agents.

9       189.    Mr. Cruz observed reporters being hit with tear gas and tried to aid a

10  member of the press with a large camera, who was rubbing his eyes from tear gas

11  exposure.

12       190.    Later, Ms. Cruz met a man with his head wrapped with a white first-aid

13  bandage, who told her that he had been hit in the head with a projectile.

14       191.    After the third round of tear gas, Ms. Cruz saw reinforcements from the

15  Los Angeles Police Department arrive, and then they issued dispersal orders. Ms.

16  Cruz notes that that was the first time she heard anyone order us to disperse. At that

17  time, she and others left the area.

18       192.    Because of the tear gas exposure, Ms. Cruz, who has asthma and other

19  health issues, experienced significant physical effects, including burning eyes,

20  difficulty breathing (requiring the use of her inhaler), migraine, dizziness, nausea,

21  and disorientation, which persisted for approximately 24 hours.

22       193.    While Ms. Cruz spent the last week recovering and she is scared that

23  this type of event could happen to me again, she will continue to go back out to

24  protest.

25       **H.    On June 7, 2025, a DHS Agent Shot Plaintiff Benjamin Climer in
        the Hand with a Tear Gas Canister While He Protested ICE Raids**

26       **in Paramount**

27       194.    On June 7, 2025, Benjamin Climer attended a protest at the Home Depot

28  near the intersection of Alondra Boulevard and Atlantic Place in Paramount. At about

1  2:00 p.m., Mr. Climer arrived at the protest and estimates that there were 100 to 150

2  other protesters, who were chanting and behaving peacefully.

3     195.  Across the street from the protest, Mr. Climer observed officers dressed

4  in camouflage and olive-green uniforms, later identified as Department of Homeland

5  Security agents based on video footage showing "Border Patrol" and "HSI" on their

6  uniforms.

7     196.  Approximately every five to six minutes, Mr. Climer observed officers

8  advancing toward the protesters and firing tear gas canisters.

9     197.  Over the course of an hour and twenty minutes, Mr. Climer estimates

10  that federal agents advanced toward protesters 15-20 times. Mr. Climer heard no

11  warnings, dispersal orders, nor announcements of unlawful assembly from these

12  officers.

13     198.  On more than 15 occasions, Mr. Climer witnessed officers firing tear

14  gas canisters and other projectiles directly at the protesters.

15     199.  To protect himself from the tear gas, Mr. Climer would hide behind trees

16  to shield himself from the fumes. And, when not under fire, Mr. Climer would

17  resume chanting and peacefully protesting.

18     200.  On one occasion, Mr. Climer provided medical assistance to a protester

19  who was spitting up mucus and believed he had been shot in the head with a rubber

20  bullet. After helping the injured protester, Mr. Climer retreated to shield himself from

21  the next round of tear gas.

22     201.  As he retreated from the area, Mr. Climer was struck by a tear gas

23  canister, which tore the skin of his left index finger and caused significant bleeding

24  and extreme pain in his left hand. Mr. Climer estimates that the officers who fired the

25  canister were approximately 50 to 75 feet away at the time.

26

27

28

202.   Mr. Climer continued to retreat from the main group of protesters to treat his wound by covering his hand with a clean nitrile glove that he brought to the protest to stop the bleeding.



203.   Despite his injury, Mr. Climer remained in the area for about another hour and continued to chant and protest peacefully. He also provided medical assistance to another protester who had been hit in the abdomen by a tear gas canister.

204.   In addition to tear gas canisters, Mr. Climer observed several types of projectiles and casings on the ground, including black foam tops and large canisters that released multiple smaller, hot gas canisters that burned the grass when they landed.

COMPLAINT

205. At around 4:30 p.m., Mr. Climer left the protest and drove to Kaiser Permanente Urgent Care in Pasadena, where his wound was x-rayed, cleaned, and closed with three sutures.



206. Mr. Climer has participated in numerous protests but has never experienced such targeted misuse of force from law enforcement.

207. Because Mr. Climer was peacefully protesting, rendering aid to fellow protesters, and retreating from the protests when struck with the tear gas canister, he was likely targeted by federal officers.

208. Federal agents shooting Mr. Climer in the hand with a tear gas canister is a clear misuse of militarized weapons, which are supposed to be shot at the ground. The manner in which federal agents used tear gas canisters here can cause significant and serious harm.

**I.    On June 9, 2025, DHS Agents Shot Plaintiff Abigail Olmeda in the Head and Body with Rubber Bullets and Pepper Balls While She Protested ICE Raids in Santa Ana**

209. On June 9, 2025, Abigail Olmeda attended a protest at the Federal Building in Santa Ana, with her spouse and sister. Ms. Olmeda estimates that there

were about 100 protestors at the building when she arrived. At the protest, Ms. Olmeda noted that the Santa Ana Police Department and Homeland Security, with "HSI" across the chest of certain officers, stood around the Federal Building.

210.   Ms. Olmeda was at least 40-50 feet from the officers and took a picture shortly after arriving at the protest.



211.   Within fifteen minutes of her arrival, DHS shot Ms. Olmeda with a pepper ball near her collar bone without any warning or audible order from law enforcement.

212.   After moving away from the area where she was shot, Ms. Olmeda's sister went to retrieve an umbrella and water bottle from Ms. Olmeda's backpack.

213.   At that point, an officer with "HSI" insignia on his uniform pointed at Ms. Olmeda and appeared to direct others toward her. In response Ms. Olmeda raised her empty hands and verbally indicated that she was unarmed.

214.   A few minutes later, Ms. Olmeda was again shot by Homeland Security Investigators with multiple pepper balls. While she was able to block some of the shots with a cardboard sign and repeatedly stated she was there peacefully, one of the pepper balls hit her knee.

COMPLAINT

215.   Homeland Security Investigators then shot a tear gas canister at Ms. Olmeda's feet. Ms. Olmeda then fled across the street with her sister.

216.   After the gas cleared, Ms. Olmeda returned to the same area around the Federal Building with other protesters.

217.   Upon returning to the area, federal agents began firing on the group. Ms. Olmeda's partner was shot multiple times with rubber bullets in the stomach and back as he fled from officers. At that point, Ms. Olmeda was struck in the temple with a rubber bullet, which caused intense pain.

218.   Once the group was safely away from the firing agents, Ms. Olmeda took a picture of her head where she was hit with a rubber bullet:



219.   After being shot in the head, Ms. Olmeda was disoriented and could not find her car without the help of her spouse.

220.   Two days later, Ms. Olmeda sought medical attention because she was suffering from disorientation, memory lapses, tingling, and extreme sharp pains.

221.   At the hospital, Ms. Olmeda found visible injuries to her head, collar bone, upper side, right arm, underarm/rib area, and right knee. Ms. Olmeda was referred to orthopedics and a neurologist, who suspected that she had a brain bruise.

COMPLAINT

222.   Although the use of force by federal officers against Ms. Olmeda has made her hesitant to speak out, she remains committed to protesting for a greater purpose and believes such force should never be used against peaceful protestors again.

223.   Federal agents shooting Ms. Olmeda in the head and body with rubber bullets and pepper balls is a misuse of militarized weapons, which are supposed to be shot at the ground and only at people who pose a threat. The way federal agents rubber bullets and pepper balls here can cause significant and serious harm.

## VI.    USE OF "LESS LETHAL" MILITARIZED WEAPONS POSES SIGNIFICANT DANGERS, INCLUDING SERIOUS INJURY OR DEATH

224.   There are significant risks in using chemical agents and kinetic weapons for alleged "crowd control," including serious bodily harm, permanent injury, death, environmental damage, and the violation of residents' rights—especially for vulnerable populations like children, the elderly, and those with pre-existing medical conditions.

225.   These so-called "less-lethal" weapons have the real risk of causing permanent injury or death, both to intended targets and bystanders, as a result of misplaced or ricocheting shots, indiscriminate use, pre-existing medical conditions, inadequate user training, repetitive applications, intentional misuse, and panic and chaos caused by frightened crowds, raising significant doubts that these weapons can be used in a manner that is simultaneously safe and effective.

226.   When using chemical agents or kinetic impact projectiles against any group of more than ten people engaged in a protest, there is an incredibly high chance of harming peaceful participants and bystanders.

### A.    Use of Chemical Weapons Can Limit Basic Human Functions and Lead to Permanent Injuries

227.   Chemical control agents cause irritation to the eyes, mouth, throat, lungs, or skin, including tear gas, pepper spray, and related substances. Exposure,

---

43

especially prolonged, to a large dose of such chemical weapons can cause permanent injuries, including blindness, glaucoma, or death from chemical burns to the throat and lungs or from respiratory failure.

228.   Chemical control agents are also dangerous because they are designed to indiscriminately affect crowds. Indeed, chemical control agents are meant to be used against groups, which makes it difficult to limit the exposure of specific individuals or small groups, increasing the risk of affecting bystanders and individuals other than the intended targets.

229.   Moreover, the use of such weapons for alleged crowd control poses an increased risk to children, the elderly, and people with certain pre-existing medical conditions, including chronic lung disease and certain eye conditions.

230.   Specifically, chemical control agents can damage critical human functions, such as:

- Eyes: Causes irritation, blurry vision, pain, temporary or permanent blindness, and direct trauma leading to corneal burns or lacerations.
- Respiratory System: Induces coughing, difficulty breathing, and can trigger severe respiratory distress, especially in individuals with preexisting conditions like asthma, potentially leading to hypoxia or death.
- Skin: Causes burning, redness, itching, allergic reactions, and sometimes blistering or burns.
- Psychological Effects: Exposure can result in disorientation, fear, anxiety, panic, and symptoms of post-traumatic stress disorder (PTSD) after prolonged or repeated exposure.
- Cardiovascular System: Increases heart rate and blood pressure, which can precipitate heart attacks in those with preexisting heart conditions.

COMPLAINT

- <u>Other Effects</u>: Irritates the nose, throat, and gastrointestinal system, leading to pain, nausea, vomiting, and in severe cases, ruptured blood vessels.
- <u>Physical Trauma</u>: Canisters and grenades can cause blunt trauma, fractures, internal injuries, and death, especially when fired at close range.

231.    The use of chemical weapons is often not proportional to the needs of crowd control during civilian protests because the effects of using these devices indiscriminately impacts peaceful participants and bystanders even when carefully targeted at others.

232.    Research has shown that people exposed to chemical weapons are much more likely to contract acute respiratory illnesses such as the flu, leading to concerns, following the COVID-19 pandemic, that the use of tear gas and pepper spray on large groups of people at protests may precipitate or exacerbate public health crises.

**B.    Use of Kinetic Impact Projectiles Can Cause Physical Trama, Including Serious Bodily Injury and Death**

233.    Kinetic impact weapons, like rubber bullets, beanbag rounds, and plastic bullets are specifically designed to cause trauma and incapacitate individuals.

234.    While these weapons are generally intended to be aimed at an individual's lower body, kinetic impact weapons can cause severe injury or disability if they hit particularly vulnerable areas of the upper body or be lethal if they hit an individual's head.

235.    Research has shown that kinetic impact weapons have caused significant injuries and deaths when used in crowd-control settings, most resulting from penetrative injuries and head, neck, and torso trauma.

236.    Specifically, kinetic impact weapons can damage critical human functions, such as:

- **Brain and Head**: Blunt trauma can cause concussions, internal bleeding, skull fractures, and irreversible damage.
- **Eyes**: Direct hits almost always cause blindness and can result in brain injury if the projectile penetrates the eye socket.
- **Cardiorespiratory System**: Can cause bruising, bleeding, lung deflation, and heart attacks if aimed at the chest.
- **Musculoskeletal System**: May result in sprains, bruises, fractures, and permanent neurovascular damage.
- **Abdomen**: Can cause internal bleeding and organ damage.
- **Skin and Soft Tissue**: Bruising, lacerations, muscle or nerve damage, and bleeding are common, with increased severity at close range.

237.  The use of these kinetic impact projectiles is often not proportional to the needs of crowd control during civilian protests because they can easily harm unintended targets and are particularly dangerous when hitting the upper body, which could lead to serious bodily harm or death.

238.  Plaintiffs intend to continue attending protests and exercising their rights to record, observe, speak and assemble. DHS's excessive and indiscriminate use of force against journalists, observers, and protesters has prevented people, including Plaintiffs, from exercising their constitutional rights, is chilling the exercise of free speech, has caused significant injuries to Plaintiffs,[1] and is continuing to cause irreparable injury to Plaintiffs and others who want to attend or report on protests.

---

[1] Plaintiffs reserve the right to amend this complaint to assert claims under the Federal Tort Claims Act once they have been administratively exhausted.

COMPLAINT

## CAUSES OF ACTION

### (First Cause of Action – Violation of First Amendment)
### By Journalists and Legal Observers

239.   Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

240.   Plaintiffs are engaged in constitutionally protected acts of assembly, speech, and expressive conduct, including without limitation the right to report, observe and record events.

241.   As alleged above, Defendants violated Plaintiff's First Amendment rights.

242.   Defendants' conduct has caused and is causing Plaintiffs irreparable injury.

### (Second Cause of Action – Violation of First Amendment)
### By Protesters

243.   Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

244.   Plaintiffs are engaged in constitutionally protected acts of assembly, speech, and expressive conduct.

245.   As alleged above, Defendants violated Plaintiff's First Amendment rights through retaliation for the exercise of protected speech.

246.   Defendants' conduct has caused and is causing Plaintiffs irreparable injury.

### (Third Cause of Action –Excessive Force)
### By All Plaintiffs

247.   Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

248.   Plaintiffs did not pose any imminent threat or danger to law enforcement.

249.   Plaintiffs have Fourth and Fifth Amendment rights to be free from unlawful seizures of their persons and undue, unreasonable, and deadly force.

COMPLAINT

250.   As alleged above, Defendants violated Plaintiffs' rights through retaliation, through targeting them without probable cause, and through the misuse of weaponry, including, without limitation, chemical agents such as tear gas, rubber bullets, impact munitions, pepper balls, pepper spray, exploding grenades, batons, fists, and other weapons.

251.   Defendants' conduct has caused and is causing Plaintiffs irreparable injury.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the Court grant the following relief:

A. Injunctive relief;

B. An award of attorneys' fees and costs;

C. Any other relief the Court deems proper.

Dated: June 18, 2025

Respectfully submitted,
BRAUNHAGEY & BORDEN LLP

By:   */s/ Matthew Borden*
            Matthew Borden

*Attorneys for Plaintiffs*

COMPLAINT