Matthew Borden, Esq. (SBN: 214323)
 borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
 hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
 declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
 gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice* forthcoming)
 opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
 peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
 jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
 awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
 mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
 slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
 jreisberg@aclusocal.org
ACLU FOUNDATION OF SOCAL
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring (SBN: 223981)
 peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmithcel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>            Plaintiffs,<br><br>      v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>            Defendants. | Case No.  2:25-CV-05563<br><br>**DECLARATION OF GIL KERLIKOWSKE** |

Additional Counsel of Record for Plaintiffs:

Carol A. Sobel (SBN: 84483)
  carolsobellaw@gmail.com
Weston Rowland (SBN: 327599)
  rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman (SBN: 71244)
Michael Seplow (SBN: 150183)
John Washington (SBN 315991)
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach 90254
Telephone: (310) 717-7373

1

I, Gil Kerlikowske, declare:

1.      I am the former Commissioner of U.S. Customs and Border Protection. I served as the Chief of Police in Seattle from 2000 through 2009.

2.      I received a BA and MA from the University of South Florida in Tampa. I also graduated from the Executive Institute at the Federal Bureau of Investigation Academy in Quantico, Virginia. I served in the United States Army and Military Police from 1970 through 1972, where I was awarded the Presidential Service Badge, and where I began training in crowd control, riots, and civil disturbances. I have worked in law enforcement and policy for 52 years. I also have served as the Director of the Office of National Drug Control Policy. I have also served as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services. I have been an IOP Fellow at Harvard Kennedy School of Government and have taught as a distinguished visiting fellow and professor of the Practice in Criminology and Criminal Justice at Northeastern University. A true and correct copy of my curriculum vitae is attached as **Exhibit 1**.

3.      During my tenure as Chief of Police in Seattle, I led and orchestrated the policing of hundreds of large and potentially volatile protests, many of which were larger than the recent protests in Los Angeles. I did the same thing when I was Police Commissioner in Buffalo.

4.      I have been asked to evaluate whether the force that federal authorities used against journalists, legal observers and protesters in Los Angeles and Santa Ana was reasonable, and whether the relief stated in the temporary restraining order against Department of Homeland Security ("DHS") requested by Plaintiffs ("TRO") is safe and workable from a law enforcement perspective. I base this declaration based on my years of experience with crowd control and excessive use of force and the witness accounts, photographs and videos of the recent protests in Los Angeles. My conclusions are as follows:

DECLARATION OF GIL KERLIKOWSKE

- **Opinion No. 1**: DHS is deploying excessive force in policing the protests, including by using force against people who are not engaged in threatening acts, misusing crowd-control munitions and teargas, and indiscriminately using force that needlessly injures people who pose no threat to law enforcement.

- **Opinion No. 2**: The TRO is safe for law enforcement. There is no reason to use force or less-lethal weapons other than in the ways that they are supposed to be used or in ways other than California law enforcement agencies are required to use them under state law. Defending federal property mainly involves establishing a perimeter around the building. There is no reason to target or disperse journalists or protestors who do not pose a threat from that position. To the extent officers leave federal property, the TRO is also safe.

- **Opinion No. 3**: The TRO is workable. Trained and experienced law enforcement are able to protect public safety without excluding journalists and legal observers or using excessive force, even in the heat of volatile protests. Any difficulties to federal authorities arise from lack of training and experience working in dense urban environments and lack of leadership that is experienced in urban civil disturbances/unrest.

## **QUALIFICATIONS**

5.    I am an expert on crowd control and use of force. In my 47 years of law enforcement, I have had substantial training and experience with crowd control and civil unrest in the context of protests, use of force in that context, and use of force generally.

6.    My formal training on crowd control began when I was with the Military Police in 1970, where I received training on response to crowd and riot control, and I continued to learn about it throughout my career in law enforcement. I also had additional training in the Army on physical security measures. I received

3

DECLARATION OF GIL KERLIKOWSKE

further in-service crowd control training when I served in the St. Petersburg Police Department. As a commander, I have supervised the training of officers on the equipment, the types of orders they will receive, and the formations that will be used for crowd control. I have familiarity with less-lethal technology, and I have been shown and fired the soft nose, pepperball and FN303 at the CBP Harper's Ferry training center in 2016.  I introduced less-lethal weapons to the Border Patrol and went to the facility to talk with the instructors and see the technology firsthand. I also received substantial training as a commander, which covered crowd control and use of force, including without limitation, 11 weeks of training at the FBI National Academy in Quantico, three weeks of training at the Senior Management Institute for Police in Boston, two weeks of FBI Law Enforcement Executive Training in Quantico, and three weeks at the FBI National Executive Institute in Quantico.

7.      I have had more experience with crowd control during civil disturbances than almost all law enforcement officers in the country. I served as Chief of Police in Seattle, where I oversaw over 200 protests. We probably had at least 25 protests every year I was there. In addition to my experience in Seattle, I also served as Police Commissioner in Buffalo, New York, where I also had duties and experience with crowd control. In overseeing those protests, my job was to make sure that all the officers who reported to me, from the line personnel all the way up, were properly trained to handle the protests. I also helped formulate and execute the strategic plans for how we would police each protest. These plans included how and when to use force, who, if anyone, would be given less-lethal weapons, and how to treat journalists, legal observers and protesters. This was an evolving art/science that varied by situation and built on the institutional experience that we built up.

8.      I have been tasered twice (while I was Police Chief in Seattle) and been subjected to pepper spray (while I was the commanding officer in Buffalo). I have reviewed and approved the training and policies on policing numerous demonstrations. I assigned command personnel to go to the WTO, IMF, G-8 and N.

4

1  Ireland to gain knowledge from viewing how other departments handled these
2  incidents. The commanders returned and provided the knowledge they had acquired.
3  After a "Mardi Gras" disturbance went awry in Seattle, Austin, and Philadelphia,
4  those agencies came to Seattle for a meeting I convened to go over how these should
5  be policed and lessons learned. As a president of the Police Executive Research
6  Forum, President of the Major Cities Chiefs Association, and member of the
7  International Association of Chiefs of Police, I have attended dozens of national and
8  international law enforcement conferences where discussions and presentations on
9  demonstrations and riots have been the topic.  For example, Chief Norm Stamper did
10 a detailed presentation and analysis of what occurred in Seattle in November 1999
11 during the World Trade Organization demonstration. I have been on the front lines of
12 many demonstrations in Seattle, standing in uniform with my officers and know
13 firsthand what policing a chaotic and volatile demonstration is like.

14      9.      I have also had substantial training and knowledge related to use of
15 force by law enforcement. As the head of multiple police departments and law
16 enforcement agencies, I was responsible for how the officers working under me
17 behaved and for supervising investigations into excessive force. I was also ultimately
18 responsible for how they were trained. I was the Internal Affairs commander in St.
19 Petersburg. I also received approval to form Internal Affairs (Professional Standards)
20 for CBP, hired the Assistant Commissioner and reviewed and approved the policies
21 for receiving and investigating complaints, including those involving the use of
22 force. I have reviewed and assessed hundreds of use of force reports and
23 investigations. For almost my entire career, evaluating uses of force has been one of
24 my job duties.

25               **MATERIALS REVIEWED**

26      10.     The evidence and materials I reviewed in connection with preparing this
27 declaration are:

28               a.      Declaration of Diya Cruz;

b.    Declaration Ben Adam Climer;

c.    Declaration of Sean Beckner-Carmitchel;

d.    Declaration of Chelsea Bell;

e.    Declaration of Jonathan Alcorn;

f.    Declaration of Lexis-Oliver Ray;

g.    Declaration of Ryanne Mena;

h.    Declaration of Michael Horowicz;

i.    Declaration of Abigail Olmeda

11.    These materials, witness statements and videos, are the type of information typically relied upon by experts in my area to assess whether tactics and force used by law enforcement during protests constituted unreasonable or excessive force.

**DISCUSSION AND ANALYSIS**

12.    As detailed below, it is my opinion that (1) DHS has repeatedly employed unnecessary and excessive force against journalists, legal observers and protesters, (2) the terms of Plaintiffs' proposed TRO are safe for law enforcement, and (3) the terms of Plaintiffs' proposed TRO can be followed by trained law enforcement with leadership that is experienced in civil disturbances and unrest.

**I.    OPINION 1: DHS IS USING EXCESSIVE AND UNNECESSARY FORCE**

13.    I have reviewed multiple declarations as well as video evidence from several different protests against ICE. My review of the materials I have seen shows that DHS appears to have engaged in widespread use of excessive and unnecessary force against journalists, legal observers and protesters.

14.    DHS's main stated purpose for involvement in the protests is that it is trying to protect federal property. DHS is not supposed to otherwise engage in police activities. Generally, in defending a property, police form a perimeter around the property. In this defensive stance, law enforcement officers (LEOs) generally do not

1   need to use force unless they are under attack, or if someone is trying to break into

2   the facility. At that point, the correct protocol is to issue instructions to the crowd,

3   such as "move back," and warn them. If officers are still under attack or crowds are

4   trying to break in to the facility after being given clear instructions to move away,

5   using teargas may be appropriate. If that does not work, or if specific individuals are

6   hurling projectiles, it may be warranted to use less-lethal impact munitions to target

7   specific individuals who pose a threat in order to stop them. If a specific person is

8   doing something dangerous, such as throwing fireworks, it is not permissible to fire

9   less-lethal projectiles into a crowd to try to stop that person because it could cause

10  serious injury to people who are not engaged in unlawful activities. An individual

11  who is the threat from hurling objects, or using fireworks as weapon, should be

12  specifically identified. Any less-lethal projectile should be directed to them and not

13  fired generally into the crowd. Even when the individual is identified it may not be

14  possible to fire the less-lethal projectile because of that person's use of the general

15  crowd as cover. Rubber bullets are capable of killing people, and they should only be

16  targeted at specific individuals when other lesser levels of force have failed or are

17  unavailable. It does not appear that DHS has followed these protocols and has

18  instead used teargas and less-lethal munitions, excessively, improperly and

19  indiscriminately in ways that are highly dangerous to everyone present.

20        15.    DHS has also been involved in law enforcement outside of federal

21  property when ICE has been conducting immigration raids. The same use-of-force

22  rules discussed above apply to these engagements, and DHS appears to have engaged

23  in the same excessive and indiscriminate use of force off federal property. When

24  outside the perimeter and a confrontation occurs, an attempt should be made to de-

25  escalate the particular individual(s) to avoid a more serious confrontation. This can

26  also be accompanied by a warning not to interfere with the law enforcement

27  operation. Police trained and experienced with policing civil unrest in dense urban

28

DECLARATION OF GIL KERLIKOWSKE

1  situations are capable of safely managing these situations without using the excessive

2  force discussed below.

3      16.    Below is my detailed analysis of the declaration and video evidence I

4  have reviewed.

5      **A.    Jonathan Alcorn**

6      17.    On June 7, 2025, a CBP agent shot Jonathan Alcorn in the arm with a

7  teargas canister, even though he was wearing a press pass, carrying professional

8  photography equipment, including a foot-long lens, was standing away from

9  protesters, and had passed by the group of officers who shot him so that they could

10 see he was a professional photojournalist. (Alcorn Decl. ¶¶ 8, 13, 15-16, 20, 24.)

11 Under these circumstances, shooting Mr. Alcorn was more likely than not excessive

12 use of force for several separate and independent reasons.

13  -   First, Mr. Alcorn was not doing anything to threaten law enforcement or

14      dangerous to others. The rule that all officers must follow, and CBP's use

15      of force policy in specific, provides that LEOs may not deploy force unless

16      it is necessary to protect against the threat of violence.

17  -   Second, Mr. Alcorn was not given any warning. Generally, before using

18      force, law enforcement should issue warnings and use de-escalation

19      techniques. It does not appear that CBP did that.

20  -   Third, Mr. Alcorn was clearly marked as press and had come close to CBP

21      officers who could see that he was a photojournalist. Even if a valid

22      dispersal order had been issued (which is unclear from the declaration), it is

23      unnecessary and improper to disperse or assault journalists.

24  -   Fourth, teargas canisters should never be fired at people. The canisters are

25      made to break open on the ground to release teargas. Using them as

26      projectile weapons is extremely dangerous, as shown from Mr. Alcorn's

27      injuries, as they can cause serious injury or potentially death. Officers who

28

DECLARATION OF GIL KERLIKOWSKE

receive training on the use of teargas launchers are trained never to fire teargas as an impact munition.[1]

- Fifth, less-lethal weapons should not be fired at someone who is running away from law enforcement as Mr. Alcorn was. (Alcorn Decl. ¶ 24-29.) That is both an unnecessary use of force and contrary to CBP's' use-of-force policy.

- Sixth, law enforcement may not retaliate against individuals for engaging in protected First Amendment activities, such as reporting or protesting. CPB officers have had extensive marksmanship training, and if an officer is firing projectiles at people, they are likely to hit their targets. Because CBP policy prohibits indiscriminately using less-lethal weapons, it appears more likely than not that Mr. Alcorn was targeted for being a reporter.

18.    Mr. Alcorn's declaration describes a pattern of excessive force against other people as well. This includes indiscriminately firing teargas canisters at the crowd. (Alcorn Decl. ¶ 18.) This is excessive for the same reasons as above. It is not how teargas is supposed to be deployed. There does not appear to have been any attempt at de-escalation or warning, which should be documented. It does not appear to have been done in response to any act or threat, and it does not appear to be targeted at specific actors who are doing something that warrants force. Law enforcement officers who are trained in policing civil unrest are capable of identifying specific individuals who are engaged in unlawful activities and taking appropriate action against them. Taking appropriate action against a criminal violator can be when it is occurring, if possible, or by identifying the individual for later arrest and prosecution. Law enforcement did this, for example, with videos of the

---

[1] My opinions in this declaration are limited to what is appropriate for crowd control. An officer may use deadly force, such as shooting a teargas cannister at someone's head, if the officer reasonably believes they are in danger of death or serious bodily injury or that a suspect poses such risks to others.

DECLARATION OF GIL KERLIKOWSKE

1  criminals who attacked the United States Capitol on January 6, 2021. This also

2  occurred in the wake of the George Floyd protests in 2020.

3       19.    Mr. Alcorn also states to have witnessed rubber bullets whizzing by him

4  in the air when he was away from protesters. (Alcorn Decl. ¶ 25-26.) This also

5  appears more likely than not to be an excessive use of force because the force does

6  not appear to be targeted at any specific dangerous actor, and rubber bullets should

7  never be shot above waist-level. People have been killed by rubber bullets fired

8  above waist-level.

9       20.    Finally, Mr. Alcorn also describes federal officers targeting a protester

10  carrying the American Flag. (Alcorn Decl. ¶ 18.) There does not appear to be any

11  reason she was targeted other than retaliation for protesting.

12       21.    All of these uses of force are more likely than not disproportionate to

13  any legitimate law enforcement interest and extremely dangerous to everyone at the

14  protest. Moreover, they do not appear to be the isolated conduct of a single officer,

15  especially when this is considered in light of the experiences of the other declarations

16  and videos I have reviewed, as discussed below.

17      **B.**    **Lexis-Olivier Ray**

18       22.    From my review of the declaration of Lexi-Olivier Ray and

19  accompanying videos, it appears more likely than not that DHS used excessive force

20  at the June 7, 2025 protest at the Metropolitan Detention Center (MDC).

21       23.    Mr. Ray describes, and his videos show, a sequence of events in which

22  DHS used excessive and indiscriminate force against everyone who was present. It

23  began with DHS coming out of the building teargassing and firing pepper balls at

24  Mr. Ray and other journalists and protesters alike. It continued when Mr. Ray left the

25  immediate vicinity of the facility when DHS shot him and shot at other press

26  members. It continued when DHS was moving its skirmish line and continuing firing

27  "at the backs of journalists and protesters all the way to Temple Street." (Ray Decl. ¶

28  30.)

DECLARATION OF GIL KERLIKOWSKE

24.    DHS's use of force was more likely than not excessive for at least the following reasons:

25.    First, the video shows that DHS officers came out of the building after protesters had retreated to leave about a 50-foot buffer between them and the building. DHS came out using teargas and firing less-lethal weapons when there does not appear to be any immediate threat to law enforcement, and people were not near the building. Such force was more likely than not unnecessary and disproportionate to any risk faced by DHS.

26.    Second, Mr. Ray describes DHS firing at least one teargas cannister that exploded above the crowd. (*Id.* ¶ 20.) That is not how teargas cannisters are supposed to be deployed.

27.    Third, Mr. Ray describes DHS firing at protesters and at him. (*Id.* ¶ 22.) Pepper balls are not supposed to be shot at people; they are supposed to be shot near people to release the irritant inside. For example, one use we trained for at CBP was to shoot a pepper ball near someone scaling a wall to break into a facility we were defending. The dangers of shooting pepper balls at people became widespread public knowledge in 2004, after Victoria Snelgrove was killed by a pepper ball fired by a Boston police officer after the Red Sox beat the Yankees in the American League Playoffs.

28.    Fourth, Mr. Ray was clearly marked as press. (Ray Decl. ¶ 8.) He posed no threat to law enforcement, and it was excessive and unnecessary to shoot pepper balls at him when he was standing to the side, not interfering with law enforcement. (Id. ¶ 22.) California law precludes dispersing press, even when lawfully dispersing protesters. Officers experienced in policing protests are capable of identifying and allowing members of the press to remain even in very chaotic circumstances. When I was the Police Chief in Seattle, we also did not disperse press even if we declared an unlawful assembly. The Portland Police Bureau was enjoined from ever dispersing journalists and legal observers during the large-scale 2020 protests and complied

1  with that injunction for years without danger to law enforcement. Using force against

2  a member of the press when they are off to the side of a protest is unnecessary and

3  excessive.

4      29.    Fifth, even when Mr. Ray was standing with tv crews and other

5  members of the press, off to the side from the protests, DHS fired an "enormous

6  volley" of pepper balls at the group of journalists. (*Id*. ¶¶ 26, 27.) This was more

7  likely than not unnecessary and excessive for many of the reasons given above: there

8  is no need to disperse press, pepper balls should not be shot at people, and such force

9  should be used in a targeted manner, not indiscriminately.

10      30.    Sixth, an officer shot Mr. Ray with a pepper ball from 10 feet away.

11  That was more likely than not excessive because he is press, shooting at people is not

12  a proper use of pepper balls, and it is especially dangerous at close range. (*Id*. ¶ 28.)

13      31.    Seventh, officers continued to fire pepper balls at Mr. Ray as he was

14  retreating, hitting him in the back. (*Id*. ¶ 29.) Pepper balls are intended to be used to

15  make crowds disperse.  If people are following orders to move away from police,

16  there is no justification to fire pepper balls toward them, much less to improperly fire

17  pepper balls so as to strike them. Shooting people in the back with less-lethal

18  weapons is contrary to how less-lethal projectile weapons are supposed to be used.

19      32.    Eighth, Mr. Ray's video shows DHS firing at photographers with

20  tripods who do not appear to be near any protesters, causing them to run for cover.

21  Such force appears to be excessive for all the reasons previously given, i.e., they are

22  press, pepper balls should not be fired at people, and they were not posing any

23  danger to law enforcement or federal property.

24      33.    Ninth, Mr. Ray observed DHS "targeting journalists instead of others."

25  (*Id*. ¶ 35.) Targeting someone for anything other than dangerous or unlawful activity

26  is excessive.

27      34.    Tenth, DHS did not give Mr. Ray, journalists, or protesters any warning

28  before using force to move their skirmish line. (*Id*. ¶ 34.) Because there does not

DECLARATION OF GIL KERLIKOWSKE

appear to have been any exigent circumstance that prevented DHS giving warning, this is more likely than not a separate example of excessive force.

35.    Eleventh, it appears that Special Response Team (SRT) was part of DHS's policing efforts. As discussed below, the SRT should not be policing urban civil unrest because they are not experienced in doing so.

**C.    Abigail Olmeda**

36.    The events described by Ms. Olmeda on June 9, 2025 also discuss at least four incidents in which it appears that DHS used excessive and indiscriminate force against Ms. Olmeda and other protesters.

37.    **Incident No. 1**: Ms. Olmeda was shot near her head by a pepper ball. (Olmeda Decl. ¶ 9.) This was excessive and unnecessary for several reasons:

-    First, as noted above, pepper balls are not supposed to be fired at people, much less at their heads. When they are misused to shoot at people, it can be lethal.

-    Second, Ms. Olmeda had been at the protest for 15 minutes, and it does not appear that she received any type of warning. If something had changed in the 15-minute period between the time she arrived and when she was shot that made force necessary, DHS should have given her a warning, especially before employing a less-lethal weapon.

-    Third, Ms. Olmeda was 40-50 feet away from law enforcement and does not appear to have been engaged in any unlawful activity, much less anything that was creating an imminent threat to law enforcement. Using any force against such a person is excessive, much less an impact munition to the head.

-    Fourth, it appears that Ms. Olmeda was shot by HSI (Homeland Security Investigations). As detailed below, this group largely conducts investigations and is not tasked with, nor experienced in, policing civil unrest in dense urban areas.

13

DECLARATION OF GIL KERLIKOWSKE

38.    **Incident No. 2**: DHS shot Ms. Olmeda again, a few minutes after shooting her the first time, when she was holding up a sign with a message critical of ICE. (*Id*. ¶¶ 11-15.) This use of force is more likely than not excessive and unnecessary for all the reasons given above: agents lacking the proper experience were shooting at her head, without giving a warning, when she posed no threat to law enforcement. The absence of any legitimate reason to target Ms. Olmeda suggests that DHS shot her in retaliation for her sign.

39.    **Incident No. 3**: DHS teargassed Ms. Olmeda. (*Id*. ¶ 16.) This was more likely than not excessive because DHS did not give warning, she did not appear to be doing anything threatening, and the people around her were also "standing peacefully." (Id. ¶ 15.)

40.    **Incident No. 4**: DHS teargassed Ms. Olmeda and shot her in the head with a rubber bullet. (*Id*. ¶¶ 17-20.) For the same reasons as above, this was unnecessary and excessive. Firing rubber bullets above waist-level is particularly dangerous, contrary to DHS policies on how such weapons should be used, and known to cause serious harm. For example, at the 2020 protests in Portland, a federal agent shot protester Donovan Labella in the head, fracturing his skill and leaving him permanently disabled.[2] The injuries Ms. Olmeda reports would be a predictable result of firing rubber bullets at people above waist-level.

41.    The force in Incident No. 4 was also more likely than not excessive because DHS fired multiple rubber bullets that hit Ms. Olmeda's umbrella and the person next to her several times (also above the waist). (*Id*. ¶¶ 17-18.) DHS officers are trained marksmen. Rubber bullets should be used to target specific individuals engaged in threatening acts. Ms. Olmeda claims that she was trying to kick a teargas

---

[2] Conrad Wilson, *Portland protester, permanently injured in 2020, reaches settlement with US Justice Department*, OPB. (Nov. 20, 2024), https://www.opb.org/article/2024/11/20/portland-protester-donovan-labella-2020-protests-us-justice-department/.

cannister away from her when she was 40-50 feet away from law enforcement, who were wearing gas masks. It appears that her conduct did not pose any immediate threat to law enforcement. Under such circumstances, firing any rubber bullets, much less multiple rounds, was more likely than not excessive. Further, one protester was hit in the back. (*Id*. ¶ 17.) Shooting someone in the back when they are not threatening to cause death or serious bodily injury is excessive.

**D.    Chelsea Bell**

42.    On June 7, 2025, Chelsea Bell, a legal observer was shot at with tear gas by CBP officers and observed CBP officers shooting less lethal weapons – primarily tear gas cannisters, but likely else pepper balls --at demonstrators and bystanders in Paramount, California. While she was at the scene in Paramount, Ms. Bell was wearing a neon green legal observer hat and observing, rather than participating in protesting the ICE raid that had allegedly occurred at a nearby Home Depot. Based on my review of her declaration and a photograph and video that is included with her declaration, it is my opinion that the force directed at her, and force she observed CBP officers using, was more likely than not excessive use of force for several separate and independent reasons.

43.    The force she described is also consistent with declarations, photographs and video evidence from three journalists who were at the scene that day, Ryanne Mena, Jonathan Alcorn, and Sean Beckner-Carmitchel. In analyzing force incidents and whether law enforcement engaged in proper or excessive force, one important factor I consider is whether different witnesses have consistent perceptions of what occurred, as these four people did.

- First, the CBP officers shot tear gas at her when she was approaching from quite a distance wearing a green legal observer hat and while she was not posing any threat or taking any aggressive actions. (Bell Decl. ¶¶ 16-17 and Exh 1.) The rule that all officers must follow, and CBP's use of force

policy in specific, provides that LEOs may not deploy force unless it is necessary to protect against the threat of violence.

- Second, the officers did not direct Ms. Bell to stop or issue a warning that they would use force against her if she continued; they just began shooting tear gas at her. (*Id.* ¶ 16) Generally, before using force, law enforcement should issue warnings and use de-escalation techniques. It does not appear that CBP did that.

- Third, Ms. Bell was clearly identifiable as a level observer by her highly visible neon green hat, which legal observers wear at protests across the country.  Even if a valid dispersal order had been issued (which it appears did not occur), it is unnecessary and improper to disperse or assault legal observers, who like journalists are present to observe what is happening, not to participate in any way in a protest.

44.    In addition to the force that DHS directed at her, the force Ms. Bell observed CBP officers directing at a relatively small group of protestors in and around Alondra Blvd also appears to be excessive for a number of reasons. Most notably, Ms Bell observed a large number of CBP officers, perhaps as many as 50, in full riot gear shooting barrage after barrage of tear gas cannisters at protestors across Alondra Boulevard. The video I reviewed shows them shooting so much tear gas that the intersection at Alondra was flooded with a mass of whitish smoke.

- First, Ms. Bell reported, and the video is consistent with her report, that the vast majority of people in the area were simply milling around or protesting.  (E.g., Bell Decl. ¶ 24). But the officers were firing massive amounts of tear gas indiscriminately at everyone in the area. It is excessive force to shoot tear gas at people who do not pose a threat of violence.

- Second, Ms. Bell did not report ever hearing a warning or dispersal order before the officers directed volleys of tear gas or other less lethal weapons at protestors and bystanders. (Bell Decl. ¶¶ 16, 24, 26),

DECLARATION OF GIL KERLIKOWSKE

- Third, less-lethal weapons should not be fired at someone who is running away from law enforcement as happened to Mr. Alcorn (Alcorn Decl. ¶ 24-26.) and as Ms. Bell observed happen to someone else. (Bell Decl ¶ 17). That is both an unnecessary use of force and contrary to CBP's' use-of-force policy.

- Fourth, even with respect to the very small number of people whom Ms. Bell observed throw a few plastic water bottles in the direction of the officers (Bell Decl ¶ 22), the force used was excessive because it was indiscriminate rather than directed at someone who may have been throwing something; it was grossly disproportionate to the threat posed because the water bottles were not coming close to the officers who were firing weapons in response; and a plastic water bottle poses little or no real threat to officers in full riot gear.[3]

## E.    Michael Horowicz

45.    On the evening and night of Saturday June 7, 2025, Michael Horowicz observed DHS officers shoot massive amounts of tear gas at protestors who did not appear to pose any threat. Then after the protestors had mostly dispersed, they continued to shoot teargas cannisters at news trucks and journalists across the street from where they were, and the journalists were clearly identifiable by their TV cameras and other equipment and posed no threat whatsoever. Under these circumstances, shooting masses of tear gas at protestors and then continuing to shoot it at journalists more likely than not constituted excessive use of force for several separate and independent reasons.

---

[3] There is some evidence in Ms. Bell's declaration that CBP officers were firing tear gas cannisters at people's head. (Bell Decl. ¶ 36.) This evidence is consistent with the declaration of Sean Beckner-Carmichael, but because the evidence in Ms. Bell's declaration does not so clearly establish that the woman mentioned in the declaration was hit with tear gas cannister, I am not relying on it specifically to form my opinion.

DECLARATION OF GIL KERLIKOWSKE

46.    Mr. Horowicz's description of events and the videos he shot are consistent with the declaration and videos shot by Lexis Oliver-Ray from the same area at the same time.

- First, the DHS officers shot tear gas at a group of clearly identifiable journalists who posed no threat whatsoever. (Horowicz Decl. ¶¶ 10-17). The rule that all officers must follow, and CBP's use of force policy in specific, provides that LEOs may not deploy force unless it is necessary to protect against the threat of violence.

- Second, it does not appear that the DHS officers gave any dispersal order or a warning that they would use force if the journalists did not move from the area. (Horowicz Decl. ¶ 17). Generally, before using force, law enforcement should issue warnings and use de-escalation techniques.

- Third, the group of people standing around the news trucks were clearly identifiable as journalists by their equipment, e.g., cameras on tripods, remote trucks with microwave antennas some of which had identifying information about their station. (Horowicz Decl. ¶¶ 5, 10, 16). Law enforcement may not retaliate against individuals for engaging in protected First Amendment activities, such as reporting or protesting.   Even if a valid dispersal order had been issued (which it appears did not occur), it is unnecessary and improper to disperse or assault journalists, who are present to observe what is happening, not to participate in any way in a protest.

- Fourth, even if there had been some threat present, which is not evident, laying down a barrage of tear gas for 20 minutes would almost certainly be grossly disproportionate to the situation.

## F.    Other Declarants

47.    The other declarations I have reviewed show a similar pattern of the same misuses of force that I already have discussed. Diya Cruz describes unnecessary use of teargas. (Cruz Decl. ¶ 10.) Ms. Mena was subjected to force even

though she was clearly marked "press." (Mena Decl. ¶¶ 8, 22.) She also describes DHS shooting at protesters with pepper balls (Mena Decl. ¶¶ 13-14.) She, herself, was shot with a pepper ball when she was physically distant from protesters and not doing anything threatening. (*Id*. ¶ 16-18, 22.) The next day she went out to report, DHS shot her in the head with a rubber bullet. (*Id*. ¶ 31.) She describes "volleys of less lethals" (*id*. ¶ 29) rather than targeted uses, and also witnessed DHS firing teargas cannisters at people. (*Id*.) All of this conduct is more likely than not excessive force and reinforces my opinions.

48.    Benajmin Climer describes similar and widespread instances of improper uses of force. He describes LEOs firing tear gas cannisters at people, as opposed to on the ground. (Climer Decl. ¶ 6.) Like Mr. Alcorn, Mr. Climer was hit by an airborne tear gas canister (*id*. ¶ 8), which is highly dangerous and should not happen. Mr. Climer also describes a protester who described getting hit in the head with a pepper ball. (*Id*. ¶ 7.) For the reasons stated above, all these uses of force were more likely than not excessive.

49.    Sean Beckner-Carmitchel is a clearly-marked journalist who DHS shot in the head with a teargas cannister when he was away from protesters trying to record an encounter between DHS officers and protestors. (Beckner-Carmitchel Decl. ¶ 13.) DHS's use of force on him was excessive for the reasons that I already have given

50.    In sum, from what I have seen, there appears to be a pervasive pattern of misuse of force by DHS against journalists, legal observers, and protesters who have been present at the recent protests in Los Angeles.

## II.    OPINION 2: THE TRO IS SAFE FOR LAW ENFORCEMENT

51.    In the context of defending federal property or supporting law enforcement operations, LEOs have no reason to target journalists or legal observers or disperse them. They also have no reason to misuse crowd-control weapons or use excessive force.

DECLARATION OF GIL KERLIKOWSKE

52.    Complying with the relief requested by Plaintiffs under these circumstances would not be unsafe or burdensome for law enforcement trained to deal with situations involving large, and sometimes unruly crowds.

## III.    OPINION 3: THE TRO IS WORKABLE

53.    Police forces under leadership trained and experienced in civil disturbances are able to protect public safety without excluding press and legal observers or violating any of the other restrictions in the TRO.

54.    It appears that there were a few incidents where someone at the protest was engaged in a crime, but there is nothing in the proposed TRO to prevent such an individual from being arrested and charged. It is quite common in some protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, but those are just the general nature of some protests. They do not have anything to do with the proposed TRO.

55.    Effective crowd control in the context of volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress First Amendment activities. It also involves coordination between law enforcement agencies. That does not appear to have occurred in this case, and there is public evidence that local and federal law enforcement are not coordinating.

56.    Police who are experienced with dealing with protests, and in specific protests where some individuals have engaged in violent and destructive acts, are capable assessing and managing the risks posed in these unique circumstances.

57.    The DHS officers involved in the incidents above appear to lack such experience. Some of the agencies involved have no responsibility for urban crowd control, such as Homeland Security Investigations (HSI), which is an investigative agency within DHS, that typically does fraud investigations and human trafficking investigations. Similarly, the Special Response Team (SRT) is a tactical unit with DHS that is part of CBP Office of Field Operations that executes dangerous

DECLARATION OF GIL KERLIKOWSKE

1  warrants. It also provided security for me, when I was head of CBP. These officers

2  are not accustomed to policing urban civil unrest; nor are they trained to do so.

3       58.    The protections in the TRO are workable for trained law enforcement.

4  To the extent that the federal agents would have any difficulty complying with the

5  TRO, such problems arise from the failure of supervision and leadership, lack of

6  experience, and failure of leadership to ensure that the agents are properly trained for

7  civil disturbances/unrest.

8

9  Dated: June 18, 2025

10

11

12                                    _____
                                              Gil Kerlikowske
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GIL KERLIKOWSKE

# EXHIBIT 1

R. Gil Kerlikowske

15 Water Street

Charleston, South Carolina 29401
gilkerlikowske@hotmail.com
Mobile: 202-306-9587

## Professional Experience

**February 2017 - Present**

Gil Kerlikowske LLC, Owner/Principal: A private consultancy specializing in border security, global supply chain security, public safety, and drug policy issues and practice.

Global Resilience Institute, Northeastern University, Distinguished Senior Fellow.

Rice University, Non-Resident Fellow (2017-2024)

Harvard University, John F. Kennedy School of Government, Institute of Politics, Resident Fellow, (Spring 2017).

Council on Foreign Relations, Member

**March 2014-January 2017**

Commissioner, United States Customs and Border Protection (CBP), U.S. Department of Homeland Security.

Nominated by President Barack Obama and unanimously confirmed by the U.S. Senate to head Customs and Border Protection (CBP). I was the only confirmed Commissioner in that Administration.  CBP is the largest law enforcement organization in the country. It has over 60,000 employees throughout the world and a budget of $13B. Comprised of the Border Patrol, Air and Marine, and Field Operations, CBP has the dual responsibility of protecting our nation's borders and ensuring the efficient movement of both trade and travel.  With Congressional approval I reorganized the executive staff, elevating trade to a direct report to me with an Executive Assistant Commissioner. I improved transparency and communication, oversaw a significant reduction in the use of force by Border Patrol agents, and implemented an electronic trade tracking system (ACE). Partnered with U.S. Chamber of Commerce on trade.  I authorized the largest fine ever imposed by CBP against VW. I negotiated pre-clearance preliminary agreements with over six countries and implemented pre-clearance in the UAE.  I significantly increased enforcement efforts on countries where the use of child labor violated U.S. law through Withhold Release Orders.  I utilized an approved advisory committee of private sector stakeholders

from all disciplines of the trade and manufacturing centers to provide advice and guidance on how to improve Customs efforts to increase efficiency and effectiveness in global supply.

## May 2009-March 2014

Director, White House Office of National Drug Control Policy (ONDCP)

Nominated by President Barack Obama and confirmed by the U.S. Senate to lead the White House drug policy office.  ONDCP is responsible for establishing the policies, priorities, and objectives for the Nation's drug control program. I was charged with producing the President's National Drug Control Strategy. The strategy directs the Nation's anti-drug efforts and establishes a program, a budget, and guidelines for cooperation among Federal, State, and local entities. I travelled the country extensively meeting with Governors, Mayors, Judges, law enforcement executives, community leaders, and individuals in treatment and recovery to re-balance the Nation's efforts and resources to focus on drug abuse as both a public health and a public safety problem. I met with leaders in over fifteen countries to enhance collaborative strategies to prevent drug abuse and to engage in law enforcement efforts to combat smuggling and transnational organized crime. I co-authored the President's Transnational Organized Crime Strategy with John Brennan.

## August 2000-May 2009

Chief of Police, Seattle, Washington

In 2007 Seattle recorded the lowest crime rate in 40 years.  The department has over 1,900 employees to police a city of 680,000 residents.  I restructured a significant critical area that was partially responsible for the chief's position becoming available—Demonstration Management.  SPD is now requested for advice and consultation on managing crowds, from the G8 in Russia to the Presidential Inauguration.  SPD achieved National Accreditation in 2003 and 2006.

The Seattle Police Foundation was formed in 2001 and provided over $500,000 annually to the organization.  A Crime Scene Investigation unit was formed in 2004 and the Cold Case unit has solved a number of homicides, including one from 1969, at the time, the oldest cold case in the United States.

I implemented the first civilian oversight for the department. Responsibility for emergency preparedness for the entire city is a function of the department. A state-of-the-art Emergency Operations Center was designed and opened in 2008.  New records management and computer aided dispatch systems were implemented in 2008. The City agreed to the first comprehensive and sustainable growth in the size of the force since the 1980's. The Seattle Police Department is regarded as one of the most professional and cutting edge big-city police departments in the Nation.

## R. GIL KERLIKOWSKE

**July 1998-August 2000**

Deputy Director, U.S. Department of Justice, Office of Community Oriented Policing Services (COPS).

This agency is responsible for providing grant funds for additional police officers and technology to local governments.  As importantly, COPS supports community policing programs  by providing training and educational material to law enforcement and community groups.  I represented the Department at speaking engagements and media events throughout the country.  I was responsible for two divisions that comprise over 60 percent of the total personnel and $6 billion in federal investments.

**January 1994-July 1998**

Police Commissioner, Buffalo, New York

As the first outside Commissioner in 30 years, I was selected by the Mayor to restructure the organization. The department was viewed as being isolated from the community and its culture did not support community policing. Over the last two decades the department was not in the forefront in using modem crime prevention and control methods, training, and advanced technology.

During my tenure, overall serious crime decreased by over 31%, violent crime by 46%, and homicides were reduced by 51%.  A community policing implementation plan was developed and mini-precincts were opened.  Two state-of-the-art district stations were opened and two more were planned and funded. This completed realignment from 14 precincts to five districts.

I initiated a Citizen Advisory Committee, Citizen Police Academy, Youth Police Academy, and high school dialogues between officers and students that improved communication and provided closer cooperation with the community. The Yale Child Development-Community Policing Program, an intervention for children exposed to violence, was implemented.  A random drug-testing program was negotiated with the PBA for all officers including the Commissioner and command staff.  I implemented an objective examination process for selecting detectives.

An independent management study by the International Association of Chiefs of Police (IACP) found the department "far more contemporary, professional and effective" under my  leadership.

**January 1990-December 1993**

Chief of Police, Fort Pierce, Florida

Fort Pierce is a racially and ethnically diverse city that was experiencing significant crime problems. Programs such as Neighborhood Oriented Patrol, Victim Assistance and Mall

Watch contributed to a reduction in crime and an improved relationship between the community and the department. A neighborhood police station was opened that provided a safe haven for a variety of programs such as scouting and after-school tutoring. The department was selected by the Mott Foundation as one of four national sites for implementing neighborhood policing centers. The department received the Attorney General's crime prevention award. National accreditation was achieved.

**April 1987-January 1990**

Chief of Police, Port St. Lucie, Florida

Impact fees on new construction were implemented to pay for future police growth. The process to achieve national accreditation was begun and a new police headquarters was designed. The department received the Attorney General's crime prevention award.

**July 1985-April 1987**

Commanding Officer, Lieutenant, Criminal Investigation Division, St. Petersburg (FL) Police Department

St. Petersburg is a city of a quarter million residents and faces the same challenges as other large urban police agencies. This division is responsible for the investigation of all major crimes. Responsibilities included management of all phases of criminal investigations, polygraph services, crime analysis, victim assistance, hostage negotiation, and a violent crimes unit. New programs such as a weekly tactical crime meeting (a forerunner of COMPSTAT), statistical reporting format, interaction with community groups, and a management review and reallocation of personnel were implemented.

**August 1984-July 1985**

Visiting Fellow, United States Department of Justice, National Institute of Justice (NIJ).

Recipient of a one-year fellowship at the National Institute of Justice, the research arm of the Department of Justice and is on the leading edge of developments in the criminal justice field.

I was an advisor to the Director and also managed grants in excess of $3 million, including the Newport News Problem-Oriented Policing Project. Other responsibilities included developing new programs and drafting long and short-range plans for the Law Enforcement Division.

## R. GIL KERLIKOWSKE

**May 1980-August 1984**

Commanding, Lieutenant, St. Petersburg (FL) Police Department

Commanded several key sections of the St. Petersburg Police Department, including, Field Training, Vice and Narcotics, and Internal Affairs.

**February 1972-May 1980**

Police Officer, Sergeant, St. Petersburg (FL) Police Department

Patrol duty with an innovative inner-city team policing unit (a predecessor of community policing) and detective assignments in narcotics and later robbery-homicide.  Began my career in St. Petersburg as a police cadet in 1969.

**February 1970-February 1972**

Security Team Leader, Army Military Police

Supervisor of one of the teams responsible for security of the presidential helicopter (President Richard Nixon).

## Select Awards and Offices

Chair, National Law Enforcement Explorers Board, (2015)
Women in Federal Law Enforcement, Award for "elimination of systemic barriers" (2015)
Penrith Award, National Executive Institute Associates (2014)
John P. McGovern Award for work in preventing drunk/drugged driving (2011)
Coordinating Council on Juvenile Justice and the Prevention of Delinquency (DOJ) (2011)
American Medical Association Nathan A. Davis Award (2011)
Honorary Doctorate, Humane Letters, University of South Florida (2010)
President, Major Cities Chiefs Association, elected twice (2007-2009)
Community Service Award, Association of Hispanic Chambers of Commerce, (2008) (WA)
Seattle University Community Leader Award, (2008)
Police Executive Research Forum *Leadership Award,* (2006)
Brotherhood/Sisterhood Annual Award, The National Conference (Christians and Jews) (1998)
President, Police Executive Research Forum (1996-1998)
Progressive Leadership Award, Citizen Action of New York (1996)
Vice Chair, Governor's Crime Laboratory Council (FL 1991-1994)
Gary P. Hayes Award for innovation in policing, Police Executive Research Forum, (1991)
U.S. Army Presidential Service Badge (1972) Outstanding Military Police Honor Graduate (1970)

R. GIL KERLIKOWSKE

## Select Speeches and Presentations

Naturalization Ceremony, Faneuil Hall, Boston (2016)
Australian National University Symposium on Policing (2007)
John Jay College of Criminal Justice, Patrick V. Murphy lecture (2007)
Community Policing, Police Service of Northern Ireland, Belfast (2005) Presentation on anti-terrorist exercise, conference in Belfast (2003)
Meeting of British Chief Constables. London (2002)
BBC Television, Glasgow: Juvenile Curfews—A Policy Debate (1997)
F.B.L International Law Enforcement Academy, Budapest (1996)
Secretary of Labor's Task Force on Labor/Management Cooperation (1995)
U.S. Conference of Mayors, Houston (1992)
Testified before President's Commission on Missing Children (1986)
Speaker at annual meeting of Police Management Association, London (1985)

## Special Activities

Home Team Advisory Committee, Government of Singapore (2020)
Representative to Int'l Association of Chiefs of Police Executive Board (2015)
Panel member, National Academy of Sciences National Research Council, ***Protecting Individual Privacy: In the struggle Against Terrorists*** (2008)
Member of the Executive Session on Policing, Harvard University (2008)
International City Management Association, editorial advisor, ***Local Government Police Management***
Consultant to ***Early Warning-Timely Response, A Guide to Safe Schools***, developed by the Department of Justice and the Department of Education (1998)
Adjunct faculty Seattle University (graduate program), Florida Atlantic University, and Buffalo State College, Northeastern University, University of South Carolina
International Association of Chiefs of Police Legislative Committee
U.S. Conference of Mayors Police Policy Board
Advisory board member/speaker/lecturer on numerous national criminal justice projects
Book jacket or preface; ***Character and Cops (1994), Superpredators: The Demonization of Our Children by the Law (1999), Police Pursuits (2000)***

## Select Publications and Papers

President's Transnational Organized Crime Strategy (2010)

Homeland Security Success through Law Enforcement Collaboration, *The Police Chief (2014)*

Co-author, A Comprehensive Approach to Internet Safety, *The Police Chief(2008)*

Contributor, Community Policing: A Contemporary Perspective, 2nd edition (1998)
OP-ED, *Boston Globe,* with Elliott Richardson, on crime prevention through law enforcement partnerships to intervene in children's lives (1997)

Co-author of article on community surveys, *The Florida Police Chief* (1989)

Co-author of article on visiting fellowships at the Department of Justice, *The Police Chief* (1985)

## Media Presentations

Extensive print, digital, radio, and television interviews domestic and international media outlets.

## Civic Involvement

National Board Chair, Fight Crime: Invest in Kids. Washington, D.C.
Hearing, Speech and Deafness Center, Seattle
United Way of King County, Seattle Advisory Board
Executive Board, National Conference (of Christians and Jews), New York
District Commissioner, Boy Scouts of America, New York and Florida
Board of Trustees, St. Mary's School for the Deaf,  New York
Board of Directors, Fort Pierce-St. Lucie County Chamber of Commerce
Campaign Chair, United Way of St. Lucie County (FL)
Board of Directors, Salvation Army. Seattle, New York and Florida
Board of Directors, "Success by 6", New York
Teacher in adult literacy program, Florida
Board of Trustees, Hospital Corporation of America, Port St. Lucie and Fort Pierce (FL)
Chair, School Superintendent's Advisory Committee, Fort Pierce (FL)
Chair, Advisory Committee of Rape Crisis Center, St. Petersburg (FL)
Board of Directors, Center Against Spouse Abuse, St. Petersburg (FL)

## Professional Development

National Executive Institute, FBI (1995)
Harvard University, John F. Kennedy School of Government National Executive Session on Policing (1988)
F.B.I. Law Enforcement Executive Development (1988)
F.B.I. National Academy (1984)
Florida Power Corporation, Total Quality Improvement (1988)
Senior Management Institute for Police (1983)

## Education

Master of Arts, Criminal Justice,  University of  South Florida, Tampa (1985).
Emphasis in urban police administration.
Bachelor of Arts, Criminal Justice, University of South Florida (1978)