## Declaration of Adam Rose

I, Adam Rose, hereby declare:

1.      I am the secretary and press rights chair of the Los Angeles Press Club, which is a plaintiff in the above-captioned action. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

**Background on the Los Angeles Press Club**

2.      Los Angeles Press Club is a 501(c)(3) nonprofit organization with no parent corporation and no stock, registered in the State of California. The organization has about 1,000 member journalists in Southern California and has operated since 1913 to support, promote and defend quality journalism.

3.      I am an individual dues-paying member of the Los Angeles Press Club in good standing and have been for well over a decade. I have spent about 20 years in media, including with LAist, Los Angeles Times, HuffPost, and CBS/Paramount. I have worked in the field and in senior editorial roles. My current job is running an applied research lab that authenticates digital evidence. In that position, I have collaborated on investigations with outlets like Reuters, Associated Press, and Rolling Stone. One of those stories was a war crimes investigation that led prosecutors to re-open a 30-year-old cold case and won a National Magazine Award, several National Press Photographer Association Awards, and a nomination for a National News Emmy.

4.      For the Los Angeles Press Club, I serve both on the board of directors and as secretary (an officer of the board). I am also the organization's press rights chair and volunteer for these roles, for which I receive no compensation.

5.      Los Angeles Press Club organizes a variety of programming to benefit members and non-members alike. We offer a *Foot In The Door Fellowship* program to help early-career journalists learn about the profession and find work opportunities, especially if they come from communities historically

1

underrepresented in the media. We provide scholarships to students, emergency grants to journalists in need (ex: losses due to recent wildfires), and grants to support investigative journalism that might otherwise go unreported. We also host a variety of educational and professional networking events. We are known for two annual and long-running awards programs which recognize notable pieces of journalism: the *Southern California Journalism Awards* and the *National Arts & Entertainment Journalism Awards*. Judging takes significant resources. We have reciprocal agreements with other press clubs around the country, who serve as neutral judges in our contest while our volunteers and staff serve as neutral judges in theirs.

6.      The role of press rights chair was established following a series of incidents in 2020 when journalists in our region were injured, detained, and/or arrested by law enforcement officials. I was elected to the role at that time and have served in it since.

7.      As press rights chair, I track and document incidents of press rights abuses throughout California, especially since 2020. I have also done historical research dating back to at least 2000. This is effectively a press function, as I report incidents through a publicly shared tracking spreadsheet and on social media. Many organization members and staff support this work.

8.      As press rights chair, I have lobbied for press protections in state law. I worked with a coalition of press advocacy groups to support California Senate Bill 98 in 2021, and worked with legislative staff to negotiate the language of the law down to the placement of punctuation. Now enshrined as California Penal Code § 409.7, the law exempts duly authorized members of the press from dispersal orders and from arrest when doing their job at an unlawful assembly. It also affirms that police may not interfere with press at such incidents. I also lobbied for Assembly Bill 48 the same year, which, among other protections, established Penal Code § 13652(b)(6) to require that police officers "minimize

possible incidental impact" of what are commonly referred to as "less lethal" munitions on journalists. As an organization, the Los Angeles Press Club formally endorsed both of these bills because of their explicit protections for journalists. Other volunteers also participated, but our staff did not similarly participate in lobbying activities.

9.     As press rights chair, I have met with command staff and press liaisons for major law enforcement agencies in our region, as well as civilian personnel such as inspector generals, communications directors (or equivalent), attorneys who represent the Departments, and elected officials and/or commissioners who have some degree of oversight. The purpose of these engagements has been to inform law enforcement leadership of their department's responsibilities to respect press rights and access, and to get their personnel to observe these protections. Other Los Angeles Press Club volunteers and staff have also participated in these activities.

10.     Press rights violations by law enforcement are often concentrated in easily recognizable periods or "flashpoints." Of particular note in Los Angeles: 2000 Democratic National Convention protests; 2007 MacArthur Park "May Day Melee" labor rights protests; 2011 Occupy protests; 2020 Black Lives Matter protests; 2021 Echo Park homeless rights protests; and 2022 abortion rights protests.

11.     I have raised alarm with law enforcement leadership about the actions of their personnel in the flashpoints in 2020, 2021, 2022, and a handful of smaller but no less important incidents. I similarly brought their attention to failure of their personnel to intercede when Israel-Palestine protesters attacked members of the media in 2024.

12.     During a 12-month period (May 2020 to April 2021) in California, I identified more than 50 incidents of apparent law enforcement misconduct toward people who should have been recognized as journalists. The victims were just

doing their job when they had their constitutional rights chilled. I provided photo and video evidence of these incidents to legislators to demonstrate the need for Senate Bill 98 and Assembly Bill 48, which the California Legislature passed overwhelmingly and the Governor signed into law.

**Los Angeles Press Club Response to June 2025 Protests**

13.     During just the first few days of June 2025 at protests in Los Angeles (notably "Anti-ICE" and "No Kings"), I identified more than 50 incidents of apparent police misconduct toward people who should have been recognized as journalists. Based on my personal knowledge of Senate Bill 98 and Assembly Bill 48, I believe law enforcement officers in these incidents have been violating both the letter and legislative intent of the law.

14.     The brief period from June 6 today has seen an overwhelmingly greater number of incidents of law enforcement assaults on press, and violations of press rights than during any other period of protest, to my knowledge and experience as press rights chair.   I know from speaking to members and reviewing photos and video, that since June 6 at least seven members of my organization have been subject to use of force or suffered a serious press rights violation by DHS officers (two of them repeatedly), six by LAPD, and five by LASD. This doesn't include potentially dozens of incidents with minor amounts of tear gas or similar chemical agents.

15.     Since June 6, 2025, I have had to divert significant time and resources from other Club activities in order to address press rights violations by law enforcement personnel. In the first seven days of these incidents, I estimate that I spent at least 100 hours personally responding to these incidents, a significant portion of which involved DHS agents. Other volunteers and staff from our organization have also supported these efforts. Both volunteer and staff time continues to be diverted from our other activities during what happens to be the busiest period of the year for our staff in annual fundraising and awards programs.

4

Our annual Journalism Awards Dinner, one of our biggest functions and
fundraising events, is scheduled for June 22, 2025. The resources our staff has
spent on responding to incidents of assaults on press by DHS officials has come
out we planned to spend, and need to spend, working on the details, logistics, and
fundraising for dinner to ensure its success.

16. Our response efforts include but are not limited to checking on victim
wellbeing, ensuring they have access to emergency grants or mental health
services, providing information on available legal support hotlines, and tips on
safety and access on protests. I have made an effort to contact most if not all of the
individuals named in this declaration, plus dozens of others. Many victims are ones
I have known personally over the years due to my work with the Los Angeles Press
Club, and many are our members.

**Documenting DHS Violations in June 2025 Protests**

17. One of my most intensive response efforts has been collecting
evidence of these incidents. To collect and document these incidents, I review
social media, send emails out to press club members, and ask journalists and
members to report incidents to me. I also try to confirm incidents by obtaining
photographic or video evidence, confirmation through other reporting sources, and
often by contacting the reporter who experienced the violation. In other words, I
approach the task of documenting violations as I approach reporting, with the need
to confirm the accuracy of reports and fact-check sources. Approaching this as
reporting has allowed me to compile a tracking spreadsheet that now includes more
than 70 potential examples of law enforcement misconduct across multiple
agencies, including DHS, since June 6. I have also put together a slideshow of
photo and video evidence. Both have been shared with law enforcement and civic
leaders in hopes of convincing them to police their own officers. To date, the
official response has been muted. These documents have also been shared with
other media members to help them report on these incidents, and I have spent

significant hours fielding media inquiries.

18.     After more than 20 years in media, I have learned that most press are reluctant to be part of the story. Further, I have witnessed a pattern from communications with general counsels and PR representatives for large newsrooms that many corporate outlets are reluctant to share details about their employees whose rights have been impacted in the field. As a result, I am confident that my reporting is a significant undercount of the incidents.

19.     The first documented attacks on press by federal officers during recent protests were in downtown Los Angeles on June 6, 2025. Staff reporter Ryanne Mena of the Los Angeles Daily News and freelance journalist Sean Beckner-Carmitchel posted to social media sites their accounts of being sprayed with tear gas and shot with pepper balls.[1] Both are members of the Los Angeles Press Club and I have had extensive conversations with Beckner-Carmitchel and communicated indirectly through him with Mena.  Both Mena and Beckner-Carmitchel have submitted declarations in this case.

20.     On June 6, independent journalist Anthony Cabassa posted photo and video of federal officers shooting him in the face with "less lethal" munitions in downtown Los Angeles.[2]

21.     On June 6, I discovered that KTLA photographer Ken Koller had posted online about being shot at by federal officers in downtown Los Angeles with "less lethal" munitions. I spoke with him about the experience. He also wrote online that he went to an urgent care and when staff asked how he got hurt, he "Points to tv in the waiting room showing Ch5, 'like that' as they show me getting

---

[1] https://x.com/ryannemena/status/1931396162726314106
[2] https://x.com/AnthonyCabassa_/status/1931159815947985222
https://x.com/AnthonyCabassa_/status/1931354604429771209
https://x.com/AnthonyCabassa_/status/1931360386777006414
https://x.com/AnthonyCabassa_/status/1931398124687552660

hit by the flash bang on tv."[3] KTLA is a newsroom member of the Los Angeles Press Club.

22.    On June 7, both Mena and Beckner-Carmitchel were again injured by federal officers firing munitions, this time in Paramount, CA. Both were hit in the head and later treated at a hospital.[4]

23.    On June 7, Lexis-Olivier Ray was repeatedly shot by federal officers with pepperballs. He wrote on social media that, "Feds didn't care if you were press. They shot at TV crews and press that were off to the side isolated from protesters."[5] Ray is a member of the Los Angeles Press Club and has submitted a declaration in this case.

24.    On June 7, KNBC reporter Mekhalo Medina and his station both posted videos online about attacks their crew suffered at the hands of federal officers.[6] One video shows Medina being targeted and shoved by officers despite wearing an obvious "press" vest and not standing in the way. Another shows where Medina's being shot with pepper balls. Medina is a longtime member of the Los Angeles Press Club (although I am not sure if his membership is current), and we have been in contact about the incident.

25.    On June 7, federal officers came out of a building in downtown Los Angeles and unleashed a barrage of tear gas on a group of readily identifiable press that was on the side of a road away from protesters. Several TV stations had

---

3
https://www.facebook.com/ken.koller.3/posts/pfbid0mC5iDDg81t4eyLSBN2Vurj
DY3vCirGVPr7N6R17K4r4ASFJ3XuZwedW3AWPuSJ57l
4 https://bsky.app/profile/acatwithnews.bsky.social/post/3lr2j2gm77c2l
https://www.latimes.com/california/story/2025-06-11/lapd-treatment-journalists
[https://perma.cc/FUD3-UFWS]
5 https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dkkvqak2p
https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dvqv4j22p
https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3e7p7lck2p
6 https://www.instagram.com/reel/DKoMRBzSay1/
https://www.instagram.com/mekahlo/reel/DKoDXJguulB/

clearly recognizable TV trucks parked with the groups and cameras were set up on tripods. Multiple videos were provided to me. [7] Given the size of the group, I have reason to believe members of the Los Angeles Press Club may have been among the victims.

26.    On June 7, federal officers also shot pepper balls at Reporter Victor Cordero and Video journalist Raul Gutierrez of Univision. Gutierrez required four days off of work to recover from his injuries. This happened in the same incident described above involving Lexis-Olivier Ray, and Ray's video shows officers firing on Cordero and Gutierrez as they try to move away.[8]

27.    On June 7, federal officers shot Jonathan Alcorn of Zuma Press with a tear gas canister. He required treatment at an urgent care facility and suffered significant burn, bruising, and swelling to his arm.[9] Alcorn has submitted a declaration in this case.

28.    On June 8, Los Angeles Times reporter James Queally posted ""Nat Guard/DHS threw tear gas canisters and smoke grenades into the crowd. Protesters and media hit. Pellet rounds deployed. All to seemingly clear path for a convoy of DHS/Border Patrol vehicles. I got hit but fine after an eye rinse."[10] The Los Angeles Times is a newsroom member of the Los Angeles Press Club.

29.    On June 8, Beckner-Carmitchel posted video of a group of heavily armored DHS officers and National Guard jointly responding to a protester who threw a small object, which an officer easily swatted out of the air. Officer then

---

[7] https://docs.google.com/presentation/d/1xlRaueaFtHnJEbPs4hGrm3XJsSSb-d7T0YRbL9Jc3P8/edit?slide=id.g365f8b4395c_1_328#slide=id.g365f8b4395c_1_328

[8] https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dvqv4j22p

[9] https://www.facebook.com/SoCalPhoto/posts/pfbid0F6gtqbLdrHwLKdXTvJbeurwUhp8tajEvdDU7WSRyZ4a4m2FWrke7uc1JYMRzMSJZl

[10] https://x.com/JamesQueallyLAT/status/1931809345429540889

unleashed a torrent of tear gas and other munitions in an apparently indiscriminate way, leading to multiple individuals in the crowd of press (who were standing off to the side) screaming about how officers were shooting at journalists.[11]

30.    I am continuing to investigate other potential incidents of federal misconduct toward journalists. This includes videos posted to TikTok where an individual identified only as Richard is wearing obvious "press" indicia on his body and is writhing in pain on the ground, with federal officers nearby. Later videos of him in a hospital include accusations about the acts of the officers. I have sent messages to the accounts that posted these videos but have yet to reach anyone.[12]

31.    Much of the subsequent reporting I reviewed addressed deployment of National Guard and/or Marines into Los Angeles, including how they were used to perform traditionally civilian law enforcement functions. Authority over those deployments is an active legal question currently being litigated. Los Angeles encompasses a large geographic area, with a City of 469 square miles and a County of over 4,000 square miles. The County population is larger than 40 states. Despite a potential Constitutional crisis in our own streets, the vast majority of people in the Los Angeles region would have had no idea about these events if not for the press reporting on them. The press is the public's surrogate to document what's happening, and is vital to other Courts who must evaluate those Constitutional questions. There could not be a more important story to guarantee access to the press.

///

///

---

[11] https://bsky.app/profile/acatwithnews.bsky.social/post/3lr4pe5iq2k22
[12] https://www.tiktok.com/@losangelescgirl/video/7515567395851816238
https://www.tiktok.com/@losangelescgirl/video/7515614123795762475
https://bsky.app/profile/lorennacleary.bsky.social/post/3lrjssb3dq227

1    I declare under penalty of perjury of the laws of the State of California and

2  the United States that the foregoing is true and correct. Executed this 17th day of

3  June, 2025, in Los Angeles, California.

4    _____

Adam Rose

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28