**Declaration of Ted Soqui**

I, Ted Soqui, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am submitting this declaration to describe how I was subject to the use of force in the form of pepperballs and rubber bullets by DHS and ICE.

3. I have worked as a photojournalist for more than 40 years. I have covered protests and major public demonstrations throughout my career. I covered the 1992 Los Angeles riots. I have received formal riot and conflict-zone training for journalists through Reuters. I know how to move carefully, how to keep a safe distance, and how to stay out of the middle of confrontations. I am cautious and experienced, and until now, that has always been enough.

4. From the beginning of the June protests, I have spent every day photographing the protests at the federal building in downtown Los Angeles. I arrived each morning around 11:00 a.m. and remained until early evening.

5. On June 8, 2025, I was positioned on South Alameda Street between 1st and 2nd Street. I was photographing with my long lens, maintaining distance from both the protest crowd and the officers. I estimate I was about 15 feet from both groups in what I believed was a safe, alongside multiple other photographers and journalists.

6. There was no perimeter marked, no audible dispersal order, and no warnings given that force was about to be used. At the time, the protest was tense but did not feel unsafe. I did not see anything that suggested escalation was imminent.

7. As I turned back and forth to photograph both groups, I was suddenly struck in the left cheekbone by a pepper ball. It exploded on impact with my face. I heard it crackle as it broke apart. Almost immediately afterward, I was hit in the right shin by a rubber bullet. The two impacts occurred in quick succession. I was

stunned and in pain.

8. Had there been any indication that a confrontation was about to occur, I would have moved away — but there was none. At no point was I between protesters and law enforcement. I was not obstructing officers, shouting, or engaging in any behavior that could be viewed as provocative. I was targeted while doing my job, standing far to the side, clearly marked as press.

9. I left soon after around 5:30 pm. I felt shaken and upset, but returned the next day to continue documenting.

10. On June 9, I again arrived at the federal building around 11:00 a.m. The protest site had changed slightly: police lines were more defined, and protesters could not access the steps or grounds of the building. Once again, I kept to the side and used my long lens to remain physically distant from both protesters and law enforcement.

11. This time, out of an abundance of caution, I wore personal protective equipment. I positioned myself farther back from the protest activity than the previous day — approximately 50 to 100 feet from the officers and protesters — once again using my long lens to photograph from a distance.

12. I was well over 50 feet away from the officers when, while facing away and preparing to leave, I was struck in the back with rubber bullets, three times in rapid succession. The pain and shock made me freeze. For a moment I could not move. When I felt able, I drove home. I had to lower my car seat because the pressure of the seat against my back was unbearable. I was shot anyway.

13. I am certain that the officers who shot me were federal officers. I observed that Immigration and Customs Enforcement (ICE) personnel were wearing blue uniforms, and Department of Homeland Security (DHS) officers wore camouflage. I saw department patches identifying them on their arms, chests, and backs. I also observed that LAPD officers remained on city streets and perimeter positions and did not enter the grounds of the federal building.

14. I know from experience that LAPD does not handle federal property security, and I was told that LAPD had been instructed not to get involved with federal operations. I have extensive photographic documentation from the scene that reflects the positioning and appearance of these agencies.

15. In my four decades of photographing protests in Los Angeles, I have never experienced anything as unsafe or extreme as what I experienced on June 8 and 9, 2025. The volume of force used, the lack of warning, and the frequency with which press were injured was unprecedented.

16. I have documented civil unrest in Los Angeles for decades — including the 1992 riots — and have always taken pride in knowing how to navigate protests safely and professionally.

17. I was not in the middle of the crowd. I was not interfering. I was clearly marked as press, and positioned carefully to avoid any confrontation. Still, despite every precaution, I was struck — in the face, in the leg, and in the back.

18. Since then, I have not felt the same safety or assuredness in the field. I've had difficulty sleeping and I feel constantly on edge. I have never had to second-guess whether I could safely do my job until now. For the first time in my career, I find myself hesitating before covering a protest — not because of the crowd, but because of law enforcement.

19. Despite my experience and ongoing fear about the force used against me, I intend to go to future protests, as a member of the press, to document this historic moment.

20. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Ted Soqui