BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ELIZABETH HEDGES
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney
General
Civil Division

ALEXANDER K. HAAS
ANDREW I. WARDEN
KATHLEEN C. JACOBS
Civil Division, Federal Programs Branch

Attorneys for Defendants

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Def. Litig. Section
PAUL (BART) GREEN (SBN 300847)
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-0805
Facsimile: (213) 894-7819
Email: Paul.Green@usdoj.gov

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES PRESS CLUB; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,<br><br>Defendants. | No. 2:25-cv-05563<br><br>**DEFENDANTS' OPPOSITION TO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>[Supporting declarations filed concurrently] |

# **TABLE OF CONTENTS**

DESCRIPTION                                                                      PAGE

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................... 2

    A.    Recent Destruction of Federal Property and Assaults on Federal Officers in Los Angeles ......................................................................... 2

    B.    DHS Deploys Officers to Protect Federal Personnel and Property. ............. 4

    C.    Surge of Federal Resources Has Reduced Violence. ................................ 4

    D.    Plaintiffs' Evidence Focuses Exclusively on Past Events that Occurred Two Weeks Ago. ................................................................. 5

III.  STANDARD OF REVIEW ......................................................................... 6

IV.   ARGUMENT ............................................................................................. 6

    A.    Plaintiffs Fail to Establish Entitlement to *Ex Parte* Relief. ......................... 6

    B.    Plaintiffs Lack Standing to Obtain a Prospective Injunction. ....................... 8

    C.    Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Claims. ............................................................................ 9

    D.    Plaintiffs Are Not Likely to Succeed on the Merits of Their Fourth and Fifth Amendment Claims. ............................................................. 14

    E.    Plaintiffs Have Not Demonstrated Irreparable Harm. .............................. 15

    F.    The Balance of Equities and Public Interest Weigh Against Granting An Injunction. ................................................................................. 17

V.    CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

DESCRIPTION                                                                          PAGE

**Cases**

*All. For The Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................ 16

*Bayer v. City of Simi Valley,*
  43 F. App'x 36 (9th Cir. 2002) .......................................................... 15

*Bell v. Keating,*
  697 F.3d 445 (7th Cir. 2012) ............................................................. 18

*Boardman v. Pacific Seafood Group,*
  822 F.3d 1011 (9th Cir. 2016) ........................................................... 16

*Branzburg v. Hayes,*
  408 U.S. 665 (1972) ..................................................................... 18-19

*California First Amendment Coal. v. Calderon,*
  150 F.3d 976 (9th Cir. 1998) ......................................................... 9, 19

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................. 13

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ................................................................... *passim*

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................... 9

*Clark v. Community for Creative Non-Violence,*
  468 U.S. 288 (1984) ........................................................................... 9

*Feiner v. New York,*
  340 U.S. 315 (1951) ......................................................................... 20

*Felarca v. Birgeneau,*
  891 F.3d 809 (9th Cir. 2018) ....................................................... 14, 15

*Flores v. Huppenthal,*
  789 F.3d 994–06 (9th Cir. 2015) ...................................................... 19

*Forrester v. City of San Diego,*
  25 F.3d 804 (9th Cir. 1994)................................................................ 15

*Fraihat v. U.S. Immigr. & Customs Enf't,*
  16 F.4th 613 (9th Cir. 2021) ............................................................. 19

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ............................................................... 6

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ......................................................................... 18

*Index Newspapers LLC v. United States Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ............................................................. *passim*

*Index Newspapers LLC v. City of Portland.*
  480 F. Supp. 3d 1120 (D. Or. 2020) ....................................... 19, 20

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) ................................................................. 18

*Jackson v. City of Bremerton*,
  268 F.3d 646 (9th Cir. 2001) ................................................... 15

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*
  138 S. Ct. 2448 (2018) ............................................................. 18

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................. 13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................... 8

*Mendocino Envt'l Ctr. v. Mendocino County*,
  192 F.3d 1283 (9th Cir. 1999) ................................................. 12

*Menotti v. Seattle*,
  409 F.3d 1113 (9th Cir. 2005) ............................................. 9, 11

*Mission Power Engineering Co. v. Continental Cas. Co.*,
  883 F. Supp. 488 (C.D. Cal. 1995) ........................................ 6, 7

*Munns v. Kerry*,
  782 F.3d 402 (9th Cir. 2015) ..................................................... 8

*Nickler v. Cnty. of Clark*,
  648 F. App'x 601 (9th Cir. 2016) ............................................ 16

*Olagues v. Russoniello*,
  770 F.2d 791 (9th Cir. 1985) ................................................... 16

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ................................................. 16

*Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*,
  478 U.S. 1 (1986) ................................................................... 10

*Rendish v. City of Tacoma*,
  123 F.3d 1216 (9th Cir. 1997) ................................................. 16

*Ryburn v. Huff*,
  565 U.S. 469 (2012) ................................................................. 20

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................... 8

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ..................................................... 6

*Trevino v. Gates*,
  99 F.3d 911 (9th Cir. 1996) ..................................................... 13

*Ubiquity Press Inc. v. Baran,*
  2020 WL 8172983 (C.D. Cal. Dec. 10, 2020) ............................................ 7

*United States v. Christopher,*
  700 F.2d 1253 (9th Cir. 1983) ................................................................... 9

*United States v. Griefen,*
  200 F.3d 1256 (9th Cir. 2000) ........................................................ 17-18, 18

*United Steelworkers of Am. v. Milstead,*
  705 F. Supp. 1426 (D. Ariz. 1988) ........................................................... 15

*Wilkinson v. Torres,*
  610 F.3d 546 (9th Cir. 2010) ................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ......................................................................... 6, 17

**Statutes**

18 U.S.C. § 111 ..................................................................................... 18

18 U.S.C. § 1361 ................................................................................... 18

40 U.S.C. § 1315 ................................................................................... 10

**Other**

41 C.F.R. § 102-74.375 ........................................................................... 10

41 C.F.R. § 102-74.385 ........................................................................... 10

# I.    INTRODUCTION

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction that would hinder the ability of federal law enforcement officers to protect federal property that has been repeatedly damaged after weeks of violence and unrest in Los Angeles—violence and unrest that, just yesterday, a Ninth Circuit panel unanimously held likely justified federalizing the California National Guard. *Newsom v. Trump*, No. 25-3727, slip op., at 28-30 (9th Cir. June 19, 2025). Plaintiffs base their request for emergency injunctive relief on alleged violations of their First, Fourth, and Fifth Amendment rights. Their request fails for several reasons.

First, Plaintiffs lack standing to seek emergency relief. It is well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *See City of Los Angeles v. Lyons,* 461 U.S. 95 (1983). Undeterred by the law or their lack of evidence, they seek an emergency injunction based on alleged past encounters involving federal law enforcement officers but have not demonstrated that similar incidents will take place in the future, much less that *these particular* plaintiffs will again experience the same alleged conduct by federal law enforcement officers. Because Plaintiffs cannot demonstrate a certainly impending injury, they lack standing to seek injunctive relief. For many of these same reasons, Plaintiffs also cannot show a likelihood of irreparable harm, a prerequisite for granting emergency injunctive relief.

Second, Plaintiffs have not established a likelihood of success on the merits because they have not shown that any protected First Amendment interest was violated, on either their right-to-access or retaliation theory. And they similarly have not shown that Department of Homeland Security (DHS) officers used excessive force, as required for Plaintiffs to show a likelihood of success on their Fourth and Fifth Amendment claims.

Third, the relief that Plaintiffs seek is entirely improper. Plaintiffs seek a sweeping injunction that would be unworkable and dangerous in light of the split-second

1

judgments that federal law enforcement officers have to make while protecting federal property, the public, and themselves during dynamic, chaotic situations. By granting immunity to journalists and observers from lawful orders to disperse, the injunction would effectively grant those individuals immunity from otherwise applicable legal requirements and would improperly bind the hands of law enforcement, including by preventing them from taking appropriate action when individuals are engaging in criminal conduct. The proposed injunction is also unworkable from a practical standpoint. It would remove agent discretion by requiring law enforcement officers responding to a violent situation threating public safety to seek permission from a superior before taking necessary action—whether or not a superior is at hand to grant such permission.

Fourth, and finally, the balance of the equities and the public interest counsel against granting Plaintiffs' request. Freedom of the press is not being threatened by the actions of the federal defendants in protecting federal property, nor are journalists being targeted. Furthermore, journalists are not entitled to any special treatment that would entitle them to remain in place despite a lawful dispersal order, much less entitle them to serve as human shields for rioters or preclude federal agents from using appropriate levels of force against violent members of a crowd. Equally important is the societal interest in public safety, including protecting federal property, as well as protecting officers and the general public against imminent threats of serious bodily injury. Simply put, the federal government has not only the right but also the obligation to protect federal property and federal officers. And the public has a compelling interest in that protection. The press is free to observe and report on the destruction of property, but it is not entitled to special access to that property in the face of a lawful order to disperse.

## II.    FACTUAL BACKGROUND

### A.    Recent Destruction of Federal Property and Assaults on Federal Officers in Los Angeles.

Beginning June 6, 2025, large-scale protests began in Los Angeles in response to

2

DHS's lawful immigration enforcement operations. *See generally,* Decl. of Ernesto Santacruz Jr. ("Santacruz Decl."), Ex. 1, Att.1. Soon after, the protests became violent. *Id.* ¶ 9. These violent acts included protestors throwing concrete chunks, bottles of liquid, and other objects at the FPS officers trying to defend federal buildings. *Id.* ¶¶ 9-12. Fearing for the safety of federal employees and officers, the ICE Field Office Director of Los Angeles activated all available ERO and HSI agents to protect the federal buildings and property that had been targets of these attacks. *Id.* ¶ 13. These federal officers were subject to violent assaults and threats, including having rocks, molotov cocktails, and fireworks thrown and shot at them; the violence continued for several days. *Id.* ¶¶ 14-28. The federal buildings in the area experienced significant damage. *Id.* Federal offices were forced to close, causing disruption to many federal agencies. *Id.* ¶ 29.

In another instance of violence against federal agents and property, at a DHS office in Paramount, California, a large crowd gathered blocking traffic and violently attacked ERO and CBP officers and agents. *Id.* ¶¶ 18-21. During the seven-hour exchange, officers were targeted with mortar-style fireworks with multiple explosions, as well as rocks and other objects. *Id.* One ERO officer was trapped inside her vehicle while the violent crowd surrounded it, began shaking it, and pummeled it with stones. *Id.* A CBP officer's wrist was shattered by an object thrown by a rioter. *Id.* The crowd lit a vehicle on fire and cut into the perimeter fence of the DHS office damaging multiple government vehicles and the property. *Id.*

The LAPD has reported that since Saturday, June 7, 2025, 575 arrests related to protest activity have been made with the majority of the arrests occurring prior or incident to the arrival of the California National Guard and the United States Marine Corps.[1] *See* "LAPD Releases Information Related to Recent Protests" (June 16, 2025) LAPD website: https://www.lapdonline.org/newsroom/lapd-releases-information-

---

[1] Since June 9, the number of arrests related to protest activity has dwindled with no such arrests since June 14.

3

related-to-recent-protests-nr25119ma/ A curfew was finally imposed on June 10.

**B.  DHS Deploys Officers to Protect Federal Personnel and Property.**

Due to the ongoing violent riots on June 6, 2025, DHS was forced to engage its officers and agents to assist FPS to secure federal property to prevent damage and ensure the safety of federal employees and other building occupants. *See* Santacruz Decl. Ex 1, Att. 1, ¶¶ 5, 13. DHS requested that all available ERO officers and HSI agents report to the federal building to hold the line against the violent protestors. *Id.* At that time, FPS faced significant logistical and operational safety issues as a group of approximately 100 individuals defaced federal property around the vehicle entrance to the Federal Building. *See generally* Decl. of Mario A. Canton, ("Canton Decl.") Ex. 2. Throughout the onslaught of violence, individuals launched rocks, chunks of concrete, water bottles with unknown liquids as well as many other riotous and illegal acts. *Id.* ¶ 5. The following morning, 110 CBP officers arrived to assist in the protection of federal personnel and property. Santacruz Decl. Ex. 1 ¶ 18. This barrage of violence against property and individuals continued until the National Guard troops were deployed throughout Los Angeles. *Id.* ¶ 23. CBP agents and officers were attacked with thrown objects such as rocks, concrete, and frozen water bottles during the Paramount riot on June 7, 2025. *See generally* Decl. of Gregory K. Bovino ("Bovino Decl.") Ex. 3.

**C.  Surge of Federal Resources Has Reduced Violence.**

Since the deployment of additional federal resources to Los Angeles, the violence at protests has greatly diminished, allowing for federal buildings and courthouses to resume normal operations and federal officers to enforce federal laws. *See* Santacruz Decl. ¶ 5; Canton Decl. ¶¶ 8-9; Bovino Decl. ¶ 9. The presence of California National guardsmen and United States Marines has been a critical deterrent for criminal activity on Federal property. Canton Decl. ¶ 8; *see* Santacruz Decl., Ex. 1, Att. 2 ¶¶ 7-12. The influx of federal officers and resources caused a significant change in the character of the protests over the past week. While large protests have continued to organize at federal facilities, the demeanor of the protesters has been more civil and peaceful, thereby

4

curtailing the need for crowd intervention. Canton Decl. ¶ 9. The number of federal arrests related to protest activity has dwindled over the past week. Further, on June 17, 2025, the Mayor of Los Angeles lifted the curfew that had been in place for the downtown area in recognition of "successful crime prevention and suppression efforts." *See* https://mayor.lacity.gov/news/mayor-bass-lifts-curfew-within-downtown-la (noting more than 30,000 people peacefully demonstrated last Saturday at 15 different locations).

**D.    Plaintiffs' Evidence Focuses Exclusively on Past Events that Occurred Two Weeks Ago.**

Plaintiffs' declarations focus entirely on events that occurred at a small number of discrete locations between June 6 and 9, 2025. *See, e.g.*, Xu Decl. (ECF No. 6-8) (June 7 incident near DHS office in Paramount); Ray Decl. (ECF No. 6-17) & Soqui Decl. (ECF No. 6-23) (June 7-8 incidents near federal building in downtown Los Angeles); Olmeda Decl. (ECF No. 6-4) (June 9 incident near the federal building in Santa Ana). Notably, Plaintiffs have not submitted any evidence of more recent alleged incidents. Indeed, the Press Rights Chair of the Los Angeles Press Club, whose job is to "track and document incidents of press rights abuses throughout California," does not identify a single use-of-force incident after June 8. *See* Rose Decl. ¶¶ 7, 29 (ECF No. 6-5). Similarly, the President of the News Guild-Communications Workers of America, an organization with more than 800 journalists and media workers in California, focuses on the same discrete alleged incidents as the individual declarants that occurred between June 6 and 9, with no evidence that anyone has been harmed since then. *See* Schleuss Dec. (ECF No. 6-16). And each of the individual declarants who describe alleged use-of-force incidents confine their testimony solely to past incidents that occurred between June 6 and 9. *See* ECF Nos. 6-4, 6-6 to 6-8, 6-10 to 6-11, 6-13 to 6-25. The declarations do not identify any specific ongoing or future protest at which they fear the use of force will be used against them.

## III.    STANDARD OF REVIEW

The standard for issuing a TRO and a preliminary injunction are substantially identical. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Either is "an extraordinary remedy that may only be awarded upon a clear slowing that the Petitioner is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a TRO to issue, the moving party must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) a TRO is in the public interest. *See id.* at 20.

Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted). As explained below, Plaintiffs cannot meet this demanding standard.

## IV.    ARGUMENT

### A.    Plaintiffs Fail to Establish Entitlement to *Ex Parte* Relief.

*Ex parte* applications are rarely justified. *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). To justify *ex parte* relief, the movant must demonstrate it "is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect." *See id.* at 492.

Plaintiffs fail to satisfy (or even address) the *Mission Power* standard for seeking emergency relief by *ex parte* application, as opposed to proceeding by a noticed motion. *Mission Power* warned of how *ex partes* "pose a threat to the administration of justice," calling out situations where "the moving party's papers reflect days, even weeks, of investigation and preparation; the opposing party has perhaps a day or two... The goal often appears to be to surprise opposing counsel or at least to force him or her to drop all

6

other work to respond on short notice." *Mission Power*, 883 F. Supp. at 490.

That is precisely what happened here. As early as June 10, 2025, Plaintiffs' counsel began working on this case, setting up a website soliciting clients. *See* Dkt. 8, Green Decl. ¶¶ 12-13. Instead of seeking relief sooner, Plaintiffs employed at least 17 lawyers to draft 24 separate factual declarations, as evidenced by Plaintiffs' own application. *See generally* Dkt. 6-2 to 6-25. On June 18, Plaintiffs waited until after close of business on the East Coast, when federal agencies were closed, to provide notice by phone. *See* Dkt. 6-2, Eliasberg Decl., ¶ 4. Even then, Plaintiffs waited nine more hours, to the next day, a federal holiday, to serve the TRO application and a huge package of declarations. Dkt. 8. Green Decl. ¶ 9.[2] During this process, Plaintiffs' counsel confirmed that they were at fault in creating the crisis. On June 18, defense counsel pointed out the ACLU's June 10 advertising to Plaintiffs' counsel and then later stated that Plaintiffs' counsel had "provided no explanation as to why the ACLU waited over a week to seek relief from the Court, a clear sign that there is no emergency here." *See* Dkt. 8-1, Ex. A (emails from AUSA Green). Plaintiffs' counsel responded to both emails but were silent on these points. *See id.* Such delay has alone warranted denial of *ex parte* relief by the Court: "The Court expected to find a detailed explanation as to why Plaintiffs delayed filing their application until a regularly-noticed motion was not an option. Plaintiffs provided nothing; not a single sentence explains why, having had knowledge of [the upcoming protests], they waited until [a federal holiday] to file their Application." *Ubiquity Press Inc. v. Baran*, 2020 WL 8172983, at *2 (C.D. Cal. Dec. 10, 2020).

Moreover, Plaintiffs have not shown any prejudice they would suffer from proceeding with a normal 28-day noticed motion for a preliminary injunction. *See Mission Power*, 883 F. Supp. at 491 ("The rules contemplate that regular noticed

---

[2] Faced with this situation, Defendants filed an *ex parte* application for an extension, and after it was filed, contacted the Clerk of Court pursuant to L.R. 77-1. *See* Dkt. 8. The undersigned was informed that the on-duty district judge had declined to rule on Defendants' application, therefore necessitating the filing of this opposition within 24 hours.

motions are most likely to produce a just result."). The allegations in the complaint (Dkt. 1) and in the declarations attached to the TRO application challenge events that took place on June 6-9. Plaintiffs assert that the TRO is needed before this weekend, June 21-22, but aside from sheer speculation, offer no evidence that any of the complained of events will occur again, let alone this weekend. Dkt. 6-1 at 1. Because there is no emergency for the requested relief here, the Application fails to establish that Plaintiffs are entitled to *ex parte* relief.

### B. Plaintiffs Lack Standing to Obtain a Prospective Injunction.

To establish standing, plaintiffs must show, as "the irreducible constitutional minimum," that: (1) they have suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical…." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Where, as here, a party seeks prospective equitable relief, the complaint must contain "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). It is therefore well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

Here, Plaintiffs do not meet the Article III requirement of standing for injunctive relief because even assuming they were subject to past law enforcement practices, they can only speculate as to whether those practices would recur. Plaintiffs' declarations address events that occurred between June 6-9, 2025, but present no evidence of more recent incidents. *See supra*. Plaintiffs do not identify any specific ongoing or future protest at which they fear the use of force will be used against them.

While Plaintiffs argue that DHS is engaged in alleged "systemic attempts" to chill reporting by the press, all the supporting evidence cited by Plaintiffs goes to what occurred in the past. *See* Dkt. 6-1 at 5-8. Federal courts have repeatedly held that a chilling effect based on a plaintiff's fear of future injury is too speculative to confer standing for injunctive relief. *See Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015);

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). As such, the Court should deny the TRO Application due to lack of standing.

**C.    Plaintiffs Are Not Likely to Succeed on the Merits of Their First Amendment Claims.**

Plaintiffs have not shown that the Defendants violated their First Amendment right of access to any public proceeding. They also have not shown that Defendants targeted them based on the exercise of First Amendment rights.

The First Amendment does not bar the government from prohibiting the public from entering or remaining on its property outside ordinary hours of operation, or from threatening its property at any time. *United States v. Christopher*, 700 F.2d 1253, 1259-61 (9th Cir. 1983). This principle applies even if the property functions as a public forum for lawful activities when it is open. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 299 (1984). And when federal officers are forced to respond to "a violent subset of protesters who disrupt civic order," such officers indisputably have power to enforce dispersal orders against the general public. *Menotti v. Seattle*, 409 F.3d 1113, 1155-56 (9th Cir. 2005).

These principles apply to journalists, legal observers, and protesters just like they apply to everyone else. The Supreme Court and the Ninth Circuit have repeatedly held that the press lacks a "constitutional right of special access to information not available to the public generally." *California First Amendment Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) and discussing other cases). In short, the First Amendment does not give "self-proclaimed journalists and 'legal observers'" the right to disobey lawful dispersal orders issued to control a violent protest. *Index Newspapers*, 977 F.3d at 839 (O'Scannlain, J., dissenting).

Additionally, federal law permits law-enforcement officers to take appropriate measures to protect federal property and personnel before violent protesters have moved onto federal property. There is no reasonable dispute that DHS officers have authority to issue dispersal orders on federal property. *See, e.g.*, 41 C.F.R. § 102-74.375 (authority to restrict access to federal property); *id.* § 102-74.385 (authority to require the public to comply with access restrictions). This authority extends to "areas outside the property to the extent necessary to protect the property and persons on the property." 40 U.S.C. § 1315(b)(1). Thus, DHS officers can "enforce Federal laws and regulations for the protection of persons and property." *Id.* § 1315(b)(2)(A).

To prove their First Amendment right-of-access claim against this backdrop, Plaintiffs face a high hurdle. They must show, first, that "the place and process" to which they sought access "have historically been open to the press and general public"; second, the Court must ask "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 8 (1986). And even if they make both of those showings, Plaintiffs cannot succeed if the government demonstrates "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9.

Plaintiffs have not shown they are likely to succeed in establishing that their access to any "process" or "proceeding" plays a "significant positive role." Indeed, they make little effort to do so, relying heavily instead on quotes from *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020)—a case about different protests that occurred five years ago in a different city and a different context. Some of the Plaintiffs allege that they are journalists who were covering various scenes around Los Angeles when they encountered DHS officers or agents. Others allege that they were present to protest or to observe. Those allegations, however, do not establish that their presence in the particular place where they allege they were targeted by DHS played a "significant positive role" in any process or proceeding. Indeed, several of the Plaintiffs

10

are vague or silent about why they were protesting in the particular place they chose.
*E.g.*, Olmeda Decl. ¶ 4 (alleging that Olmeda attended a protest at a federal building).
They do not describe any particular proceeding or event—other than the protest itself—
that they were seeking to access.

Plaintiffs allege that they were peaceful participants or observers at the protests.
Even assuming that is true, it does not give them a First Amendment claim. "[O]nce a
pattern of chaotic violence ha[s] been established"—such as that which pervaded Los
Angeles in the days surrounding Plaintiffs' alleged encounters with DHS—"it [i]s
unrealistic to expect police to be able to distinguish, minute by minute, those protestors
with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. In
circumstances where "law-breaking and law-abiding protestors [are] often
indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly
with enforcement against violent protestors," dispersing everyone from the scene of a
riot is narrowly tailored to serve a significant government interest. *Id.* at 1135. Officers
need not tailor their orders to exclude peaceful protesters or innocent bystanders, *see id.*
at 1126-28, whose lawful activities are being disrupted by "a small group of violent
protestors . . . determined to cause chaos," *id.* at 1134. It follows that officers need not
tailor their orders to exclude journalists or "legal observers" as well.

*Index Newspapers* does not support Plaintiffs' claim for relief here. First, in the
days surrounding Plaintiffs' alleged DHS encounters, the violence, unrest, damage to
federal property, and injuries to federal personnel were so severe that a Ninth Circuit
panel has unanimously held that the President "likely acted within his authority in
federalizing the National Guard." *Newsom*, slip op., at 30. In *Index Newspapers*, no
backdrop of unrest severe enough to warrant National Guard involvement informed the
panel's analysis.

The injunction Plaintiffs want also goes beyond anything *Index Newspapers*
authorized. There, the injunction provided "that if a journalist or legal observer is
incidentally exposed to crowd-control devices after remaining in the area where such

11

devices are deployed to enforce a lawful dispersal order, the Federal Defendants will not be liable for violating the injunction." 977 F.3d at 823. But here, Plaintiffs assert a right to prevent Defendants from "[f]iring kinetic impact projectiles or flashbangs at *identified wrongdoers*, if doing so *could result* in injury to a person who is not posing a threat to law enforcement." Proposed Order ¶ 3 (emphasis added). That is an exceptionally broad restriction not approved by Ninth Circuit. The same is true of paragraphs 4 and 5 of the proposed TRO, which would place granular strictures on exactly how DHS officers engage with protesters. Requiring "express[] approv[al] by an on-scene supervisor in response to specific acts of violence that the supervisor personally witnessed" before *any* use of "kinetic impact projectiles containing chemical irritant" defies the realities of crowd control by officers Plaintiffs themselves agree are "highly-trained." App. 15; *see* Santacruz Decl. ¶ 17. In sum, Plaintiffs are not likely to succeed on their right-of-access claim.

Plaintiffs' retaliation claim fails as well. To prevail, they must demonstrate that their First Amendment activity was a "substantial or motivating factor" in the conduct of DHS. *See Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) (quotation marks omitted). But Defendants prohibit retaliation against anyone—protesters, journalists, and legal observers alike—for exercising First Amendment rights. Moreover, officers must undergo training in permissible uses of force. *See* Bovino Decl. ¶ 13. To prove that officers deviated from agency policy, Plaintiffs must show that officers' split-second decisions, made in the midst of chaotic circumstances, were intended not to help control a quickly evolving situation but to retaliate against Plaintiffs. They have not done so. Plaintiffs provide no plausible evidence other than supposition of a retaliatory motive. Nor do their citations to social-media posts by government officials connect any statement to anything that allegedly occurred in their encounters with DHS.

Moreover, Plaintiffs' allegations of misconduct by individual officers occurred in the context of many interactions between federal officers and crowds in the first two

weeks of June. Their allegations thus do not supply sufficient evidence of retaliatory intent on the part of Defendants. As the Ninth Circuit has made clear in the related context of § 1983 claims against municipalities, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiffs must instead identify "practices of sufficient duration, frequency[,] and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Plaintiffs have not made the requisite showing here. That failure precludes Plaintiffs from obtaining injunctive relief against the entirety of DHS—from front line-level officers all the way up to top leadership—on the basis of the purported misconduct of a small number of agency employees. *Cf. Lewis v. Casey*, 518 U.S. 343, 359 (1996) (holding that proof of isolated instances of misconduct was "a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief").

Even if Plaintiffs were likely to prevail on their First Amendment claims, they cannot support the broad order that they seek. The requested TRO would not bar officers from singling out journalists, legal observers, and protesters for retaliatory treatment. Instead, it would require the government to single them out for *preferential* treatment, in order to exempt them from lawful orders that are properly issued to all other persons present. Those requirements are far "broader . . . than necessary to redress" the government's alleged intentional targeting of journalists and legal observers. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). They are instead designed to vindicate plaintiffs' right-of-access claim—a separate claim and one that lacks merit, for the reasons explained above. Even if Plaintiffs had established a likelihood of success on that claim, moreover, the relief they seek is far broader than necessary to protect it. Moreover, it is unworkable. The attached declarations of Ernesto Santacruz and Mario Canton explain in detail why Plaintiffs' requested relief is impracticable to implement from a real-life, law-enforcement perspective. *See* Santacruz Decl. ¶¶ 13-17; Canton Decl. ¶¶ 12-15; *cf. Index Newspapers*, 977 F.3d at 839 (O'Scannlain, J., dissenting) (decrying injunction that made "a significant and unwarranted departure from the

traditional, qualified 'right of public access' to criminal judicial proceedings that has been carefully delineated by the Supreme Court"). Especially against the backdrop of a network of regulations and precedent that allows the federal government to protect its own property, Plaintiffs' argument that this Court should grant sweeping relief on the basis of alleged assembly and speech interests they wish to exercise on or near that property is meritless.

### D.    Plaintiffs Are Not Likely to Succeed on the Merits of Their Fourth and Fifth Amendment Claims.

Plaintiffs have not shown that the particular incidents they alleged violated the Fourth or Fifth Amendment through excessive force—much less that they are entitled to an injunction against speculative future such incidents. To demonstrate excessive force, Plaintiffs must show that "police use of force" was "objectively unreasonable under the circumstances." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018). That showing requires "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The reasonableness of police use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396–97).

Plaintiffs have not made that showing. They allege that they were subjected to what they believe to be unreasonable force, but they have not established facts to show that the force was in fact unreasonable from the perspective of a "reasonable officer" (or even, in all cases, that it was directed specifically at them, rather than at others nearby). What is more, courts have generally found the use of many of crowd-control methods similar to those at issue here to be constitutionally permissible. For example, when

14

police were dismantling an illegal tent city set up by protesters on the University of

California at Berkeley campus, the Ninth Circuit rejected an excessive-force claim

(there, for damages under Section 1983) brought by protesters who had been struck with

batons and knocked over by hand while trying to block officers from dismantling the

tents. *Felarca*, 891 F.3d at 818. The officers were reasonable in using force because the

government was not required to permit "organized lawlessness," and the protesters

"substantially outnumbered" officers, "refused to obey the officers' commands to

disperse," "shouted at the officers," and "engaged the officers in verbal and physical

altercations." *Id.* (quoting *Jackson*, 268 F.3d at 652). The same is true here: After the

peaceful daytime protests have transformed into the lawless nighttime rioting (as the

attached declarations show that they often did for a period of time), officers have been

faced with protecting federal property from riotous mobs. That is the context in which

the Court must view Plaintiffs' claim. And it does not support Fourth and Fifth

Amendment violations. *See also, e.g.*, *Bayer v. City of Simi Valley*, 43 F. App'x 36, 38

(9th Cir. 2002) (holding use of tear gas was reasonable against armed unstable individual

who refused to surrender); *Forrester v. City of San Diego*, 25 F.3d 804, 805-07 (9th Cir.

1994) (holding pain compliance techniques on passive protesters not unreasonable to

remove them); *Jackson*, 268 F.3d at 652 (holding threat and use of chemical irritant to

disperse unruly crowd, where they were interfering with arrest, was not unreasonable);

*United Steelworkers of Am. v. Milstead*, 705 F. Supp. 1426, 1430, 1437 (D. Ariz. 1988)

(holding use of tear gas "for outdoor use only" on crowd gathered inside that had been

throwing objects was not excessive force, even though innocent people were also inside).

Even assuming that Plaintiffs' application showed a likelihood that Plaintiffs would

succeed in proving past violations, they cannot show an entitlement to injunctive relief

by relying on those past violations.

### E.    Plaintiffs Have Not Demonstrated Irreparable Harm.

Plaintiffs insist that by pleading a colorable First Amendment claim they have

suffered irreparable injury. Dkt. 6-1 at 19. First, Plaintiffs have not pled a colorable First

Amendment claim. *See supra* at 10-14. That failure is fatal here. *Nickler v. Cnty. of Clark*, 648 F. App'x 601, 605 (9th Cir. 2016) ("Because [Plaintiffs] failed to show a likelihood of success on the merits, [they] also could not show that irreparable harm would likely result from failure to grant the injunction").

Even if Plaintiffs had pled a colorable First Amendment claim, that does not demonstrate likelihood of irreparable injury because "no presumption of irreparable harm arises in a First Amendment retaliation claim." *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997).

Instead, "plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To establish a likelihood of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). Where "there is no showing of any real or immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting equitable relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); see *Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985). Despite Plaintiff's attempts to conjure future misconduct, they have presented no evidence to suggest such misconduct will occur.

Plaintiffs' future injuries are not only speculative and, therefore, insufficient to demonstrate the likelihood of irreparable injury (*see Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[a]n injunction will not issue" based on "a mere possibility of some remote future injury") (cleaned up)), they are premised on misstatements and outdated facts that no longer reflect reality. *Supra* at 5. The Los Angeles Police Department had the principal public safety role during recent unrest as some of the same Plaintiffs here conceded by filing their complaint against the Los Angeles County Sheriff's Department. *See Los Angeles Press Club, et al. v. County of Los Angeles*, 2:25-cv-05541-HDV-E (June 18, 2025) Dkt. 1. And since the events that

Plaintiffs complain of occurred, the National Guard and U.S. Marines are now assisting FPS in guarding federal property in Los Angeles. *Supra* at 5. Plaintiff's request for relief, therefore, is directed at the wrong entity and based on a state of affairs that no longer exists.

Plaintiffs' theory that the mere presence of federal officers shows a likelihood of irreparable harm is implausible. Mere speculation that individual officers may someday commit sporadic violations of people's rights at future protests—specifically targeting one of the Plaintiffs—cannot establish irreparable harm. Indeed, the Supreme Court expressly rejected the idea that an individual citizen faces a likelihood of irreparable harm just because there is a generalized risk that law enforcement officers may one day act unconstitutionally. *Lyons*, 461 U.S. at 111 ("[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."). Plaintiffs, therefore, have failed to demonstrate that, absent relief, they will suffer irreparable harm.

### F. The Balance of Equities and Public Interest Weigh Against Granting An Injunction.

Contrary to Plaintiffs' assertions, the balance of the equites and public interest tips sharply in favor of Defendants. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "The federal government's interest in preventing" attacks on federal officers and damage to federal buildings "is significant." *Newsom*, slip op., at 36. Both interests would be thwarted were the Court to grant the injunction requested here. Similarly, the public has an interest in the maintenance of order and public safety. Plaintiffs' extrapolations from weeks' old, cherry-picked events and imagined Constitutional violations to come, cannot outweigh the concrete harm to the federal government and the public were this Court to grant Plaintiffs' request.

There is a pointed public interest when disorder threatens the integrity of public property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) (health,

17

safety, and protection of property "are compelling reasons" and "represent significant government interests."); *see also Index Newspapers*, 977 F.3d at 838 (finding that government has an "uncontested interest in protecting federal agents and property"). Additionally, Congress has recognized such interests, including by making the destruction of federal property and assault of federal officers felonies. 18 U.S.C. §§ 111, 1361. Moreover, the federal government has an interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated[;]" for government buildings, those uses are public uses that are in the public interest. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992).

The public interest is advanced when federal officers disperse violent opportunists near federal buildings. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment"); *Griefen*, 200 F.3d at 1260 (9th Cir. 2000) (upholding the relocation of protesters who "had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project"); *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage."). Plaintiffs have not—indeed, cannot—contest the federal government's right and obligation to restore order and protect federal property.

Plaintiffs' argument that the public interest tips in their favor relies on pure *pathos*. But rhetoric about the "search for truth" (Pls.' Mem. At 21 (citing *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council* 31 138 S. Ct. 2448, 2464 (2018)) and participation in "our republican system of self-government" (*id.* (quoting *Globe Newspaper*, 457 U.S. at 604)) is unavailing when the facts are replete with violent attacks on law enforcement. Even if the protests at issue had not become violent riots, the courts have already thoroughly weighed the interest of public access to a free press and found it no greater than that of the public generally. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 684–85 (1972) ("Newsmen have no constitutional right of access to the

1   scenes of crime or disaster when the general public is excluded"); *California First*

2   *Amendment Coal. v. Calderon*, 150 F.3d 976, 981(9th Cir. 1998).

3       Regardless of Plaintiffs' interests, attempting to impose arbitrary new policing

4   rules fashioned by Plaintiffs' attorneys—not law enforcement—is impractical. Plus,

5   Plaintiffs request a scope and timeline that would create chaos and make it impossible to

6   conduct law enforcement operations when protests become unlawful. There are four

7   principal reasons Plaintiffs' requested relief is unwarranted and unworkable.

8       *First*, Plaintiffs have not limited their request for relief to any specific region.

9   Presumably (though it's unclear), they seek a nationwide injunction. Courts have

10  rejected awarding nationwide relief where nationwide evidence was lacking. *See Flores*

11  *v. Huppenthal*, 789 F.3d 994, 1005–06 (9th Cir. 2015) ("[O]nly if there has been a

12  systemwide impact may there be a systemwide remedy.") (alteration in original); *see*

13  *also Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 647 (9th Cir. 2021).

14  Plaintiffs have failed to muster sufficient evidence to support their capacious request for

15  relief.

16      *Second*, Plaintiffs' request sweeps far beyond the relief afforded in *Index*

17  *Newspapers*. 480 F. Supp. 3d 1120, 1155-57 (D. Or. 2020). There, the district court

18  granted an injunction that exempted journalists from orders to disperse but absolved

19  federal law enforcement from liability if journalists were "incidentally exposed to

20  crowd-control devices after remaining in the area . . . after the issuance of an otherwise

21  lawful dispersal order." *Id.* at 1157. Here, by contrast, Plaintiffs seek a blanket

22  prohibition from "[d]ispersing . . . the press[.]" Dkt. 6-26 at 4. This effectively gives the

23  press a veto over every lawful crowd-dispersal order issued by federal law enforcement

24  authorities.

25      *Third*, the preliminary injunction issued in *Index Newspapers* makes no mention

26  of prohibiting the use of crowd control weapons. *See* 480 F.Supp. at 1155-57. But here,

27  Plaintiffs seek blanket prohibitions on the use of "crowd control weapons . . . on people

28  who are not posing a threat to law enforcement[;]"and "[f]iring kinetic impact projectiles

19

or flashbangs at identified wrongdoers, if doing so could result in injury to a person who is not posing a threat to law enforcement" Dkt. 6-26 at 4. This requested relief is not limited to the press and therefore extends far beyond the scope of Plaintiffs' retaliation arguments. The requested relief also imposes a rule on federal enforcement agents that allows no room for incidental error.

*Fourth*, Plaintiffs' request that federal law enforcement be required to obtain "express[] approval by an on-scene supervisor" before deployment of tear gas and similar chemical irritants, *id.* at 5, effectively tying the hands of every agent who, in the chaos of dynamic situations, cannot locate a supervisor to seek permission. *See* Bovino Decl. ¶ 16. These restraints on federal law enforcement combine to frustrate the government's comprehensive interest in maintaining public order on public property. *Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court respects, as it must, the interest of the community in maintaining peace and order on its streets.").

Courts are properly reluctant to micromanage law enforcement officers responding to unpredictable and violent demonstrations in defense of public property. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation[.]").

The requested relief would incapacitate federal law enforcement's ability to handle lawless crowds and respond to imminent threats, thereby making enforcing federal law an impossibility in those circumstances. By contrast, Plaintiff reporters are free to cover whatever events they wish to, now or in the coming days. Accordingly, both the public interest and the balance of the equities weigh in favor of denying the injunction.

## V.    CONCLUSION

Defendants respectfully request that the Court deny the TRO application.

Dated:  June 19, 2025                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General

                                         ELIZABETH HEDGES
                                         SEAN SKEDZIELEWSKI
                                         Counsel to the Assistant Attorney General
                                         Civil Division

                                         ALEXANDER K. HAAS
                                         ANDREW I. WARDEN
                                         KATHLEEN C. JACOBS
                                         Civil Division, Federal Programs Branch

                                         BILAL A. ESSAYLI
                                         United States Attorney
                                         DAVID M. HARRIS
                                         Assistant United States Attorney
                                         Chief, Civil Division
                                         JOANNE S. OSINOFF
                                         Assistant United States Attorney
                                         Chief, Complex and Defensive Litigation Section


                                         _/s/ Paul (Bart) Green_
                                         PAUL (BART) GREEN
                                         Assistant United States Attorney

                                         Attorneys for Defendants


                    L.R. 11-6.2 Certificate of Compliance

     The undersigned counsel of record certifies that this memorandum contains 6,996 words, which complies with the word limit set by L.R. 11-6.1.


Dated: June 19, 2025                     _/s/ Paul (Bart) Green_
                                         PAUL (BART) GREEN