# DECLARATION OF GREGORY K. BOVINO

I, Gregory K. Bovino, declare and affirm as follows:

1. I am the Chief Patrol Agent, El Centro Sector. In this role, I drive Border Patrol Operations for the El Centro Sector, comprised of 70 miles of land border, three Border Patrol Stations, and two permanent traffic checkpoints, overseeing 1,100 employees, an 850-vehicle fleet, and a budget of $10.2 million. I have been in this position since 2020.

2. I entered on duty with the U.S. Border Patrol on November 17, 1996, with my first duty assignment in the El Centro Sector. I have served as the Chief Patrol Agent of the New Orleans Sector, directing operations spanning 694 miles of coastal border across seven states. I also served as Associate Chief of the U.S. Border Patrol Strategic Planning and Analysis Directorate & Chief of Staff Division.

3. I have a Bachelor's degree, Magna Cum Laude, in Natural Resources Management and Forestry from Western Carolina University. I also hold two master's degrees: one in National Security Strategy from the National War College, and one in Public Administration from Appalachian State University.

4. I served as the Lead Field Coordinator in Los Angeles beginning on June 8, 2025.

5. On June 6, 2025, in support of U.S. Immigration and Customs Enforcement, CBP officers and agents were sent to Los Angeles, California. Since their arrival, CBP officers and agents reported repeated assaults against them, and responded with appropriate use of force, and arrests. There have been injuries to officers and agents during CBP operations in the Los Angeles area. The injuries arise from launched or thrown projectiles and even alleged purposeful vehicle accidents directed at CBP personnel.

6. I did not witness, nor am I aware of, any CBP employee knowingly targeting journalists, legal observers, or peaceful protesters with less lethal munitions and/or crowd control devices.

7. While protecting federal officers and property in Paramount, California on Saturday June 7, 2025, the violent crowd continually assaulted agents and officers with prohibited, high explosive fireworks, as well as numerous thrown projectiles, such as rocks, concrete, and frozen water bottles. Despite repeated verbal warnings and directions to not attack federal officers, rioters continued to attack CBP officers and agents, who were forced to protect themselves.

8. Beginning June 9th, 2025, protestors in downtown Los Angeles engaged in violence towards officers and agents, both federal and state. Los Angeles Police Department, and California Highway Patrol officers deployed to a protest in the vicinity of the Roybal Federal Complex. The U.S. Army National Guard was deployed for additional support to protect federal facilities throughout the Los Angeles area.

9. The presence of Department of Defense (DoD) personnel, including the California National Guard assisted in de-escalation and allowed CBP officers and agents to concentrate on joint federal law enforcement operations throughout the Los Angeles area. This included operations in support of ICE-ERO, and the Drug Enforcement Administration.

10. The CBP Use of Force Policy is directly derived from constitutional law, and federal statutes and regulations. Pursuant to the CBP Use of Force Policy, officer and agents may use objectively reasonable force only when it is necessary to carry out their law enforcement duties. The "reasonableness" of a particular use of force is based on the totality of circumstances known by the officer or agent at the time of the use of force, and weighs the actions of the officer or agent against the rights of the subject, considering the circumstances surrounding the event. Reasonableness will be judged from the perspective of a reasonable law enforcement officer or agent. A use of force is "necessary" when it is reasonably required to carry out the authorized officer's or agent's law enforcement duties in each situation, considering the totality of facts and circumstances of the situation.

11. CBP policy addresses the deployment of less lethal devices and outlines the circumstances in which they may be utilized. Again, the use of less-lethal force must be both objectively reasonable and necessary to carry out the officer or agent's law enforcement duties. Crowd control devices and less lethal munitions are only utilized after events have become unlawful, and the appropriate warnings and time have been satisfied. Under CBP policy, chemical irritants may be utilized as a compliance tool on a subject offering, at a minimum, active resistance. Active resistance is a type of resistance where a subject physically opposes an officer or agent's control efforts. Kinetic impact can be used on a subject in response to assaultive resistance. Assaultive resistance under CBP policy is a physically manifested attempt or threat to inflict injury on CBP personnel, whether successful or not, which causes a reasonable apprehension of imminent bodily harm.

12. No CBP officer or agent is allowed to carry a less-lethal device until they have successfully completed CBP-approved initial course of instruction for such device and have been certified in its use.

13. Additionally, officers and agents receive training, at a minimum, four times per year on the legal application of force consistent with CBP Policy Guidance. All CBP employees have a duty to intervene in and/or report improper use of force by law enforcement personnel.

14. Any use of force incident involving CBP personnel may be reviewed or investigated both criminally, to ensure compliance with applicable law, as well as administratively, to ensure compliance with DHS and CBP policy. Any use of force incident involving CBP employees may be subject to an administrative review by the Office of Professional Responsibility (OPR) or local CBP management. By policy, each use of force event is reported to OPR, and OPR is currently physically present here at our Incident Command Post to ensure integrity and accountability of our use of force events.

15. CBP officers and agents are already required to, when feasible, and prior to the application of force, identify themselves and issue a verbal warning to comply with officers' or agents' instructions. In determining whether a warning is feasible under the circumstances, an officer or agent may be guided by a variety of considerations. These considerations may include whether a delay in issuing the warning is likely to increase the danger to the officer, agent, or others (including any victims or bystanders), or if a delay would result in a crime, including the commission of a crime, such as assault on a federal officer or agent. When an officer or agent does issue a verbal warning, the officer or agent should afford the subject a reasonable opportunity to voluntarily comply before applying force.

16. When officers and agents must make judgements in hostile situations, having a supervisor approve each application of force is impractical. After a protest has been deemed unlawful and warnings have been administered, the line of effort is protection of life and property. In all applications of force incidents, the calculus of "reasonableness" includes an allowance for the fact that law enforcement officers and agents are often forced to make split-second decisions. Officers and agents must make decisions about the amount of force that is necessary in a particular situation in circumstances that are tense, uncertain, and rapidly evolving. These principals are outlined distinctly in the CBP Use of Force Policy.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 19th day of June, 2025, at __Santa Monica, California.

_____
GREGORY K. BOVINO