**DECLARATION OF MARIO A. CANTON**

I, Mario Canton, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am the Regional Director for Region 9 of the Federal Protective Service (FPS), and I have served in that position since December 2012. Region 9 consists of the following states: California, Nevada, Arizona, and the Pacific Islands territories of Guam, Saipan, and American Samoa. In that role, I provide law enforcement supervision and direct 131 regional employees, 15 contractors, and more than 1,500 Protective Security Officers while overseeing security measures for more than 1,100 protected properties across the region. I manage the region's criminal investigative and intelligence, law enforcement and security, risk management, and contract security programs, along with all mission support functions. My primary place of duty is San Francisco, CA, but I arrived in Los Angeles on June 7, 2025.

3. Protests have been ongoing regularly in downtown Los Angeles and nearby since June 6, 2025. While the protests have been largely peaceful during daylight hours, they have regularly been followed by nightly criminal activity in the form of vandalism, destruction of property (including federal property), looting, arson, and assaults on federal officers. When interacting with individuals engaging in civil disorder targeting federal facilities and personnel, FPS abides by DHS and Agency-specific Use of Force policy as set forth in FPS Directive 15.5.1.2-01. When necessary to disperse crowds that threaten federal buildings, FPS officers primarily use Pepper Balls, which are non-lethal projectiles that break upon impact and release an extremely effective, high grade pepper irritant called PAVA as well as Oleoresin Capsicum, commonly known as pepper spray. When appropriate FPS will also use paint balls to mark suspects for later investigation.

4. The primary Federal facilities that have been the target for these protests are: the U.S. Courthouse located at 255 E. Temple St. in Los Angeles, the Federal building located at 300 N Los Angeles St. in Los Angeles, the HSI/DHS training facility

located at 6321 E. Alondra Blvd in Paramount, CA, and the Federal building located at 34 Civic Center Plaza in Santa Ana, CA.

5. As a result of these protests, my officers faced significant logistical and operational safety issues. For example, during the evening of June 6, 2025, a group of approximately 100 individuals defaced federal property around the vehicle entrance to the Federal building at 255 E. Temple St., with one individual throwing a chair at FPS officers. In response FPS officers deployed pepper ball from their pepper ball launcher to create a safe zone to mitigate risk of injury to officers and prevent federal infrastructure breach due to a rollup gate malfunction. One individual was observed breaking concrete pillars with a hammer in front of the Los Angeles Metropolitan Detention Center, distributing the broken concrete so that other individuals could throw them at FPS officers. The individuals, who were hiding behind dumpsters, continued to launch rocks, chunks of concrete, water bottles containing unknown liquids, cones, and scooters at officers. FPS Officers responded with deploying pepper balls, OC spray and one baton strike to effect an arrest.

6. The logistical and operational challenges were exacerbated by the delayed response that FPS received from the Los Angeles Police Department (LAPD). During the June 6 incident FPS Officers requested LAPD backup at 6:11 p.m. and LAPD had a delayed response, arriving at 7:32 p.m. When the LAPD did respond, they only cleared the city streets and did not assist FPS with removal of individuals who were threatening federal property.

7. To ensure the safety of my officers and the continuing performance of our official duties to protect federal property, facilities, and personnel in and around the Los Angeles area, FPS cross-designated U.S. Border Patrol Agents and U.S. Immigration and Customs Enforcement officers. On June 7, 2025, the National Guard arrived to assist with the protection of federal functions, facilities, and personnel.

8. With the assistance of the National Guard and DoD assets, FPS officers were and are able to continue with their federally mandated duties. Officer presence and

show of force of the California National guardsmen and the US Marines was a critical deterrent for criminal activity on Federal property.

9. Over the past week, large protests have continued to organize at Federal facilities, however the demeanor of the protesters has remained largely civil, in alignment with a peaceful demonstration, thereby curtailing our need for crowd intervention. Officer presence and show of force of the California National Guardsmen and the US Marines was a critical deterrent for criminal activity on Federal property. Finally, Mayor Karen Bass implemented a curfew (8:00 p.m. to 6:00 a.m.) in downtown Los Angeles from June 10-17. All of these combined efforts have been effective in suppressing rioters and facilitating peaceful demonstrations. The curfew coupled with officer presence and show of force of the California National Guardsmen and the US Marines was a critical deterrent for criminal activity on Federal property.

10. The FPS has continued to be the lead law enforcement agency regarding the protection of Federal facilities, property, and people thereon. National Guard and DoD personnel have provided assistance in a support role. Currently, the National Guard/DoD on-scene Commanders meet with FPS Command staff twice a day to discuss daily plans and receive updated intelligence regarding activity in and around the Federal facilities. There is an FPS law enforcement officer with or near the National Guard/DoD personnel when they are on duty at all locations.  If an incident does occur at the FBI building a designated quick response team of FPS officers are available within minutes to respond.

11. It is my understanding that the plaintiffs in this case are seeking to have federal law enforcement officers enjoined from (1) dispersing, threatening or assaulting members of the press or legal observers; (2) directing crowd control devices on people who do not pose a threat to law enforcement; (3) directing crowd control devices at people engaged in illegal activity who do not pose a threat to law enforcement; (4) using crowd control devices without giving two separate warnings to targeted individuals; and (5) using crowd control devices that contain chemical irritants without first obtaining

express approval from an on-scene commander in response to a specific act of violence personally witnessed by that on-scene commander.

12. With respect to the first request, at no time are officers under my command directed to threaten or assault any member of the public engaged in lawfully exercising their First Amendment rights, including members of the press and/or legal observers. If officers under my command do order the dispersal of members of the press and/or legal observers, it is done because they are intermingled with the crowds that have otherwise been ordered to disperse or dispersal is necessary for the protection of the members of the press or legal observers as well as the federal officers. An order enjoining FPS officers from dispersing members of the press and/or legal observers simply because of their status, would prevent the safe and efficient dispersal of crowds that would make dangerous situations more dangerous for everyone involved.

13. With respect to the second and third requests, FPS officers are trained and equipped to use crowd control techniques not only to protect law enforcement but to also prevent the destruction of government property, trespass onto federal property or illegal entry into a federal building, consistent with FPS's statutory mandate under 40 U.S.C. § 1315. An order enjoining FPS officers from using crowd control techniques to protect federal property would invite the wanton destruction of federal property and allow people to break into federal buildings while FPS officers would be unable to act prior to the offense taking place.

14. With respect to the fourth request, FPS officers are often faced with imminent threats to federal property such as commercial grade fireworks or Molotov cocktails that have the potential to burn federal buildings. While FPS does provide verbal dispersal warnings over loudspeakers whenever possible, requiring such warning even when imminent threats exist would expose the officers and the federal facilities to unnecessary risk.

15. With respect to the fifth request, as discussed above, FPS officers are frequently called upon to prevent the imminent destruction of federal property or harm to

federal officers. The most effective crowd control techniques in those situations are those that use chemical irritants to temporarily incapacitate the individuals attempting to cause harm and force them away from the facility. To require federal officers to obtain prior approval before deploying such crowd control techniques would unnecessarily expose the officers to increased risk of harm and allow the individuals seeking to engage in the violent acts an opportunity to commit the acts while the officers were waiting for approval, thereby risking harm to federal officers and federal facilities and functions they are protecting.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

      Executed on June 19, 2025, at Los Angeles, California.

MARIO A CANTON
Digitally signed by MARIO A CANTON
Date: 2025.06.19 21:26:10 -07'00'

_____
MARIO A. CANTON