## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., | Case No. 2:25-cv-05563 |
| Plaintiffs, | **DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| v. | |
| KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

## <u>DECLARATION OF ERNESTO SANTACRUZ, JR.</u>

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     I have been employed by ICE, or its predecessor Immigration and Naturalization Service (INS), since May 2002. Prior to my position as FOD, I served as the ERO Los Angeles Deputy Field Office Director, Acting Assistant Field Office Director, and Assistant Field Office Director. I have also served ERO as a

1

Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent. Prior to the creation of ICE, I served as a Detention Enforcement Officer with INS.

3.    I provided the attached three declarations detailing the violence and civil unrest federal officers have experienced in the Los Angeles area since June 6, 2025, in the lawsuit, *Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed June 9, 2025), Appeal No. 25-3727 (9th Cir. filed June 12, 2025). True and correct copies of these declarations are attached hereto as Exhibits 1-3.

4.    As the FOD for ERO Los Angeles, I direct and oversee ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national

security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

5.      Beginning on or about Friday, June 6, 2025, federal law enforcement officers, including ICE officers and special agents, conducted immigration enforcement operations in several locations in the Los Angeles area. In some areas, these officers were met with violent mobs who impeded the operations by assaulting the federal law enforcement officers. In addition, violent opportunists took advantage of protests at federal buildings to attack federal officers with rocks, fireworks, and other objects, and to destroy federal property. The delayed and insufficient response from state and local officials to this violence led to the deployment of California National Guard members and U.S. Marines to the Los Angeles area. Since their deployment, and in concert with the involvement of state and local law enforcement officials to address civil unrest at federal properties through the Los Angeles area, the violence at protests and operations in the Los Angeles area has greatly diminished, allowing for federal buildings and courthouses to resume normal operations and federal officers to enforce federal

laws in the Los Angeles area.

6.      I did not witness, nor am I aware of, any ICE employee knowingly targeting journalists, legal observers, or peaceful protestors with less lethal munitions and/or crowd control devices.

7.      I understand that Plaintiffs allege that ICE officers and special agents were present at the Santa Ana Federal Building on Monday, June 9, 2025. While some ICE special agents were present, they did not deploy any less lethal munitions and/or crowd control devices. Similarly, some ICE officers and special agents were present near the Home Depot in Paramount, California, on Saturday, June 7, 2025. They also did not deploy any less lethal munitions and/or crowd control measures.

8.      The only ICE employees who are authorized to use chemical crowd dispersal devices and diversion devices, such as flashbangs, are highly trained elite special agents and deportation officers who are members of the HSI and ERO Special Response Teams (SRTs).

9.      SRT agents and officers are trained to serve high-risk warrants under hazardous conditions, arrest dangerous criminals, and assist other law enforcement agencies during critical incidents.

10.     In responding to public safety threats, ICE officers and special agents are bound by the DHS use of force policy titled, *Update to the Department Policy on the Use of Force* (Feb. 6, 2023) (Use of Force Policy), available at:

https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf. The Use of Force Policy is guided by the Fourth Amendment as the constitutional baseline for permissible use of force by law enforcement officers and special agents in the course of their duties. The general principle undergirding the Use of Force Policy is the respect for human life and the communities served. To that end, the Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied. Further, physical force must be discontinued when resistance ceases or when the incident is under control.

11.    ICE law enforcement officers are trained in a variety of techniques to aid in appropriately resolving encounters, to include de-escalation where possible. ICE law enforcement officers are encouraged to employ tactics and techniques that effectively bring an incident under control while promoting public safety and minimizing the risk of unintended injury or serious property damage. However, recognizing the seriousness of public safety threats ICE law enforcement officers may encounter, the Use of Force Policy does not impose a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

12.    The Use of Force Policy requires ICE law enforcement officers, when feasible, prior to the application of force, to attempt to identify themselves and issue a verbal warning to comply with instructions. However, whether a warning is feasible under the circumstances requires the ICE law enforcement officer to be guided by several considerations, including, but not limited to, whether the resulting delay is likely to increase danger to the ICE law enforcement officer or others, result in the destruction of evidence, allow for a subject's escape, or result in the commission of a crime. However, when circumstances allow for a warning to be issued, ICE law enforcement officers are trained to afford subjects a reasonable opportunity to voluntarily comply before applying force. In an exigent circumstance, for self-defense or defense of another, ICE law enforcement officers are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances. However, the Use of Force Policy strictly prohibits the use of excessive force and warns its officers that DHS does not tolerate excessive force and constitutes misconduct. Under the policy, engaging in excessive force or failing to report the use of excessive force will subject the officer to administrative and criminal penalties.

13.    I have reviewed Plaintiffs' proposed order submitted with their application for a temporary restraining order. The items requested are unnecessary and would endanger the safety of law enforcement personnel and the public. First, Plaintiffs'

request to enjoin DHS from dispersing or engaging in behavior that may be

perceived as "threatening" or "assaulting" by the press or legal observers, and only

allowing ICE law enforcement officers to ask press or legal observers to change

location to avoid disrupting law enforcement, as long as the press or legal

observers have sufficient opportunity to report and observe, is unworkable. ICE

law enforcement officers are responsible for securing the impacted area and may

be unable to differentiate between members of the press and other participants.

Press markings are publicly available and while officers may have no reason to

limit press access, their ability to differentiate between actual press and those who

have come by press markings through fraudulent means cannot be determined in

real-time. Legal observers are even less easily identifiable. When ICE law

enforcement officers give a dispersal command for safety reasons, all parties are

expected to comply. Any delay in compliance or the ability to respond to a lack of

compliance poses a risk to officer safety, public safety, and the safety of any press

who may be present.

14.    Second, Plaintiffs' request to enjoin DHS from using crowd control

weapons, chemical irritants, and flash-bangs on people who are not posing a threat

to law enforcement ignores the realities of protecting officers and the public from

violent opportunists who use crowds to assault law enforcement officers. Crowd

control devices are used after crowds have been ordered to disperse, fail to do so,

and engage in criminal and assaultive behavior towards law enforcement officers and the public. Due to the nature of some crowd devices, such as CS gas and flash-bangs, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers may be impacted due to their proximity to persons who are engaged in violent and/or criminal behavior. These crowd control devices are designed and used not to cause physical injury but to protect law enforcement officers and the public from violent attacks. Moreover, consistent with the DHS Use of Force Policy, ICE law enforcement officers only use force that is necessary and reasonable based on the totality of the circumstances. ICE law enforcement officers are trained to engage those individuals who pose the greatest threat based on this reasonableness standard. ICE law enforcement officers are trained to give verbal commands and those individuals who do not comply with these commands may be perceived as a potential threat. The ICE law enforcement officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and refusal to leave a restricted area.

15.    Third, Plaintiffs' request to enjoin DHS officers from firing kinetic impact projectiles or flash-bangs at identified wrongdoers, if doing so could result in

injury to a person who is not posing a threat to law enforcement, is unnecessary and unworkable. To my knowledge, no ICE law enforcement officers used kinetic impact projectiles against any individuals during any protests identified in the Plaintiffs' *ex parte* application for a temporary restraining order. As stated previously, flash-bangs may inadvertently impact persons who fail to disperse pursuant to a lawful order and are in near proximity to an identified person engaged in violent and criminal behavior towards law enforcement officers and members of the public. Prohibiting the use of flash-bangs, which cause a loud bang noise and flash, would take away a valuable less-lethal tool for law enforcement officers to protect themselves and others. Also, consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to utilize direct impact munitions only on those individuals who pose a direct threat to law enforcement. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include the utilization of kinetic impact or chemical munitions and/or diversionary devices. ICE law enforcement officers are trained to give dispersal orders prior to the utilization of any of the aforementioned law enforcement tools when practical, and those individuals who do not heed these orders may be exposed to any or all of these. In short, those individuals who do not disperse when receiving the command to do so, identify themselves as a potential threat to law enforcement.

9

16.    Fourth, Plaintiffs' request to enjoin DHS officers from using any crowd control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individuals, where the messages explain that officers may employ crowd control weapons and must give the targeted individuals sufficient time to avoid the use of force, is both unnecessary and unworkable. Consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to give warnings when operationally feasible. A blanket requirement for two separate warnings would prevent officers from responding to exigent circumstances where the utilization of these tools could prevent harm to the public or officers. It is the subject's behavior that dictates the timeline of the utilization of these tools and if the subject or crowd behavior requires a more immediate response, officers cannot and should not compromise safety to meet an arbitrary two-warning standard. In short, ICE law enforcement officers will give commands and warnings to avoid unnecessary exposure, however, ICE law enforcement officers are permitted to use necessary force as appropriate based on the totality of circumstances.

17.    Lastly, Plaintiffs' request to enjoin DHS officers from using kinetic impact projectiles containing chemical irritant unless expressly approved by an on-scene supervisor in response to specific acts of violence that the supervisor personally witnessed, is unworkable. The on-scene commander approves all operational

contingency plans and the utilization of any impact projectiles and chemical munitions as required. The dynamic nature of operations does not always allow the supervisor to be on scene or personally witness rapidly evolving situations which may require the use of such munitions. ICE law enforcement officers are trained to use discretion and follow all policies when deploying chemical munitions and specialty impact munitions. Regardless of circumstance, all law enforcement officers are held to the necessary and reasonable standard. The deployment of these tools is dictated by the totality of circumstances facing the officer in real-time. The delay required by supervisory notification or presence would unnecessarily place law enforcement officers and community members in harm's way.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 19th day of June 2025.

ERNESTO M SANTACRUZ JR

Digitally signed by ERNESTO M SANTACRUZ JR
Date: 2025.06.19 21:15:36 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

# EXHIBIT 1

# TO DECLARATION OF

# ERNESTO SANTACRUZ, JR.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,<br><br>Defendants. | Case No. 3:25-cv-04870<br><br>**DECLARATION OF ERNESTO SANTACRUZ, JR.**<br><br>Hon. Charles R. Breyer<br><br>United States District Judge |

## DECLARATION OF ERNESTO SANTACRUZ, JR.

I, Ernesto Santacruz, Jr., hereby declare:

1.    I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.    I have been employed by ICE, or its predecessor Immigration and Naturalization Service (INS), since May 2002. Prior to my position as FOD, I served as the ERO Los Angeles Deputy Field Office Director, Acting Assistant Field Office

1

Director, and Assistant Field Office Director. I have also served ERO as a Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent. Prior to the creation of ICE, I served as a Detention Enforcement Officer with INS.

3.      As the FOD for ERO Los Angeles, I direct and oversee ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which consists of 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which

consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

4.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

5.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

6.      ERO Los Angeles officers are authorized to execute civil immigration arrest

warrants for aliens ordered removed by immigration judges, aliens subject to

expedited removal orders, and aliens for whom ERO officers have probable cause

of their removability. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1357; *see also* 8 C.F.R.

§§ 235.3(b), 236.1(b), 241.2, 287.5(e), 287.8(c).

7.      On Friday, June 6, 2025, ICE conducted immigration enforcement

operations in several locations in the Los Angeles area. A crowd of people gathered

at the site of an ICE law enforcement operation in the Garment District, tried to

prevent ICE authorities from leaving in their official vehicles, and threw objects at

the vehicles. Members of the crowd walked and ran alongside the vehicles creating

dangerous conditions for both the officers and crowd. One protestor attempted to

stop a law enforcement van's progression by standing directly in front of the van

and placing his hand on the vehicle's hood. The man also backpedaled in front of a

departing SUV, then tripped and fell in front of the vehicle. Fortunately, the driver

of the SUV was able to reverse and drive around him without harming him.

Individuals arrested during the immigration enforcement operation were taken to

the ERO facility in the federal building at 300 N. Los Angeles Street for processing.

8.      At 3:23 p.m. on June 6, Mayor Karen Bass posted on X: "This morning, we

received reports of federal immigration enforcement actions in multiple locations in

Los Angeles. As Mayor of a proud city of immigrants, who contribute to our city in

so many ways, I am deeply angered by what has taken place. These tactics sow terror in our communities and disrupt basic principles of safety in our city. My Office is in close coordination with immigrant rights community organizations. We will not stand for this."

9.      At about 5:00 p.m., I personally observed protesters pass by the front of the 300 North Los Angeles Street building heading northwest on Los Angeles Street. However, the situation turned violent and riotous as the marchers turned right and headed southeast down East Aliso Street, and then headed south on North Alameda Street.

10.      Around this time, the number of demonstrators swelled to approximately 500 at 300 North Los Angeles Street, in downtown Los Angeles, and an additional 300 at an underground parking garage gate off of North Alameda Street. This gate leads to a multilevel parking structure under all of the federal buildings in this complex, including a Veterans Affairs (VA) medical facility, the Roybal Courthouse, the 300 North Los Angeles Street Federal building, and the Metropolitan Detention Center.

11.      I observed that approximately five Federal Protective Service (FPS) inspectors, who use security expertise to protect federal facilities and protect employees, were pinned down in a defensive position by protesters and severely outnumbered while trying to defend the damaged back Alameda Street gate. The

protestors were throwing concrete chunks, bottles of liquid, and other objects at the FPS officers, as well as attempting to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damaged federal property. The FPS officers defended the parking garage entrance against the protesters who were violently trying to break open the garage gate and break into the federal building complex.

12.      At that time, just inside the federal building, approximately 130 aliens arrested by ICE earlier in the day were being processed by federal immigration officers.

13.      I feared for the safety of all the office workers, federal employees, and lawfully detained aliens in the building. This being late on a Friday afternoon, I had to call all available officers in the building to report to the back Alameda Street gate to prevent FPS from being overrun, which would have resulted in a breach of the entire federal complex. All available ERO officers and HSI agents reported to the location. The ICE officers formed a line of protection in front of the garage entrance and held the line by using pepper balls and other alternatives to lethal force, aiming to minimize harm and de-escalate situations. The combination of FPS, ERO, and HSI law enforcement officers successfully prevented a breach and held the line from approximately 5:15 p.m. to 10:30 p.m., including about an hour and a half before the Los Angeles Police Department (LAPD), having been called by FPS,

arrived on scene to push the crowd to Temple Avenue.

14.     During this time, I observed that the demonstrators continued to be violent, using chairs, dumpsters, and other items as weapons against federal law enforcement officers.

15.     Thereafter, LAPD responded to the request from FPS for assistance and according to media reports, indicate that their response was delayed due to "significant traffic congestion, the presence of demonstrators, and…the fact that federal agents had deployed irritants into the crowd before LAPD's arrival."

16.     At approximately 7:00 p.m., approximately two hours after the protesters congregated in the area, LAPD declared an "unlawful assembly," ordered protestors to leave, and gave them 5 minutes to comply. The crowd did not comply. By 8:00 p.m., LAPD blocked the crowd's path to the Metropolitan Detention Center. Protestors threw large chunks of concrete at those officers. The LAPD fired non-lethal foam projectiles and bean bag rounds in response. The federal building was heavily vandalized.

17.     The demonstrators had all departed by 11:00 p.m., with the LAPD officers following them away from the property. However, there was damage to both the Federal Building at 300 North Los Angeles Street and the Edward R. Roybal Federal Building and United States Courthouse at 255 East Temple Street, which is next door. Both locations were heavily vandalized, the window to the guard shack

was broken, there was evidence of tampering on the retractable anti-vehicle
barriers, and the roll up entrance gate was working sporadically. Federal law
enforcement officers secured the entrance gate throughout Friday night.

18.     On the next morning of Saturday, June 7, 2025, while federal officers
prepared for an immigration enforcement operation at a Department of Homeland
Security office in Paramount, California, a large crowd gathered. A large
contingent of approximately 110 Customs and Border Protection (CBP) officers
had arrived from the San Diego area to assist with immigration enforcement
operations and as a precautionary measure in the aftermath of Friday night's
violence. Prior to the start of the immigration enforcement action, these CBP
officers stood in uniform in an industrial park in advance of discussing the day's
upcoming operations.

19.     Coincidently, a Home Depot retail store – which was not the target of any
intended operation – was located just across the street from the DHS office parking
lot being used for staging.

20.     A large crowd gathered and blocked traffic in the area. The crowd became
violent and attacked the ERO and CBP officers. This led to about seven hours of
non-stop fighting, from about 9:30 a.m. to approximately 5:00 or 6:00 p.m. The
violent crowd boxed in ERO and CBP officers throwing mortar-style fireworks
with multiple explosions, rocks and mangos at them, and used shopping carts to

barricade the street, prompting our officers to try clear a path so federal vehicles could enter and exit. One ERO officer was trapped inside her law enforcement vehicle when the crowd surrounded it, pounding it, shaking it, and violently pummeling it with stones, necessitating a rescue from other officers on scene. A protester shattered the wrist of a CBP officer with a thrown object. The violent and riotous crowd set at least one vehicle on fire and possibly also set a propane tank on fire, which exploded and thankfully did not injure anyone.

21.    HSI reports that the perimeter fence of the DHS office in Paramount was cut in two places, three government vehicles were damaged, the business park sign was vandalized, and mortar-style fireworks with multiple explosions were thrown at the federal officers. In addition, at approximately 4:00 p.m., the Los Angeles Sheriff's Department (LASD) declared an "unlawful assembly" in Paramount, and the protest spread to the neighboring Compton area.

22.    Later that Saturday night, another protest formed in the vicinity of the Federal complex at 300 N. Los Angeles Street, near the location of the previous night's riot, at North Alameda Avenue and East Temple Street. According to media reports, the LAPD eventually declared this to be an unlawful assembly.

23.    I was informed by Homeland Security Investigations on the morning of Sunday, June 8, National Guard troops arrived in downtown Los Angeles. Specifically, 300 National Guard troops deployed to Paramount, Compton, and

9

downtown Los Angeles.

24.    On Sunday afternoon, at around 3:00 p.m., a large crowd of people marched

from the steps of Los Angeles City Hall to the 300 N. Los Angeles Street federal

complex. Protestors confronted a line of federal agents stationed outside. LAPD

issued a citywide Tactical Alert. Shortly thereafter, the LAPD issued a dispersal

order and made additional arrests.

25.    Then, protestors entered the 101 Freeway in downtown Los Angeles,

blocking the Aliso Street off-ramp. California Highway Patrol (CHP) officers

dispersed the crowd by 5 p.m. and moved them to the Civic Center.

26.    At approximately 9:00 p.m., LAPD declared the downtown protest to be an

unlawful assembly and ordered protestors to leave. The protesters did not leave.

They continued to move through downtown, setting off commercial-grade

fireworks toward federal officers and throwing objects at passing law enforcement

vehicles. The protestors lit fires in dumpsters and trash bins and looted at least one

store. Protestors vandalized dozens of buildings with graffiti, including the Federal

Courthouse and LAPD Headquarters.

27.    By the end of the weekend, the Federal building at 300 N. Los Angeles

Street was vandalized in numerous locations, pieces of the bollards used for

building security were broken, and the security checkpoint was in ruins. Numerous

federal officers and agents have been injured by projectiles thrown at them such as

10

rocks, water bottles, and bricks.

28.     Many law enforcement personnel, including the five FPS officers who initially held the North Alameda Street gate while severely outnumbered.  On Monday, June 9, at approximately 5:00 p.m. additional protests are formed at the 300 North Los Angeles Street federal complex, as well as at the Federal Building in Santa, Ana, Orange County, California. Based on federal agency reports, a crowd of 1,000 demonstrators gathered near the Roybal Federal Building. At this time a demonstrator drove by the building and fired paintballs at the FPS inspectors, hitting at least one in the head and neck. At the Santa Ana Federal Building, violent protestors attacked a 13-passenger federal van carrying multiple aliens and officers, rocking the vehicle, and smashing the windows. The violent protestors also damaged multiple vehicles in the surrounding parking lot.

29.     This federal complex was largely closed today Monday will again be closed Tuesday, due to the civil unrest. This is a disruption for the many federal agencies working in this building, as well as the co-located federal courthouse, VA medical facility, and Federal Bureau of Prisons facility.

30.     From what I understand, the LAPD reported they are on tactical alert and declared a partial mobilization of 400 additional officers.

31.     The aggressive horde at the Roybal Building moved downtown to Little Tokyo and City Hall later in the evening, where they clashed with LAPD officers,

injuring five, and also injured five LAPD horses. LAPD deployed less-lethal munitions and made multiple arrests.

32.    LAPD declared an unlawful assembly for the area of the Civic Center part of Los Angeles and had to shut down Route 101 in central Los Angeles in response to demonstrators throwing objects onto the freeway and damaging multiple police vehicles.

33.    Even with the LAPD, LASD, and CHP all engaged in the ensuing law enforcement activities, I believe the safety of local federal facilities and safety of those conducting immigration enforcement operations in this area of responsibility requires additional manpower and resources. Aside from the horrendous actions of the violent demonstrators at the various federal protected locations, I am also aware that there were significant instances of demonstrators posting the location, images, and family information of federal law enforcement employees online in an attempt to dox, threaten, and obstruct federal law enforcement personnel and their families and impede lawful federal activity. Demonstrators have also been posting the locations of federal law enforcement employees conducting immigration enforcement operations to threaten and obstruct their work.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best

of my information, knowledge, and belief.

Executed on this 11th day of June 2025.

ERNESTO M
SANTACRUZ
JR

Digitally signed by
ERNESTO M
SANTACRUZ JR
Date: 2025.06.11
08:16:31 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

# EXHIBIT 2

# TO DECLARATION OF

# ERNESTO SANTACRUZ, JR.

## IN THE NINTH CIRCUIT COURT OF APPEALS

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Appeal No. 25-3727 |
| | **DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | |
| Defendants. | |

## <u>DECLARATION OF ERNESTO SANTACRUZ, JR.</u>

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     The purpose of this declaration is to provide an update on the current conditions on the ground in the Los Angeles Area of Responsibility (AOR) with respect to immigration enforcement operations and the security of federal property and personnel. This declaration supplements the information in my June 11, 2025

1

declaration filed with the Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order. *See Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed June 11, 2025), Dkt. 22-1.

3.    It is my understanding that, at this time, approximately 3,000 Department of Defense personnel, which includes approximately 2,000 members of the California National Guard, are in the Los Angeles area providing protection of federal personnel, property, and functions.

4.    The 300 North Los Angeles Street Federal Building in downtown Los Angeles, California continues to be the site of daily protests, and it has been closed to the public since June 9, 2025. While the facility is largely non-operational, members of the National Guard have been essential to protect the building, the Edward R. Roybal Federal Building and U.S. Courthouse, and the Federal Bureau of Prisons Metropolitan Detention Center - all located in the same city block - from further damage or attempts at incursion and provide security to those federal employees working inside, like myself.

5.    Prior to the National Guard's deployment, rioters and protestors assaulted federal, state, and local law enforcement officers with rocks, fireworks, and other objects. They also damaged federal property by spray painting death threats to federal law enforcement officers. Photos and videos for those assaults and threatening graffiti can be found here: https://www.dhs.gov/news/2025/06/10/dhs-

sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited June 15, 2025). Several suspects have been arrested for possessing Molotov cocktails and assaulting federal officers during recent civil unrests in downtown Los Angeles, Paramount, and Santa Ana. *See* https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on June 15, 2025).

6.      It is my understanding that federal facilities in Westwood, Santa Ana, Long Beach, and other locations in California have been the site of continuing violent protests during the last week. For example, on June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside 300 North Los Angeles Federal Building and Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles", available at:https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited June 15, 2025). One suspect was taken into custody after spitting on a Federal Protective Service (FPS) officer and National Guard members. Protestors also threw red paint on FPS and National Guard members.

3

7.      The National Guard has been absolutely helpful this week by protecting

federal property and personnel during immigration enforcement operations.

Through their protective efforts, the guards have assisted on most operations that

ICE and its federal partners conducted this week. The guards are acting as a

security element, accompanying federal officers and agents during operations to

ensure safety of all involved.

8.      On Saturday, June 14th, the protests at the 300 N. Los Angeles Federal

Building continued throughout the day. The National Guard has been protecting

the entire perimeter of the federal complex all week, as protestors are gathered

throughout the area continuously. Protestors blocked the parking garage exits on

Alameda Street, preventing ICE transport vehicles from exiting with

approximately 130 immigration detainees. As the protests grew, ICE was forced to

not utilize the U.S. Marshall's transport bus as originally intended. The National

Guard cleared a path for several unmarked vans to remove the detainees in small

groups. The National Guard's assistance was key to protecting ICE officials'

ability to continue these immigration enforcement operations.

9.      Having the National Guard at our fingertips as a Quick Reaction Force is

key to maintaining officer safety and continuing our immigration enforcement

operations. The resources that they bring to protect federal immigration officials

from interference in their enforcement efforts and their presence at federal facilities

is the key to continuing operations and enforcing federal law in the Los Angeles

area.

10.     The guard's presence prevented other incidents like the one in Paramount

last Saturday, discussed in my prior declaration. There, an unruly mob attacked

ERO and U.S. Customs and Border Protection (CBP) officers, engaging them in an

hours-long fight while the local law enforcement did not intervene for several

hours. I believe that the guard's presence since their deployment to Los Angeles

has prevented this from reoccurring during our subsequent immigration

enforcement operations and has been critical to maintaining the safety of all law

enforcement officers involved.

11.     The National Guard has a Quick Reaction Force that is now a critical

resource available to us, should something like June 6th incident at the federal

building in downtown Los Angeles, or the incident in Paramount, take place in the

future.

12.     The presence of the National Guard and other Department of Defense

personnel has enabled ICE to continue to carry out its congressionally mandated

duties in the Los Angeles area. It is the additional manpower and resources

provided by these guards – indeed, their mere presence – that has ensured the

safety of local federal facilities and the safety of those enforcing federal laws here

this week.

13.     If these resources were not at my disposal, our immigration enforcement

mission would be greatly impacted.  The safety of our continued operations would

be in doubt, placing both federal employees and the general public at an

unnecessarily greater risk.

14.     The National Guard, with approximately 900 troops assigned to protect

federal buildings, has also been instrumental in enhancing the ability to protect

federal property from damage or breach attempts.

15.     Our local law enforcement colleagues, including the Los Angeles Police

Department (LAPD), Los Angeles County Sheriff's Department (LASD), and

California Highway Patrol (CHP), have all engaged in taxing law enforcement

activities throughout the week, with the assistance of their mutual aid network. But

the National Guard provides resources and protective capabilities that are

unparalleled.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

under the laws of the United States that the foregoing is true and correct to the best

of my information, knowledge, and belief.

Executed on this 15th day of June 2025.

ERNESTO M
SANTACRU
Z JR

Digitally signed by
ERNESTO M
SANTACRUZ JR
Date: 2025.06.15
17:32:06 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

# EXHIBIT 3

# TO DECLARATION OF

# ERNESTO SANTACRUZ, JR.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Case No. 3:25-cv-04870 |
| | **SUPPLEMENTAL DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | Hon. Charles R. Breyer |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | United States District Judge |
| Defendants. | |

## <u>SUPPLEMENTAL DECLARATION OF ERNESTO SANTACRUZ, JR.</u>

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), Enforcement and Removal

Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field

Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     The purpose of this declaration is to provide an update on the current

conditions on the ground in the Los Angeles Area of Responsibility (AOR) with

respect to immigration enforcement operations and the security of federal property

1

and personnel. This declaration supplements the information in my June 11, 2025 declaration filed with the Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order. *See Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed June 11, 2025), Dkt. 22-1.

3.    It is my understanding that, as of June 18, 2025, approximately 3,000 Department of Defense personnel, which includes approximately 2,000 members of the California National Guard, are in the Los Angeles area providing protection of federal personnel, property, and functions.

4.    The 300 North Los Angeles Street Federal Building in downtown Los Angeles, California continues to be the site of daily protests and was closed to the public from June 9-16, 2025. Members of the National Guard have been essential to protecting the building, the Edward R. Roybal Federal Building and U.S. Courthouse, and the Federal Bureau of Prisons Metropolitan Detention Center - all located in the same city block - from further damage or attempts at incursion and provide security to those federal employees working inside, like myself.

5.    Prior to the National Guard's deployment, rioters and protestors assaulted federal, state, and local law enforcement officers with rocks, fireworks, and other objects. They also damaged federal property by spray painting death threats to federal law enforcement officers enforcing federal immigration laws. Photos and videos for those assaults and threatening graffiti can be found here:

https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited June 18, 2025) and include "Kill ICE," "Death to ICE," "Hang Trump," and "Dead Cops." Several suspects have been arrested for possessing Molotov cocktails and assaulting federal officers during recent civil unrest in downtown Los Angeles, Paramount, and Santa Ana. *See* https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on June 18, 2025).

6.      It is my understanding that federal facilities in Westwood, Santa Ana, Long Beach, and other locations in California have been the sites of continuing violent protests during the last week. Many of these protests have been directed at objecting to ICE operations and attempting to impede those operations. For example, on June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside the 300 North Los Angeles Federal Building and the Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles," available at: https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited June 18, 2025). One suspect was taken into custody after spitting on a Federal Protective Service (FPS) officer and

National Guard members. Protestors also threw red paint on FPS and National Guard members.

7.      The National Guard has been extremely helpful this week by protecting federal property and personnel during immigration enforcement operations. Through their protective efforts, the Guards have assisted on most operations that ICE and its federal partners conducted this week, enhancing the level of safety for ICE and its federal partners to proceed with those operations. The Guards are acting as a security element, accompanying federal officers and agents during operations to ensure safety of all involved.

8.      On Saturday, June 14th, the protests at the 300 N. Los Angeles Federal Building, which included protests directed at ICE operations, continued throughout the day. The National Guard has been protecting the entire perimeter of the federal complex all week, as protestors are gathered throughout the area continuously. Protestors blocked the parking garage exits on Alameda Street, preventing ICE transport vehicles from exiting with approximately 130 immigration detainees. As the protests grew, ICE was forced to not utilize the U.S. Marshall's transport bus as originally intended. The National Guard cleared a path for several unmarked vans to remove the detainees in small groups. The National Guard's assistance was key to protecting ICE officials' ability to continue these immigration enforcement operations.

9.      Having the National Guard at our fingertips as a Quick Reaction Force is key to maintaining officer safety and continuing our immigration enforcement operations. The Guard's Quick Reaction Force is available 24/7 to federal law enforcement officers conducting operations in the Los Angeles area if and when they encounter violent mobs or individuals impeding federal immigration enforcement operations or threatening the safety of federal officers. The resources that they bring to protect federal immigration officials from interference in their enforcement efforts and their presence at federal facilities enable federal law enforcement officers to continue operations and enforce federal law in the Los Angeles area.

10.      The Guard's presence prevented other incidents like the one in Paramount on June 7, 2025, discussed in my prior declaration. There, an unruly mob attacked ERO and U.S. Customs and Border Protection (CBP) officers, engaged them in an hours-long fight while the local law enforcement did not intervene for several hours. I believe that the Guard's presence since their deployment to Los Angeles has prevented this from reoccurring during our subsequent immigration enforcement operations and has been critical to maintaining the safety of all law enforcement officers involved.

11.      The presence of the National Guard and other Department of Defense personnel has enabled ICE to continue to carry out its congressionally mandated

duties in the Los Angeles area. It is the additional manpower and resources

provided by these Guards – indeed, their mere presence – that has ensured the

safety of local federal facilities and the safety of those enforcing federal laws here

this week.

12.    If these resources were not at my disposal, our immigration enforcement

mission would be greatly impacted. The safety of our continued operations would

be in doubt, placing both federal employees and the general public, including those

peacefully protesting ICE operations, at an unnecessarily greater risk. Because of

the current threat, we would not be able to carry out as many immigration

enforcement operations as we have been able to with the Guards' assistance.

13.    The National Guard, with approximately 900 troops assigned to protect

federal buildings, has also been instrumental in enhancing the ability to protect

federal property from damage or breach attempts.

14.    Our local law enforcement colleagues, including the Los Angeles Police

Department (LAPD), Los Angeles County Sheriff's Department (LASD), and

California Highway Patrol (CHP), have all engaged in taxing law enforcement

activities throughout the week, with the assistance of their mutual aid network. But

the National Guard provides resources and protective capabilities that are

unparalleled.

6

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 18th day of June 2025.

ERNESTO M
SANTACRUZ JR

Digitally signed by ERNESTO M
SANTACRUZ JR
DN: cn=ERNESTO M
SANTACRUZ JR, o=U.S.
Government, ou=People,
email=Ernesto.M.SantacruzJr@ice.
dhs.gov, c=US
Date: 2025-06-18T08:59:45-0700

_____

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

7