1    Matthew Borden, Esq. (SBN: 214323)
        borden@braunhagey.com
2    J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
3    Kory J. DeClark, Esq. (SBN: 310571)
        declark@braunhagey.com
4    Greg Washington, Esq. (SBN: 318796)
        gwashington@braunhagey.com
5    BRAUNHAGEY & BORDEN LLP
     747 Front Street, 4th Floor
6    San Francisco, CA 94111
     Telephone: (415) 599-0210
7
     Kevin Opoku-Gyamfi, Esq.
8    (pro hac vice)
        opokugyamfi@braunhagey.com
9    BRAUNHAGEY & BORDEN LLP
     118 W. 22nd Street, 12th Floor
10   New York, NY 10011
     Telephone: (646) 829-9403
11
     [Additional counsel on next page]
12
     Attorneys for Plaintiffs
13

     Peter J. Eliasberg, Esq. (SBN: 189110)
        peliasberg@aclusocal.org
     Jonathan Markovitz, Esq. (SBN: 301767)
        jmarkovitz@aclusocal.org
     Adrienna Wong, Esq. (SBN: 282026)
        awong@aclusocal.org
     Meredith Gallen, Esq. (SBN: 291606)
        mgallen@aclusocal.org
     Summer Lacey, Esq. (SBN: 308614)
        slacey@aclusocal.org
     Jacob Reisberg, Esq. (SBN: 329310)
        jreisberg@aclusocal.org
     Mohammad Tajsar, Esq. (SBN: 280152)
        mtajsar@aclusocal.org
     ACLU FOUNDATION OF SOUTHERN
     CALIFORNIA
     1313 W 8th Street, Ste 200
     Los Angeles, CA 90017
     Telephone: (213) 977-9500

     Peter Bibring, Esq. (SBN: 223981)
        peter@bibringlaw.com
     Law Office of Peter Bibring
     2140 W Sunset Blvd # 203
     Los Angeles, CA 90026
     Telephone: (213) 471-2022

14

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

15

16

17    Los Angeles Press Club, NewsGuild -
      Communications Workers of America, Sean
18    Beckner-Carmitchel, Ryanne Mena, Lexis-
      Olivier Ray, Charles Xu, Benjamin Adam
      Climer, and Abigail Olmeda,

19                    Plaintiffs,

20            v.

21    Kristi Noem, in her official capacity as
22    Secretary of Homeland Security; U.S.
      Department of Homeland Security,

23                    Defendants.

24

Case No. 2:25-CV-05563-HDV-E

**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

Date:        August 21, 2025
Time:        10:00 a.m.
Judge:       Hon. Hernán D. Vera
Location:    Courtroom 5B, 5th Floor

25

26

27

28

1  Additional Counsel of Record for Plaintiffs:

2  Carol A. Sobel, Esq. (SBN: 84483)
       carolsobellaw@gmail.com
3  Weston Rowland, Esq. (SBN: 327599)
       rowland.weston@gmail.com
4  Law Office of Carol A. Sobel
   2632 Wilshire Boulevard, #552
5  Santa Monica, CA 90403
   Telephone: (310) 393-3055
6
   Paul Hoffman, Esq. (SBN: 71244)
7      hoffpaul@aol.com
   Michael Seplow, Esq. (SBN: 150183)
8      mseplow@sshhzlaw.com
   John Washington, Esq. (SBN 315991)
9      jwashington@sshhzlaw.com
   Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
10 200 Pier Avenue #226
   Hermosa Beach, CA 90254
11 Telephone: (310) 717-7373

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2  INTRODUCTION ...................................................................................................... 1

3  FACTUAL BACKGROUND ...................................................................................... 3

4  I.   DEFENDANTS HAVE REPEATEDLY INJURED PLAINTIFFS
5       THROUGH AN ONGOING, SUSTAINED COURSE OF CONDUCT
     THAT THREATENS PLAINTIFFS WITH RECURRENT INJURY ............................ 3
6
7  II.  DEFENDANTS' PATTERN AND PRACTICE OF USING EXCESSIVE
     FORCE IS OFFICIALLY SANCTIONED .................................................. 7

8  III. DEFENDANTS' ATTACKS ON PLAINTIFFS CAUSE CHILLING
9       EFFECTS AND OTHER CONTINUING, PRESENT HARM ........................ 9

10 IV.  PROCEDURAL HISTORY ........................................................... 10

11 ARGUMENT ....................................................................................... 10

12 I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................. 11

13      A.   DHS Is Systematically Violating Plaintiffs' First Amendment Right of Access . 12

14      B.   DHS Is Systematically Retaliating Against Plaintiffs for Exercising Their First
15           Amendment Rights ....................................................................... 15

16           1.   Plaintiffs Are Engaged in Protected Activities ......................... 15

17           2.   DHS's Use of Force Would Chill a Person of Ordinary Firmness from
18                Continuing to Engage in Protected Activity ............................. 16

19           3.   Plaintiffs' Protected Activity Was a Substantial Motivating Factor in Federal
                  Agents' Conduct ....................................................................... 17

20 II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE
21      COURT'S INTERVENTION ............................................................ 23

22 III. THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH
        STRONGLY IN FAVOR OF PLAINTIFFS ......................................... 24
23
   CONCLUSION .................................................................................. 25
24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..................................................................... 10

5

*Allee v. Medrano*,
    416 U.S. 802 (1974) .................................................................................... 11

6

*Am. Beverage Ass'n v. City & Cty. of S.F.*,
    916 F.3d 749 (9th Cir. 2019) ....................................................................... 24

7

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016) ....................................................................... 17

8

*Askins v. U.S. Dep't of Homeland Sec.*,
    899 F.3d 1035 (9th Cir. 2018) ..................................................................... 14

9

*Brown v. Entm't Merch. Ass'n*,
    564 U.S. 786 (2011) .................................................................................... 25

10

*Cmty. House, Inc. v. City of Boise*,
    490 F.3d 1041 (9th Cir. 2007) ..................................................................... 24

11

*Collins v. Jordan*,
    110 F.3d 1363 (9th Cir. 1996) ..................................................................... 16

12

*Consumer Opinion LLC v. Frankfort News Corp.*,
    No. 16-CV-05100-BLF, 2016 WL 6804607 (N.D. Cal. Nov. 17, 2016) ................ 11

13

*Creative Power Sols v. Energy Servs. Grp*,
    No. CV-21-01559-PHX-DLR, 2021 WL 4503455 (D. Ariz. Oct. 1, 2021) .............. 11

14

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) ....................................................................... 24

15

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ....................................................................... 11

16

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ..................................................................... 24

17

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................... 23

18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ....................................................................... 6

19

*Flynt Distrib. Co. v. Harvey*,
    734 F.2d 1389 (9th Cir. 1984) ...................................................................... 6

20

*Fordyce v. City of Seattle*,
    55 F.3d 436 (9th Cir. 1995) ........................................................................ 15

21

*Galvin v. Hay*,
    374 F.3d 739 (9th Cir. 2004) ....................................................................... 16

22

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011) ......................................................................... 15

23

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
    457 U.S. 596 (1982) .................................................................................... 25

24

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) ....................................................................... 10

25

26

27

28

MPA ISO OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939)...................................................................................................... 16

*Hartman v. Moore*,
   547 U.S. 250 (2006)...................................................................................................... 15

*Index Newspapers LLC v. United States Marshals Service*,
   977 F.3d 817 (9th Cir. 2020) ................................................................................. passim

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ................................................................................. 2, 15

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ........................................................................................ 24

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
   192 F.3d 1283 (9th Cir. 1999) ..................................................................................... 15

*Mills v. Alabama*,
   384 U.S. 214 (1966)...................................................................................................... 25

*Reed v. Lieurance*,
   863 F.3d 1196 (9th Cir. 2017) ..................................................................................... 14

*Terminiello v. Chicago*,
   337 U.S. 1 (1949)........................................................................................................ 16

*Turner v. Lieutenant Driver*,
   848 F.3d 678 (5th Cir. 2017) ....................................................................................... 25

*Ulrich v. City & Cty. of S.F.*,
   308 F.3d 968 (9th Cir. 2002) ....................................................................................... 17

*Uncanny Valley Productions, LLC v. Ingalls*,
   No. 18-cv-778-CAS, 2018 WL 6177240 (C.D. Cal. July 2, 2018) ............................ 11

*United States Olympic Committee v. Does 1-10*,
   No. C-08-3514 JSW (JL), 2009 WL 10703686 (N.D. Cal. Mar. 10, 2009) ................ 11

*Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*,
   460 F. Supp. 2d 1165 (C.D. Cal. 2006) ...................................................................... 23

*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005) ....................................................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................................ 24

# **INTRODUCTION**

Plaintiffs are journalist associations, reporters, legal observers, and non-violent protesters. Defendant Department of Homeland Security ("DHS") is needlessly assaulting Plaintiffs and their members, some on multiple occasions, at the ongoing protests over immigration raids in Southern California. Plaintiffs seek a preliminary injunction to stop DHS from chilling them from exercising their First Amendment rights at events within the Central District of California.

Since June 6, 2025, when the federal government launched a series of aggressive immigration raids using heavily armed, masked agents to round up people at workplaces, businesses, and on public streets,[1] DHS agents have used unnecessary, indiscriminate, and excessive force on people seeking to exercise their First Amendment rights to report on, observe, or object to what ICE is doing. DHS wielded such force at multiple protests in Central California from June 6 through June 9, in Pico Rivera on June 17, in Maywood on June 20, in Ladera Heights on June 23, in Los Angeles on July 7, and in Camarillo and Carpinteria on July 10. While the events have differed in size and character, DHS's violent, retaliatory conduct has not. Declarations and videos show DHS targeting journalists and legal observers, firing tear gas grenades at people, teargassing bystanders for no reason, shooting people in the head, smashing the hands of people recording the events with their phones, misusing crowd control weapons, indiscriminately firing into crowds, pointing loaded guns at people who are not threatening them, shooting people who are running away in the back, throwing tear gas at people while leaving the scene of an arrest, and attacking crowds without warning. DHS is misusing force in ways known to cause death and are causing serious injuries, such as burns, hematomas, wounds, concussions, avulsions, memory lapses, and brain contusions.

Plaintiffs are likely to succeed on their First Amendment access claims. In *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817, 824 (9th Cir. 2020), the Ninth Circuit affirmed an injunction preventing DHS from intimidating, dispersing, and using force against reporters and legal observers. As documented in forty eyewitness declarations that Plaintiffs submit in support of this motion, DHS is doing the exact same things now. Plaintiffs are

---

[1] *See Vasquez Perdomo et al v. Noem*, 2:25-cv-05605 (C.D. Cal.), filed June 20, 2025.

likely to succeed on the merits of their First Amendment access claims and will suffer irreparable

harm for the same reasons the Ninth Circuit gave in *Index Newspapers*, and this Court gave in *Los*

*Angeles Press Club v. City of Los Angeles*, No. 25-cv-5423-HDV-E, ECF 44 ("LAPD Case") at 9-

12.

    Plaintiffs are also likely to succeed on their retaliation claims. Defendant Kristi Noem has

publicly stated that "videotaping" ICE—an activity the Ninth Circuit has held is protected by the

First Amendment—is the kind of "violence" [2] against which DHS will "hit back hard."[3] As shown

in the Expert Declaration of Gil Kerlikowske, the former police chief of Seattle and former head of

Customs and Border Protection, DHS has engaged in a pattern of indiscriminate, unnecessary, and

excessive violence against reporters, legal observers, and protesters alike. The only reasonable

inference is that DHS—a repeat offender that the President told to use "big force" against the

protests—is retaliating against Plaintiffs for exercising their First Amendment rights. LAPD Case

at 10 (quoting *Index Newspapers*, 977 F.3d. at 827-829) (unnecessary violence is circumstantial

proof of retaliatory intent). As Defendants intended, this violence has chilled the constitutional

rights of Plaintiffs and others who want to exercise their First Amendment rights without risking

violence, death, and disability.

    The other equitable factors overwhelmingly favor issuing an injunction. As detailed in Mr.

Kerlikowske's declaration, the relief Plaintiffs seek is safe and workable. The balance of equities

thus tilts heavily in favor of Plaintiffs. The public interest also weighs strongly in Plaintiffs' favor.

The free press and peaceful protest are the cornerstones of our democracy, and the courts are the

guardians that must defend this public interest. *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

If the federal government can assault journalists and suppress dissent, it will have a monopoly over

the messaging about the protests and underlying ICE raids—exactly the evil that the First

Amendment was created to protect against.

---

[2] Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids," Forbes
Breaking News (Jul. 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.
[3] Interview with Kristi Noem, "'TRAIN WRECK MAYOR': Kristi Noem slams LA official", *Fox News,* YouTube
(June 2025), https://www.youtube.com/watch?v=ymYIXrH9pjg at 3:29.

DHS's arguments do not undermine Plaintiffs' entitlement to relief. On June 20, this court denied a TRO seeking similar relief on an emergency basis (without prejudice to a noticed motion for a preliminary injunction, like this one) on the grounds that Plaintiffs had provided evidence of wrongdoing only from June 7 through 9, 2025. The *same day* that TRO denial order was issued, DHS again launched tear gas and flash bang grenades against peaceful protesters (including three City Council members) and children in the City of Maywood. Since that day, DHS has continued on multiple occasions in numerous locations throughout the Central District to attack reporters, observers, and peaceful protesters as dissent over ICE raids has continued. DHS's pattern of ongoing violence, as intended, is chilling Plaintiffs from exercising their First Amendment rights. A preliminary injunction is necessary to protect them.

## **FACTUAL BACKGROUND**

## I.   **DEFENDANTS HAVE REPEATEDLY INJURED PLAINTIFFS THROUGH AN ONGOING, SUSTAINED COURSE OF CONDUCT THAT THREATENS PLAINTIFFS WITH RECURRENT INJURY**

On June 6, 2025, the Trump administration began conducting indiscriminate and terrifying immigration enforcement actions across Southern California. (Compl. ¶ 2.) DHS officers came in masks, wearing paramilitary gear, brandishing rifles, and started abducting community members from churches, carwashes, and ordinary places of business. (*Id*.) As word of these attacks spread, protests began. Californians concerned about their family members, congregation members, union members, and neighbors showed up at sites of raids to document what was happening, to remind the targeted community members of their legal rights, and to protest the federal government's invasion of their neighborhoods and violent separation of their families. (*Id*. ¶ 3.)

Protests, large and small, have recurred repeatedly after community members learn about ICE raids. Some are larger, like the ones on June 6 through 9, July 4, and July 10. Others are smaller, such as the ones on June 17, 20, 23, and 27 and July 7. The throughline of these events is that DHS agents at the protests have been deploying excessive, unnecessary, and retaliatory violence across the board— as promised by Secretary of DHS, Kristi Noem, and President Trump. (*Id*. ¶¶ 50, 57, 59-60.) At each protest, large or small, DHS has misused crowd control weapons (e.g., tear gas, rubber bullets, flash bangs and other munitions) or actual firearms to threaten, injure,

and deter journalists, legal observers and protesters from exercising their rights to assemble, protest and document these events. DHS is misusing crowd control weapons in ways that needlessly imperil everyone present (Gil Kerlikowske Decl., ECF 6-3, ¶¶ 13-50), and cause serious injuries. (Rohini Haar Decl., ECF 6-12, ¶¶ 16-20).

Plaintiffs have been directly injured by Defendants' pattern and practice of retaliatory, excessive force while they have engaged in First-Amendment protected activities:

- DHS agents shot journalist Plaintiff Ryanne Mena with a pepper ball when she was covering a protest, though she was physically distanced from protesters and not doing anything threatening. (Mena Decl., ECF 6-22, ¶¶ 16-18, 22.) The next day she went out to report, DHS shot her in the head with a rubber bullet, severely injuring her. (*Id.* ¶ 31.)

- DHS agents shot Plaintiff Sean Beckner-Carmitchel in the head with a teargas canister while he was reporting on a protest.  (Beckner-Carmitchel Decl., ECF 6-6, ¶ 13). At the next protest he covered, DHS agents shot him with a pepper ball. (Supp. Beckner-Carmitchel Decl., ECF 6-25, ¶¶ 8, 13.) The combination of these attacks physically destroyed Mr. Beckner-Carmitchel's press pass. (*Id.* ¶ 12; Supp. Rose Decl., ¶ 8.)

- DHS agents shot Plaintiff Lexis-Olivier Ray with pepper balls, once in the hand and multiple times in the back, as he was filming them. (Ray Decl., ECF 6-17, ¶¶ 27-29.)

- DHS agents shot Plaintiff Charles Xu, a legal observer, in the calf with a pepper ball as he was filming them arrest a protester. (Xu Decl. , ECF 6-8, ¶¶ 12-13.)

- DHS agents shot Plaintiff Benjamin Adam Climer in the hand with a tear gas canister while he was peacefully protesting, causing a wound that required sutures. (Climer Decl., ECF 6-7, ¶¶ 8, 11, 16-17.)

- DHS agents shot a rubber bullet at Plaintiff Abigail Olmeda's temple and at least five pepper balls at her body as she was peacefully holding up a sign that said, "Raids don't teach Justice – they teach fear. Education thrives on inclusion, not intimidation." . (Olmeda Decl., ECF 6-4, ¶¶ 2, 8-9, 12, 16-18.) The emergency room physicians who treated her after this incident suspected she had suffered a "brain bruise" and referred her to an orthopedist and a neurologist for follow-up care. (*Id.* ¶ 22.)

- Plaintiff Los Angeles Press Club's members and journalists employed by the Club's members have been assaulted by Defendants on multiple occasions, at multiple protests, and on multiple dates from June 6 through July 10. (Rose Decl., ECF 6-5 ¶¶ 14, 17-30; Supp. Rose Decl. ¶¶ 14-17; Marantos Decl. ¶¶ 2-4; Berg Decl. ¶¶ 2-3; R.R. Decl. ¶ 2 ). These attacks have, in turn, caused harm to the Club as an organization. (Rose Decl. ¶ 15; Suppl. Rose Decl. ¶¶ 6-10.)

- Plaintiff NewsGuild's members have been injured on multiple occasions, at multiple protests, and on multiple dates from June 6 through July 10 (Schleuss Decl., ECF 6-16, ¶ 3, 5-9; Taha Decl. ¶¶ 6-7; Marantos Decl. ¶¶ 2-4). And those harms have in turn caused harm to Plaintiff NewsGuild as an organization. (Schleuss Decl., ECF 6-16, ¶¶ 5-9-; Taha Decl. ¶¶ 5-6, 15-17.)

 

*DHS shot journalist Plaintiff Sean Beckner-Carmitchel in the head with a tear-gas canister*

Defendants' repeated attacks against Plaintiffs and their members are part of a sustained course of conduct that has not only injured them on multiple occasions, but also has injured numerous other journalists, observers, and protesters. In addition to the evidence of repeated violations of Plaintiffs' rights cited above, the record is replete with evidence of DHS assaults against other peaceful protesters and journalists, involving the same retaliatory misuse of the same weapons that injured each of the Plaintiffs in this case. (Soqui Decl., ECF 6-23, ¶¶ 5, 7  (reporter

1  shot in face with pepper ball on June 8); Barbadillo Decl., ¶¶ 2, 7-13 (legal observer subjected to

2  multiple volleys of tear gas and pepper balls, causing vomiting, on June 8); Aguiluz Decl. ¶¶ 2, 13,

3  20-22 (Mayor of Maywood teargassed alongside protesting constituents while inquiring about DHS

4  detention on June 20; Nadolishny Decl. ¶¶ 8-11 (protester shot on feet, legs, and ear with pepper

5  balls on July 10); Alcorn Decl., ECF 6-15; Anderson Decl.; A.R. Decl.; Bell Decl., ECF 6-10.;

6  Berg Decl.; Carbonati Decl., ECF 6-9; Coven Decl.; Cruz Decl., ECF 6-11; De La Riva Decl.;

7  Dransfeldt Decl.; Fisher Decl.; Guardado Decl.; Howell-Egan Decl., ECF 6-13; Horowicz Decl.,

8  ECF 6-19; Le Blanc Decl.; Lopez Decl., ECF 6-14; Lubka Decl.; Marquez Decl.; Ochoa Decl.,

9  ECF 6-20; Paz Decl., ECF 6-18; Petrosian Decl., ECF 6-24; Reyna Decl., ECF 6-21; Solorzano

10  Decl.; Teran Decl.; Wilczewski Decl.) Independent news reporting confirms that this sustained

11  course of conduct remains ongoing. *See* Jonah Valdez, "A Pattern of Violence: Documenting ICE

12  Agents' Brutal Use of Force in LA Immigration Raids," *The Intercept* (July 7, 2025),

13  https://theintercept.com/2025/07/07/ice-raids-la-violence-video-bystanders.[4]

14       As recently as last week, on July 10, DHS agents carried out two more assaults on

15  protesters and reporters assembled at the sites of two distinct ICE raids in this District, one of

16  which the Congressional Representative for the area described as follows:

17       DHS and ICE conducted their raid using a disturbing and disproportionate level of
        force, both on the farm workers they were targeting and the peaceful protesters who
18      gathered to defend their neighbors. . . . [A]gents, in full military gear, fire[d] smoke
        canisters and other projectiles into a crowd of peaceful civilians. . . . [A]gents threw
19      a stun grenade into the crowd. Several civilians were injured, including a child.[5]

20  On the same day, heavily-armed DHS agents blocked roadways near farms in Camarillo (Ventura

21  County) and Carpinteria (Santa Barbara County) and unloaded volleys of tear gas, rubber bullets,

22  smoke bombs, and flash-bang bombs on family members of detained farm workers, concerned

23  community members, protesters, public officials, and journalists gathered in response to learning

24

25  [4] The Court may consider news articles and "give even inadmissible evidence weight" to decide this motion for a
    preliminary injunction. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189–90 (9th Cir.
26  2024) (holding that there was "no error in the district court's consideration of [a] news article" because "the Federal
    Rules of Evidence do not strictly apply in the preliminary injunction context," and a "trial court may give even
27  inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial")
    (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).
    [5] U.S. Representative Salud Carbajal "Carbajal Response to Inaccurate and Misleading ICE Claims", *Press Releases of
28  U.S. Representative Salud Carbajal* (Jul. 14, 2025),
    https://carbajal.house.gov/news/documentsingle.aspx?DocumentID=3297.

1   that immigration raids were happening nearby. (Nadolishny Decl. ¶¶ 8-11 (protester shot by DHS

2   on feet, legs, and ear with pepper balls on July 10); Solorzano Decl. ¶¶ 16-20, 26 (public official

3   who experienced flashbangs and smoke bombs used by DHS against crowd of protesters on July

4   10); Marantos Decl. ¶¶ 15-17, 24-26, 28;  Anderson Decl. ¶¶ 2, 7. 9-11; Wilczewski ¶¶ 7-12; A.R.

5   Decl. ¶¶ 8-10, 18, 20; Fisher Decl. ¶¶ 12-14; Dransfeldt Decl. ¶¶ 10-12, 14.)

6        As this Court has observed, "Protests of federal immigration policy continue in Los

7   Angeles." LAPD Case at 8. The government has vowed to continue the raids that spur the protests.[6]

8   As in the LAPD Case, the journalist Plaintiffs (some of whom submitted declarations in both cases)

9   intend to continue covering the protests. (Beckner-Carmitchel Decl., ECF 6-6, ¶ 19; Mena Decl.,

10  ECF 6-22, ¶ 38; Ray Decl., ECF 6-17, ¶ 37; *see also* Marantos Decl. ¶¶ 33-34; Berg Decl. ¶ 14;

11  R.R. Decl. ¶ 11 (members of organization Plaintiffs).) The protester Plaintiffs intend to keep

12  protesting as ICE raids continue. (Olmeda Decl., ECF 6-4, ¶ 24; Climer Decl., ECF 6-7, ¶ 19.)

13  Taken together, these facts establish that Plaintiffs face a threat of recurrent injury.

14  **II.    DEFENDANTS' PATTERN AND PRACTICE OF USING EXCESSIVE FORCE IS
        OFFICIALLY SANCTIONED**

15       Defendant Noem and other high-level government officials have approved and encouraged

16  DHS's pattern and practice of using excessive force against people exercising their rights to protest

17  and report on government activities, including Plaintiffs.

18       On June 7, 2025, the day after DHS agents unleashed massive amounts of chemical and

19  projectile weapons against protesters, legal observers, and reporters in Paramount, seriously

20  injuring Plaintiffs Beckner-Carmitchel, Climer, and Mena, Defendant Noem stated publicly, "A

21

22  [6] For example, on Monday July 7, 2025, Border Patrol El Centro Sector Chief Gregory Bovino, one of DHS declarants
    in opposition to Plaintiffs' motion for TRO (Dkt. 11-2), said in an interview with Fox 11 Los Angeles "[t]he federal
23  government is not leaving L.A" because "[w]e're going to be here until that mission is accomplished.". He added that
    residents "[b]etter get used to us now . . . because this is gonna be normal very soon." Gregory Bovino, *Interview With*
24  *FOX 11 Los Angeles* (July 7,2025) FOXLA, https://www.foxla.com/video/1670529. That same day, Tricia
    McLaughlin, DHS Spokeswoman sent an email to the New York Times, stating that "[t]he operation is ongoing . . . So
25  that should be a message in and of itself." ." Jill Cowan and Mimi Dyer, "Federal Agents March Through L.A. Park,
    Spurring Local Outrage", *New York Times* (Jul. 7,
26  2025),https://web.archive.org/web/20250708010032/https://www.nytimes.com/2025/07/07/us/la-macarthur-park-
    immigration.html. This is consistent with President Trump's directive: "ICE Officers are herewith ordered, by notice of
27  this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass
    Deportation Program in History.in order to achieve this, we must expand efforts to detain and deport Illegal Aliens in
28  America's largest Cities, such as Los Angeles[.]"Donald J. Trump, *Truth Social* (July 7, 2025, 10:42AM)
    https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

message to LA rioters: you will not stop us or slow us down."[7] That evening, DHS agents opened fire on protesters and a group of journalists, including Plaintiff Ray, striking him with pepper balls multiple times. (Ray Decl. ¶¶ 27-29, ECF 6-17; *see also* R.R. Decl. ¶¶ 5-6, Ochoa Decl. ¶¶ 4, 8-9, ECF 6-20; Paz Decl. ¶¶ 5, 7, 14-18, ECF 6-18.)

The next day, June 8, President Trump announced that he was directing Defendant Noem "to take all such action necessary . . . to put an end to [the] Migrant riots,"[8] and Defendant Noem herself stated, in an interview with "Face the Nation," "[w]e're not going to let a repeat of 2020 happen," referencing the groundswell of protests against police brutality following the killing of George Floyd in 2020.[9] That day, DHS agents fired multiple volleys of chemical weapons and projectiles at a group of protesting families, union leaders, and reporters, striking Plaintiff Beckner-Carmitchel and destroying his press pass. (Beckner-Carmitchel Decl., ECF 6-6, ¶ 12-17; Supp. Rose Decl. ¶ 8, *see also* Barbadillo Decl. ¶¶ 2, 7-10; Coven Decl. ¶¶ 2, 11-12; Petrosian Decl. ECF 6-24, ¶¶ 12-18.) The following day, DHS agents shot Plaintiff Olmeda with a rubber bullet and pepper balls while she was peacefully holding a protest sign.

The next day, on June 10, President Trump told reporters at the White House that Southern California protests "were met with very strong force." He stated that the federal actions in Southern California were "the first, perhaps, of many" federal efforts to suppress protesters and that future protests were "going to be met with equal or greater force."[10] In an interview with Fox News on June 10, 2025, Defendant Noem stated, about DHS's response to the ongoing protests in this

---

[7] Kristi Noem, *"A message to the LA rioters: you will not stop us or slow us down. @ICEgov will continue to enforce the law. And if you lay a hand on a law enforcement officer, you will be prosecuted to the fullest extent of the law."* (X, May 17, 2025, 7:00 PM), https://x.com/Sec_Noem/status/1931456023493308787.

[8] Donald J. Trump, *"A once great American City, Los Angeles, has been invaded and occupied by Illegal Aliens and Criminals. Now violent, insurrectionist mobs are swarming and attacking our Federal Agents … Order will be restored, the Illegals will be expelled, and Los Angeles will be set free."* (Truth Social, June 8, 2025, 7:03 PM), https://truthsocial.com/@realDonaldTrump/posts/114649780431129598.

[9] Interview with Kristi Noem, "We are not going to let a repeat of 2020 happen," *CBS News: Face The Nation,* YouTube (June 2025), https://www.youtube.com/watch?v=JlzS-RfqICI. https://www.youtube.com/watch?v=JlzS-RfqICI.

[10] Soo Rin Kim, *Trump Warns of L.A. Military Deployment in Response to ICE Protests*, ABC News (July 7, 2025, 6:45 PM), https://abcnews.go.com/Politics/trump-warns-la-military-deployment-response-ice-protests/story?id=122700315.

1  District, "We're going to hit them back and hit them back harder than we have before . . . The more

2  that they protest . . . the harder ICE is going to come after them."[11]

3       A few days later, on June 14, Defendant DHS issued an internal bulletin titled, "Recent

4  Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest). (Shapiro Decl., Ex. A ("DHS

5  Bulletin").) That official bulletin identified "use of cameras," "livestreaming" and videorecording

6  at protests as "unlawful civil unrest" tactics and "threats." (*Id.*) Consistent with this bulletin, DHS

7  agents proceeded to wield stun grenades, tear gas, and even firearms against people protesting or

8  filming DHS activities on June 18, 19, 20, 22, and July 7, threatening members of Plaintiff LA

9  Press Club with these weapons while they were engaged in reporting. (R.R. Decl. ¶ 9; Berg Decl.

10  ¶¶ 9-10; *see also* Le Blanc Decl. ¶¶ 13-15; Valdez, *supra*.)

11       After DHS agents fired rubber bullets, pepper balls, and multiple rounds of tear gas at

12  protesters, public officials, and journalists gathered outside two ICE raids site in two different

13  towns in the Central Coast on July 10—injuring a member of Plaintiff NewsGuild (Marantos Decl.

14  ¶¶ 15-17)— Defendant Noem held a press conference where she stated, "Thanks to the courage of

15  [DHS agents], we know that the rioters won't win." She then stated that "videotaping [ICE agents]

16  . . . when they're out on operations" was "violence."[12]

17  **III.    DEFENDANTS' ATTACKS ON PLAINTIFFS CAUSE CHILLING EFFECTS AND OTHER CONTINUING, PRESENT HARM**

18       Defendants' violent course of conduct is chilling Plaintiffs' exercise of First Amendment-

19  protected activities and causing Plaintiffs other continuing, present harm. The journalist Plaintiffs

20  and the organizational Plaintiffs' members have limited their reporting due to the experiences of

21  being injured and their fears of being injured again if Defendants launch another assault against

22  them. (*See* Ray Decl., ECF 6-17, ¶ 37 ("I am really quite spooked that federal officers appear to be

23  using force for no apparent reason and targeting people who are obviously journalists. If I am at a

24  protest policed by federal officers, I am likely to stay further back to avoid being subject to force or

25  arrested. But I won't get the same coverage if I am too far away."); Supp. Mena Decl. ¶ 10 ("In

26

27  [11] Interview with Kristi Noem, "'TRAIN WRECK MAYOR': Kristi Noem slams LA official", *Fox News*, YouTube (June 2025), https://www.youtube.com/watch?v=ymYIXrH9pjg at 3:29.

28  [12] "Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids," Forbes Breaking News (Jul. 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

light of my experience getting shot by DHS agents twice, I will definitely wear personal protective equipment when covering protest events in the future...I do anticipate that wearing all this gear, while clearly necessary, may pose a barrier to effective reporting"); Marantos Decl. ¶ 34; R.R. Decl. ¶ 11).) Similarly, DHS's attacks on the protester Plaintiffs are chilling their protected expression. (Olmeda Decl., ECF 6-4 , ¶ 24 ("The force that was used against me makes me feel somewhat hesitant to speak out"); Climer Decl., ECF 6-7, ¶ 19,.) The organizational Plaintiffs are still diverting time and resources towards responding to DHS's attacks on their members. (Supp. Rose Decl. ¶¶ 6-10; Taha Decl. ¶¶ 5-16.) Plaintiff Mena has not fully recovered from the serious injuries Defendants inflicted on her a month ago when they shot her in the head with a rubber bullet, which have impeded her ability to report. (Supp. Mena Decl. ¶¶ 5-7.)

## IV.    PROCEDURAL HISTORY

After extensive investigation, Plaintiffs filed this case on June 18, 2025, and concurrently sought a TRO. On June 20, the TRO was denied on the grounds that Plaintiffs had not sufficiently established a danger of ongoing harm. The basis for denying the TRO was that all the declarations Plaintiffs had filed related to conduct between the period of June 6 and June 9, and that this failed to establish a pattern of ongoing conduct that necessitated a TRO. (ECF 19 at 4.) The Court held, however, that Plaintiffs' motion was "denied without prejudice to filing a regularly noticed motion for a preliminary injunction." (*Id.* at 5.)

## ARGUMENT

Plaintiffs may obtain a preliminary injunction if they show that "(1) [they are] likely to succeed on the merits; (2) [they are] likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip [in their] favor; and (4) an injunction is in the public interest." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014). Alternatively, plaintiffs who show that the balance of hardships tips "sharply" in their favor need only raise "serious questions" going to the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) ("[T]he greater the relative hardship to [plaintiff], the less probability of success must be shown." (quotations omitted)).

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS

Plaintiffs are likely to succeed on the merits of all their First Amendment claims.[13] DHS's dangerous, sweeping, and unnecessary use of tear gas, rubber bullets, grenades and impact munitions to suppress and retaliate against newsgathering and protest is unconstitutional for at least the following reasons: (1) it violates the journalist and observer Plaintiffs' right of access; and (2) it is being done in retaliation against all Plaintiffs' exercise of their First Amendment rights. The Court denied Plaintiffs' motion for a TRO citing a lack of evidence of violations after June 9. The record now shows an ongoing course of denying access and retaliation, with DHS shooting and tear-gassing more journalists and protesters multiple times since June 9, including just one week ago. Plaintiffs have also supplemented their evidence showing that this sustained course of conduct was not only officially authorized but also has been officially sanctioned and approved (*see supra,* pp. 7-9), and continues to cause Plaintiffs' irreparable harm by chilling their First Amendment activity (*see supra*, pp. 9-10). This evidence addresses the Court's concerns with the initial TRO, provides the type of new material that other courts have found sufficient to warrant preliminary injunctive relief, and demonstrates the requested relief is appropriate here.[14]

Preliminary injunctions based on the First Amendment are appropriate when law enforcement actions "chill… the willingness of people to exercise their First Amendment rights." *Allee v. Medrano*, 416 U.S. 802, 810 (1974). To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the Government bears the burden of justifying the restriction on Plaintiffs' speech. (*Id.*)

---

[13] Defendants' conduct also violates Plaintiffs' Fourth and Fifth Amendment rights to be free of excessive force. This motion is limited to Plaintiffs' First Amendment claims because they are sufficient to support the requested relief. *See* LAPD Case at 11 n.5.

[14] Courts have repeatedly issued TROs or preliminary injunctions after denying the initial TRO due to changes in the evidentiary record. *See, e.g.*, *Creative Power Sols v. Energy Servs. Grp*, No. CV-21-01559-PHX-DLR, 2021 WL 4503455, *1-2 (D. Ariz. Oct. 1, 2021) (granting renewed TRO after plaintiff provided additional facts); *Consumer Opinion LLC v. Frankfort News Corp*, No. 16-CV-05100-BLF, 2016 WL 6804607, *1-2 (N.D. Cal. Nov. 17, 2016) (granting, in part, renewed TRO after plaintiff submitted additional evidence); *United States Olympic Committee v. Does 1-10*, No. C-08-3514 JSW (JL), 2009 WL 10703686, *2 (N.D. Cal. Mar. 10, 2009) (granting renewed TRO after plaintiff amended complaint to include additional information); *Uncanny Valley Productions, LLC v. Ingalls*, No. 18-cv-778-CAS, 2018 WL 6177240 (C.D. Cal. July 2, 2018) (granting preliminary injunction after denying TRO).

**A.    DHS Is Systematically Violating Plaintiffs' First Amendment Right of Access**

In *Index Newspapers*, journalists and legal observers covering the 2020 protests in Portland obtained an injunction against DHS, the U.S. Marshals, and local police, which provided that so long as they did not impede law enforcement, DHS could not subject them to force or arrest. 977 F.3d at 823. In affirming the injunction, the Ninth Circuit upheld the right of access to report on and observe protests, stating that this "access plays a significant positive role in the functioning of our democracy." *Id*. at 830-31. The Ninth Circuit rejected DHS's argument that dispersing the press was "essential to protecting the government's interest," and found instead that plaintiff's expert Gil Kerlikowske—the same expert who has provided testimony in this case—had credibly established that "trained and experienced law enforcement personnel are able to protect public safety without dispersing journalists and legal observers . . . even in the heat of crowd control." (*Id*. at 831-33.) And it pointed out, as Mr. Kerlikowske does in his declaration in this case (ECF 6-3 at ¶ 28), that Portland police followed the injunction in *Index Newspapers* without danger to law enforcement. *Index Newspapers*, 977 F.3d at 833.

Here, as in *Index Newspapers*, there is a "mountain of evidence"(*Id.* At 831) that DHS is interfering with Plaintiffs' right of access. (*See supra*, ¶¶ 10-52 .) For example, video confirms Mr. Ray's testimony that DHS tear-gassed and fired pepper balls at him when he was clearly identified as press, (Ray Decl., ECF 6-17, ¶¶ 8, 27-28), and that DHS fired pepper balls at other identifiable reporters, including those carrying news cameras, to disperse them. (*Id*. ¶ 31.) As Mr. Ray attests, he was standing with TV crews and other members of the press, off to the side from the protests, when DHS fired an "enormous volley" of pepper balls at the group of journalists. (*Id*. ¶¶ 26, 27; *see also id*. ¶ 35 (observing that DHS was "targeting journalists").)

Similarly, DHS shot Plaintiff Ryanne Mena twice on different days, with a pepper ball and with a rubber bullet, when she was clearly marked "press," and when she was physically distant from protesters and not doing anything threatening. (Mena Decl., ECF 6-22, ¶¶ 8, 16- 22.) DHS also shot Plaintiff Sean Beckner-Carmithel in the head with a teargas canister even though he was a clearly marked journalist who was away from protesters trying to record an encounter between DHS officers and protesters. (Beckner-Carmithel Decl., ECF 6-6, ¶¶ 13-14.) Footage captured by

1  protesters when DHS shot Plaintiffs Beckner-Carmitchel and Mena shows DHS agents shooting at

2  multiple other journalists covering the same protest. (Reyna Decl., ECF 6-21, ¶¶ 9, 18.)

3         On July 4, a member of Plaintiff Los Angeles Press Club, a documentary filmmaker, was

4  filming a protest in Downtown Los Angeles when, without provocation, DHS agents physically

5  pushed him and other reporters out of the area. (R.R. Decl. ¶ 8.) When the filmmaker stated that he

6  was press, a DHS agent replied, "It doesn't matter." (*Id.*) On July 7, in MacArthur Park, DHS

7  agents threatened the same filmmaker with a firearm—though he posed no danger to law

8  enforcement and was clearly marked "Press" —when he moved to film agents' interaction with a

9  protester. (Id. ¶ 10.) At the same protest, DHS agents threatened reporter Tina-Desiree Berg, an LA

10  Press Club member, with a stun grenade, although she, too, was marked "Press" and was not doing

11  anything to threaten them. (Berg Decl. ¶ 10.)

12        Just last week, DHS tear-gassed Jeanette Marantos (a member of Plaintiff NewsGuild and

13  reporter for the Los Angeles Times, a member of Plaintiff Los Angeles Press Club) as she was

14  reporting on a protest in Camarillo. (Marantos Decl. ¶ 2.) DHS teargassed Ms. Marantos three

15  separate times. The first round was so intense that she struggled to see and breathe for several

16  minutes which "made it difficult for [her] to do [her] job." (*Id.* ¶¶ 14-18, 24-25, 28.) DHS also

17  attacked an ABC 7 news team reporting from the same protest in Camarillo. A newscaster covering

18  the protests reported "tear gas cannisters started flowing, less than lethal rounds started deploying,

19  and my photographer got hit twice by less than lethal rounds, and he's got blood on one of his

20  arms."[15] The reporter noted that his crew was "terrified of being hit by less than lethal rounds and

21  overwhelmed by tear gas clogging the throat." (*Id.*) As a result, the photographer was bleeding

22  from his arm, and the entire news team had to flee the area. (*Id.*) Other journalists and observers

23  were impeded from reporting at the same protest by DHS's use of chemical weapons against them.

24  (Fisher Decl. ¶¶ 6-7, 10-12, 16-17).

25        DHS has similarly violated the First Amendment access rights of legal observers, including

26  Plaintiff Charles Xu. When Mr. Xu, a legal observer with the National Lawyers Guild of Los

27

28  _____
[15] ABC7, "News crew hit with less-lethal during clash between immigration agents, protesters near Camarillo" (July 10, 2025), https://www.youtube.com/watch?v=Y3uQ36s9sB0 at 1:41.

1  Angeles, tried to record DHS's arrest of a protester, DHS shot him in the leg with a pepper ball,

2  though he wore a hat that clearly identified him as a legal observer. (Xu Decl., ECF 6-8, ¶ 12.)

3  Defendants' practice of launching massive amounts of chemical weapons combined with multiple

4  volleys of projectile weapons has made it impossible for legal observers like Plaintiff Xu to

5  continue their observation without suffering serious physical harm, even when they are physically

6  separated from protesters and present no threat to agents. (*See, e.g.,* Barbadillo Decl. ¶¶ 7-11;

7  Petrosian Decl., ECF 6-24, ¶¶ 15-21; Bell Decl., ECF 6-10, ¶¶ 16-17)

8         These examples are not random acts. They are systematic attempts to prevent reporting on

9  the protests and ICE raids—an act that Defendant Noem has described as "violence." (*See also*

10  DHS Bulletin.) Videos, such as the ones posted on ABC 7 or taken by Mr. Ray or Ms. Reyna,

11  along with numerous declarations, all show that DHS is targeting news trucks, reporters with

12  tripods or professional cameras, and people far away from protesters, to clear journalists and

13  observers from the area. (Ray Decl., ECF 6-17, ¶ 31 (shooting pepper balls at Univision reporter's

14  camera and tripod); Reyna Decl., ECF 6-21, ¶ 9 (shooting tear gas canister at reporter's camera and

15  tripod); Lopez Decl., ECF 6-14, ¶ 9 (shooting at man wearing a "press vest"); Horowicz Decl.,

16  ECF 6-19, ¶¶ 5, 10-12); Fisher Decl. ¶¶ 12-16 (journalist reported at a distance from a line of DHS

17  agents after they teargassed her in order to be "safer".) DHS has also targeted individuals for

18  photographing the license plates of ICE vehicles,[16] and it has targeted individuals who take their

19  cameras or phones to the protests to document the events and what ICE is doing. (Coven Decl. ¶ 5.)

20  This course of conduct is consistent with the agency's official practice of treating "use of cameras,"

21  "livestreaming" and videorecording at protests as "unlawful civil unrest" tactics and "threats."

22  (DHS Bulletin, p. 3). DHS has injured Plaintiffs pursuant to a policy and practice that is plainly

23  unconstitutional. *See Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017) (concluding that the

24  Plaintiff "was located on a public street, which is a quintessential public forum," and "was

25  engaging in the First Amendment-protected activity of observing a government operation"); *Askins*

26  *v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) (the "right to photograph and

27

28  ---
[16] https://theintercept.com/2025/07/07/ice-raids-la-violence-video-bystanders/.

record matters of public interest…includes the right to record law enforcement officers engaged in the exercise of their official duties in public places."); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ( "the First Amendment protects the filming of government officials in public spaces").[17]

There is no valid government justification for denying Plaintiffs' right of access, much less an "overriding interest" that DHS would have to prove to overcome that right. *Index Newspapers*, 977 F.3d at 829. "[T]he public's interest is served by the role the press plays, [which is] strong support for [the] conclusion that plaintiffs [have] demonstrated a likelihood of success on the merits of their First Amendment right-of-access claim." *Id.* at 831; *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) (government could not demonstrate compelling interest to block plaintiff's right to access "horse gathers"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing "First Amendment right to film matters of public interest" and that government had no compelling interest to block plaintiff's right to film police actions during public demonstration).

## B.    DHS Is Systematically Retaliating Against Plaintiffs for Exercising Their First Amendment Rights

Plaintiffs are likely to prevail on their First Amendment retaliation claims. The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must allege (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). These elements are easily satisfied here.

### 1.    Plaintiffs Are Engaged in Protected Activities

As shown above, the Plaintiffs have a First Amendment right of access to document and observe government activities. Plaintiffs also have a First Amendment right to assemble and

---

[17] As the court explained in *Glik*, "changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper. Such developments make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status." 655 F.3d at 84.

1    protest. *See*, *e.g.*, *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). The traditional public

2    forum consists of streets, sidewalks, and parks." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496,

3    515 (1939). "There is a strong First Amendment interest in protecting the public's right to gather in

4    traditional public forum locations that are critical to the content of their message, just as there is a

5    strong interest in protecting speakers seeking to reach a particular audience." *Galvin v. Hay*, 374

6    F.3d 739, 752 (9th Cir. 2004). Criticism of the Government is no less protected when it is angry or

7    even inflammatory. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Indeed, angry and inflammatory

8    protests are predictable "when the government acts in highly controversial ways, or other events

9    occur that excite or arouse the passions of the [public]. The more controversial the occurrence, the

10   more likely people are to demonstrate." *Collins*, 110 F.3d at 1372. Courts have frequently

11   "emphasized the importance of government's permitting the public to engage in spontaneous First

12   Amendment activity, such as demonstrations, in response to controversial events."

### 2.    DHS's Use of Force Would Chill a Person of Ordinary Firmness from Continuing to Engage in Protected Activity

13

14        "[B]eing shot with less-lethal munitions like pepper balls [and] tear gas, … being pepper

15   sprayed at close range, or being shoved by a law enforcement officer would chill a person of

16   ordinary firmness from continuing to exercise their First Amendment rights." *Index Newspapers*,

17   977 F3d. at 827 n.4.; LAPD Case at 10. Defendants have indeed chilled journalists', protesters',

18   and legal observers' exercise of their rights. Barbadillo Decl. ¶ 14 (going forward she is likely to be

19   hesitant to observe from "the front of the action"); Lopez Decl., ECF 6-14 ¶ 17 ("This experience

20   made me feel I need to be more cautious or fearful at protests in the future."); Coven Decl. ¶ 16 ("I

21   am afraid I might not be able to capture as many instances of violence or brutality if I stay further

22   away from [the officers] but I also don't want to be too close if something like this happens

23   again."); Solorzano Decl. ¶ 30 ("[T]his was a chilling experience. I feel scared that DHS agents feel

24   comfortable using weapons against people who are just peacefully observing their actions.");

25   Aguiluz Decl. ¶ 26 ("If federal agents show up in my community again I would still go to

26   observe…but at the same time, I would be afraid."); Nadolishny Decl. ¶ 19; Marantos Decl. ¶ 34;

27   Anderson Decl. ¶ 13; Dransfeldt Decl. ¶¶ 10-13; A.R. Decl. ¶¶ 21-23. The chemical irritants,

28

kinetic projectiles, and flashbang grenades being used by DHS have been linked "to lasting

physical symptoms, such as allergic reactions, respiratory damage, mental distress, anxiety and

post-traumatic stress," and misuse of those weapons can be fatal. (Haar Decl., ECF 6-12, ¶¶ 16-20.)

### 3.    Plaintiffs' Protected Activity Was a Substantial Motivating Factor in Federal Agents' Conduct

The last element of a retaliation claim is that a plaintiff's protected activity must be "a

substantial motivating factor" in federal agents' conduct—that is, there must be some "nexus

between [federal agents'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of

Regents*, 824 F.3d 858, 867 (9th Cir. 2016). That element is easily met here.

"As with proof of motive in other contexts, this element of a First Amendment retaliation

suit may be met with either direct or circumstantial evidence." *Ulrich v. City & Cty. of S.F.*, 308

F.3d 968, 979 (9th Cir. 2002). Both this Court and the Ninth Circuit have found that numerous

instances of unnecessary attacks give rise to a strong interference of retaliation. *Index Newspapers*,

977 F.3d at 827; LAPD Case at 10-11. This case is even more compelling because such facts

similarly exist here alongside direct proof of retaliatory intent.

### a.    Substantial Direct Evidence of Retaliation Exists

Since the start of June, President Trump and Secretary Noem, who are ultimately in charge

of operations, have repeatedly professed their hatred of reporters and protesters and have vowed to

use "big force" against protesters.[18] In a post from June 7, 2025, President Trump wrote, "If

Governor Gavin Newscum [*sic*], of California, and Mayor Karen Bass, of Los Angeles, can't do

their jobs, which everyone knows they can't, then the Federal Government will step in and solve

the problem, RIOTS & LOOTERS, the way it should be solved!!!"[19] The same day, President

Trump threatened, "These Radical Left protests, by instigators and often paid troublemakers, will

NOT BE TOLERATED."[20] On June 8, he directed Defendant Noem to take "all such actions

necessary" to stop the protests, writing, "Now violent, insurrectionist mobs are swarming and

---

[18]New York Times https://www.nytimes.com/2025/06/10/us/politics/trump-military-parade-protests.html.

[19]https://truthsocial.com/@realDonaldTrump/posts/114644899133296098.

[20]https://truthsocial.com/@realDonaldTrump/posts/114646378582957392

1  attacking our Federal Agents to try and stop our deportation operations—But these lawless riots

2  only strengthen our resolve. I am directing Secretary of Homeland Security Kristi Noem, Secretary

3  of Defense Pete Hegseth, and Attorney General Pam Bondi, in coordination with all other relevant

4  Departments and Agencies, to take all such action necessary to liberate Los Angeles from the

5  Migrant Invasion, and put an end to these Migrant riots."[21] The same day, he added, "ARREST

6  THE PEOPLE IN FACE MASKS, NOW!"[22]

7          Defendant Noem has declared her agency's policy of retaliation, stating, "We're going to hit

8  them back and hit them back harder than we have before...The more that they protest and commit

9  acts of violence against law enforcement officers the harder ICE is going to come after them."[23]

10  She has expressly approved her agency's policy of treating protected First Amendment activity,

11  such as filming, as "violence" that justifies DHS agents "hit[ting] . . . back hard [ ]," stating, "I will

12  tell you that violence is anything that threatens [ICE agents] and their safety, so it is . . .

13  videotaping them, where they're at, when they're out on operations."[24] These admissions by

14  Defendant Noem and the marching orders President Trump has publicly issued to her and DHS are

15  direct evidence that retaliation was a substantial motivating factor behind the violent, militarized

16  assaults that have injured Plaintiffs.

17              **b.    DHS's Conduct Corroborates the Direct Evidence of Retaliatory
                        Intent**

18          A "mountain of evidence" shows that DHS agents have acted exactly as Defendant Noem

19  and President Trump instructed—they have repeatedly targeted force, such as tear gas, rubber

20  bullets, and pepper balls, against Plaintiffs and other protesters demonstrating peacefully; assaulted

21  Plaintiffs and other reporters standing apart from protesters and clearly identified as press; attacked

22  crowds of protesters without issuing prior warnings; and used firearms and less-lethal weapons

23  against Plaintiffs and other press and protesters in ways that are dangerous and violate DHS's own

24

25  [21] https://truthsocial.com/@realDonaldTrump/posts/114649780431129598.

26  [22] https://truthsocial.com/@realDonaldTrump/posts/114651482271002772.

27  [23] https://x.com/bulwarkonline/status/1932248255041064965?s=42.

28  [24] https://www.youtube.com/watch?v=uDFX4q6huH8

1   policies. Each of these acts, viewed separately, would be circumstantial proof of retaliation. Taken

2   together, over a sustained period, in light of the express directions from Defendant Noem and

3   President Trump to target people who protest or record ICE, the evidence that retaliation was a

4   "substantial or motivating factor" in Defendants' conduct is overwhelming.

5          Here, as in *Index* and the LAPD case, the evidence shows that Defendants used force

6   against Plaintiffs when they were standing apart from protesters, while photographing and

7   observing DHS's actions. (Mena Decl., ECF 6-22, ¶ 22 (Plaintiff was standing apart from

8   protesters, clearly identified as reporter by press credentials around her neck and writing in

9   notebook when DHS agents shot at her); Ray Decl., ECF 6-17, ¶¶ 26-28 (shot while standing 50

10  feet away by TV trucks with group of other journalists).) Similarly, Defendants used force against

11  other Plaintiffs when they were engaged in obviously peaceful protest, nowhere near anyone posing

12  a threat. (Olmeda Decl., ECF 6-4, ¶¶ 7, 15; Climer Decl., ECF6-7, ¶ 4). The record is replete with

13  instances in which DHS has attacked journalists and observers standing apart from protesters, and

14  protesters who were not near any conduct that would supposedly threaten law enforcement. (*E.g.,*

15  Alcorn Decl., ECF 6-15, ¶¶ 8, 13, 15-16, 20, 24; Bell Decl., ECF 6-10, ¶¶ 16-17 and Ex 1;

16  Horowicz Decl., ECF 6-19, ¶¶ 5, 10, 16; Carbonati Decl., ECF 6-9, ¶ 2; Ochoa Decl., ECF 6-20, ¶

17  2; Lopez Decl., ECF 6-14, ¶ 2).) For example, in Camarillo last week, DHS shot Alexander

18  Nadolishny, a 55-year-old protester, repeatedly with pepper balls, without warning, after he and the

19  other protesters had complied with the officers' command to move back by five feet. (Nadolishny

20  Decl. ¶¶ 8-10.) After Mr. Nadolishny ran away and stood alone in a field to escape the

21  bombardment and tear gas, a DHS agent shot him in the head with a pepperball. (*Id*. ¶ 11.) As the

22  Ninth Circuit held in *Index*, and this Court recognized in the LAPD case, such evidence is

23  "exceptionally strong evidentiary support" for a finding of retaliatory motivation. 977 F.3d at 829.

24         Similarly, the evidence—including video—shows that Defendants shoot at news cameras

25  and news trucks set apart from protesters and posing no threat to federal agents.[25] (Ray Decl., ECF

26  6-17, ¶ 31 (shooting pepper balls at Univision reporter's camera and tripod); Reyna Decl., ECF 6-

27

28  [25] https://www.youtube.com/watch?v=E6qK7AIjUC0

21, ¶ 9 (shooting tear gas canister at reporter's camera and tripod); Horowicz Decl., ECF 6-19, ¶¶

10-12 (shooting at news trucks 100 feet away from protesters, even after protesters fled). This

shows retaliation because it serves no purpose other than to prevent and deter reporting. (*See*

Kerlikowske Decl., ECF 6-3, ¶ 17 ("CBP officers have had extensive marksmanship training, and if

an officer is firing projectiles . . . they are likely to hit their targets.").) This practice is part of

Defendants' ongoing policy of retaliating against people for recording ICE activities. On June 17,

in Pico Rivera, a DHS agent slapped the phone out of the hands of a bystander trying to record the

violent arrest of a U.S. citizen.[26] On June 18, in Pasadena, a DHS agent brandished his service

pistol at a man who took a photo of his license plate, *see supra,* Valdez. On June 19, in Pacoima,

DHS officers punched, body slammed, and handcuffed a bystander recording ICE's arrest of a

street vendor undergoing a heart attack *Id*. On June 20, in Santa Ana, a DHS officer pointed his gun

at a bystander who was recording masked agents detaining a small group of people. *Id*. On June 23,

DHS agents who pulled a young woman off the street into an unmarked van threw tear gas at a

bystander who recorded them. (Le Blanc Decl. ¶¶ 13-17.) On July 7, DHS agents pointed their guns

at a member of Plaintiff Los Angeles Press Club when he attempted to film an interaction between

a protester and Border Patrol agents. (R.R. Decl. ¶ 10.) This course of conduct should also be

considered evidence of retaliatory motive. *Cf. Index Newspapers*, 977 F.2d at 828 (considering

incident where federal agents shoved a photojournalist to try to get her to stop recording their arrest

of a protester as evidence of retaliation).

   The Ninth Circuit has also recognized that evidence showing the defendants "misuse[d] …

crowd-control munitions" was circumstantial proof of retaliatory intent. *Id*. at 828. The record here

is also full of evidence of Defendants' pattern and practice of misusing such weapons when

wielding them against Plaintiffs and other protesters, observers, and reporters in this District:

- DHS has repeatedly misused pepper balls. "Pepper balls are not supposed to be shot at

   people; they are supposed to be shot near people to release the irritant inside."

   (Kerlikowske Decl., ECF 6-3, ¶ 27.)  But DHS has shot pepper balls *at* the bodies of

   Plaintiffs and other protesters, observers, and reporters—causing them painful

---

[26] https://www.youtube.com/watch?v=KDrUl-xojq8.

injuries—at multiple protests over more than a month. (*See* Mena Decl., ECF 6-22, ¶¶
13-20, (June 7); Ray Decl. ¶¶ 27-29, ECF 6-17 (June 7); Xu Decl., ECF 6-8, ¶ 12; *see
also* Climer Decl., ECF 6-7, ¶ 7; Soqui Decl., ECF 6-23, ¶ 7 (shot in face with pepper
ball); Olmeda Decl., ECF 6-4, ¶ 9 (June 9); Nadolishny Decl. ¶ 11 (shot in ear with
pepper ball on July 10).)

- Similarly, "[t]eargas canisters should never be fired at people. The canisters are made to
  break open on the ground to release teargas. Using them as projectile weapons is
  extremely dangerous, [and] can cause severe injury or potentially death. Officers who
  receive training on the use of teargas launchers are trained never to fire teargas as an
  impact munition." (Kerlikowske Decl., ECF 6-3, ¶ 17; see also Haar Decl., ECF 6-12, ¶
  17 ("direct trauma from canisters and grenades is the number one cause of death from
  chemical irritants").)[27] Yet DHS shot Plaintiff Beckner-Carmitchel in the head with a
  tear gas canister when he was trying to record an encounter between DHS and
  protesters. (Beckner-Carmitchel Decl., ECF 6-6, ¶ 13.) DHS also shot Plaintiff Climer
  with a tear gas canister as he was peacefully protesting. (Climer Decl., ECF 6-7, ¶ 8.)
  DHS has repeatedly misused teargas canisters in this way, injuring other journalists and
  protesters. (*See, e.g.,* Carbonati Decl., ECF 6-9, ¶ 2; Alcorn Decl., ECF 6-15, ¶¶ 28, 34-
  35).

- DHS has also misused rubber bullets. "Firing rubber bullets above waist-level is
  particularly dangerous, contrary to DHS policies on how such weapons should be used,
  and known to cause serious harm. For example, at the 2020 protests in Portland, a
  federal agent shot protester Donovan Labella in the head, fracturing his skill and leaving
  him permanently disabled." (Kerlikowske Decl., ECF 6-3, ¶ 40.) Indeed, DHS has
  caused both Plaintiff Olmeda and Plaintiff Mena serious head injuries by shooting them

---

[27] The potential for supposedly non-lethal tear gas weapons to have tragic consequences when used inappropriately
during protests is well known in Los Angeles, where journalist Ruben Salazar was killed when a Los Angeles sheriff's
deputy fired a tear gas canister that struck him in the head while he was covering the National Chicano Moratorium
Against the Vietnam War, fifty-five years ago. As one commentator has written, the use of purportedly "less-lethal"
weapons in Los Angeles and Paramount today is a "haunting echo" of the killing of Mr. Salazar. John D'Anna, "Why
the Death of Reporter Ruben Salazar 55 Years Ago Resonates With Journalists Covering LA Protests Today,"
*CalMatters*, June 11, 2025, https://calmatters.org/justice/2025/06/ruben-salazars-death-journalists-protests/.

in the head with rubber bullets. (Olmeda Decl., ECF 6-4, ¶¶ 18-22; Mena Decl., ECF 6-22, ¶¶ 30, 37; Supp. Decl. Mena ¶¶ 5-6).

- DHS has indiscriminately fired volleys of projectiles into crowds of protesters and press, in violation of its own rules. (*See e.g.*, Kerlikowske Decl., ECF 6-3, ¶ 44; Ray Decl., ECF 6-17, ¶ 29; Alcorn Decl., ECF 6-15, ¶ 17, 24-26; Bell Decl., ECF 6-10, ¶ 17; Howell-Egan Decl., ECF 6-13, ¶¶ 9-10; Petrosian Decl., ECF 6-24, ¶ 15) These attacks were not provoked by any immediate threat to officer safety. (Alcorn Decl., ECF 6-15, ¶¶ 16, 18;Bell Decl., ECF 6-10, ¶¶ 15-16, 22, 24, 39-40; Ray Decl., ECF 6-17, ¶¶ 2, 18, 33-34; Howel-Egan Decl., ECF 6-13, ¶ 8; Petrosian Decl., ECF 6-24, ¶¶ 11, 20.) For example, DHS indiscriminately fired volleys of rubber bullets and pepper balls into a crowd of protesters, concerned families, and press in Camarillo last week. (Nadolishny Decl. ¶¶ 8-12.)

Indiscriminate violence against crowds has no innocent explanation. Law enforcement officers can identify wrongdoers and should not fire at them if doing so exposes others to harm. (Kerlikowske Decl., ECF 6-3, ¶ 14 ("If a specific person is doing something dangerous, such as throwing fireworks, it is not permissible to fire less-lethal projectiles into a crowd to try to stop that person because it could cause serious injury to people who are not engaged in unlawful activities.").) Since June 9, 2025, there has been no legitimate reason for DHS's uses of force. (Kerlikowske Supp. Decl. ¶ 17.)

DHS has also repeatedly failed to give warnings before it uses force—another violation of its own rules. (Kerlikowske Decl. ¶¶ 37, 39, 43, 46.) Failure to warn provides "robust support" for retaliatory intent because it shows an intent to harm people rather than give them a chance to comply and avoid injury. *See Index Newspapers*, 977 F.3d at 827-28. DHS agents did not give a warning any of the times it shot Plaintiffs with projectiles. (Beckner-Carmitchel Decl., ECF6-6, ¶ 13; Supp. Beckner-Carmitchel Decl., ECF 6-25, ¶¶ 9, 10; Climer Decl., ECF 6-7, ¶¶ 8,15; Olmeda Decl., ECF 6-4, ¶¶ 8, 12, 16-18; Mena Decl., ECF 6-22, ¶¶ 16, 23, 30, 35; Ray Decl., 6-17, ¶ 34; Xu Decl., ECF 6-8, ¶¶ 9, 13.)  Protesters, journalists, and observers present in Camarillo and Carpinteria consistently reported that DHS agents used tear gas in an apparent effort to clear people

1   from roadways, without first asking or otherwise directing people to move and without any

2   warning. (Marantos Decl. ¶¶ 24, 28; Dransfeldt Decl. ¶ ¶ 10-12; A.R. Decl. ¶¶ 8-9, 18; Solorzano

3   Decl. ¶¶ 16-19, 26-27; Anderson Decl. ¶ 9, Wilczewski Decl. ¶¶ 7-11.) DHS also failed to give any

4   warning before firing pepper balls into a crowd of protesters and press at Camarillo (Nadolishny

5   Decl. ¶¶ 8-9); before using stun grenades and tear gas against a small crowd of protesters and local

6   officials in Maywood (De La Riva Decl. ¶¶ 14-15; Aguiluz Decl. ¶¶ 20-22; Guardado Decl. ¶¶ 11-

7   17; Marquez Decl. ¶¶ 15-16); before throwing tear gas at a small group of observers in Ladera

8   Heights (Le Blanc Decl. ¶¶ 13-17); and before any of the protests where it unleashed massive

9   amounts of chemical irritants and fired multiple volleys of projectiles at protesters and press,

10  between June 6 and June 9 (Bell Decl., ECF 6-10, ¶¶ 24, 26; Cruz Decl., 6-11, ¶¶ 10, 15; Howell-

11  Egan Decl., ECF 6-13, ¶¶ 8-21; Paz Decl., 6-18, ¶ 15; Ochoa Decl., ECF 6-20, ¶¶ 2, 8; Reyna

12  Decl., ECF 6-21, ¶ 6; Soqui Decl., ¶¶ 6, 15; Petrosian Decl., ECF 6-24, ¶¶ 9, 15.)

13      The evidence in the record shows that since June 6, DHS has engaged in a pattern of

14  "excessive force against reporters, observers and protesters, including by repeatedly failing to give

15  warnings before deploying force, by using force that is unnecessary and by misusing crowd control

16  weapons, such as firing pepper balls directly at people." (Kerlikowske Supp. Decl. ¶ 14.)

17  Combined with the direct evidence of Defendant Noem's retaliatory animus against protesters, this

18  circumstantial evidence shows that DHS is trying to punish and deter whole groups—anyone there

19  or nearby—from exercising their First Amendment rights. The sheer number of abuse of force

20  incidents documented in the declarations submitted with Plaintiffs' motion "provide[s]

21  exceptionally strong evidentiary support for" determining "that some of the Federal Defendants

22  were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment

23  rights." *Index Newspapers*, 977 F.3d at 829.

24  **II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S
        INTERVENTION**

25      As both this Court and the Ninth Circuit have held, "The loss of First Amendment

26  freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v.*

27  *Burns*, 427 U.S. 347, 373 (1976); LAPD Case at 11. *Vietnamese Buddhism Study Temple in Am. v.*

28

1   *City of Garden Grove*, 460 F. Supp. 2d 1165, 1172 (C.D. Cal. 2006). Because constitutional

2   violations often cannot be adequately remedied through damages, the Ninth Circuit does "not

3   require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*,

4   944 F.3d 816, 833 (9th Cir. 2019).

5           Because Plaintiffs have, at minimum, raised a colorable claim that the exercise of their

6   constitutionally protected rights to protest, gather news, and record government activity in public

7   have been infringed, they have satisfied the irreparable-injury requirement. *See id*.

8   **III.    THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY
            IN FAVOR OF PLAINTIFFS**

9
10          The Court "must balance the competing claims of injury and must consider the effect on

11  each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council,*

12  *Inc.*, 555 U.S. 7, 24 (2008). Since this case involves government actors, the balance of equities

13  factor merges with the fourth factor, public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

14  1073, 1092 (9th Cir. 2014). This balance tilts sharply in Plaintiffs' favor because the balance of

15  equities and public interest always favor "prevent[ing] the violation of a party's constitutional

16  rights." *Melendres*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); accord,

17  *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). *Am. Beverage Ass'n v.*
    *City & Cty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019).

18
19          Plaintiffs have shown irreparable and concrete harm because the federal agents' actions

20  block their ability to exercise their First Amendments rights. *See Index Newspapers*, 977 F.3d at

21  838 ("When weighing public interests, courts have consistently recognized the significant public

22  interest in upholding First Amendment principles."). By contrast, the relief Plaintiffs seek does

23  little, if any, harm to DHS, which can and should pursue less restrictive and more narrowly tailored

24  responses to any unlawful activity that might occur during protests. As explained by Mr.

25  Kerlikowske, "[c]omplying with the relief requested by Plaintiffs under these circumstances would

26  not be unsafe or burdensome for law enforcement trained to deal with situations involving large,

27  and sometimes unruly crowds." (Kerlikowske Decl., ECF 6-3, ¶ 52.) "Police forces under

28  leadership trained and experienced in civil disturbances are able to protect public safety without

1  excluding press and legal observers or violating any of the other restrictions in the TRO." (*Id.* ¶

2  53.) Indeed, this Court recently imposed similar restraints on LAPD. LAPD Case at 12-13.

3      The public interest also favors Plaintiffs. There is a strong public interest in protecting the

4  rights of journalists, legal observers, and protesters. "The Free Speech Clause exists principally to

5  protect discourse on public matters," *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011), and

6  "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our

7  republican system of self-government." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,

8  457 U.S. 596, 604 (1982). These rights are further protected by the free press. The "Constitution

9  specifically selected the press … to play an important role in the discussion of public affairs" to

10 serve as a "powerful antidote to any abuses of power" by "keeping officials elected by the people

11 responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214,

12 219 (1966) (citation omitted). As the Court explained in *Index Newspapers*, "excluding the media

13 from public fora can have particularly deleterious effects on the public interest." 977 F.3d at 830.

14 Similarly, "[f]ilming the police," whether by reporters, legal observers, or activists, "contributes to

15 the public's ability to hold the police accountable, ensure that police officers are not abusing their

16 power, and make informed decisions about police policy." *Turner v. Lieutenant Driver*, 848 F.3d

17 678, 689 (5th Cir. 2017).

18     In contrast, there is certainly no public interest in allowing federal agents to engage in

19 unrestrained violence against the press, legal observers, and protesters.

20                        **<u>CONCLUSION</u>**

21     For the foregoing reasons, the Court should grant Plaintiffs' motion for preliminary

22 injunction.

23 Dated: July 18, 2025                        Respectfully submitted,
                                               BRAUNHAGEY & BORDEN LLP
24

25                                             By:    */s/ Matthew Borden*

26                                                  Matthew Borden

27                                             *Attorneys for Plaintiffs*

28