| | |
|---|---|
| Matthew Borden, Esq. (SBN: 214323)<br>borden@braunhagey.com<br>J. Noah Hagey, Esq. (SBN: 262331)<br>hagey@braunhagey.com<br>Kory J. DeClark, Esq. (SBN: 310571)<br>declark@braunhagey.com<br>Greg Washington, Esq. (SBN: 318796)<br>gwashington@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>747 Front Street, 4th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 599-0210<br><br>Kevin Opoku-Gyamfi, Esq.<br>(*pro hac vice*)<br>opokugyamfi@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>118 W. 22nd Street, 12th Floor<br>New York, NY 10011<br>Telephone: (646) 829-9403<br><br>[Additional counsel on next page]<br><br>*Attorneys for Plaintiffs* | Peter J. Eliasberg, Esq. (SBN: 189110)<br>peliasberg@aclusocal.org<br>Jonathan Markovitz, Esq. (SBN: 301767)<br>jmarkovitz@aclusocal.org<br>Adrienna Wong, Esq. (SBN: 282026)<br>awong@aclusocal.org<br>Meredith Gallen, Esq. (SBN: 291606)<br>mgallen@aclusocal.org<br>Summer Lacey, Esq. (SBN: 308614)<br>slacey@aclusocal.org<br>Jacob Reisberg, Esq. (SBN: 329310)<br>jreisberg@aclusocal.org<br>Mohammad Tajsar, Esq. (SBN: 280152)<br>mtajsar@aclusocal.org<br>ACLU FOUNDATION OF SOUTHERN CALIFORNIA<br>1313 W 8th Street, Ste 200<br>Los Angeles, CA 90017<br>Telephone: (213) 977-9500<br><br>Peter Bibring, Esq. (SBN: 223981)<br>peter@bibringlaw.com<br>Law Office of Peter Bibring<br>2140 W Sunset Blvd # 203<br>Los Angeles, CA 90026<br>Telephone: (213) 471-2022 |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>Plaintiffs,<br><br>v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>Defendants. | Case No. 2:25-CV-05563-HDV-E<br><br>**DECLARATION OF ALECA LE BLANC IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION** |

Additional Counsel of Record for Plaintiffs:

Carol A. Sobel, Esq. (SBN: 84483)
 carolsobellaw@gmail.com
Weston Rowland, Esq. (SBN: 327599)
 rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman, Esq. (SBN: 71244)
 hoffpaul@aol.com
Michael Seplow, Esq. (SBN: 150183)
 mseplow@sshhzlaw.com
John Washington, Esq. (SBN 315991)
 jwashington@sshhzlaw.com
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 717-7373

# Declaration of Aleca Le Blanc

I, Aleca Le Blanc, declare the following:

1. I make this declaration from my personal knowledge and if called to testify to these facts I could and would do so competently.

2. My name is Aleca Le Blanc. I have lived in Los Angeles County for twenty-five years, and the neighborhood of Ladera Heights for ten years. I am a U.S. Citizen and was born in California. I have a PhD in Art History and am an Associate Professor at UC Riverside.

3. As an Angeleno, I have been horrified by the Department of Homeland Security's assault on my neighbors and community members, which has escalated significantly in recent weeks. In mid-June, I attended a know-your-rights training with a community organization to better understand how I can support day laborers when ICE comes to my community.

4. On June 23, 2025, I learned about an ICE raid that had just taken place at a nearby Home Depot in Marina del Rey, on Jefferson Blvd. When I left my house, at approximately 10:30 a.m. that morning to run routine errands, I stopped at my local Home Depot, at the corner of Slauson Ave and S. Fairfax Ave, to check in with the community and provide know-your-rights information.

5. When I arrived, the area where day laborers typically congregate was almost empty. There were about five people total in the area, including an older man who appeared to be Latino, three Black men who were seeking work, and a young street vendor selling food, whose name I later learned is C. She was very petite and wearing a red apron. She appeared to be Latina, with brown skin and long dark hair.

6. I was standing about 10 feet away from C. It was very quiet and calm, with very little traffic. I had been there for approximately five minutes when suddenly a commotion began. I was jostled as an older man came out of nowhere, running full speed past me. I realized he was chasing C.

7. The man was at least 6 feet tall and 250 pounds. He was dressed entirely in street clothes, wearing jeans, a t-shirt, and a baseball cap. He had on sunglasses and as he was running, I saw him pull up a neck gator to cover his face. He also had a utility belt around his waist and what looked like a gun in a holster on his right side. He had no uniform, no police vest, no badge—nothing that would indicate that he was anything other than a private citizen. My instinct was that he was an angry man trying to catch a young woman, potentially an angry ex-boyfriend. I was standing close by and within earshot when the commotion began. I did not hear him say anything before or while he was running. I did not see him approach her, he seemed to come out of nowhere.

8. Concerned for her safety, I ran after them. C had reached a tree across the street and was clinging to it. She was still wearing her work apron. When I arrived, there was a second man. He was also in plain street clothes, with a neck gator covering his face and a baseball cap. He had a vest on with a Border Patrol patch. He had a radio and a gun strapped to his jeans. He kept his hand on his gun. The man who had chased her started to grab C but then stopped. He kept asking the second man what he should do next. It did not seem like he had training. It added to my suspicion that this was not a legitimate operation.

9. A minute or two later, two large unmarked Sports Utility Vehicles pulled up to the curb and idled in the red zone. They had out-of-state plates and tinted windows. Six more men in regular street clothes—jeans, sneakers, baseball caps, sunglasses—exited the vehicles carrying large guns, wearing camouflage vests, and with neck gators covering their faces. They immediately surrounded the tree C was clinging to. At least two of them had the biggest guns I had ever seen, maybe four feet long, and they held them in front of their bodies. A driver remained in each vehicle, keeping the motors running.

10. I repeatedly asked the men to identify themselves and to show a warrant with a judge's signature. They never acknowledged my questions, and no one would

answer me. Never did I hear any of them at any point identify their agency affiliations, say they were ICE, or that they were law enforcement at all.

11. One of the men asked C a question in Spanish: what city she was from. She did not answer the question. After that I didn't hear them say anything to her, except for "let's go," in English. It wasn't clear if they were speaking to her or to me.

12. The first man – the older plain-clothed man who had chased her – began to pull at C's body, using his physical strength to pry her from the tree. C is very petite, maybe 5 feet tall and about 100 pounds. The man pulling at her was at least 6 feet tall and 250 pounds. He did not identify himself. He still was not wearing anything that indicated he was law enforcement. He pulled her off the tree and put her hands behind her back, handcuffing her. She did not resist, squirm, or cry. She was very calm. Several of the men walked her to one of the cars, shoved her inside the back seat, and one of the men climbed in next to her.

13. Three of us stood close. Five to seven other people had emerged from the strip mall and nearby apartments, all standing on the sidewalk at a distance, observing. At least one person had their phone out as if they were recording. Once they put her in the car and closed the doors, I presumed the encounter was over and walked between their cars so I could cross to the other side of the street, where there is a fire station. Everyone else also began to disperse.

14. As soon as I reached the other side of the street, however, I heard at least two explosions back-to-back, car doors slamming shut, and the sound of screeching tires. I turned around and saw that the vehicle in front had sped away, and smoke was billowing from three discrete places where it had been idling, immediately adjacent to the shopping center and the spot where C. had been taken. Three to four of the people who had been with me on the sidewalk when C. was taken were still standing on the sidewalk amidst the smoke. I quickly began recording what I was seeing with my phone. Here is a copy of my recording: https://www.youtube.com/shorts/N-V3zaZPStY.

3

15. I saw that one woman appeared to be recording the remaining unmarked SUV amidst the smoke. Seconds previously, when I had walked across the street, that SUV and another unmarked SUV had been idling in the area where the smoke now was. I could see that the first SUV had already left. I could also see the driver's side doors of the second SUV close as the smoke expanded around the car.

16. Within about twenty seconds, the smoke reached my side of the street, and I realized it was tear gas because it made me close my eyes and cough for several minutes, so that I couldn't speak or see. I ran inside the nearby fire station to escape the smoke. The firefighters also had to lower their garage doors to keep the tear gas from entering.

17. I did not see anyone standing in the street or blocking the flow of traffic or the SUVs in any way before the smoke was released against the people who had been watching the men who took C.

18. The firefighters took me into the fire station and gave me water to rinse out my eyes, which continued to itch and burn for several minutes. I was very upset by what I had just witnessed, which appeared to be a kidnapping. After explaining this to the firefighters, they phoned the Sheriff's Department so I could file a report about the kidnapping. The Sheriff's Department sent an officer to take my report. He took photographs of the scene, interviewed a neighbor who witnessed the event, and ultimately collected the tear gas canisters that were left in the road. The officer found three.

19. It was very distressing to witness what looked like a violent kidnapping. As a woman, this is my nightmare, and why I enrolled my 15-year-old daughter in a self-defense class just last month. Women are constantly aware of the potential for violence against them during their everyday activities, whether in parking garages, opening their front door for a package, or even while exercising. In this instance, it was on a Monday morning that an entrepreneurial woman was working to support her family. They didn't appear even to know her name, but instead by happenstance, they drove by and saw a petite woman with brown skin who would be easy to overtake.

20. The use of force was also grotesquely disproportionate and completely unnecessary at every stage of the encounter. To have eight masked men with big guns surrounding one small woman. And then, after they had detained her and were preparing to drive away, to use tear gas on a handful of civilians on a public street, who were doing nothing but bearing witness, and had already disbursed, was shocking and terrifying, and further confirmed my suspicions that what I had witnessed was extrajudicial.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed at Los Angeles County, California on July 17, 2025.

*aleca le blanc*
Aleca Le Blanc