Matthew Borden, Esq. (SBN: 214323)
borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice*)
opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
jreisberg@aclusocal.org
Mohammad Tajsar, Esq. (SBN: 280152)
mtajsar@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>Plaintiffs,<br><br>v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>Defendants. | Case No. 2:25-CV-05563-HDV-E<br><br>**DECLARATION OF KIMBERLY FISHER IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION** |

1  Additional Counsel of Record for Plaintiffs:

2  Carol A. Sobel, Esq. (SBN: 84483)
   carolsobellaw@gmail.com
3  Weston Rowland, Esq. (SBN: 327599)
   rowland.weston@gmail.com
4  Law Office of Carol A. Sobel
   2632 Wilshire Boulevard, #552
5  Santa Monica, CA 90403
   Telephone: (310) 393-3055
6
   Paul Hoffman, Esq. (SBN: 71244)
7  hoffpaul@aol.com
   Michael Seplow, Esq. (SBN: 150183)
8  mseplow@sshhzlaw.com
   John Washington, Esq. (SBN 315991)
9  jwashington@sshhzlaw.com
   Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
10 200 Pier Avenue #226
   Hermosa Beach, CA 90254
11 Telephone: (310) 717-7373

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:25-cv-05563-HDV-E
DECLARATION OF FISHER ISO PLAINTIFFS' PRELIMINARY INJUNCTION

**Declaration of Kimberly Fisher**

I, Kimberly Fisher, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am a journalist and am submitting this declaration to describe how U.S. Customs and Border Patrol (CBP) agents deployed tear gas at a peaceful crowd in Camarillo, California. I did not hear any dispersal orders or warnings nor did I see anyone threaten the agents before they deployed the tear gas.

3. I am a managing editor and reporter at the *Ventura County Sun* and *Ojai Valley News*. I have been an on-staff journalist for about two years but have been freelancing in Ventura County for almost 13 years.

4. At about 11 am on July 10, 2025, the *Ojai Valley News* received a news tip that there was an immigration action at Glass House Farms in Camarillo. We contacted a freelance photographer, and he let us know he was already on his way to Laguna Road. When he arrived, he started sending us photographs of the scene. Thursdays are the paper's production days, so I am typically in the newsroom helping our small team with production. That day, however, I was in Ventura attending a court case that I had been covering for the paper. The session started at 1:30 pm, so my editor and I agreed that we would check in after I got out of court about whether I should go to Glass House. After I got out of court, my editor told me to head to Camarillo.

5. I arrived at Laguna Road close to the intersection of Las Posas Road and Laguna Road at about 3:30 pm. I know it was about 3:30 pm because there is a time stamp of 3:32 pm on the first photograph I took that shows me walking from my car.

6. Because I had come from court, I was wearing a suit and had my press lanyard around my neck, tucked inside my shirt.

7. For the first 20 to 30 minutes I was there, I walked around taking

1

photographs with my medium-to-large camera.

8. I saw a line of roughly 30 Department of Homeland Security (DHS) agents lined up across both lanes of traffic on Laguna Road about halfway between Glass House and the Laguna Road/Las Posas Road intersection. I knew they were DHS agents because I could see badges that said "Immigration and Customs Enforcement" (ICE) and "Customs and Border Patrol" (CBP). There was a group of about 100 protestors facing the agents. For the most part, the protestors stayed about 6 to 10 feet away from the agents. Every now and then, two or three protestors would get closer, but they were never really close. They weren't in the agents' faces, and the protestors never had their bodies against the agents. I saw men, women, Latinos, white people, and some children. A few people were waving American or Mexican flags. I also saw a person in a wheelchair.

9. To my eye, this was non-violent protesting. People were verbally taunting the agents, but I didn't see any protestors throw anything or threaten to make contact with the agents.

10. After about 20 to 30 minutes, I heard someone say my name. It was A.R., a resident of greater Los Angeles whom I had previously met. He started telling me about what he had experienced before I got there, so I asked him if I could interview him and record it on my iPhone. A.R. told me he witnessed agents grab two protestors. During the interview, A.R. briefly stopped speaking because a protestor had started reciting a prayer. A.R. and I were standing about 6 to 10 feet away from the line of agents at the top of the line on the north side of Laguna Road. I recorded the interview on my phone and had my camera strap on my shoulder. Below is a photograph I took of the line of agents after finishing my interview with A.R.

11. After I finished the interview with A.R., I walked away from the line of agents. I turned my back to them because I was trying to use my body to create shade so I could see my phone well enough to send the interview to my colleagues. At this point, I was about 30 to 40 feet from the line of agents.

12. All the sudden, I heard a "Pop! Pop! Pop!" sound and saw people running toward and passing me on the road. Simultaneously, there was a white vehicle driving down the road. I never heard any warning or order to disperse. I understood the "pop" sounds were gas canisters hitting the ground and being deployed by the agents. Because I wasn't facing the agents, I'm not sure whether they had thrown it in the air or directed it at the ground. I believe DHS agents deployed the tear gas because at that point, all of the agents I could see that were wearing the lighter camouflaged uniforms that the National Guard wears were only holding wooden batons. I did not see the National Guard agents holding anything that looked like tear gas canisters. I have a video of the tear gas time stamped at 3:54 pm, so I assume the agents had deployed the tear gas shortly before that.

13. It was immediately hard to breathe. My eyes were burning so badly that I couldn't see. There were some people crying and coughing. People were shouting, telling people to pour water on their faces. Out of the corner of my eye, I

3

could see a woman to my left who was crying and gasping hard for air. There was a bottle of water on the ground, and I was trying to tell her to use it.

14. I made the decision to get down on one knee. I couldn't see. I was afraid of falling and twisting an ankle because I was wearing boots with a small heel, and, on the north side of the road, the dirt shoulder was uneven. Beyond the shoulder, there was a steep drop into an irrigation ditch. I dropped my phone and camera so I could compose myself. A.R. found me and told me he was going to bring me water. I heard him say "Look up, look up, I'm going to pour water on your face," and he did. That immediately helped.

15. I've been at a lot of big protests but have never experienced tear gas. My first thought was, "How bad is this going to be?"

16. After the tear gas, I decided I was going to stay there to continue reporting, but I felt like I needed to be somewhere safer. I am pretty calm and collected in intense situations like this, but I still felt like I should move to a different location. I assessed the scene and realized I could go to the other side of the street, south of Laguna Road, so I would be upwind of the tear gas if the agents deployed it again. I saw two large TV cameras farther away and decided to stay in that area. At this new location, I was about 12 to 15 feet away and to the side of the line of agents. If I had felt more comfortable, I would have stayed in the midst of the protestors in the center of the action and would have moved to the side occasionally. I felt somewhat disadvantaged in covering the situation at my new location.

17. For the rest of the day, I stayed in this location and continued taking photographs. I saw Ventura County Fire Department trucks and ambulances come and go. Protestors continued to be vocal. At one point, agents drove out a large, dark vehicle with a big disc on top. I knew the agents on the truck were federal because of the uniforms they were wearing. I later confirmed using my photographs that the side of the truck had a DHS logo on it. I saw agents wearing

the same uniforms as the DHS agents standing on the truck. A man in the crowd told me the disc on the vehicle was an LRAD (long-range acoustic device) weapon. I didn't know what that was and asked if it was a sonic weapon – the man said it was. I felt nervous about the LRAD truck because I didn't know what I would do if the agents deployed it, and I didn't know if the sound could cause permanent damage. I tried to tell the older woman who spoke Spanish and was standing near me that the sound could be bad for her ears. The agents did not end up using the LRAD weapon while I was there.

18. I ended up leaving between 5:32 pm, the time stamp from my last photograph, and 6 pm because I had to get to a class at 6:30 pm.

19. I think the reporting on this is very important, and we need to get the story out to the public. But going forward, I need to do that from a safer spot, avoiding being that close to the line of agents again. I definitely want to avoid the situation I experienced at Glass House for the sake of my health. I don't want to be breathing in tear gas.

20. After going to Laguna Road, I had a conversation with my editor about planning how we are going to go about our coverage moving forward. We are a tiny paper, so we're always aware of stretching our resources too thin. We don't want someone to get hurt at all, let alone seriously injured, because we care about the wellbeing of our reporting staff, and having someone injured would impact our ability to provide news coverage in the region.

1 | I declare under penalty of perjury of the laws of the State of California
2 | and the United States that the foregoing is true and correct. Executed July 17,
3 | 2025 in Ojai, California.

_____
Kimberly Fisher