Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
  declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
  gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice*)
  opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
  peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
  jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
  awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
  mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
  slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
  jreisberg@aclusocal.org
Mohammad Tajsar, Esq. (SBN: 280152)
  mtajsar@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
  peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>Plaintiffs,<br><br>v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>Defendants. | Case No. 2:25-CV-05563-HDV-E<br><br>**SUPPLEMENTAL DECLARATION OF GIL KERLIKOWSKE IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION** |

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

Additional Counsel of Record for Plaintiffs:

Carol A. Sobel, Esq. (SBN: 84483)
  carolsobellaw@gmail.com
Weston Rowland, Esq. (SBN: 327599)
  rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman, Esq. (SBN: 71244)
  hoffpaul@aol.com
Michael Seplow, Esq. (SBN: 150183)
  mseplow@sshhzlaw.com
John Washington, Esq. (SBN 315991)
  jwashington@sshhzlaw.com
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 717-7373

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

I, Gil Kerlikowske, declare:

1. I am the former Commissioner of U.S. Customs and Border Protection ("CBP"). I served as the Chief of Police in Seattle from 2000 through 2009.

2. I received a BA and MA from the University of South Florida in Tampa. I also graduated from the Executive Institute at the Federal Bureau of Investigation Academy in Quantico, Virginia. I served in the United States Army and Military Police from 1970 through 1972, where I was awarded the Presidential Service Badge, and where I began training in crowd control, riots, and civil disturbances. I have worked in law enforcement and policy for 52 years. I also have served as the Director of the Office of National Drug Control Policy. I have also served as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services. I have been an IOP Fellow at Harvard Kennedy School of Government and have taught as a distinguished visiting fellow and professor of the Practice in Criminology and Criminal Justice at Northeastern University. A true and correct copy of my curriculum vitae is attached as **Exhibit 1**.

3. During my tenure as Chief of Police in Seattle, I led and orchestrated the policing of hundreds of large and potentially volatile protests, many of which were larger than the recent protests in Los Angeles. I did the same thing when I was Police Commissioner in Buffalo.

4. I have been asked to evaluate whether the force that federal authorities used against journalists, legal observers and protesters in Camarillo, Carpinteria, Downtown Los Angeles, Ladera Heights, Paramount, and Santa Ana was reasonable, and whether the relief stated in the requested preliminary injunction against Department of Homeland Security ("DHS") requested by Plaintiffs is safe and workable from a law enforcement perspective. I base this declaration based on my years of experience with crowd control and excessive use of force and the witness accounts, photographs and videos of the recent protests in Camarillo, Carpinteria,

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

Downtown Los Angeles, Ladera Heights, Paramount, and Santa Ana. My
conclusions are as follows:

- **Opinion No. 1**: DHS is deploying excessive force in policing the protests, including by using force against people who are not engaged in threatening acts, misusing crowd-control munitions and teargas, and indiscriminately using force that needlessly injures people who pose no threat to law enforcement.

- **Opinion No. 2**: The requested injunction is safe for law enforcement. There is no reason to use force or less-lethal weapons other than in the ways that they are supposed to be used or in ways other than California law enforcement agencies are required to use them under state law. Defending federal property mainly involves establishing a perimeter around the building. There is no reason to target or disperse journalists or protestors who do not pose a threat from that position. To the extent officers leave federal property, the requested injunction is also safe.

- **Opinion No. 3**: The requested injunction is workable. Trained and experienced law enforcement are able to protect public safety without excluding journalists and legal observers or using excessive force, even in the heat of volatile protests. Any difficulties to federal authorities arise from lack of training and experience working in dense urban environments and lack of leadership that is experienced in urban civil disturbances/unrest.

## QUALIFICATIONS

5.    I am an expert on crowd control and use of force. In my 47 years of law enforcement, I have had substantial training and experience with crowd control and civil unrest in the context of protests, use of force in that context, and use of force generally.

6.    My formal training on crowd control began when I was with the Military Police in 1970, where I received training on response to crowd and riot

control, and I continued to learn about it throughout my career in law enforcement. I also had additional training in the Army on physical security measures. I received further in-service crowd control training when I served in the St. Petersburg Police Department. As a commander, I have supervised the training of officers on the equipment, the types of orders they will receive, and the formations that will be used for crowd control. I have familiarity with less-lethal technology, and I have been shown and fired the soft nose, pepperball and FN303 at the CBP Harper's Ferry training center in 2016.  I introduced less-lethal weapons to the Border Patrol and went to the facility to talk with the instructors and see the technology firsthand. I also received substantial training as a commander, which covered crowd control and use of force, including without limitation, 11 weeks of training at the FBI National Academy in Quantico, three weeks of training at the Senior Management Institute for Police in Boston, two weeks of FBI Law Enforcement Executive Training in Quantico, and three weeks at the FBI National Executive Institute in Quantico.

7.    I have had more experience with crowd control during civil disturbances than almost all law enforcement officers in the country. I served as Chief of Police in Seattle, where I oversaw over 200 protests. We probably had at least 25 protests every year I was there. In addition to my experience in Seattle, I also served as Police Commissioner in Buffalo, New York, where I also had duties and experience with crowd control. In overseeing those protests, my job was to make sure that all the officers who reported to me, from the line personnel all the way up, were properly trained to handle the protests. I also helped formulate and execute the strategic plans for how we would police each protest. These plans included how and when to use force, who, if anyone, would be given less-lethal weapons, and how to treat journalists, legal observers and protesters. This was an evolving art/science that varied by situation and built on the institutional experience that we built up.

8.    I have been tasered twice (while I was Police Chief in Seattle) and been subjected to pepper spray (while I was the commanding officer in Buffalo). I have

1  reviewed and approved the training and policies on policing numerous

2  demonstrations. I assigned command personnel to go to the WTO, IMF, G-8 and N.

3  Ireland to gain knowledge from viewing how other departments handled these

4  incidents. The commanders returned and provided the knowledge they had acquired.

5  After a "Mardi Gras" disturbance went awry in Seattle, Austin, and Philadelphia,

6  those agencies came to Seattle for a meeting I convened to go over how these should

7  be policed and lessons learned. As a president of the Police Executive Research

8  Forum, President of the Major Cities Chiefs Association, and member of the

9  International Association of Chiefs of Police, I have attended dozens of national and

10  international law enforcement conferences where discussions and presentations on

11  demonstrations and riots have been the topic.  For example, Chief Norm Stamper did

12  a detailed presentation and analysis of what occurred in Seattle in November 1999

13  during the World Trade Organization demonstration. I have been on the front lines of

14  many demonstrations in Seattle, standing in uniform with my officers and know

15  firsthand what policing a chaotic and volatile demonstration is like.

16      9.      I have also had substantial training and knowledge related to use of

17  force by law enforcement. As the head of multiple police departments and law

18  enforcement agencies, I was responsible for how the officers working under me

19  behaved and for supervising investigations into excessive force. I was also ultimately

20  responsible for how they were trained. I was the Internal Affairs commander in St.

21  Petersburg. I also received approval to form Internal Affairs (Professional Standards)

22  for CBP, hired the Assistant Commissioner and reviewed and approved the policies

23  for receiving and investigating complaints, including those involving the use of

24  force. I have reviewed and assessed hundreds of use of force reports and

25  investigations. For almost my entire career, evaluating uses of force has been one of

26  my job duties.

27

28

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

## MATERIALS REVIEWED

10.     The evidence and materials I reviewed in connection with preparing this declaration are:

a.     Declaration of Diya Cruz;

b.     Declaration Ben Adam Climer;

c.     Declaration of Sean Beckner-Carmitchel;

d.     Declaration of Chelsea Bell;

e.     Declaration of Jonathan Alcorn;

f.     Declaration of Lexis-Oliver Ray;

g.     Declaration of Ryanne Mena;

h.     Declaration of Michael Horowicz;

i.     Declaration of Abigail Olmeda;

j.     Declaration of Adam Rose;

k.     Declaration of Charles Xu;

l.     Declaration of Chase Carbonati;

m.     Declaration of Elizabeth Howell-Egan;

n.     Declaration of Emiliano Lopez;

o.     Declaration of Maria-Alejandra Paz;

p.     Declaration of Miholany Ochoa;

q.     Declaration of N. Reyna;

r.     Declaration of Ted Soqui;

s.     Declaration of Tina Petrosian;

t.     Declaration of Maritza Guardado;

u.     Declaration of Diana Barbadillo;

v.     Declaration of Eduardo De LA Riva;

w.     Declaration of Mayra Aguiluz;

x.     Declaration of Shannon Anderson;

y.     Declaration of Alex Nadolishny;

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

1        z.      Declaration of Graham Coven;

2        aa.     Declaration of Mónica Solórzano;

3        bb.     Declaration of Heber Marquez;

4        cc.     Declaration of Tina Desiree-Berg;

5        dd.     Declaration of Aleca Le Blanc;

6        ee.     Declaration of Jeanette Marantos;

7        ff.     Declaration of Kimberly Fisher;

8        gg.     Declaration of Bev Dransfeldt;

9        hh.     Declaration of A.R.;

10       ii.     Declaration of R.R.;

11       jj.     Declaration of Sarah Wiczewski;

12       kk.     Declaration of Veronica Miranda

13       ll.     https://theintercept.com/2025/07/07/ice-raids-la-violence-video-

14               bystanders/

15       11.     These materials, witness statements and videos, are the type of

16   information typically relied upon by experts in my area to assess whether tactics and

17   force used by law enforcement during protests constituted unreasonable or excessive

18   force.

19                        **DISCUSSION AND ANALYSIS**

20       12.     As detailed below, it is my opinion that (1) DHS has repeatedly

21   employed unnecessary and excessive force against journalists, legal observers and

22   protesters, (2) the terms of Plaintiffs' proposed preliminary injunction are safe for

23   law enforcement, and (3) the terms of Plaintiffs' proposed preliminary injunction can

24   be followed by trained law enforcement with leadership that is experienced in civil

25   disturbances and unrest.

26

27

28

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

# I. OPINION 1: DHS IS USING EXCESSIVE AND UNNECESSARY FORCE

13.    I have reviewed multiple declarations as well as video evidence from several different protests against ICE. My review of the materials I have seen shows that DHS appears to have engaged in widespread use of excessive and unnecessary force against journalists, legal observers and protesters.

14.    DHS's initial stated purpose for involvement in the protests is that it is trying to protect federal property. DHS is not supposed to otherwise engage in police activities. Generally, in defending a property, police form a perimeter around the property. In this defensive stance, law enforcement officers (LEOs) generally do not need to use force unless they are under attack, or if someone is trying to break into the facility. At that point, the correct protocol is to issue instructions to the crowd, such as "move back," and warn them. If officers are still under attack or crowds are trying to break into the facility after being given clear instructions to move away, using teargas may be appropriate. If that does not work, or if specific individuals are hurling projectiles, it may be warranted to use less-lethal impact munitions to target specific individuals who pose a threat in order to stop them. If a specific person is doing something dangerous, such as throwing fireworks, it is not permissible to fire less-lethal projectiles into a crowd to try to stop that person because it could cause serious injury to people who are not engaged in unlawful activities. An individual who is the threat from hurling objects, or using fireworks as weapon, should be specifically identified. Any less-lethal projectile should be directed to them and not fired generally into the crowd. Even when the individual is identified it may not be possible to fire the less-lethal projectile because of that person's use of the general crowd as cover. Rubber bullets are capable of killing people, and they should only be targeted at specific individuals when other lesser levels of force have failed or are unavailable. It does not appear that DHS has followed these protocols and has instead used teargas and less-lethal munitions, excessively, improperly and indiscriminately in ways that are highly dangerous to everyone present.

1    15.    DHS has also been involved in law enforcement outside of federal

2  property when ICE has been conducting immigration raids. The same use-of-force

3  rules discussed above apply to these engagements, and DHS appears to have engaged

4  in the same excessive and indiscriminate use of force off federal property. When

5  outside the perimeter and a confrontation occurs, an attempt should be made to de-

6  escalate the particular individual(s) to avoid a more serious confrontation. This can

7  also be accompanied by a warning not to interfere with the law enforcement

8  operation. Police trained and experienced with policing civil unrest in dense urban

9  situations are capable of safely managing these situations without using the excessive

10  force discussed below.

11    16.    I have reviewed a substantial number of declarations and videos that

12  involve a diverse mix of individuals discussing experiences both to themselves and

13  those around them. The declarants include journalists, legal observers, participants in

14  the protests, and elected officials and comprise a wide range of ages. The evidence I

15  have seen also spans a range of dates and geographical locations, and the protests

16  vary in size and duration. I originally submitted a declaration discussing my

17  conclusion based on events on June 6-9, 2025 that DHS had engaged in a pattern of

18  using excessive force against reporters, legal observers and protesters. The

19  subsequent events have reinforced those conclusions. My observations regarding

20  events post-dating June 9, 2025, show that DHS has continued to use excessive force

21  against reporters, observers and protesters, including by repeatedly failing to give

22  warnings before deploying force, by using force that is unnecessary and by misusing

23  crowd control weapons, such as firing pepper balls directly at people.

24    17.    In the post-June 9 materials I reviewed, I did not see grounds for

25  deploying force. Elizabeth Howell-Egan mentioned that water bottles were thrown in

26  the direction of DHS agents. However, law enforcement personnel were wearing

27  protective clothing and equipment, and as detailed above and below, a person or

28  persons throwing water bottles is not grounds for deploying force without warning

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

1    against a crowd that includes non-violent protesters. There is also evidence, such as

2    the declaration of Alexander Nadolishny, showing that when officers did provide

3    orders, that protesters adhered to them.

4         18.    The new evidence I reviewed also showed the ongoing lack of training

5    and coordination that I discussed in my initial declaration. For example, Maritza

6    Guardado saw that a detainee was removed from a government SUV and displayed

7    to the crowd and photographed. She interpreted this as a display to further anger and

8    enrage the crowd. This demonstrates a lack of knowledge of basic law enforcement

9    tactics in an arrest situation with an angry crowd in attendance. The individual

10   detained once inside a government vehicle should immediately be driven away to a

11   location away from the crowd. That way additional questions can be asked, facts

12   ascertained, and either the person charged or released. Mayra Aguiluz stated that she

13   heard a federal law enforcement officer say LAPD or LASD should be called to

14   "come out here right now." This demonstrates a lack of coordination and

15   communication with the law enforcement organization that has primary jurisdiction.

16        19.    Below is my detailed analysis of the some of the declaration and video

17   evidence that I have reviewed. Because many of the misuses of force discussed in the

18   declarations and shown in the videos have been of the same nature, I have not

19   provided a detailed analysis for each of the declarations that I have reviewed.

20       **A.    Jonathan Alcorn**

21        20.    On June 7, 2025, a CBP agent shot Jonathan Alcorn in the arm with a

22   teargas canister, even though he was wearing a press pass, carrying professional

23   photography equipment, including a foot-long lens, was standing away from

24   protesters, and had passed by the group of officers who shot him so that they could

25   see he was a professional photojournalist. (Alcorn Decl. ¶¶ 8, 13, 15-16, 20, 24.)

26   Under these circumstances, shooting Mr. Alcorn was more likely than not excessive

27   use of force for several separate and independent reasons.

28

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

- First, Mr. Alcorn was not doing anything to threaten law enforcement or dangerous to others. The rule that all officers must follow, and CBP's use of force policy in specific, provides that LEOs may not deploy force unless it is necessary to protect against the threat of violence.

- Second, Mr. Alcorn was not given any warning. Generally, before using force, law enforcement should issue warnings and use de-escalation techniques. It does not appear that CBP did that.

- Third, Mr. Alcorn was clearly marked as press and had come close to CBP officers who could see that he was a photojournalist. Even if a valid dispersal order had been issued (which is unclear from the declaration), it is unnecessary and improper to disperse or assault journalists.

- Fourth, teargas canisters should never be fired at people. The canisters are made to break open on the ground to release teargas. Using them as projectile weapons is extremely dangerous, as shown from Mr. Alcorn's injuries, as they can cause serious injury or potentially death. Officers who receive training on the use of teargas launchers are trained never to fire teargas as an impact munition.[1]

- Fifth, less-lethal weapons should not be fired at someone who is running away from law enforcement as Mr. Alcorn was. (*Id*. ¶¶ 24-29.) That is both an unnecessary use of force and contrary to CBP's' use-of-force policy.

- Sixth, law enforcement may not retaliate against individuals for engaging in protected First Amendment activities, such as reporting or protesting. CPB officers have had extensive marksmanship training, and if an officer is firing projectiles at people, they are likely to hit their targets. Because CBP

---

[1] My opinions in this declaration are limited to what is appropriate for crowd control. An officer may use deadly force, such as shooting a teargas cannister at someone's head, if the officer reasonably believes they are in danger of death or serious bodily injury or that a suspect poses such risks to others.

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

1    policy prohibits indiscriminately using less-lethal weapons, it appears more

2    likely than not that Mr. Alcorn was targeted for being a reporter.

3    21.    Mr. Alcorn's declaration describes a pattern of excessive force against

4    other people as well. This includes indiscriminately firing teargas canisters at the

5    crowd. (*Id*. ¶ 18.) This is excessive for the same reasons as above. It is not how

6    teargas is supposed to be deployed. There does not appear to have been any attempt

7    at de-escalation or warning, which should be documented. It does not appear to have

8    been done in response to any act or threat, and it does not appear to be targeted at

9    specific actors who are doing something that warrants force. Law enforcement

10    officers who are trained in policing civil unrest are capable of identifying specific

11    individuals who are engaged in unlawful activities and taking appropriate action

12    against them. Taking appropriate action against a criminal violator can be when it is

13    occurring, if possible, or by identifying the individual for later arrest and prosecution.

14    Law enforcement did this, for example, with videos of the criminals who attacked the

15    United States Capitol on January 6, 2021. This also occurred in the wake of the

16    George Floyd protests in 2020.

17    22.    Mr. Alcorn also states to have witnessed rubber bullets whizzing by him

18    in the air when he was away from protesters. (*Id*. ¶¶ 25-26.) This also appears more

19    likely than not to be an excessive use of force because the force does not appear to be

20    targeted at any specific dangerous actor, and rubber bullets should never be shot

21    above waist-level. People have been killed by rubber bullets fired above waist-level.

22    23.    Finally, Mr. Alcorn also describes federal officers targeting a protester

23    carrying the American Flag. (*Id*. ¶ 18.) There does not appear to be any reason she

24    was targeted other than retaliation for protesting.

25    24.    All of these uses of force are more likely than not disproportionate to

26    any legitimate law enforcement interest and extremely dangerous to everyone at the

27    protest. Moreover, they do not appear to be the isolated conduct of a single officer,

28

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

1  especially when this is considered in light of the experiences of the other declarations

2  and videos I have reviewed, as discussed below.

3      **B.    Lexis-Olivier Ray**

4      25.    From my review of the declaration of Lexi-Olivier Ray and

5  accompanying videos, it appears more likely than not that DHS used excessive force

6  at the June 7, 2025 protest at the Metropolitan Detention Center (MDC).

7      26.    Mr. Ray describes, and his videos show, a sequence of events in which

8  DHS used excessive and indiscriminate force against everyone who was present. It

9  began with DHS coming out of the building teargassing and firing pepper balls at

10  Mr. Ray and other journalists and protesters alike. It continued when Mr. Ray left the

11  immediate vicinity of the facility when DHS shot him and shot at other press

12  members. It continued when DHS was moving its skirmish line and continuing firing

13  "at the backs of journalists and protesters all the way to Temple Street." (Ray Decl. ¶

14  30.)

15      27.    DHS's use of force was more likely than not excessive for at least the

16  following reasons:

17      28.    First, the video shows that DHS officers came out of the building after

18  protesters had retreated to leave about a 50-foot buffer between them and the

19  building. DHS came out using teargas and firing less-lethal weapons when there does

20  not appear to be any immediate threat to law enforcement, and people were not near

21  the building. Such force was more likely than not unnecessary and disproportionate

22  to any risk faced by DHS.

23      29.    Second, Mr. Ray describes DHS firing at least one teargas cannister that

24  exploded above the crowd. (*Id*. ¶ 20.) That is not how teargas cannisters are supposed

25  to be deployed.

26      30.    Third, Mr. Ray describes DHS firing at protesters and at him. (*Id*. ¶ 22.)

27  Pepper balls are not supposed to be shot at people; they are supposed to be shot near

28  people to release the irritant inside. For example, one use we trained for at CBP was

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

1   to shoot a pepper ball near someone scaling a wall to break into a facility we were

2   defending. The dangers of shooting pepper balls at people became widespread public

3   knowledge in 2004, after Victoria Snelgrove was killed by a pepper ball fired by a

4   Boston police officer after the Red Sox beat the Yankees in the American League

5   Playoffs.

6         31.    Fourth, Mr. Ray was clearly marked as press. (*Id.* ¶ 8.) He posed no

7   threat to law enforcement, and it was excessive and unnecessary to shoot pepper

8   balls at him when he was standing to the side, not interfering with law enforcement.

9   (*Id.* ¶ 22.) California law precludes dispersing press, even when lawfully dispersing

10  protesters. Officers experienced in policing protests are capable of identifying and

11  allowing members of the press to remain even in very chaotic circumstances. When I

12  was the Police Chief in Seattle, we also did not disperse press even if we declared an

13  unlawful assembly. The Portland Police Bureau was enjoined from ever dispersing

14  journalists and legal observers during the large-scale 2020 protests and complied

15  with that injunction for years without danger to law enforcement. Using force against

16  a member of the press when they are off to the side of a protest is unnecessary and

17  excessive.

18        32.    Fifth, even when Mr. Ray was standing with tv crews and other

19  members of the press, off to the side from the protests, DHS fired an "enormous

20  volley" of pepper balls at the group of journalists. (*Id.* ¶¶ 26, 27.) This was more

21  likely than not unnecessary and excessive for many of the reasons given above: there

22  is no need to disperse press, pepper balls should not be shot at people, and such force

23  should be used in a targeted manner, not indiscriminately.

24        33.    Sixth, an officer shot Mr. Ray with a pepper ball from 10 feet away.

25  That was more likely than not excessive because he is press, shooting at people is not

26  a proper use of pepper balls, and it is especially dangerous at close range. (*Id.* ¶ 28.)

27        34.    Seventh, officers continued to fire pepper balls at Mr. Ray as he was

28  retreating, hitting him in the back. (*Id.* ¶ 29.) Pepper balls are intended to be used to

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

1  make crowds disperse.  If people are following orders to move away from police,

2  there is no justification to fire pepper balls toward them, much less to improperly fire

3  pepper balls so as to strike them. Shooting people in the back with less-lethal

4  weapons is contrary to how less-lethal projectile weapons are supposed to be used.

5       35.     Eighth, Mr. Ray's video shows DHS firing at photographers with

6  tripods who do not appear to be near any protesters, causing them to run for cover.

7  Such force appears to be excessive for all the reasons previously given, i.e., they are

8  press, pepper balls should not be fired at people, and they were not posing any

9  danger to law enforcement or federal property.

10      36.     Ninth, Mr. Ray observed DHS "targeting journalists instead of others."

11  (*Id*. ¶ 35.) Targeting someone for anything other than dangerous or unlawful activity

12  is excessive.

13      37.     Tenth, DHS did not give Mr. Ray, journalists, or protesters any warning

14  before using force to move their skirmish line. (*Id*. ¶ 34.) Because there does not

15  appear to have been any exigent circumstance that prevented DHS giving warning,

16  this is more likely than not a separate example of excessive force.

17      38.     Eleventh, it appears that Special Response Team (SRT) was part of

18  DHS's policing efforts. As discussed below, the SRT should not be policing urban

19  civil unrest because they are not experienced in doing so.

20  **C.     Abigail Olmeda**

21      39.     The events described by Ms. Olmeda on June 9, 2025 also discuss at

22  least four incidents in which it appears that DHS used excessive and indiscriminate

23  force against Ms. Olmeda and other protesters.

24      40.     **Incident No. 1**: Ms. Olmeda was shot near her head by a pepper ball.

25  (Olmeda Decl. ¶ 9.) This was excessive and unnecessary for several reasons:

26      -   First, as noted above, pepper balls are not supposed to be fired at people,

27          much less at their heads. When they are misused to shoot at people, it can

28          be lethal.

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

- Second, Ms. Olmeda had been at the protest for 15 minutes, and it does not appear that she received any type of warning. If something had changed in the 15-minute period between the time she arrived and when she was shot that made force necessary, DHS should have given her a warning, especially before employing a less-lethal weapon.

- Third, Ms. Olmeda was 40-50 feet away from law enforcement and does not appear to have been engaged in any unlawful activity, much less anything that was creating an imminent threat to law enforcement. Using any force against such a person is excessive, much less an impact munition to the head.

- Fourth, it appears that Ms. Olmeda was shot by HSI (Homeland Security Investigations). As detailed below, this group largely conducts investigations and is not tasked with, nor experienced in, policing civil unrest in dense urban areas.

41.     **Incident No. 2**: DHS shot Ms. Olmeda again, a few minutes after shooting her the first time, when she was holding up a sign with a message critical of ICE. (*Id*. ¶¶ 11-15.) This use of force is more likely than not excessive and unnecessary for all the reasons given above: agents lacking the proper experience were shooting at her head, without giving a warning, when she posed no threat to law enforcement. The absence of any legitimate reason to target Ms. Olmeda suggests that DHS shot her in retaliation for her sign.

42.     **Incident No. 3**: DHS teargassed Ms. Olmeda. (*Id*. ¶ 16.) This was more likely than not excessive because DHS did not give warning, she did not appear to be doing anything threatening, and the people around her were also "standing peacefully." (Id. ¶ 15.)

43.     **Incident No. 4**: DHS teargassed Ms. Olmeda and shot her in the head with a rubber bullet. (*Id*. ¶¶ 17-20.) For the same reasons as above, this was unnecessary and excessive. Firing rubber bullets above waist-level is particularly

1   dangerous, contrary to DHS policies on how such weapons should be used, and

2   known to cause serious harm. For example, at the 2020 protests in Portland, a federal

3   agent shot protester Donovan Labella in the head, fracturing his skill and leaving him

4   permanently disabled.[2] The injuries Ms. Olmeda reports would be a predictable

5   result of firing rubber bullets at people above waist-level.

6        44.    The force in Incident No. 4 was also more likely than not excessive

7   because DHS fired multiple rubber bullets that hit Ms. Olmeda's umbrella and the

8   person next to her several times (also above the waist). (*Id*. ¶¶ 17-18.) DHS officers

9   are trained marksmen. Rubber bullets should be used to target specific individuals

10  engaged in threatening acts. Ms. Olmeda claims that she was trying to kick a teargas

11  cannister away from her when she was 40-50 feet away from law enforcement, who

12  were wearing gas masks. It appears that her conduct did not pose any immediate

13  threat to law enforcement. Under such circumstances, firing any rubber bullets, much

14  less multiple rounds, was more likely than not excessive. Further, one protester was

15  hit in the back. (*Id*. ¶ 17.) Shooting someone in the back when they are not

16  threatening to cause death or serious bodily injury is excessive.

17       **D.    Chelsea Bell**

18       45.    On June 7, 2025, Chelsea Bell, a legal observer was shot at with tear gas

19  by CBP officers and observed CBP officers shooting less lethal weapons – primarily

20  tear gas cannisters, but likely else pepper balls --at demonstrators and bystanders in

21  Paramount, California. While she was at the scene in Paramount, Ms. Bell was

22  wearing a neon green legal observer hat and observing, rather than participating in

23  protesting the ICE raid that had allegedly occurred at a nearby Home Depot. Based

24  on my review of her declaration and a photograph and video that is included with her

25

26  ───────────────

27  [2] Conrad Wilson, *Portland protester, permanently injured in 2020, reaches settlement with US Justice Department*, OPB. (Nov. 20, 2024),

28  https://www.opb.org/article/2024/11/20/portland-protester-donovan-labella-2020-protests-us-justice-department/.

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

declaration, it is my opinion that the force directed at her, and force she observed CBP officers using, was more likely than not excessive use of force for several separate and independent reasons.

46.    The force she described is also consistent with declarations, photographs and video evidence from three journalists who were at the scene that day, Ryanne Mena, Jonathan Alcorn, and Sean Beckner-Carmitchel. In analyzing force incidents and whether law enforcement engaged in proper or excessive force, one important factor I consider is whether different witnesses have consistent perceptions of what occurred, as these four people did.

- First, the CBP officers shot tear gas at her when she was approaching from quite a distance wearing a green legal observer hat and while she was not posing any threat or taking any aggressive actions. (Bell Decl. ¶¶ 16-17 and Exh 1.) The rule that all officers must follow, and CBP's use of force policy in specific, provides that LEOs may not deploy force unless it is necessary to protect against the threat of violence.

- Second, the officers did not direct Ms. Bell to stop or issue a warning that they would use force against her if she continued; they just began shooting tear gas at her. (*Id*. ¶ 16) Generally, before using force, law enforcement should issue warnings and use de-escalation techniques. It does not appear that CBP did that.

- Third, Ms. Bell was clearly identifiable as a level observer by her highly visible neon green hat, which legal observers wear at protests across the country.  Even if a valid dispersal order had been issued (which it appears did not occur), it is unnecessary and improper to disperse or assault legal observers, who like journalists are present to observe what is happening, not to participate in any way in a protest.

47.    In addition to the force that DHS directed at her, the force Ms. Bell observed CBP officers directing at a relatively small group of protestors in and

around Alondra Blvd also appears to be excessive for a number of reasons. Most notably, Ms Bell observed a large number of CBP officers, perhaps as many as 50, in full riot gear shooting barrage after barrage of tear gas cannisters at protestors across Alondra Boulevard. The video I reviewed shows them shooting so much tear gas that the intersection at Alondra was flooded with a mass of whitish smoke.

- First, Ms. Bell reported, and the video is consistent with her report, that the vast majority of people in the area were simply milling around or protesting.  (E.g., Bell Decl. ¶ 24). But the officers were firing massive amounts of tear gas indiscriminately at everyone in the area. It is excessive force to shoot tear gas at people who do not pose a threat of violence.

- Second, Ms. Bell did not report ever hearing a warning or dispersal order before the officers directed volleys of tear gas or other less lethal weapons at protestors and bystanders. (*Id*. ¶¶ 16, 24, 26),

- Third, less-lethal weapons should not be fired at someone who is running away from law enforcement as happened to Mr. Alcorn (Alcorn Decl. ¶ 24-26.) and as Ms. Bell observed happen to someone else. (Bell Decl. ¶ 17). That is both an unnecessary use of force and contrary to CBP's' use-of-force policy.

- Fourth, even with respect to the very small number of people whom Ms. Bell observed throw a few  plastic water bottles in the direction of the officers (Bell Decl. ¶ 22), the force used was excessive because it was indiscriminate rather than directed at someone who may have been throwing something; it was grossly disproportionate to the threat posed because the water bottles were not coming close to the officers who were firing weapons in response; and a plastic water bottle poses little or no real threat to officers in full riot gear.[3]

---

[3] There is some evidence in Ms. Bell's declaration that CBP officers were firing tear gas cannisters at people's head. (Bell Decl. ¶ 36.) This evidence is consistent with the

18                              Case No. 2:25-cv-05563-HDV-E

**E.    Michael Horowicz**

48.    On the evening and night of Saturday June 7, 2025, Michael Horowicz observed DHS officers shoot massive amounts of tear gas at protestors who did not appear to pose any threat. Then after the protestors had mostly dispersed, they continued to shoot teargas cannisters at news trucks and journalists across the street from where they were, and the journalists were clearly identifiable by their TV cameras and other equipment and posed no threat whatsoever. Under these circumstances, shooting masses of tear gas at protestors and then continuing to shoot it at journalists more likely than not constituted excessive use of force for several separate and independent reasons.

49.    Mr. Horowicz's description of events and the videos he shot are consistent with the declaration and videos shot by Lexis Oliver-Ray from the same area at the same time.

- First, the DHS officers shot tear gas at a group of clearly identifiable journalists who posed no threat whatsoever.  (Horowicz Decl. ¶¶ 10-17). The rule that all officers must follow, and CBP's use of force policy in specific, provides that LEOs may not deploy force unless it is necessary to protect against the threat of violence.

- Second, it does not appear that the DHS officers gave any dispersal order or a warning that they would use force if the journalists did not move from the area.  (*Id*. ¶ 17). Generally, before using force, law enforcement should issue warnings and use de-escalation techniques.

- Third, the group of people standing around the news trucks were clearly identifiable as journalists by their equipment, e.g., cameras on tripods, remote trucks with microwave antennas some of which had identifying

declaration of Sean Beckner-Carmichael, but because the evidence in Ms. Bell's declaration does not so clearly establish that the woman mentioned in the declaration was hit with tear gas cannister, I am not relying on it specifically to form my opinion.

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

1    information about their station.  (*Id*. ¶¶ 5, 10, 16). Law enforcement may

2    not retaliate against individuals for engaging in protected First Amendment

3    activities, such as reporting or protesting.    Even if a valid dispersal order

4    had been issued (which it appears did not occur), it is unnecessary and

5    improper to disperse or assault journalists, who are present to observe what

6    is happening, not to participate in any way in a protest.

7    -    Fourth, even if there had been some threat present, which is not evident,

8    laying down a barrage of tear gas for 20 minutes would almost certainly be

9    grossly disproportionate to the situation.

10    **F.    Elected Officials**

11    50.    I have reviewed declarations by several elected officials: Mayra

12    Aguiluz, Eduardo De La Riva, Heber Marquez, and Monica Solórzano. DHS

13    treatment of these individuals more likely than not constituted excessive force. It

14    appears that DHS subjected them to force (1) without warning and (2) in the absence

15    of any danger to law enforcement. As noted above, force should not be used without

16    a warning, unless the circumstances make a warning infeasible, and significant force,

17    such as teargas, should not be used unless there is a compelling need. There did not

18    appear to be any immediate need to address any risk in any of these situations

19    described by the elected officials.

20    **G.    Other Declarants**

21    51.    The other declarations I have reviewed show a similar pattern of the

22    same misuses of force that I already have discussed. Diya Cruz describes

23    unnecessary use of teargas. (Cruz Decl. ¶ 10.) So does Maritza Guardado. (Guardado

24    Decl. ¶¶ 12, 13, 16.) So does Graham Coven. (Coven Decl. ¶ 11.) So do many others,

25    for example: Elizabeth Howell-Egan, Mayra Aguiluz, Eduardo De La Riva, Monica

26    Solórzano, Heber Marquez, and Shannon Anderson. In all these declarations, just as I

27    described with Mr. Alcorn, there does not appear to have been any attempt at de-

28    escalation or warning. It does not appear to have been done in response to any act or

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

1    threat, and it does not appear to be targeted at specific actors who are doing

2    something that warrants force.

3        52.    Like many other declarants, such as Jeanette Marantos, R.R. and

4    Kimberly Fisher, Ms. Mena was subjected to force even though she was clearly

5    marked "press." (Mena Decl. ¶¶ 8, 22.) She also describes DHS shooting at

6    protesters with pepper balls (Mena Decl. ¶¶ 13-14.) So do many others, for example

7    Nadolishny Decl. ¶¶ 8-11; Barbadillo Decl. ¶ 7; Lopez Decl. ¶¶ 7-9; Climer Decl.¶ 7;

8    Soqui Decl. ¶ 7; Ray Decl. ¶ 29; Xu Decl. ¶ 8. Ms. Mena, herself, was shot with a

9    pepper ball when she was physically distant from protesters and not doing anything

10   threatening. (*Id*. ¶ 16-18, 22.) The next day she went out to report, DHS shot her in

11   the head with a rubber bullet. (*Id*. ¶ 31.) She describes "volleys of less lethals" (*id*. ¶

12   29) rather than targeted uses, and also witnessed DHS firing teargas cannisters at

13   people. (*Id*.) All of this conduct is more likely than not excessive force and reinforces

14   my opinions.

15       53.    Benajmin Climer describes similar and widespread instances of

16   improper uses of force. He describes LEOs firing tear gas cannisters at people, as

17   opposed to on the ground. (Climer Decl. ¶ 6.) Like Mr. Alcorn, Mr. Climer was hit

18   by an airborne tear gas canister (*id*. ¶ 8), which is highly dangerous and should not

19   happen. Mr. Climer also describes a protester who described getting hit in the head

20   with a pepper ball. (*Id*. ¶ 7.) For the reasons stated above, all these uses of force were

21   more likely than not excessive.

22       54.    Sean Beckner-Carmitchel is a clearly-marked journalist who DHS shot

23   in the head with a teargas cannister when he was away from protesters trying to

24   record an encounter between DHS officers and protestors. (Beckner-Carmitchel

25   Decl. ¶ 13.) DHS's use of force on him was excessive for the reasons that I already

26   have given.

27

28

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY
INJUNCTION

### H.    Conclusion

55.    There appears to be a pervasive pattern of misuse of force by DHS against journalists, legal observers, and protesters who have been present at the protests in Southern California. That pattern has continued since June 6, 2025, both at smaller events and larger protests. This pattern includes failure to give warnings, using unnecessary force in the absence of danger to law enforcement, and misuse of crowd-control weapons.

## II.    OPINION 2: THE PRELIMINARY INJUNCTION IS SAFE FOR LAW ENFORCEMENT

56.    In the context of defending federal property or supporting law enforcement operations, LEOs have no reason to target journalists or legal observers or disperse them. They also have no reason to misuse crowd-control weapons or use excessive force.

57.    Complying with the relief requested by Plaintiffs under these circumstances would not be unsafe or burdensome for law enforcement trained to deal with situations involving large, and sometimes unruly crowds.

## III.    OPINION 3: THE PRELIMINARY INJUNCTION IS WORKABLE

58.    Police forces under leadership trained and experienced in civil disturbances are able to protect public safety without excluding press and legal observers or violating any of the other restrictions in the preliminary injunction.

59.    It appears that there were a few incidents where someone at the protest was engaged in a crime, but there is nothing in the proposed preliminary injunction to prevent such an individual from being arrested and charged. It is quite common in some protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, but those are just the general nature of some protests. They do not have anything to do with the proposed preliminary injunction.

60.    Effective crowd control in the context of volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress First Amendment activities. It also involves coordination between law enforcement

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

1  agencies. That does not appear to have occurred in this case, and there is public

2  evidence that local and federal law enforcement are not coordinating.

3      61.    Police who are experienced with dealing with protests, and in specific

4  protests where some individuals have engaged in violent and destructive acts, are

5  capable assessing and managing the risks posed in these unique circumstances.

6      62.    The DHS officers involved in the incidents above appear to lack such

7  experience. Some of the agencies involved have no responsibility for urban crowd

8  control, such as Homeland Security Investigations (HSI), which is an investigative

9  agency within DHS, that typically does fraud investigations and human trafficking

10  investigations. Similarly, the Special Response Team (SRT) is a tactical unit with

11  DHS that is part of CBP Office of Field Operations that executes dangerous

12  warrants. It also provided security for me, when I was head of CBP. These officers

13  are not accustomed to policing urban civil unrest; nor are they trained to do so.

14      63.    The protections in the preliminary injunction are workable for trained

15  law enforcement. To the extent that the federal agents would have any difficulty

16  complying with the preliminary injunction, such problems arise from the failure of

17  supervision and leadership, lack of experience, and failure of leadership to ensure

18  that the agents are properly trained for civil disturbances/unrest.

19  Dated: July 18, 2025

20

21

22                                                   _____

23                                                   Gil Kerlikowske

24

25

26

27

28

SUPP. DECLARATION OF KERLIKOWSKE ISO PLAINTIFFS' PRELIMINARY INJUNCTION

# EXHIBIT 1

## R. GIL KERLIKOWSKE

R. Gil Kerlikowske

15 Water Street

Charleston, South Carolina 29401
gilkerlikowske@hotmail.com
Mobile: 202-306-9587

## Professional Experience

**February 2017 - Present**

Gil Kerlikowske LLC, Owner/Principal: A private consultancy specializing in border security, global supply chain security, public safety, and drug policy issues and practice.

Global Resilience Institute, Northeastern University, Distinguished Senior Fellow.

Rice University, Non-Resident Fellow (2017-2024)

Harvard University, John F. Kennedy School of Government, Institute of Politics, Resident Fellow, (Spring 2017).

Council on Foreign Relations, Member

**March 2014-January 2017**

Commissioner, United States Customs and Border Protection (CBP), U.S. Department of Homeland Security.

Nominated by President Barack Obama and unanimously confirmed by the U.S. Senate to head Customs and Border Protection (CBP). I was the only confirmed Commissioner in that Administration.  CBP is the largest law enforcement organization in the country. It has over 60,000 employees throughout the world and a budget of $13B. Comprised of the Border Patrol, Air and Marine, and Field Operations, CBP has the dual responsibility of protecting our nation's borders and ensuring the efficient movement of both trade and travel.  With Congressional approval I reorganized the executive staff, elevating trade to a direct report to me with an Executive Assistant Commissioner. I improved transparency and communication, oversaw a significant reduction in the use of force by Border Patrol agents, and implemented an electronic trade tracking system (ACE). Partnered with U.S. Chamber of Commerce on trade.  I authorized the largest fine ever imposed by CBP against VW. I negotiated pre-clearance preliminary agreements with over six countries and implemented pre-clearance in the UAE.  I significantly increased enforcement efforts on countries where the use of child labor violated U.S. law through Withhold Release Orders.  I utilized an approved advisory committee of private sector stakeholders

from all disciplines of the trade and manufacturing centers to provide advice and guidance on how to improve Customs efforts to increase efficiency and effectiveness in global supply.


## May 2009-March 2014

Director, White House Office of National Drug Control Policy (ONDCP)

Nominated by President Barack Obama and confirmed by the U.S. Senate to lead the White House drug policy office.  ONDCP is responsible for establishing the policies, priorities, and objectives for the Nation's drug control program. I was charged with producing the President's National Drug Control Strategy. The strategy directs the Nation's anti-drug efforts and establishes a program, a budget, and guidelines for cooperation among Federal, State, and local entities. I travelled the country extensively meeting with Governors, Mayors, Judges, law enforcement executives, community leaders, and individuals in treatment and recovery to re-balance the Nation's efforts and resources to focus on drug abuse as both a public health and a public safety problem. I met with leaders in over fifteen countries to enhance collaborative strategies to prevent drug abuse and to engage in law enforcement efforts to combat smuggling and transnational organized crime. I co-authored the President's Transnational Organized Crime Strategy with John Brennan.


## August 2000-May 2009

Chief of Police, Seattle, Washington

In 2007 Seattle recorded the lowest crime rate in 40 years.  The department has over 1,900 employees to police a city of 680,000 residents.  I restructured a significant critical area that was partially responsible for the chief's position becoming available—Demonstration Management.  SPD is now requested for advice and consultation on managing crowds, from the G8 in Russia to the Presidential Inauguration.  SPD achieved National Accreditation in 2003 and 2006.

The Seattle Police Foundation was formed in 2001 and provided over $500,000 annually to the organization.  A Crime Scene Investigation unit was formed in 2004 and the Cold Case unit has solved a number of homicides, including one from 1969, at the time, the oldest cold case in the United States.

I implemented the first civilian oversight for the department. Responsibility for emergency preparedness for the entire city is a function of the department. A state-of-the-art Emergency Operations Center was designed and opened in 2008.  New records management and computer aided dispatch systems were implemented in 2008. The City agreed to the first comprehensive and sustainable growth in the size of the force since the 1980's. The Seattle Police Department is regarded as one of the most professional and cutting edge big-city police departments in the Nation.

## R. GIL KERLIKOWSKE

**July 1998-August 2000**

Deputy Director, U.S. Department of Justice, Office of Community Oriented Policing Services (COPS).

This agency is responsible for providing grant funds for additional police officers and technology to local governments.  As importantly, COPS supports community policing programs  by providing training and educational material to law enforcement and community groups.  I represented the Department at speaking engagements and media events throughout the country.  I was responsible for two divisions that comprise over 60 percent of the total personnel and $6 billion in federal investments.

**January 1994-July 1998**

Police Commissioner, Buffalo, New York

As the first outside Commissioner in 30 years, I was selected by the Mayor to restructure the organization. The department was viewed as being isolated from the community and its culture did not support community policing. Over the last two decades the department was not in the forefront in using modem crime prevention and control methods, training, and advanced technology.

During my tenure, overall serious crime decreased by over 31%, violent crime by 46%, and homicides were reduced by 51%.  A community policing implementation plan was developed and mini-precincts were opened.  Two state-of-the-art district stations were opened and two more were planned and funded. This completed realignment from 14 precincts to five districts.

I initiated a Citizen Advisory Committee, Citizen Police Academy, Youth Police Academy, and high school dialogues between officers and students that improved communication and provided closer cooperation with the community. The Yale Child Development-Community Policing Program, an intervention for children exposed to violence, was implemented.  A random drug-testing program was negotiated with the PBA for all officers including the Commissioner and command staff.  I implemented an objective examination process for selecting detectives.

An independent management study by the International Association of Chiefs of Police (IACP) found the department "far more contemporary, professional and effective" under my  leadership.

**January 1990-December 1993**

Chief of Police, Fort Pierce, Florida

Fort Pierce is a racially and ethnically diverse city that was experiencing significant crime problems. Programs such as Neighborhood Oriented Patrol, Victim Assistance and Mall

## R. GIL KERLIKOWSKE

Watch contributed to a reduction in crime and an improved relationship between the community and the department. A neighborhood police station was opened that provided a safe haven for a variety of programs such as scouting and after-school tutoring. The department was selected by the Mott Foundation as one of four national sites for implementing neighborhood policing centers. The department received the Attorney General's crime prevention award. National accreditation was achieved.

### April 1987-January 1990

Chief of Police, Port St. Lucie, Florida

Impact fees on new construction were implemented to pay for future police growth. The process to achieve national accreditation was begun and a new police headquarters was designed. The department received the Attorney General's crime prevention award.

### July 1985-April 1987

Commanding Officer, Lieutenant, Criminal Investigation Division, St. Petersburg (FL) Police Department

St. Petersburg is a city of a quarter million residents and faces the same challenges as other large urban police agencies. This division is responsible for the investigation of all major crimes. Responsibilities included management of all phases of criminal investigations, polygraph services, crime analysis, victim assistance, hostage negotiation, and a violent crimes unit. New programs such as a weekly tactical crime meeting (a forerunner of COMPSTAT), statistical reporting format, interaction with community groups, and a management review and reallocation of personnel were implemented.

### August 1984-July 1985

Visiting Fellow, United States Department of Justice, National Institute of Justice (NIJ).

Recipient of a one-year fellowship at the National Institute of Justice, the research arm of the Department of Justice and is on the leading edge of developments in the criminal justice field.

I was an advisor to the Director and also managed grants in excess of $3 million, including the Newport News Problem-Oriented Policing Project. Other responsibilities included developing new programs and drafting long and short-range plans for the Law Enforcement Division.

**R. GIL KERLIKOWSKE**

**May 1980-August 1984**

Commanding, Lieutenant, St. Petersburg (FL) Police Department

Commanded several key sections of the St. Petersburg Police Department, including, Field Training, Vice and Narcotics, and Internal Affairs.

**February 1972-May 1980**

Police Officer, Sergeant, St. Petersburg (FL) Police Department

Patrol duty with an innovative inner-city team policing unit (a predecessor of community policing) and detective assignments in narcotics and later robbery-homicide.  Began my career in St. Petersburg as a police cadet in 1969.

**February 1970-February 1972**

Security Team Leader, Army Military Police

Supervisor of one of the teams responsible for security of the presidential helicopter (President Richard Nixon).

## Select Awards and Offices

Chair, National Law Enforcement Explorers Board, (2015)
Women in Federal Law Enforcement, Award for "elimination of systemic barriers" (2015)
Penrith Award, National Executive Institute Associates (2014)
John P. McGovern Award for work in preventing drunk/drugged driving (2011)
Coordinating Council on Juvenile Justice and the Prevention of Delinquency (DOJ) (2011)
American Medical Association Nathan A. Davis Award (2011)
Honorary Doctorate, Humane Letters, University of South Florida (2010)
President, Major Cities Chiefs Association, elected twice (2007-2009)
Community Service Award, Association of Hispanic Chambers of Commerce, (2008) (WA)
Seattle University Community Leader Award, (2008)
Police Executive Research Forum *Leadership Award,* (2006)
Brotherhood/Sisterhood Annual Award, The National Conference (Christians and Jews) (1998)
President, Police Executive Research Forum (1996-1998)
Progressive Leadership Award, Citizen Action of New York (1996)
Vice Chair, Governor's Crime Laboratory Council (FL 1991-1994)
Gary P. Hayes Award for innovation in policing, Police Executive Research Forum, (1991)
U.S. Army Presidential Service Badge (1972) Outstanding Military Police Honor Graduate (1970)

**R. GIL KERLIKOWSKE**

## Select Speeches and Presentations

Naturalization Ceremony, Faneuil Hall, Boston (2016)
Australian National University Symposium on Policing (2007)
John Jay College of Criminal Justice, Patrick V. Murphy lecture (2007)
Community Policing, Police Service of Northern Ireland, Belfast (2005) Presentation on anti-terrorist exercise, conference in Belfast (2003)
Meeting of British Chief Constables. London (2002)
BBC Television, Glasgow: Juvenile Curfews—A Policy Debate  (1997)
F.B.L International Law Enforcement Academy, Budapest (1996)
 Secretary of Labor's Task Force on Labor/Management Cooperation (1995)
U.S. Conference of Mayors, Houston (1992)
 Testified before President's Commission on Missing Children (1986)
Speaker at annual meeting of Police Management Association, London (1985)

## Special Activities

Home Team Advisory Committee, Government of Singapore (2020)
Representative to Int'l Association of Chiefs of Police Executive Board (2015)
Panel member, National Academy of Sciences National Research Council, ***Protecting Individual Privacy: In the struggle Against Terrorists*** (2008)
Member of the Executive Session on Policing, Harvard University (2008)
International City Management Association, editorial advisor, ***Local Government Police Management***
Consultant to ***Early Warning-Timely Response, A Guide to Safe Schools****,* developed by the Department of Justice and the Department of Education (1998)
Adjunct faculty Seattle University (graduate program), Florida Atlantic University, and Buffalo State College, Northeastern University, University of South Carolina
International Association of Chiefs of Police Legislative Committee
U.S. Conference of Mayors Police Policy Board
Advisory board member/speaker/lecturer on numerous national criminal justice projects
Book jacket or preface; ***Character and Cops (1994),*** ***Superpredators: The Demonization of Our Children by the Law*** *(1999),* ***Police Pursuits*** *(2000)*

## Select Publications and Papers

President's Transnational Organized Crime Strategy (2010)

Homeland Security Success through Law Enforcement Collaboration, *The Police Chief (2014)*

Co-author, A Comprehensive Approach to Internet Safety, *The Police Chief(2008)*

Contributor, Community Policing: A Contemporary Perspective, 2nd edition (1998)
 OP-ED, *Boston Globe,* with Elliott Richardson, on crime prevention through law enforcement partnerships to intervene in children's lives (1997)

R. GIL KERLIKOWSKE

Co-author of article on community surveys, *The Florida Police Chief* (1989)

Co-author of article on visiting fellowships at the Department of Justice, *The Police Chief* (1985)

## Media Presentations

Extensive print, digital, radio, and television interviews domestic and international media outlets.

## Civic Involvement

National Board Chair, Fight Crime: Invest in Kids. Washington, D.C.
Hearing, Speech and Deafness Center, Seattle
United Way of King County, Seattle Advisory Board
Executive Board, National Conference (of Christians and Jews), New York
District Commissioner, Boy Scouts of America, New York and Florida
Board of Trustees, St. Mary's School for the Deaf, New York
Board of Directors, Fort Pierce-St. Lucie County Chamber of Commerce
Campaign Chair, United Way of St. Lucie County (FL)
Board of Directors, Salvation Army. Seattle, New York and Florida
Board of Directors, "Success by 6", New York
Teacher in adult literacy program, Florida
Board of Trustees, Hospital Corporation of America, Port St. Lucie and Fort Pierce (FL)
Chair, School Superintendent's Advisory Committee, Fort Pierce (FL)
Chair, Advisory Committee of Rape Crisis Center, St. Petersburg (FL)
Board of Directors, Center Against Spouse Abuse, St. Petersburg (FL)

## Professional Development

National Executive Institute, FBI (1995)
Harvard University, John F. Kennedy School of Government National Executive Session on Policing (1988)
F.B.I. Law Enforcement Executive Development (1988)
F.B.I. National Academy (1984)
Florida Power Corporation, Total Quality Improvement (1988)
Senior Management Institute for Police (1983)

## Education

Master of Arts, Criminal Justice, University of South Florida, Tampa (1985).
Emphasis in urban police administration.
Bachelor of Arts, Criminal Justice, University of South Florida (1978)