BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
ANDREW I. WARDEN
KATHLEEN C. JACOBS
Civil Division, Federal Programs Branch

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PAUL (BART) GREEN (Cal. Bar No. 300847)
Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-0805
     Email: Paul.Green@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES PRESS CLUB; *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,<br><br>    Defendants. | No. 2:25-cv-05563-HDV-E<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Supporting declarations filed concurrently]<br><br>Hearing Date:   August 25, 2025<br>Hearing Time:   10:00 a.m.<br>Ctrm:         5B<br>Hon.          Hernán D. Vera |

# TABLE OF CONTENTS

DESCRIPTION                                                                                          PAGE

TABLE OF AUTHORITIES ................................................................................................. i

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 2

        A.      The Court Previously Rejected Plaintiffs' Application for Injunctive Relief.................... 2

        B.      Recent Interference with Law Enforcement Operations........................................ 3

        C.      Legal Authority to Protect Federal Property, Personnel, and Functions .......................... 3

        D.      DHS Officers Have Responded Lawfully and Appropriately to Recent Attacks and Riots on Federal Personnel and Property in the Greater Los Angeles Area ............. 5

                1.      Riots of June 6-9 at Metropolitan Detention Center and Paramount ICE Facility ....................................................................................... 5

                2.      Xpress Carwash in Maywood ................................................................. 6

                3.      Home Depot at Slauson Ave................................................................... 7

                4.      Riots of July 4 at Metropolitan Detention Center................................ 7

                5.      MacArthur Park ..................................................................................... 8

                6.      Glass House Farms in Camarillo and Carpinteria................................. 8

III.    STANDARD FOR INJUNCTIVE RELIEF ....................................................... 11

IV.     ARGUMENT........................................................................................................ 11

        A.      Law of the Case Requires Denial of the PI Motion ......................................... 11

                1.      Judge Wilson Correctly Held that Plaintiffs Lacked Standing and the Relief Sought Was Overbroad ................................................... 11

                2.      Plaintiffs Still Lack Standing to Seek Prospective Relief Because Their Past Injuries Are No Indication of Future Conduct ...................... 12

        B.      Plaintiffs Are Not Likely to Succeed on the Merits Because They Have Not Demonstrated Facts Sufficient to Show a First Amendment Violation.......................... 14

                1.      Plaintiffs Were Not Engaged in First Amendment Protected Activity When Defendants Used Crowd Control Measures ................................ 14

                2.      There Is No Right of Access to Criminal Warrant Operations or to Breach Federal Detention Centers.............................................................. 15

i

## TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                                                    PAGE

       a.   Plaintiffs Seek Access to a Place or Process Not Historically Open to the Press or General Public .................................................................... 15

       b.   Public Access Does Not Play a Significant Role in Riots or Criminal Warrant Operations .......................................................... 17

       c.   The Government's Overriding Interest in Protecting Law Enforcement Officers and Federal Property Is Essential to Preserving Life ........................................................................................ 17

    3.   Federal Officers Dispersed Rioters and Did Not Retaliate Against Press Personnel for Protected Activity ...................................................... 21

    4.   The Legally Improper Injunction Plaintiffs Seek is Overbroad and Unworkable ........................................................................................ 23

       a.   The Injunction Impermissibly Seeks Relief on Behalf of Nonparties ................................................................................................ 23

       b.   The Injunction Imposes Unmanageable Constraints on Law Enforcement Officers Carrying Out Their Official Law Enforcement Duties ......................................................................... 25

  C.   Plaintiffs Cannot Demonstrate Irreparable Harm ............................................ 28

  D.   Both the Balance of Equities and Public Interests Weigh Against an Injunction............ 29

V.   CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

<u>DESCRIPTION</u>                                                                                                   <u>PAGE</u>

**Cases**

*Adderley v. State of Fla.*,
   385 U.S. 39 (1966) ..................................................................... 16

*All. For The Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ..................................................... 28

*Am. Commc'ns Ass'n, C.I.O., v. Douds*,
   339 U.S. 382 (1950) ................................................................... 14

*Am. Fed'n of Gov't Emps. v. Trump*,
   2025 WL 2180674 (9th Cir. Aug. 1, 2025) ............................... 23

*Askins v. U.S. Dep't of Homeland Sec.*,
   899 F.3d 1035 (9th Cir. 2018) ................................................... 12

*Bell v. Keating*,
   697 F.3d 445 (7th Cir. 2012) ............................................... 29-30

*Bello-Reyes v. Gaynor*,
   985 F.3d 696 (9th Cir. 2021) ..................................................... 23

*Boardman v. Pac. Seafood Grp*,
   822 F.3d 1011 (9th Cir. 2016) ................................................... 28

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ............................................................ 16, 30

*Brown v. Ent. Merch. Ass'n*,
   564 U.S. 786 (2011) ................................................................... 30

*Cal. First Amend. Coal. v. Calderon*,
   150 F.3d 976 (9th Cir. 1998) ............................................... 16, 30

*City of LA v. Lyons*,
   461 U.S. 95 (1983) ..................................................... 1, 13, 28, 29

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................... 14

*Clark v. Cmty. for Creative Non-Violence*,
   468 U.S. 288 (1984) ................................................................... 16

*Does I thru XXIII v. Advanced Textile Corpo.*,
   214 F.3d 1058 (9th Cir. 2000) ................................................... 13

*FDA v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024) ................................................................... 14

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ................................................................ 11

*Globe Newspaper,Co. v. Superior Ct. for Norfolk Cnty.*,
   457 U.S. 596 (1982) ............................................................................ 30

*Grayned v. City of Rockville*,
   408 U.S. 114 (1972) ...................................................................... 14, 29

*In re Debs*,
   158 U.S. 564 (1895) .............................................................................. 4

*In re Neagle*,
   135 U.S. 1 (1890) ............................................................................ 4, 18

*Index Newspapers LLC v. U.S. Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) ...................................................... *passim*

*Index Newspapers LLC v. U.S. Marshals Serv.*,
   480 F. Supp. 3d 1120 (D. Or. 2020) ............................................. 25-26

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
   505 U.S. 672 (1992) ............................................................................ 29

*Lujan v. Defs.of Wildlife*,
   504 U.S. 555 (1992) ...................................................................... 12-13

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ........................................................ 2, 25

*Mendocino Envt'l Ctr. v. Mendocino Cnty.*,
   192 F.3d 1283 (9th Cir. 1999) ............................................................ 22

*Menotti v. City of Seattle*,
   409 F.3d 1113 (9th Cir. 2005) ...................................................... 16, 17

*Munns v. Kerry*,
   782 F.3d 402 (9th Cir. 2015) .............................................................. 14

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025) ..................................................... 20, 29

*Nickler v. Cnty. of Clark*,
   648 F. App'x 601 (9th Cir. 2016) ....................................................... 28

*Nken v. Holden*,
   556 U.S. 418 (2009) ............................................................................ 30

*Olagues v. Russoniello*,
   770 F.2d 791 (9th Cir. 1985) .............................................................. 28

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
   636 F.3d 1150 (9th Cir. 2011) ............................................................ 28

*Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*,
    478 U.S. 1 (1986) ................................................................. 15, 17

*Rendish v. City of Tacoma*,
    123 F.3d 1216 (9th Cir. 1997) ........................................ 28

*Ryburn v. Huff*,
    565 U.S. 469 (2012) ....................................................... 27

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ......................................................... 13

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) .......................................... 22

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) .............................................. 2, 24

*United States v. Christopher*,
    700 F.2d 1253- 61 (9th Cir. 1983) ................................ 16

*United States v. Griefen*,
    200 F.3d 1256 (9th Cir. 2000) ..................................... 29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................ 11, 20, 29

*Wooten v. BNSF Railway Co.*,
    2017 WL 1089546 (D. Mont. Mar. 21, 2017) ................ 20

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ................................................. 3, 4

**Statutes**

18 U.S.C. § 111 ................................................................ 10, 18, 29

18 U.S.C. § 2101 ..................................................................... 14

18 U.S.C. § 1361 ..................................................................... 29

40 U.S.C. § 1315 ................................................................... 3, 18

CA Penal Code § 405 .............................................................. 14

**Rules**

Fed. R. Civ. P. 23 .................................................................... 19

Fed. R. Civ. P. 65 .................................................................... 30

**Regulations**

41 C.F.R. § 102-74.375 ........................................................... 18

v

41 C.F.R. § 102-74.385 ............................................................................................. 18

**Other Authorities**

DHS Releases Update on Criminal Illegal Aliens Arrested, Children Rescued During Marijuana Grow Site Operation" (July 14, 2025), https://perma.cc/3P56-W6PQ ("July 14 Press Release") ................ 8

"FBI releases photo of man accused of firing at federal agents during Camarillo immigration raid" (July 17, 2025), https://abc7.com/post/fbi-releases-photo-man-accused-firing-at-federal-agents-immigration-raid-camarillo/17156995/ ................................................................. 3

"Federal Complaints Charge SoCal Residents with Assault, Throwing Molotov Cocktails at Officers During Recent Civil Unrest", U.S. Attorney's Office, https://perma.cc/H8B9-B25Zs ....................... 3

ICE, CBP Arrest at Least 361 Illegal Aliens During Marijuana Grow Site Operation, Rescue at Least 14 Children, DHS (July 13, 2025), https://perma.cc/FBX6-DL3V ("July 13 Press Release") ............................................................................................. 8, 9

ICE Employee Attacked by Rioters after Congressman Doxes Him to Mob at California Marijuana Facility" (July 14, 2025), at https://perma.cc/2T98-3KN2 ................................................. 9

"July 1, 2025: Additional Charges Filed in Connection to Immigration" Los Angeles DA's Office website, https://perma.cc/DRG4-YCRX ............................................................... 3

"KABC, *FBI releases photo of man accused of firing at federal agents during Camarillo immigration raid,*" MSN News (July 17, 2025), http://perma.cc/7A8m-XEBE ................................. 9

"Most Wanted", July 10, 2025, https://www.fbi.gov/wanted/seeking-info/firing-a-weapon-at-federal-officers ............................... 9

"Tips for Safely Covering Protests" Los Angeles Press Club Website: https://lapressclub.org/tips-for-safely-covering-protests-updated-2022/ ........................................... 19

vi

## I.    INTRODUCTION

Plaintiffs seek a mandatory injunction to dictate crowd-control policy in ways that would tie the hands of federal law enforcement officers ("LEOs") even in circumstances of imminent danger and would risk bogging this Court down in micro-management of crowd-control decisions by federal law enforcement. Plaintiffs further seek to micro-manage use of crowd-control measures against all "people" in this district—without any tie to any particular plaintiff. These inflexible and vague constraints are untenable on their face, and the resulting second-guessing of U.S. Department of Homeland Security ("DHS") decisions is inconsistent with established law and endangers officer safety.

Judge Wilson already found that Plaintiffs' claims failed because Plaintiffs lacked standing to seek a temporary restraining order where the injuries alleged were weeks old and where Plaintiffs had presented no evidence that such events—even if they had amounted to injuries—would recur in the future. Judge Wilson also found the relief sought by Plaintiffs was overbroad and unrelated to the alleged Constitutional violations. Despite this, Plaintiffs now seek a preliminary injunction that is nearly identical to their requested temporary restraining order, based in substantial part on the same evidence Judge Wilson found lacking. The Court need go no further and can deny Plaintiffs' motion on these grounds alone.

Plaintiffs' renewed claims still lack standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *See City of LA v. Lyons*, 461 U.S. 95 (1983). Plaintiffs have not demonstrated that constitutional violations will occur prospectively, much less that these plaintiffs will be subject to them. Because Plaintiffs cannot demonstrate certainly impending injury or likelihood of irreparable harm, they lack standing to seek injunctive relief.

Overwhelming justification for each use of force by Defendants dooms Plaintiffs' merits claims. Every single allegation by Plaintiffs was preceded by violent acts against federal officers. In each case, federal officers exercised restraint, using the lowest level of effective force available to protect themselves and others. Any alleged injuries to members of the press resulted from their decision to enter the midst of violent rioters. Freedom of the press is not threatened by the Defendants' protection of federal personnel and property, nor are journalists being targeted. The press is free to observe and report on the violent attacks against federal personnel and the destruction of property, but it is not

1

entitled to join the riots or receive special access in the face of lawful orders to disperse

Furthermore, Plaintiffs' request for relief remains overbroad and untethered to the harms alleged. Plaintiffs have not limited their request for relief to the parties as required by the Supreme Court's recent holding in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). Plaintiffs' requests for inflexible rules to govern crowd control are inappropriate and not tailored enough to meet this Circuit's standards for injunctive relief. *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015).

Finally, the balance of the equities and the public interest favor Defendants. Recently, violence against Federal LEOs performing law enforcement duties has increased by 830 percent. As Plaintiffs' evidence shows, individuals opposed to the implementation of federal criminal and immigration law have attempted to thwart law enforcement operations. The public interest in maintaining public safety and protecting officers and the public against imminent threats of serious bodily injury is paramount.

For these reasons, as explained further below, Plaintiffs' motion should be denied.

## II.    BACKGROUND

### A.    The Court Previously Rejected Plaintiffs' Application for Injunctive Relief

On June 20, 2025, Judge Wilson denied Plaintiffs' application for TRO, which was based on alleged injuries sustained between June 6-9, 2025. *See* ECF 19; Notice of *Ex Parte* Appl. for TRO ECF 6. Distinguishing Plaintiffs' case from *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020), the Court explained that because Plaintiffs' claims were only based on past conduct, Plaintiffs could not demonstrate an "ongoing, sustained pattern of [mis]conduct … between the date the complaint was filed and the date the district court entered a preliminary injunction." ECF 19 at 4. Ultimately, the Court denied Plaintiffs' application for failure to establish the "substantial risk of future harm required for standing." *Id.*

Further, the Court concluded that "Plaintiffs' requested relief is too broad." *Id.* at 5. Even if there were a constitutional violation (an issue the Court did not reach), the Court held the "appropriate remedy would be a narrowly crafted injunction prohibiting Defendants from using excessive force to disperse crowds without warning," rather than a broad injunction that "would restrict lawful crowd control measures and potentially impede Defendants' legitimate law enforcement responsibilities." *Id.*

2

**B.      Recent Interference with Law Enforcement Operations**

Since the events giving rise to the denial of Plaintiffs' TRO in early June 2025 (*see* Defs' Opp'n to *Ex Parte* Appl. ("TRO Opp.") at 3-5, ECF 11), the DHS and its component agencies U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP") have continued to conduct lawful customs and immigration enforcement operations in the Central District of California. Declaration of Eddy Wang ¶3, attached hereto. Unfortunately, in carrying out these duties, federal officers have been subjected to an 830 percent increase in assaults against them. "DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults" (July 15, 2025) at https://perma.cc/3X6F-W43C. Federal officers have been attacked with rocks (*see e.g.*, Declaration of Brian Szemes ¶10, attached hereto), Molotov cocktails ("Federal Complaints Charge SoCal Residents with Assault, Throwing Molotov Cocktails at Officers During Recent Civil Unrest", U.S. Attorney's Office, https://perma.cc/H8B9-B25Zs), fireworks (Declaration of Roger Scharmen ¶¶15, 17, 21, attached hereto), water bottles (Marantos Decl. ¶18 ECF 34-11), metal cans, and flag poles. Scharmen Decl. ¶¶26, 28. They've been spit on and shot at. "FBI releases photo of man accused of firing at federal agents during Camarillo immigration raid" (July 17, 2025) at https://abc7.com/post/fbi-releases-photo-man-accused-firing-at-federal-agents-immigration-raid-camarillo/17156995/; "Illegal Alien in Los Angeles Charged with Spitting on ICE Officer" (June 11, 2025), at https://perma.cc/BZ9D-K5YC. Federal property has been damaged and defaced. TRO Opp. at 3; *see also* "July 1, 2025: Additional Charges Filed in Connection to Immigration" Los Angeles DA's Office website, at https://perma.cc/DRG4-YCRX ("[Suspect charged with] spray painting an expletive on the side of the federal Veterans Affairs building"). Despite this, DHS and its component agencies take care to safeguard the First Amendment rights of protestors and the press consistent with the safety of the public, federal officials, and federal property. Scharmen Decl. ¶37.

**C.      Legal Authority to Protect Federal Property, Personnel, and Functions**

The federal government has broad authority to protect federal property, personnel, and government functions. Congress has authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a). In addition, the Constitution grants the President the "executive Power," U.S. Const. art. II, § 1, cl. 1, and affords him

3

both the authority and the responsibility to "take care that the Laws be faithfully executed." *Id.* These provisions authorize the President to enforce laws enacted by Congress as well as protect federal officials, federal property, and the performance of federal functions. *See In re Neagle*, 135 U.S. 1, 64-68 (1890) (holding that the President has inherent authority to provide bodyguards, immune from state law, to protect judicial officers under the Take Care Clause). "The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights entrusted by the Constitution to its care." *In re Debs*, 158 U.S. 564, 582 (1895).

In exercising this authority, DHS has issued policy guidance on the use of force by its officers. *See* DHS Policy on the Use of Force (Feb. 6, 2023) (Wang Decl. Exhibit 1). DHS policy authorizes officers to "use only the level of force that is objectively reasonable in light of the facts and circumstances confronting [the officer] at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy § II.B. The policy states that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* § III.C. Further, officers must demonstrate proficiency with less-lethal force devices, such as impact weapons or chemical agents, before using such devices. *Id.* § IV.

In all events, DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* at. III. DHS also has instructed its employees about the importance of respecting activities protected by the First Amendment. *See* DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019) (Exhibit A of the Declaration of Paul (Bart) Green, attached hereto). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1. The DHS policy requires officers, when feasible under the circumstances, to issue warnings prior to the use of force and to allow individuals a reasonable opportunity to comply. *Id.* §III.E. Crowd control devices and less-lethal munitions ("LLMs") are only utilized after events have become unlawful. Declaration of Matthew S. Harvey ¶5, attached hereto.

4

**D.    DHS Officers Have Responded Lawfully and Appropriately to Recent Attacks and Riots on Federal Personnel and Property in the Greater Los Angeles Area**

Plaintiffs' motion for preliminary injunction seeks relief based on several violent attacks and dangerous riots directed against federal personnel and property that occurred in the greater Los Angeles Area between June 9 and July 20, 2025. Plaintiffs' evidence generally falls into two categories. First, Plaintiffs have resubmitted the same evidence about incidents that occurred between June 6-9 that Judge Wilson already considered and rejected as insufficient for injunctive relief. Second, Plaintiffs' motion includes new evidence of five attacks on federal officers and property that occurred between June 20 and July 10. Defendants' evidence presents a far more complete picture of these attacks and riots than Plaintiffs' evidence, demonstrating that federal officers responded lawfully and appropriately to each of these dangerous situations.

1.    <u>Riots of June 6-9 at Metropolitan Detention Center and Paramount ICE Facility</u>

From June 6-9, 2025, demonstrations erupted in response to law enforcement operations by DHS and quickly descended into violent riots. Scharmen Decl. ¶¶2, 11-22. On June 6, rioters breached the Metropolitan Detention Center ("MDC"), shined green lasers in officers' eyes, threw rocks, chairs, concrete, and full water bottles. *Id.* ¶¶11-12. On June 7, the ingress and egress of MDC was repeatedly blocked, ICE officers were assaulted while conducting enforcement operations, bricks were thrown through car windows, multiple vehicles were burned, Molotov cocktails were thrown at officers, and large pieces of concrete were thrown at officers while rioters shouted "KILL ICE!" *Id.* ¶¶13-15. On June 8, rioters again blocked the vehicle entry point for MDC and refused to comply with dispersal orders, threw rocks and other objects at officers, launched fireworks near federal buildings, and continued to graffiti and destroy federal property until the following morning. *Id.* ¶¶16-17. On June 9, rioters surrounded a vehicle attempting to leave MDC and spray painted it while occupied by an officer who was forced to retreat to MDC out of fear for his safety. *Id.* ¶¶18-19. When crowd control measures were used, it was only in response to violence by rioters. *Id.* ¶¶12, 15-16.

On the morning of June 7, 2025, the mere sight of CBP and DHS agents prompted demonstrators to swarm an ICE facility located in a business park in Paramount, blocking the entrance agents were using to prepare for lawful immigration enforcement operations later that day in Los

5

Angeles. Declaration of Daniel Parra ¶¶5-8, attached hereto. Although there was never a raid planned at the nearby Home Depot, this was the misguided belief of several Plaintiffs' declarants. Parra Decl. ¶5; *see e.g.* Carmitchel Decl. ¶4 ECF 6-6 describing the swarming of the ICE Facility as a "potential immigration raid at the Home Depot." At the sight of the DHS/ICE staging, the anti-ICE demonstration almost immediately devolved into a riot when protestors began blocking agents' ingress and egress from the business park. *Id.* ¶7. By 10:00 a.m., over 100 rioters surrounded agents and began physically assaulting the agents, including punching a CBP agent in the face. *Id.* ¶8. When the agents pursued the assailant, the crowd intervened to prevent his apprehension. *Id.* With the violent crowds approaching officers, officers were forced to deploy crowd control devices to keep them back. *Id.* ¶9. For the next several hours, rioters threw objects at officers including rocks, broken cinder blocks, large fireworks, munition cannisters, water bottles filled with human waste, and large fruit. *Id.* ¶¶9-10. Due to the extremely violent actions of the rioters, officers had to use Kinetic Impact devices and Pepperballs to keep the violent crowd at bay. *Id.* ¶10. Many CBP agents suffered contusions, ringing in their ears from fireworks exploding near their heads, and even a broken finger after an object was thrown through the driver's side window of a government vehicle. *Id.* ¶ 14.

On June 9, 2025, at the Federal Building located in Santa Ana, demonstrations turned violent beginning with blocking vehicles from exiting the building. Scharmen Decl. ¶19. In the afternoon, demonstrators grew to approximately 1,500 people. *Id.* Repeatedly blocking ingress and egress from the building, they were given three dispersal orders at 5:02 p.m. *Id.* ¶20. At that time, demonstrators grew more agitated encroaching on federal property, throwing rocks, frozen water bottles, billiard balls, eggs, and aluminum cans at officers. *Id.* ¶19-20. Officers used LLMs to disburse the violent crowd. *Id.* ¶20-21. After the initial dispersal orders, protestors returned and deployed fireworks at officers. *Id.* ¶ 21-22.

### 2. Xpress Carwash in Maywood

On June 20, 2025, Border Patrol ("BP") agents were engaged in an immigration enforcement mission at the Xpress Car Wash in Maywood. Harvick Decl. ¶10. After agents arrived, a group of individuals formed and targeted the agents with full bottles containing unknown liquids, plastic items, metal objects, and other projectiles; one individual even crashed his car into a government vehicle. *Id.* & Ex. A (photos of vehicle damage); *see also* Aguiluz Decl. ¶¶13 ECF 34-15 (video footage showing

the collision). Someone else smashed a window on the government vehicle with a crowbar. Harvick Decl. Ex. A. Due to these assaults, crowd control devices were deployed at the assaultive subjects, and one individual was arrested for assault. *Id.*

3.    Home Depot at Slauson Ave

On June 23, 2025, BP personnel conducted immigration enforcement outside the Home Depot at 4925 West Slauson Ave, Los Angeles, CA. Harvick Decl. ¶11. In response, individuals surrounded the agents, impeded them from placing detained individuals into government vehicles, and blocked egress. *Id.* At least one rioter used his truck to block the agents' egress. *Id.* These acts necessitated agents to deploy a single CS cannister to allow the agents to depart. *Id.*

4.    Riots of July 4 at Metropolitan Detention Center

On July 4, 2025, the Federal Protective Service ("FPS") received intelligence that protests would occur throughout Los Angeles and increased staffing to ensure the safety of federal facilities and employees. Scharmen Decl. ¶24. At 3:00 p.m., 300 protestors gathered at the Alameda Gate of the Roybal Building, which is adjacent to the MDC. *Id.* ¶25. The U.S. Marine Corps, California National Guard, and CBP supported FPS in protecting federal employees and property. Declaration of Kevin Green ¶12, attached hereto. At 3:07 p.m., protestors surrounded an ICE van attempting to enter the Alameda gate, threatening the safety of the vehicle occupants and protestors. Scharmen Decl. ¶25.

At 4:55 p.m., FPS received a report that two individuals were threatening to shoot U.S. Marines who were present. *Id.* At 5:41 p.m., rioters threw items at officers protecting federal property. *Id.* ¶26. An Area Commander for FPS was struck in the helmet and gas mask by a metal drink can causing liquid to splash onto his face. *Id.* The same FPS Area Commander was struck with a flagpole. *Id.* ¶28. Another officer was kicked. Kevin Green Decl. ¶15. At 5:52 p.m., due to the inability of vehicles to safely enter and exit the Roybal Building, harassment, and physical threats from the crowd, (Scharmen Decl. ¶27), FPS issued verbal dispersal orders for unlawful assembly over a commercial-grade public address (PA) speaker system positioned facing the rioters. *Id.* The dispersal order was repeated at 5-minute intervals over a 45-minute period. *Id.* Despite the repeated orders, the crowd refused to disperse. *Id.* ¶28. At 6:42 p.m., the Los Angeles Police Department ("LAPD") issued another dispersal order from a helicopter flying overhead declaring unlawful assembly and that those present must exit the

area. *Id.* ¶29. The LAPD's warning was audible on the ground. *Id.*

By 7:02 p.m. the rioters set up a barrier on Alameda Street using A-frame traffic barriers. *Id.* ¶30. At the request of LAPD, and after having over an hour to comply with law enforcement directives, FPS relocated media personnel to a different area from which they would be able to safely observe the unlawful assembly. *Id.* ¶31. This was done to ensure that no one remained behind the line of officers. *Id.* Allowing anyone to remain behind the officers would pose risks to those officers and to public safety "contrary to well-established crowd control operations." *Id.* Any members of the press who failed to heed repeated warnings to relocate would have been subject to the necessary physical expansion of the protected area. *Id.* ¶32. Members of the press that complied with law enforcement directives were able to observe the unlawful assembly from a different position. *Id.* Defendants did not deploy any LLMs or crowd control devices at MDC on July 4. *Id.* ¶34; Kevin Green Decl. ¶15.

### 5. MacArthur Park

On July 7, 2025, a joint operation was conducted at MacArthur Park in Los Angeles, California. Wang Decl. ¶20. Plaintiffs allege that officers pointed their weapons at a film maker who was at the site. R.R. Declaration ¶10, ECF 34-18; Berg Declaration ¶7, ECF 34-22. Federal officers involved in the operation at MacArthur Park did not use force, deploy, or threaten to deploy, any LLMs or crowd control devices (Harvick Decl. ¶8; Kevin Green Decl. ¶7; Szemes Decl. ¶4, 8), despite "peaceful" protestors slashing a tire on an Enforcement and Removal Operations Special Response Team van. *Id.* "[O]fficers did not point their weapons at protestors to threaten them." Kevin Green Decl. ¶7.

### 6. Glass House Farms in Camarillo and Carpinteria

On July 10, 2025, federal LEOs executed criminal warrants at two marijuana grow sites operated by Glass House Farms. ICE, CBP Arrest at Least 361 Illegal Aliens During Marijuana Grow Site Operation, Rescue at Least 14 Children, DHS (July 13, 2025), at https://perma.cc/FBX6-DL3V ("July 13 Press Release"). The operations led to the arrest of 361 illegal aliens and rescue of fourteen children from "potential exploitation, forced labor and human trafficking." *Id.*; "DHS Releases Update on Criminal Illegal Aliens Arrested, Children Rescued During Marijuana Grow Site Operation" (July 14, 2025), https://perma.cc/3P56-W6PQ ("July 14 Press Release"). Prior convictions among those arrested include kidnapping, rape, attempted rape, child molestation, battery, DUI, hit-and-run, willful

8

cruelty to a child, and burglary. *Id.* "During the operation, more than 500 rioters attempted to disrupt operations." July 13 Press Release. Four of the rioters are being "criminally processed for assaulting or resisting the officers." *Id.* One violent rioter fired a gun at LEOs. "KABC, *FBI releases photo of man accused of firing at federal agents during Camarillo immigration raid,*" MSN News (July 17, 2025), at http://perma.cc/7A8m-XEBE (video footage showing suspect firing handgun). The FBI's search for the individual who fired at federal LEOs is underway. "Most Wanted", July 10, 2025, https://www.fbi.gov/wanted/seeking-info/firing-a-weapon-at-federal-officers.[1] The rioters also damaged multiple vehicles. Szemes Decl. ¶10.

The HSI led operations, predicated on criminal search warrants for violations of federal law including harboring aliens and unlawful employment of aliens, centered on two facilities, one in Camarillo and the other in Carpinteria. July 13 Press Release; Wang Decl. ¶21. In addition to executing the criminal warrant, the operation involved evidence gathering and perimeter security. *Id.* HSI was supported by Office of Field Operations Special Response Team ("OFO SRT"), which aided in securing the perimeter of the operations. Kevin Green Decl. ¶8.

The facility on Laguna Road in Camarillo is approximately one square kilometer in diameter with various buildings and greenhouses on the property. Harvick Decl. ¶13. Federal LEOs secured the intersections on both ends of Laguna Road to maintain egress routes for detainee transport and EMS service. *Id.* ¶14. Two protests occurred on Laguna Road on both sides of the secured area. The protest to the west occurred near Wood Road and Laguna Road (Teran Decl. ¶8 (34-8)), while the protest to the east occurred near Las Posas Road and Laguna Road A.R. Decl. ¶3, ECF 34-2. Additional violence and obstruction from rioters occurred on dirt roads near the facility. Harvick Decl. ¶16. Rioters "threw rocks, glass bottles, full water bottles, commercial grade fireworks, and other projectiles at agents, government vehicles, and white vans being used to transport detainees." *Id.* ¶15. Rioters also "attempt[ed] to block vehicles coming in and out of the Glass House Facility" and "refuse[d] to follow [BP] orders to stop blocking the road." *Id.* Rioters also brought baseball bats that they used to damage dozens of government vehicles. Szemes ¶10. Rioters smashed government vehicle windows and slashed

---

[1] It was here that an ICE officer was doxed, resulting in him being assaulted and hospitalized. "ICE Employee Attacked by Rioters after Congressman Doxes Him to Mob at California Marijuana Facility" (July 14, 2025), at https://perma.cc/2T98-3KN2; *see also* Solorzano Decl. ¶23.

tires. *Id.* "This conduct posed an immediate threat to agent safety and hindered their ability to maintain
order and protect the safety of those working inside the farm, to include detainees." Harvick Decl. ¶16.
Facing these threats, federal officers made over 10 announcements to disperse, consistent with the DHS
policy, before deploying CS gas and pepper ball rounds. Szemes Decl. ¶11.

At approximately 12:50 p.m., a vehicle transporting a detained subject that required immediate
medical assistance was surrounded by the crowd and pelted with rocks and water bottles. Harvick Decl.
¶14. Only after agents repeatedly deployed CS gas was the vehicle able to safely depart. *Id.* At 2:25
p.m., a crowd of rioters blocking the road was ordered via loudspeaker to clear the road to allow a
convoy of vehicles to pass. Harvick Decl. ¶16. After repeated warnings, agents began to walk toward
the crowd. *Id.* Rioters threw objects, smoke bombs, and even deployed fireworks at the agents. *Id.* The
agents responded by deploying crowd control devices to defend themselves and disperse the rioters. *Id.*
At 2:45 p.m. (Marantos Decl. ¶¶6, 9, 14; Anderson Decl. ¶8 ECF 34-21), the protestors east of the
marijuana grow site interfered with the criminal warrant operation by blocking a law enforcement
vehicle. Marantos Decl ¶9; Anderson Decl. ¶8; Lubka Decl. ¶11-12 ECF 34-24. Federal LEOs then
deployed tear gas because the crowd grew increasingly violent and rioters assaulted federal LEOs.
Kevin Green Decl. ¶¶10-11. Rioters began throwing water bottles at a vehicle as it attempted to pass.
Marantos Decl. ¶18. A university professor was also arrested for throwing a tear gas cannister at federal
LEOs and has been charged with several offenses under 18 U.S.C. § 111. Kevin Green Decl. ¶10.

Later, rioters blocked another vehicle attempting to exit the secured area (A.R. Decl. ¶20) and
*obstructed four ambulances and a fire truck* attempting to pass. Marantos Decl. ¶28. Due to the crowd's
behavior, officers were forced to deploy LLMs to protect agents and others. Kevin Green Decl. ¶11.
The crowd control methods used were the "lowest level of force" available to agents. *Id.*

At the Glass House in Camarillo, rioters attempted to interrupt the operations by stepping closer
to the secured line despite officers' instructions to back away (Nadolishny Decl. ¶7 ECF 34-4) and
breach the secured perimeter. Dransfeldt Decl. ¶14 ECF 34-5 ("one person tried to get past the line of
officers, which set off the first wave of tear gas"). Later, rioters used their own vehicles to block roads
and turned on their high beam headlights to impair the agents' vision and prevent them from departing.
Harvick Decl. ¶16. Another rioter drove his vehicle at the government convoy causing a government

10

vehicle to drive off the road into a ditch. *Id.* "In all of these events, LLMs were only deployed after situations became dangerous and subjects became assaultive." *Id.* ¶19.

At the Glass House, Carpinteria location, near Casitas Pass Road and Route 192, rioters blocked the egress of a vehicle from the secure area by the facility, requiring officers to clear a path for the vehicle through the crowd. Solorzano Decl. ¶15 ECF 34-16. One person threw a water bottle at an officer. Kevin Green Decl. ¶11. Three to four other individuals were seen reaching for rocks and were dispersed with LLMs. *Id.* OFO SRT agents deployed one Controlled Noise and Light Distraction device and four Pepperball Launching System Area Saturation devices as part of their mission to provide perimeter security—these devices were not used to directly impact targets but focused on the area around assaultive subjects. Kevin Green Decl. ¶11.

## III.    STANDARD FOR INJUNCTIVE RELIEF

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear slowing that the [Petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See id.* at 20.

Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on LEOs as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted). As explained below, Plaintiffs cannot meet this demanding standard.

## IV.    ARGUMENT

### A.    Law of the Case Requires Denial of the PI Motion

#### 1.    Judge Wilson Correctly Held that Plaintiffs Lacked Standing and the Relief Sought Was Overbroad

The law-of-the-case doctrine provides that "when a court decides upon a rule of law, that

11

decision should continue to govern the same issues in subsequent stages in the same case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). The prior denial of the application for TRO controls here. Judge Wilson held that Plaintiffs lacked standing and that the relief sought was overbroad. ECF 19. This remains the case today.

A significant portion of evidence presented by Plaintiffs was already considered in the former application for TRO. Practically every factual allegation in their preliminary injunction motion is disproportionally weighted with declarations already considered and found insufficient in this case. *See generally* Mem. of P.&A. in Supp. of Pls.' Mot. for Prelim. Inj. ECF 34-1 ("PI Mem."). Of the 205 citations to declarations throughout their brief, 117 cite back to declarations from their original TRO application. *Id.* Even more telling: 21 of Plaintiffs' citations in their PI Memorandum refer to alleged injuries *predating* their TRO application. *See* ECF Nos. 34-6, 34-9, 34-18, 34-25, and 34-27. The predominant references to ECF 6 throughout their PI Memorandum make clear that Plaintiffs seek prospective relief for allegations that principally occurred almost two months ago.[2]

Plaintiffs rely on mere conjecture about future governmental actions and fail to present concrete evidence to substantiate their fears. *See Index Newspapers LLC*, 977 F.3d at 824. Plaintiffs have not submitted new evidence that Defendants have engaged in an *ongoing or sustained* pattern of conduct resulting in injuries to members of the press since the Complaint was filed. *See Index Newspapers*, 977 F.3d at 826. Further, evidence of alleged injuries to unrelated third parties cannot support Plaintiffs' request for relief. Similar to Judge Wilson's conclusion, here, Plaintiffs filed their motion over one week after the last alleged injuries occurred, with every weekend from June 20-July 18 being free of a single allegation. Simply put, Plaintiffs' scattershot allegations, based largely on stale evidence already considered, fails to support the extraordinary injunction they seek.

    2.     <u>Plaintiffs Still Lack Standing to Seek Prospective Relief Because Their Past Injuries Are No Indication of Future Conduct</u>

To establish standing, plaintiffs must show, as "the irreducible constitutional minimum," that: (1) they have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical ...." *Lujan v.*

---

[2] In addition, Defendants' opposition to the TRO *ex parte* application (attached here for the PI record) shows why such allegations lack merit. *See* Paul Green Decl. Ex. B-E.

*Defs.of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). Where, as here, a party seeks prospective equitable relief, the complaint must contain "allegations of future injury [that are] particular and concrete*." Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). It is therefore well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *See Lyons*, 461 U.S. at 101-02.

Here, Plaintiffs do not have Article III standing for injunctive relief because they can only speculate as to whether an interaction with DHS officers will recur, let alone will result in a substantial threat of injury. Plaintiffs' application relies largely on evidence submitted with their prior application for injuries sustained at the beginning of June—almost two months ago. Judge Wilson considered that evidence and found it lacking. There is no basis for this Court to reach a different conclusion.

In the 32 days since Plaintiffs' TRO was denied, Plaintiffs have submitted allegations of 5 subsequent incidents—June 20, June 23, July 4, July 7, & July 10. But the subsequent declarations largely relate to nonparties and events that Defendants do not concede were lawful protests. Only one of the declarations submitted by Plaintiffs with their current application does not involve a dangerous riot erupting in response to the lawful detention of aliens and individuals. *See* R.R. Decl. ¶7-8. Moreover, out of the 26 declarations submitted with Plaintiffs' motion, only 5 of them are authored by Plaintiffs or their members or even relate to Plaintiffs at all. Marantos Decl., Taha Decl. ECF Nos. 34-17, R.R. Decl., Berg Decl., & Rose Decl. Of these 5, only 3 (including one anonymous declaration[3]) were authored by declarants who were *actually present* for a single post-TRO denial "protest" and none sustained any injury. Marantos Decl., R.R. Decl, & Berg Decl. The only Plaintiff-member declarant complaining of tear gas acknowledged that it could have been deployed because "protestors" at Glass House were surrounding vehicles, throwing items at vehicles, and to disperse people blocking the road preventing access of four ambulances and a fire truck. Marantos Decl. ¶28.

In sum, Plaintiffs' evidence is a far cry from the sustained "pattern of conduct that had persisted

---

[3] The Court should disregard Plaintiffs' anonymous declarations. Before proceeding anonymously or pseudonymously, the party must demonstrate their "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-68 (9th Cir. 2000). Plaintiffs have provided no such justification here. The Court should either strike the anonymous declarations or assign them no meaningful weight in deciding Plaintiffs' motion. Striking the R.R. declaration leaves only two submitted by Plaintiffs or their members that actually attended a post-denied TRO "protest."

13

for weeks and was ongoing" in *Index Newspapers* where the court found "federal officers had intentionally targeted journalists and legal observers in retaliation for their news-reporting efforts." *See* 977 F.3d at 823, 826. Plaintiffs' fear that they will suffer future injury is too speculative to confer Article III standing for injunctive relief. *See Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

To the extent Plaintiffs seek organizational standing by describing their expenditure of resources (Taha Decl.; Rose Decl. ECF 34-25), the Supreme Court has foreclosed this "limitless approach" to standing as "flatly inconsistent with Article III." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 391-92 (2024)*; see Clapper*, 568 U.S. at 415-16.

**B.      Plaintiffs Are Not Likely to Succeed on the Merits Because They Have Not Demonstrated Facts Sufficient to Show a First Amendment Violation**

Violence towards federal LEOs and obstruction of lawful criminal warrant operations are not protected First Amendment activities. Plaintiffs' First Amendment claims under right-of-access and retaliation theories both lack a factual and legal basis to support preliminary injunctive relief.

1.      Plaintiffs Were Not Engaged in First Amendment Protected Activity When Defendants Used Crowd Control Measures

The freedoms provided in the First Amendment "are dependent upon the power of constitutional government to survive" and "[i]f it is to survive it must have power to protect itself against unlawful conduct." *Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 394 (1950). Pursuant to preserving our form of government, riots are not protected constitutional activity. They are illegal under both state and federal law. CA Penal Code § 405 (2024); 18 U.S.C. § 2101. And a journalist does not convert a riot into protected activity by stepping into the midst of violent offenders. *See Grayned v. City of Rockville*, 408 U.S. 114, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

Journalists do not practice the freedom of the press when they disregard lawful dispersal orders issued for the protection of human life, aid a crowd in obstructing law enforcement vehicles from accessing the area where an active criminal warrant operation is under way, or by blocking federal law enforcement and emergency response vehicles from transporting injured individuals to a hospital. *See, e.g.*, Scharmen Decl. ¶¶20, 27-28, 32, 39; Harvick Decl. ¶ 16; Kevin Green Decl. ¶13. Neither are

14

journalists protected by the First Amendment if they fire weapons, throw rocks, chunks of concrete, bottles, fireworks, and other objects, or kick, or otherwise attack LEOs. *See, e.g.*, *supra* §II.B.5; Scharmen Decl. ¶¶5, 11-23, 27-29, 31-32 37-39; Kevin Green Decl. ¶¶10-11, 14; Harvick Decl. ¶¶10, 15. To the extent journalists or legal observers participated in riots or aided and abetted individuals who participated in riots, they were not engaged in protected First Amendment activity.

  2. <u>There Is No Right of Access to Criminal Warrant Operations or to Breach Federal Detention Centers</u>

  To prove their First Amendment right-of-access claim, Plaintiffs must show, first, that "the place and process" to which they sought access "have historically been open to the press and general public"; second, the Court must ask "whether public access plays a significant role in the functioning of the particular process in question." *Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 8 (1986). Even if they make both of those showings, Plaintiffs cannot succeed if the government demonstrates "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9. Plaintiffs have not shown they are likely to succeed in establishing that their access to any "process" or "proceeding" plays a "significant positive role." *Id.* at 8. And as discussed in further detail below, Plaintiffs have failed to establish (nor can they) that they had the right to access besieged federal personnel and property in the first place. Plaintiffs also fail to establish that public access to criminal warrant operations or the interior of Federal Buildings play a significant role in the process of conducting criminal warrant operations or maintaining the security of federal buildings. And even if Plaintiffs could establish both a historical pedigree for access and their significance to the processes in question, they cannot overcome the significant overriding government interest in closure of these areas for the preservation of human life.

  a. *Plaintiffs Seek Access to a Place or Process Not Historically Open to the Press or General Public*

  Plaintiffs fail to establish that the driveways that grant ingress to federal buildings or the vicinity of criminal warrant operations are places or processes historically open to the press or general public. *Press-Enter. Co.*, 478 U.S. at 8. Indeed, they make little effort to do so and instead rely heavily on out-of-context quotes from *Index Newspapers*—a case about protests occurring five years ago in a different city and under a different set of circumstances where the government did not challenge that the protests

15

were historically open to the public. 977 F.3d at 830.

But the First Amendment does not bar the government from prohibiting the public from entering or remaining on its property outside ordinary hours of operation, or from threatening its property at any time. *United States v. Christopher*, 700 F.2d 1253, 1259- 61 (9th Cir. 1983). This principle applies even if the property functions as a public forum for lawful activities when it is open. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984). And when federal officers are forced to respond to "a violent subset of protesters who disrupt civic order," such officers indisputably have power to enforce dispersal orders against the general public. *Menotti v. City of Seattle*, 409 F.3d 1113, 1155-56 (9th Cir. 2005). These principles apply to journalists, legal observers, and protesters just like they apply to everyone else. The Supreme Court and the Ninth Circuit have repeatedly held that the press lacks a "constitutional right of special access to information not available to the public generally." *Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) and discussing other cases). In short, the First Amendment does not give the press "a special right of access not shared by the general public." *Index Newspapers*, 977 F.3d at 830. Here, dispersal orders were repeatedly given, meaning that those who remained, including journalists, "would have been subject to the necessary physical expansion of the protected area." Scharmen Decl. ¶¶27-32; *see also* Harvick Decl. ¶16; Paul Green Decl. Ex. D ¶12 ECF 11-2; Paul Green Decl. Ex. E ¶ 14.

The Supreme Court has long rejected the view that the First Amendment permits individuals to protest "whenever and however and wherever they please." *Adderley v. State of Fla.*, 385 U.S. 39, 48 (1966). Where even otherwise peaceful protestors trespassed on state property and blocked a driveway that granted access to a jail, the Supreme Court upheld convictions for trespass because jails are not traditionally open to the public for First Amendment assemblies. *Id.* at 47-48. Plaintiffs, including members of the Press, engaged in the same type of conduct here by obstructing access to a federal detention facility and blocking federal LEOs from accessing the area of an ongoing criminal warrant operation. Scharmen ¶¶11-25, 28-32, 37-39; Harvick Decl. ¶16. In short, the First Amendment does not give "self-proclaimed journalists and 'legal observers'" the right to disobey lawful dispersal orders issued to control a violent protest. *Index Newspapers*, 977 F.3d at 839 (O'Scannlain, J., dissenting).

Even assuming *arguendo* that some Plaintiffs took steps to distinguish themselves from rioters

16

and remained nonviolent, it does not give them a First Amendment claim. "[O]nce a pattern of chaotic violence ha[s] been established"—such as that which pervaded each of Plaintiffs' alleged encounters with DHS (excepting the MacArthur Park incident where DHS deployed no crowd control measures)— "it [i]s unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. In circumstances where "law-breaking and law-abiding protestors [are] often indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly with enforcement against violent protestors," dispersing everyone from the scene of a riot is narrowly tailored to serve a significant government interest. *Id.* at 1135. Officers need not tailor their orders to exclude peaceful protesters or innocent bystanders, *see id.* at 1126-28, whose lawful activities are being disrupted by "a small group of violent protestors … determined to cause chaos." *Id.* at 1134. It follows that officers need not tailor their orders to exclude journalists or "legal observers" either. Here, officers repeatedly went above and beyond their legal obligations by designating specific areas for media and assisting in the relocation of media personnel away from the riots. *See, e.g.*, Scharmen Decl. ¶ 31.

   b. *Public Access Does Not Play a Significant Role in Riots or Criminal Warrant Operations*

  Plaintiffs have not shown they are likely to succeed in establishing that their access to any "process" or "proceeding" plays a "significant positive role in the functioning of the particular process in question." *Press-Enter. Co.*, 478 U.S. at 8. The processes in question here are not nonviolent protests. Harvick Decl. ¶8, 10, 15-19. The violence brought against Defendants preceded any force, crowd control measures, or denial of Plaintiffs' access to certain areas. *Id.* Crowds were dispersed and crowd control measures deployed only after protests descended into chaotic riots or where apparent protestors began actively obstructing federal criminal warrant operations by shooting at and otherwise attacking LEOs. *See generally*, *supra* §II.B. Once riots break out and LEOs are attacked, journalists and legal observers no longer play a significant role; if anything, by remaining in these violent areas, they endanger themselves and others. Scharmen Decl. ¶31-39.

   c. *The Government's Overriding Interest in Protecting Law Enforcement Officers and Federal Property Is Essential to Preserving Life*

  Plaintiffs fail to show that they have suffered a First Amendment violation because none of their

17

claims can overcome the government's overriding interest in protecting human life. Federal law permits LEOs to take appropriate measures to protect federal personnel before violent protesters have moved onto federal property. There is no reasonable dispute that DHS officers have authority to issue dispersal orders on federal property. *See, e.g.*, 41 C.F.R. § 102-74.375 (authority to restrict access to federal property); *id.* § 102-74.385 (authority to require the public to comply with access restrictions). This authority extends to "areas outside the property to the extent necessary to protect the property and persons on the property." 40 U.S.C. § 1315(b)(1). Thus, DHS officers can "enforce Federal laws and regulations for the protection of persons and property." *Id.* § 1315(b)(2)(A); *see In re Neagle*, 135 U.S. at 64-68. And at all times, regardless of where they are located, federal officers have authority to protect themselves and those they have detained from violence. 18 U.S.C. § 111. In each case that Plaintiffs allege their access was dampened, the government had an overriding interest in the protection of human life that justified the deployment of crowd control measures. As discussed below, the declarations submitted by Plaintiffs have a reoccurring theme: the declarant's disregard of lawful dispersal orders issued for the protection of human life resulted in declarant's self-inflicted "injury."

For example, anonymous declarant R.R. complains that he and other members of the press were pushed back after dispersal orders were issued outside of MDC on July 4. R.R. Decl. ¶8. But the evidence shows the volatile and dangerous situation FPS was facing at that time. *See generally,* Scharmen Decl. Bottles and a full metal drink can were thrown at FPS officers. *Id.* ¶¶13-19. Despite these immediate threats, FPS issued verbal dispersal orders for unlawful assembly over the PA system. *Id.* ¶14. This order was repeated over a 45-minute period. *Id.* The crowd refused to leave and grew more violent *Id.* Alameda Street had to be cleared for the protection of federal personnel and federal property. *Id.* ¶¶15-17. Members of the press were repeatedly directed to change locations. *Id.* ¶¶15-19. If R.R. failed to comply despite numerous requests to members of the press, then his exposure to crowd control measures was of his own making and not a violation of the First Amendment. *Id.* ¶19.

Next, Plaintiffs rely on the declaration of Plaintiff-member Marantos claiming "DHS teargassed [her] three separate times." PI Mem. 13. This is a blatant mischaracterization of Marantos' statement. At the Glass House protest on July 10, Marantos inserted herself deep within the crowd "close to the truck, in the center of the road" when tear gas was deployed *for the purpose of dispersal of the*

18

*individuals around the truck.* Marantos Decl. ¶15. Had she heeded Plaintiff Los Angeles Press Club's "Tips for Safely Covering Protests" she would not have been exposed to the effects of crowd control devices. (Feb. 7, 2022) Los Angeles Press Club Website: https://lapressclub.org/tips-for-safely-covering-protests-updated-2022/ ("**Don't interfere with police.** Give a reasonable amount of room and don't stand close behind [police][;]" "If you participate [in protests] besides newsgathering or if you break any law, the police will not treat you as press." (emphasis retained)). The second time tear gas was deployed, Marantos speculates that it could have been for a vehicle trying to leave or agents pushing the line further from Glass House. Marantos Decl. ¶24. She even admits that it mostly dissipated before it reached her—a far cry from Plaintiffs' characterization that *DHS tear gassed her three separate times. Id.* Next, "CBP used tear gas a third time while [she] was there" because "it was trying to clear the way for four ambulances and a fire truck." *Id.* ¶28. Marantos *never* claims DHS tear gassed *her* three times, and her own description of events bears no similarity to the claims of "intentional targeting of journalists or legal observers" at issue in *Index Newspapers. Id.* ¶¶15, 24, & 28; *Index Newspapers*, 977 F.3d at 837.

The remaining declarations attached to the PI motion are from unrelated third parties and claim no actual injury. For example, Plaintiffs rely on nonparty Kimberly Fisher's account that she "reported at a distance from a line of DHS agents after they teargassed her in order to be 'safer,'" but fails to acknowledge that at the time tear gas was deployed, she was 30-40 feet in front of the line of agents—placing her in the middle of the riot occurring at Glass House. ECF 34 at 14; Fisher Decl. ¶11, ECF 34-12. Members of the press who intentionally stand amid a violent crowd would naturally subject themselves to lawful crowd dispersal efforts. Scharmen Decl. ¶9. Indeed, multiple government declarants describe the Glass House riots as a dangerous situation for both the public and LEOs, necessitating the use of appropriate crowd dispersal measures. Harvick Decl. ¶¶10-19 (describing accounts of violence and threats against officers, vehicles, including emergency vehicles being blocked from movement); Kevin Green Decl. ¶10-11. The fact that Fisher inserted herself deep within the riots is not, as Plaintiffs' mischaracterizations would have it, a violation of the First Amendment.

Moreover, declarations related to non-journalist, non-plaintiffs should not be considered here. Plaintiffs have not attempted to certify a putative class under Rule 23 and they cannot rely on injuries to

19

non-parties to support injunctive relief to the named Plaintiffs. *See Winter*, 555 U.S. at 20 ("A plaintiff

seeking a preliminary injunction must establish ... that *he* is likely to suffer irreparable harm[.]")

(emphasis added); *Wooten v. BNSF Railway Co.*, 2017 WL 1089546, at *1 (D. Mont. Mar. 21, 2017)

("The Court agrees … that harms alleged against third parties are not relevant to the irreparable harm

prong of the *Winter* analysis."). To the extent the Court affords weight to these non-party declarations,

Defendants direct the Court's attention to the statements in these declarations that undermine any

asserted First Amendment violation. *See, e.g.*, Dransfeldt Decl. ¶5 (declarant states that he knew tear

gas was deployed but got closer anyway); Anderson Decl. ¶9 (declarant ran away before tear gas was

deployed); LeBlanc Decl. ¶16dr ECF 34-3 (declarant left the area before tear gas was deployed and

sought shelter); Marquez Decl. ¶21 ECF 34-10 (declarant returns to scene after tear gas is deployed);

Ellison Decl. ¶4 ECF 34-13)("I positioned myself close to the front of the group of protestors").

To the extent the Court considers evidence from the beginning of June already found

insufficient to grant injunctive relief, Plaintiffs still cannot establish First Amendment violations. Given

the barrage of violence against agents and officers from June 6-9, 2025, it is difficult to imagine a scene

where crowd control devices would be more appropriate. *Newsom v. Trump*, 141 F.4th 1032, 1040 (9th

Cir. 2025) ("it is likely that the President lawfully exercised his statutory authority … which authorizes

federalization of the National Guard when 'the President is unable with the regular forces to execute the

laws of the United States.'"). Plaintiffs' declarants repeatedly insert themselves in the middle of violent

riots then complain when crowd control devices are launched against the violent crowd that they joined.

Despite significant evidence and real-time incident reports to the contrary, Plaintiffs fail to fully

acknowledge the volatile scene and swarming of agents by an angry mob at the riot outside the ICE

Facility in Paramount on June 7. Parra Decl. ¶¶7-11. The mob repeatedly assaulted federal agents and

damaged federal property by pelting agents and vehicles with rocks and cinderblocks. *Id.* ¶¶9-10. One

Plaintiff was exposed to crowd control devices only after he repositioned himself close to a violent

mob. Carmitchel Decl. ¶¶10. Another declarant acknowledges that firecrackers were thrown at agents.

Alcorn Decl. ¶14 ECF 6-15. Inexplicably, "news crews set up their equipment in the middle of the

violent rioters" but "[f]or the safety of … personnel, [BP] needed to deploy LLMs in the area where

those rioters were engaged in violent action against [BP] agents." Parra Decl. ¶13.

Other unlawful demonstrations occurred between June 6-9 at MDC. *Supra* §II.D.1. Plaintiffs' nonparty declarants corroborate that Defendants faced violent riots. Declarant Egan attaches video from June 6 at MDC which clearly shows rioters hiding behind barricades and refusing to get back despite orders by agents and pepperballs being fired by agents. Egan Decl. ¶9 ECF 6-13. Egan corroborates that "[s]ometimes it appeared that the agents were shooting in response to objects like water bottles being thrown in their direction." *Id.* at ¶ 10. That same day, Plaintiff-declarant Mena additionally describes a rioter "hurl a desk chair towards the driveway" of MDC where federal agents were present and describes at least five bottles being thrown. Mena Decl. ¶¶10-11 ECF 6-22.

Finally, Plaintiff Olmeda ignores the fact that an extremely violent riot was already underway when she arrived at the Santa Ana federal building. *Supra* §II.D.1. Acknowledging that she moved towards the federal building encroaching on the line of officers and had someone gathering items out of her backpack, she apparently believes that because her subjective intentions were not harmful, officers should or could somehow exempt her from LLMs directed at violent rioters. Olmeda Decl. ¶¶8-12, 16 ECF 6-4. Olmeda's declaration places her in a violent crowd repeatedly encroaching on the line established by federal agents, retreating, and returning to encroach again. *Id.*

LEOs have been swarmed, attacked, punched, pelted with rocks and cinderblocks, chairs, water bottles, and human waste, and had a bone broken. *See generally*, Scharmen Decl.; Parra Decl. Rioters repeatedly passed from First Amendment protected activity into violence, forcing officers to engage in crowd control measures to protect themselves. *Id.* Rioters have assisted fleeing assailants escape from the scene of an assault against federal agents. Parra Decl. ¶8. LEOs actions during these riots were essential to the preservation of the value of human life which is higher than First Amendment values.

3.    Federal Officers Dispersed Rioters and Did Not Retaliate Against Press Personnel for Protected Activity

On these facts, Plaintiffs' retaliation claims also fail on their face for many of the same reasons. Each alleged incident of retaliation raised by Plaintiffs, leaving aside the MacArthur Park operation where no violence occurred (except by vandals against government property (*supra* §II.D.5)) and no crowd control measures were deployed (Harvick Decl. ¶8), was preceded either by frenzied violence directed at LEOs by rioters, or by mobs using their bodies and vehicles to constructively detain LEOs

21

by blocking their ingress and egress. Harvick Decl. ¶10-19. Each use of crowd control devices by federal agents was amply justified and not retaliatory.

To prevail, Plaintiffs must demonstrate, *inter alia*, that they were engaged in "constitutionally protected activity" and that the protected activity was a "substantial or motivating factor" in the Defendants' conduct. *See Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) (quotation marks omitted). Plaintiffs utterly fail to meet that burden. First, for all the reasons argued above, Plaintiffs were not engaged in constitutionally protected activity. *Supra* §IV.B.1.

Second, each specific deployment of crowd control devices was prompted by violence or interference with lawful federal operations. *Supra* §II.B. Even if Plaintiffs could show a one-off constitutional violation amid the chaos of the riots they participated in, the Ninth Circuit has made clear in the related context of Section 1983 claims against municipalities, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiffs must instead identify "practices of sufficient duration, frequency[,] and consistency that the conduct has become a traditional method of carrying out policy." *Id*.[4] Plaintiffs cannot establish a practice of misconduct, so their retaliation claims must fail.

The evidence of retaliation in this case falls well short of *Index Newspapers*, where the Court found "many instances in which plaintiffs were standing nowhere near protestors while photographing and observing the Federal Defendants' action" but were nevertheless targeted with direct applications of force. 977 F.3d at 827-29 (noting at least 45 instances of targeted force against journalists over a 15-day period). Plaintiffs have produced nothing comparable here. Additionally, the declaration of Matthew Harvey, CBP's Director of Less-Lethal Training Branch, undercuts the speculation of Plaintiffs' expert, Gil Kerlikowski, that DHS's use of force is excessive and in retaliation against Plaintiffs for exercising their First Amendment rights. *See generally*, Harvey Decl. To the contrary, CBP has established policies, procedures, and training to ensure the use of less-lethal force is

---

[4] Plaintiffs' only attempt to establish a DHS policy of suppressing First Amendment rights is to flagrantly mischaracterize an intelligence assessment which describes the threat posed to federal law enforcement by doxing and drone-surveillance used to alert violent offenders to DHS's movements. Shapiro Decl. Ex A ECF 34-19. Plaintiffs would have this Court believe that the assessment characterizes "use of cameras" as "unlawful civil unrest." PI Mem. This is simply false. *See* Shapiro Decl. Ex A.

22

1  reasonable and not based on an impermissible purpose. *Id.* ¶8.

2      Even if Plaintiffs could establish a prima facie First Amendment retaliation claim, the claim

3  fails if the government can "show that it would have taken the same action even in the absence of the

4  protected conduct." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021). On the present record,

5  there is no basis to conclude that Defendants would have responded any differently to the violent

6  situations they confronted if the press was not in attendance or acting in a different capacity. *See Am.*

7  *Fed'n of Gov't Emps. v. Trump*, 2025 WL 2180674, at *4 (9th Cir. Aug. 1, 2025) (reversing

8  preliminary injunction because "the government has shown that the President would have taken the

9  same action even in the absence of the protected conduct").

10      4.    The Legally Improper Injunction Plaintiffs Seek is Overbroad and Unworkable

11      Plaintiffs' requested relief fails for two independent reasons. First, the relief sought is precisely

12  the kind of universal injunction that the Supreme Court has decisively rejected. Second, the relief

13  sought is insufficiently tailored to prevent the harms alleged and would endanger the public, federal

14  personnel, and federal property were it implemented.

15          a.    The Injunction Impermissibly Seeks Relief on Behalf of Nonparties

16      The injunctive relief sought by Plaintiffs cannot be granted because it flagrantly violates the

17  Supreme Court's recent landmark holding in *CASA*, forbidding the use of universal (*i.e.*, non-party

18  specific) injunctions. Plaintiffs ask this court to enjoin Defendants from engaging in various forms of

19  crowd-control measures directed at "the press," "legal observers," "people who are not posing a threat,"

20  "targeted individuals," and "any person". Proposed PI ¶¶ 1, 2, 4, 6. Not even one of Plaintiffs' six

21  proposed injunctions is limited to named individual plaintiffs or named organizational plaintiffs and

22  their members. An injunction directed at "any person" simply cannot be squared with *CASA*. The

23  injunctive relief that Plaintiffs sought in connection with their June 18, 2025 Proposed TRO came

24  *before* the *CASA* decision. Incredibly, Plaintiffs have not narrowed their requested relief *at all* in the

25  wake of the decision. *Compare* Pls. Proposed TRO at 4-5 ECF 6-26 *with* Proposed PI at 4-5. Plaintiffs

26  are free to ignore Supreme Court precedent (at their peril), but not this Court.

27      In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that bar the

28

23

1   defendant from enforcing "a law or policy against *anyone*," in contrast to injunctions limited to the
2   plaintiff. *CASA, Inc.*, 145 S. Ct. at 2548. The Court found that the statutory grant of jurisdiction over
3   suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts
4   of equity at our country's inception." *Id*. at 2551 (citation modified). And "[n]either a universal
5   injunction nor any analogous form of relief was available … at the time of the founding." *Id*. Rather,
6   "suits in equity were brought by and against individual parties." *Id.* "Because the universal injunction
7   lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the
8   Judiciary Act." *Id.* at 2554. At most, a court granting equitable relief "may administer complete relief
9   *between the parties*." *Id*. at 2557. "Under this principle, the question is not whether an injunction offers
10  complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction
11  will offer complete relief *to the plaintiffs before the court*." *Id*. And even then, "[c]omplete relief is not
12  a guarantee—it is the maximum a court can provide." *Id*. at 2558. Plaintiffs' proposed injunction
13  violates these basic principes by seeking district-wide relief on behalf any "press or legal observers" in
14  the Central District of California. *See generally* Proposed PI. The fact that Plaintiffs seek only district-
15  wide, as opposed to nationwide relief, is irrelevant: the injunction violates *CASA* because it goes
16  beyond providing complete relief to *Plaintiffs* specifically.

17          Plaintiffs may attempt to argue that a narrower injunction than the one sought would not work,
18  because it would be impractical to expect agents to inquire into whether someone is a plaintiff before
19  releasing tear gas or issuing a dispersal order. But *CASA* cannot be so easily brushed aside. The Court
20  warned that "[c]omplete relief" is not "synonymous with universal relief," but is instead "a narrower
21  concept: The equitable tradition has long embraced the rule that courts generally 'may administer
22  complete relief *between the parties*. '" *Id*. at 2557. Thus, although "the complete-relief principle has
23  deep roots in equity[,]" it does not "justif[y] award of relief to nonparties." *Id*. at 2556. To be sure, there
24  are cases where "afford[ing] the plaintiff complete relief[] [leaves] the court [with] only one feasible
25  option[,]" which has "the practical effect of benefiting nonparties"—but any such "benefit to nonparties
26  … [is] merely incidental." *Id*. at 2557. But *CASA* rejected the argument that relief to non-parties can be
27  justified as "the only practical" solution; as the Court reiterated, "the policy pros and cons" of universal
28  relief "are beside the point." *Id*. at 2558, 2560. Any logistical hurdles present a compliance issue for the

1    government to address; not an excuse for courts to exceed their powers.

2        Here the benefit to nonparties is anything but incidental: Plaintiffs' seek an injunction

3    benefitting "any person." Proposed PI ¶ 6. It is difficult to imagine a *more* universal injunction than

4    Plaintiffs'. *CASA* does not allow that. Plaintiffs' less capacious requests for injunctive relief are no

5    more in line with *CASA* because they too fail to make even a passing attempt at limiting the relief to the

6    parties before the Court. Plaintiffs fail to make any effort at meeting the standards for relief in *CASA*.

7        b.    *The Injunction Imposes Unmanageable Constraints on Law Enforcement*
            *Officers Carrying Out Their Official Law Enforcement Duties*

8

9        Judge Wilson denied Plaintiffs' *ex parte* TRO application on June 20, 2025 because "Plaintiffs'

10    requested relief is too broad." ECF 19 at 5. In the face of this decision in the government's favor,

11    Plaintiffs made no substantive changes to their Proposed PI—the Proposed PI is nearly word for word

12    identical to the proposed TRO. Therefore, Judge Wilson's opinion controls this aspect of the dispute:

13        Plaintiffs seek a [PI] that sweeps far beyond the alleged violations. The requested relief

14        would restrict lawful crowd control measures and potentially impede Defendants'

15        legitimate law enforcement responsibilities. Such broad relief violates the fundamental

16        principle that injunctive relief must be precisely tailored to address only the specific

17        constitutional harm, not broadly constrain otherwise lawful government action.

18    *Id.* Judge Wilson's opinion accords with Ninth Circuit precedent which has "long held that injunctive

19    relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265

20    (9th Cir. 2015). (quotation omitted) "[A]n injunction against state actors must directly address and

21    relate to the constitutional violation itself and must not require more of state officials than is necessary

22    to assure their compliance with the Constitution." *Id.* (cleaned up). Plaintiffs' proposed injunction fails

23    this requirement several times over.

24        Each one of Plaintiffs' requests is overbroad and unsupported by their arguments. Plaintiffs'

25    first request sweeps far beyond the relief afforded in *Index Newspapers*. There, the district court granted

26    an injunction that exempted journalists from orders to disperse but absolved federal law enforcement

27    from liability if journalists were "incidentally exposed to crowd-control devices after remaining in the

28    area where such devices were deployed after the issuance of an otherwise lawful dispersal order." 480

25

F. Supp. 3d 1120, 1157 (D. Or. 2020). Here, by contrast, Plaintiffs seek a blanket prohibition enjoining DHS from "[d]ispersing … the press[.]" Proposed PI at 4. This would effectively give the press a veto over every lawful crowd-dispersal order issued by federal officers and would "prevent the safe and efficient dispersal of crowds thereby making already dangerous situations even more dangerous for everyone involved." Scharmen Decl. ¶5. Plaintiffs' first request also asks this Court to grant relief to "the press" as that term was defined in *Index Newspapers*, 977 F.3d at 823 (requiring defendants to distinguish between journalists, legal observers, and protestors using "visual identifiers" including "press passes, … and people carrying professional-grade photographic equipment"). But "[p]ress markings are publicly available and officers' ability to differentiate between actual press and those who have come by press markings through fraudulent means cannot be determined in real-time." Wang Decl. ¶23. Legal observers are even more difficult to identify. *Id.*

The preliminary injunction issued in *Index Newspapers* makes no mention of prohibiting the use of crowd control weapons. *See* 480 F.Supp. 3d at 1155-57. But here, Plaintiffs' second and third requests seek blanket prohibitions on the use of "crowd control weapons … on people who are not posing a threat of imminent harm to a [LEO] or another person[;]"and "[f]iring kinetic impact projectiles or flashbangs at identified targets, if doing so could result in injury to a person who is not posing a threat of immanent harm to a [LEO] or another person." Proposed PI at 4-5. This requested relief "poses serious operational risks" and "would invite the wanton destruction of federal property and allow people to break into federal buildings while FPS officers would be unable to act." Scharmen ¶6. Furthermore, the relief sought is not limited to the press but extends to all "people who are not posing a threat[,]" and therefore sweeps far beyond the scope of Plaintiffs' access and retaliation arguments. Proposed PI at 4-5. The requested relief also imposes on LEOs a zero-collateral damage rule. But given the "chaotic and rapidly evolving nature of a riot … reasonable uses of force" can expose non-threatening individuals, who remain present after a dispersal order has been given, to crowd control tools. Scharmen ¶6. This zero-collateral damage request is especially misguided because some LLMs "are designed to impact more than one or more subject(s) at a time, within the range of deployment." Harvey Decl. ¶11. Additionally, Plaintiffs' request fails to acknowledge that LLMs are an appropriate tool even when a crowd does not pose a specific imminent threat to a LEO but rather obstructs

1    transportation and fails to comply with law enforcement orders. *Id.* ¶10. Plus, "anyone who does not

2    comply with lawful dispersal commands may be considered a potential threat to law enforcement

3    depending on subsequent actions and refusal to leave a restricted area." Wang Decl. ¶24.

4        Plaintiffs' fourth request that "two separate warnings be given" before use of "any crowd

5    control weapon" ignores operational realities and puts agents at risk in unpredictable and volatile

6    situations that can present imminent threats that leave no time for warnings. Scharmen Decl. ¶7. The

7    request would require an officer to provide two warnings when a rioter is, for example, imminently

8    about to throw a brick at the officer at close range. Harvey Decl. ¶12. "A blanket requirement for two

9    separate warnings would prevent officers from responding to exigent circumstances where the

10   utilization of these tools could prevent harm to the public or officers." Wang Decl. ¶26.

11       Plaintiffs' fifth request that federal law enforcement be required to obtain "express[] approval

12   by an on-scene supervisor" before deployment of tear gas and similar chemical irritants (Proposed PI at

13   5) effectively ties the hands of every agent who, in the chaos of dynamic situations, cannot locate a

14   supervisor to seek permission. *See* Wang Decl. ¶27; Paul Green Decl. Ex. C ¶16. Requiring express

15   approval "by an on-scene supervisor in response to specific acts of violence that the supervisor

16   personally witnessed" before any use of "kinetic impact projectiles containing chemical irritant" defies

17   the realities of crowd control in rapidly unfolding situations. Harvey Decl. ¶13.

18       Plaintiffs' sixth request for relief is vague insofar as it prohibits firing "other crowd control

19   weapons" at "sensitive areas[.]" Proposed PI at 5. These designations "lack[] the specificity necessary

20   to provide guidance to CBP officers and agents." Harvey Decl. ¶14. The request is also unnecessary

21   because "CBP's use of force policy already prohibits the intentional targeting of the head, neck, spine,

22   or groin of the intended subject … unless the use of deadly force is reasonable." *Id.*

23       The concerted effect of Plaintiffs' six requests for relief will put agents in dangerous Catch-22

24   scenarios where they must choose between contempt of the Court's injunction or risking their lives. *See*

25   *Id.* ¶15. Courts are properly reluctant to micromanage LEOs responding to unpredictable and violent

26   demonstrations in defense of themselves and others and it should not do so here. *Ryburn v. Huff*, 565

27   U.S. 469, 477 (2012) ("judges should be cautious about second-guessing a police officer's assessment,

28   made on the scene, of the danger presented by a particular situation[.]").

27

## C.    Plaintiffs Cannot Demonstrate Irreparable Harm

Even if Plaintiffs sought proper relief, they have failed to establish irreparable harm. Plaintiffs insist that by pleading a colorable First Amendment claim they have suffered irreparable injury. PI Mem. First, Plaintiffs have not established a likelihood of success on their First Amendment claim. *See supra* at §IV.B. That failure is fatal here. *Nickler v. Cnty. of Clark*, 648 F. App'x 601, 605 (9th Cir. 2016) ("Because [Plaintiffs] failed to show a likelihood of success on the merits, [they] also could not show that irreparable harm would likely result from failure to grant the injunction"). In any event, "no presumption of irreparable harm arises in a First Amendment retaliation claim." *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997). Instead, "plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To establish a likelihood of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [they] must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). Where "there is no showing of any real or immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting equitable relief. *Lyons*, 461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985). Despite Plaintiffs' attempts to conjure future misconduct, they present no evidence to suggest such alleged misconduct will recur. Plaintiffs' future injuries are not only speculative and, therefore, insufficient to demonstrate the likelihood of irreparable injury, they are premised on mischaracterizations that do not reflect reality. *Supra* at 18; *see Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[a]n injunction will not issue" based on "a mere possibility of some remote future injury[]").

Since Plaintiffs filed their TRO, the nature of the so-called protests has changed, becoming more sporadic, but also violent as opportunists target law enforcement operations for interference. *Supra* at §II.D.2-3, & 6. Plaintiffs' request for relief, therefore, is based on a state of affairs that no longer exists—the raid on Glass House Farms, for example, was an extraordinary operation unlikely to have a close analogue. Plaintiffs' theory that the continued enforcement of federal law shows a likelihood of irreparable harm is implausible. Mere speculation that individual officers may somehow,

28

someday commit sporadic violations of people's rights at future protests—specifically targeting one of the Plaintiffs—cannot establish irreparable harm. Indeed, an individual citizen does not face a likelihood of irreparable harm just because there is a generalized risk that LEOs may one day act unconstitutionally. *Lyons*, 461 U.S. at 111 ("[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [LEOs] are unconstitutional."). Plaintiffs have failed to demonstrate that, absent relief, they will suffer irreparable harm.

### D.    Both the Balance of Equities and Public Interests Weigh Against an Injunction

The balance of the equites and public interest tips sharply in favor of Defendants who are enforcing existing law and defending life and property in response to repeated violent attacks. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. (citation omitted). "The federal government's interest in preventing" attacks on federal officers and damage to federal buildings "is significant." *Newsom*, 141 F.4th at 1054.

Moreover, there is a pointed public interest when disorder threatens the integrity of public property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) (health, safety, and protection of property "are compelling reasons" and "represent significant government interests."); *see also Index Newspapers*, 977 F.3d at 838 (finding that government has an "uncontested interest in protecting federal agents and property"). Additionally, Congress has recognized such interests, including by making the destruction of federal property and assault of federal officers felonies. 18 U.S.C. §§ 111, 1361. The federal government has an interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated[;]" for government buildings, those uses are public uses that are in the public interest. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992). The public interest is advanced when federal officers disperse violent opportunists near federal buildings and personnel. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment"); *Griefen*, 200 F.3d at 1260 (upholding the relocation of protesters who "had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project[]"); *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise

29

protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage."). Plaintiffs cannot dispute that the federal government and public have a compelling interest in the protection of federal property and personnel.

Plaintiffs' rhetoric about "protect[ing] discourse" (PI Mem. at 25 (citing *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 790 (2011)) and participation in "our republican system of self-government" (PI Mem. at 25 (quoting *Globe Newspaper, Co. v. Superior Ct. of Norfolk Cnty.*, 457 U.S. 596, 604 (1982))) is unavailing when the facts are replete with violent attacks on law enforcement. Even if the "protests" had not become violent riots, the courts have already thoroughly weighed the interest the press has in access and found it no greater than that of the public generally. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972) ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded"); *Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998).

Imposing arbitrary policing rules fashioned by Plaintiffs' attorneys—not law enforcement—would create chaos and is unwarranted since Plaintiffs' imagined Constitutional violations cannot outweigh the concrete harm to the government and the public were this Court to grant their request.

Finally, the Court should order security with any preliminary injunction. Under Rule 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." If the Court grants an injunction here, it should require Plaintiffs to post a bond commensurate with the scope of any injunction.

To the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for seven days to allow the United States to seek emergency relief if appeal is authorized. Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken v. Holden*, 556 U.S. 418, 434 (2009) (describing standard for obtaining stay and noting "substantial overlap" with "the factors governing preliminary injunctions").

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the Motion.

1    Dated: August 18, 2025                  Respectfully submitted,

2                                            BRETT A. SHUMATE
                                             Assistant Attorney General
3                                            Civil Division

4                                            ERIC J. HAMILTON
                                             Deputy Assistant Attorney General
5
                                             SEAN SKEDZIELEWSKI
6                                            Counsel to the Assistant Attorney General
                                             Civil Division
7
                                             ALEXANDER K. HAAS
8                                            ANDREW I. WARDEN
                                             KATHLEEN C. JACOBS
9                                            Civil Division, Federal Programs Branch

10                                           BILAL A. ESSAYLI
                                             Acting United States Attorney
11                                           DAVID M. HARRIS
                                             Assistant United States Attorney
12                                           Chief, Civil Division
                                             DANIEL A. BECK
13                                           Assistant United States Attorney
                                             Chief, Complex and Defensive Litigation Section
14

15                                               /s/ Sean Skedzielewski
                                             SEAN SKEDZIELEWSKI
16                                           Counsel to the Assistant Attorney General
                                             Civil Division
17                                           U.S. Department of Justice, Civil Division
                                             950 Pennsylvania Ave NW
18                                           Washington, DC 20530
                                             Office: (202) 307-1697
19                                           Sean.Skedzielewski@usdoj.gov

20                                           Attorneys for Defendants

21

22                       L.R. 11-6.2 Certificate of Compliance

23          The undersigned counsel of record certifies that this memorandum contains 30 pages, which

24   complies with the page limit set by court order dated August 12, 2025.

25

26    Dated: August 18, 2025                     /s/ Sean Skedzielewski
                                             SEAN SKEDZIELEWSKI
27

28

                                        31