UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., | Case No. 2:25-cv-05563 |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, | **DECLARATION OF EDDY WANG** |
| Defendants. | |

## **DECLARATION OF EDDY WANG**

I, Eddy Wang, hereby declare:

1.      I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) as the Special Agent in Charge (SAC) of the Los Angeles Field Office (HSI Los Angeles). I have held this position since August 2023.

2.      I have been employed by ICE since 2003. Prior to my position as SAC, I served as the Acting Special Agent in Charge of HSI Los Angeles, Deputy SAC of HSI Los Angeles, and Assistant SAC of the HSI Philadelphia Field Office. I have also served HSI as a Program Manager, Section Chief, and Unit Chief within the HSI Headquarters National Gang Unit. Lastly, I was a Special Agent and Group Supervisor with HSI Los Angeles.

3.      As the SAC for HSI Los Angeles, I direct and oversee ICE's enforcement of federal customs and immigration laws within the Central District of California. To accomplish the ICE mission in the Los Angeles Area of Responsibility (AOR), HSI

Special Agents in my office conduct investigations of alleged violations of customs and immigration laws and other laws enforced by ICE.

4.     HSI is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. HSI Los Angeles has more than 400 personnel, including over 300 Special Agents throughout eight offices in Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura Counties. HSI Special Agents have a wide array of responsibilities related to the enforcement of the country's immigration and customs laws and the investigation of criminal activity, which include the investigation of contraband and merchandise smuggling, fraud in both import and export transactions, criminal finance and money laundering, worksite enforcement, alien smuggling, human trafficking, cybercrimes, and infringements upon intellectual property rights. ICE's mission is to uphold public safety and protect the United States from terrorist attacks and criminal activity through investigating and interdicting the people, money, and materials that support terrorist and criminal activity. ICE plays important roles in securing the nation's borders and in ensuring economic, transportation, and infrastructure security.

5.     I make this declaration based upon my personal knowledge, consultation with colleagues, and/or my review of official ICE records.

6.     Beginning on or about Friday, June 6, 2025, federal law enforcement officers, including HSI Special Agents, conducted immigration enforcement operations in several locations in the Los Angeles area. In some areas, these officers were met by individuals who impeded and/or obstructed these operations.

7.     I did not witness, nor am I aware of, any HSI employee knowingly targeting journalists, legal observers, or peaceful protestors with less-lethal devices, chemical munitions, and/or diversionary devices.

8.     The only HSI employees who are authorized to use less-lethal devices, chemical

munitions, and/or diversionary devices are highly trained special agents who are members of the HSI Special Response Teams (SRTs).

9.      HSI SRT agents are trained to serve high-risk warrants under hazardous conditions, arrest dangerous criminals, and assist other law enforcement agencies during critical incidents.

10.     On June 6, 2025, I was present at the federal complex in Downtown Los Angeles when the Federal Protective Service (FPS) put out a call for agencies within the 300 North Los Angeles Federal Building to help secure the vehicle entrance/exit off Alameda Street that was being encroached upon by violent protestors. Several HSI special agents and I responded to the Alameda Street exit/entrance to support FPS efforts to prevent the violent protestors from further entering the federal property. During this time, I witnessed water bottles, pieces of fractured concrete, and fireworks thrown in the direction of HSI special agents and other law enforcement officials.

11.     At no time did I direct HSI Los Angeles SRT agents to target a member of the press or any peaceful observer nor did I witness HSI Los Angeles SRT agents target said parties  at or near the federal complex in Downtown Los Angeles on June 6, 2025.

12.     On June 7, 2025, a small number of HSI Los Angeles personnel and I were present at a business complex on Alondra Boulevard across from the Home Depot located at 6400 Alondra Boulevard, Paramount, California. This was not a planned immigration enforcement action at the Home Depot and the business complex was a staging area for immigration enforcement activity with the U.S. Border Patrol.

13.     No HSI SRT agent deployed any less-lethal devices, chemical munitions, and/or diversionary devices on June 7, 2025, at or near the business park across from the Home Depot in Paramount, California.

14.     On June 9, 2025, while HSI agents were present at the 34 Civic Center Plaza federal building in Santa Ana, California, no HSI SRT agents were present.

3

15.    No HSI agent deployed any less-lethal devices, chemical munitions, and/or diversionary devices on June 9, 2025, at the 34 Civic Center Plaza federal building in Santa Ana, California.

16.    In responding to public safety threats, ICE officers and special agents are bound by the DHS Use of Force policy titled, Update to the Department Policy on the Use of Force (Feb. 6, 2023) (Use of Force Policy), available at: https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf. The DHS Use of Force Policy is guided by the Fourth Amendment as the constitutional baseline for permissible use of force by law enforcement officers and special agents in the course of their duties. The DHS Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied. Further, physical force must be discontinued when resistance ceases or when the incident is under control.

17.    ICE HSI law enforcement officers are trained in a variety of techniques to aid in appropriately resolving encounters. ICE HSI law enforcement officers are trained to employ tactics and techniques that use the force necessary to effectively bring an incident under control. However, recognizing the seriousness of public safety threats ICE law enforcement officers may encounter, the DHS Use of Force Policy does not impose a duty for them to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

18.    The DHS Use of Force Policy requires ICE law enforcement officers, when feasible, prior to the application of force, to attempt to identify themselves and issue a verbal warning to comply with instructions. However, whether a warning is feasible under the circumstances requires the ICE law enforcement officer to be guided by several considerations, including, but not limited to, whether the resulting delay is likely

4

35

to increase danger to the ICE law enforcement officer or others, result in the destruction of evidence, allow for a subject's escape, or result in the commission of a crime. However, when circumstances allow for a warning to be issued, ICE HSI law enforcement officers are trained to afford subjects a reasonable opportunity to voluntarily comply before applying force. In an exigent circumstance, for self-defense or defense of another, ICE law enforcement officers are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances. However, the DHS Use of Force Policy strictly prohibits the use of excessive force and warns its officers that DHS does not tolerate excessive force and it constitutes misconduct. Under the policy, engaging in excessive force or failing to report the use of excessive force will subject the officer to administrative and criminal penalties.

19.    I understand that Plaintiffs allege that HSI Special Agents were present at various locations within the Los Angeles AOR where federal enforcement operations took place. From the protest locations listed in Plaintiffs' preliminary injunction declarations, HSI Los Angeles SRT agents were only present at MacArthur Park in Los Angeles, California, on July 7, 2025, Glass House Farms in Camarillo, California, on July 10, 2025, and Glass House Farms in Carpinteria, California, on July 10, 2025, and I can confirm that they did not use force or deploy or threaten to deploy any less-lethal devices, chemical munitions, or diversionary devices at those locations.

20.    On July 7, 2025, HSI Los Angeles SRT agents were present at MacArthur Park in Los Angeles, California to support a U.S. Customs and Border Protection (CBP) organized operation. The role of the HSI Los Angeles SRT agents was to provide perimeter security.

21.    HSI Los Angeles was the lead investigative agency at Glass House Farms enforcement action at the Carpinteria, California, and Camarillo, California, locations on July 10, 2025, and obtained criminal search warrants for violations of federal law,

5

**36**

including harboring aliens and unlawful employment of aliens. The role of HSI Los

Angeles at the Carpinteria, California, location was to execute the criminal search

warrant, gather evidence, and provide perimeter security. In conjunction with this

operation, HSI Los Angeles's role at the Glass House Farms in Camarillo, California, on

July 10, 2025, was to gather evidence related to their investigation while CBP had

operational control of the execution of the search warrant and provided perimeter

security. Additionally, ERO SRT officers provided security support for the operation in

Camarillo, California.

22.    Rioters and protesters attempted to disrupt the Glass House Farms enforcement

operations. These operations led to the rescue of several unaccompanied alien children

and the arrests of over 300 illegal aliens.

23.    I have reviewed Plaintiffs' proposed order submitted with their application for a

preliminary injunction. The relief requested is unnecessary and would endanger the

safety of law enforcement personnel and the public. First, Plaintiffs' request that this

Court enjoin DHS from dispersing munitions or engaging in behavior that may be

perceived as "threatening" or "assaulting" by the press or legal observers, only allowing

HSI Special Agents to ask press or legal observers to change location to avoid disrupting

law enforcement, as long as the press or legal observers have sufficient opportunity to

report and observe. This is simply unworkable. In addition to executing high-risk

criminal search and arrest warrants, HSI SRT agents are responsible for securing an

impacted area and may be unable to differentiate between members of the press and

other participants. Press markings are publicly available and while officers may have no

reason to limit press access, their ability to differentiate between actual press and those

who have come by press markings through fraudulent means cannot be determined in

real-time. Legal observers are even less easily identifiable when co-mingled among large

crowds, which include criminal actors. When HSI SRT agents give a dispersal command

for safety reasons, all parties, including those claiming affiliation with the press, are

expected to comply. Any delay in compliance or the ability to respond to a lack of compliance poses a risk to officer safety, public safety, and the safety of any press or legal observers who may be present.

24.     Second, Plaintiffs' request to enjoin DHS from using less-lethal devices, chemical munitions, and/or diversionary devices, including flash-bangs, on people who are not posing an imminent threat to law enforcement or another person, ignores the realities of protecting officers and the public from violent protestors who use the anonymity of crowds to assault law enforcement officers. Less-lethal devices, chemical munitions, and/or diversionary devices are used after crowds have been ordered to disperse, fail to do so, and/or engage in criminal and assaultive behavior towards law enforcement officers and the public. Due to the nature of some less-lethal devices, chemical munitions, and/or diversionary devices, such as CS (tear) gas, Oleoresin Capsicum (OC) Spray, and flash-bangs, which disperse widely—persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers may be impacted, due to their proximity to persons who are engaged in violent and/or criminal behavior. Enjoining HSI's use of less-lethal devices, and/or chemical munitions, and/or diversionary devices would impair HSI's ability to safety execute both criminal search and arrest warrants targeting child predators, fentanyl traffickers, and others, but also to safely conduct immigration enforcement actions. Moreover, consistent with the DHS Use of Force Policy, HSI SRT agents only use force that is necessary and reasonable based on the totality of the circumstances. HSI SRT agents are trained to engage those individuals who pose a threat based on this reasonableness standard. HSI SRT agents are trained to give verbal commands and those individuals who do not comply with these commands may be perceived as a potential threat. Part of HSI SRT agents' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and refusal to leave

7

a restricted area.

25.    Third, Plaintiffs' request to enjoin DHS officers from firing kinetic impact
projectiles at identified wrongdoers, or deploying diversionary devices, such as flash-
bangs, if doing so could result in injury to a person who is not posing an imminent threat
to law enforcement or another person, is unnecessary and unworkable. To my
knowledge, no HSI Los Angeles SRT agents have used kinetic impact projectiles or
flash-bang diversionary devices against any individuals during any protests identified in
the Plaintiffs' preliminary injunction motion. Prohibiting the use of flash-bangs, which
create a bright light and loud noise, would take away a valuable diversionary device for
law enforcement officers to protect themselves and others. Also, consistent with the
DHS Use of Force Policy, HSI SRT agents are trained to utilize direct impact munitions
only on those individuals who pose a threat to law enforcement. If a dispersal order is
given and subjects do not comply with this directive, they may be subject to necessary
and reasonable uses of force to include the utilization of kinetic impact or chemical
munitions and/or diversionary devices.

26.    Fourth, Plaintiffs' request that this Court enjoin DHS officers from using any less-
lethal devices, chemical munitions, and/or diversionary devices without giving at least
two separate warnings in a manner and at a sound level where: (1) it can be heard by the
targeted individuals, (2) the messages explain that officers may employ less-lethal
devices, chemical munitions, and/or diversionary devices; and (3) must give the targeted
individuals sufficient time to avoid the use of force, is both unnecessary and unworkable.
Consistent with the DHS Use of Force Policy, HSI SRT agents are trained to give
warnings when operationally feasible. A blanket requirement for two separate warnings
would prevent officers from responding to exigent circumstances where the use of these
tools could prevent harm to the public or officers. It is the subject's behavior that dictates
the use of these tools and if the subject or crowd behavior requires a more immediate
response, officers cannot and should not compromise safety to meet an arbitrary two-

warning standard. In addition, situations where the use of less-lethal measures are needed are often loud, chaotic, and spread over a large area. Plaintiffs' request relies on a subjective standard of whether the protestors, journalists, legal observers, or others can hear verbal warnings before any use of force is employed, which is beyond the control of federal officers. Indeed, it is partly within the control of the crowd. While HSI SRT agents can provide verbal commands and warnings, when possible to do so as explained previously, they cannot guarantee or prove everyone in the crowd was able to hear and understand these warnings.

27.    Fifth, Plaintiffs' request that this Court enjoin DHS officers from using kinetic impact projectiles containing chemical irritants unless expressly approved by an on-scene supervisor in response to specific acts of violence that the supervisor personally witnessed. This is unworkable and vague. The deployment of these tools is dictated by the totality of circumstances facing the officer in real-time. The delay required by supervisory notification or presence would unnecessarily place law enforcement officers and community members in harm's way. Nor would a supervisor on scene necessarily see the act of violence in question. Furthermore, it is not clear who the Plaintiffs are referring to as the on-scene supervisor.

28.    Lastly, Plaintiffs' request that this Court enjoin DHS officers from using less-lethal devices, chemical munitions, and/or diversionary devices, such as tear gas, smoke canisters or flash-bang grenades so as to strike any person, or firing kinetic impact projectiles at the head, neck, groin, spine, or other sensitive areas, unless that person poses an immediate threat of death or serious bodily injury. This is both unnecessary and unworkable. To my knowledge, no HSI Los Angeles SRT agents struck any person with any tear gas canisters, flash-gang grenades, kinetic impact projectiles or other less-lethal devices, chemical munitions and/or diversionary devises, including in sensitive body parts, during any protests identified in the Plaintiffs' application for a preliminary injunction. As stated previously, consistent with the DHS Use of Force Policy, HSI SRT

9

**40**

agents are trained to use direct impact munitions only on those individuals who pose a direct threat to law enforcement, including those who fail to comply with a law enforcement instruction or order since they are identified as a potential threat to law enforcement. Also consistent with the DHS Use of Force Policy, HSI SRT agents may only use the level of force that is objectively reasonable under the totality of the circumstances.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 18th day of August, 2025, at Long Beach, California.


Eddy Wang
Special Agent in Charge
DHS ICE HSI Los Angeles

10

**41**

# EXHIBIT 1



**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

Issue Date: February 6, 2023

Policy Statement 044-05 (Revision 01)

MEMORANDUM FOR:   Agency Leaders

FROM:   Alejandro N. Mayorkas
Secretary

SUBJECT:   **Update to the Department Policy on the Use of Force**

---

## I.    Purpose

Pursuant to the Secretary's authority under Title 6, United States Code (U.S.C.) § 112, this
policy articulates Department-wide standards and guidelines related to the use of force by
Department of Homeland Security (DHS) law enforcement officers and agents (LEOs) and
affirms the duty of all DHS employees to report improper uses of force. All DHS Components
and Offices employing LEOs (hereafter "Components") are directed to implement this guidance,
including investigation and documentation practices, through Component-specific policy,
procedure, and training.

This Memorandum supersedes the Memorandum from Acting Deputy Secretary Claire Grady
*Department Policy on the Use of Force* (September 7, 2018) and has been updated to comply
with Executive Order 14074, *Advancing Effective, Accountable Policing and Criminal Justice
Practices to Enhance Public Trust and Public Safety*, May 25, 2022. The September 1, 2021,
*Addendum on the Use of Force Pursuant to 6 U.S.C. § 124n Operations* (counter unmanned
aircraft systems) remains in effect.

## II.    Use of Force Standard

### A.    Introduction

In determining the appropriateness of a particular use of force, the Department is guided
by constitutional law, as interpreted by the U.S. Supreme Court.[1] The Fourth
Amendment supplies a constitutional baseline for permissible use of force by LEOs in the
course of their official duties; law enforcement agencies may adopt policies that further
constrain the use of force. This policy describes the governing legal framework and
articulates additional principles to which the Department will adhere.

---

[1] See, e.g., *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

**EXHIBIT 1**

**43**

Update to the Department Policy on the Use of Force
Page 2

B.    General Statement

LEOs may use force only when no reasonably effective, safe, and feasible alternative
appears to exist and may use only the level of force that is **objectively reasonable** in
light of the facts and circumstances confronting the LEO at the time force is applied.

C.    Discussion: The Fourth Amendment "Reasonableness" Standard

1.    The Supreme Court has ruled that "all claims that law enforcement officers
have used excessive force—deadly or not—in the course of an arrest,
investigatory stop, or other 'seizure' of a free citizen should be analyzed under
the Fourth Amendment and its 'reasonableness' standard."[2] This standard is
an objective one that, in the context of use of force policy and practice, is
often referred to as "objective reasonableness."

2.    Because this standard is "not capable of precise definition or mechanical
application," its "proper application requires careful attention to the facts and
circumstances of each particular case."[3] The reasonableness of a LEO's use
of force must be judged "from the perspective of a reasonable officer on the
scene, rather than with the 20/20 vision of hindsight."[4] In determining
whether the force a LEO used to effect a seizure was reasonable, courts allow
for the fact that LEOs are often forced to make split-second judgments, in
circumstances that are tense, uncertain, and rapidly evolving.

3.    Consequently, there may be a range of responses that are reasonable and
appropriate under a particular set of circumstances.

4.    Once used, physical force[5] must be discontinued when resistance ceases or
when the incident is under control.

---

[2] *Graham,* 490 U.S. at 396. The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an
officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means
intentionally applied* (emphasis in original)." *Brendlin v. California,* 551 U.S. 249, 254 (2007) (citations omitted).
[3] *Graham,* (citing *Garner,* 471 U.S. at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort
of . . . seizure'"). The "totality of the circumstances" refers to all factors surrounding a particular use of force. In *Graham,* the
Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the
severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and
whether the subject is actively resisting arrest or attempting to evade arrest by flight. Other factors include, but are not limited to:
the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of
the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is
forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on
account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the
subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.
[4] *Id.*
[5] Other than the force reasonably required to properly restrain a subject and safely move the subject from point to point. That is,
once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or
other control techniques" to safely and securely conclude the incident.

**EXHIBIT 1**
**44**

Update to the Department Policy on the Use of Force
Page 3

### III. General Principles

A.     Respect for Human Life

All DHS personnel have been entrusted with a critical mission: "With honor and integrity, we will safeguard the American people, our homeland, and our values."  In keeping with this mission, respect for human life and the communities we serve shall continue to guide DHS LEOs in the performance of their duties.

B.     De-escalation

To ensure that DHS LEOs are proficient in a variety of techniques that could aid them in appropriately resolving an encounter, Components shall provide use of force training that includes de-escalation tactics and techniques.

C.     Use of Safe Tactics

1.  DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage. DHS LEOs should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

2.  Chokeholds and carotid restraints are prohibited unless deadly force is authorized (see Section VI).  Chokeholds and carotid restraints must not be used as a means to control non-compliant subjects or persons resisting arrest.

D.     Additional Considerations

1.  DHS LEOs are permitted to use force that is objectively reasonable in light of the totality of the circumstances.  This standard does not require LEOs to meet force with equal or lesser force.

2.  DHS LEOs do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

3.  DHS LEOs are permitted to utilize force against an animal if the animal poses an immediate danger to the officer or others in close proximity to the animal. These incidents shall be reported per Component guidelines.  A firearm may also be used to humanely euthanize an animal that appears to be seriously injured or diseased.

**EXHIBIT 1**
**45**

Update to the Department Policy on the Use of Force
Page 4

E.    Warnings

1.    When feasible, prior to the application of force, a DHS LEO must attempt to identify themselves and issue a verbal warning to comply with the LEO's instructions.  In determining whether a warning is feasible under the circumstances, a LEO may be guided by a variety of considerations including, but not limited to, whether the resulting delay is likely to:

a.    Increase the danger to the LEO or others, including any victims and/or bystanders;

b.    Result in the destruction of evidence;

c.    Allow for a subject's escape; or

d.    Result in the commission of a crime.

2.    In the event that a LEO issues such a warning, where feasible, the LEO should afford the subject a reasonable opportunity to voluntarily comply before applying force.

F.    Exigent Circumstances

In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances.

G.    Medical Care

As soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries, complains of being injured, or requests medical attention.  This may include rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility.

H.    Duty to Intervene in and Report Improper Use of Force

1.    The Department is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability.  As such, Components will ensure that their policies and procedures unambiguously underscore the following:

**The use of excessive force is unlawful and will not be tolerated.  Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.**

**EXHIBIT 1**

**46**

Update to the Department Policy on the Use of Force
Page 5

2.  DHS LEOs have a duty to intervene to prevent or stop a perceived use of excessive force by another LEO—except when doing so would place the observing/responding LEO in articulable, reasonable fear of death or serious bodily injury.

3.  **Any DHS employee** with knowledge of a DHS LEO's improper use of force shall, without unreasonable delay, report it to their chain of command, the internal affairs division, the DHS Office of Inspector General, and/or other reporting mechanism identified by Component policy or procedure.

4.  Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution. Components shall ensure that all personnel are aware of these obligations, as well as the appropriate mechanism(s) by which such reports should be made.

I.   Training

Components shall ensure that their LEOs are trained in their Component's use of force policies, at least annually, including related legal updates, discretion in using deadly force and less than lethal force, and de-escalation techniques. Training shall include scenario-based learning that simulates operating conditions, such as shooting scenarios and the application of force, including deadly force. Such training shall be recorded in component training records. Components must also provide annual training to their LEOs on:

1.  The prohibition on chokeholds and carotid restraints unless the legal standard for deadly force is met;

2.  The affirmative duty to request and/or render medical aid following the use of force;

3.  The affirmative duty to intervene if a LEO is misusing force or using excessive force; and

4.  Implicit bias and profiling.

J.   Officer Wellness Resources

As soon as practicable after a use of force incident, Components shall ensure that employees are immediately advised of available wellness resources if the employee was involved in or witnessed an incident where force was used.

**EXHIBIT 1**

**47**

Update to the Department Policy on the Use of Force
Page 6

**IV.**     **Less-Lethal Force and Less-Lethal Devices**

A.     All Components shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques, authorized less-lethal devices, and necessary training and certifications—both initial and recurring.

B.     Components shall conduct less-lethal use of force training no less than every two years and incorporate decision-making and scenario-based situations in these training programs.

C.     DHS LEOs are prohibited from carrying any unauthorized less-lethal device for duty use.

D.     LEOs shall demonstrate proficiency, in accordance with established Component standards, for each less-lethal device that they are authorized and certified to carry.  If a certification or valid waiver expires, a LEO is prohibited from carrying that device for duty use until the LEO meets the requirements for recertification on that device.

**V.**     **Warning Shots and Disabling Fire**

A.     General Prohibition

Except in the limited circumstances described in Section V.B., "Exceptions," DHS LEOs are prohibited from discharging firearms solely:

1.   As a warning or signal ("warning shots"); or

2.   To disable moving vehicles, vessels, aircraft, or other conveyances ("disabling fire").

B.     Exceptions

1.   Warning Shots

a.   <u>Maritime Law Enforcement Operations</u>: Authorized U.S. Coast Guard (USCG), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed.  Such warning shots are classified as less-lethal force.

b.   <u>Aviation Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave the airspace, and only after all other available means of signaling have failed.  Such warning shots are classified as less-lethal force.

**EXHIBIT 1**
**48**

Update to the Department Policy on the Use of Force
Page 7

    2. Disabling Fire

        a. <u>Maritime Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel, when conducting maritime law enforcement operations, may discharge firearms to disable moving vessels or other maritime conveyances. Such disabling fire is classified as less-lethal force.

        b. <u>Physical Protection</u>: Authorized United States Secret Service (USSS) personnel exercising USSS's protective responsibilities, and other authorized and appropriately trained DHS LEOs assigned to assist USSS in exercising these responsibilities, may discharge firearms to disable moving vehicles, vessels, and other conveyances, and such disabling fire is classified as less-lethal force—EXCEPT: <u>Aircraft in Flight</u>: Disabling fire against an aircraft in flight is permitted only if the use of deadly force against the occupants of the aircraft, or in response to the threat posed by the aircraft, itself, is otherwise authorized under this policy. This is classified as a use of deadly force.[6]

  C. Safety Considerations

    1. Warning shots and disabling fire are inherently dangerous and, when authorized under this policy, should be used with all due care. DHS LEOs must exercise good judgment at all times and ensure that safety is always the primary consideration.

    2. When authorized LEOs deem warning shots or disabling fire warranted, each shot must have a defined target.

**VI. Deadly Force**

  A. General Guidelines

    1. As with any use of force, a LEO's use of deadly force must be objectively reasonable in light of the facts and circumstances confronting the LEO at the time force is applied.

        a. DHS LEOs may use deadly force only when necessary, that is when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person.[7]

---

[6] As a use of deadly force, this is not mere "disabling fire," which by definition is not intended to cause bodily injury.
[7] For more detailed discussion of the use of force standard and the "reasonableness" determination, see Section II., Use of Force Standard.

**EXHIBIT 1**
**49**

Update to the Department Policy on the Use of Force
Page 8

   b. <u>Fleeing Subjects</u>: Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the LEO has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape.[8]

   c. Deadly force shall not be used against a person whose actions are only a threat to themselves or property. This prohibition expressly does not apply if the person poses an imminent threat of death or serious physical injury to the officer or to another person.

B.   Discharge of Firearms

   1.   General Guidelines

      a. Discharging a firearm against a person constitutes the use of deadly force and shall be done only with the intent of preventing or stopping the threatening behavior that justifies the use of deadly force.

      b. The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force.

      c. Discharging a firearm from a moving vehicle is prohibited except when deadly force is authorized, or except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

   2.   Moving Vehicles, Vessels, Aircraft, or other Conveyances

      a. DHS LEOs are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy.[9] Before using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of-control conveyance.

      b. Firearms shall not be discharged solely as a warning or signal at moving vehicles, vessels, aircraft, or other conveyances, except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

---

[8] See *Garner*, 471 U.S. at 11-12. To further illustrate a "threat of serious physical harm," the *Garner* Court explained: "…if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Id. The Supreme Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

[9] Here, a distinction is drawn between firing at the operator, i.e., targeting the operator with the intent to cause serious physical injury or death, and firing at a moving vehicle or other conveyance solely as a warning or signal or to disable the vehicle, and with no intent to injure (see section V., Warning Shots and Disabling Fire).

**EXHIBIT 1**
**50**

Update to the Department Policy on the Use of Force
Page 9

    c.   Firearms shall not be discharged solely to disable moving vehicles, vessels, aircraft, or other conveyances, except when deadly force is authorized or under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

**VII.    Reporting Requirements and Incident Tracking**

A.    Uses of force shall be documented and investigated pursuant to Component policies.

B.    It is a Department priority to ensure more consistent Department-wide reporting and tracking of use of force incidents. More consistent data will enable both the Department and Components to more effectively assess uses of force, conduct meaningful trend analysis, revise policies, and take appropriate corrective actions if needed.

C.    Components shall establish internal processes to collect and report accurate data on Component use of force activities. The Office of Strategy, Policy, and Plans, in consultation with the Components and DHS headquarters offices, will establish reporting timelines, reportable data elements, and other reporting requirements. Components shall provide to the DHS Office of Strategy, Policy, and Plans the following reportable use of force incidents and data:

    1.   Any injury or death to an officer, subject, or bystander;

    2.   Any use of deadly force against a person, to include when a firearm is discharged at a person;

    3.   Any intentional deployment of a less-lethal device against a subject, including canines against a subject;

    4.   Any use of a vehicle, weapon, or physical tactic or technique that delivers a kinetic impact to a subject; and

    5.   For only CBP, USCG, and ICE, use of disabling fire against a maritime vessel or aircraft.

D.    All Components shall participate in the Federal Bureau of Investigation's (FBI) National Use of Force Data Collection program and report such data to the FBI in the manner prescribed.

E.    Additional law enforcement-related reporting:

    1.   No-Knock Entries: Components shall report data on the use of no-knock entries to the Office of Strategy, Policy, and Plans annually, in the manner and format prescribed by the Office of Strategy, Policy, and Plans. Components

**EXHIBIT 1**
**51**

Update to the Department Policy on the Use of Force
Page 10

shall provide timely notification of all no-knock warrants and entries to the Office for Civil Rights and Civil Liberties (CRCL) within 30 days of execution.  Notification shall include the supporting affidavit and a copy of the warrant, unless prohibited by law or court order.  CRCL may request additional information to review for compliance with policy and to inform recommendations for protecting civil rights and civil liberties, as appropriate.  CRCL seeks to review the data provided, as well as other related data, over the next year, and provide the Law Enforcement Coordination Council with findings and suggested actions based upon CRCL's work.

2.  Other statistical reports as required by the Under Secretary for Strategy, Policy, and Plans.

**VIII.  Departmental Review and Oversight**

A.      Each DHS Component will establish and maintain a use of force review council or committee to perform internal analysis of use of force incidents from the perspective of training, tactics, policy, and equipment; to identify trends and lessons learned; and to propose any necessary improvements to policies and procedures.

B.      The Secretary, supported by the Office of Strategy, Policy, and Plans, shall manage a Law Enforcement Coordination Council (LECC) to provide a forum by which Components can share lessons learned regarding use of force policies, training, law enforcement administrative matters, and oversight.  The LECC will be comprised of all Components and offices with operational law enforcement elements and will include participation from relevant DHS headquarters offices with oversight or support responsibilities.  LECC members will be responsible for reporting on use of force-related trends, developments, and lessons learned within their respective Components.  The LECC will be structured with subcommittees addressing areas of law enforcement policy, training, administration.  Additional subcommittees may be established as needed.

**IX.    Military Activities**

This policy shall not apply to the United States Coast Guard when operating under the Standing Rules of Engagement, or to other DHS personnel when they fall under Department of Defense control as civilians accompanying the force.

**X.      Limiting the Use of No-Knock Entries**

DHS LEOs shall limit the use of no-knock entries to situations where knocking would create an imminent threat of physical violence to the LEO or another person or only for evidence preservation in national security matters.

A.      Warrant: A DHS LEO may seek judicial authorization to conduct a no-knock entry only if that LEO has reasonable grounds to believe at the time the warrant is sought that knocking and announcing the LEO's presence would create an imminent threat of

**EXHIBIT 1**
**52**

Update to the Department Policy on the Use of Force
Page 11

physical violence to the LEO or another person or for evidence preservation in a national security matter.

1. A LEO may only seek a warrant for a no-knock entry in situations where announcing the LEO's presence would create an imminent threat of physical violence after obtaining approval from the Criminal Chief of the relevant U.S. Attorney's Office and an Assistant Special Agent in Charge (or equivalent rank) in the LEO's field office.

2. Evidence Preservation in National Security Matters: Should an exceptional circumstance arise in a national security matter where no imminent threat of physical violence is present but the LEO believes the evidence is material to the protection of life or public safety and not merely to advance a criminal prosecution, and the risk of evidence destruction so pronounced, that a no-knock entry is warranted, judicial authorization for a no-knock warrant can be sought if approval is first obtained from the principal leader of the Component and from the United States Attorney or relevant Assistant Attorney General, with notice provided to the Office of the Deputy Attorney General.

3. Once judicial authorization is obtained, LEOs may proceed without knocking and announcing their presence unless they learn of facts that negate the circumstances that justified this exception to the knock and announce rule.

B.      Exigent Circumstances: If the LEO did not anticipate the need for a no-knock entry when applying for the warrant, the LEO may conduct a no-knock entry only if exigent circumstances arise at the scene such that knocking and announcing the LEO's presence would create an imminent threat of physical violence to the LEO or another person. The LEO shall immediately notify the Special Agent in Charge/Head of Field Office and provide written notice to the U.S. Attorney in the district in which the entry was made.

## XI.    No Right of Action

This policy is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## XII.   Definitions

A. ***Deadly Force***: Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury. In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

**EXHIBIT 1**
**53**

Update to the Department Policy on the Use of Force
Page 12

    B. ***Chokeholds and Carotid Restraints***: Chokeholds apply pressure to the throat or windpipe and restrict an individual's ability to breathe. The carotid restraint technique restricts blood flow to the brain causing temporary unconsciousness.

    C. ***De-Escalation***: The use of communication or other techniques during an encounter to stabilize, slow, or reduce the intensity of a potentially violent situation without using physical force, or with a reduction in force.

    D. ***Disabling Fire***: Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

    E. ***Exigent Circumstances:*** A situation that demands unusual or immediate action that may allow LEOs to circumvent usual procedures in order to preserve life or prevent catastrophic outcomes.

    F. ***Law Enforcement Officer***: A position occupied by a DHS employee authorized by statute to enforce the laws of the United States, carry firearms, and make criminal arrests in the performance of their assigned duties.

    G. ***Less-Lethal Device***: An instrument or weapon that is designed or intended to be used in a manner that is not likely to cause death or serious bodily injury (see "Serious Bodily Injury"). Examples include, but are not limited to, conducted electrical weapons/electronic control weapons, impact weapons, and certain chemical agents. These are also commonly referred to as "intermediate force" or "less-than-lethal" weapons or devices.

    H. ***Less-Lethal Force***: Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

    I. ***Lessons Learned***: Information gleaned through internal review and analysis of use of force incidents that is sufficiently significant or critical to consider a change to policies, procedures, or training standards. Lessons learned may include, for example, information that can enhance law enforcement personnel skills; identify gaps in current training; identify current unique criminal trends being experienced in the field; provide information on new equipment recommendations or gaps; identify concerns with standard less-lethal equipment/tactics; or any information that can prevent harm to the community, law enforcement, or arrestees.

    J. ***National Security Matter***: Subject matter that relates to the security and defense of the United States, including: classified information; terrorism; espionage; great power competition; critical infrastructure protection; cybersecurity; and weapons of mass destruction.

**EXHIBIT 1**
**54**

Update to the Department Policy on the Use of Force
Page 13

     K.  **_Serious Bodily Injury_**: Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

     L.  **_Use of Force_**: The intentional application by law enforcement of any weapon, instrument, device, or physical power in order to control, restrain, or overcome the resistance, or gain compliance or custody, of another.

     M.  **_Warning Shot_**: Discharge of a firearm as a warning or signal, for the purpose of compelling compliance from an individual, but not intended to cause bodily injury.

**EXHIBIT 1**
**55**