1
### DECLARATION OF PAUL (BART) GREEN

2    I, Paul (Bart) Green, do hereby declare and state as follows:

3    1.    I am an Assistant United States Attorney and represent the defendants in

4    this action. I make this declaration from my personal knowledge, and my review of the

5    files in this action. If called upon to testify, I would testify competently thereto.

6    2.    Attached as **Exhibit A** is a true and correct copy of a DHS memorandum to

7    all DHS employees regarding Information Regarding First Amendment Protected

8    Activities, dated May 17, 2019.

9    3.    Attached as **Exhibit B** is a true and correct copy of Defendants' Opposition

10    to *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause re:

11    Preliminary Injunction, filed on June 19, 2025 at ECF No. 11.

12    4.    Attached as **Exhibit C** is a true and correct copy of the Declaration of

13    Gregory K. Bovino, filed on June 19, 2025 at ECF No. 11-1.

14    5.    Attached as **Exhibit D** is a true and correct copy of the Declaration of

15    Mario A. Canton, filed on June 19, 2025 at ECF No. 11-2.

16    6.    Attached as **Exhibit E** is a true and correct copy of the Declaration of

17    Ernesto Santacruz, Jr., filed on June 19, 2025 at ECF No. 11-3.

18

19    Executed on August 18, 2025, at Los Angeles, California.

20

21    *Paul B. Green*

22    PAUL (BART) GREEN

23

24

25

26

27

28

**129**

# EXHIBIT A

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

May 17, 2019

MEMORANDUM FOR:   All DHS Employees

FROM:   Kevin K. McAleenan
Acting Secretary

SUBJECT:   Information Regarding First Amendment Protected Activities

I am proud of the work you do every day to protect our Homeland.  You serve as America's Frontline and your commitment to the highest ethical and moral principles is a testament to each of you, the founding values of our Department, and our nation.  It is in this spirit that I write to you today to emphasize – as you all know – that the privilege of administering and enforcing federal laws carries with it the responsibility for upholding the principles of professionalism, impartiality, courtesy, and respect for civil rights and civil liberties.

DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights.[1]  Under the Privacy Act of 1974, all DHS personnel[2] are prohibited from maintaining records that describe how a U.S. citizen (USC) or alien lawfully admitted for permanent residence (LPR)[3] exercises his or her First Amendment rights, "unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."[4]

Information, in any form, regarding how an individual exercises First Amendment rights shall include (among other things):

1.  Information about an individual's religious beliefs and practices;
2.  Information about an individual's political or personal beliefs or associations, academic or scientific inquiries, or the expressions thereof;

---

[1] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.
[2] For purposes of this memorandum, "DHS personnel" includes all DHS employees, including those who are law enforcement agents and officers and those in the intelligence community, as well as those performing work on behalf of DHS employees, such as contractors.
[3] To the extent that a person's status is unknown or unclear, for the purposes of this policy that person shall be treated as an "individual" covered by the Privacy Act. 5 U.S.C. § 552a(a)(2).
[4] 5 U.S.C. § 552a(e)(7).

~~FOR OFFICIAL USE ONLY~~

**EXHIBIT A**
**130**

Case 2:25-cv-05563-HDV-E   Document 47-4   Filed 08/18/25   Page 4 of 86   Page ID
#:1030
Case 3:20-cv-01035-SI   Document 67-6   Filed 07/21/20   Page 2 of 4

3. Information about an individual's (including journalists, attorneys, academics, representatives of non-governmental organizations, etc.) reporting activities and documentation; or,
4. Information about an individual's associations with others for lawful purposes, including participation in protests or other non-violent demonstrations against government policy or actions.

Individuals' First Amendment rights are protected regardless of the medium of their communications. These principles apply to communications such as oral or written speech (both in paper and electronic form); non-verbal communications such as art works; and, in some instances, to commercial speech and gestures (such as physical rituals associated with prayer).

With those First Amendment rights in mind, I direct that DHS personnel shall not collect, maintain in DHS systems, or use information protected by the First Amendment *unless* (a) an individual has expressly granted their consent for DHS to collect, maintain, and use that information; (b) maintaining the record is expressly authorized by a federal statute; or (c) that information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers. In addition, DHS personnel should not pursue by questioning, research or other means, information relating to how an individual exercises his or her First Amendment rights unless one or more of the same conditions applies.

**Express Statutory Authorization**

DHS agencies may collect and maintain records regarding First Amendment activity when doing so is *expressly authorized by statute*. As explained in longstanding guidance from the Office of Management and Budget (OMB), a statute need not specifically address the maintenance of records of First Amendment activities if it references activities that are relevant to a determination concerning an individual.[5] Thus, for example, DHS personnel may collect information on First Amendment protected activity when that activity is relevant to the granting or denial of a pending application.

**Consent of the Individual**

Records on First Amendment activity may be maintained if the individual voluntarily provides it, thereby consenting to its use by DHS. For example, "if an individual volunteers information on civic or religious activities in order to enhance his chances of receiving a benefit, such as

---

[5] Privacy Act Implementation, Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,965 (July 9, 1975) (hereinafter OMB Guidelines). The Guidelines specifically cite to the Immigration and Nationality Act (INA) as an example: "[S]ince the Immigration and Nationality Act makes the possibility of religious or political persecution relevant to a stay of deportation, the information on these subjects may be admitted in evidence, and therefore would not be prohibited by [subsection (e)(7)]." OMB Guidelines, at 28,965. Many other INA provisions potentially involve consideration of First Amendment activity. E.g., 8 U.S.C. 1101(a)(43) (definition of refugee, for purpose of refugee and asylum eligibility determinations, includes persecution based on membership in social group, religion, or political opinion); 8 U.S.C. 1182(a)(3)(B) (inadmissibility of any alien who, inter alia, "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization"); 8 U.S.C. 1182(a)(3)(D) (ground of inadmissibility for membership or affiliation with the Communist or other totalitarian party); 8 U.S.C. 1182(a)(3)(F) (ground of inadmissibility for association with terrorist organizations); 8 U.S.C. 1227(a)(4)(B) (deportability of aliens admitted to the United States if described in terrorism-related grounds of inadmissibility); 8 U.S.C. 1424 (prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government).

**EXHIBIT A**
**131**

executive clemency, the agency may consider information thus volunteered."[6] As applied to DHS, individuals may voluntarily provide consent in submitting their associations and beliefs when applying for naturalization pursuant to filing USCIS Form N-400[7] or may proactively provide information in written materials, including correspondence, or during an inspection or encounter.

**Relevant to Law Enforcement Activity**

If the use of information regarding First Amendment protected activities is not otherwise covered by one or both of the exceptions discussed above (explicit statutory authority and consent), DHS personnel may include such information in DHS systems if the information is pertinent to and within the scope of an authorized criminal, civil, or administrative law enforcement activity.[8]

For example, information about First Amendment protected activities is pertinent to and within the scope of DHS's administration or enforcement of a statute, regulation, or executive order when all DHS personnel:

1. Document questions and responses relating to an individual's occupation, purpose for international travel, or any merchandise the individual seeks to bring across the border;
2. Document questions, responses, or other information to validate information supplied by an individual or determine whether potential criminal, civil, or administrative violations exist relating to the laws that DHS enforces or administers;
3. Document journalistic or scientific research, academic inquiry, and/or analysis or questions and responses relating to information regarding an individual indicating a potential violation of a law DHS enforces or administers, or a threat to border security, national security, officer safety, or public safety;
4. Document research and/or analysis relating to activities protected by the First Amendment to the extent that it may facilitate an individual's travel by, for example, verifying information provided by the individual —(e.g., validating a visa based on a religious purpose); or,
5. Take into account information regarding religion in order to identify whether a reasonable accommodation for an individual's religious beliefs would be appropriate. This may include subsequent documentation of relevant information in DHS records regarding the action (for example, noting that a certain action was undertaken as an accommodation or noting that an accommodation was requested or deemed appropriate).

Each of us is called to do an extraordinarily important job for our nation. In executing this mission, it is my job to ensure that you are empowered to do so in accordance with our highest moral, ethical, and legal obligations. To this end, I have tasked the DHS Office for Civil Rights and Civil Liberties and the DHS Privacy Office to review existing guidance and develop new

---

[6] OMB Guidelines, at 28965.

[7] It must be noted that DHS/USCIS may also collect this information pursuant to its statutory authority in determining whether the applicant comes under section 313 of the INA's (8 U.S.C. 1424) prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government  Thus, collecting and maintaining this information is lawful both because of express statutory authorization as described above, and because the applicant consented to providing it by signing and filing the application.

[8] DHS may still maintain records consistent with 552a(e)(7) even if there is no ongoing or current law enforcement investigation.

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 6 of 86    Page ID
#:1032
Case 3:20-cv-01035-SI    Document 67-6    Filed 07/21/20    Page 4 of 4

guidance, where appropriate, to assist the operational components in implementing this memorandum.[9]

As you execute your mission each day, our Privacy and Civil Rights and Civil Liberties colleagues stand by to assist with any further questions or concerns you may have on this topic.  Please contact Jonathan R. Cantor, Acting Chief Privacy Officer and Peter Mina, CRCL Deputy Officer for Programs and Compliance, and their staffs with those questions.  Please contact your Component Counsel Offices with any legal questions.

---

[9] Nothing in this policy memorandum or tasking otherwise impairs the statutory or delegated authorities and responsibilities of the Privacy Office or the Office for Civil Rights and Civil Liberties, including the authority to "investigate complaints and information indicating possible abuses of civil rights or civil liberties" under 6 U.S.C. § 345 or investigate noncompliance DHS privacy policies under 6 U.S.C. § 142.

**EXHIBIT A**
**133**

# EXHIBIT B

| | |
|---|---|
| 1    BRETT A. SHUMATE | BILAL A. ESSAYLI |
|       Assistant Attorney General | United States Attorney |
| 2    Civil Division | DAVID M. HARRIS |
| | Assistant United States Attorney |
| 3    ERIC J. HAMILTON | Chief, Civil Division |
|       Deputy Assistant Attorney General | JOANNE S. OSINOFF |
| 4 | Assistant United States Attorney |
|    ELIZABETH HEDGES | Chief, Complex and Def. Litig. Section |
| 5    SEAN SKEDZIELEWSKI | PAUL (BART) GREEN (SBN 300847) |
|       Counsel to the Assistant Attorney | Assistant United States Attorney |
| 6    General | Federal Building, Suite 7516 |
|       Civil Division | 300 North Los Angeles Street |
| 7 | Los Angeles, California 90012 |
|    ALEXANDER K. HAAS | Telephone: (213) 894-0805 |
| 8    ANDREW I. WARDEN | Facsimile: (213) 894-7819 |
|       KATHLEEN C. JACOBS | Email: Paul.Green@usdoj.gov |
| 9    Civil Division, Federal Programs Branch | |

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES PRESS CLUB; *et al.*, | No. 2:25-cv-05563 |
|      Plaintiffs, | **DEFENDANTS' OPPOSITION TO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
|      v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*, | [Supporting declarations filed concurrently] |
|      Defendants. | |

**EXHIBIT B**

134

1

## <u>TABLE OF CONTENTS</u>

2    <u>DESCRIPTION</u>                                                          <u>PAGE</u>

3

4    TABLE OF AUTHORITIES ................................................................................ii

5    I.    INTRODUCTION ................................................................................ 1

6    II.    FACTUAL BACKGROUND................................................................ 2

7          A.    Recent Destruction of Federal Property and Assaults on Federal
                 Officers in Los Angeles................................................................ 2

8
          B.    DHS Deploys Officers to Protect Federal Personnel and Property. ............ 4
9
          C.    Surge of Federal Resources Has Reduced Violence. .................................. 4
10
          D.    Plaintiffs' Evidence Focuses Exclusively on Past Events that
11               Occurred Two Weeks Ago. ........................................................... 5

12    III.    STANDARD OF REVIEW ............................................................... 6

13    IV.    ARGUMENT ..................................................................................... 6

14          A.    Plaintiffs Fail to Establish Entitlement to *Ex Parte* Relief. ......................... 6

15          B.    Plaintiffs Lack Standing to Obtain a Prospective Injunction....................... 8

16          C.    Plaintiffs Are Not Likely to Succeed on the Merits of Their First
                 Amendment Claims. ..................................................................... 9
17
          D.    Plaintiffs Are Not Likely to Succeed on the Merits of Their Fourth
18               and Fifth Amendment Claims. ...................................................... 14

19          E.    Plaintiffs Have Not Demonstrated Irreparable Harm. ............................. 15

20          F.    The Balance of Equities and Public Interest Weigh Against Granting
                 An Injunction............................................................................. 17
21
      V.    CONCLUSION................................................................................. 20

22

23

24

25

26

27

28

i
**EXHIBIT B**

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>DESCRIPTION</u>                                                               <u>PAGE</u>

3

**Cases**

4

*All. For The Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................. 16

5

6

*Bayer v. City of Simi Valley,*
   43 F. App'x 36 (9th Cir. 2002) ............................................. 15

7

*Bell v. Keating,*
   697 F.3d 445 (7th Cir. 2012) ............................................. 18

8

*Boardman v. Pacific Seafood Group,*
   822 F.3d 1011 (9th Cir. 2016) ............................................. 16

9

10

*Branzburg v. Hayes,*
   408 U.S. 665 (1972) ............................................. 18-19

11

*California First Amendment Coal. v. Calderon,*
   150 F.3d 976 (9th Cir. 1998) ............................................. 9, 19

12

13

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ............................................. 13

14

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................. *passim*

15

16

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................. 9

17

*Clark v. Community for Creative Non-Violence,*
   468 U.S. 288 (1984) ............................................. 9

18

19

*Feiner v. New York,*
   340 U.S. 315 (1951) ............................................. 20

20

*Felarca v. Birgeneau,*
   891 F.3d 809 (9th Cir. 2018) ............................................. 14, 15

21

*Flores v. Huppenthal,*
   789 F.3d 994–06 (9th Cir. 2015) ............................................. 19

22

23

*Forrester v. City of San Diego,*
   25 F.3d 804 (9th Cir. 1994) ............................................. 15

24

*Fraihat v. U.S. Immigr. & Customs Enf't,*
   16 F.4th 613 (9th Cir. 2021) ............................................. 19

25

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) ............................................. 6

26

27

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ............................................. 18

28

ii
**EXHIBIT B**

*Index Newspapers LLC v. United States Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020)................................................................ *passim*

*Index Newspapers LLC v. City of Portland.*
  480 F. Supp. 3d 1120 (D. Or. 2020) ....................................... 19, 20

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) ...................................................................... 18

*Jackson v. City of Bremerton*,
  268 F.3d 646 (9th Cir. 2001)........................................................ 15

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*
  138 S. Ct. 2448 (2018) ................................................................. 18

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...................................................................... 13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................ 8

*Mendocino Envt'l Ctr. v. Mendocino County*,
  192 F.3d 1283 (9th Cir. 1999) ..................................................... 12

*Menotti v. Seattle*,
  409 F.3d 1113 (9th Cir. 2005) .................................................. 9, 11

*Mission Power Engineering Co. v. Continental Cas. Co.*,
  883 F. Supp. 488 (C.D. Cal. 1995) ............................................. 6, 7

*Munns v. Kerry*,
  782 F.3d 402 (9th Cir. 2015) ......................................................... 8

*Nickler v. Cnty. of Clark*,
  648 F. App'x 601 (9th Cir. 2016) ................................................ 16

*Olagues v. Russoniello*,
  770 F.2d 791 (9th Cir. 1985) ....................................................... 16

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ..................................................... 16

*Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*,
  478 U.S. 1 (1986) ......................................................................... 10

*Rendish v. City of Tacoma*,
  123 F.3d 1216 (9th Cir. 1997) ..................................................... 16

*Ryburn v. Huff*,
  565 U.S. 469 (2012) ...................................................................... 20

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .......................................................................... 8

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ......................................................... 6

*Trevino v. Gates*,
  99 F.3d 911 (9th Cir. 1996) ......................................................... 13

iii
**EXHIBIT B**

*Ubiquity Press Inc. v. Baran,*
    2020 WL 8172983 (C.D. Cal. Dec. 10, 2020) ............................................ 7

*United States v. Christopher,*
    700 F.2d 1253 (9th Cir. 1983) ................................................................... 9

*United States v. Griefen,*
    200 F.3d 1256 (9th Cir. 2000) ....................................................... 17-18, 18

*United Steelworkers of Am. v. Milstead,*
    705 F. Supp. 1426 (D. Ariz. 1988) .......................................................... 15

*Wilkinson v. Torres,*
    610 F.3d 546 (9th Cir. 2010) ................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 6, 17

**Statutes**

18 U.S.C. § 111 ............................................................................................ 18

18 U.S.C. § 1361 .......................................................................................... 18

40 U.S.C. § 1315 .......................................................................................... 10

**Other**

41 C.F.R. § 102-74.375 ................................................................................ 10

41 C.F.R. § 102-74.385 ................................................................................ 10

iv
**EXHIBIT B**

**138**

## I.    INTRODUCTION

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction that would hinder the ability of federal law enforcement officers to protect federal property that has been repeatedly damaged after weeks of violence and unrest in Los Angeles—violence and unrest that, just yesterday, a Ninth Circuit panel unanimously held likely justified federalizing the California National Guard. *Newsom v. Trump*, No. 25-3727, slip op., at 28-30 (9th Cir. June 19, 2025). Plaintiffs base their request for emergency injunctive relief on alleged violations of their First, Fourth, and Fifth Amendment rights. Their request fails for several reasons.

First, Plaintiffs lack standing to seek emergency relief. It is well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *See City of Los Angeles v. Lyons,* 461 U.S. 95 (1983). Undeterred by the law or their lack of evidence, they seek an emergency injunction based on alleged past encounters involving federal law enforcement officers but have not demonstrated that similar incidents will take place in the future, much less that *these particular* plaintiffs will again experience the same alleged conduct by federal law enforcement officers. Because Plaintiffs cannot demonstrate a certainly impending injury, they lack standing to seek injunctive relief. For many of these same reasons, Plaintiffs also cannot show a likelihood of irreparable harm, a prerequisite for granting emergency injunctive relief.

Second, Plaintiffs have not established a likelihood of success on the merits because they have not shown that any protected First Amendment interest was violated, on either their right-to-access or retaliation theory. And they similarly have not shown that Department of Homeland Security (DHS) officers used excessive force, as required for Plaintiffs to show a likelihood of success on their Fourth and Fifth Amendment claims.

Third, the relief that Plaintiffs seek is entirely improper. Plaintiffs seek a sweeping injunction that would be unworkable and dangerous in light of the split-second

judgments that federal law enforcement officers have to make while protecting federal property, the public, and themselves during dynamic, chaotic situations. By granting immunity to journalists and observers from lawful orders to disperse, the injunction would effectively grant those individuals immunity from otherwise applicable legal requirements and would improperly bind the hands of law enforcement, including by preventing them from taking appropriate action when individuals are engaging in criminal conduct. The proposed injunction is also unworkable from a practical standpoint. It would remove agent discretion by requiring law enforcement officers responding to a violent situation threating public safety to seek permission from a superior before taking necessary action—whether or not a superior is at hand to grant such permission.

Fourth, and finally, the balance of the equities and the public interest counsel against granting Plaintiffs' request. Freedom of the press is not being threatened by the actions of the federal defendants in protecting federal property, nor are journalists being targeted. Furthermore, journalists are not entitled to any special treatment that would entitle them to remain in place despite a lawful dispersal order, much less entitle them to serve as human shields for rioters or preclude federal agents from using appropriate levels of force against violent members of a crowd. Equally important is the societal interest in public safety, including protecting federal property, as well as protecting officers and the general public against imminent threats of serious bodily injury. Simply put, the federal government has not only the right but also the obligation to protect federal property and federal officers. And the public has a compelling interest in that protection. The press is free to observe and report on the destruction of property, but it is not entitled to special access to that property in the face of a lawful order to disperse.

## II.   FACTUAL BACKGROUND

### A.   Recent Destruction of Federal Property and Assaults on Federal Officers in Los Angeles.

Beginning June 6, 2025, large-scale protests began in Los Angeles in response to

**EXHIBIT B**

**140**

1  DHS's lawful immigration enforcement operations. *See generally,* Decl. of Ernesto
2  Santacruz Jr. ("Santacruz Decl."), Ex. 1, Att.1. Soon after, the protests became violent.
3  *Id.* ¶ 9. These violent acts included protestors throwing concrete chunks, bottles of
4  liquid, and other objects at the FPS officers trying to defend federal buildings. *Id.* ¶¶ 9-
5  12. Fearing for the safety of federal employees and officers, the ICE Field Office
6  Director of Los Angeles activated all available ERO and HSI agents to protect the
7  federal buildings and property that had been targets of these attacks. *Id.* ¶ 13. These
8  federal officers were subject to violent assaults and threats, including having rocks,
9  molotov cocktails, and fireworks thrown and shot at them; the violence continued for
10  several days. *Id.* ¶¶ 14-28. The federal buildings in the area experienced significant
11  damage. *Id.* Federal offices were forced to close, causing disruption to many federal
12  agencies. *Id.* ¶ 29.

13        In another instance of violence against federal agents and property, at a DHS
14  office in Paramount, California, a large crowd gathered blocking traffic and violently
15  attacked ERO and CBP officers and agents. *Id.* ¶¶ 18-21. During the seven-hour
16  exchange, officers were targeted with mortar-style fireworks with multiple explosions, as
17  well as rocks and other objects. *Id.* One ERO officer was trapped inside her vehicle
18  while the violent crowd surrounded it, began shaking it, and pummeled it with stones. *Id.*
19  A CBP officer's wrist was shattered by an object thrown by a rioter. *Id.* The crowd lit a
20  vehicle on fire and cut into the perimeter fence of the DHS office damaging multiple
21  government vehicles and the property. *Id.*

22        The LAPD has reported that since Saturday, June 7, 2025, 575 arrests related to
23  protest activity have been made with the majority of the arrests occurring prior or
24  incident to the arrival of the California National Guard and the United States Marine
25  Corps.[1] *See* "LAPD Releases Information Related to Recent Protests" (June 16, 2025)
26  LAPD website: https://www.lapdonline.org/newsroom/lapd-releases-information-

27  ─────────────────
28        [1] Since June 9, the number of arrests related to protest activity has dwindled with
      no such arrests since June 14.

**EXHIBIT B**

1    related-to-recent-protests-nr25119ma/ A curfew was finally imposed on June 10.

2    **B.    DHS Deploys Officers to Protect Federal Personnel and Property.**

3    Due to the ongoing violent riots on June 6, 2025, DHS was forced to engage its

4    officers and agents to assist FPS to secure federal property to prevent damage and ensure

5    the safety of federal employees and other building occupants. *See* Santacruz Decl. Ex 1,

6    Att. 1, ¶¶ 5, 13. DHS requested that all available ERO officers and HSI agents report to

7    the federal building to hold the line against the violent protestors. *Id.* At that time, FPS

8    faced significant logistical and operational safety issues as a group of approximately 100

9    individuals defaced federal property around the vehicle entrance to the Federal Building.

10   *See generally* Decl. of Mario A. Canton, ("Canton Decl.") Ex. 2. Throughout the

11   onslaught of violence, individuals launched rocks, chunks of concrete, water bottles with

12   unknown liquids as well as many other riotous and illegal acts. *Id.* ¶ 5. The following

13   morning, 110 CBP officers arrived to assist in the protection of federal personnel and

14   property. Santacruz Decl. Ex. 1 ¶ 18. This barrage of violence against property and

15   individuals continued until the National Guard troops were deployed throughout Los

16   Angeles. *Id.* ¶ 23. CBP agents and officers were attacked with thrown objects such as

17   rocks, concrete, and frozen water bottles during the Paramount riot on June 7, 2025. *See*

18   *generally* Decl. of Gregory K. Bovino ("Bovino Decl.") Ex. 3.

19   **C.    Surge of Federal Resources Has Reduced Violence.**

20   Since the deployment of additional federal resources to Los Angeles, the violence

21   at protests has greatly diminished, allowing for federal buildings and courthouses to

22   resume normal operations and federal officers to enforce federal laws. *See* Santacruz

23   Decl. ¶ 5; Canton Decl. ¶¶ 8-9; Bovino Decl. ¶ 9. The presence of California National

24   guardsmen and United States Marines has been a critical deterrent for criminal activity

25   on Federal property. Canton Decl. ¶ 8; *see* Santacruz Decl., Ex. 1, Att. 2 ¶¶ 7-12. The

26   influx of federal officers and resources caused a significant change in the character of the

27   protests over the past week. While large protests have continued to organize at federal

28   facilities, the demeanor of the protesters has been more civil and peaceful, thereby

4
**EXHIBIT B**

1    curtailing the need for crowd intervention. Canton Decl. ¶ 9. The number of federal

2    arrests related to protest activity has dwindled over the past week. Further, on June 17,

3    2025, the Mayor of Los Angeles lifted the curfew that had been in place for the

4    downtown area in recognition of "successful crime prevention and suppression efforts."

5    *See* https://mayor.lacity.gov/news/mayor-bass-lifts-curfew-within-downtown-la (noting

6    more than 30,000 people peacefully demonstrated last Saturday at 15 different

7    locations).

8        **D.    Plaintiffs' Evidence Focuses Exclusively on Past Events that Occurred**

9            **Two Weeks Ago.**

10        Plaintiffs' declarations focus entirely on events that occurred at a small number of

11    discrete locations between June 6 and 9, 2025. *See, e.g.*, Xu Decl. (ECF No. 6-8) (June 7

12    incident near DHS office in Paramount); Ray Decl. (ECF No. 6-17) & Soqui Decl. (ECF

13    No. 6-23) (June 7-8 incidents near federal building in downtown Los Angeles); Olmeda

14    Decl. (ECF No. 6-4) (June 9 incident near the federal building in Santa Ana). Notably,

15    Plaintiffs have not submitted any evidence of more recent alleged incidents. Indeed, the

16    Press Rights Chair of the Los Angeles Press Club, whose job is to "track and document

17    incidents of press rights abuses throughout California," does not identify a single use-of-

18    force incident after June 8. *See* Rose Decl. ¶¶ 7, 29 (ECF No. 6-5). Similarly, the

19    President of the News Guild-Communications Workers of America, an organization with

20    more than 800 journalists and media workers in California, focuses on the same discrete

21    alleged incidents as the individual declarants that occurred between June 6 and 9, with

22    no evidence that anyone has been harmed since then. *See* Schleuss Dec. (ECF No. 6-16).

23    And each of the individual declarants who describe alleged use-of-force incidents

24    confine their testimony solely to past incidents that occurred between June 6 and 9. *See*

25    ECF Nos. 6-4, 6-6 to 6-8, 6-10 to 6-11, 6-13 to 6-25. The declarations do not identify

26    any specific ongoing or future protest at which they fear the use of force will be used

27    against them.

28

5
**EXHIBIT B**

## III.   STANDARD OF REVIEW

The standard for issuing a TRO and a preliminary injunction are substantially identical. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Either is "an extraordinary remedy that may only be awarded upon a clear slowing that the Petitioner is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a TRO to issue, the moving party must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) a TRO is in the public interest. *See id.* at 20.

Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted). As explained below, Plaintiffs cannot meet this demanding standard.

## IV.   ARGUMENT

### A.   Plaintiffs Fail to Establish Entitlement to *Ex Parte* Relief.

*Ex parte* applications are rarely justified. *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). To justify *ex parte* relief, the movant must demonstrate it "is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect." *See id.* at 492.

Plaintiffs fail to satisfy (or even address) the *Mission Power* standard for seeking emergency relief by *ex parte* application, as opposed to proceeding by a noticed motion. *Mission Power* warned of how *ex partes* "pose a threat to the administration of justice," calling out situations where "the moving party's papers reflect days, even weeks, of investigation and preparation; the opposing party has perhaps a day or two... The goal often appears to be to surprise opposing counsel or at least to force him or her to drop all

6
**EXHIBIT B**

1   other work to respond on short notice." *Mission Power*, 883 F. Supp. at 490.

2        That is precisely what happened here. As early as June 10, 2025, Plaintiffs'

3   counsel began working on this case, setting up a website soliciting clients. *See* Dkt. 8,

4   Green Decl. ¶¶ 12-13. Instead of seeking relief sooner, Plaintiffs employed at least 17

5   lawyers to draft 24 separate factual declarations, as evidenced by Plaintiffs' own

6   application. *See generally* Dkt. 6-2 to 6-25. On June 18, Plaintiffs waited until after close

7   of business on the East Coast, when federal agencies were closed, to provide notice by

8   phone. *See* Dkt. 6-2, Eliasberg Decl., ¶ 4. Even then, Plaintiffs waited nine more hours,

9   to the next day, a federal holiday, to serve the TRO application and a huge package of

10  declarations. Dkt. 8. Green Decl. ¶ 9.[2] During this process, Plaintiffs' counsel confirmed

11  that they were at fault in creating the crisis. On June 18, defense counsel pointed out the

12  ACLU's June 10 advertising to Plaintiffs' counsel and then later stated that Plaintiffs'

13  counsel had "provided no explanation as to why the ACLU waited over a week to seek

14  relief from the Court, a clear sign that there is no emergency here." *See* Dkt. 8-1, Ex. A

15  (emails from AUSA Green). Plaintiffs' counsel responded to both emails but were silent

16  on these points. *See id.* Such delay has alone warranted denial of *ex parte* relief by the

17  Court: "The Court expected to find a detailed explanation as to why Plaintiffs delayed

18  filing their application until a regularly-noticed motion was not an option. Plaintiffs

19  provided nothing; not a single sentence explains why, having had knowledge of [the

20  upcoming protests], they waited until [a federal holiday] to file their Application."

21  *Ubiquity Press Inc. v. Baran*, 2020 WL 8172983, at *2 (C.D. Cal. Dec. 10, 2020).

22        Moreover, Plaintiffs have not shown any prejudice they would suffer from

23  proceeding with a normal 28-day noticed motion for a preliminary injunction. *See*

24  *Mission Power*, 883 F. Supp. at 491 ("The rules contemplate that regular noticed

---

[2] Faced with this situation, Defendants filed an *ex parte* application for an
extension, and after it was filed, contacted the Clerk of Court pursuant to L.R. 77-1. *See*
Dkt. 8. The undersigned was informed that the on-duty district judge had declined to rule
on Defendants' application, therefore necessitating the filing of this opposition within 24
hours.

7
**EXHIBIT B**

1  motions are most likely to produce a just result."). The allegations in the complaint (Dkt.

2  1) and in the declarations attached to the TRO application challenge events that took

3  place on June 6-9. Plaintiffs assert that the TRO is needed before this weekend, June 21-

4  22, but aside from sheer speculation, offer no evidence that any of the complained of

5  events will occur again, let alone this weekend. Dkt. 6-1 at 1. Because there is no

6  emergency for the requested relief here, the Application fails to establish that Plaintiffs

7  are entitled to *ex parte* relief.

8        **B.    Plaintiffs Lack Standing to Obtain a Prospective Injunction.**

9        To establish standing, plaintiffs must show, as "the irreducible constitutional

10  minimum," that: (1) they have suffered an "injury in fact – an invasion of a legally

11  protected interest which is (a) concrete and particularized and (b) actual or imminent, not

12  conjectural or hypothetical…." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

13  Where, as here, a party seeks prospective equitable relief, the complaint must contain

14  "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a*

15  *Better Env't*, 523 U.S. 83, 109 (1998). It is therefore well-established that a plaintiff

16  lacks standing to obtain prospective injunctive relief for alleged future injuries based on

17  allegations of prior harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

18        Here, Plaintiffs do not meet the Article III requirement of standing for injunctive

19  relief because even assuming they were subject to past law enforcement practices, they

20  can only speculate as to whether those practices would recur. Plaintiffs' declarations

21  address events that occurred between June 6-9, 2025, but present no evidence of more

22  recent incidents. *See supra*. Plaintiffs do not identify any specific ongoing or future

23  protest at which they fear the use of force will be used against them.

24        While Plaintiffs argue that DHS is engaged in alleged "systemic attempts" to chill

25  reporting by the press, all the supporting evidence cited by Plaintiffs goes to what

26  occurred in the past. *See* Dkt. 6-1 at 5-8. Federal courts have repeatedly held that a

27  chilling effect based on a plaintiff's fear of future injury is too speculative to confer

28  standing for injunctive relief. *See Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015);

8

**EXHIBIT B**

**146**

1    *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture

2    standing merely by inflicting harm on themselves based on their fears of hypothetical

3    future harm that is not certainly impending"). As such, the Court should deny the TRO

4    Application due to lack of standing.

5        **C.**    **Plaintiffs Are Not Likely to Succeed on the Merits of Their First**

6            **Amendment Claims.**

7          Plaintiffs have not shown that the Defendants violated their First Amendment

8    right of access to any public proceeding. They also have not shown that Defendants

9    targeted them based on the exercise of First Amendment rights.

10          The First Amendment does not bar the government from prohibiting the public

11    from entering or remaining on its property outside ordinary hours of operation, or from

12    threatening its property at any time. *United States v. Christopher*, 700 F.2d 1253, 1259-

13    61 (9th Cir. 1983). This principle applies even if the property functions as a public forum

14    for lawful activities when it is open. *Clark v. Community for Creative Non-Violence*, 468

15    U.S. 288, 299 (1984). And when federal officers are forced to respond to "a violent

16    subset of protesters who disrupt civic order," such officers indisputably have power to

17    enforce dispersal orders against the general public. *Menotti v. Seattle*, 409 F.3d 1113,

18    1155-56 (9th Cir. 2005).

19          These principles apply to journalists, legal observers, and protesters just like they

20    apply to everyone else. The Supreme Court and the Ninth Circuit have repeatedly held

21    that the press lacks a "constitutional right of special access to information not available

22    to the public generally." *California First Amendment Coal. v. Calderon*, 150 F.3d 976,

23    981 (9th Cir. 1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) and

24    discussing other cases). In short, the First Amendment does not give "self-proclaimed

25    journalists and 'legal observers'" the right to disobey lawful dispersal orders issued to

26    control a violent protest. *Index Newspapers*, 977 F.3d at 839 (O'Scannlain, J.,

27    dissenting).

28

1        Additionally, federal law permits law-enforcement officers to take appropriate

2    measures to protect federal property and personnel before violent protesters have moved

3    onto federal property. There is no reasonable dispute that DHS officers have authority to

4    issue dispersal orders on federal property. *See, e.g.*, 41 C.F.R. § 102-74.375 (authority to

5    restrict access to federal property); *id.* § 102-74.385 (authority to require the public to

6    comply with access restrictions). This authority extends to "areas outside the property to

7    the extent necessary to protect the property and persons on the property." 40 U.S.C.

8    § 1315(b)(1). Thus, DHS officers can "enforce Federal laws and regulations for the

9    protection of persons and property." *Id.* § 1315(b)(2)(A).

10        To prove their First Amendment right-of-access claim against this backdrop,

11    Plaintiffs face a high hurdle. They must show, first, that "the place and process" to which

12    they sought access "have historically been open to the press and general public"; second,

13    the Court must ask "whether public access plays a significant positive role in the

14    functioning of the particular process in question." *Press-Enter. Co. v. Super. Ct. of Cal.*

15    *for Riverside Cnty.*, 478 U.S. 1, 8 (1986). And even if they make both of those showings,

16    Plaintiffs cannot succeed if the government demonstrates "an overriding interest based

17    on findings that closure is essential to preserve higher values and is narrowly tailored to

18    serve that interest." *Id.* at 9.

19        Plaintiffs have not shown they are likely to succeed in establishing that their

20    access to any "process" or "proceeding" plays a "significant positive role." Indeed, they

21    make little effort to do so, relying heavily instead on quotes from *Index Newspapers LLC*

22    *v. United States Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020)—a case about different

23    protests that occurred five years ago in a different city and a different context. Some of

24    the Plaintiffs allege that they are journalists who were covering various scenes around

25    Los Angeles when they encountered DHS officers or agents. Others allege that they were

26    present to protest or to observe. Those allegations, however, do not establish that their

27    presence in the particular place where they allege they were targeted by DHS played a

28    "significant positive role" in any process or proceeding. Indeed, several of the Plaintiffs

10

**EXHIBIT B**

1  are vague or silent about why they were protesting in the particular place they chose.

2  *E.g.*, Olmeda Decl. ¶ 4 (alleging that Olmeda attended a protest at a federal building).

3  They do not describe any particular proceeding or event—other than the protest itself—

4  that they were seeking to access.

5      Plaintiffs allege that they were peaceful participants or observers at the protests.

6  Even assuming that is true, it does not give them a First Amendment claim. "[O]nce a

7  pattern of chaotic violence ha[s] been established"—such as that which pervaded Los

8  Angeles in the days surrounding Plaintiffs' alleged encounters with DHS—"it [i]s

9  unrealistic to expect police to be able to distinguish, minute by minute, those protestors

10  with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. In

11  circumstances where "law-breaking and law-abiding protestors [are] often

12  indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly

13  with enforcement against violent protestors," dispersing everyone from the scene of a

14  riot is narrowly tailored to serve a significant government interest. *Id.* at 1135. Officers

15  need not tailor their orders to exclude peaceful protesters or innocent bystanders, *see id.*

16  at 1126-28, whose lawful activities are being disrupted by "a small group of violent

17  protestors . . . determined to cause chaos," *id.* at 1134. It follows that officers need not

18  tailor their orders to exclude journalists or "legal observers" as well.

19      *Index Newspapers* does not support Plaintiffs' claim for relief here. First, in the

20  days surrounding Plaintiffs' alleged DHS encounters, the violence, unrest, damage to

21  federal property, and injuries to federal personnel were so severe that a Ninth Circuit

22  panel has unanimously held that the President "likely acted within his authority in

23  federalizing the National Guard." *Newsom*, slip op., at 30. In *Index Newspapers*, no

24  backdrop of unrest severe enough to warrant National Guard involvement informed the

25  panel's analysis.

26      The injunction Plaintiffs want also goes beyond anything *Index Newspapers*

27  authorized. There, the injunction provided "that if a journalist or legal observer is

28  incidentally exposed to crowd-control devices after remaining in the area where such

1   devices are deployed to enforce a lawful dispersal order, the Federal Defendants will not
2   be liable for violating the injunction." 977 F.3d at 823. But here, Plaintiffs assert a right
3   to prevent Defendants from "[f]iring kinetic impact projectiles or flashbangs at *identified*
4   *wrongdoers*, if doing so *could result* in injury to a person who is not posing a threat to
5   law enforcement." Proposed Order ¶ 3 (emphasis added). That is an exceptionally broad
6   restriction not approved by Ninth Circuit. The same is true of paragraphs 4 and 5 of the
7   proposed TRO, which would place granular strictures on exactly how DHS officers
8   engage with protesters. Requiring "express[] approv[al] by an on-scene supervisor in
9   response to specific acts of violence that the supervisor personally witnessed" before *any*
10  use of "kinetic impact projectiles containing chemical irritant" defies the realities of
11  crowd control by officers Plaintiffs themselves agree are "highly-trained." App. 15; *see*
12  Santacruz Decl. ¶ 17. In sum, Plaintiffs are not likely to succeed on their right-of-access
13  claim.

14          Plaintiffs' retaliation claim fails as well. To prevail, they must demonstrate that
15  their First Amendment activity was a "substantial or motivating factor" in the conduct of
16  DHS. *See Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th
17  Cir. 1999) (quotation marks omitted). But Defendants prohibit retaliation against
18  anyone—protesters, journalists, and legal observers alike—for exercising First
19  Amendment rights. Moreover, officers must undergo training in permissible uses of
20  force. *See* Bovino Decl. ¶ 13. To prove that officers deviated from agency policy,
21  Plaintiffs must show that officers' split-second decisions, made in the midst of chaotic
22  circumstances, were intended not to help control a quickly evolving situation but to
23  retaliate against Plaintiffs. They have not done so. Plaintiffs provide no plausible
24  evidence other than supposition of a retaliatory motive. Nor do their citations to social-
25  media posts by government officials connect any statement to anything that allegedly
26  occurred in their encounters with DHS.

27          Moreover, Plaintiffs' allegations of misconduct by individual officers occurred in
28  the context of many interactions between federal officers and crowds in the first two

12
**EXHIBIT B**

150

1   weeks of June. Their allegations thus do not supply sufficient evidence of retaliatory

2   intent on the part of Defendants. As the Ninth Circuit has made clear in the related

3   context of § 1983 claims against municipalities, "[l]iability for improper custom may not

4   be predicated on isolated or sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th

5   Cir. 1996). Plaintiffs must instead identify "practices of sufficient duration, frequency[,]

6   and consistency that the conduct has become a traditional method of carrying out

7   policy." *Id.* Plaintiffs have not made the requisite showing here. That failure precludes

8   Plaintiffs from obtaining injunctive relief against the entirety of DHS—from front line-

9   level officers all the way up to top leadership—on the basis of the purported misconduct

10  of a small number of agency employees. *Cf. Lewis v. Casey*, 518 U.S. 343, 359 (1996)

11  (holding that proof of isolated instances of misconduct was "a patently inadequate basis

12  for a conclusion of systemwide violation and imposition of systemwide relief").

13       Even if Plaintiffs were likely to prevail on their First Amendment claims, they

14  cannot support the broad order that they seek. The requested TRO would not bar officers

15  from singling out journalists, legal observers, and protesters for retaliatory treatment.

16  Instead, it would require the government to single them out for *preferential* treatment, in

17  order to exempt them from lawful orders that are properly issued to all other persons

18  present. Those requirements are far "broader . . . than necessary to redress" the

19  government's alleged intentional targeting of journalists and legal observers. *See*

20  *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). They are instead designed to

21  vindicate plaintiffs' right-of-access claim—a separate claim and one that lacks merit, for

22  the reasons explained above. Even if Plaintiffs had established a likelihood of success on

23  that claim, moreover, the relief they seek is far broader than necessary to protect it.

24  Moreover, it is unworkable. The attached declarations of Ernesto Santacruz and Mario

25  Canton explain in detail why Plaintiffs' requested relief is impracticable to implement

26  from a real-life, law-enforcement perspective. *See* Santacruz Decl. ¶¶ 13-17; Canton

27  Decl. ¶¶ 12-15; *cf. Index Newspapers*, 977 F.3d at 839 (O'Scannlain, J., dissenting)

28  (decrying injunction that made "a significant and unwarranted departure from the

13
**EXHIBIT B**

1    traditional, qualified 'right of public access' to criminal judicial proceedings that has

2    been carefully delineated by the Supreme Court"). Especially against the backdrop of a

3    network of regulations and precedent that allows the federal government to protect its

4    own property, Plaintiffs' argument that this Court should grant sweeping relief on the

5    basis of alleged assembly and speech interests they wish to exercise on or near that

6    property is meritless.

7        **D.**    **Plaintiffs Are Not Likely to Succeed on the Merits of Their Fourth and**

8            **Fifth Amendment Claims.**

9        Plaintiffs have not shown that the particular incidents they alleged violated the

10    Fourth or Fifth Amendment through excessive force—much less that they are entitled to

11    an injunction against speculative future such incidents. To demonstrate excessive force,

12    Plaintiffs must show that "police use of force" was "objectively unreasonable under the

13    circumstances." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018). That showing

14    requires "balancing 'the nature and quality of the intrusion on the individual's Fourth

15    Amendment interests against the countervailing governmental interests at stake.'" *Id.*

16    (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The reasonableness of police

17    use of force must be "judged from the perspective of a reasonable officer on the scene,

18    rather than with the 20/20 vision of hindsight," and the analysis "must embody

19    allowance for the fact that police officers are often forced to make split-second

20    judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

21    amount of force that is necessary in a particular situation." *Wilkinson v. Torres*, 610 F.3d

22    546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396–97).

23        Plaintiffs have not made that showing. They allege that they were subjected to

24    what they believe to be unreasonable force, but they have not established facts to show

25    that the force was in fact unreasonable from the perspective of a "reasonable officer" (or

26    even, in all cases, that it was directed specifically at them, rather than at others nearby).

27    What is more, courts have generally found the use of many of crowd-control methods

28    similar to those at issue here to be constitutionally permissible. For example, when

1  police were dismantling an illegal tent city set up by protesters on the University of
2  California at Berkeley campus, the Ninth Circuit rejected an excessive-force claim
3  (there, for damages under Section 1983) brought by protesters who had been struck with
4  batons and knocked over by hand while trying to block officers from dismantling the
5  tents. *Felarca*, 891 F.3d at 818. The officers were reasonable in using force because the
6  government was not required to permit "organized lawlessness," and the protesters
7  "substantially outnumbered" officers, "refused to obey the officers' commands to
8  disperse," "shouted at the officers," and "engaged the officers in verbal and physical
9  altercations." *Id.* (quoting *Jackson*, 268 F.3d at 652). The same is true here: After the
10  peaceful daytime protests have transformed into the lawless nighttime rioting (as the
11  attached declarations show that they often did for a period of time), officers have been
12  faced with protecting federal property from riotous mobs. That is the context in which
13  the Court must view Plaintiffs' claim. And it does not support Fourth and Fifth
14  Amendment violations. *See also, e.g.*, *Bayer v. City of Simi Valley*, 43 F. App'x 36, 38
15  (9th Cir. 2002) (holding use of tear gas was reasonable against armed unstable individual
16  who refused to surrender); *Forrester v. City of San Diego*, 25 F.3d 804, 805-07 (9th Cir.
17  1994) (holding pain compliance techniques on passive protesters not unreasonable to
18  remove them); *Jackson*, 268 F.3d at 652 (holding threat and use of chemical irritant to
19  disperse unruly crowd, where they were interfering with arrest, was not unreasonable);
20  *United Steelworkers of Am. v. Milstead*, 705 F. Supp. 1426, 1430, 1437 (D. Ariz. 1988)
21  (holding use of tear gas "for outdoor use only" on crowd gathered inside that had been
22  throwing objects was not excessive force, even though innocent people were also inside).
23  Even assuming that Plaintiffs' application showed a likelihood that Plaintiffs would
24  succeed in proving past violations, they cannot show an entitlement to injunctive relief
25  by relying on those past violations.

26      **E.      Plaintiffs Have Not Demonstrated Irreparable Harm.**

27      Plaintiffs insist that by pleading a colorable First Amendment claim they have
28  suffered irreparable injury. Dkt. 6-1 at 19. First, Plaintiffs have not pled a colorable First

1  Amendment claim. *See supra* at 10-14. That failure is fatal here. *Nickler v. Cnty. of*
2  *Clark*, 648 F. App'x 601, 605 (9th Cir. 2016) ("Because [Plaintiffs] failed to show a
3  likelihood of success on the merits, [they] also could not show that irreparable harm
4  would likely result from failure to grant the injunction").

5        Even if Plaintiffs had pled a colorable First Amendment claim, that does not
6  demonstrate likelihood of irreparable injury because "no presumption of irreparable
7  harm arises in a First Amendment retaliation claim." *Rendish v. City of Tacoma*, 123
8  F.3d 1216, 1226 (9th Cir. 1997).

9        Instead, "plaintiffs may not obtain a preliminary injunction unless they can show
10  that irreparable harm is likely to result in the absence of the injunction." *All. For The*
11  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To establish a likelihood
12  of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient
13  to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman*
14  *v. Pacific Seafood Group*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original).
15  Where "there is no showing of any real or immediate threat that the plaintiff will be
16  wronged again," there is no irreparable injury supporting equitable relief. *City of Los*
17  *Angeles v. Lyons*, 461 U.S. 95, 111 (1983); see *Olagues v. Russoniello*, 770 F.2d 791,
18  797 (9th Cir. 1985). Despite Plaintiff's attempts to conjure future misconduct, they have
19  presented no evidence to suggest such misconduct will occur.

20        Plaintiffs' future injuries are not only speculative and, therefore, insufficient to
21  demonstrate the likelihood of irreparable injury (*see Park Vill. Apartment Tenants Ass'n*
22  *v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[a]n injunction will not
23  issue" based on "a mere possibility of some remote future injury") (cleaned up)), they
24  are premised on misstatements and outdated facts that no longer reflect reality. *Supra* at
25  5. The Los Angeles Police Department had the principal public safety role during recent
26  unrest as some of the same Plaintiffs here conceded by filing their complaint against the
27  Los Angeles County Sheriff's Department. *See Los Angeles Press Club, et al. v. County*
28  *of Los Angeles*, 2:25-cv-05541-HDV-E (June 18, 2025) Dkt. 1. And since the events that

1  Plaintiffs complain of occurred, the National Guard and U.S. Marines are now assisting
2  FPS in guarding federal property in Los Angeles. *Supra* at 5. Plaintiff's request for relief,
3  therefore, is directed at the wrong entity and based on a state of affairs that no longer
4  exists.

5      Plaintiffs' theory that the mere presence of federal officers shows a likelihood of
6  irreparable harm is implausible. Mere speculation that individual officers may someday
7  commit sporadic violations of people's rights at future protests—specifically targeting
8  one of the Plaintiffs—cannot establish irreparable harm. Indeed, the Supreme Court
9  expressly rejected the idea that an individual citizen faces a likelihood of irreparable
10  harm just because there is a generalized risk that law enforcement officers may one day
11  act unconstitutionally. *Lyons*, 461 U.S. at 111 ("[A] federal court may not entertain a
12  claim by any or all citizens who no more than assert that certain practices of law
13  enforcement officers are unconstitutional."). Plaintiffs, therefore, have failed to
14  demonstrate that, absent relief, they will suffer irreparable harm.

15      **F.    The Balance of Equities and Public Interest Weigh Against Granting**
16          **An Injunction.**

17      Contrary to Plaintiffs' assertions, the balance of the equites and public interest tips
18  sharply in favor of Defendants. The Court "must balance the competing claims of injury
19  and must consider the effect on each party of the granting or withholding of the
20  requested relief." *Winter*, 555 U.S. at 24. "The federal government's interest in
21  preventing" attacks on federal officers and damage to federal buildings "is significant."
22  *Newsom*, slip op., at 36. Both interests would be thwarted were the Court to grant the
23  injunction requested here. Similarly, the public has an interest in the maintenance of
24  order and public safety. Plaintiffs' extrapolations from weeks' old, cherry-picked events
25  and imagined Constitutional violations to come, cannot outweigh the concrete harm to
26  the federal government and the public were this Court to grant Plaintiffs' request.

27      There is a pointed public interest when disorder threatens the integrity of public
28  property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) (health,

17

**EXHIBIT B**

**155**

safety, and protection of property "are compelling reasons" and "represent significant
government interests."); *see also Index Newspapers*, 977 F.3d at 838 (finding that
government has an "uncontested interest in protecting federal agents and property").
Additionally, Congress has recognized such interests, including by making the
destruction of federal property and assault of federal officers felonies. 18 U.S.C. §§ 111,
1361. Moreover, the federal government has an interest in "preserv[ing] the property
under its control for the use to which it is lawfully dedicated[;]" for government
buildings, those uses are public uses that are in the public interest. *Int'l Soc. for Krishna
Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992).

The public interest is advanced when federal officers disperse violent opportunists
near federal buildings. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)
("[W]here demonstrations turn violent, they lose their protected quality as expression
under the First Amendment"); *Griefen*, 200 F.3d at 1260 (9th Cir. 2000) (upholding the
relocation of protesters who "had already shown by their destructive conduct that they
presented a clear and present danger to the safe completion of the construction project");
*Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise protected speech
may be curtailed when an assembly stokes—or is threatened by—imminent physical or
property damage."). Plaintiffs have not—indeed, cannot—contest the federal
government's right and obligation to restore order and protect federal property.

Plaintiffs' argument that the public interest tips in their favor relies on pure
*pathos*. But rhetoric about the "search for truth" (Pls.' Mem. At 21 (citing *Janus v. Am.
Fed'n of State, Cty., & Mun. Emps., Council* 31 138 S. Ct. 2448, 2464 (2018)) and
participation in "our republican system of self-government" (*id.* (quoting *Globe
Newspaper*, 457 U.S. at 604)) is unavailing when the facts are replete with violent
attacks on law enforcement. Even if the protests at issue had not become violent riots,
the courts have already thoroughly weighed the interest of public access to a free press
and found it no greater than that of the public generally. *See, e.g.*, *Branzburg v. Hayes*,
408 U.S. 665, 684–85 (1972) ("Newsmen have no constitutional right of access to the

1   scenes of crime or disaster when the general public is excluded"); *California First*

2   *Amendment Coal. v. Calderon*, 150 F.3d 976, 981(9th Cir. 1998).

3       Regardless of Plaintiffs' interests, attempting to impose arbitrary new policing

4   rules fashioned by Plaintiffs' attorneys—not law enforcement—is impractical. Plus,

5   Plaintiffs request a scope and timeline that would create chaos and make it impossible to

6   conduct law enforcement operations when protests become unlawful. There are four

7   principal reasons Plaintiffs' requested relief is unwarranted and unworkable.

8       *First*, Plaintiffs have not limited their request for relief to any specific region.

9   Presumably (though it's unclear), they seek a nationwide injunction. Courts have

10  rejected awarding nationwide relief where nationwide evidence was lacking. *See Flores*

11  *v. Huppenthal*, 789 F.3d 994, 1005–06 (9th Cir. 2015) ("[O]nly if there has been a

12  systemwide impact may there be a systemwide remedy.") (alteration in original); *see*

13  *also Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 647 (9th Cir. 2021).

14  Plaintiffs have failed to muster sufficient evidence to support their capacious request for

15  relief.

16      *Second*, Plaintiffs' request sweeps far beyond the relief afforded in *Index*

17  *Newspapers*. 480 F. Supp. 3d 1120, 1155-57 (D. Or. 2020). There, the district court

18  granted an injunction that exempted journalists from orders to disperse but absolved

19  federal law enforcement from liability if journalists were "incidentally exposed to

20  crowd-control devices after remaining in the area . . . after the issuance of an otherwise

21  lawful dispersal order." *Id.* at 1157. Here, by contrast, Plaintiffs seek a blanket

22  prohibition from "[d]ispersing . . . the press[.]" Dkt. 6-26 at 4. This effectively gives the

23  press a veto over every lawful crowd-dispersal order issued by federal law enforcement

24  authorities.

25      *Third*, the preliminary injunction issued in *Index Newspapers* makes no mention

26  of prohibiting the use of crowd control weapons. *See* 480 F.Supp. at 1155-57. But here,

27  Plaintiffs seek blanket prohibitions on the use of "crowd control weapons . . . on people

28  who are not posing a threat to law enforcement[;]"and "[f]iring kinetic impact projectiles

19
**EXHIBIT B**

**157**

1    or flashbangs at identified wrongdoers, if doing so could result in injury to a person who

2    is not posing a threat to law enforcement" Dkt. 6-26 at 4. This requested relief is not

3    limited to the press and therefore extends far beyond the scope of Plaintiffs' retaliation

4    arguments. The requested relief also imposes a rule on federal enforcement agents that

5    allows no room for incidental error.

6         *Fourth*, Plaintiffs' request that federal law enforcement be required to obtain

7    "express[] approval by an on-scene supervisor" before deployment of tear gas and

8    similar chemical irritants, *id.* at 5, effectively tying the hands of every agent who, in the

9    chaos of dynamic situations, cannot locate a supervisor to seek permission. *See* Bovino

10    Decl. ¶ 16. These restraints on federal law enforcement combine to frustrate the

11    government's comprehensive interest in maintaining public order on public property.

12    *Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court respects, as it must, the

13    interest of the community in maintaining peace and order on its streets.").

14         Courts are properly reluctant to micromanage law enforcement officers

15    responding to unpredictable and violent demonstrations in defense of public property.

16    *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("judges should be cautious about second-

17    guessing a police officer's assessment, made on the scene, of the danger presented by a

18    particular situation[.]").

19         The requested relief would incapacitate federal law enforcement's ability to

20    handle lawless crowds and respond to imminent threats, thereby making enforcing

21    federal law an impossibility in those circumstances. By contrast, Plaintiff reporters are

22    free to cover whatever events they wish to, now or in the coming days. Accordingly,

23    both the public interest and the balance of the equities weigh in favor of denying the

24    injunction.

25    **V.    CONCLUSION**

26         Defendants respectfully request that the Court deny the TRO application.

27

28

20
**EXHIBIT B**

1   Dated:  June 19, 2025                          Respectfully submitted,

2                                                  BRETT A. SHUMATE
                                                   Assistant Attorney General
3                                                  Civil Division

4                                                  ERIC J. HAMILTON
                                                   Deputy Assistant Attorney General
5
                                                   ELIZABETH HEDGES
6                                                  SEAN SKEDZIELEWSKI
                                                   Counsel to the Assistant Attorney General
7                                                  Civil Division

8                                                  ALEXANDER K. HAAS
                                                   ANDREW I. WARDEN
9                                                  KATHLEEN C. JACOBS
                                                   Civil Division, Federal Programs Branch
10
                                                   BILAL A. ESSAYLI
11                                                 United States Attorney
                                                   DAVID M. HARRIS
12                                                 Assistant United States Attorney
                                                   Chief, Civil Division
13                                                 JOANNE S. OSINOFF
                                                   Assistant United States Attorney
14                                                 Chief, Complex and Defensive Litigation Section

15

16                                                 _/s/ Paul (Bart) Green_____
                                                   PAUL (BART) GREEN
17                                                 Assistant United States Attorney

18                                                 Attorneys for Defendants

19

20                       L.R. 11-6.2 Certificate of Compliance

21        The undersigned counsel of record certifies that this memorandum contains 6,996

22   words, which complies with the word limit set by L.R. 11-6.1.

23

24   Dated: June 19, 2025                          _/s/ Paul (Bart) Green_____
                                                   PAUL (BART) GREEN
25

26

27

28

                                          21
                                     **EXHIBIT B**

# EXHIBIT C

## DECLARATION OF GREGORY K. BOVINO

I, Gregory K. Bovino, declare and affirm as follows:

1.     I am the Chief Patrol Agent, El Centro Sector. In this role, I drive Border Patrol Operations for the El Centro Sector, comprised of 70 miles of land border, three Border Patrol Stations, and two permanent traffic checkpoints, overseeing 1,100 employees, an 850-vehicle fleet, and a budget of $10.2 million. I have been in this position since 2020.

2.     I entered on duty with the U.S. Border Patrol on November 17, 1996, with my first duty assignment in the El Centro Sector. I have served as the Chief Patrol Agent of the New Orleans Sector, directing operations spanning 694 miles of coastal border across seven states. I also served as Associate Chief of the U.S. Border Patrol Strategic Planning and Analysis Directorate & Chief of Staff Division.

3.     I have a Bachelor's degree, Magna Cum Laude, in Natural Resources Management and Forestry from Western Carolina University. I also hold two master's degrees: one in National Security Strategy from the National War College, and one in Public Administration from Appalachian State University.

4.     I served as the Lead Field Coordinator in Los Angeles beginning on June 8, 2025.

5.     On June 6, 2025, in support of U.S. Immigration and Customs Enforcement, CBP officers and agents were sent to Los Angeles, California. Since their arrival, CBP officers and agents reported repeated assaults against them, and responded with appropriate use of force, and arrests. There have been injuries to officers and agents during CBP operations in the Los Angeles area. The injuries arise from launched or thrown projectiles and even alleged purposeful vehicle accidents directed at CBP personnel.

6.     I did not witness, nor am I aware of, any CBP employee knowingly targeting journalists, legal observers, or peaceful protestors with less lethal munitions and/or crowd control devices.

1
**EXHIBIT C**

**160**

7.      While protecting federal officers and property in Paramount, California on Saturday June 7, 2025, the violent crowd continually assaulted agents and officers with prohibited, high explosive fireworks, as well as numerous thrown projectiles, such as rocks, concrete, and frozen water bottles. Despite repeated verbal warnings and directions to not attack federal officers, rioters continued to attack CBP officers and agents, who were forced to protect themselves.

8.      Beginning June 9th, 2025, protestors in downtown Los Angeles engaged in violence towards officers and agents, both federal and state. Los Angeles Police Department, and California Highway Patrol officers deployed to a protest in the vicinity of the Roybal Federal Complex. The U.S. Army National Guard was deployed for additional support to protect federal facilities throughout the Los Angeles area.

9.      The presence of Department of Defense (DoD) personnel, including the California National Guard assisted in de-escalation and allowed CBP officers and agents to concentrate on joint federal law enforcement operations throughout the Los Angeles area. This included operations in support of ICE-ERO, and the Drug Enforcement Administration.

10.     The CBP Use of Force Policy is directly derived from constitutional law, and federal statutes and regulations. Pursuant to the CBP Use of Force Policy, officer and agents may use objectively reasonable force only when it is necessary to carry out their law enforcement duties. The "reasonableness" of a particular use of force is based on the totality of circumstances known by the officer or agent at the time of the use of force, and weighs the actions of the officer or agent against the rights of the subject, considering the circumstances surrounding the event. Reasonableness will be judged from the perspective of a reasonable law enforcement officer or agent. A use of force is "necessary" when it is reasonably required to carry out the authorized officer's or agent's law enforcement duties in each situation, considering the totality of facts and circumstances of the situation.

2
**EXHIBIT C**

**161**

11.     CBP policy addresses the deployment of less lethal devices and outlines the circumstances in which they may be utilized. Again, the use of less-lethal force must be both objectively reasonable and necessary to carry out the officer or agent's law enforcement duties. Crowd control devices and less lethal munitions are only utilized after events have become unlawful, and the appropriate warnings and time have been satisfied. Under CBP policy, chemical irritants may be utilized as a compliance tool on a subject offering, at a minimum, active resistance. Active resistance is a type of resistance where a subject physically opposes an officer or agent's control efforts. Kinetic impact can be used on a subject in response to assaultive resistance. Assaultive resistance under CBP policy is a physically manifested attempt or threat to inflict injury on CBP personnel, whether successful or not, which causes a reasonable apprehension of imminent bodily harm.

12.     No CBP officer or agent is allowed to carry a less-lethal device until they have successfully completed CBP-approved initial course of instruction for such device and have been certified in its use.

13.     Additionally, officers and agents receive training, at a minimum, four times per year on the legal application of force consistent with CBP Policy Guidance. All CBP employees have a duty to intervene in and/or report improper use of force by law enforcement personnel.

14.     Any use of force incident involving CBP personnel may be reviewed or investigated both criminally, to ensure compliance with applicable law, as well as administratively, to ensure compliance with DHS and CBP policy. Any use of force incident involving CBP employees may be subject to an administrative review by the Office of Professional Responsibility (OPR) or local CBP management. By policy, each use of force event is reported to OPR, and OPR is currently physically present here at our Incident Command Post to ensure integrity and accountability of our use of force events.

3

**EXHIBIT C**

15.    CBP officers and agents are already required to, when feasible, and prior to
the application of force, identify themselves and issue a verbal warning to comply with
officers' or agents' instructions. In determining whether a warning is feasible under the
circumstances, an officer or agent may be guided by a variety of considerations. These
considerations may include whether a delay in issuing the warning is likely to increase
the danger to the officer, agent, or others (including any victims or bystanders), or if a
delay would result in a crime, including the commission of a crime, such as assault on a
federal officer or agent. When an officer or agent does issue a verbal warning, the officer
or agent should afford the subject a reasonable opportunity to voluntarily comply before
applying force.

16.    When officers and agents must make judgements in hostile situations,
having a supervisor approve each application of force is impractical. After a protest has
been deemed unlawful and warnings have been administered, the line of effort is
protection of life and property. In all applications of force incidents, the calculus of
"reasonableness" includes an allowance for the fact that law enforcement officers and
agents are often forced to make split-second decisions. Officers and agents must make
decisions about the amount of force that is necessary in a particular situation in
circumstances that are tense, uncertain, and rapidly evolving. These principals are
outlined distinctly in the CBP Use of Force Policy.

I declare, under penalty of perjury, that the foregoing is true and correct to the best
of my information, knowledge and belief.

Executed this 19th day of June, 2025, at __Santa Monica, California.

_____
GREGORY K. BOVINO

4
**EXHIBIT C**

**163**

# EXHIBIT D

### <u>DECLARATION OF MARIO A. CANTON</u>

I, Mario Canton, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2.    I am the Regional Director for Region 9 of the Federal Protective Service (FPS), and I have served in that position since December 2012.  Region 9 consists of the following states: California, Nevada, Arizona, and the Pacific Islands territories of Guam, Saipan, and American Samoa. In that role, I provide law enforcement supervision and direct 131 regional employees, 15 contractors, and more than 1,500 Protective Security Officers while overseeing security measures for more than 1,100 protected properties across the region. I manage the region's criminal investigative and intelligence, law enforcement and security, risk management, and contract security programs, along with all mission support functions. My primary place of duty is San Francisco, CA, but I arrived in Los Angeles on June 7, 2025.

3.    Protests have been ongoing regularly in downtown Los Angeles and nearby since June 6, 2025. While the protests have been largely peaceful during daylight hours, they have regularly been followed by nightly criminal activity in the form of vandalism, destruction of property (including federal property), looting, arson, and assaults on federal officers. When interacting with individuals engaging in civil disorder targeting federal facilities and personnel, FPS abides by DHS and Agency-specific Use of Force policy as set forth in FPS Directive 15.5.1.2-01. When necessary to disperse crowds that threaten federal buildings, FPS officers primarily use Pepper Balls, which are non-lethal projectiles that break upon impact and release an extremely effective, high grade pepper irritant called PAVA as well as Oleoresin Capsicum, commonly known as pepper spray. When appropriate FPS will also use paint balls to mark suspects for later investigation.

4.    The primary Federal facilities that have been the target for these protests are: the U.S. Courthouse located at 255 E. Temple St. in Los Angeles, the Federal building located at 300 N Los Angeles St. in Los Angeles, the HSI/DHS training facility

1

**EXHIBIT D**

1   located at 6321 E. Alondra Blvd in Paramount, CA, and the Federal building located at

2   34 Civic Center Plaza in Santa Ana, CA.

3        5.     As a result of these protests, my officers faced significant logistical and

4   operational safety issues. For example, during the evening of June 6, 2025, a group of

5   approximately 100 individuals defaced federal property around the vehicle entrance to

6   the Federal building at 255 E. Temple St., with one individual throwing a chair at FPS

7   officers.  In response FPS officers deployed pepper ball from their pepper ball launcher

8   to create a safe zone to mitigate risk of injury to officers and prevent federal

9   infrastructure breach due to a rollup gate malfunction. One individual was observed

10  breaking concrete pillars with a hammer in front of the Los Angeles Metropolitan

11  Detention Center, distributing the broken concrete so that other individuals could throw

12  them at FPS officers. The individuals, who were hiding behind dumpsters, continued to

13  launch rocks, chunks of concrete, water bottles containing unknown liquids, cones, and

14  scooters at officers. FPS Officers responded with deploying pepper balls, OC spray and

15  one baton strike to effect an arrest.

16       6.     The logistical and operational challenges were exacerbated by the delayed

17  response that FPS received from the Los Angeles Police Department (LAPD). During

18  the June 6 incident FPS Officers requested LAPD backup at 6:11 p.m. and LAPD had a

19  delayed response, arriving at 7:32 p.m. When the LAPD did respond, they only cleared

20  the city streets and did not assist FPS with removal of individuals who were threatening

21  federal property.

22       7.     To ensure the safety of my officers and the continuing performance of our

23  official duties to protect federal property, facilities, and personnel in and around the Los

24  Angeles area, FPS cross-designated U.S. Border Patrol Agents and U.S. Immigration and

25  Customs Enforcement officers. On June 7, 2025, the National Guard arrived to assist

26  with the protection of federal functions, facilities, and personnel.

27       8.     With the assistance of the National Guard and DoD assets, FPS officers

28  were and are able to continue with their federally mandated duties. Officer presence and

show of force of the California National guardsmen and the US Marines was a critical deterrent for criminal activity on Federal property.

9.  Over the past week, large protests have continued to organize at Federal facilities, however the demeanor of the protesters has remained largely civil, in alignment with a peaceful demonstration, thereby curtailing our need for crowd intervention. Officer presence and show of force of the California National Guardsmen and the US Marines was a critical deterrent for criminal activity on Federal property. Finally, Mayor Karen Bass implemented a curfew (8:00 p.m. to 6:00 a.m.) in downtown Los Angeles from June 10-17. All of these combined efforts have been effective in suppressing rioters and facilitating peaceful demonstrations.  The curfew coupled with officer presence and show of force of the California National Guardsmen and the US Marines was a critical deterrent for criminal activity on Federal property.

10.  The FPS has continued to be the lead law enforcement agency regarding the protection of Federal facilities, property, and people thereon. National Guard and DoD personnel have provided assistance in a support role. Currently, the National Guard/DoD on-scene Commanders meet with FPS Command staff twice a day to discuss daily plans and receive updated intelligence regarding activity in and around the Federal facilities. There is an FPS law enforcement officer with or near the National Guard/DoD personnel when they are on duty at all locations.  If an incident does occur at the FBI building a designated quick response team of FPS officers are available within minutes to respond.

11.  It is my understanding that the plaintiffs in this case are seeking to have federal law enforcement officers enjoined from (1) dispersing, threatening or assaulting members of the press or legal observers; (2) directing crowd control devices on people who do not pose a threat to law enforcement; (3) directing crowd control devices at people engaged in illegal activity who do not pose a threat to law enforcement; (4) using crowd control devices without giving two separate warnings to targeted individuals; and (5) using crowd control devices that contain chemical irritants without first obtaining

3
**EXHIBIT D**

1    express approval from an on-scene commander in response to a specific act of violence
2    personally witnessed by that on-scene commander.

3        12.    With respect to the first request, at no time are officers under my command
4    directed to threaten or assault any member of the public engaged in lawfully exercising
5    their First Amendment rights, including members of the press and/or legal observers.  If
6    officers under my command do order the dispersal of members of the press and/or legal
7    observers, it is done because they are intermingled with the crowds that have otherwise
8    been ordered to disperse or dispersal is necessary for the protection of the members of
9    the press or legal observers as well as the federal officers.  An order enjoining FPS
10   officers from dispersing members of the press and/or legal observers simply because of
11   their status, would prevent the safe and efficient dispersal of crowds that would make
12   dangerous situations more dangerous for everyone involved.

13       13.    With respect to the second and third requests, FPS officers are trained and
14   equipped to use crowd control techniques not only to protect law enforcement but to also
15   prevent the destruction of government property, trespass onto federal property or illegal
16   entry into a federal building, consistent with FPS's statutory mandate under 40 U.S.C. §
17   1315.  An order enjoining FPS officers from using crowd control techniques to protect
18   federal property would invite the wanton destruction of federal property and allow
19   people to break into federal buildings while FPS officers would be unable to act prior to
20   the offense taking place.

21       14.    With respect to the fourth request, FPS officers are often faced with
22   imminent threats to federal property such as commercial grade fireworks or Molotov
23   cocktails that have the potential to burn federal buildings.  While FPS does provide
24   verbal dispersal warnings over loudspeakers whenever possible, requiring such warning
25   even when imminent threats exist would expose the officers and the federal facilities to
26   unnecessary risk.

27       15.    With respect to the fifth request, as discussed above, FPS officers are
28   frequently called upon to prevent the imminent destruction of federal property or harm to

1  federal officers.  The most effective crowd control techniques in those situations are

2  those that use chemical irritants to temporarily incapacitate the individuals attempting to

3  cause harm and force them away from the facility.  To require federal officers to obtain

4  prior approval before deploying such crowd control techniques would unnecessarily

5  expose the officers to increased risk of harm and allow the individuals seeking to engage

6  in the violent acts an opportunity to commit the acts while the officers were waiting for

7  approval, thereby risking harm to federal officers and federal facilities and functions they

8  are protecting.

9        I declare under penalty of perjury that the foregoing is true and correct to the best

10  of my knowledge and belief.

11

12        Executed on June 19, 2025, at Los Angeles, California.

13

14  MARIO A    Digitally signed by
        MARIO A CANTON

15  CANTON    Date: 2025.06.19
        21:26:10 -07'00'

16  MARIO A. CANTON

17

18

19

20

21

22

23

24

25

26

27

28

5

**EXHIBIT D**

**168**

# EXHIBIT E

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 46 of 86    Page ID
#:1072
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 1 of 41    Page ID #:368

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendants. | Case No. 2:25-cv-05563 <br><br> **DECLARATION OF ERNESTO SANTACRUZ, JR.** |

## DECLARATION OF ERNESTO SANTACRUZ, JR.

I, Ernesto Santacruz, Jr., hereby declare:

1.    I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.    I have been employed by ICE, or its predecessor Immigration and Naturalization Service (INS), since May 2002. Prior to my position as FOD, I served as the ERO Los Angeles Deputy Field Office Director, Acting Assistant Field Office Director, and Assistant Field Office Director. I have also served ERO as a

1

**EXHIBIT E**
**169**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 47 of 86    Page ID
#:1073
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 2 of 41    Page ID #:369

Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent. Prior to the creation of ICE, I served as a Detention Enforcement Officer with INS.

3.    I provided the attached three declarations detailing the violence and civil unrest federal officers have experienced in the Los Angeles area since June 6, 2025, in the lawsuit, *Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed June 9, 2025), Appeal No. 25-3727 (9th Cir. filed June 12, 2025). True and correct copies of these declarations are attached hereto as Exhibits 1-3.

4.    As the FOD for ERO Los Angeles, I direct and oversee ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national

2

**EXHIBIT E**
**170**

security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

5.     Beginning on or about Friday, June 6, 2025, federal law enforcement officers, including ICE officers and special agents, conducted immigration enforcement operations in several locations in the Los Angeles area. In some areas, these officers were met with violent mobs who impeded the operations by assaulting the federal law enforcement officers. In addition, violent opportunists took advantage of protests at federal buildings to attack federal officers with rocks, fireworks, and other objects, and to destroy federal property. The delayed and insufficient response from state and local officials to this violence led to the deployment of California National Guard members and U.S. Marines to the Los Angeles area. Since their deployment, and in concert with the involvement of state and local law enforcement officials to address civil unrest at federal properties through the Los Angeles area, the violence at protests and operations in the Los Angeles area has greatly diminished, allowing for federal buildings and courthouses to resume normal operations and federal officers to enforce federal

3

**EXHIBIT E**
**171**

laws in the Los Angeles area.

6.      I did not witness, nor am I aware of, any ICE employee knowingly targeting journalists, legal observers, or peaceful protestors with less lethal munitions and/or crowd control devices.

7.      I understand that Plaintiffs allege that ICE officers and special agents were present at the Santa Ana Federal Building on Monday, June 9, 2025. While some ICE special agents were present, they did not deploy any less lethal munitions and/or crowd control devices. Similarly, some ICE officers and special agents were present near the Home Depot in Paramount, California, on Saturday, June 7, 2025. They also did not deploy any less lethal munitions and/or crowd control measures.

8.      The only ICE employees who are authorized to use chemical crowd dispersal devices and diversion devices, such as flashbangs, are highly trained elite special agents and deportation officers who are members of the HSI and ERO Special Response Teams (SRTs).

9.      SRT agents and officers are trained to serve high-risk warrants under hazardous conditions, arrest dangerous criminals, and assist other law enforcement agencies during critical incidents.

10.      In responding to public safety threats, ICE officers and special agents are bound by the DHS use of force policy titled, *Update to the Department Policy on the Use of Force* (Feb. 6, 2023) (Use of Force Policy), available at:

4

**EXHIBIT E**
**172**

https://www.dhs.gov/sites/default/files/2023-04/23_0206_s1_use-of-force-policy-update.pdf. The Use of Force Policy is guided by the Fourth Amendment as the constitutional baseline for permissible use of force by law enforcement officers and special agents in the course of their duties. The general principle undergirding the Use of Force Policy is the respect for human life and the communities served. To that end, the Use of Force Policy requires that law enforcement officers only use force when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the law enforcement officer at the time force is applied. Further, physical force must be discontinued when resistance ceases or when the incident is under control.

11.    ICE law enforcement officers are trained in a variety of techniques to aid in appropriately resolving encounters, to include de-escalation where possible. ICE law enforcement officers are encouraged to employ tactics and techniques that effectively bring an incident under control while promoting public safety and minimizing the risk of unintended injury or serious property damage. However, recognizing the seriousness of public safety threats ICE law enforcement officers may encounter, the Use of Force Policy does not impose a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

**EXHIBIT E**
**173**

12.    The Use of Force Policy requires ICE law enforcement officers, when feasible, prior to the application of force, to attempt to identify themselves and issue a verbal warning to comply with instructions. However, whether a warning is feasible under the circumstances requires the ICE law enforcement officer to be guided by several considerations, including, but not limited to, whether the resulting delay is likely to increase danger to the ICE law enforcement officer or others, result in the destruction of evidence, allow for a subject's escape, or result in the commission of a crime. However, when circumstances allow for a warning to be issued, ICE law enforcement officers are trained to afford subjects a reasonable opportunity to voluntarily comply before applying force. In an exigent circumstance, for self-defense or defense of another, ICE law enforcement officers are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances. However, the Use of Force Policy strictly prohibits the use of excessive force and warns its officers that DHS does not tolerate excessive force and constitutes misconduct. Under the policy, engaging in excessive force or failing to report the use of excessive force will subject the officer to administrative and criminal penalties.

13.    I have reviewed Plaintiffs' proposed order submitted with their application for a temporary restraining order. The items requested are unnecessary and would endanger the safety of law enforcement personnel and the public. First, Plaintiffs'

**EXHIBIT E**
**174**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 52 of 86    Page ID
#:1078
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 7 of 41    Page ID #:374

request to enjoin DHS from dispersing or engaging in behavior that may be perceived as "threatening" or "assaulting" by the press or legal observers, and only allowing ICE law enforcement officers to ask press or legal observers to change location to avoid disrupting law enforcement, as long as the press or legal observers have sufficient opportunity to report and observe, is unworkable. ICE law enforcement officers are responsible for securing the impacted area and may be unable to differentiate between members of the press and other participants. Press markings are publicly available and while officers may have no reason to limit press access, their ability to differentiate between actual press and those who have come by press markings through fraudulent means cannot be determined in real-time. Legal observers are even less easily identifiable. When ICE law enforcement officers give a dispersal command for safety reasons, all parties are expected to comply. Any delay in compliance or the ability to respond to a lack of compliance poses a risk to officer safety, public safety, and the safety of any press who may be present.

14.     Second, Plaintiffs' request to enjoin DHS from using crowd control weapons, chemical irritants, and flash-bangs on people who are not posing a threat to law enforcement ignores the realities of protecting officers and the public from violent opportunists who use crowds to assault law enforcement officers. Crowd control devices are used after crowds have been ordered to disperse, fail to do so,

**EXHIBIT E
175**

and engage in criminal and assaultive behavior towards law enforcement officers and the public. Due to the nature of some crowd devices, such as CS gas and flash-bangs, persons who fail to disperse pursuant to lawful orders, but are not posing an immediate threat to law enforcement officers may be impacted due to their proximity to persons who are engaged in violent and/or criminal behavior. These crowd control devices are designed and used not to cause physical injury but to protect law enforcement officers and the public from violent attacks. Moreover, consistent with the DHS Use of Force Policy, ICE law enforcement officers only use force that is necessary and reasonable based on the totality of the circumstances. ICE law enforcement officers are trained to engage those individuals who pose the greatest threat based on this reasonableness standard. ICE law enforcement officers are trained to give verbal commands and those individuals who do not comply with these commands may be perceived as a potential threat. The ICE law enforcement officers' responsibility is to ensure the scene is safe for law enforcement personnel and the community, and anyone who does not comply with lawful dispersal commands may be considered a potential threat to law enforcement depending on subsequent actions and refusal to leave a restricted area.

15.    Third, Plaintiffs' request to enjoin DHS officers from firing kinetic impact projectiles or flash-bangs at identified wrongdoers, if doing so could result in

**EXHIBIT E**
**176**

injury to a person who is not posing a threat to law enforcement, is unnecessary and unworkable. To my knowledge, no ICE law enforcement officers used kinetic impact projectiles against any individuals during any protests identified in the Plaintiffs' *ex parte* application for a temporary restraining order. As stated previously, flash-bangs may inadvertently impact persons who fail to disperse pursuant to a lawful order and are in near proximity to an identified person engaged in violent and criminal behavior towards law enforcement officers and members of the public. Prohibiting the use of flash-bangs, which cause a loud bang noise and flash, would take away a valuable less-lethal tool for law enforcement officers to protect themselves and others. Also, consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to utilize direct impact munitions only on those individuals who pose a direct threat to law enforcement. If a dispersal order is given and subjects do not comply with this directive, they may be subject to necessary and reasonable uses of force to include the utilization of kinetic impact or chemical munitions and/or diversionary devices. ICE law enforcement officers are trained to give dispersal orders prior to the utilization of any of the aforementioned law enforcement tools when practical, and those individuals who do not heed these orders may be exposed to any or all of these. In short, those individuals who do not disperse when receiving the command to do so, identify themselves as a potential threat to law enforcement.

**EXHIBIT E**
**177**

16.    Fourth, Plaintiffs' request to enjoin DHS officers from using any crowd control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individuals, where the messages explain that officers may employ crowd control weapons and must give the targeted individuals sufficient time to avoid the use of force, is both unnecessary and unworkable. Consistent with the DHS Use of Force Policy, ICE law enforcement officers are trained to give warnings when operationally feasible. A blanket requirement for two separate warnings would prevent officers from responding to exigent circumstances where the utilization of these tools could prevent harm to the public or officers. It is the subject's behavior that dictates the timeline of the utilization of these tools and if the subject or crowd behavior requires a more immediate response, officers cannot and should not compromise safety to meet an arbitrary two-warning standard. In short, ICE law enforcement officers will give commands and warnings to avoid unnecessary exposure, however, ICE law enforcement officers are permitted to use necessary force as appropriate based on the totality of circumstances.

17.    Lastly, Plaintiffs' request to enjoin DHS officers from using kinetic impact projectiles containing chemical irritant unless expressly approved by an on-scene supervisor in response to specific acts of violence that the supervisor personally witnessed, is unworkable. The on-scene commander approves all operational

**EXHIBIT E
178**

contingency plans and the utilization of any impact projectiles and chemical munitions as required. The dynamic nature of operations does not always allow the supervisor to be on scene or personally witness rapidly evolving situations which may require the use of such munitions. ICE law enforcement officers are trained to use discretion and follow all policies when deploying chemical munitions and specialty impact munitions. Regardless of circumstance, all law enforcement officers are held to the necessary and reasonable standard. The deployment of these tools is dictated by the totality of circumstances facing the officer in real-time. The delay required by supervisory notification or presence would unnecessarily place law enforcement officers and community members in harm's way.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 19th day of June 2025.

ERNESTO M SANTACRUZ JR

Digitally signed by ERNESTO M SANTACRUZ JR
Date: 2025.06.19 21:15:36 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

11

**EXHIBIT E**
**179**

# EXHIBIT 1

# TO DECLARATION OF

# ERNESTO SANTACRUZ, JR.

**EXHIBIT E**

**180**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Case No. 3:25-cv-04870 |
| | **DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | Hon. Charles R. Breyer |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | United States District Judge |
| Defendants. | |

## <u>DECLARATION OF ERNESTO SANTACRUZ, JR.</u>

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     I have been employed by ICE, or its predecessor Immigration and Naturalization Service (INS), since May 2002. Prior to my position as FOD, I served as the ERO Los Angeles Deputy Field Office Director, Acting Assistant Field Office

1

Director, and Assistant Field Office Director. I have also served ERO as a Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent. Prior to the creation of ICE, I served as a Detention Enforcement Officer with INS.

3.       As the FOD for ERO Los Angeles, I direct and oversee ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which consists of 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which

2

**EXHIBIT E**
**182**

Case 2:25-cv-05563-HDV-E   Document 47-4   Filed 08/18/25   Page 60 of 86   Page ID
#:1086
Case 2:25-cv-05563   Document 11-3   Filed 06/19/25   Page 15 of 41   Page ID #:382

consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

4.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

5.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**EXHIBIT E**
**183**

6.      ERO Los Angeles officers are authorized to execute civil immigration arrest warrants for aliens ordered removed by immigration judges, aliens subject to expedited removal orders, and aliens for whom ERO officers have probable cause of their removability. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1357; *see also* 8 C.F.R. §§ 235.3(b), 236.1(b), 241.2, 287.5(e), 287.8(c).

7.      On Friday, June 6, 2025, ICE conducted immigration enforcement operations in several locations in the Los Angeles area. A crowd of people gathered at the site of an ICE law enforcement operation in the Garment District, tried to prevent ICE authorities from leaving in their official vehicles, and threw objects at the vehicles. Members of the crowd walked and ran alongside the vehicles creating dangerous conditions for both the officers and crowd. One protestor attempted to stop a law enforcement van's progression by standing directly in front of the van and placing his hand on the vehicle's hood. The man also backpedaled in front of a departing SUV, then tripped and fell in front of the vehicle. Fortunately, the driver of the SUV was able to reverse and drive around him without harming him. Individuals arrested during the immigration enforcement operation were taken to the ERO facility in the federal building at 300 N. Los Angeles Street for processing.

8.      At 3:23 p.m. on June 6, Mayor Karen Bass posted on X: "This morning, we received reports of federal immigration enforcement actions in multiple locations in Los Angeles. As Mayor of a proud city of immigrants, who contribute to our city in

**EXHIBIT E**
**184**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 62 of 86    Page ID
#:1088
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 17 of 41    Page ID #:384

so many ways, I am deeply angered by what has taken place. These tactics sow

terror in our communities and disrupt basic principles of safety in our city. My

Office is in close coordination with immigrant rights community organizations. We

will not stand for this."

9.      At about 5:00 p.m., I personally observed protesters pass by the front of the

300 North Los Angeles Street building heading northwest on Los Angeles Street.

However, the situation turned violent and riotous as the marchers turned right and

headed southeast down East Aliso Street, and then headed south on North Alameda

Street.

10.     Around this time, the number of demonstrators swelled to approximately

500 at 300 North Los Angeles Street, in downtown Los Angeles, and an additional

300 at an underground parking garage gate off of North Alameda Street. This gate

leads to a multilevel parking structure under all of the federal buildings in this

complex, including a Veterans Affairs (VA) medical facility, the Roybal

Courthouse, the 300 North Los Angeles Street Federal building, and the

Metropolitan Detention Center.

11.     I observed that approximately five Federal Protective Service (FPS)

inspectors, who use security expertise to protect federal facilities and protect

employees, were pinned down in a defensive position by protesters and severely

outnumbered while trying to defend the damaged back Alameda Street gate. The

**EXHIBIT E**
**185**

Case 2:25-cv-05563-HDV-E     Document 47-4     Filed 08/18/25     Page 63 of 86    Page ID
#:1089
Case 2:25-cv-05563     Document 11-3     Filed 06/19/25     Page 18 of 41    Page ID #:385

protestors were throwing concrete chunks, bottles of liquid, and other objects at the

FPS officers, as well as attempting to use large rolling commercial dumpsters as a

battering ram to breach the parking garage gate and damaged federal property. The

FPS officers defended the parking garage entrance against the protesters who were

violently trying to break open the garage gate and break into the federal building

complex.

12.      At that time, just inside the federal building, approximately 130 aliens

arrested by ICE earlier in the day were being processed by federal immigration

officers.

13.      I feared for the safety of all the office workers, federal employees, and

lawfully detained aliens in the building. This being late on a Friday afternoon, I had

to call all available officers in the building to report to the back Alameda Street gate

to prevent FPS from being overrun, which would have resulted in a breach of the

entire federal complex. All available ERO officers and HSI agents reported to the

location. The ICE officers formed a line of protection in front of the garage entrance

and held the line by using pepper balls and other alternatives to lethal force, aiming

to minimize harm and de-escalate situations. The combination of FPS, ERO, and

HSI law enforcement officers successfully prevented a breach and held the line

from approximately 5:15 p.m. to 10:30 p.m., including about an hour and a half

before the Los Angeles Police Department (LAPD), having been called by FPS,

6

**EXHIBIT E**
**186**

arrived on scene to push the crowd to Temple Avenue.

14.     During this time, I observed that the demonstrators continued to be violent, using chairs, dumpsters, and other items as weapons against federal law enforcement officers.

15.     Thereafter, LAPD responded to the request from FPS for assistance and according to media reports, indicate that their response was delayed due to "significant traffic congestion, the presence of demonstrators, and…the fact that federal agents had deployed irritants into the crowd before LAPD's arrival."

16.     At approximately 7:00 p.m., approximately two hours after the protesters congregated in the area, LAPD declared an "unlawful assembly," ordered protestors to leave, and gave them 5 minutes to comply. The crowd did not comply. By 8:00 p.m., LAPD blocked the crowd's path to the Metropolitan Detention Center. Protestors threw large chunks of concrete at those officers. The LAPD fired non-lethal foam projectiles and bean bag rounds in response. The federal building was heavily vandalized.

17.     The demonstrators had all departed by 11:00 p.m., with the LAPD officers following them away from the property. However, there was damage to both the Federal Building at 300 North Los Angeles Street and the Edward R. Roybal Federal Building and United States Courthouse at 255 East Temple Street, which is next door. Both locations were heavily vandalized, the window to the guard shack

**EXHIBIT E**
**187**

was broken, there was evidence of tampering on the retractable anti-vehicle barriers, and the roll up entrance gate was working sporadically. Federal law enforcement officers secured the entrance gate throughout Friday night.

18.     On the next morning of Saturday, June 7, 2025, while federal officers prepared for an immigration enforcement operation at a Department of Homeland Security office in Paramount, California, a large crowd gathered. A large contingent of approximately 110 Customs and Border Protection (CBP) officers had arrived from the San Diego area to assist with immigration enforcement operations and as a precautionary measure in the aftermath of Friday night's violence. Prior to the start of the immigration enforcement action, these CBP officers stood in uniform in an industrial park in advance of discussing the day's upcoming operations.

19.     Coincidently, a Home Depot retail store – which was not the target of any intended operation – was located just across the street from the DHS office parking lot being used for staging.

20.     A large crowd gathered and blocked traffic in the area. The crowd became violent and attacked the ERO and CBP officers. This led to about seven hours of non-stop fighting, from about 9:30 a.m. to approximately 5:00 or 6:00 p.m. The violent crowd boxed in ERO and CBP officers throwing mortar-style fireworks with multiple explosions, rocks and mangos at them, and used shopping carts to

barricade the street, prompting our officers to try clear a path so federal vehicles

could enter and exit. One ERO officer was trapped inside her law enforcement

vehicle when the crowd surrounded it, pounding it, shaking it, and violently

pummeling it with stones, necessitating a rescue from other officers on scene. A

protester shattered the wrist of a CBP officer with a thrown object. The violent and

riotous crowd set at least one vehicle on fire and possibly also set a propane tank

on fire, which exploded and thankfully did not injure anyone.

21.    HSI reports that the perimeter fence of the DHS office in Paramount was cut

in two places, three government vehicles were damaged, the business park sign

was vandalized, and mortar-style fireworks with multiple explosions were thrown

at the federal officers. In addition, at approximately 4:00 p.m., the Los Angeles

Sheriff's Department (LASD) declared an "unlawful assembly" in Paramount, and

the protest spread to the neighboring Compton area.

22.    Later that Saturday night, another protest formed in the vicinity of the

Federal complex at 300 N. Los Angeles Street, near the location of the previous

night's riot, at North Alameda Avenue and East Temple Street. According to

media reports, the LAPD eventually declared this to be an unlawful assembly.

23.    I was informed by Homeland Security Investigations on the morning of

Sunday, June 8, National Guard troops arrived in downtown Los Angeles.

Specifically, 300 National Guard troops deployed to Paramount, Compton, and

9

**EXHIBIT E**
**189**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 67 of 86    Page ID
#:1093
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 22 of 41    Page ID #:389

downtown Los Angeles.

24.     On Sunday afternoon, at around 3:00 p.m., a large crowd of people marched

from the steps of Los Angeles City Hall to the 300 N. Los Angeles Street federal

complex. Protestors confronted a line of federal agents stationed outside. LAPD

issued a citywide Tactical Alert. Shortly thereafter, the LAPD issued a dispersal

order and made additional arrests.

25.     Then, protestors entered the 101 Freeway in downtown Los Angeles,

blocking the Aliso Street off-ramp. California Highway Patrol (CHP) officers

dispersed the crowd by 5 p.m. and moved them to the Civic Center.

26.     At approximately 9:00 p.m., LAPD declared the downtown protest to be an

unlawful assembly and ordered protestors to leave. The protesters did not leave.

They continued to move through downtown, setting off commercial-grade

fireworks toward federal officers and throwing objects at passing law enforcement

vehicles. The protestors lit fires in dumpsters and trash bins and looted at least one

store. Protestors vandalized dozens of buildings with graffiti, including the Federal

Courthouse and LAPD Headquarters.

27.      By the end of the weekend, the Federal building at 300 N. Los Angeles

Street was vandalized in numerous locations, pieces of the bollards used for

building security were broken, and the security checkpoint was in ruins. Numerous

federal officers and agents have been injured by projectiles thrown at them such as

**EXHIBIT E**
**190**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 68 of 86    Page ID
#:1094
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 23 of 41    Page ID #:390

rocks, water bottles, and bricks.

28.     Many law enforcement personnel, including the five FPS officers who initially held the North Alameda Street gate while severely outnumbered.  On Monday, June 9, at approximately 5:00 p.m. additional protests are formed at the 300 North Los Angeles Street federal complex, as well as at the Federal Building in Santa, Ana, Orange County, California. Based on federal agency reports, a crowd of 1,000 demonstrators gathered near the Roybal Federal Building. At this time a demonstrator drove by the building and fired paintballs at the FPS inspectors, hitting at least one in the head and neck. At the Santa Ana Federal Building, violent protestors attacked a 13-passenger federal van carrying multiple aliens and officers, rocking the vehicle, and smashing the windows. The violent protestors also damaged multiple vehicles in the surrounding parking lot.

29.     This federal complex was largely closed today Monday will again be closed Tuesday, due to the civil unrest. This is a disruption for the many federal agencies working in this building, as well as the co-located federal courthouse, VA medical facility, and Federal Bureau of Prisons facility.

30.     From what I understand, the LAPD reported they are on tactical alert and declared a partial mobilization of 400 additional officers.

31.     The aggressive horde at the Roybal Building moved downtown to Little Tokyo and City Hall later in the evening, where they clashed with LAPD officers,

**EXHIBIT E
191**

injuring five, and also injured five LAPD horses. LAPD deployed less-lethal munitions and made multiple arrests.

32.    LAPD declared an unlawful assembly for the area of the Civic Center part of Los Angeles and had to shut down Route 101 in central Los Angeles in response to demonstrators throwing objects onto the freeway and damaging multiple police vehicles.

33.    Even with the LAPD, LASD, and CHP all engaged in the ensuing law enforcement activities, I believe the safety of local federal facilities and safety of those conducting immigration enforcement operations in this area of responsibility requires additional manpower and resources. Aside from the horrendous actions of the violent demonstrators at the various federal protected locations, I am also aware that there were significant instances of demonstrators posting the location, images, and family information of federal law enforcement employees online in an attempt to dox, threaten, and obstruct federal law enforcement personnel and their families and impede lawful federal activity. Demonstrators have also been posting the locations of federal law enforcement employees conducting immigration enforcement operations to threaten and obstruct their work.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best

**EXHIBIT E**
**192**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 70 of 86    Page ID
#:1096
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 25 of 41    Page ID #:392

of my information, knowledge, and belief.


Executed on this 11th day of June 2025.


ERNESTO M
SANTACRUZ
JR

Digitally signed by
ERNESTO M
SANTACRUZ JR
Date: 2025.06.11
08:16:31 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

13

**EXHIBIT E**
**193**

# EXHIBIT 2

# TO DECLARATION OF

# ERNESTO SANTACRUZ, JR.

**EXHIBIT E**

**194**

## IN THE NINTH CIRCUIT COURT OF APPEALS

GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,

Plaintiffs,

v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,

Defendants.

Appeal No. 25-3727

**DECLARATION OF ERNESTO SANTACRUZ, JR.**

## <u>DECLARATION OF ERNESTO SANTACRUZ, JR.</u>

I, Ernesto Santacruz, Jr., hereby declare:

1.      I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.      The purpose of this declaration is to provide an update on the current conditions on the ground in the Los Angeles Area of Responsibility (AOR) with respect to immigration enforcement operations and the security of federal property and personnel. This declaration supplements the information in my June 11, 2025

1

**EXHIBIT E**
**195**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 73 of 86    Page ID
#:1099
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 28 of 41    Page ID #:395

declaration filed with the Defendants' Opposition to Plaintiffs' Motion for a
Temporary Restraining Order. *See Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed
June 11, 2025), Dkt. 22-1.

3.　　It is my understanding that, at this time, approximately 3,000 Department of
Defense personnel, which includes approximately 2,000 members of the California
National Guard, are in the Los Angeles area providing protection of federal
personnel, property, and functions.

4.　　The 300 North Los Angeles Street Federal Building in downtown Los
Angeles, California continues to be the site of daily protests, and it has been closed
to the public since June 9, 2025. While the facility is largely non-operational,
members of the National Guard have been essential to protect the building, the
Edward R. Roybal Federal Building and U.S. Courthouse, and the Federal Bureau
of Prisons Metropolitan Detention Center - all located in the same city block - from
further damage or attempts at incursion and provide security to those federal
employees working inside, like myself.

5.　　Prior to the National Guard's deployment, rioters and protestors assaulted
federal, state, and local law enforcement officers with rocks, fireworks, and other
objects. They also damaged federal property by spray painting death threats to
federal law enforcement officers. Photos and videos for those assaults and
threatening graffiti can be found here: https://www.dhs.gov/news/2025/06/10/dhs-

**EXHIBIT E**
**196**

sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited June 15, 2025). Several suspects have been arrested for possessing Molotov cocktails and assaulting federal officers during recent civil unrests in downtown Los Angeles, Paramount, and Santa Ana. *See* https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on June 15, 2025).

6.      It is my understanding that federal facilities in Westwood, Santa Ana, Long Beach, and other locations in California have been the site of continuing violent protests during the last week. For example, on June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside 300 North Los Angeles Federal Building and Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles", available at:https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited June 15, 2025). One suspect was taken into custody after spitting on a Federal Protective Service (FPS) officer and National Guard members. Protestors also threw red paint on FPS and National Guard members.

**EXHIBIT E**
**197**

Case 2:25-cv-05563-HDV-E   Document 47-4   Filed 08/18/25   Page 75 of 86   Page ID
#:1101
Case 2:25-cv-05563   Document 11-3   Filed 06/19/25   Page 30 of 41   Page ID #:397

7.      The National Guard has been absolutely helpful this week by protecting
federal property and personnel during immigration enforcement operations.
Through their protective efforts, the guards have assisted on most operations that
ICE and its federal partners conducted this week. The guards are acting as a
security element, accompanying federal officers and agents during operations to
ensure safety of all involved.

8.      On Saturday, June 14th, the protests at the 300 N. Los Angeles Federal
Building continued throughout the day. The National Guard has been protecting
the entire perimeter of the federal complex all week, as protestors are gathered
throughout the area continuously. Protestors blocked the parking garage exits on
Alameda Street, preventing ICE transport vehicles from exiting with
approximately 130 immigration detainees. As the protests grew, ICE was forced to
not utilize the U.S. Marshall's transport bus as originally intended. The National
Guard cleared a path for several unmarked vans to remove the detainees in small
groups. The National Guard's assistance was key to protecting ICE officials'
ability to continue these immigration enforcement operations.

9.      Having the National Guard at our fingertips as a Quick Reaction Force is
key to maintaining officer safety and continuing our immigration enforcement
operations. The resources that they bring to protect federal immigration officials
from interference in their enforcement efforts and their presence at federal facilities

**EXHIBIT E**
**198**

is the key to continuing operations and enforcing federal law in the Los Angeles area.

10.     The guard's presence prevented other incidents like the one in Paramount last Saturday, discussed in my prior declaration. There, an unruly mob attacked ERO and U.S. Customs and Border Protection (CBP) officers, engaging them in an hours-long fight while the local law enforcement did not intervene for several hours. I believe that the guard's presence since their deployment to Los Angeles has prevented this from reoccurring during our subsequent immigration enforcement operations and has been critical to maintaining the safety of all law enforcement officers involved.

11.     The National Guard has a Quick Reaction Force that is now a critical resource available to us, should something like June 6th incident at the federal building in downtown Los Angeles, or the incident in Paramount, take place in the future.

12.     The presence of the National Guard and other Department of Defense personnel has enabled ICE to continue to carry out its congressionally mandated duties in the Los Angeles area. It is the additional manpower and resources provided by these guards – indeed, their mere presence – that has ensured the safety of local federal facilities and the safety of those enforcing federal laws here this week.

5

**EXHIBIT E**
**199**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 77 of 86    Page ID
#:1103
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 32 of 41    Page ID #:399

13.    If these resources were not at my disposal, our immigration enforcement mission would be greatly impacted.  The safety of our continued operations would be in doubt, placing both federal employees and the general public at an unnecessarily greater risk.

14.    The National Guard, with approximately 900 troops assigned to protect federal buildings, has also been instrumental in enhancing the ability to protect federal property from damage or breach attempts.

15.    Our local law enforcement colleagues, including the Los Angeles Police Department (LAPD), Los Angeles County Sheriff's Department (LASD), and California Highway Patrol (CHP), have all engaged in taxing law enforcement activities throughout the week, with the assistance of their mutual aid network. But the National Guard provides resources and protective capabilities that are unparalleled.

**EXHIBIT E
200**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 78 of 86    Page ID
#:1104
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 33 of 41    Page ID #:400

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 15th day of June 2025.

ERNESTO M
SANTACRU
Z JR

Digitally signed by
ERNESTO M
SANTACRUZ JR
Date: 2025.06.15
17:32:06 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

7

**EXHIBIT E
201**

# EXHIBIT 3

# TO DECLARATION OF

# ERNESTO SANTACRUZ, JR.

**EXHIBIT E**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Case No. 3:25-cv-04870 |
| | **SUPPLEMENTAL DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | Hon. Charles R. Breyer |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | United States District Judge |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF ERNESTO SANTACRUZ, JR.

I, Ernesto Santacruz, Jr., hereby declare:

1.    I am employed by the Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), Enforcement and Removal

Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field

Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.    The purpose of this declaration is to provide an update on the current

conditions on the ground in the Los Angeles Area of Responsibility (AOR) with

respect to immigration enforcement operations and the security of federal property

1

**EXHIBIT E**
**203**

and personnel. This declaration supplements the information in my June 11, 2025 declaration filed with the Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order. *See Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed June 11, 2025), Dkt. 22-1.

3.      It is my understanding that, as of June 18, 2025, approximately 3,000 Department of Defense personnel, which includes approximately 2,000 members of the California National Guard, are in the Los Angeles area providing protection of federal personnel, property, and functions.

4.      The 300 North Los Angeles Street Federal Building in downtown Los Angeles, California continues to be the site of daily protests and was closed to the public from June 9-16, 2025. Members of the National Guard have been essential to protecting the building, the Edward R. Roybal Federal Building and U.S. Courthouse, and the Federal Bureau of Prisons Metropolitan Detention Center - all located in the same city block - from further damage or attempts at incursion and provide security to those federal employees working inside, like myself.

5.      Prior to the National Guard's deployment, rioters and protestors assaulted federal, state, and local law enforcement officers with rocks, fireworks, and other objects. They also damaged federal property by spray painting death threats to federal law enforcement officers enforcing federal immigration laws. Photos and videos for those assaults and threatening graffiti can be found here:

2

**EXHIBIT E**
**204**

https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited June 18, 2025) and include "Kill ICE," "Death to ICE," "Hang Trump," and "Dead Cops." Several suspects have been arrested for possessing Molotov cocktails and assaulting federal officers during recent civil unrest in downtown Los Angeles, Paramount, and Santa Ana. *See* https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on June 18, 2025).

6.    It is my understanding that federal facilities in Westwood, Santa Ana, Long Beach, and other locations in California have been the sites of continuing violent protests during the last week. Many of these protests have been directed at objecting to ICE operations and attempting to impede those operations. For example, on June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside the 300 North Los Angeles Federal Building and the Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles," available at: https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited June 18, 2025). One suspect was taken into custody after spitting on a Federal Protective Service (FPS) officer and

3

**EXHIBIT E**
**205**

Case 2:25-cv-05563-HDV-E    Document 47-4    Filed 08/18/25    Page 83 of 86    Page ID
#:1109
Case 2:25-cv-05563    Document 11-3    Filed 06/19/25    Page 38 of 41    Page ID #:405

National Guard members. Protestors also threw red paint on FPS and National
Guard members.

7.      The National Guard has been extremely helpful this week by protecting
federal property and personnel during immigration enforcement operations.
Through their protective efforts, the Guards have assisted on most operations that
ICE and its federal partners conducted this week, enhancing the level of safety for
ICE and its federal partners to proceed with those operations. The Guards are
acting as a security element, accompanying federal officers and agents during
operations to ensure safety of all involved.

8.      On Saturday, June 14th, the protests at the 300 N. Los Angeles Federal
Building, which included protests directed at ICE operations, continued throughout
the day. The National Guard has been protecting the entire perimeter of the federal
complex all week, as protestors are gathered throughout the area continuously.
Protestors blocked the parking garage exits on Alameda Street, preventing ICE
transport vehicles from exiting with approximately 130 immigration detainees. As
the protests grew, ICE was forced to not utilize the U.S. Marshall's transport bus as
originally intended. The National Guard cleared a path for several unmarked vans
to remove the detainees in small groups. The National Guard's assistance was key
to protecting ICE officials' ability to continue these immigration enforcement
operations.

4

**EXHIBIT E**
**206**

9.      Having the National Guard at our fingertips as a Quick Reaction Force is key to maintaining officer safety and continuing our immigration enforcement operations. The Guard's Quick Reaction Force is available 24/7 to federal law enforcement officers conducting operations in the Los Angeles area if and when they encounter violent mobs or individuals impeding federal immigration enforcement operations or threatening the safety of federal officers. The resources that they bring to protect federal immigration officials from interference in their enforcement efforts and their presence at federal facilities enable federal law enforcement officers to continue operations and enforce federal law in the Los Angeles area.

10.     The Guard's presence prevented other incidents like the one in Paramount on June 7, 2025, discussed in my prior declaration. There, an unruly mob attacked ERO and U.S. Customs and Border Protection (CBP) officers, engaged them in an hours-long fight while the local law enforcement did not intervene for several hours. I believe that the Guard's presence since their deployment to Los Angeles has prevented this from reoccurring during our subsequent immigration enforcement operations and has been critical to maintaining the safety of all law enforcement officers involved.

11.     The presence of the National Guard and other Department of Defense personnel has enabled ICE to continue to carry out its congressionally mandated

**EXHIBIT E**
**207**

duties in the Los Angeles area. It is the additional manpower and resources provided by these Guards – indeed, their mere presence – that has ensured the safety of local federal facilities and the safety of those enforcing federal laws here this week.

12.    If these resources were not at my disposal, our immigration enforcement mission would be greatly impacted. The safety of our continued operations would be in doubt, placing both federal employees and the general public, including those peacefully protesting ICE operations, at an unnecessarily greater risk. Because of the current threat, we would not be able to carry out as many immigration enforcement operations as we have been able to with the Guards' assistance.

13.    The National Guard, with approximately 900 troops assigned to protect federal buildings, has also been instrumental in enhancing the ability to protect federal property from damage or breach attempts.

14.    Our local law enforcement colleagues, including the Los Angeles Police Department (LAPD), Los Angeles County Sheriff's Department (LASD), and California Highway Patrol (CHP), have all engaged in taxing law enforcement activities throughout the week, with the assistance of their mutual aid network. But the National Guard provides resources and protective capabilities that are unparalleled.

6

**EXHIBIT E**
**208**

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 18th day of June 2025.

ERNESTO M
SANTACRUZ JR

Digitally signed by ERNESTO M
SANTACRUZ JR
DN: cn=ERNESTO M
SANTACRUZ JR, o=U.S.
Government, ou=People,
email=Ernesto.M.SantacruzJr@ice.
dhs.gov, c=US
Date: 2025-06-18T08:59:45-0700

_____

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

7

**EXHIBIT E
209**