UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., | Case No. 2:25-cv-05563 |
| Plaintiffs, | |
| v. | **DECLARATION OF MATTHEW S. HARVEY** |
| KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

## DECLARATION OF MATTHEW S. HARVEY

I, Matthew S. Harvey, declare and affirm as follows:

1.      I am employed by U.S. Customs and Border Protection (CBP).  CBP employs more than 45,000 law enforcement employees in addition to thousands of employees in trade and support capacities.

2.      I am the Director of the Less-Lethal Training Branch of the Law Enforcement Safety and Compliance Directorate of the CBP.  The Less-Lethal Training Branch educates, trains, and certifies tactical instructors who deliver training to CBP personnel. I have been employed in the Less-Lethal Training Branch as the Assistant Director from June 2022 to November 2024 and as the Director since November 2024.

3.      I have served as a border patrol agent and supervisory border patrol agent in sectors on the Southern and Northern borders of the United States.  Prior to my selection as the Assistant Director and Director of the Less-Lethal Training Branch, I was a liaison to CBP's Office of Professional Responsibility assigned to its Use of Force Incident Team in Washington D.C. from 2020 to 2022.  I also served as an instructor in the

**215**

Advanced Physical Techniques Department for two years at the Border Patrol Academy in New Mexico where I delivered training that included empty hand, ground, and edged weapons defense. More information concerning my law enforcement experience is detailed in a true and correct copy of my resume, which is attached hereto as Exhibit 1.

4.    CBP officers and agents, including law enforcement employees of the U.S. Border Patrol (USBP) and the Office of Field Operations (OFO), must comply with CBP's Use of Force Policy, which originally went into effect in 2010 and was subsequently modified in 2014, and then most recently updated to the current policy in January 2021. A true and correct copy of the CBP Use of Force Policy dated January 2021 is attached hereto as Exhibit 2. The policy is directly derived from constitutional law and federal statutes and regulations. Pursuant to the CBP Use of Force Policy, officers and agents may use objectively reasonable force only when it is necessary to carry out their law enforcement duties. The "reasonableness" of a particular use of force is based on the totality of circumstances known by the officer or agent at the time of the use of force and weighs the actions of the officer or agent against the rights of the subject, considering the circumstances surrounding the event.

5.    CBP policy addresses the deployment of less lethal devices and outlines the circumstances in which they may be utilized. Again, the use of less-lethal force must be both objectively reasonable and necessary to carry out the officer's or agent's law enforcement duties. Crowd control devices and less-lethal munitions are only utilized after events have become unlawful. Due to the dynamic and often rapidly evolving situations encountered during these events, giving warnings and/or commands and time for a subject or subjects to comply with them is not always feasible. Under CBP policy, chemical irritants may be utilized as a compliance tool on a subject offering, at a minimum, active resistance. Active resistance is a type of resistance where a subject physically opposes an officer's or agent's control efforts. Kinetic impact can be used on a subject in response to assaultive resistance. Assaultive resistance under CBP policy is

defined as resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self. This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent. The Policy explains that less-lethal force is force that is not likely or intended to cause serious bodily injury or death. The use of less-lethal devices or weapons is meant for situations where empty-hand physical techniques are not sufficient, practical, or appropriate.

6.      Basic training for OFO and USBP officers and agents on less-lethal force includes arrest and control techniques, counter assault techniques, select less-lethal devices, scenario-based training, and the legal application of force. After basic training, all authorized officers/agents are required to participate in training in less-lethal techniques, tactics, and/or devices on a quarterly basis. Training includes arrest and control techniques, counter assault techniques, CBP authorized devices, and scenario-based training. More advanced training is provided in Mobile Field Force (MFF) training. MFF I and MFF II are available, but not mandatory, for all officers and agents. MFF I training includes crowd control familiarization, basic formations, and gas mask proficiency. MFF II training expands into shield and baton proficiency, multiple formations and movement, CS gas exposure, and mass arrest procedures. Additional training through CBP's specialty teams that include the Border Tactical Team (BORTAC), Border Search Trauma and Rescue Team (BORSTAR), Mobile Response Team (MRT), and Special Response Team (SRT) may include munitions that include the Controlled Noise Light Distraction Device (CNLDD) and Fogger. Officers and agents are required to obtain certifications for the use of each CBP authorized less-lethal device they carry and must complete an annual recertification on them each fiscal year.

7.      Mr. Kerlikowske stated in his Supplemental Declaration that DHS agents including the Special Response Team (SRT) "are not accustomed to policing urban civil unrest; nor are they trained to do so." CBP SRT units do more than execute warrants,

they deploy in a number of situations including but not limited to: combating national threats through specialized capabilities, advancing integration across DHS and other federal law enforcement agencies, and providing technical expertise. Furthermore, they receive training for responses to civil unrest in urban areas and have consistently deployed in direct response to crowd control situations in urban environments over the last several years. Similarly, BORTAC agents, who are part of the U.S. Border Patrol, conduct special operations in both urban and rural environments, and frequently integrate with other agencies supporting multiple functions. They also receive extensive training for responses to civil unrest in urban areas. Currently, the USBP Special Operations Group (SOG), which oversees the BORTAC, BORSTAR, and MRT teams, is responsible for the delivery of the MFF certifications.

8.      CBP officers and agents are trained and equipped, depending on individual certifications, to use a wide variety of less-lethal equipment, including crowd control devices. Less-lethal equipment used by CBP officers and agents includes Oleoresin Capsicum (OC) spray (also referred to as pepper spray), collapsible straight batons, Electronic Control Weapons (ECWs and also referred to as TASERs), compressed air launchers that include the Pepperball Launching System (PLS) and FN303, munition launchers that include the 40MM, and Controlled Noise and Light Distraction Devices (CNLDD and commonly referred to as a flash-bang). Smoke canisters may also be used for crowd control purposes. The use of CBP authorized less-lethal devices have varying effective distances and application of force depending on the subject's actions and are primarily used against people exhibiting active or assaultive resistance. Some devices, such as the PLS, may be used for various levels of resistance. The PLS may be used with an area saturation deployment for active resistant subjects but may also be used for kinetic impact against assaultive subjects. The PLS projectiles are filled with micro pulverized OC powder that causes irritation to mucus membranes. Other device options include handheld chemical devices that can deploy smoke, CS gas, or OC. CNLDDs,

which Plaintiffs refer to as flash-bangs, are designed to produce a momentary burst of intense light and deafening sound to disorient and confuse individuals without causing permanent harm to intended targets or the general public. This crucial window of distraction enables officers and agents to gain control of situations, neutralize threats, and protect lives while individuals are distracted. CNLDDs may be used as handheld equipment or launched aerially for air bursts by munition launchers. CBP officers and agents do not use nor are they equipped with rubber bullets. CBP also does not use nor are its agents and officers in California equipped with an LRAD (long-range acoustic device) for crowd control purposes.

9.    I have reviewed Plaintiffs' proposed order submitted with their motion for a preliminary injunction. The conditions set forth in the proposed order are not workable, are vague, and will endanger the safety of law enforcement personnel. Prohibiting the use of crowd control or less-lethal equipment in response to riots and protests may result in the use of physical force if these less harmful, less-lethal measures are constrained as requested in Plaintiffs' proposed order. By removing less-lethal means as an option, the requested relief would leave officers and agents with only physical techniques to control crowds.

10.    Plaintiffs' request in Section III, Subsection 2, of the proposed order to enjoin or prohibit the use of potentially any crowd control weapons, including, but not limited to, kinetic impact projectiles, chemical irritants, or flash-bangs, on persons not posing a threat of imminent harm to a law enforcement officer or another person is unworkable. This request effectively bars the use of crowd control devices for some of the purposes for which they were designed and are authorized under CBP policy. Under the current CBP policy, crowd control devices are used only in appropriate  situations. For example, a compressed air launcher or a munitions launcher deploying certain chemical irritants may be used as compliance tools in situations where a person or persons are offering active resistance or disobeying a lawful order, including crowd situations where a crowd

or an individual is not obeying a lawful order to disperse or to stop obstructing the lawful
operations or activities of law enforcement personnel. However, the use of a compressed
air launcher delivering kinetic impact projectiles or a munitions launcher deploying
specialty impact munition is restricted to situations when a CBP officer or agent is
confronted with assaultive resistance where the intended target(s) or crowds pose a threat
of physical injury to the officer or agent or the other persons. In Mr. Kerlikowske's
declaration, he stated, "a person or persons throwing water bottles is not grounds for
deploying force without warning" and that "a plastic water bottle poses little or no real
threat to officers in full riot gear." In both situations, an object is being thrown towards
CBP officers or agents. Furthermore, rioters or protesters also often throw other
dangerous objects such as glass bottles, bricks, or other heavy or flammable objects.
Regardless of the object, this act raises the level of force by a subject or subjects to
assaultive resistance. If deemed reasonable and necessary, an officer/agent is authorized
to respond with force up to and including kinetic impact with specific less-lethal devices.
Plaintiffs' proposed order also fails to address situations where the use of less-lethal
devices for crowd control is reasonable and necessary. For example when CBP officers
or agents are addressing a crowd or protest that is obstructing transportation, such as
ingress or egress to or from a location where lawful immigration arrests are occurring,
and the crowd is failing to comply with law enforcement orders but there is not a specific
imminent threat of harm to a person, less-lethal devices can be deployed as an effective
and appropriate tool. In this situation, the use of a crowd control device may be
necessary to obtain compliance with the lawful order.

11.    Plaintiffs' request in Section III, Subsection 3, of the proposed order to enjoin or
prohibit the use of any crowd control weapon involving the use of kinetic impact
projectiles or flash-bangs when a person not posing a threat of imminent harm to a law
enforcement officer or another person could possibly be injured is not workable. All
CBP authorized officers or agents certified in Mobile Field Force operations and various

authorized less-lethal devices are trained to consider the environment in which these
crowd control devices are used and the possible collateral harm caused by their use.
However, these devices are generally designed to have an impact upon a specific area
and/or are deployed towards a particular subject.  In crowd control or riot situations the
devices are designed to impact one or more subject(s) at a time, within the range of
deployment.  As stated previously, CNLDDs are designed to produce a loud noise and a
flash of light that may inadvertently impact people who are in or near proximity to an
identified person engaged in assaultive resistance to a CBP officer or agent or failing to
disperse in response to a lawful order.  They may also be launched aerially in order to
affect large groups and therefore may collaterally affect persons in a crowd.  Prohibiting
the use of CNLDDs, which are designed to momentarily disorient, confuse, or distract,
but not bodily injure, intended targets threatening to cause imminent harm to a CBP
officer or agent or other persons, because of the mere possibility that a third party may
be affected would prevent law enforcement officers from using a valuable less-lethal
device to protect themselves and others while limiting and minimizing the level of force
used on any one subject or multiple subjects.

12.    Plaintiffs' requirement in Section III, Subsection 4, of the proposed order, that
CBP officers and agents cannot use any crowd control weapon in any situation without
giving at least two separate warnings, in a manner and at a sound level where it can be
heard by the targeted individuals, and where the targeted individuals must be given
sufficient time to avoid the use of force, is not feasible.  To the extent that this restriction
prohibits any use of crowd control weapons without giving at least two separate
warnings, it places CBP officers and agents and the public at risk.  Crowd control
devices are often used in unstable situations in which there is no reasonable opportunity
to issue warnings in a manner and sound level that can be heard by the targeted
individuals or crowds with sufficient time to change their behavior.  This warning
requirement is not always feasible during an active riot or under exigent circumstances,

**221**

such as when a rioter or protester may imminently throw a brick, Molotov cocktail or other incendiary object, or brandish a firearm. Crowds, even at "peaceful" protests, can become loud and quickly unruly, which lessens the feasibility of issuing warnings in these tense, uncertain, and rapidly developing situations. CBP officers and agents are trained to provide warnings when operationally feasible. Prior to the deployment of less-lethal force, such as kinetic impact projectiles, the individual officer or agent is trained to analyze the use of force based on the necessity and reasonableness of the action under the totality of the circumstances.

13.     Plaintiffs' requirement in Section III, Subsection 5, of the proposed order, that the use of kinetic impact projectiles containing a chemical irritant is prohibited unless expressly approved by an on-scene supervisor who personally witnesses the specific acts of violence is untenable. The requirement of on scene supervisor approval prior to the deployment of these devices places CBP officers and agents and the public at risk of injury and creates an undue burden for CBP personnel. CBP supervisors are likely to be overseeing the conduct of multiple officers or agents at any given time. They may only be available by radio communications when CBP officers or agents are confronted by a situation requiring the immediate use of kinetic impact projectiles or chemical irritants to protect themselves or the public from a risk of harm. Additionally, even if a supervisor is on scene and readily available for approval, the supervisor is likely unable to observe all actions by all subjects in which an officer/agent may deem it necessary to deploy some level of force involving kinetic impact projectiles or chemical munitions. Moreover, during a crowd control situation, a CBP officer's or agent's proximity to a supervisor is unpredictable.

14.     Lastly, Plaintiffs' request in Section III, Subsection 6, of the proposed order to enjoin the deployment of gas canisters or flash-bang grenades so as to strike any person, or firing kinetic impact projectiles or other crowd control weapons at the head, neck, groin, spine, or other sensitive areas, unless that person poses an immediate threat of

death or serious bodily injury is unnecessary and unreasonably vague. CBP's use of force policy already prohibits the intentional targeting of the head, neck, spine, or groin of the intended subject by compressed air launchers or munitions launchers, unless the use of deadly force is reasonable. Although this subsection of the proposed order implicitly refers to the use of such launchers for deployment of tear gas cannisters, flash-bang grenades, and kinetic impact projectiles, its reference to "other crowd control devices" is vague and lacks the specificity necessary to provide guidance to CBP officers and agents. Furthermore, the subsection's reference to "other sensitive areas" is also vague, because any part of a person's body may be sensitive to the impact of kinetic impact projectiles or other items launched from compressed air launchers or munition launchers. Thus, this language in Subsection 6 improperly and severely limits the use of such launchers or CNLDDs even when their use is warranted to protect CBP officers and agents or the public under conditions where harm to them is threatened that is less than serious bodily harm.

15.    Furthermore, it is also important to consider the total impact of all of the subsections of Plaintiffs' order acting in concert. For example, if an individual or small group of CBP officers or agents, without an on-the-scene supervisor, are conducting an immigration arrest and they are assaulted by a group of individuals contesting the arrest, these officers/agents will not under the terms of Plaintiffs' proposed order be able to use a crowd control device to defend themselves even if they had sufficient time to issue two warnings. A similar situation could occur during a riot where an individual officer/agent is confronting an imminent risk of harm, has insufficient time to provide the assaulting person or persons with two warnings, and is prohibited from using a kinetic impact launcher or a CNLDD to protect themselves because the possibility that another member of the riot who is not assaulting the officer/agent might be affected by the impact of pepperballs, CS gas, or the noise and light caused by the CNLDD.

16.    This declaration does not assess any of the alleged individual instances of uses of less-lethal force or crowd control devices set forth in Plaintiffs' declarations in support of their motion for preliminary injunction.  The right to supplement opinions and opine upon particular incidents is reserved until discovery, including depositions, is conducted.

I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my information, training, and knowledge.

Executed this 1st day of August, 2025, at Harpers Ferry, West Virginia.

Dated: August 1, 2025

*Matthew S. Harvey*
MATTHEW S. HARVEY

224

# EXHIBIT 1

## Matthew S. Harvey
440 Koonce Rd Harpers Ferry, WV 25425
Work Phone: 304-535-5369

---

**CURRENT TITLE AND GRADE:** Director, Customs and Border Protection Law Enforcement Safety and Compliance Directorate
Service EOD: 11/27/2000|

---

### PROFESSIONAL EXPERIENCE:

*DIRECTOR*                                                                        *11/3/2024-PRESENT*
*Law Enforcement Safety and Compliance-Harpers Ferry, WV*

*Less Lethal Training Branch 6/5/2022-Present:* Assigned as the Director of the Less Lethal Training Branch (LLTB). I am responsible for the less-lethal training program that requires quarterly mandated training for ~45,000 CBP uniformed personnel. I oversee a subordinate staff that includes one Assistant Director, 14 Course Developer/Instructor (CD/I) CBP personnel from USBP, OFO, and AMO, two Mission Support Specialists, and up to five TDY staff.

I am responsible for ensuring the LLTB fulfills numerous collateral responsibilities that fall to the scope of the cadre that include briefings to DHS, CBP, and component executives. My duties also include overseeing the development and delivery of the following programs:
- Less Lethal Instructor Training Program (LLITP)
- Professional Development Evaluation Course (PDEC)
- Less Lethal Specialty Impact-Chemical Munitions (LLSI-CM)
- Controlled Noise Light Distraction Device (CNLDD)

*ASSISTANT DIRECTOR*                                                            *6/5/2022-11/3/2024*
*Law Enforcement Safety and Compliance -Harpers Ferry, WV*

*Less Lethal Training Branch 6/5/2022-11/3/2024:* Assigned as the Assistant Director of the Less Lethal Training Branch (LLTB). I am responsible for supervising 15 direct report Course Developer/Instructor (CD/I) CBP personnel from USBP, OFO, and AMO. My duties also include overseeing the development and delivery of the following programs:
- Less Lethal Instructor Training Program (LLITP)
  - 3-week program for basic level instructors that includes: arrest and control techniques, counter assault tactics, CBP approved less-lethal devices, de-escalation, report writing and articulation, legal application of force, and scenario-based training.
- Professional Development Evaluation Course (PDEC)
  - 1-week course for returning instructors within a 5-year valid certification period that includes: arrest and control techniques, counter assault tactics, CBP approved less-lethal devices, de-escalation, legal application of force, and associative phase drills.
- Less Lethal Specialty Impact-Chemical Munitions (LLSI-CM)
  - 2-day course that covers all CBP approved handheld chemical munitions, 40MM launcher, and legal application of force.
- Controlled Noise Light Distraction Device (CNLDD)

- o  1-day course for CBP specialty team members that includes U.S. Border Patrol
     BORTAC/BORSTAR and Office of Field Operations SRT covering legal application of
     force.

I led the research, development, and implementation of instructional material, reference material, and
guidance for new defensive tactics considerations for field-level instructors to access following CBP's
revised grooming standards.  This material will directly address assaults on agents and officers through
hair and gear grabs by assailants.

***Acting Director 7/16/2023-5/4/2024:*** Assigned as Acting Director of the Less Lethal Training Branch.  In
addition to the main duties as Assistant Director, I was responsible for managing the branch budget,
overseeing two Mission Support Specialists, and approving all changes to the branch curriculum.  This
required me to accurately track expenditures by the branch in direct support of our training mission,
ensure all administrative actions are completed timely, and that all course content is updated and accurate.
I appointed three branch CD/Is to the role of Acting Assistant Director and mentored them in the roles
and responsibilities of the position.

### OPERATIONS OFFICER                                     10/14/2018-6/4/2022
*Office of Border Patrol Headquarters -Washington, D.C.*

***CBP Office of Professional Responsibility (OPR) 1/5/20-6/4/2022:*** Assigned as the U.S. Border Patrol
liaison to the OPR Investigative Operations Division Use of Force Incident Team where I provided
subject matter expertise knowledge in U.S. Border Patrol policy to OPR agents regarding potential
violations.  I was responsible for reviewing all CBP-wide Enforcement Action Statistical Analysis and
Reporting (E-STAR) events (approximately 2000k per year) and determining if they qualify for local
(approximately 600-700 per year) or national Use of Force review.  I reviewed national level cases and
recommended clarification where needed in the investigation prior to submission to the executive review
board.

Presented a training plan for armed personnel response to the Commissioner's Duress Alarm.  This
included cross training armed personnel from varying agencies in the SITROOM and the Commissioner's
Armed Security Detail.  The training would include basic room clearing and small team tactics.

### DEPUTY PATROL AGENT IN CHARGE                          2/05/2017-10/13/2018
*Buffalo Border Patrol Station - Tonawanda, New York*

Managed the operational functions of a complex station consisting of Supervisory Border Patrol Agents
(SBPAs) and Border Patrol agents (BPAs).  The area of responsibility consisted of linear international
border, serrated coastline (riverine and lake environment) and counties of land-based patrols that cover
over 4,000 square miles.  Operations included line-watch, city patrol, transportation check, and specialty
units.  Maintained a risk-based enforcement posture by identifying, prioritizing, and targeting threats.

***Acting Patrol Agent in Charge-Buffalo Station:*** Called upon to provide leadership coverage whenever
the PAIC was out of the office for any length of time.  Duties included responding to any inquiries by
sector personnel, fulfilling administrative roles and attending any liaison-based meetings with outside
entities.

**SUPERVISORY BORDER PATROL AGENT**                    *2/20/2011-2/04/2017*
*Niagara Falls Border Patrol Station-Niagara Falls, New York*

Supervised a patrol group of agents that included specialty units such as Marine and Bike patrol.  Held various collateral responsibilities that included Disrupt Unit SBPA, coordinating the annual Self Inspection Program (SIP), Primary Firearms Instructor (PFI), training coordinator, and assisted in station budget projections.

***Acting Deputy Patrol Agent in Charge-Niagara Falls Station:***  Assigned to the Niagara Falls Border Patrol Station (NIB) as Acting Deputy Patrol Agent in Charge (DPAIC) for 60 days from September to October 2016.  I was responsible for running operations and carrying out the vision of the Patrol Agent in Charge.

***Interim Deputy Commander Buffalo Sector SOD-Niagara Falls Station/Buffalo Sector:***  As a BORTAC member assigned to Buffalo Sector (BUN), I was instrumental in creating the first ever Buffalo Sector Special Operations Detachment (SOD).  As the interim Deputy Commander, my team involvement led to integral partnerships and training with other agency teams.  Along with another member of the team, we laid the foundation of what eventually became a successful implementation of an SOD within BUN.  This work included independent team and multiple agency joint training within the SOD mission set.

I was the Co-Chair for the Western New York Tactical Operations Group.  Along with Coast Guard representatives, I coordinated training and exercises for a multi-agency team response to waterborne threats on Lakes Erie and Ontario.  The Coast Guard command also requested training for response to hostile activity on their base.  I coordinated and delivered training that included threat-based response, team movement, and other agency response coordination.  This culminated with a full-scale exercise to test the Coast Guard capabilities, resources, and other agency interaction.  The results were presented to the base chain of command and allowed them to make decisions on how to better prepare their personnel in the event of an actual incursion.

***Training Coordinator-Buffalo Sector:***  From April 2013 to May 2014, I was detailed to the Buffalo Sector (BUN) Training Unit.  Responsible for training large groups of agents in quarterly qualifications, quarterly use of force and active shooter scenarios.

**SUPERVISORY BORDER PATROL AGENT CD/I**                    *5/24/2009-2/19/2011*
*Border Patrol Academy-Artesia, New Mexico*

Assigned to the Advanced Physical Techniques Department with six other CD/I personnel that taught the Physical Techniques Instructor and senior agent courses.  I developed an export defensive tactics program for various sectors within the Border Patrol.  This included standing empty hand techniques, ground, and edged weapons defense.  I was an intricate member of a departmental workgroup that created the CBP Physical Fitness standard (known as PTFIT) that promotes an overall better culture of fitness within CBP.  We were responsible for creating standards that would be a median for all CBP to include Border Patrol Agents, Air and Marine Officers, and Customs and Border Protection Officers.

Detailed to instruct basic academy class #921.  I was responsible for instructing all levels of techniques to include empty hand, arrest, intermediate weapons, and ground defense and how they relate to the CBP Use of Force policy to prepare new interns for field readiness.

228

***BORDER PATROL AGENT***                                    *4/15/2007-5/23/2009*
*Houlton Border Patrol Station-Houlton, Maine*

Performed Border Patrol duties that included line-watch, roving patrol, ATV, snowmobile, bus checks
and intermittent checkpoint operations.  I was the primary defensive tactics instructor and responsible for
station level annual training in all use of force weapons and policy.  I instructed the Houlton Police
Department in the use of the collapsible straight baton so they could implement it as one of their
intermediate force options into their use of force policy.

***Intermediate Force Instructor-Advanced Training Center Harpers Ferry, West Virginia:*** From
January-June 2008, I was detailed to the Advanced Training Center in Harpers Ferry, West Virginia as an
Intermediate Force Instructor.  I was responsible for assisting permanent instructors and instructing CBP
Intermediate Force classes that included Border Patrol Agents, Air and Marine Agents, and Customs and
Border Protection Officers (CBPO).  I also taught classes for OFO Advanced Admissibility, Secondary
Processing, and Enforcement Officer Training.

***BORDER PATROL AGENT***                                    *11/27/2000-4/14/2007*
*Tucson Border Patrol Station-Tucson, Arizona*

Performed Border Patrol duties of line-watch, roving patrol, checkpoint, highway interdiction, and
operating the infrared scope trucks.  I successfully apprehended and processed numerous alien and
narcotic cases.  I was the primary defensive tactics instructor at the station level.  From September 2003-
April 2007, I coordinated and led the annual ASP and OC recertification as well as all other aspects of
defensive tactics authorized within the CBP Use of Force policy.

## SPECIALIZED TRAINING:

CUSTOMS AND BORDER PROTECTION
- ***Daigle Law Group Use of Force Summit 2022***
- ***Advanced Law Enforcement Rapid Response Training for Active Shooter Scenarios 2013***
- ***The Cooper Institute Law Enforcement Fitness Specialist 2010***
- ***Border Patrol Firearms Instructor 2009***
- ***FLETC Law Enforcement Instructor Training Program 2009***
- ***Intermediate Force Instructor 2006***
- ***Border Patrol Physical Techniques Instructor 2003***
- ***Incident Command System/National Incident Management System 100, 120a, 130, 200, 230b,
  235b, 300, 700a, 775, 800, 800b***

## TRIAL AND COURT EXPERIENCE

Testimony as an expert witness in Customs and Border Protection Use of Force techniques and policies:

United States District Court, District of New Mexico:
- *United States v. Oscar Orrantia* [2:22-cr-1360 MIS-1] (December 2023)
- *United States v. Oscar Orrantia* [2:22-cr-1360 MIS-1] (November 2023), Daubert Hearing

United States District Court, Western District of Texas:
- *United States v. Miguel Angel Delgado Jr* [23-CR-00466-KC] (April 2024)

# EXHIBIT 2



# CBP Use of Force Policy

Law Enforcement Safety and Compliance Directorate
Operations Support
4500-002A

January 2021



U.S. Customs and Border Protection

# FOREWORD FROM THE COMMISSIONER

U.S. Customs and Border Protection (CBP) is entrusted with the critical responsibility of protecting our nation's borders.  This mandate carries with it the authority to use force up to and including the use of deadly force.  The following policy provides guidance and parameters under which force may be used.  It also provides the levels of oversight when force is used, and the ongoing training and demonstration of decision-making and skill surrounding the use of force.

A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties.  In all instances, covered in this policy or not, Authorized Officers/Agents shall only use objectively reasonable and necessary force to effectively bring an incident under control, while minimizing the risk of injury for all involved parties.

The use of excessive force by CBP law enforcement personnel is strictly prohibited.

As CBP employees, this *Policy*, in conjunction with the *Administrative Guidelines and Procedures Handbook*, serves as your authoritative reference for firearms procedures and use of force related issues.  By conforming to standard use of force policies, procedures, training, and equipment, Authorized Officers/Agents can more effectively protect themselves and the public they serve.

This *Policy* establishes the minimum CBP policy standards regarding the use of force. CBP offices may establish additional policy guidance where they deem necessary, in accordance with the minimum standards articulated in this *Policy*.

CBP adheres to the *DHS Policy on the Use of Force* and the *Department of Homeland Security Commitment to Nondiscriminatory Law Enforcement and Screening Activities* policy statement.

Violation of the *CBP Use of Force Policy* may constitute grounds for disciplinary action.

This document sets forth policy and training guidance for CBP employees, while meeting the requirements of the *DHS Policy on the Use of Force*, and does not create or confer any right, privilege, or benefit for any person, party or entity.  United States v. Caceres, 440 U.S. 741 (1979).

*Mark A. Meyer* (signature)

Mark A. Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

# Table of Contents

FOREWORD FROM THE COMMISSIONER ............................................................. i

Chapter 1:  General Guidelines.............................................................................3
   A.  Use of Force By Authorized Officers/Agents ..............................................3
   B.  Objectively Reasonable and the Totality of Circumstances ..............................5
   C.  Use of Safe Tactics..........................................................................6
   D.  De-Escalation ................................................................................6
   E.  Emergency Situations .......................................................................7
   F.  Duty to Intervene In and Report Improper Use of Force ...............................7
   G.  Procurement, Instruction, and Devices...................................................7
   H.  DHS Commitment to Nondiscriminatory Law Enforcement Activities................8

Chapter 2:  Use of Deadly Force...........................................................................9
   A.  General Guidelines and Responsibilities .................................................9

Chapter 3:  Use of Less-Lethal Force .................................................................. 11
   A.  General Guidelines and Responsibilities ............................................... 11
   B.  Use of Less-Lethal Devices/Techniques ............................................... 14
   C.  Warning Shots and Disabling Fire ...................................................... 20

Chapter 4:  Vehicular Immobilizations and Pursuit Intervention................................ 22
   A.  General Guidelines and Responsibilities ............................................... 22
   B.  Vehicle Immobilization Devices (VID)................................................... 22
   C.  Offensive Driving Techniques (ODT).................................................... 25

Appendix I:  DHS Policy on the Use of Force ......................................................... 27

Appendix II:  DHS Commitment to Nondiscriminatory Law Enforcement Activities ..... 38

Appendix III:  DHS Policy Statement #045-06 ......................................................... 40

Appendix IV:  CBP Domestic Violence Policy............................................................ 47

Appendix V:  Use of Force Policy Clarification - Emergency Situations ..................... 56

Appendix VI:  Glossary...................................................................................... 58

This *Policy* is consistent with the *DHS Policy on the Use of Force, and* supersedes the *U.S. Customs and Border Protection Use of Force Policy, Guidelines and Procedures Handbook* (HB 4500-01C) dated May 2014, and any prior CBP policy or directive to the extent that it is inconsistent with the content of this *Policy*.

# Chapter 1:   General Guidelines

A.  Use of Force By Authorized Officers/Agents

1.  A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties.

2.  Among other duties, CBP has the responsibility to deter, prevent, detect, respond to, and interdict the unlawful movement or illegal entry of terrorists, drug smugglers and traffickers, human smugglers and traffickers, aliens, and other persons who may undermine the security of the United States.[1]

3.  CBP policy on the use of force by Authorized Officers/Agents is derived from constitutional law, as interpreted by federal courts in cases such as Graham v. Connor, 490 U.S. 386 (1989) and Tennessee v. Garner, 471 U.S. 1 (1985), federal statutes and applicable DHS and CBP policies.

4.  Authorized Officers/Agents may use "objectively reasonable" force only when it is necessary to carry out their law enforcement duties.

5.  The "reasonableness" of a particular use of force is based on the totality of circumstances known by the officer/agent at the time of the use of force, and weighs the actions of the officer/agent against the rights of the subject, in light of the circumstances surrounding the event.[2]  Reasonableness will be judged from the perspective of a reasonable officer/agent on the scene rather than with the 20/20 vision of hindsight.

6.  The calculus of reasonableness embodies an allowance for the fact that law enforcement officers/agents are often forced to make split-second decisions - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

7.  A use of force is "necessary" when it is reasonably required to carry out the Authorized Officer's/Agent's law enforcement duties in a given situation, considering the totality of facts and circumstances of such particular situation.

---

[1] 6 U.S.C. §211; 8 U.S.C. § 1357 (INA § 287).
[2] The Supreme Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)." Brendlin v. California, 551 U.S. 249, 254 (2007)(citations omitted).

A use of deadly force is "necessary" when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of death or serious bodily injury to the officer/agent or to another person.

8. An Authorized Officer/Agent may have to rapidly escalate or de-escalate through use of force options, depending on the totality of facts and circumstances of the particular situation. Once used, physical force[3] must be discontinued when resistance ceases or when the incident is under control.

9. Based on the totality of circumstances, different officers/agents may have different responses to the same situation, any of which may be both reasonable and necessary.

   a. CBP Authorized Officers/Agents are permitted to use force that is objectively reasonable and necessary in light of the totality of the circumstances. This standard does not require Officers/Agents to meet force with equal or lesser force.

   b. CBP Authorized Officers/Agents do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

10. When feasible, prior to the application of force, an Authorized Officer/Agent must attempt to identify him- or herself and issue a verbal warning to comply with the officer/agent's instructions. In determining whether a warning is feasible under the circumstances, an officer/agent may be guided by a variety of considerations including, but not limited to, where the resulting delay by issuing the warning is likely to:

    a. Increase the danger to the officer/agent or others, including any victims and or bystanders;

    b. Result in the destruction of evidence;

    c. Allow for a subject's escape; or

    d. Result in the commission of a crime.

---

[3] Department of Homeland Security, *Department Policy on the Use of Force*, Policy Statement #044-05 (2018) FN 5. "Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point. That is, once a subject is secured with restraints, a LEO may maintain physical control of the subject via the use of a 'come along or other control techniques' to safely and securely conclude the incident."

In the event that an officer/agent issues such a warning[4], where feasible, the officer/agent should afford the subject a reasonable opportunity to voluntarily comply before applying force.

11. Following any incident involving the use of force, Authorized Officers/Agents shall seek medical assistance for any person who appears, or claims to be injured, or as otherwise required by subsections of this policy.

B. Objectively Reasonable and the Totality of Circumstances

1. The reasonableness inquiry for an application of force is an objective one: the question is whether the officer's/agent's actions are objectively reasonable in light of the totality of facts and circumstances confronting him or her, without regard to underlying intent or motivation.

2. In determining whether a use of force is "objectively reasonable," an Authorized Officer/Agent must give careful attention to the totality of facts and circumstances of each particular case, including:

   a. Whether the subject poses an imminent threat to the safety of the officer/agent or others;

   b. The severity of the crime at issue;

   c. Whether the subject is actively resisting seizure or attempting to evade arrest by flight;

   d. Whether the circumstances are tense, uncertain, and rapidly evolving; and

   e. The foreseeable risk of injury to involved subjects and others.

3. "Totality of circumstances" refers to all factors existing in each individual case.  In addition to those listed in Subsection B.2 above, these factors may include (but are not limited to):

   a. The training, age, physical build, and strength of the officer/agent(s);

   b. The training, mental attitude, age, physical build, and strength of the subject(s);

   c. Disproportionate number of subjects present;

---

[4] Officers/agents should have a reasonable basis to believe that the subject can comprehend the warning.

d. Subject's demonstrated propensity for violence;

e. Statements of intent from subject(s);

f. Weapon(s) involved; present, or in proximity;

g. Prior intelligence;

h. National security;

i. The presence of other officers/agents, subjects, vehicle passengers, or bystanders;

j. Subject vehicle speed and type; and

k. Environmental conditions and/or road conditions.

C. Use of Safe Tactics

1. Authorized Officers/Agents should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of the officer/agent and the public, and that minimize the risk of unintended injury or serious property damage.

2. Except where otherwise required by inspections or other operations, Authorized Officers/Agents should avoid standing directly in front of or behind a subject vehicle.  Officers/agents should not place themselves in the path of a moving vehicle or use their body to block a vehicle's path.

3. Authorized Officers/Agents should avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

4. Authorized Officers/Agents shall not discharge their firearms in response to thrown or launched projectiles unless the officer/agent has a reasonable belief, based on the totality of circumstances, that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.  Officers/agents may be able to obtain a tactical advantage in these situations through measures such as seeking cover or distancing themselves from the immediate area of danger.  Officers/agents do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

D. De-Escalation

1. De-escalation tactics and techniques seek to minimize the likelihood of the need to use force, or minimize force used during an incident, to increase the probability of voluntary compliance.

2. Authorized Officers/Agents shall employ de-escalation tactics and techniques, when safe and feasible, that do not compromise law enforcement priorities.

E. Emergency Situations[5]

1. An emergency situation is an unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat.

   In such threatening and emergent situations, Authorized Officers/Agents are authorized to use any available weapon, device, or technique in a manner that is reasonable and necessary for self-defense or the defense of another person.

F. Duty to Intervene In and Report Improper Use of Force

1. CBP is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, this *Policy* ensures that CBP law enforcement personnel fully understand and adhere to the following:

   The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.

2. CBP law enforcement personnel have a duty to intervene to prevent or stop a perceived use of excessive force by another officer/agent - except when doing so would place the observing/responding officer/agent in articulable, reasonable fear of death or serious bodily injury.

3. Any CBP employee with knowledge of the improper use of force by law enforcement personnel shall, without unreasonable delay, report it to his or her chain of command and/or the Office of Professional Responsibility.

4. Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution.

G. Procurement, Instruction, and Devices

1. The Executive Director of the LESC is responsible for the approval of firearms and less-lethal device Instructor Guide Books, training materials, and certification standards.

---

[5] See Appendix V: Use of Force Policy Clarification - Emergency Situations.

2.  Firearms and less-lethal devices, systems, and associated equipment shall only be purchased through contracts and procedures established or approved by the LESC.  Additional information regarding the procurement of less-lethal devices and equipment may be found on the CBP Authorized Equipment List.

3.  The LESC shall be responsible for the periodic review of the usage of firearms and less-lethal devices, systems, and associated equipment, in order to evaluate compliance with policy, as well as to assess their overall safety and effectiveness.

H.  DHS Commitment to Nondiscriminatory Law Enforcement and Screening Activities

1.  The DHS *Commitment to Nondiscriminatory Law Enforcement and Screening Activities* policy statement (<u>Appendix II</u>) is applicable to all situations in which officers/agents exercise their use of force authority.

**239**

# Chapter 2:  Use of Deadly Force

A.  General Guidelines and Responsibilities

1.  Deadly force is force likely to cause serious bodily injury or death of a person.

2.  Authorized Officers/Agents may use deadly force only when necessary; that is, when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

   a.  Serious Bodily Injury - Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

3.  Discharging a firearm at a person shall be done only with the intent of stopping that person from continuing the threatening behavior that justifies the use of deadly force.

4.  Discharging a firearm as a warning is prohibited except for the limited circumstances described in Chapter 3.C.

5.  Discharging a firearm as a distress signal is permitted in emergency situations.[6]

6.  Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the officer/agent has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the officer/agent or others and such force is necessary to prevent escape.[7]

7.  Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

---

[6] An unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat. See Appendix IV Use of Force Policy Clarification – Emergency Situations.

[7] See Tennessee v. Garner, 471 U.S. 1, 11-12 (1985). To further illustrate a "threat of serious physical harm," the Garner Court explained: "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  The Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

a. Such deadly force may include a moving vehicle aimed at officers/agents or others present, but would not include a moving vehicle merely fleeing from officers/agents unless the vehicle or the escape of the subject poses an imminent threat of serious bodily injury or death to the officer/agent or to another person.

b. The hazard of an uncontrolled conveyance shall be taken into consideration prior to the use of deadly force.

8. Firearms shall not be fired solely to disable motor vehicles, vessels, aircraft, or other conveyances.  The only exception is that Authorized Officers/Agents, when conducting maritime law enforcement operations, may use specifically authorized firearms and ammunition to disable moving vessels or other maritime conveyances (See Chapter 3.C).

9. A firearm may be used in self-defense or in defense of another person to prevent an imminent attack by an animal.  A firearm may also be used to euthanize an animal that appears to be seriously injured or diseased.  This discharge does not constitute a use of deadly force.

10. The act of establishing a grip, drawing a weapon, or pointing a weapon does not constitute the use of deadly force.

# Chapter 3:   Use of Less-Lethal Force[8]

A.  General Guidelines and Responsibilities

1.  Less-lethal force is force not likely or intended to cause serious bodily injury or death.

2.  Any use of less-lethal force must be both objectively reasonable and necessary in order to carry out the Authorized Officer's/Agent's law enforcement duties.

3.  Less-lethal devices/weapons may be used in situations where empty-hand techniques are not sufficient, practical, or appropriate to control disorderly or violent subjects.

4.  Authorized Officers/Agents may use objectively reasonable and necessary force to address a threat posed from the degradation of the International Boundary Barriers (IBB).[9]  Officers/Agents should seek to employ tactics and techniques that effectively prevent the threat posed by the activity while minimizing any unintended injury.

5.  In order to fulfil the national security obligation to protect its borders, the United States employs IBB at and between Ports of Entry, capable of controlling the flow of people and goods crossing its border.  The degradation of such capabilities may facilitate the unimpeded access of unknown subjects and materials into the United States.[10]

    a.  An individual cutting, destroying, or attempting to destroy IBB is committing, or has committed, one or more crimes.[11] Authorized Officers/Agents shall make all reasonable efforts to apprehend the individual for a violation of applicable federal criminal law.

    b.  When feasible, prior to the application of force, Authorized Officers/Agents who encounter an individual engaging in degradation of the IBB shall issue a

---

[8] Referenced in prior versions of CBP policy or applicable regulations as "intermediate force" or "non-deadly force" and used herein with the same purpose and effect.

[9] The International Boundary Barrier (IBB), as defined in this policy, is the physical barrier at or between Ports of Entry and placed along the international boundary.

[10] 6 U. S. C. §211(c)(5); Hernandez v. Mesa, 140 S. Ct. 735, 746 (2020); United States v. Flores-Montano, 541 U.S. 149, 152-53 (2004).

[11] See, e.g., 18 U.S.C. § 1361 (willful government property depredation), 8 U.S.C. § 1325 (improper entry by an alien), 19 U.S.C. § 1459 (requirement to report arrival in the United States).

verbal warning[12] to direct the subject(s) to cease the criminal activity and should afford the subject a reasonable opportunity to voluntarily comply.

c.  While every use of force scenario is unique, officers/agents should consider a number of factors in determining whether to employ a reasonable amount of force when dealing with IBB destruction: whether the subject refuses to comply following a verbal warning; whether the individual continues to engage in federal criminal activity; lack of other law enforcement options to prevent the continued criminal activity; potential use of a weapon or tool used to degrade IBB; imminence of any threat posed by the IBB degradation; and the unlawful entry of goods/contraband or persons.

d.  If Authorized Officers/Agents determine that a reasonable amount of force is necessary to address a threat posed by IBB degradation, they may use authorized less-lethal devices for area saturation, or any lesser degree of force, to effect arrest and/or prevent the continued commission of federal criminal activity.

    (1) Prior to deploying such force, Authorized Officers/Agents must give reasonable consideration to any factors which may counsel against the use of such force, such as the presence of vulnerable subjects including small children, the elderly, those who are visibly pregnant, or individuals who lack the ability to quickly disperse from the area.[13]

    (2) Authorized Officers/Agents must cease application of force, and seek medical assistance where feasible, when criminal activity ceases or when the incident is under control.

    (3) Authorized Officers/Agents may not use deadly force solely in defense of the IBB unless there is an imminent threat of death or serious bodily injury to the officer/agent or others.

e.  The guidance provided in this subsection is a baseline by which to assess commonly occurring scenarios regarding destruction of IBB. Every incident is unique, and additional facts, intelligence, information, etc. may warrant a different response.  Nothing in this section prohibits, limits, or restricts the ability of Authorized Officers/Agents to use reasonable force, and authorized use of force devices, to carry out their law enforcement duties.

---

[12] Officers/agents should have a reasonable basis to believe that the subject can comprehend the warning.
[13] Nelson v. City of Davis, 685 F.3d 867, 877 (9th Cir. 2012).

6.  As part of a mass unlawful entry event, if individuals enter the United States using acts of violence, or threats of violence, a reasonable amount of force may be used to effect arrests, or to protect Authorized Officers/Agents and others from an imminent threat.

    a.  Authorized Officers/Agents may utilize chemical area saturation, or any lesser degree of force, to effect an arrest or to defend self or others against imminent threats caused by mass unlawful entries when:

        (1) There is probable cause to believe that multiple individuals in the group are using force or threatening to use force to effect an unlawful entry; and

        (2) The criminal actions of the group have continued after the issuance of lawful commands and verbal warnings to cease the criminal activity; and

        (3) Reasonable consideration has been given to any factors which may counsel against the use of such force, such as the presence of vulnerable subjects including, small children, the elderly, those who are visibly pregnant, or individuals who lack the ability to quickly disperse from the area.[14]

    b.  The guidance provided in this subsection is a baseline by which to assess commonly occurring incidents regarding mass unlawful entries. Every incident is unique, and additional facts, intelligence, information, etc. may warrant a different response. Nothing in this section prohibits, limits, or restricts the ability of Authorized Officers/Agents to use reasonable force, and authorized use of force devices, to carry out their law enforcement duties or to protect officers/agents and others from an imminent threat.

    c.  When arrests of individuals involved in a mass entry event are not feasible, the use of chemical munitions is authorized only in defense of self or others. Officers/agents do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

7.  Authorized Officers/Agents who are trained and LESC-certified in their use may use the following less-lethal options:

    a.  Empty-Hand Strikes;

    b.  Oleoresin Capsicum (OC) Spray;

---

[14] Nelson v. City of Davis, 685 F.3d 867, 877 (9th Cir. 2012).

   c.  Collapsible Straight Batons (CSB);

   d.  Electronic Control Weapons (ECW);

   e.  Compressed Air Launchers  (e.g., Pepperball® Launching System (PLS), FN303);

   f.  Munition Launchers (e.g., 40mm);

   g.  Less-Lethal Specialty Impact - Chemical Munitions (LLSI-CM);

   h.  Vehicle Immobilization Devices (VID); or

   i.  Other less-lethal devices or techniques (e.g. Controlled Noise and Light Distraction Devices (CNLDDs), etc.) authorized by the Executive Director of the LESC and approved for use by the Designated Official (DO).

8. While performing uniformed law enforcement duties, Authorized Officers/Agents who carry firearms are also required to carry one or more of the following: OC Spray, an ECW, or a CSB.

   a.  Officers/agents may only be issued and carry devices in which they are certified.

   b.  Responsible Officials (ROs) may require that Authorized Officers/Agents carry additional less-lethal devices (that the Authorized Officer/Agent is certified to carry) while performing uniformed law enforcement duties.

9. ROs may establish requirements for non-uniformed carriage of less-lethal devices based on operational needs.

10. A less-lethal device or technique may be used in self-defense, or in defense of another person, to prevent an imminent attack by an animal.  This use shall not constitute a use of less-lethal force.

B. Use of Less-Lethal Devices/Techniques

1. Guidelines and Responsibilities

The following guidelines and responsibilities apply to all CBP less-lethal techniques, devices, systems, and associated equipment.  Additional device-specific guidelines are contained in following subsections.

   a.  The use of choke-holds, neck restraints, and/or any other restraint technique that applies prolonged pressure to the neck that may restrict blood flow or air passage, are strictly prohibited, absent circumstances where deadly force would be objectively reasonable.

b. Only Authorized Officers/Agents may discharge a CBP less-lethal device, except during CBP-authorized training, events, or activities.

Non-CBP personnel who wish to use CBP less-lethal devices during joint operations should receive CBP-approved training in the use of the less-lethal device(s) prior to use.

c. The use of less-lethal devices/techniques (or any other weapon) as deadly force (i.e., in a manner that could reasonably cause death or serious bodily injury) is not precluded if the use of deadly force would otherwise be objectively reasonable.

d. Only less-lethal devices, systems, and associated equipment authorized by LESC shall be carried and deployed by Authorized Officers/Agents.

e. Less-lethal devices, systems, and associated equipment shall not be altered in any way without the written authorization of the Executive Director of the LESC.

2. Contact Controls

a. Contact Controls such as strategic positioning, escort holds, joint manipulation or immobilization, or touch pressure point stimulation may be utilized as a compliance technique on a subject offering, at a minimum, passive resistance.

3. Empty-Hand Strikes

a. Strike Pressure Point Techniques may be utilized as a compliance tool on a subject offering, at a minimum, active resistance.

b. Other strikes (e.g., punches, kicks, etc.) may be utilized as a defensive tactic on a subject offering, at a minimum, assaultive resistance.

c. Authorized Officers/Agents shall not intentionally target the throat or spine when using Empty Hand Strikes.

4. Oleoresin Capsicum (OC) Spray

a. OC Spray may be utilized as a compliance tool on a subject offering, at a minimum, active resistance.

b. Authorized Officers/Agents may only use chemical agents authorized by the Executive Director of the LESC.  Officers/agents may not carry personally-owned OC devices for duty use.

246

c. Authorized Officers/Agents should not use OC, and should consider other force options, with respect to subjects who are: small children; visibly pregnant; and operators of motor vehicles.

d. Authorized Officers/Agents shall decontaminate subjects in custody that have been exposed as soon as practicable.

e. Authorized Officers/Agents are responsible for advising their supervisors when the devices issued to them are approaching the end of their useable life so that the devices may be replaced prior to their expiration date.

f. The Transportation Security Agency (TSA) and Federal Aviation Administration (FAA) do not permit any chemical agents in the cabin of a commercial aircraft.  As provided by 49 C.F.R. § 175.10, self-defense spray (mace or pepper spray) may be carried in checked baggage, provided the container does not exceed four fluid ounces and has a positive means to prevent accidental discharge.  All CBP employees will comply with this regulation.  Chemical agents shall be carried aboard CBP aircraft only in accordance with *CBP Air Operations Handbook (AOH)* guidelines.

5. Collapsible Straight Baton (CSB)

a. A CSB may be utilized as a defensive tool on a subject offering, at a minimum, assaultive resistance.

b. Authorized Officers/Agents may only use CSBs authorized by the Executive Director of the LESC.  Officers/agents may not carry personally-owned batons for duty use.

c. The following acts and techniques with the CSB are prohibited when using less-lethal force:

(1) Use of a baton to apply "come-along" holds to the neck area; and

(2) Intentional strikes with the baton to the head, the neck, the face, the groin, the solar plexus, the kidneys, or the spinal column.

6. Electronic Control Weapon (ECW)

An ECW is a less-lethal weapon which is designed to deliver short duration electronic pulses (Drive-Stun Mode), or Neuro-Muscular Incapacitation/NMI (Probe Deployment Mode), with minimal risk of serious bodily injury or death.

a. An ECW may be utilized as a compliance tool on a subject offering, at a minimum, active resistance in a manner that the Authorized Officer/Agent reasonably believes may result in injury to themselves or to another person.

247

b. An ECW should be deployed for one standard device cycle and then the situation should be evaluated to determine if additional cycles are both reasonable and necessary.

c. If the use of the ECW is unsuccessful, the Authorized Officer/Agent should transition to another reasonable force option.

d. CBP personnel should not use an ECW, and should consider other force options, with respect to subjects who are: small children; elderly; visibly pregnant; low body mass index (BMI) persons; near known flammable materials; on elevated surfaces; operating conveyances; adjacent to traffic; in water sufficient to drown; running; or handcuffed.

   (1) Authorized Officers/Agents should use an ECW on a subject who is running only when the officer/agent has reasonable belief that the subject presents an imminent threat of injury to an officer/agent or another person. The threat presented by the subject must outweigh the risk of injury to the subject that might occur as a result of an uncontrolled fall while the subject is running.

e. Authorized Officers/Agents should not intentionally expose a subject to more than one ECW at a time.

f. Authorized Officers/Agents shall not intentionally target the head, neck, groin, or female breast.

g. When practical and when other officers/agents are present, Authorized Officers/Agents should verbalize "TASER, TASER, TASER" prior to deployment to notify fellow officers/agents of the imminent use of an ECW. This will alert fellow officers/agents to prepare to control a subject under the power of an ECW.

h. ECWs shall be carried with a cartridge installed, on the non-gun side in a cross-draw manner.

i. Any subject in CBP custody who has been exposed to an ECW shall, as soon as possible, be seen by an Emergency Medical Technician or other trained medical professional.

j. CBP personnel trained and certified in the use of an ECW may remove probes embedded in a person's skin, provided the probes are not embedded in a sensitive area like the head, neck, genitals, or female breast tissue. Probe removals in those instances shall be performed by a trained medical professional.

k. ECW probes are considered a biohazard and shall be disposed of according to established biohazard disposal protocol.

l. Each ECW shall have all stored utilization data downloaded quarterly. ROs shall ensure that all downloaded ECW data is securely stored and maintained for a minimum of three years.

m. After each ECW deployment, data related to that deployment shall be downloaded and saved. If the deployment was the result of a reportable use of force a copy of the data report shall be attached to the use of force report in the CBP Enforcement Action Statistical Analysis and Reporting System (E-STAR).

7. Compressed Air Launchers (e.g., PLS and FN303)

Compressed air launchers are less-lethal impact/chemical irritant delivery systems that are powered by compressed air. The launchers can deliver a variety of less-lethal projectiles including kinetic impact, PAVA pepper powder, and non-toxic marking rounds.

a. A compressed air launcher may be used for area saturation against subject(s) who, at a minimum, demonstrate active resistance.

b. A compressed air launcher may be used as a kinetic impact delivery system on subject(s) who, at a minimum, demonstrate assaultive resistance, with exceptions during maritime operations outlined in Chapter 3.C.3 of this *Policy*.

c. Authorized Officers/Agents may use a compressed air launcher to mark a conveyance for identification purposes in situations where a conveyance has failed to comply with another officer's/agent's lawful attempt to stop it, in situations where the use of a vehicle immobilization device would not be reasonable, or if an involved vehicle is leaving the scene of an enforcement action without authorization. When deploying a compressed air launcher for marking and identification purposes, officers/agents may not intentionally target the conveyance's windows.

d. Authorized Officers/Agents should not use a compressed air launcher, and should consider other force options, on subjects who are: small children; elderly; visibly pregnant; or operating a conveyance.

e. Authorized Officers/Agents shall not use a PLS for kinetic impact on subjects less than 3 feet away unless the use of deadly force is reasonable and necessary.

f. The FN303 shall not be deployed if the officer/agent is less than 10 feet from the subject unless the use of deadly force is reasonable and necessary.

g. The intentional targeting of areas where there is a substantial risk of serious bodily injury or death is considered a use of deadly force.  Authorized Officers/Agents shall not intentionally target the head, neck, spine, or groin of the intended subject, unless the use of deadly force is reasonable.

8. Munition Launchers (e.g., 40mm) and Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM)

Munition Launchers are a delivery system for less-lethal specialty impact/chemical munitions (LLSI-CM) that are designed to deliver an impact projectile, a chemical irritant projectile, or a combination projectile with more accuracy, higher velocity, and longer range than a projectile deployed by hand.

LLSI-CM can also be delivered by means of a device that is designed to be hand-thrown by an Authorized Officer/Agent.

a. Subject to the exceptions described in subsection c below, a Less-Lethal Chemical Munition (LLCM) may be utilized as a compliance tool on a subject offering, at a minimum, active resistance.

b. Subject to the exceptions described in subsection c, below, a Less-Lethal Specialty Impact (LLSI) munition may be utilized as a compliance tool on a subject offering, at a minimum, assaultive resistance.

c. Authorized Officers/Agents should not use an LLSI-CM and should consider other force options with respect to subjects who are: small children; elderly; visibly pregnant; near known flammable materials (when using a pyrotechnic device); or operating conveyances.

d. Authorized Officers/Agents shall not intentionally target the head, neck, groin, spine, or female breast.

e. Any subject in CBP custody who has been exposed to an LLSI-CM shall, as soon as practicable, be seen by an Emergency Medical Technician or other trained medical professional.

f. The (FAA) prohibits the transportation of LLCMs and LLSI-CM combinations (e.g., CS (O-Chlorobenzylidene-malononitrile), Stingball) onboard commercial aircraft.  All CBP employees will comply with this regulation.  Transportation of LLSI-CM munitions will be accomplished by the use of a CBP vehicle/vessel and/or an authorized commercial ground carrier.

g. The transportation of LLSI-CM onboard CBP vessels shall conform with the appropriate safety standards such as storage and transportation of the devices in insulated, water-proof containers to prevent damage or unintended discharge.

**250**

      h.  Approval from the Executive Director of the LESC is required prior to each individual purchase of LLSI-CM.

  9.  Controlled Noise and Light Distraction Devices (CNLDD)

A CNLDD is a pyrotechnic device that, once activated, emits a bright light and loud noise to momentarily disorient and confuse subjects giving officers/agents a brief tactical advantage.

      a.  CNLDDs may be utilized with supervisory approval during pre-planned law enforcement operations when actionable intelligence of pre-assault indicators or other relevant intelligence information has been identified which requires their use to gain a tactical advantage.

      b.  In all other instances, CNLDDs may be used as a compliance tool on a subject offering, at a minimum, assaultive resistance.

      c.  Authorized Officers/Agents should not use a CNLDD, and should consider other force options, on subjects who are: small children; elderly; visibly pregnant; or near known flammable materials.

      d.  Responsible Supervisory personnel shall ensure that ATF regulations and guidelines are known and followed by all subordinate personnel involved in the handling, storage, or use of CNLDDs.

      e.  The RO (or his or her designee) shall ensure that CNLDDs are only issued to trained and certified officers/agents with an articulated need for a CNLDD.

C.  Warning Shots and Disabling Fire

  1.  Warning Shots - Warning shots are not permitted except as follows:

      a.  Maritime Law Enforcement Operations: Authorized Officers/Agents conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed.  Such warning shots are classified as less-lethal force.

      b.  Aviation Law Enforcement Operations: Authorized Officers/Agents conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave airspace, and only after all other available means of signaling have failed.  Such warning shots are classified as less-lethal force.

  2.  Disabling Fire - Firearms may not be used solely to disable moving vehicles, vessels, aircraft, or other conveyances, except when Authorized Officers/Agents are conducting maritime law enforcement activities against maritime conveyances.

    a.  When a pursued vessel fails to comply with an order to stop, and warning shots have been deployed, the CBP Vessel or Aircraft Commander may elect to authorize disabling fire.

    b.  The authority to commence disabling fire rests with the Vessel or Aircraft Commander.  The decision to fire, however, ultimately rests with the shooter. It is the shooter's responsibility to ensure the safe deployment of the disabling rounds.

3.  Authorized Officers/Agents may use CBP less-lethal devices specifically approved by the LESC for use against subjects who are intentionally preventing the deployment of marine disabling fire (e.g., by blocking access to or covering the engine of a vessel) if the failure to stop the vessel would pose an imminent threat to the safety of the officer/agent or others.

4.  Warning shots and disabling fire shall be deployed with adherence to CBP-approved programs, policies, procedures, and directives.

5.  Only ordnance approved by the Executive Director of the LESC, shall be authorized for use in conducting warning and/or disabling fire.

6.  Only those Authorized Officers/Agents who have successfully completed LESC-approved training are authorized to utilize warning shots and/or disabling fire.

7.  Warning shots and/or disabling fire pose a potential hazard; therefore, good judgment shall be exercised at all times.  They cannot be fired where there is a reasonable belief that personal injury, death, or unintended property damage will occur.  Safety shall always be the first consideration when utilizing warning shots and/or disabling fire.

8.  The use of warning shots and/or disabling fire is considered less-lethal force, and shall be reported in accordance with the requirements of this chapter.

# Chapter 4:   Vehicular Immobilizations and Pursuit Intervention

A. General Guidelines and Responsibilities

1. Vehicular Immobilization Devices (VIDs) and Offensive Driving Techniques
   (ODT) are specialized devices and techniques designed and deployed with the
   intended result of causing a vehicle to stop through the controlled deflation of a
   vehicle tire, intentional vehicular contact, or other means of restraint.

2. Any use of VIDs and/or ODT must be both objectively reasonable and necessary
   in order to carry out the Authorized Officer's/Agent's law enforcement duties.

3. VIDs and ODT may be used in situations where the law enforcement benefit and
   the need to immobilize the subject vehicle and/or otherwise end a vehicle pursuit
   outweighs the immediate or foreseeable risk of injury to involved subjects and
   others created by the deployment of a VID or use of an ODT.

   a. While every use of force scenario is unique, factors to consider in determining
      the reasonableness of a contemplated deployment of a VID or ODT include,
      but are not limited to:

      (1) Vehicle Speed;

      (2) Proximity of Population Centers;

      (3) Traffic Flow;

      (4) Weather or Road Conditions; and

      (5) Availability of Alternative Measures.

4. The direction contained within this chapter, regarding the use of VIDs and ODTs
   are not to supersede the direction found within the *Emergency Driving, Including
   Vehicular Pursuits by U.S. Customs and Border Protection Personnel Directive*
   (CBP Directive 4510-26).

B. Vehicle Immobilization Devices (VID)

1. VIDs (including Controlled Tire Deflation Devices or CTDDs) are specialized
   less-lethal devices whose deployment is intended to result in the controlled
   deflation of a vehicle tire or otherwise cause a vehicle to stop.

2.  The immediate or potential danger to the public created by the deployment of the
    VID should be less than the immediate or potential danger to the public should
    the suspect vehicle be allowed to proceed without deployment of the VID.
    The VID shall be deployed in a manner that minimizes risk of injury to persons or
    damage to property.

3.  Authorized Officers/Agents will announce the use of a VID on the service radio.
    A supervisor can deny (terminate) the deployment.  Preapproval for the use of a
    VID is not required.

4.  When otherwise objectively reasonable a VID may be deployed:

    a.  When an Authorized Officer/Agent directs a motor vehicle to stop and the
        vehicle fails to comply with the officer's/agent's order;

    b.  When a vehicle attempts to avoid inspection at a primary or secondary
        inspection area of a checkpoint or port of entry (POE);

    c.  When a vehicle unlawfully crosses the border between POEs;

    d.  When an Authorized Officer/Agent, acting within the guidelines set forth in this
        *Handbook*, is trying to prevent a suspect vehicle from leaving the area where
        a warrant is being served or where officers/agents have determined, or
        developed at least reasonable suspicion, that a crime is being or may have
        been committed that the officer/agent has the authority to enforce;

    e.  When another law enforcement agency requests deployment of the VID in an
        emergency.  Supervisory approval is required unless exigent circumstances
        can be articulated; or

    f.  When the configuration at checkpoints, or Ports of Entry, allows for the
        placement of the VID on stationary vehicles for safety of the officers/agents
        and others.  Placement of a VID in this manner does not constitute a
        reportable use of force unless accompanied by an attempt to flee.

5.  The road where an Authorized Officer/Agent is considering the deployment of a
    VID should provide an unimpeded view of vehicular traffic from all directions.
    The VID may be used only in areas where topography, roadway surfaces, and
    vehicular conditions indicate that deployment can be accomplished with
    reasonable safety.

6. The Authorized Officer/Agent who deploys the VID should:

   a. During deployment of a VID, remain in visual contact and control of the VID unless the deploying officer/agent can articulate why visual contact and control are not safe and/or practical;

   b. Prior to deploying the VID, ensure that all CBP and other agency personnel involved are notified of the pending deployment via available communication methods.  Communication shall be maintained between officers/agents in the deployment area unless exigent circumstances preclude such communication;

   c. Remove or deactivate the VID before becoming involved in the apprehension of the subject(s) unless exigent circumstances preclude such removal or deactivation; and

   d. Remember that safety is paramount.  The officer/agent retains the discretion not to deploy the VID.

7. Authorized Officers/Agents shall not deploy a VID in school zones when children are present or traveling to or from the school, or in cases when the danger to the public outweighs the enforcement benefit.

8. Authorized Officers/Agents conducting enforcement operations on CBP aircraft are permitted to overtake a pursued vehicle in order to deploy a VID.  Authorized Officers/Agents operating on the ground shall not overtake a pursued vehicle without prior authorization from a supervisor in order to deploy a VID.

9. Authorized Officers/Agents shall not deploy a VID to stop the following types of vehicles, except where an immediate danger to life makes it reasonable to deploy the VID:

   a. Two or three-wheeled vehicles;

   b. Vehicles known or reasonably believed to be transporting hazardous materials; or

   c. Vehicles that are believed to pose an unusual hazard to officers/agents or the public.

10. When a VID causes *unintentional* damage to a vehicle:

   a. The involved officer/agent will immediately report the incident to the duty supervisor;

255

b.  The duty supervisor shall provide a tort claim form (SF-95) to the driver of the vehicle for the damages to the vehicle that may have been caused by the VID along with instructions on how to complete the form and where to send the claim; and

c.  In cases when the vehicle is rendered immobile, procedures shall be in place to assist the driver in making the vehicle mobile.

C.  Offensive Driving Techniques (ODT)

1.  ODTs are any driving technique that is consistent with CBP training and is intended to end a pursuit through intentional vehicle-to-vehicle impact.

2.  ODT are uses of force that may be considered less-lethal force or deadly force depending on a number of variables.  As such, ODTs are classified in two different classes; Class 1 and Class 2.

a.  Class 1 ODTs are techniques performed at low speeds, under good road/environmental conditions, resulting in a low foreseeable risk of injury to the subject; therefore Class 1 ODTs are considered less-lethal applications of force.

b.  Class 2 ODTs are techniques used when the risk of injury to the subject is elevated due to excessive speeds and/or other known circumstances.  Class 2 ODTs should only be authorized when the actions of the subject driver presents an imminent threat of death or serious bodily harm; Class 2 ODTs are considered applications of deadly force.

c.  Officers/agents and supervisors must consider all the factors above and presented in Chapter 1, Subsection B, of this policy, as well all material presented during ODT training to determine the appropriate class.

3.  ODTs may be utilized to end a vehicular pursuit when:

a.  A supervisor that is currently certified and trained by CBP to manage/authorize the use of ODT has given authorization to employ the technique (this requirement is a must absent an articulable, exigent circumstance that warrants the use of deadly force after considering the all the factors presented in Chapter 1.B of this policy);

b.  The officers/agents employing the ODT has been certified and trained by CBP to perform the technique;

    c.  The immediate or potential danger to the public created by the use of the
       ODT is less than the immediate or potential danger to the public created by
       allowing the vehicle to proceed without deployment of the ODT or ending the
       pursuit via other means is less safe or has been determined impossible or
       ineffective; and,

    d.  The ODT is employed in a manner consistent with CBP ODT training that
       minimizes risk of injury to all involved parties and/or damage to property.

4.  Remember that safety is paramount.  The officer/agent retains the discretion not
    to employ an ODT.

5.  Authorized Officers/Agents shall not employ ODT in school zones when children
    are present or traveling to or from the school, or in cases when the danger to the
    public outweighs the enforcement benefit.

6.  Authorized Officers/Agents shall not employ ODT to stop the following types of
    vehicles, except where an immediate danger to life makes it reasonable to
    employ an ODT:

    a.  Two or three-wheeled vehicles;

    b.  Vehicles known or reasonably believed to be transporting hazardous
       materials; or

    c.  Vehicles that are believed to pose an unusual hazard to officers/agents or the
       public.

## Appendix I:  DHS Policy on the Use of Force



Issue Date:  September 7, 2018

Policy Statement 044-05

MEMORANDUM FOR:      Component Heads

FROM:                Claire M. Grady
                     Acting Deputy Secretary of Homeland Security and
                     Under Secretary for Management

SUBJECT:             **Department Policy on the Use of Force**

### I.    Purpose

Pursuant to the Secretary's authority under Title 6, United States Code (U.S.C.) § 112, this
policy articulates Department-wide standards and guidelines related to the use of force by
Department of Homeland Security (DHS) law enforcement officers and agents (LEOs) and
affirms the duty of all DHS employees to report improper uses of force. All DHS Components
employing LEOs are directed to implement this guidance, including investigation and
documentation practices, through Component-specific policy, procedure, and training.

This memorandum supersedes the Memorandum from Secretary Tom Ridge, "Department of
Homeland Security Policy on the Use of Deadly Force" (June 25, 2004).

### II.   Use of Force Standard

#### A.    Introduction

In determining the appropriateness of a particular use of force, the Department is guided
by constitutional law, as interpreted by the U.S. Supreme Court.[1] The Fourth Amendment
supplies a constitutional baseline for permissible use of force by LEOs in the course of
their official duties; law enforcement agencies may adopt policies that further constrain
the use of force. This policy describes the governing legal framework and articulates
additional principles to which the Department will adhere.

#### B.    General Statement

Unless further restricted by DHS Component policy, DHS LEOs are permitted to use
force to control subjects in the course of their official duties as authorized by law, and in
defense of themselves and others. In doing so, a LEO shall use only the force that is
**objectively reasonable** in light of the facts and circumstances confronting him or her at
the time force is applied.

---

[1] See, e.g., *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

C.    Discussion: The Fourth Amendment "Reasonableness" Standard

1.The Supreme Court has ruled that "all claims that law enforcement officers have
used excessive force—deadly or not—in the course of an arrest, investigatory
stop, or other 'seizure' of a free citizen should be analyzed under the Fourth
Amendment and its 'reasonableness' standard."[2]  This standard is an objective one
that, in the context of use of force policy and practice, is often referred to as
"objective reasonableness."

2.Because this standard is "not capable of precise definition or mechanical
application," its "proper application requires careful attention to the facts and
circumstances of each particular case."[3]  The reasonableness of a LEO's use of
force must be judged "from the perspective of a reasonable officer on the scene,
rather than with the 20/20 vision of hindsight."[4]  In determining whether the force
a LEO used to effect a seizure was reasonable, courts allow for the fact that LEOs
are often forced to make split-second judgments, in circumstances that are tense,
uncertain, and rapidly evolving.

3.Consequently, there may be a range of responses that are reasonable and
appropriate under a particular set of circumstances.

4.Once used, physical force[5] must be discontinued when resistance ceases or
when the incident is under control.

### III.    General Principles

A.    Respect for Human Life

All DHS personnel have been entrusted with a critical mission: safeguarding the
American people, our homeland, and our values.  In keeping with this mission, respect
for human life and the communities we serve shall continue to guide DHS LEOs in the
performance of their duties.

---

[2] *Graham*, 490 U.S. at 396.  The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an
officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means
intentionally applied* (emphasis in original)."   Brendlin v. California, 551 U.S. 249, 254 (2007)(citations omitted).
[3] *Graham*. (citing *Garner*, 471 U.S at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort
of . . . seizure'").  The "totality of the circumstances" refers to all factors surrounding a particular use of force.  In *Graham*, the
Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the
severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and
whether the subject is actively resisting arrest or attempting to evade arrest by flight.  Other factors include, but are not limited to:
the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of
the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is
forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on
account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the
subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.
[4] *Id.*
[5] Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point.  That is,
once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or
other control techniques" to safely and securely conclude the incident.

B.      De-escalation

To ensure that DHS LEOs are proficient in a variety of techniques that could aid them in appropriately resolving an encounter, DHS Components shall provide use of force training that includes de-escalation tactics and techniques.

C.      Use of Safe Tactics

DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage. DHS LEOs should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

D.      Additional Considerations

1.DHS LEOs are permitted to use force that is reasonable in light of the totality of the circumstances. This standard does not require LEOs to meet force with equal or lesser force.

2.DHS LEOs do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

E.      Warnings

1.When feasible, prior to the application of force, a DHS LEO must attempt to identify him- or herself and issue a verbal warning to comply with the LEO's instructions. In determining whether a warning is feasible under the circumstances, a LEO may be guided by a variety of considerations including, but not limited to, whether the resulting delay is likely to:

a.Increase the danger to the LEO or others, including any victims and/or bystanders;

b.      Result in the destruction of evidence;

c.      Allow for a subject's escape; or

d.      Result in the commission of a crime.

2.In the event that a LEO issues such a warning, where feasible, the LEO should afford the subject a reasonable opportunity to voluntarily comply before applying force.

260

F.      Exigent Circumstances

In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is reasonable in light of the circumstances.

G.      Medical Care

As soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries, complains of being injured, or requests medical attention. This may include rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility.

H.      Duty to Intervene In and Report Improper Use of Force

1.The Department is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, DHS law enforcement Components will ensure that their policies and procedures unambiguously underscore the following:

**The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.**

2.DHS LEOs have a duty to intervene to prevent or stop a perceived use of excessive force by another LEO—except when doing so would place the observing/responding LEO in articulable, reasonable fear of death or serious bodily injury.

3.**Any DHS employee** with knowledge of a DHS LEO's improper use of force shall, without unreasonable delay, report it to his or her chain of command, the internal affairs division, the DHS Office of Inspector General, and/or other reporting mechanism identified by Component policy or procedure.

4.Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution. DHS Components shall ensure that all personnel are aware of these obligations, as well as the appropriate mechanism(s) by which such reports should be made.

IV.    **Less-Lethal Force and Less-Lethal Devices**

A. All DHS Components employing LEOs shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques; authorized less-lethal devices; and necessary training and certifications—both initial and recurring.

B. DHS Components shall conduct less-lethal use of force training no less than every two years and incorporate decision-making and scenario-based situations in these training programs.

C. DHS LEOs are prohibited from carrying any unauthorized less-lethal device for duty use.

D. LEOs shall demonstrate proficiency, in accordance with established Component standards, for each less-lethal device that they are authorized and certified to carry. If a certification or valid waiver expires, a LEO is prohibited from carrying that device for duty use until he or she meets the requirements for recertification on that device.

V.    **Warning Shots and Disabling Fire**

A.    General Prohibition

Except in the limited circumstances described in Section V.B., "Exceptions," DHS LEOs are prohibited from discharging firearms solely:

1.    As a warning or signal ("warning shots") or

2.    To disable moving vehicles, vessels, aircraft, or other conveyances ("disabling fire").

B.    Exceptions

1.    Warning Shots

a.    <u>Maritime Law Enforcement Operations</u>: Authorized U.S. Coast Guard (USCG), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

b.    <u>Aviation Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave the airspace, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

2.    Disabling Fire

a.    <u>Maritime Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel, when conducting maritime law enforcement operations, may discharge firearms to disable moving vessels or other maritime conveyances. Such disabling fire is classified as less-lethal force.

b.    <u>Physical Protection</u>: Authorized United States Secret Service (USSS) personnel exercising USSS's protective responsibilities, and other authorized and appropriately trained DHS LEOs assigned to assist USSS in exercising these responsibilities, may discharge firearms to disable moving vehicles, vessels, and other conveyances, and such disabling fire is classified as less-lethal force—EXCEPT: <u>Aircraft in Flight</u>: Disabling fire against an aircraft in flight is permitted only if the use of deadly force against the occupants of the aircraft, or in response to the threat posed by the aircraft, itself, is otherwise authorized under this policy. This is classified as a use of deadly force. [6]

C.    Safety Considerations

1.Warning shots and disabling fire are inherently dangerous and, when authorized under this policy, should be used with all due care. DHS LEOs must exercise good judgment at all times and ensure that safety is always the primary consideration.

2.When authorized LEOs deem warning shots or disabling fire warranted, each shot must have a defined target.

## VI.   Deadly Force

A.    General Guidelines

1.    As with any use of force, a LEO's use of deadly force must be reasonable in light of the facts and circumstances confronting him or her at the time force is applied.

---

[6]As a use of deadly force, this is not mere "disabling fire," which by definition is not intended to cause bodily injury.

2.A DHS LEO may use deadly force only when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person.[7]

    a.Fleeing Subjects: Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the LEO has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape.[8]

B.    Discharge of Firearms

    1.    General Guidelines

    a.Discharging a firearm against a person constitutes the use of deadly force and shall be done only with the intent of preventing or stopping the threatening behavior that justifies the use of deadly force.

    b.The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force.

    2.    Moving Vehicles, Vessels, Aircraft, or other Conveyances

    a.DHS LEOs are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy.[9] Before using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of-control conveyance.

    b.Firearms shall not be discharged solely as a warning or signal or solely to disable moving vehicles, vessels, aircraft, or other conveyances, except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

---

[7] For more detailed discussion of the use of force standard and the "reasonableness" determination, see Section II., Use of Force Standard.

[8] See *Garner*, 471 U.S. at 11-12. To further illustrate a "threat of serious physical harm," the *Garner* Court explained: "...if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* The Supreme Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

[9] Here, a distinction is drawn between firing at the operator, i.e., targeting the operator with the intent to cause serious physical injury or death, and firing at a moving vehicle or other conveyance solely as a warning or signal or to disable the vehicle, and with no intent to injure (see section V., Warning Shots and Disabling Fire).

## VII.    Reporting Requirements and Incident Tracking

A.    Uses of force shall be documented and investigated pursuant to Component policies.

B. It is a Department priority to ensure more consistent Department-wide reporting and tracking of use of force incidents. More consistent data will enable both the Department and Components to more effectively assess use of force activities, conduct meaningful trend analysis, revise policies, and take appropriate corrective actions.

C. DHS Components employing LEOs shall establish internal processes to collect and report accurate data on Component use of force activities. At a minimum, Components shall report the following as a "use of force incident" when resulting from a use of force:

1. A less-lethal device is utilized against a person (except when the device is deployed in a non-striking control technique);

2.    Serious bodily injury occurs;

3. Deadly force is used against a person, to include when a firearm is discharged at a person; or

4.    Death occurs.

D. Components shall report this data to the Deputy Secretary, through the Deputy Assistant Secretary for Law Enforcement Policy, on no less than an annual basis (in accordance with a process and timeline to be determined) and to others as required for official purposes.

## VIII.    Departmental Review and Oversight

A. Each DHS Component employing LEOs will establish and maintain a use of force review council or committee to perform internal analysis of use of force incidents from the perspective of training, tactics, policy, and equipment; to identify trends and lessons learned; and to propose any necessary improvements to policies and procedures.

B. The Office of Strategy, Policy, and Plans, working in consultation with DHS Components employing LEOs, shall establish the DHS Use of Force Council to provide a forum by which Components can share lessons learned regarding use of force policies, training, and oversight. The DHS Use of Force Council will be chaired by the Office of Strategy, Policy, and Plans and comprised of one executive-level representative from each of the following DHS Components:

1.    Office of the Under Secretary for Management
2.    National Protection and Programs Directorate

 3.   United States Customs and Border Protection
 4.   United States Coast Guard
 5.   United States Secret Service
 6.   Federal Emergency Management Agency
 7.   Transportation Security Administration
 8.   United States Immigration and Customs Enforcement
 9.   Office of the General Counsel
 10.  Federal Law Enforcement Training Centers
 11.  Office for Civil Rights and Civil Liberties
 12.  Privacy Office

C.    Representatives of affected DHS Components will be responsible for reporting on use of force-related trends, developments, and lessons learned within their respective Components.

## IX.  Military Activities

This policy shall not apply to the United States Coast Guard when operating under the Standing Rules of Engagement, or to other DHS personnel when they fall under Department of Defense control as civilians accompanying the force.

## X.  No Right of Action

This policy is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## XI.  Definitions

A. *Deadly Force*: Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury. In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

B. *De-Escalation*: The use of communication or other techniques during an encounter to stabilize, slow, or reduce the intensity of a potentially violent situation without using physical force, or with a reduction in force.

C. *Disabling Fire*: Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

**D. _Less-Lethal Device_**: An instrument or weapon that is designed or intended to be used in a manner that is not likely to cause death or serious bodily injury (see "Serious Bodily Injury"). Examples include, but are not limited to, conducted electrical weapons/electronic control weapons, impact weapons, and certain chemical agents. These are also commonly referred to as "intermediate force" or "less-than-lethal" weapons or devices.

**E. _Less-Lethal Force_**: Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

**F. _Lessons Learned_**: Information gleaned through internal review and analysis of use of force incidents that is sufficiently significant or critical to consider a change to policies, procedures, or training standards. Lessons learned may include, for example, information that can enhance law enforcement personnel skills; identify gaps in current training; identify current unique criminal trends being experienced in the field; provide information on new equipment recommendations or gaps; identify concerns with standard less lethal equipment/tactics; or any information that can prevent harm to the community, law enforcement, or arrestees.

**G. _Serious Bodily Injury_**: Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

**H. _Use of Force_**: The intentional application by law enforcement of any weapon, instrument, device, or physical power in order to control, restrain, or overcome the resistance, or gain compliance or custody, of another.

I.     **_Warning Shot_**: Discharge of a firearm as a warning or signal, for the purpose of compelling compliance from an individual, but not intended to cause bodily injury.

Distribution:

Under Secretary for Science and Technology
Under Secretary for Management
Under Secretary for National Protection and Programs Directorate
Under Secretary of Intelligence and Analysis
Commissioner, U.S. Customs and Border Protection
Commandant, United States Coast Guard
Director, United States Secret Service
Director, U.S. Citizenship and Immigration Services
Administrator, Federal Emergency Management Agency
Administrator, Transportation Security Administration
Assistant Secretary, U.S. Immigration and Customs Enforcement
General Counsel
Inspector General
Director, Federal Law Enforcement Training Centers
Assistant Secretary of Countering Weapons of Mass Destruction Office
Under Secretary for Strategy, Policy, and Plans Policy
Assistant Secretary for Legislative Affairs
Assistant Secretary for Public Affairs
Assistant Secretary for Partnership and Engagement
Director, Operations Coordination
Officer for Civil Rights & Civil Liberties
Chief Privacy Officer
Citizenship and Immigration Services Ombudsman
Military Advisor to the Secretary
Director, Community Partnerships
Executive Secretary

## Appendix II:  DHS Commitment to Nondiscriminatory Law Enforcement and Screening Activities

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

Homeland
Security

April 26, 2013

MEMORANDUM FOR COMPONENT HEADS

FROM:               Secretary Napolitano

Subject:            The Department of Homeland Security's Commitment to
                    Nondiscriminatory Law Enforcement and Screening Activities

The Department of Homeland Security's mission is to ensure that the Nation remains a safe,
secure, resilient place where the American way of life can thrive.  As former Secretary Ridge
explained in the predecessor to this policy, "In all we do to secure America, our strategies and
our actions must be consistent with the individual rights and civil liberties protected by the
Constitution and the rule of law."

The Department of Homeland Security's policy is to prohibit the consideration of race or
ethnicity in our investigation, screening, and enforcement activities in all but the most
exceptional instances.  The following is the Department's official policy on this issue:

*"Racial profiling" is the invidious use of race or ethnicity as a criterion in conducting stops,
searches, and other law enforcement, investigation, or screening activities. It is premised on the
erroneous assumption that any particular individual of one race or ethnicity is more likely to
engage in misconduct than any particular individual of another race or ethnicity.  The
Department of Homeland Security (DHS) has explicitly adopted the Department of Justice's
"Guidance Regarding the Use of Race by Federal Law Enforcement Agencies," issued in June
2003.  It is the policy of DHS to prohibit the consideration of race or ethnicity in our daily law
enforcement and screening activities in all but the most exceptional instances, as defined in the
DOJ Guidance.  DHS personnel may use race or ethnicity only when a compelling governmental
interest is present, and only in a way narrowly tailored to meet that compelling interest. Of
course, race- or ethnicity-based information that is specific to particular suspects or incidents,
or ongoing criminal activities, schemes or enterprises, may be considered, as stated in the DOJ
Guidance.*

*Except as noted below, it is DHS policy, although not required by the Constitution, that tools,
policies, directives, and rules in law enforcement and security settings that consider, as an
investigative or screening criterion, an individual's simple connection to a particular country, by
birth or citizenship, should be reserved for situations in which such consideration is based on an
assessment of intelligence and risk, and in which alternatives do not meet security needs, and*

**269**

*such consideration should remain in place only as long as necessary. These self-imposed limits, however, do not apply to antiterrorism, immigration, or customs activities in which nationality is expressly relevant to the administration or enforcement of a statute, regulation, or executive order, or in individualized discretionary use of nationality as a screening, investigation, or enforcement factor).*

All Components should include the DHS policy stated above in all manuals, policies, directives, and guidelines regarding any activity in which the use of race, ethnicity, or nationality may arise as a security screening, enforcement, or investigative criterion. Each Component, in coordination with the Department's Office for Civil Rights and Civil Liberties, should implement Component-specific policy and procedures to implement this guidance for law enforcement, investigation, and security activities. Moreover, all Components should ensure that all law enforcement personnel, including supervisors and managers, are trained to the standards set forth in the DOJ Guidance and the DHS policy stated above, and are held accountable for meeting those standards.

2

## Appendix III:  DHS Policy Statement #045-06

FOR OFFICIAL USE ONLY

*Deputy Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528


Homeland Security

January 10, 2017

MEMORANDUM FOR DEPARTMENT COMPONENT HEADS

FROM:            Russell C. Deyo
                 Acting Deputy Secretary

SUBJECT:         **Required Reporting of Off-Duty Contact with Law**
                 **Enforcement by DHS Law Enforcement Personnel and**
                 **the Suspension and/or Revocation of Authority to Carry a**
                 **Firearm or other Weapon and Perform Law Enforcement**
                 **Duties**

    Secretary Johnson and I greatly appreciate that every day, Department of
Homeland Security (DHS or the Department) law enforcement personnel put their lives
on the line in protection of our homeland.  We recognize that law enforcement is a
challenging occupation, characterized by high risks and inherent dangers.  At the same
time, DHS maintains an expectation that its law enforcement personnel will uphold the
highest standards of conduct in both their personal and professional lives.  To account for
those occasions when a DHS law enforcement officer is involved in a situation where
their conduct brings them into contact with, and places them under the scrutiny of law
enforcement or the judiciary, this memorandum outlines the Department's policy for
reporting such contact, and the potential implications on the law enforcement officer's
authority to carry a firearm or other weapon and perform law enforcement duties.

Policy

    This policy requires that DHS Components shall, at a minimum:

    *Expand or Ensure DHS Law Enforcement Officers' Notification Requirements*
    *Include All Off-Duty Reportable Law Enforcement Officer/Agency or Judicial*
    *Contact*

FOR OFFICIAL USE ONLY

www.dhs.gov

**271**

FOR OFFICIAL USE ONLY

To ensure officer behavior is consistent with the Department's law enforcement mission, responsibilities, and values, the Department requires all law enforcement officers report to their supervisor all off-duty reportable contact with a law enforcement officer/agency as defined in Appendix A. DHS law enforcement officers must immediately report their arrest to their supervisor. DHS law enforcement officers must report all other off-duty reportable contact to their supervisor within 48 hours of the incident.

*Require Quarterly Advisement to DHS Law Enforcement Officers of their Duty Regarding Notification of Reportable Contact, the Lautenberg Amendment's Prohibitions on Carriage of Firearms, and Annual Lautenberg Certification*

As part of the Department's strong stand against crimes of domestic violence, DHS requires that all law enforcement officers receive a quarterly verbal advisement, during quarterly firearms qualifications, of their duty to notify management of any off-duty reportable contact with a law enforcement officer/agency, to include convictions for misdemeanor crimes of domestic violence and issuance of protective or temporary restraining orders, as well as notification of the Lautenberg Amendment's prohibitions on carriage of firearms. DHS also requires all law enforcement officers complete, on an annual basis, Lautenberg Amendment certifications regarding no conviction of a misdemeanor crime of domestic violence, as defined in Appendix A.

*Notification of Lautenberg Amendment Convictions Shall Result in the Immediate Suspension and Subsequent Revocation of Authority to Carry a Firearm or Perform Law Enforcement Duties*

The Lautenberg Amendment requires that a law enforcement officer convicted of a misdemeanor crime of domestic violence may not possess a firearm or ammunition. DHS law enforcement officers convicted of such crimes, including pleas of no contest or sentences of probation before judgment, will no longer be authorized to carry a firearm or perform law enforcement functions. When a Component is initially notified of a potentially qualifying conviction, the Component is required to suspend the law enforcement officer's authority to carry a weapon and perform law enforcement duties within 24 hours of such notification. Once the Component is able to confirm the existence of a qualifying conviction, in consultation with the Component's legal counsel as appropriate, the authority to carry a weapon and perform law enforcement duties must be revoked. Subsequently, Components will pursue reassignment from a law enforcement position, an adverse action for failure to meet a condition of employment, or an adverse action based on the underlying misconduct.

*DHS Law Enforcement Officer's Mandatory Notification of the Issuance of Protective Orders, Temporary Restraining Orders or any Other Court Order*

FOR OFFICIAL USE ONLY
2

FOR OFFICIAL USE ONLY

*Restricting a DHS Law Enforcement Officer's Contact with Another Individual or
Ability to Possess a Firearm*

Consistent with DHS's law enforcement mission, the Department requires all law
enforcement officers report to their supervisor all protective and temporary restraining
orders restricting their contact with another individual or their ability to possess a firearm,
about which they are aware. Notification is required to be made within 48 hours of the
law enforcement officer becoming aware of the protective order, temporary restraining
order, or any other court order restricting the employee's contact with another individual
or ability to possess a firearm. Upon notification of the issuance of protective or
restraining orders, DHS Components must implement a process by which supervisors
make an initial determination of the appropriate course of action, in consultation with
Component leadership, Component counsel, the Component's Office of Professional
Responsibility (or equivalent) and the Component's Office of Employee and Labor
Relations (or equivalent) as appropriate.

*Mandatory Suspension of Authority to Carry a Firearm or other Weapon and to
Perform Law Enforcement Duties Following Notification of Law Enforcement
Officer/Agency Contact Involving an Allegation of Off-Duty Violence by a DHS
Law Enforcement Officer and/or Issuance of a Protective or Temporary
Restraining Order Related to an Allegation of Domestic Violence or Other Alleged
Violent Behavior*

To best protect the interests of the public, the Department, the officer involved,
and the alleged victim(s), this policy mandates the immediate suspension of an officer's
authority to carry government-issued or otherwise authorized weapon(s) and to perform
law enforcement duties upon notification of (1) an off-duty DHS law enforcement
officer's contact with a law enforcement officer/agency where the allegation contains a
component of unlawful or unjustified violence by the law enforcement officer; or (2) the
issuance of a protective or temporary restraining order against a DHS law enforcement
officer related to an allegation of domestic violence or based on some other form of
alleged violent behavior, or the officer's ability to possess a firearm.

This policy requires that Components provide verbal notice to the officer at the
time of suspension, with formal written documentation of the suspension of these
authorities within five (5) business days after the date of verbal notification. This policy
coincides with Component obligations to report all allegations of criminal misconduct
and all allegations of serious, noncriminal conduct in accordance with DHS Management
Directive 0810.1, dated June 10, 2004.

- For all circumstances requiring the formal reporting of misconduct in accordance
  with DHS Management Directive 0810.1, further assessments pertaining to the
  suspension of an officer's authority to carry government-issued or otherwise

FOR OFFICIAL USE ONLY
3

FOR OFFICIAL USE ONLY

authorized weapon(s) and to perform law enforcement duties will be coordinated with the appropriate DHS internal investigative entity (Office of Inspector General and/or the Component Office of Professional Responsibility, or equivalent).

- For all circumstances that do not require the formal reporting of misconduct in accordance with DHS Management Directive 0810.1, Components will develop procedures to determine if continued suspension of an officer's authority to carry government-issued or otherwise authorized weapon(s) and to perform law enforcement duties is warranted. This will include an assessment into the facts and circumstances conducted by Component leadership (not less than a second-line supervisor) to determine whether continued suspension is warranted. In conducting such assessments, Component managers will consider both the law enforcement contact, action or order issued and the conduct of the officer involved. Even if a state or local court or law enforcement agency declines to take action, a review by Component managers may reveal that the officer's conduct is inconsistent with the continued authority to carry a firearm or other weapon or perform federal law enforcement duties.

In all situations where a Component suspends or revokes an officer's law enforcement authority to carry a firearm, DHS requires that Components immediately take custody of any government-issued firearms or other weapons, and where applicable, rescind, in writing, any previous authorizations to utilize a personally-owned firearm in the performance of the officer's duties.

*Take Prompt Remedial Action for Failure to Report Law Enforcement and Judicial Contact*

In accordance with this directive, upon awareness of an off-duty reportable contact that was not reported by a DHS law enforcement officer as required by this policy, DHS Components will review the situation, the factors underlying the failure to report, and take appropriate actions based on the information received, including discipline for misconduct as appropriate and in a manner consistent with law and regulation. DHS Components' policies will include penalties for a failure to report off-duty reportable contact.

*Mandatory Biannual Reporting of All Suspensions or Revocations of DHS Law Enforcement Officer's Authority to Carry a Firearm and Perform Law Enforcement Duties*

To promote greater transparency and accountability, DHS mandates that Department Components track and report to the Deputy Assistant Secretary for Law Enforcement Policy the number of law enforcement officers who have had their authorities suspended or revoked following off-duty contact with a law enforcement

FOR OFFICIAL USE ONLY
4

FOR OFFICIAL USE ONLY

officer/agency or the issuance of a protective or temporary restraining order, and those
who have subsequently had their authorities reinstated following internal agency review
and assessment.

> *Require Annual Training for all Department Supervisors of Law Enforcement
> Officers on Federal Law, Regulations, and Department Policy Regarding the
> Suspension or Revocation of an Officer's Law Enforcement Authorities*

As part of the Department's effort to establish sound policy and consistent practice
regarding the suspension or revocation of a law enforcement officer's authorities, annual
training will be provided to managers regarding the decision-making process associated
with this policy.

> *Require Annual Domestic Violence Awareness Training for all Department Law
> Enforcement Officers*

As part of the Department's strong stand against crimes of domestic violence,
annual training will be provided to all Department law enforcement officers regarding
these crimes to reinforce Department values and assist in preventing domestic violence.

Within 60 days from the date of this policy, each DHS Component shall designate
an executive-level point of contact at the Component's headquarters office who will be
responsible for the implementation of this policy, and for promoting compliance with its
provisions, within his or her area of responsibility and who will consult with their
Component privacy office to ensure appropriate Privacy Act coverage for the collection
of this information. Upon designating a POC for this policy, DHS Components will
provide DHS Law Enforcement Policy with their designee's contact information. In
addition, within 60 days from the date of this policy, each DHS Component shall provide
to DHS Law Enforcement Policy their plan to implement the policy, ensuring that
responsibilities under labor relations statutes and union agreements are fulfilled, as
applicable.

All questions regarding the scope and implementation of this policy should be
directed to the Deputy Assistant Secretary for Law Enforcement Policy, Office of Policy.

FOR OFFICIAL USE ONLY


APPENDIX A

**Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law
Enforcement Personnel and the Suspension and/or Revocation of Authority to
Carry a Firearm or other Weapon and Perform Law Enforcement Duties**

For the purposes of this policy, the following terms have the definitions set forth below:

*Convicted of a Misdemeanor Crime of Domestic Violence:* a law enforcement
officer who has been found guilty under federal, state or tribal law of a crime
defined by 18 U.S.C. § 921(a)(33)(A), provided that the law enforcement officer
"was represented by counsel in the case, or knowingly and intelligently waived the
right to counsel in the case," and, if the law enforcement officer was entitled to a
trial by jury, the case was, in fact, tried by jury or the law enforcement officer
"knowingly and intelligently waived the right to have the case tried by a jury, by
guilty plea or otherwise," 18 U.S.C. § 921(a)(33)(B). Convictions include no
contest pleas and sentences of probation.

*Government-Authorized Personally Owned Weapon:* A firearm or other weapon
that is not government-owned, but is authorized by the government for use by a
law enforcement officer in performance of their official duties.[1]

*Government-Owned Weapon:* A firearm or other weapon owned by the
government and assigned to a law enforcement officer for use in performance of
their official duties.

*DHS Law Enforcement Officer:* For the purpose of this policy, a law enforcement
officer is any employee within the Department who is duly sworn and authorized
by law to carry a weapon, make arrests, or execute search and arrest warrants.

*Lautenberg Amendment:* Specifically refers to 18 U.S.C. § 922(g)(9), which
prohibits anyone who has been convicted in any court of a misdemeanor crime of
domestic violence from possessing any firearm or ammunition.

*Off-Duty Reportable Contact:* All instances where a DHS law enforcement officer
is off-duty and not acting in an official capacity and is questioned, interviewed,
detained, or arrested as a subject of an enforcement action or investigation by a
law enforcement agency (either internal to DHS or external) during the course of
said agency's official duties to determine if the DHS law enforcement officer was
a party to an alleged violation of law. Reportable contact also includes the known

---

[1] Nothing in this policy shall be construed as interfering with the right of law enforcement officers to carry privately
owned firearms for personal use as private citizens. Law enforcement officers are expected to comply with all
applicable federal, state, and local laws when exercising this right.

FOR OFFICIAL USE ONLY

issuance of any protective order, temporary restraining order, or other court order restricting a DHS law enforcement officer's contact with another individual. Reportable contact excludes instances when a DHS law enforcement officer is contacted for civil violations or traffic violations where there was no allegation of violence, threat of violence, or where the civil or traffic violation did not include the possession or use of alcohol or drugs.

*Suspend Law Enforcement Authorities:* an affirmative management action, in writing and pursuant to any procedures which have been or may be established, which temporarily removes a law enforcement officer's authority to perform law enforcement duties and carry a government-issued firearm or other weapon, as well as the authority granted through their law enforcement position to carry a personally-owned or off-duty weapon as a result of alleged misconduct (including self-reported misconduct) or disciplinary action. The action results in the law enforcement officer's surrender of all DHS-issued firearms or other weapons, badges and credentials, and temporary removal of the authorization to carry a firearm in the performance of the officer's official duties and perform law enforcement duties, to include the authorization of home-to-work privileges.

*Revoke Law Enforcement Authorities:* an affirmative management action, in writing and pursuant to any procedures which have been or may be established, which permanently terminates a law enforcement officer's authority to perform law enforcement duties and carry a government-issued firearm or other weapon, as well as any authority previously granted through their law enforcement position to carry a personally-owned firearm while on duty. This action results in the law enforcement officer's surrender of all DHS-issued firearms or other weapons, badges and credentials, and termination of the authorization to carry a firearm in the performance of the officer's official duties, to include the authorization of home-to-work privileges. In accordance with law, regulation, and policy, a permanent revocation of firearms credentials may be grounds for reduction in grade, reassignment, or removal.

# Appendix IV:  CBP Domestic Violence Policy



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

**DIRECTIVE NUMBER:** 51000-004

**EFFECTIVE DATE:** December 9, 2020

**SUPERSEDES:** N/A

**OFFICE:** Enterprise Services

**SUBJECT CODE:**

**SUB OFFICE:** Human Resources Management

**DISTRIBUTION:**

**PROGRAM OFFICE:** Human Resources Policy and
Programs Directorate/Human Resources Policy and
Regulatory Affairs Division

### U.S. CUSTOMS AND BORDER PROTECTION
### DOMESTIC VIOLENCE POLICY

**1   PURPOSE**

1.1     U.S. Customs and Border Protection (CBP) strives to promote a safe and healthy
work environment for all employees, and to sustain a workforce that is free from the
harmful effects of domestic violence.

**2   POLICY**

2.1     It is the policy of CBP to provide assistance to employees who are victims of domestic
violence.  It is also the policy of CBP to prohibit employees from committing domestic violence,
and to ensure domestic violence offenders are held accountable for their actions.

**3   AUTHORITIES / REFERENCES**

3.1     Presidential Memorandum, Establishing Policies for Addressing Domestic Violence in
the Federal Workforce (April 18, 2012);

3.2     Office of Personnel Management, Guidance for Agency-Specific Domestic Violence,
Sexual Assault, and Stalking Policies (February 2013);

3.3     Title 5, Code of Federal Regulations, Part 735, Employee Responsibilities and Conduct;

3.4     Title 18, United States Code § 922(g)(9);

3.5     Department of Homeland Security Policy Directive 045-06, Required Reporting of Off-
Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension
and/or Revocation of Authority to Carry a Firearm or Other Weapon and Perform Law
Enforcement Duties (January 10, 2017);

3.6     CBP Standards of Conduct, Directive 51735-013B (December 9, 2020);



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

3.7     CBP Table of Offenses and Penalties (December 9, 2020);

3.8     Arrest of CBP Employees, Directive 51735-014A (December 9, 2020);

3.9     CBP Use of Force Policy, Guidelines and Procedures Handbook, HB 4500-01C (May 2014);

3.10    Delegation of Authority for Disciplinary and Adverse Actions, Delegation Order Number 20-017 (October 6, 2020).

**4  SCOPE**

4.1     This Directive applies to all CBP employees.  Where there are differences in this Directive and a negotiated union agreement, the negotiated union agreement shall govern over those matters concerning bargaining unit employees.

**5  RESPONSIBILTIES**

5.1     Executive Assistant Commissioners; Chief, U.S. Border Patrol; Assistant Commissioners; and headquarters office executive leadership are responsible for ensuring compliance with the provisions of this Directive within their respective program offices, and for ensuring the necessary support and resources are available to supervisors and managers in their efforts to address employee and workplace issues caused by domestic violence.

5.2     The Assistant Commissioner, Office of Human Resources Management, is responsible for ensuring the provisions of this Directive are compliant with Federal regulations and OPM guidance, for providing administrative advice and support to supervisors and managers on domestic violence matters affecting the workplace, and promoting employee awareness of CBP's domestic violence policies.

5.3     The Office of Professional Responsibility (OPR) is responsible for investigating allegations of domestic violence and any workplace incidents related to acts of domestic violence, whether an employee is a victim or offender, and for serving as a CBP liaison with outside law enforcement entities.

5.4     Supervisors and managers are responsible for ensuring employees are aware of the provisions of this Directive, for maintaining a safe and non-threatening work environment, for offering assistance through the Employee Assistance Program (EAP) to employees who either commit or are affected by domestic violence, for following Agency policies and procedures, and for promptly initiating administrative action against employees who are domestic violence offenders.

5.5     Employees at all levels of CBP are responsible for upholding CBP's integrity and professionalism standards. With exception of employee victims, who are urged, all CBP



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

employees are responsible for reporting any acts, suspected acts, or threats of domestic violence through their supervisory chain of command and OPR, and for considering use of the EAP and other resources that are available to improve personal health, wellness and safety.

## 6    DEFINITIONS

6.1    Domestic Violence – Felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

6.2    Domestic Violence Offender – An individual who commits or threatens to commit an act of domestic violence.

6.3    Protection or Restraining Order – A protection order, also called a restraining order or stay-away order, is an order issued by a court to protect a victim from a perpetrator. Protection orders may be issued in criminal cases as a condition of probation or condition of release, particularly in a domestic violence, sexual assault, or stalking related crime.

6.4    Workplace – An employee's official duty station or alternative work location that is associated with the employee's established tour of duty (working hours). The employee is considered to be in the workplace while in or using the resources of CBP, or anywhere that he or she is conducting CBP business, or while on work-related travel.

6.5    Workplace-related incidents – Refers to incidents of domestic violence affecting the employee outside the workplace, including acts, attempted acts, or threatened acts by or against the employee and/or against the employee's family or property that are brought into the workplace, or that occur outside the workplace but have an impact on the workplace, or that occur inside the workplace.

## 7    STATEMENT OF CONFIDENTIALITY

7.1    CBP recognizes an employee's right to privacy and the need for confidentiality of all incidents of domestic violence. CBP will maintain the confidentiality of employee disclosures of domestic violence, both orally and in writing, received from both victims and perpetrators, to the extent permitted by law. In the event information must be disclosed to protect the safety of the disclosing employee or for the protection of others, CBP will limit such disclosure to that which is minimally necessary for protection and safety. CBP will attempt to provide advance notice to the disclosing employee that the information minimally necessary will be disclosed, to whom it will be disclosed, the reasons for the disclosure and the information being disclosed. Written disclosures must be kept in a confidential and separate file from employee personnel records.

Page 3 of 9

280



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

## 8 PROCEDURES

8.1    General Awareness

   8.1.1    Supervisors must ensure their employees are aware of the policies and provisions
   of this Directive, and the Agency's prohibition against domestic violence.

   8.1.2    Supervisors and managers are required to complete agency-sponsored training on
   how to manage and respond to employee victims or employee offenders of domestic
   violence, and any workplace-related incidents stemming from domestic violence.

   8.1.3    CBP employees who exercise law enforcement authority.

      8.1.3.1    CBP employees are required to receive a quarterly verbal advisement,
      during quarterly firearms qualifications (normally), of their duty to notify
      management of any off-duty reportable contact, as outlined in 8.3.4, with a law
      enforcement officer/agency, to include convictions for misdemeanor crimes of
      domestic violence and issuance of protective or temporary restraining orders, as well
      as notification of the Lautenberg Amendment's prohibitions on carriage of firearms.
      These employees are also required to complete an annual Lautenberg Amendment
      certification which certifies they have no convictions of a misdemeanor crime of
      domestic violence.

   8.1.4    CBP employees are required to complete annual domestic violence awareness
   training.

8.2    Employee Victims of Domestic Violence

   8.2.1    Reporting Requirements – Employees who are victims of domestic violence are
   urged, but are not required to immediately report the incident to their first-line supervisor,
   and/or to the Office of Professional Responsibility through the toll-free Joint Intake
   Center Hotline at 1-877-2INTAKE (1-877-246-8253) or Joint.Intake@dhs.gov.

      8.2.1.1    Supervisors and managers are to act promptly and in accordance with
      applicable Agency procedures upon receiving a report of an employee victim of
      domestic violence. Relevant facts must be assessed to properly address any
      immediate effects on the employee and the workplace. Supervisors should consult
      with their senior management officials and contact the EAP for guidance.

   8.2.2    Workplace Flexibilities – Various workplace flexibilities may be extended to
   employee victims of domestic violence, to the greatest extent permissible by law, and in
   accordance with CBP policies. Workplace flexibilities may include: various forms of
   paid, unpaid, and advanced leave, telework arrangements, and flexible work schedules.
   All possible leave options should be considered for employee victims of domestic
   violence. Employees must be sure to comply with procedural requirements of workplace

Page 4 of 9

**281**

DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

flexibilities programs. The employee must disclose sufficient details about a domestic
violence incident to enable the supervisor to make workplace flexibilities approval
decisions. When the need for time off is foreseeable, an employee must provide
reasonable advance notice to the agency.

8.2.3  Proof/Evidence – In making workplace flexibilities considerations, a supervisor
may use an employee's credible statements as proof of a domestic violence incident.
Supervisors may request additional proof or verification, such as police or court reports, a
service provider's statement, a protection order, medical verification, or other forms of
credible evidence, but employee-victims shall not be required to provide this information.
If a supervisor believes that more information is needed before making a workplace
flexibility decision, but more information is not provided by the employee-victim, then
the agency will make a decision based on evidence already in the agency's possession
from the employee-victim.

8.2.4  Employee Autonomy – Supervisors must not request or require an employee
victim of domestic violence to report the domestic violence incident to law enforcement
authorities. To do so could ultimately place victims of domestic violence in greater
danger. Furthermore, filing a report with law enforcement authorities should not be a
condition for approving requests for leave or other workplace flexibilities.

8.2.5  Work Status – An employee can be charged absent without leave (AWOL) if the
employee is absent from work without supervisory approval. Employee victims of
domestic violence may later request to have charges of AWOL substituted by another
form of leave, as permitted by Agency leave policies. AWOL substitutions are subject to
supervisory approval, and based on the circumstances of each individual case.

8.2.6  Employee Referrals – Employees who are victims of domestic violence are
encouraged to seek assistance through professional services (see Appendix A). In all
instances, supervisors must refer employees to the EAP. Employee victims of domestic
violence are advised to utilize EAP support services, although use of the EAP is not
mandatory.

8.3  Employee Offenders of Domestic Violence

8.3.1  Workplace Incidents – Employees who commit acts of domestic violence in the
workplace will be removed from the premises, reported to OPR, subject to arrest and/or
prosecution, and subject to disciplinary/adverse action, up to and including removal from
Federal service.

8.3.2  Employee Reporting Requirements – An employee who (whether on or off-duty)
is arrested, receives a summons or citation to appear in court on criminal charges, is
indicted or convicted of domestic violence, or is the subject of a protection or restraining
order must report the incident to their first line supervisor (or other manager within their
chain of command) and to OPR (1-877-2INTAKE) as soon as possible. If arrested, an

Page 5 of 9

282



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

employee must report the arrest immediately, or as soon as possible, but not more than 24 hours after the arrest. If reporting the arrest within the prescribed timeframe is precluded by circumstances of the arrest, then it must be reported as soon as circumstances allow, along with a full explanation of the reason the arrest was not reported immediately.

8.3.3   Arrest Notification – Upon receiving notification of an employee arrest/incarceration for domestic violence, supervisors must promptly follow Agency procedures as outlined in the Arrest of CBP Employees Directive (#51735-014A).

8.3.4   Law Enforcement and Judicial Contact Notification – CBP employees who exercise law enforcement authority who are off-duty and not acting in an official capacity and are questioned, interviewed, or detained as a subject of an enforcement action or investigation by a law enforcement agency during the course of the agency's official duties to determine if the CBP employee was a party to an alleged violation of law, must report this contact with law enforcement within 48 hours to their first-line supervisor. These CBP employees must also report the known issuance of any protective order, temporary restraining order, or other court order restricting contact with another individual or ability to carry a firearm. This reporting excludes civil violations or traffic violations where there is no allegation of violence, threat of violence, or where the civil violations or traffic violations did not include the possession or use of alcohol or drugs.

8.3.5   Work Status (Arrest/Incarceration) – Leave requests will be handled consistent with negotiated agreements, Directives, and Federal regulations.

8.3.6   Administrative Action – In accordance with the CBP Standards of Conduct and Table of Offenses and Penalties, employees who commit or threaten to commit acts of domestic violence will have administrative action taken against them. Both on and off duty acts of domestic violence can result in administrative action, i.e., disciplinary action ranging up to removal from Federal service, even for a first offense. Supervisors should contact their servicing LER Specialist early in the process for advice, and initiate swift and immediate administrative action for domestic violence offenses.

8.3.6.1   Indefinite Suspension – Where a nexus exists, an employee will be placed on indefinite suspension when there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed. Indefinite suspension places an employee in a temporary non-duty/non-pay status pending investigation, inquiry, or further Agency action, in accordance with Agency procedures and consistent with Federal regulations. Supervisors should immediately consult with their LER Specialist to ensure employees are placed on indefinite suspension expeditiously, as circumstances warrant.

8.4   CBP Firearms/Defensive Equipment – Employees with authority to carry a firearm, ammunition, and other CBP defensive equipment in the performance of their duties will normally have their authority revoked following an arrest or charge of domestic violence for thirty days following the arrest or charge. After 30 days, CBP will follow the procedures set

Page 6 of 9



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

forth in the Collective Bargaining Agreement (if applicable), and decide whether under all of the circumstances the Officer's firearm carriage authority should be reinstated.  In rare circumstances, if no nexus exists, management will reinstate the officer's authority to carry a firearm and return the service-issued firearm as soon as practicable, within the initial 30 days. The revocation of authority to carry a firearm will continue throughout the disposition or proceedings of a domestic violence case.  An employee who commits domestic violence will have all law enforcement authority revoked during the pendency of the matter, in accordance with Agency procedures.

8.5    Conviction of Domestic Violence (Lautenberg Amendment) – Under certain provisions of the Federal Gun Control Act, employees who are subject to a protective order related to domestic violence or convicted of a qualifying misdemeanor crime of domestic violence are prohibited from possessing or carrying firearms or ammunition (18 U.S.C. 922(g)).  The provision regarding misdemeanor crimes of domestic violence is known as the "Lautenberg Amendment," which does not afford an exemption for those who carry firearms in the performance of their official duties. Within 24 hours of receiving notification of a potentially qualifying conviction, CBP will temporarily rescind and may subsequently revoke the employee's authority to carry a firearm and perform law enforcement duties. Therefore, any employee who must carry a firearm or ammunition in the performance of their duties as a condition of employment may face disciplinary action, up to and including removal from Federal service, if impacted by the Lautenberg Amendment. In the cases where the conviction has been expunged, consult the collective bargaining agreement.  Absent other outstanding misconduct issues, an authorized officer who has had a domestic violence conviction (i.e., Lautenberg Amendment) expunged will be treated as if the conviction had never occurred, e.g. the authorized officer will be permitted to carry a firearm in accordance with the provisions of the CBP Use of Force Policy, Guidelines and Procedures Handbook, HB 4500-01C.

8.6    Self-Help Referrals – Employees who commit domestic violence are encouraged to seek self-help through professional services, to include services offered by the EAP.  However, appropriate disciplinary action may still be imposed for committing an act of domestic violence even if an employee seeks self-help.  The employee's supervisor should remind the employee of the availability of EAP services, although use of the EAP is not mandatory.

## 9    WORKPLACE SAFETY AND PRECAUTIONS

9.1    Office Security – Supervisors should be prepared to follow their local safety procedures with regards to threats or emergencies related to acts of domestic violence.  Workplace safety plans should be properly executed.  Supervisors and security personnel should ensure office safety precautions are administered to protect employees against impermissible entry into a work environment by unauthorized individuals.

9.2    Workplace-Related Incidents – Supervisors should appropriately address any employee circumstances that may lead to domestic disturbances in the workplace.  In some instances, both a domestic violence victim and offender may be assigned to the same work unit or locale, and may need to be separated during work hours.  If an employee has a protective order against

Page 7 of 9



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

another employee, and the order allows the alleged offender to report to a nearby or same work location, consideration should be given to changing the alleged offender's duty location or the employee-victim's duty location (if more feasible and the employee-victim requests/or agrees to the change), granting telework options, or changing tours of duty as preventive and protective measures. Impacted employees should be directed to avoid contact while on duty.

## 10    NON-DISCRIMINATION

10.1    CBP is committed to treating all individuals in a non-discriminatory manner, without regard to their protective status under Federal law, Executive Order, regulation, or policy in all employment programs and management decisions, to include those involved in or affected by domestic violence. CBP policy strictly prohibits any form of unlawful discrimination. Any employee, applicant for employment, or former employee who believes he or she has been discriminated against because of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age, physical or mental disability, status as a parent, genetic information, or experienced retaliation for prior EEO involvement, and wishes to file an EEO complaint, must seek informal EEO counseling within 45 calendar days of the alleged discriminatory event by:  emailing the CBP EEO Complaint Filing Mailbox at cbpeeocomplaintfiling@dhs.gov; calling 1-877-MY-EEO-HELP (1-877-693-3643); or contacting the servicing EEO Specialist.

10.2    CBP is committed to ensuring domestic violence communications, resources, assistance, and workplace flexibilities are afforded to all employees, including those with limitations or disabilities.

*Mark A. Morgan*                                          DEC 1 1 2020

_____                          _____
Mark A. Morgan                                                Date
Chief Operating Officer and
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

**APPENDIX**

**DOMESTIC VIOLENCE ASSISTANCE AND RESOURCES**

**Local law enforcement – Dial 911 in case of an emergency**

**CBP Office of Professional Responsibility – Joint Intake Center**
**877-246-8253**

**CBP Employee Assistance Program**
**800-755-7002**

**National Coalition Against Domestic Violence**
**www.ncadv.org**

**National Domestic Violence Hotline**
**1-800-799-SAFE**
**www.thehotline.org**

**U.S. Office of Personnel Management**
**www.opm.gov**

**U.S. Department of Justice**
**www.doj.gov**

# Appendix V:  Use of Force Policy Clarification - Emergency Situations

440 Koonce Road
Harpers Ferry, WV  25425



**U.S. Customs and Border Protection**

AUG 1 2 2019

MEMORANDUM FOR:      See Distribution

THROUGH:      William A. Ferrara
Executive Assistant Commissioner
Operations Support

FROM:      Christopher A. Bishop
Acting Director
Law Enforcement Safety and Compliance Directorate

SUBJECT:      Use of Force Policy Clarification – Emergency Situations

Generally, prior to being issued any U.S. Customs and Border Protection (CBP) authorized use of force device or firearm, the CBP Use of Force Policy mandates that all CBP law enforcement personnel receive training and demonstrate an acceptable level of proficiency on each of the devices or firearms they are issued.  Failure to ensure the proper training of its personnel and/or require its personnel to demonstrate proficiency exposes the agency to allegations of negligent or inadequate training, judgment or supervision.  Furthermore, officers and agents that carry or deploy use of force devices or firearms on which they have not received the appropriate training or demonstrated the required level of proficiency may also be found negligent.  In either of the above cases, the agency may be liable under relevant tort law statutes.  However, understanding the often unpredictable nature of law enforcement encounters, the CBP Use of Force Policy contains specific exceptions for emergency situations.  The purpose of this memorandum is to clarify what constitutes an emergency situation.

An emergency situation can be defined as an unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat.  In such threatening and emergent situations, authorized officers and agents may use any available weapon in a manner that is reasonable, and necessary for self-defense or the defense of another person.[1]  In these situations officers and agents must remember that the manner in which any less-lethal device or firearm is used must still comply with the objectively reasonableness analysis to which all law enforcement uses of force are subjected.  For instance, deadly force must not be used unless there is a reasonable belief that the subject of such force poses an imminent threat of death or serious physical injury.

---

[1] CBP Use of Force Policy, Guidelines and Procedures Handbook, Office of Training and Development, HB 4500-01C, Chapter 4: *Guidelines and Procedures on the Use of Less Lethal Force*, at 37.

Use of Force Policy Clarification – Emergency Situations
Page 2

In contrast, an emergency situation does not exist when the agency has advance notice, with time to plan operations and prepare for incidents that may occur in the near future. As a proactive measure to address potential threats, officers or agents must not be issued, carry, or use a less-lethal device or firearm for which they have not met the minimum training and proficiency standards.

In addition to the training and proficiency requirements listed above, CBP law enforcement personnel may only be issued and carry use of force devices or firearms that are listed on the Authorized Equipment List.

Please feel free to contact me if you have any questions. If members of your staff have any questions, they may contact Christopher A. Bishop, Acting Director, LESC, at (304) 724-5922 or email Christopher A. Bishop@cbp.dhs.gov.

Distribution:    Commissioner
                 Deputy Commissioner
                 Executive Assistant Commissioners
                 Chief, U.S. Border Patrol
                 Assistant Commissioners

## Appendix VI:  Glossary

<u>Active Resistance</u> - A type of resistance where physical attributes are being used to resist an officer/agent's control efforts.  The efforts are not directed toward the officer/agent but rather appear intended to thwart an officer's/agent's control efforts.

<u>Authorized Officers/Agents</u> - CBP Officers, Border Patrol Agents, Air and Marine Officers and Agents, OPR Special Agents and Investigators, and other qualified CBP personnel as designated by the Commissioner of CBP.

<u>Assault</u>

<u>Reportable Assault</u> (Reportable in E-STAR) - Any action which meets the definition of Assault, Assaultive Resistance (Physical Injury, Serious bodily injury), or Transferred Intent regardless of whether or not the subject was apprehended, identified, or the prosecutorial disposition.

<u>Assault</u> - A physically manifested attempt or threat to inflict injury on CBP personnel, whether successful or not, which causes a reasonable apprehension of imminent bodily harm.

<u>Assaultive Resistance</u> (Physical Injury) - Resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self.  This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent.

<u>Assaultive Resistance</u> (Serious Bodily Injury/Death) - Resistance characterized by a level of aggression or violence that causes or has the potential to cause serious bodily injury or death to the officer/agent, others, or self.

<u>Transferred Intent</u> - When an intent to cause harm to one person results in harm or damage to another person or a thing instead of the intended human target. (e.g., when a launched or thrown projectile strikes an officer or agent's vehicle, but misses the area in which an officer/agent is sitting).

<u>Authorized Equipment List (AEL)</u> - A list of equipment that the LESC has tested, evaluated, and authorized for use within CBP.  All equipment must be approved for field use by the DO.  The AEL can be found on the LESC section of CBPnet.

<u>Body Armor Coordinator (BAC)</u> - A designated employee who is responsible for ordering and issuing body armor as required.

Carry - Carry (of a handgun) refers to any manner of carry that implies the handgun is ready to be drawn and fired if necessary.  Carry (of a shoulder-fired weapon) refers to any manner of carry that implies the firearm is ready to be utilized for law enforcement operations.

CBP Firearm (as referenced in this Handbook) - A firearm that has been authorized by the Executive Director of the LESC, and approved for use by a Designated Official.

Co-Authority (COA) - An individual designated by the Responsible Official to act in his/her stead in all functions in the Firearms, Armor and Credentials Tracking System (FACTS).

Collapsible Straight Baton (CSB) - A less-lethal device composed of cylindrical shafts that lock into each other when expanded. The shafts are usually made of steel, but lightweight baton models may have shafts made from aluminum alloy.

Compliance Techniques - Actions taken by an Authorized Officer/Agent on a subject to establish and maintain control.  Examples of compliance techniques include the use of Oleoresin Capsicum (OC) spray, strike pressure points, stunning techniques, takedowns, joint manipulations and use of an Electronic Control Weapon (ECW).

Compressed Air Launcher - A less-lethal impact/chemical irritant delivery system that is powered by compressed air. The launcher can deliver a variety of less-lethal projectiles including, PAVA pepper powder, non-toxic marking rounds, and those designed for kinetic impact.

Contact Controls - Actions taken by an Authorized Officer/Agent on a subject to establish and maintain control.  Contact controls may include measures such as strategic positioning, escort holds, joint manipulation or immobilization, or touch pressure point stimulation.

Controlled Noise and Light Distraction Device (CNLDD) - A pyrotechnic less-lethal device designed to emit a bright light and loud noise to momentarily disorient and confuse subjects.

Cooperative Controls - Actions taken by an Authorized Officer/Agent on a subject to establish and maintain control.  Cooperative controls may include verbal commands.

Counter Assault Techniques - Actions taken when a subject has either assaulted the officer/agent or is displaying a willingness and intent to do so.  Examples of counter assault techniques are concentrated strikes involving the use of empty-hand techniques (e.g., the use of body parts as weapons), the CSB and the ECW.

Deadly Force - Any use of force that carries a substantial risk of causing death or
serious bodily injury (see "Use of Force" and "Serious Bodily Injury").  Deadly force does
not include force that is not likely to cause death or serious bodily injury, but
unexpectedly results in such death or injury. In general, examples of deadly force
include, but are not limited to, intentional discharges of firearms against persons, uses
of impact weapons to strike the neck or head, any strangulation technique, strikes to the
throat, and the use of any edged weapon.

Designated Official - Executive Assistant Commissioners and Chief, United States
Border Patrol (or their Headquarters designees); Assistant Commissioner, Office of
Professional Responsibility; and the Executive Director, Law Enforcement Safety and
Compliance Directorate.

Disabling Fire - Discharge of a firearm for the purpose of preventing a non-compliant
moving vehicle, vessel, aircraft, or other conveyance from operating under its own
power, but not intended to cause bodily injury.

Electronic Control Weapon (ECW) - A less-lethal device which is designed to use short-
duration electronic pulses to cause Neuro-Muscular Incapacitation (NMI) and/or pain,
with minimal risk of serious bodily injury or death.

Emergency Situation - An unplanned event or exigent circumstance that occurs with no
advanced warning, rapidly evolves, and which requires a reactive response to address
an imminent threat.

Employee Assistance Program (EAP) - A CBP program established to provide
assistance and guidance to employees.

Empty Hand Strikes - Strikes delivered by a body part (e.g. palm heel strike, jab, cross,
elbow strike, snap kick, or knee strike).

Enforcement Action Statistical Analysis and Reporting System (E-STAR) - A CBP
computer system for recording assaults, reportable uses of force, pursuits, reportable
firearms discharges, and other related data.

Field Armorer (FA) - A CBP-certified firearms instructor who has been LESC trained and
certified to conduct limited maintenance and repair of CBP firearms.

Firearms Coordinator (FCO) - A designated employee who is responsible for receiving,
controlling and issuing CBP firearms and associated equipment to CBP personnel
within their duty area.

Firearms Instructor (FI) - An Authorized Officer/Agent who has been LESC trained and
certified to conduct firearms training, tactics, and proficiency evaluations for CBP
Authorized Officers/Agents.

Firearms, Armor, and Credential Tracking System (FACTS) - A CBP computer system that provides oversight and lifecycle accountability for specified law enforcement assets and equipment (including firearms, body armor, ECWs, and munition launchers).

FN303 - A less-lethal launcher, powered by compressed air, that delivers frangible, plastic projectiles filled with capsaicin powder.  The projectiles are designed to burst upon impact and disperse the capsaicin powder either into the environment (area saturation) or onto the subject(s) (kinetic impact).

International Boundary Barrier (IBB) - A physical barrier at or between Ports of Entry and placed along the international boundary, which has been designed, manufactured and/or constructed with the capability of controlling the flow of people and goods crossing the border.

The Law Enforcement Safety and Compliance Directorate (LESC) - A division of CBP Operations Support responsible for development of CBP use of force policy, procurement of CBP firearms and tactical equipment, and the development and oversight of use of force training for CBP.

Less-Lethal Coordinator (LLCO) - A designated employee who is responsible for receiving, controlling, and issuing CBP less-lethal use of force equipment to CBP personnel within their duty area.

Less-Lethal Force: Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

Less-Lethal Instructor (LLI) - An Authorized Officer/Agent who has been LESC trained and certified to conduct less-lethal training, tactics, and proficiency evaluations for CBP Authorized Officers/Agents.

Less-Lethal Training Safety Officer (LLTSO) - An officer/agent trained in less-lethal safety procedures to augment safety requirements during authorized less-lethal training.

Less-Lethal Specialty Impact and Chemical Munition (LLSI-CM) - Less-lethal munitions that are designed to deliver impact, chemical irritant, or both.  LLSI-CM can be delivered by means of designated hand thrown munitions or by a munitions launcher.

Mechanical Resistance - A type of active resistance where an object external to physical attributes is used to increase the effectiveness of resistance to an officer/agent's control efforts.  The efforts are not directed toward the officer/agent but rather appear intended to thwart an officer's/agent's control efforts by physically securing or holding another object.

<u>Munition Launcher</u> - A less-lethal specialty impact/chemical munition (LLSI-CM) delivery system that is designed to deliver an impact projectile, a chemical irritant projectile, or a combination projectile with more accuracy, higher velocity, and longer range than a projectile deployed by hand.

<u>Non-Standard Firearm</u> - A firearm that is not on the CBP Authorized Equipment List.

<u>O-Chlorobenzylidenemalononitrile (CS)</u> - The active ingredient in CS gas or spray.

<u>Offensive Driving Techniques (ODT)</u> - ODTs are any driving technique that is consistent with CBP training and is intended to end a pursuit through intentional vehicle-to-vehicle impact.

<u>Oleoresin Capsicum (OC)</u> - The active ingredient in OC spray, derived from cayenne pepper.

<u>OC Spray</u> - A hand held aerosol less-lethal device that disperses the inflammatory agent capsaicin in a conical mist, stream, gel or foam.

<u>Passive Resistance</u> - A type of resistance that is not believed to represent an immediate threat or flight risk, and which is not physical resistance to an Authorized Officer's/Agent's control efforts, but is not cooperative.

<u>Pepperball Launching System (PLS)</u> - A less-lethal launcher, powered by compressed air, that typically delivers frangible, plastic projectiles filled with capsaicin powder.  The projectiles are designed to burst upon impact and disperse the capsaicin powder either into the environment (area saturation) or onto the subject(s) (kinetic impact).

<u>Personal Property Management Oversight Board (PPMOB)</u> - A board composed of representatives from all CBP offices that determines the disposition of lost or stolen CBP assets.

<u>Range Safety Officer (RSO)</u> - An officer/agent trained in range safety procedures and utilized as a safety officer.

<u>Reportable Use of Force</u> (Reportable in E-STAR) - Any use of deadly force; any intentional deployment of a CBP less-lethal device; or any use of a vehicle, weapon, physical tactic or technique that delivers (or is intended to deliver) a kinetic impact to a subject.

<u>Responsible Officials (RO)</u> - Executive Assistant Commissioners (EACs), Chief, U.S. Border Patrol (USBP); Assistant Commissioners (ACs); Chief Patrol Agents (CPA); Directors, Field Operations (DFO); Directors, Air Operations and Marine Operations (DAO, DMO); Executive Director of the Law Enforcement Safety and Compliance Directorate (LESC); Executive Directors, Office of Professional Responsibility (OPR);

Division Directors, Office of Training and Development (OTD); and other officials
designated in writing by the Commissioner.

<u>Serious Bodily Injury</u> - Physical injury that involves long-term and obvious disfigurement;
long-term loss or impairment of the function of a bodily member, organ, or mental
faculty; or a substantial risk of death.

<u>Shoulder-Fired Weapon (SFW)</u> - A CBP rifle, shotgun, or other long arm.

<u>Totality of Circumstances</u> - The consideration of all facts and circumstances applicable
in a particular law enforcement encounter.

<u>Uniformed Law Enforcement Officer/Agent</u> - Authorized Officers/Agent wearing the
official uniform of the three uniformed components of CBP: Air and Marine Operations,
Office of Field Operations, or United States Border Patrol.

<u>Use of Force</u> - When a law enforcement tactic, technique, less-lethal device or weapon
is used to arrest a subject, address a potential threat, or ensure compliance with a
lawful order.

<u>Use of Force Device</u> - Any item designed or marketed as a device which is intended to
cause pain or discomfort to modify the behavior of an individual or group.  This includes,
but is not limited to, devices that may modify an individual's behavior through:

1. Acoustics;
2. Focused or Directed Light;
3. Electrical Current;
4. Directed Energy;
5. Kinetic Impact; or
6. Chemicals.

<u>Vehicle Immobilization Device (VID)</u> - A specialized device whose deployment is
intended to result in the controlled deflation of a vehicle tire or otherwise cause a vehicle
to stop.