UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendants. | Case No. 2:25-cv-05563 <br><br> DECLARATION OF DANIEL PARRA |

## DECLARATION OF DANIEL PARRA

I, Daniel I. Parra, declare and affirm as follows:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line. I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

2. I entered on duty with the U.S. Border Patrol on July 28, 2002. My first assignment as a Border Patrol Agent was at the El Centro Station, El Centro Sector. Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity. These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El

1

1 | Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector.  As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation.

3. From June 8, 2025 to present, I serve as the Incident Commander for Operation At Large Los Angeles, and I operate out of the Border Patrol Incident Command Post (BP ICP).  In this position, I oversee all U.S. Border Patrol operations in the greater Los Angeles area.  I ensure the Border Patrol agents have all the proper resources, not only in terms of materiel, but the requisite training needed to operate in such a complex and fluid environment.  I oversee logistics, prosecutions, use of force events, personnel, and intelligence.  I report directly to the DHS Tactical Commander or act as the DHS Tactical Commander in his absence.  The BP ICP reports up to the DHS National Incident Command Center.

4. I make this declaration based upon my personal knowledge, consultation with colleagues, and/or my review of official CBP records.  If called to testify, I would and could do so competently.

5. On the morning of June 7, 2025, I, along with several of my command staff and Border Patrol personnel traveled to Paramount, California, specifically 6401 Alondra Blvd, which is a business park.  I have attached a satellite map of this area as Exhibit A.  The park itself is a complex of buildings, which include approximately ten buildings with small interconnecting roads inside the park.  The entire park is surrounded by a chain link fence and there are two gated entry and exit gates that are approximately 75 yards apart, both are on Alondra Blvd.  Within this business park, there is an Immigration and Customs Enforcement (ICE) facility that Border Patrol was going to

2

use as a staging area to conduct operations throughout Los Angeles later in the day. The ICE facility is near the back of the business park. Border Patrol was not engaged in any operational mission when we arrived. Rather, we traveled to this location for staging. On the opposite side of the street from the business park on Alondra Blvd was a Home Depot. The ICE facility's proximity to a Home Depot was coincidental, and not a consideration when determining a location for staging. Rather the location was due to operational and security considerations. Border Patrol had limited options that could meet its needs, and this ICE facility was the best available location for staging.

6.  Border Patrol personnel arrived at approximately 8:00 AM at one of the gates. We arrived in unmarked vehicles as well as government vehicles that were clearly marked in green and white as United States Border Patrol and U.S. Customs and Border Protection. Border Patrol arrived prior to ICE being there and we had to wait for approximately 30 minutes before ICE arrived and was able to let us proceed through that singular access point into the business park.

7.  At about 9:00 AM approximately fifty protesters started gathering in the grassy areas in the median by the intersection of Alondra Blvd. Some protesters made their way into the roadway. There were about 20 Border Patrol agents inside the business park. In a short time, the crowd got more agitated. They began blocking traffic and shouting and chanting at the agents. This caused approximately 40 Border Patrol agents that were en route to be delayed. At 9:20 AM five government vehicles that were marked in green and white as United States Border Patrol and U.S. Customs and Border Protection with lights and sirens on arrived and attempted turn left into the business park. At this point, the protest had devolved into a riot. Rioters ran up to the vehicles and began hitting the windows with their hands, shouting at the drivers, and verbally challenging agents to individual physical fights.

8.  At 9:20 AM the 20 Border Patrol agents and ICE personnel inside the business park formed a semi-circle about 15 feet outside the east gate in an attempt to protect the

3

incoming agents while denying rioters entry into the business park. By 10:00 AM the crowd grew to about 100 rioters. They were standing in the median or lanes of traffic. Vehicles traveling on Alondra Blvd. were stopped. There were horns, shouting, chanting, and loud music all of which added to the chaos. At one point a rioter, who seemed to be encouraging others, was making physical contact by purposefully bumping agents with his body. When he was commanded to back up or be arrested, he punched a Border Patrol agent in the face and ran. A few agents gave chase but about 75 rioters approached these agents causing them to stop and deploy chemical and smoke munitions to prevent the crowd from getting closer.

9. Over the course of the next few hours, the crowd size grew and got more and more aggressive. Government vehicles attempting to exit the business park were attacked. The rioters threw various objects including rocks, pieces of broken cinder blocks, large fireworks, empty deployed munition cannisters, large fruit, and water bottles that appeared to be filled with human waste at the vehicles driven by the Border Patrol agents. As rioters attacked vehicles, agents used various less lethal devices, including, but not limited to, CS gas and pepper balls for area saturation, to push the crowd back and away from the vehicles. Two convoys of five to six vehicles were able to leave, but then rioters constructed roadblocks with cinder blocks, shopping carts, trash cans, furniture, nails and screws, wooden pallets, and other materials. All four lanes of Alondra Blvd were blocked just west of the western gate. This completely denied entry or exit to the business park. Several large fires were set in the middle of the street.

10. Between 1:00 PM and 5:00 PM the crowd grew to 200 people. They became more aggressive. They continued to throw rocks, fireworks, broken cinder blocks, mangos and avocados, and many other unknown objects that agents only had a few moments to determine if they presented a threat of injury. At this point many rioters would throw objects at the agents and then seek cover behind various objects, including using large tree trunks and electrical control boxes to hide. Due to this, hand thrown

4

devices including, but not limited to, Controlled Noise and Light Distraction Devices (known as flash bangs because they emit a loud sound and create a flash of bright light), CS canisters (which emit chemical gas), and smoke were no longer effective to control the crowd. Therefore, agents began to deploy non-hand thrown devices, and utilized munition launchers. The munitions launchers utilized included various less lethal Pepperball Launching System (PLS) devices (similar to a paint ball gun), FN303 devices, and various 40-millimeter launchers. The PLS and FN303 devices deliver plastic projectiles filled with capsaicin powder. They may also contain a small amount of marking paint. They are designed to be used against an individual, or they may be used to saturate an area with capsaicin. The 40-millimeter launcher can also be used to deliver less-lethal force against a person, or to saturate an area. 40-millimeter devices used against a person are roughly the consistency of a pencil eraser, or softer.

11. At approximately 5:00 PM the Los Angeles County Sheriff declared the crowd an unlawful assembly. They told the rioters to vacate the area, or they would be subject to arrest. The Los Angeles County Sheriff cleared Alondra Blvd. by deploying various less than lethal devices on individuals who refused to leave the area or threw objects at them. Border Patrol continued to protect the ICE facility until the road was cleared, and all agents and government vehicles could safely leave the area somewhere between 6:00 to 7:00 PM.

12. In the twenty-three years of service with the Border Patrol this was one of the most dangerous situations that I have been involved with. There was a highly organized and sustained level of violence exhibited towards Border Patrol personnel. Due to the high level of sustained violence by the rioters, approximately 102 Border Patrol agents deployed some type of less-lethal munition (LLM). In many cases an agent deployed various types of LLMs multiple times with a total of almost 400 deployments. In fact, after several hours we had to request that our Air and Marine Operations (AMO) resupply us via helicopter with additional LLMs. We requested a resupply at 2:30PM

5

and the resupply via helicopter did not arrive until approximately 4:20 PM. The landing zone had to be within the business park as any other nearby location would result in the opportunity for the crowd to engage with the helicopter, resulting in a highly perilous situation for both AMO personnel and the crowd itself.

13.     We would not and did not target journalists. However, due to the chaotic situation, as described above, it was extremely difficult to tell who a journalist was. In many instances, I observed news crews set up their equipment in the middle of the violent rioters. For the safety of our personnel, we needed to deploy LLMs in the area where those rioters were engaged in violent actions against Border Patrol agents.

14.     Many Border Patrol agents suffered contusions as a result of being hit by various types of projectiles. They also suffered from ringing in their ears from fireworks exploding near their heads. One Border Patrol agent suffered a broken finger when a rock (or some other hard object) was thrown through the driver's side window of the government vehicle he was driving. Because of the force with which it was thrown, the object broke the window, travelled through it, hit his hand, and broke his finger.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 15th day of August, 2025, at Long Beach, California.

DANIEL I. PARRA

# EXHIBIT A

**Exhibit A**
**302**