Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
    declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
    gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice*)
    opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
    peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
    jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
    awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
    mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
    slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
    jreisberg@aclusocal.org
Mohammad Tajsar, Esq. (SBN: 280152)
    mtajsar@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
    peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>        Plaintiffs,<br><br>    v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>        Defendants. | Case No. 2:25-CV-05563-HDV-E<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      August 25, 2025<br>Time:     10:00 a.m.<br>Judge:    Hon. Hernán D. Vera<br>Location:  Courtroom 5B, 5th Floor |

1   Additional Counsel of Record for Plaintiffs:

2   Carol A. Sobel, Esq. (SBN: 84483)
        carolsobellaw@gmail.com
3   Weston Rowland, Esq. (SBN: 327599)
        rowland.weston@gmail.com
4   Law Office of Carol A. Sobel
    2632 Wilshire Boulevard, #552
5   Santa Monica, CA 90403
    Telephone: (310) 393-3055
6
    Paul Hoffman, Esq. (SBN: 71244)
7       hoffpaul@aol.com
    Michael Seplow, Esq. (SBN: 150183)
8       mseplow@sshhzlaw.com
    John Washington, Esq. (SBN 315991)
9       jwashington@sshhzlaw.com
    Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
10  200 Pier Avenue #226
    Hermosa Beach, CA 90254
11  Telephone: (310) 717-7373

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................II

ARGUMENT................................................................................................................. 2

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS..................................... 2

        A.      Defendants' Claims That Plaintiffs Were Involved in Violent Riots Are False..... 2

        B.      The Unrebutted Evidence Establishes Plaintiffs' Retaliation Claims ................... 4

        C.      Plaintiffs Are Likely to Prevail on Their Access Claims ....................................... 5

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM .................................................. 7

III.    PLAINTIFFS HAVE STANDING TO SEEK A PRELIMINARY
        INJUNCTION.................................................................................................. 8

        A.      The Undisputed Record Establishes Plaintiffs' Present, Ongoing Injuries ............ 8

        B.      The Record Also Establishes a Credible Threat of Future Injury to Plaintiffs....... 9

                1.      The Evidence Of An Officially Sanctioned, Sustained Pattern Of Conduct
                        Establishes A Likelihood Of Recurrent Injury ............................................ 9

                2.      All The *Furgatch* Factors Establish A Likelihood Of Recurrence........... 10

        C.      *Lyons* Does Not Apply To The Facts And Claims Presented Here...................... 11

        D.      The Organizational Plaintiffs Have Standing ...................................................... 12

IV.     THE REQUESTED RELIEF IS WORKABLE AND IN THE PUBLIC
        INTEREST ................................................................................................... 12

CONCLUSION.................................................................................................... 15

REPLY ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Alsaada v. City of Columbus, Ohio*,
2021 WL 3375834 (S.D. Ohio June 25, 2021) .......................................................... 17

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ........................................................................... 15, 17

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ......................................................................... 14, 15

*Ballentine v. Tucker*,
28 F.4th 54 (9th Cir. 2022) ...................................................................................... 9

*Bello-Reyes v. Gaynor*,
985 F.3d 696 (9th Cir. 2021) .................................................................................... 9

*Berg v. Cnty. of L.A.*,
2021 WL 4691154 (C.D. Cal. May 28, 2021) ........................................................ 18

*Brown v. Bd. of Educ.*,
349 U.S. 294 (1955) ................................................................................................ 19

*Cal. First Amend. Coal. v. Calderon*,
150 F.3d 976 (9th Cir. 1998) .................................................................................. 17

*Collins v. Jordan*,
110 F.3d 1363 (9th Cir. 1996) ................................................................................ 11

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61, (2001) ................................................................................................ 19

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .................................................................................. 12

*Does I thru XXIII v. Advanced Textile Corp.*,
214 F.3d 1058 (9th Cir. 2000) .................................................................................. 8

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir. 1996) ............................................................................. 19, 20

*Edwards v. Toys "R" Us*,
527 F.Supp.2d 1197 (C.D. Cal. 2007) ..................................................................... 8

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................ 12

*Fed. Election Comm'n v. Furgatch*,
869 F.2d 1256 (9th Cir. 1989) ................................................................................ 15

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) .......................................................................... 10, 15

*Goyette v. City of Minneapolis*,
338 F.R.D. 109 (D. Minn. 2021) ............................................................................ 17

*Heyne v. Caruso*,
69 F.3d 1475 (9th Cir. 1995) .................................................................................... 8

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) ................................................................................................ 19

*Hunter v. Cty. of Sacramento*,
652 F.3d 1225 (9th Cir. 2011) ................................................................................ 15

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ............................................................. 8
*Index Newspapers v. City of Portland*,
  480 F. Supp. 3d 1120 (D. Or. 2020) ............................................. 12, 15, 16
*Index Newspapers v. United States Marshals Service*
  977 F.3d 817 (9th Cir. 2020) ............................................................ passim
*Jones v. City of Los Angeles*,
  2023 WL 2558789 (C.D. Cal. Jan. 24, 2023) ........................................ 10
*L. Ctr. v. Noem*,
  2025 WL 1172442 (C.D. Cal. Apr. 16, 2025) ....................................... 17
*L.A. Press Club v. City of L.A.*,
  2025 WL 1909661 ("LAPC") ................................................................... 13
*LaDuke v. Nelson*,
  762 F.2d, 1318 (9th Cir. 1985) ............................................................. 16
*Libertarian Party of Los Angeles County v. Bowen*,
  709 F.3d 867, 870 (9th Cir. 2013) ........................................................ 16
*LSO, Ltd. v. Stroh*,
  205 F.3d 1146 (9th Cir. 2000) ............................................................. 15
*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ............................................................... 15
*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ............................................................. 18
*Menotti v. City of Seattle*,
  409 F.3d 1113 (9th Cir. 2005) ........................................................ 10, 12
*Munns v. Kerry*,
  782 F.3d 402 (9th Cir. 2015) ............................................................... 13
*Nelson v. City of Davis*,
  685 F.3d 867 (9th Cir. 2012) ............................................................. 9, 18
*Peltz v. City of Los Angeles*,
  2025 WL 1412479 (C.D. Cal. Feb. 20, 2025) ...................................... 11
*Porter v. Martinez*,
  68 F.4th 429 (9th Cir. 2023) ............................................................... 14
*Rendish v. City of Tacoma*,
  123 F.3d 1216 (9th Cir. 1997) ............................................................. 12
*Sanderlin v. Dwyer*,
  116 F.4th 905 (9th Cir. 2024) ............................................................... 9
*Seever v. City of Modesto*,
  2022 WL 17418355 (E.D. Cal. Dec. 5, 2022) ........................................ 8
*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) ......................................................................... 19
*Vasquez Perdomo v. Noem*,
  2025 WL 2181709 (9th Cir. Aug. 1, 2025) .................................. 17, 19, 20
*Wash. State Ass'n. of Head Start & Early Childhood Assistance & Educ. Program v. Kennedy*,
  2025 WL 1685420 (W.D. Wash. 2025) .................................................. 8
*Washington v. Trump*,
  2025 WL 2061447 (9th Cir. July 23, 2025) .......................................... 18
*Wooley v. Maynard*,
  430 U.S. 705 (1977) ............................................................................. 13

**<u>Statutes</u>**

Cal. Penal Code § 409.7(a)(1), 3 ................................................................................................. 18

REPLY ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## **INTRODUCTION**

In their Opposition, Defendants do little to refute the 40 declarations documenting DHS's sweeping, dangerous attacks on press, legal observers, and protestors across 11 protests, eight locations, and five weeks, that establish a clear pattern of violating the First Amendment. They do not dispute that shooting someone with a tear gas canister (MPA in Support of Mot. for Preliminary Injunction (Mot.) at 21, ECF 34-1), shooting someone in the head (*id.*), or shooting someone in the back (*id.* at 4; Ortiz Decl. ¶ 21) is wrong. Yet they offer no explanation for why they repeatedly did these things, chilling Plaintiffs' First Amendment exercise and causing them severe injuries—several more than once. They do not say they investigated any of this undisputed misconduct or disciplined the officers who did it. They offer no explanation, other than retaliation, for why they repeatedly violated their own policies and do not say they will stop.

Nor do they address or recant the public statements made by Defendant Noem encouraging DHS's pattern of force at protests against the agency's ongoing raids, or DHS statements expressing retaliatory animus towards protesters and press. While Defendants argue their oppressive force in this District is justified because "recently, violence against Federal LEOs performing law enforcement duties has increased by 830 percent" (Opp. to Mot. for PI (Opp.) at 2, ECF 47), they do not dispute Secretary Noem's statement that DHS counts videotaping ICE agents as "violence" to arrive at that figure.[1] They do not dispute that Noem said, of Southern California communities: "The more they protest … the harder ICE is going to come after them."

Defendants fail to undermine Plaintiffs' likelihood of success. On the retaliation claims, DHS attempts to paint Plaintiffs as rioters or as obstructing officers. But they present no evidence to support these claims and fail to refute the evidence (including video) demonstrating that officers attacked Plaintiffs and many others when they were distant from any threatening activity and posed no threat themselves. As the Ninth Circuit held in *Index Newspapers*, this provides "exceptionally

---

[1] Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids," Forbes Breaking News (Jul. 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 (responding to reporter asking how data underlying Noem's assertion that ICE officers faced a 700 percent increase in violence was collected with statement that violence includes "videotaping them when they're out on operations").

1  strong evidentiary support" for Plaintiffs' retaliation claim. 977 F.3d at 829. On the access claims,

2  DHS simply repeats the same arguments it lost in *Index*.

3        The other arguments Defendants offer about irreparable harm, justiciability and workability

4  also lack merit. As in *Index*, Defendants' conduct is chilling Plaintiffs from exercising their First

5  Amendment rights, and the conduct is likely to recur given that the ICE raids will continue,

6  protestors will continue to protest, and reporters and legal observers will continue to do their jobs.

7  Moreover, Defendants officially sanction the excessive force that they apply to these events. As to

8  workability, this injunction is essentially the same one that Defendants successfully followed after

9  *Index*, along with provisions that prevent Defendants from retaliating against Plaintiffs using

10  excessive force barred by its own policies and Ninth Circuit law. For all these reasons, the Court

11  should issue a preliminary injunction in the revised form provided with this motion.

12                                <u>**ARGUMENT**</u>

13  **I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

14        **A.    Defendants' Claims That Plaintiffs Were Involved in Violent Riots Are False**

15        Defendants' rhetoric, and many of their arguments, turn on calling Plaintiffs "rioters." (*See,*

16  *e.g.,* Opp. at 14.) But they offer no evidence that any Plaintiff engaged in any violent conduct and

17  make only generalized hearsay accusations about conduct by unnamed demonstrators. The

18  unrefuted evidence establishes that Plaintiffs were peacefully engaged in First Amendment activity

19  each time DHS agents attacked them. (Mot. at 4; *see also, e.g.,* Mena  Decl. ¶ 22 ("I was wearing

20  two press credentials on a lanyard around my neck [and … ] writing notes with a pen in my

21  notebook. I was clearly removed from the protestors, standing by myself and doing my job.").)

22  "[P]eaceful protesters, journalists, and members of the general public cannot be punished for the

23  violent acts of others." *Index*, 977 F.3d at 834.

24        Defendants' claims about the "the violent acts of others" around Plaintiffs are also untrue.

25  For example, Defendants claim that Ms. Olmeda joined an "extremely violent riot" of

26  "approximately 1,500 people," and that DHS shot at the "encroaching" crowd to disperse them

27  from the steps of the federal building. (Opp. at 21.) But video, photographs, and corroborating

28  witnesses confirm Ms. Olmeda's account: roughly 100 non-violent protestors gathered on the

1    sidewalk many yards from the federal building steps, and they did nothing to justify DHS suddenly

2    opening fire on them while Ms. Olmeda stood peacefully holding a protest sign. (*See* Olmeda Decl.

3    ¶¶ 7-20; F.F.  Decl. ¶¶ 2-3; Tran Decl. ¶¶ 2-3.[2]) Video also disproves Defendants' other trumped-

4    up claims of protester obstruction and violence.[3]

5        It is not even clear who Defendants are referring to when they say that Plaintiffs joined

6    "violent riots" to obstruct access to a federal detention facility and block DHS from accessing a

7    warrant operation. The hearsay evidence they cite says nothing about Plaintiffs at all. To the extent

8    Defendants accuse Mr. Ray of joining crowds to block access to MDC, the video evidence

9    disproves their claim. (Ray Decl. ¶¶ 19, 22, 26-31 (videos confirming testimony that he was

10   standing to the side, separate from crowds, repeatedly saying he was "press," when DHS shot

11   him).) Defendants suggest Ms. Marantos "interfered with" officers by "inserting herself deep

12   within a riot," but the sole evidence they cite is her declaration, which does not support their claim.

13   Ms. Marantos' declaration, video, and seven corroborating declarations of people who attended the

14   same protest, all make clear there was no "violent riot" at all when DHS initiated violence, and Ms.

15   Marantos, like others present, was shocked when DHS deployed tear gas just to clear a path for a

16   Fish & Wildlife truck, without warning or asking her to move. (Supp. A.R. Decl. ¶¶ 2-6; Anderson

17   Decl. ¶¶ 8-9; Saillant Decl. ¶ 9-10; Alvarez Decl. ¶¶ 14-15; Lubka Decl. ¶¶ 11-13; Fisher Decl. ¶¶

18   9, 12; Bertrand Decl. ¶¶ 10-16.)

19

20   ---

     [2] The Santanero (June 9, 2025), https://www.instagram.com/reel/DKs1ZOTy0Zz/. Plaintiffs may submit evidence in

21   "direct response" to the opposition papers to rebut or recontextualize specific assertions or pieces of evidence. *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1205 n.31 (C.D. Cal. 2007); *accord*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d

22   919, 955–56 (C.D. Cal. 2015). Plaintiffs' declarants meet the requirements to proceed anonymously given the risk of political retribution and doxxing present here. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-

23   68 (9th Cir. 2000); *Wash. State Ass'n. of Head Start & Early Childhood Assistance & Educ. Program v. Kennedy*, 2025 WL 1685420 (W.D. Wash. 2025). Non-party declarations are properly considered by the Court as relevant evidence of

24   DHS's retaliatory motive and official pattern and practice. *See, e.g., Heyne v. Caruso*, 69 F.3d 1475, 1481 (9th Cir. 1995) (improper to exclude evidence of non-parties' experiences relevant to show defendant's motive); *Seever v. City

25   of Modesto*, 2022 WL 17418355, at *6 (E.D. Cal. Dec. 5, 2022) (courts "regularly" consider "third-party allegations" as evidence for "practice or custom claims").

26   [3]*See, e.g.,* Aguiluz  Decl. ¶ 16 (showing DHS recklessly caused collision with car driving down a public street, contrary to Defendants' suggestion that rioter intentionally crashed a car into a federal vehicle (Opp. at 6)); LeBlanc  Decl. ¶¶

27   14, 17 (showing no obstructing crowd or car, unlike Defendants' claims (Opp. at 7)); *see also* James Queally and Brittney Mejia, "Trump's top federal prosecutor in L.A. struggles to secure indictments in protest cases," L.A. Times

28   (July 23, 2025), https://www.latimes.com/california/story/2025-07-23/protester-charges-essayli (describing multiple cases where video evidence disproved DHS agents' sworn statements, so charges dropped).

1    Defendants misrepresent the evidence to claim DHS agents shot Mr. Beckner-Carmitchel

2   only after he situated himself "close to a violent mob." (Opp. at 20.) They cite only his declaration,

3   which never describes the protesters as violent, and says that he was "probably at least 20 feet away

4   to the east of where the protestors were" when DHS shot him in the head with a tear gas canister.

5   (Beckner-Carmitchel Decl., ¶ 10 & Ex. 1 (map illustrating how he moved apart from protestors).)

6   Defendants' mendacious attempt to defame everyone at protests as violent rioters only reinforces

7   the unrefuted evidence of their retaliatory animus.

8       **B.    The Unrebutted Evidence Establishes Plaintiffs' Retaliation Claims**

9    Defendants do not dispute the substantial direct evidence of retaliatory motive. (Mot. at 17-

10  18.) Nor do they refute the "mountain" of circumstantial evidence that, under *Index*, is sufficient to

11  establish retaliation. 977 F.3d at 827-28; Mot. at 19-23. They simply pretend this evidence does not

12  exist. (Opp. at 22.) Though Defendants generally argue their use of force was justified, they fail to

13  rebut the evidence, including video, showing they attacked Plaintiffs and numerous other declarants

14  who were peacefully protesting or reporting. *See Sanderlin v. Dwyer*, 116 F.4th 905, 911 (9th Cir.

15  2024) (reasonable to infer officer's use of force against protester was "motivated by retaliatory

16  animus" because there was "no legitimate justification" for firing rubber bullet to disperse non-

17  violent plaintiff, citing *Nelson v. City of Davis*, 685 F.3d 867, 873-874 (9th Cir. 2012) ) (officer not

18  entitled to qualified immunity for using pepperball on person who disobeyed dispersal order)).

19   Defendants also argue that DHS "would have taken the same action" against Plaintiffs if

20  they had not been engaged in First Amendment activity (Opp. at 23), but they fail to meet their

21  burden of explaining why they would have targeted Plaintiffs and other protesters and journalists

22  who were standing apart from the crowd, not blocking any driveway, and away from any threat, if

23  they had not been protesting or reporting on a protest. *See Bello-Reyes v. Gaynor*, 985 F.3d 696,

24  702 (9th Cir. 2021). Defendants offer no cogent reason why they would have randomly assaulted

25  Plaintiffs in ways that violate DHS's own policies and standard training if they had not been

26  protesting, reporting, or observing the protests (Harvey Decl. ¶ 14, Ex. 2 at 249-250 (limiting use

27  of kinetic impact weapons to targets assaulting officers, and prohibiting targeting of head, neck,

28  and spine); Mot. at 21-22), and they do not dispute that DHS injured Plaintiffs while they were at

1   protests against DHS operations. *See Ballentine v. Tucker*, 28 F.4th 54, 63 (9th Cir. 2022) (officers'

2   knowledge that Plaintiffs were activists vocally critical of police supported finding retaliatory

3   motive);[4] *Jones v. City of Los Angeles*, 2023 WL 2558789, at *14 (C.D. Cal. Jan. 24, 2023) (jury

4   could reasonably infer retaliatory animus).

5        Defendants argue that "isolated incidents" cannot establish a policy or custom of retaliation.

6   (Opp. at 22.) But repetition of the same conduct at a dozen events, over five weeks, often multiple

7   times on the same day, with numerous journalists injured by DHS more than once at different

8   protests, cannot be fairly construed as "isolated incidents." (Mot. at 5-7; *Menotti v. City of Seattle*,

9   409 F.3d 1113, 1148 (9th Cir. 2005) (multiple incidents of suppression of speech on same day

10  indicative of official unconstitutional policy); *see also Index*, 977 F.3d at 826 (same). Defendants

11  do not dispute that Secretary Noem approved and encouraged DHS's use of force at protests in this

12  District. (Mot. at 7-9.) They admit that CBP's less-lethal trainer promotes using excessive force

13  against demonstrators and reporters attending protests. (Kerlikowske Reply Decl. ¶¶ 8-15.) Though

14  DHS proffers policies established under different leadership that prohibit retaliation and limit use

15  of crowd control weapons, it offers no proof that it has disciplined any of the officers who violated

16  these policies, which itself shows a policy of retaliation. *See Gomez v. Vernon*, 255 F.3d 1118,

17  1127 (9th Cir. 2001) (refusal to discipline officers that retaliated against people exercising First

18  Amendment rights is "evidence of a policy or custom").

19       **C.    Plaintiffs Are Likely to Prevail on Their Access Claims**

20       Defendants' arguments about the access claims by reporters and legal observers are the

21  same ones they lost in *Index*. For example, they claim that "journalists do not practice freedom of

22  the press when they disregard lawful dispersal orders" (Opp. at 14) and that Plaintiffs have no right

23  "to access besieged federal property and personnel." (*Id*. at 15.) But in *Index*, the Ninth Circuit

24  rejected these arguments. It held that journalists reporting on the besieged federal court in Portland

25  had a First Amendment right to access and report on the events.

26

27  _____

    [4] Defendants' animus against the ongoing protests encompasses members of the press reporting on them. *See, e.g.,*
    "DHS Debunks Fake News Media Narratives from June," (Jun. 30, 2025), https://www.dhs.gov/news/2025/06/30/dhs-
28  debunks-fake-news-media-narratives-june (purporting to "hold[ ] the media accountable for spreading disinformation
    to the American people," and asserting "the media have falsely claimed the riots in Los Angeles are 'peaceful.'").

1    As in *Index*, Plaintiffs have presented "a mountain of evidence that the … Defendants

2    routinely left federal property" to carry out their assaults, 977 F.3d at 831, and DHS shot or

3    brandished a weapon at each of the Plaintiffs while they were reporting or observing from a city

4    street or sidewalk. (Mena Decl. ¶¶ 16-17, 29-30; Beckner-Carmitchel Decl. ¶¶ 10, 13; Xu Decl. 6-

5    8, ¶¶ 11-12; Marantos Decl. ¶¶ 14-17; R.R.  Decl. ¶¶ 6, 10.) Because Plaintiffs' access claims are

6    based on denial of access to protests taking place on public streets and sidewalks, which are public

7    fora, *see Collins v. Jordan,* 110 F.3d 1363, 1371 (9th Cir. 1996), Defendants' arguments under

8    *Press Enterprise* (Opp. at 15-17) are all meritless. *See Index*, 977 F.3d at 830-831 (access to

9    protests "plays a significant positive role in the functioning of our democracy"); *accord*, *Peltz v.*

10   *City of Los Angeles*, 2025 WL 1412479 at *6 (C.D. Cal. Feb. 20, 2025).

11   Defendants argue the government has an overriding interest in protecting federal property

12   and personnel, (Opp. at 18), but fail to show that attacking reporters and legal observers reporting

13   from public streets and sidewalks is "lawful, much less essential or narrowly tailored" to serve this

14   claimed interest. *Index*, 977 F.3d at 834; *see also id.* at 831; *Peltz*, 2025 WL 1412479 at *7. As in

15   *Index*, there is no evidence Plaintiffs, or any other press or legal observers, engaged in threatening

16   conduct, and "the record is replete with instances in which members of the press were targeted

17   when they were not mixed with, or even proximate to, protesters." 977 F.3d at 834; Mot. at 14.

18   Defendants do not argue that  dispersing press and observers, which the requested relief is narrowly

19   tailored to address (Mot. at 20-22 and *infra* at 14-15), are "essential" or "narrowly tailored" to

20   secure federal property or "preserve life."[5] (Kerlikowse Decl. ¶¶ 14-15, 56 (opining that DHS's

21   conduct is "needless" and "unnecessary" and attesting to more tailored ways to address threats).)[6]

22   Defendants argue that *Menotti* enables them to disperse reporters and observers if some

23   individuals act violently at a protest. (Opp at 17.) *Index* rejected this argument, too. It held that the

24   same government interests DHS cites did not allow it to disperse reporters and observers because

---

25   [5] Defendants admit their policy authorizes sweeping uses of force that make it unsafe for any reporter or observer to
26   access a protest area any time an individual throws a water bottle or a vehicle seeks to enter or leave the area. (Harvey
     Decl. ¶ 10; *see also* Mot. at 22-23; Marantos Decl. ¶ 16 (No announcement, no statement "like 'Disperse or these
27   things will happen" made before detonating gas to clear road); Anderson Decl. ¶¶ 8-9; Saillant Decl. ¶ 9-10; Alvarez
     Decl. ¶¶ 14-15; Lubka Decl. ¶¶ 11-13; Wilczewski Decl. ¶¶ 10-11; Griffin Decl. ¶¶ 9-13; Solorzano Decl. ¶¶ 16-19.)
     [6] *See* Dransfeldt Decl. ¶¶ 10, 12, 14; Anderson Decl. ¶ 7, 10; Wilczewski Decl. ¶¶7-9; Barbadillo Decl. ¶¶ 8-12;
28   Petrosian Decl. ¶¶ 9-17.

1  DHS could not prove "that dispersing the press was essential or that their response was narrowly

2  tailored to serve the government's interest in protecting federal property." *Index*, 977 F.3d at 833.

3  Under circumstances not present here, *Menotti* allowed police to create a buffer zone to keep out

4  protesters, while allowing them to continue protesting; it did not stop people reporting on those

5  protests from doing so, as a dispersal order would. *Menotti* confirms that restrictions on First

6  Amendment rights must be "narrowly tailored to serve a significant government interest,"

7  distinguishing the circumscribed, "well-defined" access restriction in that case from the

8  unconstitutional county-wide denial of access in *Collins*. 409 F.3d at 1113, 1136 (9th Cir. 2005).

9  Thus, *Menotti* belies Defendants' claim of unfettered authority to deny reporters and observers

10  access to protests "throughout the whole" of the Central District. *Id.*

11  **II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM**

12       As this Court found in its order on Plaintiffs' ex parte application (ECF 40 at 1), and for the

13  reasons in Plaintiffs' briefs (ECF 35-1 at 1-3 and ECF 38 at 4-5), Plaintiffs face irreparable harm.

14  *See also Index*, 977 F.3d at 837-38 (chill on plaintiffs' exercise of their First Amendment rights

15  based on wounds they sustained as bystanders at protests "unquestionably constitute[d] irreparable

16  injury"). As in *Index*, Defendants argue that under *Rendish v. City of Tacoma*, 123 F.3d 1216 (9th

17  Cir. 1997), retaliation claims are carved out of the blackletter rule that First Amendment injuries

18  are irreparable. This Court should reject the argument—which, in any case, does not address

19  Plaintiffs' access claims—for the same reasons *Index* did. *Index Newspapers v. City of* Portland,

20  480 F. Supp. 3d 1120, 1151 n.12 (D. Or. 2020) (discussing at length, *inter alia, Elrod*, 427 U.S. at

21  373; *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)).

22       Defendants again contend that injunctive relief is unavailable because the "nature of the

23  protests has changed." (Opp. at 28.) But the last time DHS represented to the Court that protests

24  were becoming more "sporadic," it was speaking out of both sides of its mouth: elsewhere warning

25  of a "high likeliness" that demonstrations against ICE would "continue and grow," and calling for a

26  crackdown on video recording at the anticipated protests. (Shapiro Decl. Ex. A at 3, ECF 34-19.)

27  Right after DHS argued that National Guard and Marines had assumed responsibility for protest

28  response, such that Plaintiffs' request for relief was "directed at the wrong entity" (ECF 11 at 17),

DHS repeatedly deployed chemical and impact munitions against protests after the deployment of these military forces, including when National Guard was present and did not use similar force. (Fisher Decl. ¶¶ 8, 12; Marantos Decl ¶¶ 10-13, 35; *see also* Barbadillo Decl. ¶¶ 6-10.) While telling the Court that federal arrests related to protest activity had "dwindled," (ECF 11 at 5), DHS continued to violently arrest observers and protestors.[7] And the very day the Court denied the TRO (based on Defendants' claims that they would no longer use or need to use force), they fired tear gas and shock grenades at people documenting and protesting CBP's detention of a Maywood teenager, including three Maywood city council members. They then wielded the same type of force against press, observers, and protestors several more times in the following weeks. (Mot. at 5-7.) On this record, Defendants cannot credibly claim that the "state of affairs" has changed so that Plaintiffs are no longer at risk.

The undisputed evidence shows multiple Plaintiffs and declarants were injured multiple times over days or weeks. This record shows DHS is likely to continue the pattern of violent conduct that injures Plaintiffs. (*See infra* at 10-11.) DHS raids, protests, and Plaintiffs' reporting are continuing. (Supp. Rose Decl. ¶¶ 19-20; Mot. at 7.) "The likelihood of repeated confrontations together with the evidence [of] Defendants' sustained pattern of conduct suffices to show that Plaintiffs risk recurrent future injury." *L.A. Press Club v. City of L.A.*, 2025 WL 1909661 ("LAPC"), at *4 (C.D. Cal. July 10, 2025) (citation omitted); *see also Wooley v. Maynard,* 430 U.S. 705 (1977) (injunctive relief available where plaintiff was injured three times in five weeks).

**III.   PLAINTIFFS HAVE STANDING TO SEEK A PRELIMINARY INJUNCTION**

**A.   The Undisputed Record Establishes Plaintiffs' Present, Ongoing Injuries**

Plaintiffs have standing to seek a preliminary injunction because DHS's oppressive force has "'chilled' the exercise of [their] First Amendment rights, and . . . this First Amendment injury is ongoing." *Index*, 977 F.3d at 826. "[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury" that establishes standing. *Id*. The cases Defendants cite

---

[7] *See* Jonah Valdez, "A Pattern of Violence: Documenting ICE Agents' Brutal Use of Force in LA Immigration Raids," The Intercept (July 7, 2025), https://theintercept.com/2025/07/07/ice-raids-la-violence-video-bystanders (documenting violent arrests of protestors and observers on June 17, June 19, and June 24); Karen Garcia, "L.A. volunteers who document ICE raids are being arrested," L.A. Times (Aug. 13, 2025), https://www.latimes.com/california/story/2025-08-13/la-volunteers-who-document-ice-raids-are-being-arrested-how-to-do-it-safely.

apply only where the chill is based solely "on a fear of future injury that itself [is] too speculative

to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015). In contrast to these cases,

where the plaintiffs failed to show the government had applied or would ever apply the challenged

actions to them, the chill on Plaintiffs here is based not on speculation but on DHS's actual actions

against them and the resulting concrete injuries. *See Porter v. Martinez*, 68 F.4th 429, 438 (9th Cir.

2023), *cert denied*, 144 S.Ct. 1007 (2024) (self-censorship where one's "own experience supports

an actual and well-founded fear" establishes standing); Mot. at 9-10 (Plaintiffs modifying behavior

out of fear based on experience); *see also Index,* 977 F.3d at 837-38 (First Amendment chill based

on physical injuries resulting from DHS use of force at protests a "substantial injury").[8]

**B.    The Record Also Establishes a Credible Threat of Future Injury to Plaintiffs**

**1.    The evidence of an officially sanctioned, sustained pattern of conduct
establishes a likelihood of recurrent injury**

As this Court has stated, "the possibility of recurring injury ceases to be speculative when

actual repeated incidents are documented." LAPC at *4. Here, as in *Index*, the same Plaintiffs,

"journalists and legal observers monitoring the protests [were] injured by the . . . Defendants more

than once,"[9] and  Plaintiffs provide evidence of an "ongoing, sustained pattern of conduct,"

including 40 declarations, photographs, video, and corroborating news sources, documenting

DHS's repeated misuse of munitions against press, observers, and protestors, 977 F.3d at 826; Mot.

at 3-7. Based on this record, the Court may readily find a likelihood of recurrence.

The law of the case does not bar such a finding. (Opp. at 11-12.) The TRO order expressly

states that it is "without prejudice to … a regularly noticed motion for preliminary injunction."

(ECF 19.) In any event, "[t]he law of the case doctrine does not preclude a court from reassessing

its own legal rulings in the same case"; it only applies to appellate rulings. *Askins v. U.S. Dep't of*

---

[8] Defendants fail entirely to address the other present, ongoing injuries stemming from their past attacks on Plaintiffs
that establish Plaintiffs' standing. (Mot. at 9-10 (compiling evidence of present organizational and personal harm—
including new evidence that Plaintiffs had not previously presented in support of their TRO application).)

[9] *See, e.g.,* Mena  Decl. ¶¶ 16-22, 30-31 (plaintiff shot twice at two different protests); Beckner-Carmitchel  Decl. ¶ 14;
Supp. Beckner-Carmitchel  Decl. ¶ 12 (plaintiff shot twice at two different protests); Ray  Decl. ¶¶ 22, 28; *see also*
Soqui  Decl. ¶¶ 7, 17 (photojournalist shot twice at two different protests); Petrosian  Decl. ¶¶ 10, 21-22 (use of pepper
balls against legal observer at two different protests); Rose  Decl. ¶ 14 (members of LA Press Club); Schleuss  Decl. ¶¶
5-9 (members of NewsGuild injured).

1    *Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018)).[10] Defendants ignore that courts routinely

2    deny TROs before granting preliminary injunctions based on a fuller record. (Mot. at 11, n.14.)

3    While the TRO order found that the evidence before the Court then failed to establish a risk of

4    future harm, that was because Plaintiffs had not yet submitted evidence of DHS force after June 9.

5    *Id.* The evidence now shows DHS's pattern of conduct "persisted for weeks" after that, causing

6    "numerous injuries . . . between the date the complaint was filed" and the date of the preliminary

7    injunction motion—including on the day of the TRO order and at two different protests just one

8    week before Plaintiffs filed this motion. 977 F.3d at 826; Mot. at 5-7.

9            The fact that DHS's pattern of conduct is "officially sanctioned behavior" also shows that

10   recurrent injury is "sufficiently likely" to establish standing. *Armstrong v. Davis*, 275 F.3d 849, 861

11   (9th Cir. 2001); *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012). Defendants do not dispute

12   DHS officials' statements promising retaliatory force against protests and declaring that

13   videotaping agents "is violence." (Mot. at 7-9.[11]) Nor do they offer any proof that they have

14   disciplined or investigated any of the officers who violated agency policies by shooting tear gas

15   canisters, rubber bullets, and pepper balls directly at Plaintiffs and others peacefully protesting or

16   reporting. This, too, is proof that DHS's retaliatory misconduct is officially sanctioned so likely to

17   recur. *Cf. Gomez*, 255 F.3d at 1127; *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir.

18   2011) ("uninvestigated and . . . unpunished" constitutional violations establish official practice).

19   Defendants do not dispute DHS officials' statements approving the agency's conduct each time it

20   injured Plaintiffs. (Mot. at 7-9.) Their "failure to disavow" the challenged conduct also weighs "in

21   favor of a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

22                   **2.    All the *Furgatch* factors establish a likelihood of recurrence**

23           Here, as in *Index*, each of the factors outlined in *Fed. Election Comm'n v. Furgatch*, 869

24   F.2d 1256, 1263 n.5 (9th Cir. 1989), points to a likelihood of recurrence. First, "the degree of

25   scienter involved is high," because the challenged conduct "relates to targeting of journalists and

26

27   [10] The TRO order also did not consider or rule on how the present, ongoing chill on Plaintiffs establishes standing.

28   [11] *See also* "Homeland Security Secretary Kristi Noem speaks amid LA protests," Reuters (Jun. 12, 2025) at 9:20 ("No
     protestors are gonna block our way, because [ICE officers] are going to ensure that we handle these protestors").

1  legal observers and not merely incidental harm to them during crowd control." *Index*, 480 F. Supp.

2  3d at 1153; Mot. at 19-20 (evidence of targeting). Second, "the occurrences were not isolated;

3  Plaintiffs provided significant evidence of numerous journalists[,] legal observers," and protestors

4  targeted by Defendants. *Index*, 480 F. Supp. 3d at 1153; Mot. at 3-7. Third, "Defendants have not

5  recognized the wrongful nature of their conduct but instead assert that they have only engaged in

6  lawful conduct," including in their papers filed in this case, and they have presented no evidence of

7  "disciplin[ing] any federal agent or officer for any conduct." 480 F. Supp. 3d at 1153. Fourth, "the

8  disdainful comments publicly made by the highest officials at [DHS] with respect to journalists,

9  legal observers, Plaintiffs, protesters, and the City of [Los Angeles] . . . show [Defendants] are

10  likely to be enabled or tempted to engage in future violations." 480 F. Supp. 3d at 1154; Mot. at 7-

11  9, 17-18 (compiling such comments). Finally, Defendants have given no "assurances… against

12  future violations." 480 F.Supp.3d at 1154. They "did not stipulate to preliminary injunctive relief,"

13  or claim the conduct will change, and ask the Court to allow them to continue the conduct that

14  injured Plaintiffs. *Id.*; Borden Decl. Ex. 1, ECF 35-2, showing the conduct is likely to recur. 480 F.

15  Supp. 3d at 1154, *aff'd* 977 F.3d at 827.

16        **C.**    ***Lyons* does not apply to the facts and claims presented here**

17        *Lyons* does not control here for several reasons. *First*, the "nature of plaintiffs' [ongoing

18  First Amendment] injuries . . . sharply differs from the substantive due process injury asserted in

19  *Lyons*." *Index*, 977 F.3d at 826. First Amendment cases like this one "present unique standing

20  considerations" such that "the inquiry tilts dramatically toward a finding of standing." *Bowen*, 709

21  F.3d at 870 (citation omitted). *Second*, ample evidence supports "a finding of likely recurrence"—a

22  finding the district court in *Lyons* never made. *LaDuke*, 762 F.2d, 1318, 1324 (9th Cir. 1985) (also

23  noting "the appropriateness of federal injunctive relief to combat a 'pattern' of illicit law

24  enforcement behavior"). *Third*, "unlike in *Lyons*," the same DHS conduct has repeatedly injured

25  multiple Plaintiffs, showing that their "risk of future injury is not speculative." *Index*, 977 F.3d at

26  826;. *Fourth*, in contrast to *Lyons*, where the opinion "expressly noted the absence of any written or

27  oral pronouncements by the . . . Department sanctioning" the challenged conduct, here there are

28  both (Mot. at 7-9; *supra* n.9) showing DHS's pattern of conduct is "officially sanctioned." *LaDuke*,

762 F.2d at 1324. *Fifth,* "[u]nlike Mr. Lyons," Plaintiffs "are subject to constitutional injury based on . . . completely innocent behavior." *Id.* at 1326. Whereas in *Lyons* the plaintiff had to commit a future violation of an unchallenged law before suffering the injury alleged, Plaintiffs risk injury by simply exercising their First Amendment rights. *Armstrong,* 275 F.3d at 866. *Sixth,* unlike Lyons, the organizational Plaintiffs have numerous members, increasing the likelihood of recurrent harm to them. *Vasquez Perdomo v. Noem*, 2025 WL 2181709 at *12 (9th Cir. Aug. 1, 2025).

### D.    The Organizational Plaintiffs Have Standing

The press organizations meet all the requirements for organizational standing. Their members have been injured by Defendants' pattern of violent conduct, such that those members "would have standing to sue in their own right";[12] the relief sought here is plainly germane to the organizations' purposes of supporting quality journalism and securing rights and safe working conditions for journalists;[13] and "neither the First Amendment claim[s] nor the injunctive relief requested requires the participation of individual members in the lawsuit." *Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 980–81 (9th Cir. 1998). Undisputed evidence shows DHS's actions have directly affected and interfered with the organizations' core business activities and pre-existing services, establishing they have standing to sue on their own behalf.[14] *See Imm. Defs. L. Ctr. v. Noem*, 2025 WL 1172442, at *8 (C.D. Cal. Apr. 16, 2025) (citation omitted).

## IV.    THE REQUESTED RELIEF IS WORKABLE AND IN THE PUBLIC INTEREST

Though DHS argues that the requested relief would improperly constrain law enforcement, Plaintiffs merely seek (1) the same injunction against DHS that the Ninth Circuit affirmed in *Index*, which DHS safely complied with; plus (2) relief to prevent retaliation against non-press Plaintiffs by requiring DHS to follow Ninth Circuit use-of-force law and its own policies.

As to the first form of relief, DHS knows that its workability arguments are incorrect because in *Index*, the court enjoined it from dispersing reporters and legal observers, and it operated under that injunction for months without any harm. The City of Portland followed the same

---

[12] Compl. ¶¶ 6-7; Rose Decl. ¶ 14; Supp. Rose Decl. ¶¶ 14-17; Schleuss Decl. ¶¶ 5-9; Marantos Decl. ¶¶ 3-4.

[13] Compl. ¶¶ 6-7; Rose Decl. ¶ 2; Taha Decl. ¶¶ 3-5.

[14] Compl. ¶¶ 6-7; Rose Decl. ¶¶ 15-16; Supp. Rose Decl. ¶¶ 6-10; Schleuss Decl. ¶ 4; Taha Decl. ¶¶ 9-16.

injunction for more than a year before changing its police directives to adopt its terms. Many other courts—including this Court, LAPC at *13—have issued similar injunctions,[15] and California law prohibits all law enforcement from dispersing the press at protests. Cal. Penal Code § 409.7(a)(1), 3). As in *Index*, DHS claims its officers may be unable to differentiate between members of the press and other participants, but given its track record doing just that in Portland, the expert declaration of Gil Kerlikowske (the former Commanding Officer of CBP), and the ability of other law enforcement agencies to follow similar rules, Defendants' arguments are unpersuasive. Because the injunction demands Defendants comply with their own policies, they also cannot complain that abiding by the injunction "poses serious operational risks." (Opp. at 26.) Similarly, as to Defendants' retaliatory use of force, the proposed relief is not "unworkable" either; it simply brings Defendants into compliance with Ninth Circuit law and its own policies. *Nelson*, 685 F.3d at 873-874; Kerlikowke Reply Decl. ¶ 7; Harvey Decl. ¶ 14, Ex. 2 at 249-250. Defendants' workability argument is predicated on the testimony of a line weapons instructor who has no experience policing protests or training people on it, has not studied the issue, or even policed a protest as a line agent. (Kerlikowske Reply Decl. ¶ 7.) Defendants' arguments are also contrary to what many other courts have done. *See*, *e.g.*, *Berg v. Cnty. of L.A.*, 2021 WL 4691154, *15-16 (C.D. Cal. May 28, 2021) (enjoining using less-lethal weapons "indiscriminately fired," "deliberately aimed to strike individuals," and without warning). Speculating about any harms that they may suffer from an injunction without offering any alternative remedy that would provide relief to Plaintiffs is itself fatal to Defendants' challenge to the scope of the proposed injunction. *Washington v. Trump*, 2025 WL 2061447, at *1038 (9th Cir. July 23, 2025) (rejecting challenge to injunction because Defendants failed to propose a narrower one).

The requested injunction is also "tailored to remedy the specific harm alleged"; Defendants' denial of the journalist Plaintiffs' right of access and Defendants' retaliatory uses of force against both the journalist and protestor Plaintiffs. *Melendres v. Arpaio*, 784 F.3d 1254,1265 (9th Cir. 2015). Paragraph 1 prohibits Defendants from unlawfully preventing journalists from reporting

---

[15] *See also Goyette v. City of Minneapolis*, 338 F.R.D. 109, 117 (D. Minn. 2021); *Alsaada v. City of Columbus, Ohio*, 2021 WL 3375834 (S.D. Ohio June 25, 2021).

1    from otherwise accessible areas, while Paragraphs 2 through 6 limit Defendants' practice of

2    retaliating against Plaintiffs by targeting them with unnecessary crowd control devices and other

3    weaponry. Defendants argue that they cannot be forced to abide by an injunction that limits their

4    use of crowd control devices and other "less lethal" weaponry against Plaintiffs, even if the Court

5    were to find that they have deployed these violent tools as retaliation for Plaintiffs' protected

6    activities. But when the extensive record demonstrates Defendants have chosen to retaliate against

7    Plaintiffs using these tools as a matter of course, an injunction that curtails the documented

8    retaliatory uses of such weapons is necessary to end the retaliation. *Corr. Servs. Corp. v. Malesko*,

9    534 U.S. 61, 74, (2001) ("[I]njunctive relief has long been recognized as the proper means for

10   preventing entities from acting unconstitutionally.").

11        Defendants are correct that the relief here is broader than in *Index*. (Opp. at 25-26) But that

12   is because *Index* did not seek relief on behalf of protesters.  Plaintiffs here include protestors as

13   well as members of the press—all of whom are entitled to relief. Neither reporters, nor peaceful

14   protesters should be subject to retaliation, such as using less-lethal weapons on people who fail to

15   disperse. (Kerlikowske Reply Decl. ¶¶ 8-15.) Thus, the injunction here, as modified in the attached

16   proposed order, only exempts harms that arise from lawful uses of force, and at the same time, now

17   makes exceptions for exigent circumstances to eliminate any possible legitimate safety concerns.

18        Contrary to Defendants' arguments, the TRO order did not address or resolve any of these

19   issues, and Plaintiffs have submitted with this brief a new proposed order that is tailored to address

20   the concerns Defendants raised in their opposition. As noted, the law of the case does not bar this

21   Court from considering the relief requested here, *see supra* at 10, and the Supreme Court has long

22   held that "equity has been characterized by a practical flexibility in shaping its remedies and by a

23   facility for adjusting and reconciling public and private needs." *Brown v. Bd. of Educ.*, 349 U.S.

24   294, 300 (1955) (cleaned up), *accord Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946).

25        Defendants also argue that the proposed relief violates *Trump v. CASA, Inc.*, 145 S. Ct.

26   2540 (2025), because it applies to people other than Plaintiffs. (Opp. at 23.) But CASA held that

27   injunctions may create incidental benefits, and the requested relief is "no broader than necessary to

28   provide complete relief" to the individual Plaintiffs and members of the organizational Plaintiffs.

1   *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1502 (9th Cir. 1996); *see also CASA*,

2   145 S. Ct. at 2557. Plaintiffs seek an injunction that applies only to the counties covered by the

3   press organization Plaintiffs and their members, not nationwide. It "is not an impermissible

4   'universal' injunction like the ones disapproved in CASA." *Vasquez Perdomo v. Noem*, 2025 WL

5   2181709, *21 (9th Cir. Aug. 1, 2025). The geographic scope of the injunction is necessary to

6   provide Plaintiffs complete relief, because Plaintiffs intend to pursue the First Amendment

7   activities at issue across this coverage area, *see e.g.,* Supp. Rose Decl. ¶¶ 2-5; and Defendants are

8   repeating the same pattern of injurious pattern conduct across the area. (Mot. at 5-7 (evidence of

9   DHS assaults in Los Angeles, Orange, Ventura, and Santa Barbara counties).)

10      The injunction's scope is permissible under Ninth Circuit precedent and *CASA* because no

11  other form of relief would work. LA Press Club has roughly 1,000 members and NewsGuild has

12  roughly 26,000 members. (Rose Decl. ¶ 2; Schleuss Decl. ¶ 2.) It would be impossible for

13  Defendants to distribute the photos of the ever-changing membership, have every single DHS agent

14  memorize the faces, and then try to recognize and exempt them in the heat of a protest, Similarly,

15  DHS's retaliation has taken the form of sweeping attacks against everyone in the vicinity of

16  protests and shooting at people from a distance; as in *Easyriders*, it is unlikely if not impossible

17  that officers would determine whether Plaintiffs or a member of the press organizations were

18  among those targeted before engaging in such retaliatory conduct. 92 F.3d at 1502. "Given the

19  nature of [this] challenged conduct … enjoining Defendants from [subjecting] *only the Plaintiffs*

20  [to it] would not afford the Plaintiffs meaningful relief." *Vasquez Perdomo*, 2025 WL 2181709, at

21  *21. Thus, the situation in this case is distinct from *CASA*, where the government can determine

22  that someone is a named plaintiff *before* acting against them.

23                                     **<u>CONCLUSION</u>**

24      For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary

25  injunction.

26

27

28

1   Dated: August 21, 2025                    Respectfully submitted,

2                                             BRAUNHAGEY & BORDEN LLP

3
                                             By: ___/s/ Matthew Borden_____
4
                                                   Matthew Borden
5
                                             *Attorneys for Plaintiffs*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28