Matthew Borden, Esq. (SBN: 214323)
borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice*)
opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
jreisberg@aclusocal.org
Mohammad Tajsar, Esq. (SBN: 280152)
mtajsar@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>Plaintiffs,<br><br>v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>Defendants. | Case No. 2:25-CV-05563-HDV-E<br><br>**REPLY DECLARATION OF GIL KERLIKOWSKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: August 25, 2025<br>Time: 10:00 a.m.<br>Judge: Hon. Hernán D. Vera<br>Location: Courtroom 5B, 5th Floor |

Additional Counsel of Record for Plaintiffs:

Carol A. Sobel, Esq. (SBN: 84483)
 carolsobellaw@gmail.com
Weston Rowland, Esq. (SBN: 327599)
 rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman, Esq. (SBN: 71244)
 hoffpaul@aol.com
Michael Seplow, Esq. (SBN: 150183)
 mseplow@sshhzlaw.com
John Washington, Esq. (SBN 315991)
 jwashington@sshhzlaw.com
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 717-7373

Case No. 2:25-cv-05563-HDV-E
KERLIKOWSKE REPLY DECL. ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Gil Kerlikowske, declare:

1.  I am the former Commissioner of U.S. Customs and Border Protection ("CBP"). I served as the Chief of Police in Seattle from 2000 through 2009.

2.  I make this declaration for the limited purpose of responding to a few of the assertions in the Declaration of Matthew S. Harvey.

3.  In Paragraph 7 of his declaration, Mr. Harvey states that various DHS agents have received training on civil unrest in urban areas, but offers no evidence of what this training consists of, or that agents on these teams are adequately trained and experienced to handle large protests in urban areas, or even medium-size or small ones.

4.  The focus of the Special Response Team ("SRT") and Special Operations Group ("SOG") is unusual situations, such terrorist threats, search and rescue, and warrant execution. "SRT is a small, highly trained team of U.S. Customs and Border Protection Officers delivering special weapons and tactics to land, sea and air environments across the United States."[1] SOG combines the Border Tactical Unit ("BORTAC") and Border Patrol Search, Trauma, and Rescue Unit ("BORSTAR"), which "advance the missions of the Border Patrol and U.S. Customs and Border Protection CBP by handling uncommon and dangerous situations outside the normal scope of Border Patrol agent duties."[2] Based on my experience as Commissioner of CBP and as Chief of Police in Seattle, where I helped police hundreds of protests, some of which exceeded 50,000 people, it is my opinion that the training CBP personnel get does not equip them to effectively police urban unrest, given the focus of these teams and their other specialization and skills.

5.  Further, policing in an urban environment is far more than "training." New officers who have graduated from the Academy are paired with senior and more experienced officers to work in an urban area. They are evaluated in Field Training on the interactions they have in the community. Mr. Harvey offers no evidence to even suggest that CBP officers receive such experience.

---

[1] https://www.instagram.com/reel/DIQDUv7swbb/

[2] https://www.cbp.gov/sites/default/files/documents/Border%20Patrol%20Special%20Operations%20Group.pdf

6. As a low-level CBP employee without any stated experience in policing urban unrest, Mr. Harvey does not appear to be qualified to contradict my expert opinion on this.

7. For similar reasons, Mr. Harvey also does not appear to be qualified to challenge my expert opinions on workability. He does not claim that he has any experience formulating strategic plans for how to police a protest. He does not claim that he has any experience training people on how to police a protest. He does not claim to be familiar with how other cities and law enforcement agencies have safely and effectively put in place similar restrictions to the ones Plaintiffs are seeking. He does not even claim to have ever policed a protest as a line agent. Mr. Harvey's C.V. shows that he is a weapons instructor and not a high-level supervisor who sets policy.

8. In Paragraph 10, Mr. Harvey states that preventing law enforcement from using crowd-control weapons "on persons not posing a threat of imminent harm to a law enforcement officer or another person is unworkable" and that this would bar law enforcement from using crowd control weapons in ways that are allowed by current CBP policy. According to him, it would be permissible to use crowd-control weapons "as compliance tools in situations where a person or persons are offering active resistance or disobeying a lawful order, including crowd situations where a crowd or an individual is not obeying a lawful order to disperse" or if someone is obstructing transportation "but there is not a specific imminent threat of harm to a person." I disagree with these statements.

9. Unlike Mr. Harvey, I have had more than 50 years of experience in evaluating uses of force. I have been the head of multiple police departments, where I had ultimate responsibility for ensuring proper use of force. I also served as an Internal Affairs Commander. I also reviewed and set up the Internal Affairs at CBP, and have reviewed hundreds of use-of-force reports and investigations over the course of my career.

10. Less lethal weapons should not be used as "compliance tools." Nor should they be used on someone for disobeying a lawful order to disperse or stop blocking a road. Trespassing is just a minor infraction. It should not be met with less-lethal force, which, as I pointed out in my original declaration, can sometimes be deadly. Less-lethal force should only be used on aggressive individuals who pose an immediate threat to law enforcement or to prevent an assault. It is not

appropriate against passive individuals, especially ones that are not resisting arrest. Any reasonable law enforcement officer, especially one tasked with training people on less lethal weapons, should know this.

11. If someone is breaking a law, the appropriate course of conduct is to arrest them. If someone is disobeying a dispersal order, and has been given a fair opportunity to exit, it is permissible to arrest them. In situations where protesters may be arrested, law enforcement should set up a plan that enables police to effectively and safely make arrests. Such a plan includes establishing pre-arrest teams, bringing an adequate supply of flex cuffs, and having adequate pre-arranged transportation ready for arrestees (large transport vehicles, if necessary) at locations that will facilitate leaving. The arrest process also gives officers a chance to de-escalate the situation with the arrestee and people around them.

12. If an arrest goes badly, for example people nearby are interfering, then an officer could use pepper spray. Pepper spray is less toxic than teargas and more directed and controlled than teargas, which often affects neighboring properties.

13. In smaller crowds of around 100 people, trained law enforcement can identify violent wrongdoers without additional processes. In larger protests, law enforcement can strategically position spotters to assess who the violent individuals are so that they can be apprehended.

14. For similar reasons, I disagree with Mr. Harvey's conclusions in Paragraph 11 of his declaration, in which he states that it would be permissible to deploy a flash bang grenade next to a person who refused to disperse, and his follow-on conclusion that if it would be permissible to expose a peaceful protester in proximity to a person who failed to disperse to such force. Flash bang grenades can cause significant harm and should be deployed similarly to other less lethal weapons.

15. Mr. Harvey also attaches a copy of the current CBP Use of Force Manual. Section D refers to de-escalation and states that agents "shall employ de-escalation tactics and techniques." I have not seen any evidence that DHS agents ever did this for any of the declarations and videos that I reviewed.

1    I declare under penalty of perjury of the laws of the United States that the foregoing is true
2  and correct to the best of my knowledge, information, and belief.

Dated: August 21, 2025

_____
Gil Kerlikowske