1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10   LOS ANGELES PRESS CLUB et al.,          Case No. 2:25-cv-05563-HDV-E

11

12                  Plaintiffs,              **ORDER GRANTING PLAINTIFFS'
                                             MOTION FOR PRELIMINARY
13                                           INJUNCTION [34]**

14          v.

15

16   KRISTI NOEM et al.,

17

18                  Defendants.

19

20

21

22

23

24

25

26

27

28

                                        1

## I.    INTRODUCTION

In the wake of this summer's immigration raids across Southern California, the world watched as protests multiplied.  As expected, members of the press did what they have always done: positioned themselves at the scene to report on, record, photograph, and observe these events of immense public importance.

This action arises out of what happened next.  With tensions escalating, officers from the Federal Protective Services ("FPS"), Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP" or "Border Patrol") unleashed crowd control weapons indiscriminately and with surprising savagery.  In downtown Los Angeles, journalists were repeatedly hit with pepper balls—plastic projectiles filled with a chemical irritant—while taking cover behind media trucks.  In Maywood, federal agents teargassed a small group of protestors, including teens, senior, and local officials.  In Paramount, two reporters were shot in the head with rubber bullets.  In Camarillo and Carpinteria, federal agents deployed countless volleys of tear gas, rubber bullets, and smoke bombs on family members of detained farm workers, concerned public officials, journalists, and protestors.

These were not isolated incidents.  Indeed, the record includes detailed and credible declarations from nearly 50 journalists, legal observers, and protestors averring that federal law enforcement agents used rubber bullets, pepper balls, tear gas, and other crowd control weapons on them at protests from June 6 through July 10, 2025.[1]

Plaintiffs in the instant action include the Los Angeles Press Club ("LA Press Club"), NewsGuild-Communications Workers of America ("NewsGuild"), and individual journalists, legal observers, and protestors.  They initiated the present action against Kristi Noem and the U.S.

---

[1] CBP officers use oleoresin capsicum spray (commonly referred to as "pepper spray"), collapsible straight batons, electronic control weapons (commonly referred to as "TASERs"), compressed air launchers including the Pepperball Launching System, munitions launchers, and controlled noise and light distraction devices (commonly referred to as flash-bangs).  Declaration of Matthew Harvey ("Harvey Decl.") ¶ 8, Ex. 2 ("CBP Use of Force Policy") at 244–45 [Dkt. 47-5].  Pepper balls are filled with pulverized oleoresin capsicum powder, which causes irritation to mucus membranes.  Harvey Decl. ¶ 8.  The Court will refer to these devices collectively as "crowd control weapons."

Department of Homeland Security ("DHS") seeking to enjoin Defendants' excessive use of force. They argue in the main that Defendants' actions constitute retaliation for constitutionally protected activities, in violation of Plaintiffs' First Amendment rights ("Motion").  [Dkt. 34-1].

After reviewing carefully all of the evidence presented, the Court agrees, and on that basis issues a modified version of the requested preliminary injunction.  Specifically, the Court concludes that federal agents' indiscriminate use of force—targeting journalists standing far from any protest activity, launching scorching-hot tear gas canisters directly at people, and shooting projectiles at protestors attempting to comply with dispersal orders—will undoubtedly chill the media's efforts to cover these public events and protestors seeking to express peacefully their views on national policies.

To be clear, the Court expresses no sympathy for those private individuals who engaged in violence during this period.  Indeed, this Order does not prevent any appropriate enforcement of the law against these individuals.  But the actions of a relative few does not give DHS *carte blanche* to unleash near-lethal force on crowds of third parties in the vicinity.  Indeed, under the guise of protecting the public, federal agents have endangered large numbers of peaceful protestors, legal observers, and journalists—as well as the public that relies on them to hold their government accountable.  The First Amendment demands better.

Plaintiffs' Motion is granted.

II.     **BACKGROUND**

    A.     **Factual Background[2]**

        1.     **Downtown Los Angeles (June 6–9)**

            a.     <u>June 6, 2025</u>

On June 6, 2025, Plaintiff Ryanne Mena covered an ICE raid at a clothing shop in downtown Los Angeles. Declaration of Ryanne Mena ("Mena Decl.") ¶¶ 3–4 [Dkt. 6-22]. She followed the ensuing protests to the Metropolitan Detention Center ("MDC"). *Id.* Mena was wearing a lanyard with two different press credentials and carried a notepad. *Id.* ¶ 8.

Roger Scharmen, Deputy Regional Director of the FPS, avers that by approximately 5:35 p.m., protestors blocked access to the vehicle gate on Alameda Street, and at 6:12 p.m. some protestors began shining green lasers at officers and throwing chair, rocks, and water bottles. Declaration of Roger Scharmen ("Scharmen Decl.") ¶ 11 [Dkt. 47-3]. Mena observed that though the protests were mostly peaceful, one protestor hurled a desk chair towards the driveway leading into the MDC (without hitting anyone). Mena Decl. ¶¶ 9–10.

Between 6 p.m. and 7 p.m., federal officers began shooting pepper balls and other projectiles against the protestors. Declaration of Emiliano Lopez ("Lopez Decl.") ¶ 7 [Dkt. 6-14]; Declaration of Elizabeth Howell-Egan ("Howell-Egan Decl.") ¶¶ 6–13 [Dkt. 6-13]; Scharmen Decl. ¶ 12 (averring that FPS deployed pepper balls and pepper spray in response to "the violent riot"). Law enforcement officials reported that, between about 7 and 7:30 p.m., individual protestors threw "pieces of concrete" in the direction of officers. Scharmen Decl. ¶ 12; *see also* Declaration of Mario

---

[2] Because of the extraordinary nature of a motion for injunctive relief, "a district court may consider evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and pleadings." *Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 926 (C.D. Cal. 2019) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

In light of the severity of the potential harm and the vulnerability of journalists and protestors to retaliation, *see infra* Part II.C.3., the Court finds that R.R. and A.R. have shown a need to proceed anonymously. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000) (citations omitted) (directing courts to consider "(1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears, and (3) the anonymous party's vulnerability to such retaliation").

A. Canton ("Canton Decl.") ¶ 5 [Dkt. 11-2]; Declaration of Eddy Wang ("Wang Decl.") ¶ 10 [Dkt. 47-1]; Declaration of Ernesto Santacruz, Jr. ("Santacruz Decl.") [Dkt. 11-3], Ex. A ¶¶ 11, 16.

Observers reported that the actions of law enforcement sometimes appeared targeted at individuals filming the agents. *See* Lopez Decl. ¶ 7 (averring that the officers began shooting rounds after a young woman walked forward to film the agents); *id.* ¶¶ 9–12 (averring that Lopez was shot while he was assisting an injured man, both of whom were carrying cameras). Others saw very little connection between the use of the crowd control weapons and the actions of the protestors. *See* Howell-Egan Decl. ¶ 10 (averring that "[s]ometimes it appeared that the agents were shooting in response to objects like water bottles being thrown in their direction," but at other times not in response to any threat from the protestors). Federal officers with DHS uniforms continued shooting projectiles until at least 7:20 p.m. Howell-Egan Decl. ¶¶ 11–15; Declaration of Tina Petrosian ("Petrosian Decl.") ¶¶ 5–11 [Dkt. 6-24].

At some point, about 12 federal officers bearing DHS insignia proceeded down the driveway in riot gear and began shooting at the group of about 100 protestors. Mena Decl. ¶¶ 11–12. Mena— an experienced reporter who had covered two or three dozen protests before—immediately backed away from the protestors to avoid getting hit, while still maintaining her vantage point over the action. *Id.* ¶¶ 3, 16. She was about 20 feet away from the group of protestors (and clearly identifiable as a journalist) when she was hit by a pepper ball on her left thigh, causing excruciating pain. *Id.* ¶¶ 8, 17–20, 22.

Federal officers continued using pepper balls, pepper spray, tear gas, and flashbangs against the protestors. Howell-Egan Decl. ¶ 15; Mena Decl. ¶ 24; Petrosian Decl. ¶ 11.

### b. June 7, 2025

The next day, on June 7, 2025, Plaintiff Lexis-Olivier Ray, an investigative reporter, photographer, and member of the LA Press Club, arrived at the MDC to cover a group of about 100 protestors, including families, who had gathered there. Declaration of Lexis-Olivier Ray ("Ray Decl.") ¶¶ 3–5, 9–10 [Dkt. 6-17]; Scharmen Decl. ¶¶ 13–14. On several occasions, federal officers

1  in uniforms labeled "Police DHS," "POLICE," and "SRT"[3] cleared a path for vehicles to emerge

2  from the garage.  Ray Decl. ¶ 11; Scharmen Decl. ¶ 15, Ex. 2 at 92.  Protestors were blocking one

3  lane of traffic on Alameda Street, but cars and buses passed freely.  Ray Decl. ¶¶ 10, 13.  FPS

4  reported violence at the nearby Federal Building at 300 N. Los Angeles Street.  Scharmen Decl.

5  ¶¶ 13–14, Ex. 2 at 92–93 (noting individuals throwing "objects," including "large pieces of

6  concrete" and blocking vehicles from accessing the facilities).

7      Just after 8 p.m., FPS issued a dispersal order.  *Id.* ¶ 15; Ray Decl. ¶ 16.  While most

8  protestors were attempting to comply, one individual threw a firework at the gate.  Ray Decl. ¶ 17;

9  Scharmen Decl, Ex. 2 at 93.  At around 8:30 p.m., FPS and CBP officers poured out of the gate,

10  firing pepper balls and tear gas canisters.  Ray Decl. ¶ 19; Declaration of Michael Horowicz

11  ("Horowicz Decl.") ¶ 11 [Dkt. 6-19]; Scharmen Decl. ¶ 15, Ex. 2 at 93.  Officers formed a skirmish

12  line and pushed protestors south on Alameda Street towards Temple Street.  Ray Decl. ¶¶ 23–25;

13  Scharmen Decl. ¶ 15.

14      After most protestors had already left the area, officers continued to fire on the media.  Ray

15  was standing at least 50 feet away from the police line along with other journalists by a group of

16  media trucks in a brightly lit area.  Ray Decl. ¶¶ 24–26.  As he was clearly identifiable as a

17  journalist—wearing a lanyard with two different press credentials—Ray believed that he could

18  remain where he was.  *Id.* ¶¶ 8, 26.  But the officers proceeded to fire pepper balls and tear gas at

19  both the protestors and the journalists.  *Id.* ¶¶ 27, 30–31; Horowicz Decl. ¶¶ 11–12 (after dispersing

20  the protestors by throwing and shooting tear gas canisters at them, the officers continued to shoot

21  still more tear gas canisters at a group of news trucks more than 100 feet away for at least 20

22  minutes).  Ray shouted that they were press but he was hit by pepper balls multiple times, including

23  on his upper back.  *Id.* ¶¶ 28–29.

24      Documentary filmmaker R.R. was also filming the protests.  Declaration of R.R. ("R.R.

25  Decl.") ¶¶ 3, 5 [Dkt. 34-18].  Though he wore his press credentials and held his camera, R.R. was hit

---

[3] "SRT" refers to the Special Response Team within ICE's Enforcement and Removal Operations.
Scharmen Decl. ¶ 15, Ex. 2 at 91.

1  with a pepper ball on the leg and then a projectile in the back, while officers with DHS patches

2  pushed a small group of protestors down Alameda Street. *Id.* ¶¶ 4–6.

3        At 8:57 p.m., the Los Angeles Police Department ("LAPD") replaced federal law

4  enforcement on the skirmish line, and the federal officers returned to federal property. Scharmen

5  Decl. ¶ 15; *see also* Ray Decl. ¶ 32. Eventually, some protestors returned to MDC. At around 11

6  p.m., when the remaining protestors started to disperse, "a mix" of DHS, ICE, and LAPD officers

7  showered protestors with tear gas, pepper bullets, and flash-bang grenades "all of a sudden" and

8  without warning. Declaration of Maria-Alejandra Paz ¶¶ 11–15 [Dkt. 22-18].

9                  **c.**     **June 8, 2025**

10        On June 8, freelance journalist Sean Beckner-Carmitchel followed a protest march from

11  Boyle Heights to the MDC. Supplemental Declaration of Sean Beckner-Carmitchel ("Supplemental

12  Beckner-Carmitchel Decl.") ¶¶ 1, 3–4, 5–7 [Dkt. 6-25]; Declaration of Graham Coven ("Coven

13  Decl.") ¶¶ 6–8 [Dkt. 34-9]. When the march approached the MDC, it met a line of DHS and

14  National Guard officers on the street.[4] *Id.* ¶¶ 7–8; Declaration of Diana Barbadillo ("Barbadillo

15  Decl.") ¶ 4 [Dkt. 34-6] (testifying that around one or two hundred protestors gathered in front of

16  around 75 federal agents in National Guard, ICE, and DHS fatigues). FPS reports that demonstrators

17  blocked the loading dock of the Edward R. Roybal Federal Building. Scharman Decl. ¶ 16, Ex. 3 at

18  98–99. *See also* Coven Decl. ¶ 8, Ex. 1 (showing location of the protest in front of the MDC).

19        Just after 1 p.m., DHS officers began launching tear gas canisters, flash-bang grenades, and

20  pepper balls into a group of protestors and press alike. Barbadillo Decl. ¶¶ 7–8; *id.* ¶ 10 ("I

21  witnessed DHS agents spray pepper spray directly at a member of the press, who was holding his

22  camera."); Supplemental Beckner Carmitchel Decl. ¶¶ 7–11 (showing individuals in brightly colored

23  "NEWS MEDIA" vests and using professional video cameras). Legal observer Diane Barbadillo

24  avers that at the time DHS agents began firing, no protestor was within striking distance of the

25  agents; the press were closest to the line. Barbadillo Decl. ¶ 9; Coven Decl. ¶¶ 10–11 ("There was

26

27  _____

28  [4] By June 8, the National Guard had arrived to assist FPS with the protection of federal facilities in
Los Angeles. Canton Decl. ¶ 7.

1  nothing that provoked them."); *cf.* Scharmen Decl., Ex. 3 ("FPS Inspectors deployed [pepper] spray

2  and [] pepper balls due to rocks and other objects being thrown at them.").  Beckner-Carmichel was

3  hit with a pepper ball, destroying his press pass.  Supplemental Beckner-Carmichel Decl. ¶ 12.

4       Later that afternoon, veteran photojournalist Ted Soqui was positioned on Alameda Street,

5  between First and Second Street, photographing the protest from about fifteen feet away using a long

6  lens camera.  Declaration of Ted Soqui ("Soqui Decl.") ¶¶ 3, 5, 9 [Dkt. 6-23].  Without warning, he

7  was struck on the left cheekbone by a pepper ball and then in the right shin with a rubber bullet in

8  quick succession.  *Id.* ¶¶ 6–8; *id.* ¶ 13 (noting that the officers who shot him wore ICE or DHS

9  department patches); *see also* Petrosian Decl. ¶¶ 14–16 (averring that DHS agents deployed pepper

10  balls, flash-bang grenades, and pepper spray directly into the crowd again around 3 p.m.).[5]

11       **d.**    **June 9, 2025**

12       Soqui returned to the Federal Building on Alameda Street at around 11 a.m.  Soqui Decl.

13  ¶ 10.  Out of an abundance of caution, he wore personal protective equipment and remained at least

14  50 feet from both protestors and officers.  *Id.* ¶ 11.  But when he was facing away and preparing to

15  leave, Soqui was shot in the back with rubber bullets ***three times***.  *Id.* ¶¶ 12–13.[6]

16       **2.**    **Paramount**

17       Early on the morning of June 7, protestors gathered near a business park on 6401 Alondra

18  Boulevard in Paramount, which included an ICE facility that the Border Patrol planned to use as a

19  staging area.  Declaration of Daniel Parra ("Parra Decl.") ¶¶ 5–7 [Dkt. 47-6].  At 9:20 a.m., Border

20  Patrol agents and ICE personnel formed a semi-circle around the gate to deny protestors entry into

21  the business park.  *Id.* ¶¶ 7–8.

---

[5] The only incident that federal officers could have been responding to around this time is protestors painting graffiti or launching fireworks near the Federal Building at 300 Los Angeles Street, over a block from where Soqui was working.  Scharmen Decl. ¶ 17, Ex. 3 at 100–102.

[6] Insofar as Defendants proffer any evidence about the events of June 9, they aver that protestors vandalized a government owned-vehicle leaving the Roybal Federal Building.  Scharmen Decl. ¶ 18, Ex. 4.

Jonathan Alcorn, a photojournalist with almost 40 years of experience, arrived at around 11 a.m. Declaration of Jonathan Alcorn ("Alcorn Decl.") ¶¶ 4, 9 [Dkt. 6-15]. As usual, he wore his Los Angeles Sheriff's Department press pass and his Press Photographer's Association of Greater LA ID and carried two large, professional still cameras. *Id.* ¶ 8. Most protestors had gathered on the side of Alondra—a wide thoroughfare—opposite from the Border Patrol officers, about 150 to 200 feet away, though a small number ran into the street, getting within twenty feet of the officers. *Id.* ¶¶ 13–14; Declaration of N. Reyna ("Reyna Decl.") ¶ 4 [Dkt. 6-21]; Declaration of Diya Cruz ("Cruz Decl.") ¶¶ 6–7 [Dkt. 6-11]. Declarants concur that the crowd at this point was peaceful, chanting messages like "ICE is not welcome in LA!" Reyna Decl. ¶ 5; Cruz Decl. ¶ 9.

What happened next is disputed. Border Patrol avers that one protestor punched an agent and ran away and, in the wake of the incident, "about 75 rioters approached these agents, causing them to . . . deploy chemical and smoke munitions to prevent the crowd from getting closer." Parra Decl. ¶ 8. Observers at the scene instead testify that Border Patrol officers unleashed tear gas onto the crowd, including media, without warning. Alcorn Decl. ¶¶ 11–13, 16; Reyna Decl. ¶¶ 5–6; Cruz Decl. ¶ 10. What appears clear from the video, however, is that officers began shooting tear gas towards a reporter. *See* Reyna Decl. ¶¶ 6–10 (attaching video showing tear gas cannister dropping near an individual in bright orange vest labeled "PRESS," with a duffel bag labeled "PRESS," holding a professional camera, alone in the street); Cruz Decl. ¶¶ 10–12. And officers began firing canisters "indiscriminately" at people who posed no threat to them, including an unarmed, middle-aged woman holding a U.S. flag, over 50 feet from away. Alcorn Decl. ¶ 18.

The protest continued throughout the day. Border Patrol and Homeland Security Investigations ("HSI") officers used flash-bang grenades, pepper balls, and tear gas on countless occasions.[7] Declaration of Charles Xu ("Xu Decl.") ¶¶ 8, 10 [Dkt. 6-8] (averring that they used "at least twenty less lethals" at 1:59 p.m., 2:12 p.m., and 2:17 p.m.); Cruz Decl. ¶ 14 (averring that since

---

[7] ICE avers that though some ICE officers and HSI agents were present at the Paramount protest, they did not deploy any crowd control devices. Santacruz Decl. ¶ 7; Wang Decl. ¶ 13. The Court finds these statements to be not credible as to HIS, given the other evidence in the record. *See* Declaration of Sean Beckner-Carmichel ("Beckner-Carmitchel Decl.") ¶ 9 [Dkt. 6-6] (describing seeing HSI agents shooting stun grenades, tear gas canisters, and kinetic munitions); Declaration of Benjamin Climer ("Climer Decl.") ¶ 5 [Dkt. 6-7] (same); Mena Decl. ¶¶ 27–28 (same).

she arrived at the protest around 11 a.m, agents shot tear gas at her three different times, about 15 minutes apart); Declaration of Benjamin Climer ("Climer Decl.") ¶¶ 4–6 [Dkt. 6-7] (averring that after he arrived at 2 p.m., over the course of about an hour and 20 minutes, officers shot tear gas canisters at the protesters "[a]pproximately every five to six minutes"); Declaration of Chase Carbonati ("Carbonati Decl.") ¶¶ 5–7 [Dkt. 6-9] (testifying that he was hit in the back of the leg by a burning hot tear gas canister as he was leaving the scene shortly after 1 p.m.).

Border Patrol avers that the crowd grew and became more aggressive, throwing objects at vehicles exiting the business park. Parra Decl. ¶¶ 9–10 (testifying that at some point between 1 p.m. and 5 p.m. protestors threw rocks, fireworks, and broken cinder blocks, fruit, and other objects); Declaration of Gregory Bovino ("Bovino Decl.") ¶ 7 [Dkt. 11-1]. Plaintiffs' declarants concede that protestors threw items on occasion, but insist that the use of crowd control weapons did not appear to be precipitated by the protestors' actions and was not preceded by any warning or dispersal order. Xu Decl. ¶¶ 9, 13; Declaration of Chelsea Bell ("Bell Decl.") ¶¶ 16, 22–25, 32 [Dkt. 6-10]; Alcorn Decl. ¶¶ 14, 16; Mena Decl. ¶ 29; Climer Decl. ¶¶ 4, 6. Protestor and Emergency Medical Technician Benjamin Climer was hit in the hand by a tear gas cannister while helping fellow protestors injured by the canisters. Climer Decl. ¶¶ 7–8, 11.

Legal observers and journalists were not spared. Around 2 p.m., photojournalist Alcorn was hit by a tear gas canister while taking cover behind an SUV, hundreds of yards from the gates of the ICE facility. Alcorn Decl. ¶¶ 24–28, Ex. 1. Legal observer Charles Xu was hit by a pepper ball on the calf while filming an arrest. Xu Decl. ¶ 12. As journalist Plaintiff Sean Beckner-Carmitchel was filming the protestors—from almost 20 feet away—he was hit in the head with a tear gas canister. Declaration of Sean Beckner-Carmitchel ("Beckner-Carmitchel Decl.") ¶¶ 10, 13, Ex. 1 [Dkt. 6-6].

Almost simultaneously, while watching Border Patrol unleash a barrage of rubber bullets and canisters directly at protestors from about 30 to 50 feet away, Mena was hit in the head with a rubber bullet, above her right ear, sustaining a concussion. Mena Decl. ¶¶ 25, 27–29, 31, 37. Shortly after, she and Beckner-Carmitchel were overwhelmed by tear gas. Id. ¶ 33.

At around 5 p.m., the Los Angeles Sheriff's Department declared an unlawful assembly and cleared the area. Parra Decl. ¶ 11.

10

### 3. Federal Building, Santa Ana

On June 9, Plaintiff Abigail Olmeda attended a protest at the Federal Building in Santa Ana, where officers from the Santa Ana Police Department, FPS, and ICE HSI agents were present. Declaration of Abigail Olmeda ("Olmeda Decl.") ¶¶ 4–5 [Dkt. 6-4]; Scharmen Decl. ¶¶ 19–22; Santacruz Decl. ¶ 7. The protest remained peaceful all day, but FPS avers that by 5 p.m., the protest became more "disorderly," with some protestors "encroaching on federal property and throwing dangerous objects like large rocks, frozen water bottles, miniature billiard balls, eggs, and aluminum cans at officers." Scharmen Decl. ¶ 20, Ex. 5 at 111. Dispersal orders were given just after 5 p.m. and "the command was given to clear the stairs in front of the building." *Id.* ¶ 20.

Shortly after arriving at 5 p.m., Olmeda was holding a sign on the sidewalk, down the stairs from the federal building, when she was shot with a pepper ball near her collar bone. *Id.* ¶¶ 4, 7–9. She saw an officer with HSI insignia, who appeared to be directing other officers armed with pepper ball guns and tear gas towards her. *Id.* ¶ 10; Scharmen Decl., Ex. 5 at 111 ("FPS, [Enforcement and Removal Operations], and [HSI] all deployed less lethal munitions."). Without warning, Olmeda was shot again. *Id.* ¶ 12. When she and her partner later returned to the base of the steps, her partner was shot multiple times in the stomach and then in the back with rubber bullets. *Id.* ¶ 17. Olmeda was shot in the head with a rubber bullet. *Id.* ¶¶ 18–19.

FPS deployed less-lethal munitions on two other occasions later that evening. Scharmen Decl. ¶¶ 21–22, Ex. 5 at 111.

### 4. Xpress Wash, Maywood

On Friday, June 20, 2025, Maywood's mayor, city council members, and community members gathered at the Xpress Wash on Slauson Avenue in Maywood, where Border Patrol personnel were carrying out an immigration raid. Declaration of Kyle C. Harvick ("Harvick Decl.") ¶ 10 [Dkt. 48-1]; Declaration of Eduardo De La Riva ("Riva Decl.") ¶¶ 3, 5 [Dkt. 34-7]; Declaration of Heber Marquez ("Marquez Decl.") ¶¶ 3, 6–7 [Dkt. 34-10]. Protestors gathered in front of Xpress Wash and the nearby bus stop, on the traffic median on Slauson, and at Riverfront Park, across the street from the car wash. Riva Decl. ¶¶ 9, 11, Ex. 1. CBP avers that, at some point, individuals targeted agents with "full bottles containing unknown liquids" and other projectiles and damaged a

federal government vehicle. Harvick Decl. ¶ 10, Ex. A. Plaintiffs' declarants stated that they did not see protestors throw anything before federal agents opened fire. Riva Decl. ¶ 12; Marquez Decl. ¶¶ 10, 18; Declaration of Maritza Guardado ("Guardado Decl.") ¶¶ 9, 11 [Dkt. 34-14]; Declaration of Mayra Aguiluz ("Aguiluz Decl.") ¶¶ 19, 23 [Dkt. 34-15].

Federal agents first released a smoke bomb. Riva Decl. ¶ 15; Marquez Decl. ¶ 15; Harvick Decl. ¶ 10. Within a few seconds, another agent shot pepper balls at the protestors' feet. Riva Decl. ¶ 15. Agents then tossed a tear gas canister at the protestors on the Slauson Ave sidewalk. *Id.* ¶ 18; Guardado Decl. ¶ 12. The protestors—a mix of adults, teens, and a few seniors—started to run, some of them moving towards Riverside Park. Riva Decl. ¶ 20; Guardado Decl. ¶ 12. Agents released more tear gas, first at a small group of people standing by the bus stop, and then at protestors who had gathered (or taken refuge) in Riverside Park—across the street from the raid. Guardado Decl. ¶¶ 13, 15–16; Aguiluz Decl. ¶ 20; Marquez Decl. ¶ 18; Harvick Decl. ¶ 10 (averring that "the situation necessitated the use of a variety of less-than-lethal specialty impact and chemical munitions," including pepper balls, tear gas canisters, and a smoke bomb).

### 5. Home Depot, Ladera Heights

On June 23, Aleca Le Blanc, a professor at the University of California, Riverside, arrived at a Home Depot parking lot to observe a potential immigration raid. Declaration of Aleca Le Blanc ("Le Blanc Decl.") ¶¶ 2, 4 [Dkt. 34-3]. Border Patrol avers that a group of individuals impeded detention efforts and obstructed their route of egress. Harvick Decl. ¶ 11. Border Patrol again released tear gas, reaching even observers who had dispersed across the street. *Id.*; Le Blanc Decl. ¶¶ 14–16.

### 6. Metropolitan Detention Center (July 4)

On July 4, R.R. filmed a group of protestors at MDC. R.R. Decl. ¶ 7. Having received reports of multiple demonstrations throughout the day, the National Guard and the Border Patrol Special Response Team assisted FPS in protecting federal property. Scharmen Decl. ¶ 24; Declaration of Kevin Green ("Green Decl.') ¶ 13 [Dkt. 47-7]. Throughout the day, FPS reported that protestors blocked the entrance to the Roybal Building, adjacent to MDC, and obstructed an ICE vehicle. Scharmen Decl. ¶ 25. At 5:41 p.m., protestors began throwing bottles. *Id.* ¶ 26, Ex. 6 at

120–21.  At 5:52, the FPS issued verbal dispersal orders over a public address speaker system.
Scharmen Decl. ¶ 27, Ex. 6 at 121.  At around 6 p.m., Border Patrol agents and DHS officers started
pushing the crowd to make way for a white car with a CBP logo.  R.R. Decl. ¶ 7.  About twenty
minutes later, federal officers formed a line and began pushing back against the group.  *Id.* ¶ 8;
Scharmen Decl. ¶ 29, Ex. 6 at 122–23 (noting that the crowd was throwing objects); Green Decl.
¶ 14 (" . . . there was an intensity in the crowd and projectiles were thrown from the civilian
protestors into and on top of our SRT formation").

When the line drew close to him, R.R. objected that he was a member of the press but one of
the DHS officers told him, "It doesn't matter."  R.R. Decl. ¶ 8.  At approximately 6:42, the FPS
issued a dispersal warning from an overhead helicopter, and after 7:08 p.m., the FPS assisted the
LAPD in relocating members of the media.  Scharmen Decl. ¶¶ 29, 31, Ex. 6 at 123–24.

## 7.    MacArthur Park

On July 7, journalists Tina-Desiree Berg and R.R. went to MacArthur Park to cover a
potential immigration raid.  Declaration of Tina-Desiree Berg ("Berg Decl.") ¶ 4 [Dkt. 34-22]; R.R.
Decl. ¶ 9.  Both wore press badges readily visible on a lanyard around their necks.  Berg Decl. ¶ 7;
R.R. Decl. ¶ 10.  They observed a group of about 75 to 100 protestors "verbally squabbling" with
approximately 100 federal officers, some of whom wore uniforms labeled HSI and some of whom
wore yellow arm patches and dark green uniforms consistent with CBP officers.  Berg Decl. ¶¶ 5–6;
R.R. Decl. ¶ 9–10.  At one point, when R.R. moved to capture an interaction between a protestor and
some Border Patrol agents, the agents pointed their guns at him.  Berg Decl. ¶¶ 7, 9 (estimating that
they pointed the gun at him for approximately 30 seconds); R.R. Decl. ¶ 10.  Another threatened to
pull the pin on a stun grenade.  R.R. Decl. ¶ 10.

CBP and ICE deny that the SRT used any crowd control weapons or that any officers
threatened members of the media.  Green Decl. ¶ 7; Declaration of Brian Szemes ("Szemes Decl.") ¶
8 [Dkt. 47-2].

## 8.    Glass House Farms, Carpinteria and Camarillo

On July 10—just one week before Plaintiffs' Motion was filed—community members
gathered at Glass House Farms facilities, where immigration raids were taking place.  The raid (and

13

1    protests) centered on two Glass House Farms facilities: one on Route 192 in Carpinteria and another

2    on Laguna Road in Camarillo.  The Camarillo protests congregated in two locations: to the west of

3    the facility on Wood Road and Laguna Road and to the east of the facility near Las Posas Road and

4    Laguna.  Declaration of Gabriel Teran ("Teran Decl.") ¶ 8 [Dkt. 34-8].

5          Some members of the crowd were friends and family members of Glass House Farms

6    employees, while others were concerned elected officials or community members.  Declaration of

7    Sarah Wilczewski ("Wilczewski Decl.") ¶ 4 [Dkt. 34-20]; Declaration of Beverly Dransfeldt

8    ("Dransfeldt Decl.") ¶ 7 [Dkt. 34-5]; Declaration of Willard Lubka ¶ 9 [Dkt. 34-24].  HSI was the

9    lead investigative agency at Glass House Farms, with Border Patrol personnel also present at the

10   Camarillo location "to ensure operational control . . . and provide[] perimeter security."  Harvick

11   Decl. ¶ 12; Green Decl. ¶ 9.

12                    a.        **West side of Camarillo facility**

13         On the west side of the Camarillo facility, CBP agents had blocked off Laguna Road.

14   Wilczewski Decl. ¶ 5.  Protestors gathered around the caution tape, chanting, "We don't want you."

15   *Id.* ¶ 6.  When college professor Dolores Ortiz arrived around 11 a.m., the atmosphere seemed

16   relaxed.  Declaration of Dolores Ortiz ("Ortiz Decl.") ¶¶ 4, 6 [Dkt. 49-5].  But sometime before

17   noon, the tone shifted.  *Id.* ¶ 7.  The agents began pulling gas masks over their faces.  *Id.*  Without

18   warning, and without any violence from protestors, the agents deployed tear gas and other

19   projectiles, throwing canisters deep into the crowd.  *Id.* ¶ 11; Wilczewski Decl  ¶¶ 7–9.  By the time

20   Beverly Dransfeldt, Chair of the Pleasant Valley Recreation and Park District Board, arrived around

21   12:20 p.m., she saw crowds of people running from tear gas.  Dransfeldt Decl. ¶ 5.

22         After protestors gathered at the blockade again at 1 p.m., agents deployed tear gas and

23   projectiles into the crowd a second time, purportedly to clear the way for an ambulance arriving at

24   the facility.  Wilczewski Decl. ¶¶ 10, 12–13.  Ortiz observed that throughout the day, agents would

25   deploy tear gas and pepper balls about every 30 minutes or an hour, without warning and without

26   any precipitating violence from the protestors.  Ortiz Decl. ¶ 14.

27         Around 1:30 p.m., CBP agents ordered protestors to move back five feet.  Declaration of

28   Alexander Nadolishny ("Nadolishny Decl.") ¶ 7 [Dkt. 34-4]; Declaration of Kristin Ellison ("Ellison

Decl.") ¶ 6  [Dkt. 34-13].  Though the protestors complied, CBP agents fired pepper balls at them.  Nadolishny Decl. ¶¶ 8–10; Ellison Decl. ¶¶ 6–7.  As 55-year-old engineer Alexander Nadolishny ran away from the line, he looked back to see an agent pointing a gun at him.  Nadolishny Decl. ¶ 11.  He felt a pepper ball hit his ear and saw agents aiming and hitting other protestors in the head with the same munitions.  *Id.*

At 2:25 p.m., CBP again deployed tear gas and pepper balls after ordering protestors to clear a road.  Harvick Decl. ¶ 15; Nadolishny Decl. ¶ 12 (averring that he saw agents launch at least three or four tear gas canisters into the crowd of protestors and attaching photos); *id.* ¶ 16 (observing about ten other people who had sustained injuries from rubber bullets); Teran Decl. ¶¶ 11–12 (observing that protestors on the west side had been "heavily exposed to tear gas" or struck by projectiles); Dransfeldt Decl. ¶ 11 (noting that people sported circular raised welts from pepper balls); Ortiz Decl. ¶ 18 (noting that the pepper balls were strong enough that they shattered at least one windshield); *id.* ¶ 20 (noting that one woman sported 14 bruises).  After Dransfeldt returned to her car, an officer pointed his gun at her car.  Dransfeldt Decl. ¶ 15.  CBP avers that protestors threw smoke bombs, fireworks, and various objects at agents.  Harvick Decl. ¶ 15.  Plaintiffs' declarants state that the protest escalated only after tear gas was used.  *See* Nadolishny Decl. ¶ 9; Teran Decl. ¶¶ 17, 20 ("No one was doing anything violent before the tear gas was used."); Ortiz Decl. ¶ 31 ("Throughout my entire time at the protest, I did not see anyone throwing rocks, bottles, or fireworks.").

At 3:42 p.m., a caravan of vehicles emerged, driving east.  Teran Decl. ¶¶ 21–22.  An agent in the last van shot a demonstrator standing on the side of the road and tossed out additional gas canisters.  *Id.* ¶¶ 24–26.  At 5 p.m., a Border Tactical Unit team was deployed to the west side of the Camarillo facility to clear a path.  Harvick Decl. ¶ 16.

### b.    East side of Camarillo facility

Alec Bertrand, a recording engineer and musician, arrived near the intersection of Las Posas and Laguna Road before 12 p.m.  Declaration of Alec Bertrand ("Bertrand Decl.") ¶¶ 3, 6 [Dkt. 49-2].  He joined a group of about 40 people protesting in front of a line of 20 to 23 officers, each bearing a yellow patch identifying them as ICE and CBP.  *Id.* ¶¶ 8–9.  He was unable to get closer than ten feet from the officers and did not observe anyone in the small group doing anything violent.

*Id.* ¶¶ 9–10; *see also* Declaration of Diane Alvarez ("Alvarez Decl.") ¶ 7 [Dkt. 39-4] (averring that protestors were not doing anything that could have been construed as "threatening or impeding agents").

After only 20 minutes, the officers unleashed tear gas and projectiles without warning. Bertrand Decl. ¶¶ 11–12; Alvarez Decl. ¶ 10 (averring that agents began shoving a reporter at the front of the line before unleashing the tear gas). Bertrand was hit first on his groin, then his shoulder and leg, and finally on his hand, leaving his fingers bloodied. Bertrand Decl. ¶¶ 13–18. He required hand surgery and could barely use his hand three weeks later. *Id.* ¶¶ 23–24.

At 12:50 p.m., an ICE vehicle sought to exit the perimeter on the east side of the Camarillo facility to provide security for a detained subject who required medical assistance. Harvick Decl. ¶ 16. CBP alleges protestors repeatedly obstructed the vehicle. *Id.* Agents deployed tear gas into the crowd. *Id.*; Declaration of Shannon Anderson ("Anderson Decl.") ¶ 7 [Dkt. 34-21].

Jeanette Marantos, a features reporter at the *Los Angeles Times* and NewsGuild member, agreed to cover the ICE raids at Glass House Farms as she lived nearby in Ventura. Declaration of Jeanette Marantos ("Marantos Decl.") ¶¶ 3, 5 [Dkt. 34-11]. She arrived at around 2:30 p.m., wearing a safety vest with "MEDIA" emblazoned in large letters and her press badge clipped to the front. *Id.* ¶¶ 6–7. She reached a line of National Guard and CBP officers blocking Laguna Road. *Id.* ¶¶ 8–13.

Shortly after Marantos arrived, CBP agents released tear gas without warning. *Id.* ¶¶ 14, 16; Declaration of A.R. ("A.R. Decl.") ¶ 6 [Dkt. 34-2] (averring that CBP agents began throwing tear gas canisters and grenades after conversing with newly arrived agents who appeared to be National Guard); *see also* Declaration of Catherine Saillant ("Saillant Decl.") ¶ 9 [Dkt. 49-3] (testifying that she did not observe anything "threatening or violent" from the crowd before the agents released tear gas around 2:50 p.m.); Supplemental Declaration of A.R. ("Supplemental A.R. Decl.") ¶¶ 2–4 [Dkt. 49-9] (videos of the protest on Laguna Road at 2:25 p.m. and 2:39 p.m., showing no violent actions by protestors); Declaration of Veronica Miranda ("Miranda Decl.") ¶ 10 [Dkt. 34-23] (from vantage point at the front of the line, saw no "acts of aggression" by protestors). After agents deployed the tear gas, some protestors flung water bottles towards the black pick-up truck in the middle of the street, but they were far from the line of agents. Marantos Decl. ¶¶ 18, 21.

1    CBP agents released tear gas at least two more times, again without warning. *Id.* ¶¶ 24–25,

2    28; Declaration of Kimberly Fisher ("Fisher Decl.") ¶ 12 [Dkt. 34-12] (averring that DHS agents,

3    without warning to disperse, deployed tear gas just before 3:54 p.m.). Declarants state consistently

4    that the only violence they witnessed were protestors flinging plastic water bottles. A.R. Decl. ¶ 8;

5    Marantos Decl. ¶ 21 ("[O]ther than the water bottles . . . the only other 'violence' I saw was verbal –

6    some people were just angry and rude."); Fisher Decl. ¶¶ 8–9 ("People were verbally taunting the

7    agents, but I didn't see any protestors throw anything or threaten to make contact with the agents.");

8    Saillant Decl. ¶ 13 ("I did not observe anyone in the crowd doing anything violent.").

9                    **c.    Carpinteria facility**

10    Research scientist Lynn Griffin and her twelve-year-old daughter headed to the Carpinteria

11    facility to hand out Know Your Rights cards to those detained at the local farms. Declaration of

12    Lynn Griffin ("Griffin Decl.") ¶¶ 4–5 [Dkt. 49-7]. They arrived to see a crowd of local community

13    members, including elderly people and families with three- and four-year-old toddlers. *Id.* ¶ 8. Just

14    30 minutes after they arrived, agents threw tear gas cannisters into the crowd—without any

15    provocation or instigation. *Id.* ¶¶ 9–10 ("I did not see anyone throwing rocks, water bottles, or any

16    other projectiles at any of the agents at any point."); *see* Supplemental Declaration of Mónica

17    Solórzano ¶ 3 [Dkt. 49-10] (video of the Carpinteria protest at 11:18 a.m., showing no signs of

18    violence).

19    At 12:10 p.m., CBP agents trying to clear a path for a vehicle exiting the Carpinteria facility

20    detonated a flash-bang grenade at the feet of a group of community members, including Mayor

21    Natalia Alarcon, Vice Mayor Mónica Solórzano, and Councilmember Julia Mayer. Declaration of

22    Mónica Solórzano ("Solórzano Decl.") ¶¶ 3, 8, 15–17 [Dkt. 34-16]. Solórzano avers that they

23    received no warning and that the vehicle was able to pass them on the two-way road. *Id.* ¶¶ 17, 19.

24    As some agents began returning to their vehicles at the Carpinteria facility, community

25    members yelled and chanted, "You are tearing apart families!" *Id.* ¶ 25. While agents departed the

26    Carpinteria location, "a bottle of water was thrown" and "three to four individuals were seen bending

27    down to grab what was assumed to be rocks." Green Decl. ¶ 11. One agent in tan fatigues with an

28    SRT badge threw a smoke bomb into the crowd. Solórzano Decl ¶ 26.

ICE and CBP arrested over 300 immigrants at the Glass House Farm. Defendants'
Opposition to Plaintiffs' Motion ("Opposition") 8–9 [Dkt. 47].

**B.    Organizational Plaintiffs**

Finally, Plaintiffs proffer evidence about the activities of the organizational Plaintiffs, LA
Press Club and NewsGuild. *See* Declaration of Adam Rose ("Rose Decl.") [Dkt. 6-5]; Declaration
of Jonathan Schleuss ("Schleuss Decl.") [Dkt. 6-16]; Declaration of Nadia Taha ("Taha Decl.")
[Dkt. 34-17]; Supplemental Declaration of Adam Rose ("Supplemental Rose Decl.") [Dkt. 34-25].

The LA Press Club is a 501(c)(3) nonprofit organization, offering scholarships and
fellowship opportunities, educational and professional networking events, and awards programs for
journalists in Southern California, as well as non-member journalists. Rose Decl. ¶¶ 2, 5. In the
wake of the George Floyd protests in 2020, the LA Press Club created the role of "Press Rights
Chair" to track journalists' interactions with law enforcement, lobby for greater protections for press,
and engage law enforcement agencies and civic officials about the rights of journalists. *Id.* ¶¶ 6–12;
Supplemental Rose Decl. ¶ 5. For example, the LA Press Club worked with a coalition of press
advocacy groups to support California Senate Bill 98 (now enshrined as California Penal Code
section 409.7), which exempts duly authorized members of the press from dispersal orders. Rose
Decl. ¶ 8.

Since the outbreak of protests on June 6, 2025, the LA Press Club has diverted significant
time and resources to assist injured journalists with medical and legal services, provide tips on safety
and access during protests, and document press rights violations. *Id.* ¶¶ 13–16; Supplemental Rose
Decl. ¶¶ 6–11. In addition, the LA Press Club has created a new program providing personal
protective equipment, first aid materials, and field communication devices to journalists working in
the field. Supplemental Rose Decl. ¶ 9. Because of these efforts, Secretary and Press Rights Chair
Adam Rose had to divert time and resources from fundraising and award programs, including the LA
Press Club's annual Journalism Awards Dinner. Rose Decl. ¶¶ 1, 15; Supplemental Rose Decl ¶ 10.

NewsGuild is the largest labor union representing media workers in North America,
representing more than 25,000 employees. Schleuss Decl. ¶ 2. NewsGuild represents more than 800
journalists and media workers in California through its local unions, the Media Guild of the West

and the Pacific Media Workers Guild, including those at the *Los Angeles Times*, the Southern California News Group, CalMatters and other publications. *Id.* ¶ 3; Taha Decl. ¶¶ 1–2. As a labor union, NewsGuild's primary function is to advance the economic interests and working conditions of its members through collective bargaining agreements. Schleuss Decl. ¶ 4, Taha Decl. ¶¶ 3–4.

Since June 6, NewsGuild and its local unions in California have prioritized emergency response efforts, diverting time from their regular duties. Schleuss Decl. ¶ 4; Taha Decl. ¶¶ 5–16. For example, local union staff have provided member consultations about their contractual rights to refuse dangerous assignments or to obtain employer-funded protective equipment. Schleuss Decl. ¶ 4. The Media Guild of the West has diverted time and resources to address press rights violations, including providing safety gear to journalists covering protests and advising member journalists about their rights and safety measures. Taha Decl. ¶¶ 6–15. Because of these exigent efforts, Executive Director Nadia Taha has been forced to cancel scheduled meetings and postpone National Labor Relations Act representative responsibilities to prioritize responding to alleged DHS violations. *Id.* ¶¶ 1, 5, 16.

## C.    Expert Declarations

Plaintiffs produce declarations from Gil Kerlikowske, former CBP Commissioner and former Seattle Chief of Police, and Dr. Rohini Haar, a licensed physician specializing in emergency medicine. Declaration of Gil Kerlikowske ("Kerlikowske Decl.") [Dkt. 6-3]; Supplemental Declaration of Gil Kerlikowske ("Supplemental Kerlikowske Decl.") [Dkt. 34-26]; Reply Declaration of Gil Kerlikowske ("Kerlikowske Reply Decl.") [Dkt. 49-1]; Declaration of Dr. Rohini Haar ("Haar Decl.") [Dkt. 6-12]. Defendants proffer Matthew S. Harvey, Director of the Less-Lethal Training Branch of the Law Enforcement Safety and Compliance Directorate of the CBP. Declaration of Matthew S. Harvey ("Harvey Decl.") [Dkt. 47-5]. The Court finds that all three are qualified, credible, and persuasive expert witnesses and considers their testimony herein.

### 1.    Gil Kerlikowske

Kerlikowske draws on his 47 years of law enforcement experience, including training and experience with crowd control and use of force in response to large and volatile protests. Kerlikowske Decl. ¶ 5, Ex. 1. While serving as the Seattle Chief of Police and as Buffalo's Police

19

Commissioner, Kerlikowske orchestrated the police response to hundreds of protests. *Id.* ¶¶ 3, 7, Ex. 1. In these roles, he was also responsible for training officers to comply with law and department policy, overseeing their compliance, and supervising investigations into uses of excessive force. *Id.* ¶ 9. Kerlikowske also served as Commissioner of the CBP, where he oversaw a significant reduction in the use of force by Border Patrol agents. *Id.*, Ex. 1.

Drawing from this experience, Kerlikowske opines that DHS is deploying excessive force, particularly by using force against individuals who are not engaged in threatening acts, misusing crowd-control munitions and tear gas, and indiscriminately using force. *Id.* ¶ 4; Supplemental Kerlikowske Decl. ¶ 4. He also states that Plaintiffs' proposed injunction is safe for law enforcement, workable in application, and permits trained and experienced law enforcement personnel to protect public safety. Kerlikowske Decl. ¶ 4; Supplemental Kerlikowske Decl. ¶ 4.

### 2.    Matthew Harvey

Since 2022, Harvey has worked in CBP's Less-Lethal Training Branch, training and certifying tactical instructors who in turn deliver training to over 45,000 CBP personnel. Harvey Decl. ¶¶ 1–2, Ex. 1. Prior to this, he served on CBP's Use of Force Incident team and as an instructor at the Border Patrol Academy, delivering training on empty hand, ground, and edged weapons defense. *Id.* ¶ 3.[8]

Based on his review, Harvey opines that Plaintiffs' proposed injunction is unworkable, vague, and endangers the safety of law enforcement personnel. *Id.* ¶¶ 9–15. More specifically, Harvey objects that Plaintiffs' proposed injunction fails to address situations where the use of crowd control weapons is reasonable and necessary, limits the ability of law enforcement to protect themselves and the public, and leaves officers with only physical techniques to control crowds. *Id.*

### 3.    Dr. Rohini Haar

Dr. Haar is an attending physician in the Department of Emergency Medicine at Kaiser Hospital in Oakland, California and an adjunct professor at the University of California, Berkeley

---

[8] The Court notes that while Harvey has expertise on CBP policy on the use of crowd control weapons, he lacks experience supervising police responses to volatile protests. Kerlikowske Reply Decl. ¶ 7.

School of Public Health.  Haar Decl. ¶¶ 3–4.  Dr. Haar's research focuses on the impacts of violence and human rights violations on health, including the use and abuse of crowd control weapons like tear gas and kinetic impact projectiles.  *Id.* ¶¶ 4, 6–10, Ex. A.

Based on her research and experience, Dr. Haar concludes that crowd control weapons can cause significant and long-lasting health harms, from respiratory damage to blunt force trauma to post-traumatic stress disorder.  *Id.* ¶¶ 15–20, 36–45.  In particular, some types of kinetic impact projectiles fired at close range can be as lethal as conventional live ammunition.  *Id.* ¶¶ 18, 56–59. Law enforcement agencies increasingly use combination weapons, which compound the risks of kinetic impact projectiles and chemical irritants.  *Id.* ¶ 58.  For example, pepper balls are hard plastic spheres designed to burst on impact and release a chemical irritant similar to pepper spray.  *Id.*

### D.    Procedural Background

LA Press Club and NewsGuild; journalists Sean Beckner-Carmitchel, Ryanne Mena, and Lexis-Olivier Ray; legal observer Charles Xu; and protestors Benjamin Adam Climer and Abigail Olmeda initiated this action on June 18, 2025.  Complaint ¶¶ 6–13 [Dkt. 1].  Plaintiffs alleged claims for First Amendment right of access and retaliation and Fourth and Fifth Amendment excessive force against Defendants Kristi Noem and DHS.  *Id.* ¶¶ 239–51.

On the same day, Plaintiffs filed an *ex parte* application for a temporary restraining order enjoining Defendants from dispersing, threatening, or assaulting the press and limiting their use of crowd control weapons, including kinetic impact projectiles, chemical irritants, and flash-bang grenades.  [Dkt. 6].  On June 20, Judge Stephen V. Wilson denied Plaintiffs' application, finding that, based on alleged constitutional violations between June 6 and June 9, Plaintiffs "fail[ed] to establish the 'substantial risk' of future harm" required for Article III standing.  Order Denying Plaintiffs' Ex Parte Application for Temporary Restraining Order ("TRO Order") 4 [Dkt. 19].  Judge Wilson also commented—without reaching the issue—that Plaintiffs' proposed injunction exceeded the breadth necessary to remedy the alleged violations.  *Id.* at 5.

On July 9, 2025, the matter was transferred to this Court.  [Dkt. 29].

1    On July 18, 2025, Plaintiffs moved for a preliminary injunction, contending that they are

2    likely to succeed on their First Amendment right of access and retaliation claims.  The Court heard

3    oral argument on August 25, 2025 and took the matter under submission.  [Dkt. 50].

4    **III.    LEGAL STANDARD**

5    To prevail on a motion for a preliminary injunction, the movant must establish that (1) it is

6    likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent the preliminary

7    injunction, (3) the balance of equities tips in its favor, and (4) a preliminary injunction is in the

8    public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Meinecke v. City of*

9    *Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).  Where the non-movant is a government entity, "the third

10   and fourth factors . . . merge."  *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of*

11   *Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc).

12   In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale such that "a

13   stronger showing of one element may offset a weaker showing of another."  *Id*. at 684 (citing

14   *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017)).  "When the balance of

15   equities tips sharply in the plaintiff's favor, the plaintiff must raise only serious questions on the

16   merits—a lesser showing than likelihood of success."  *Id*. (citation omitted).

17   **IV.    DISCUSSION**

18   A.    **Standing[9]**

19   1.    **Likelihood of future harm**

20   To establish the "irreducible constitutional minimum of standing," a plaintiff must have

21   suffered an "actual or imminent" injury in fact, such that the injury is "fairly trace[able]" to the

22

23

24

---

25   [9] Defendants first argue that the law of the case doctrine requires the denial of the present Motion.
     Opposition at Motion 11–12.  Not so.  Plaintiffs' Application for the temporary restraining order was

26   expressly denied "WITHOUT PREJUDICE to . . . a regularly noticed motion for preliminary
     injunction."  TRO Order at 5 (capitalization in original).  *See Askins v. U.S. Dep't of Homeland Sec.*,

27   899 F.3d 1035, 1043 (9th Cir. 2018) (finding that the law of the case doctrine did not apply where
     the district court dismissed Plaintiffs' claim without prejudice and Plaintiffs filed an amended

28   complaint).  That Motion is now properly before the Court, and must be considered on its merits.

1    defendant's challenged conduct and likely to be "redressed by a favorable decision."[10] *Lujan v.*

2    *Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).  Plaintiffs may establish standing

3    for prospective injunctive relief by alleging "either 'continuing, present adverse effects'" of a

4    defendant's past illegal conduct, "or 'a sufficient likelihood that [they] will again be wronged in a

5    similar way.'"  *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (first quoting *O'Shea v.*

6    *Littleton*, 414 U.S. 488, 495–96 (1974), and then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95,

7    111 (1983)).  Plaintiffs may show that an injury is likely to recur in "at least two ways:" they may

8    show that the injury "stems from" the defendant's written policy, or that the harm is "part of a

9    'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"

10    *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (first quoting *Armstrong v. Davis*, 275 F.3d

11    849, 861 (9th Cir. 2001) and then quoting *LaDuke v. Nelson,* 762 F.2d 1318, 1324 (9th Cir. 1985)).

12    　　　Defendants contend that Plaintiffs have not established that their injuries are likely to recur.

13    Opposition at 12–14.  But the Ninth Circuit has unequivocally and forcefully rejected this same

14    argument in *Index Newspapers LLC v. United States Marshals Service*, finding that the "risk of

15    future injury [was] not speculative," where an "ongoing, sustained pattern of conduct . . . resulted in

16    numerous injuries to members of the press" since the action was filed.  977 F.3d 817, 826 (9th Cir.

17    2020).  Here, as in *Index Newspapers*, some Plaintiffs were indeed injured more than once.  Mena

18    Decl. ¶¶ 16–22, 30–31 (shot by pepper ball and rubber bullet on two separate occasions); Beckner-

19    Carmitchel Decl. ¶¶ 13–14 and Supp. Beckner-Carmitchel Decl. ¶ 12 (hit by tear gas canister and

20    pepper ball at two different protests); Ray Decl. ¶¶ 22, 28 (shot by pepper balls twice); *Index*

21    *Newspapers*, 977 F.3d at 826 (quoting *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir.

22    1992)) ("[T]he possibility of recurring injury ceases to be speculative when actual repeated incidents

23    are documented.").  And, as in *Index Newspapers*, "many victims had been standing on public

24    streets, sidewalks, and parks, well away from protestors, and were not engaged in unlawful activity"

25

_____

26    [10] "At this very preliminary stage of the litigation, [plaintiffs] may rely on the allegations in their
27    Complaint and whatever other evidence they submitted in support of their [preliminary injunction]
      motion to meet their burden [to establish standing]."  *Washington v. Trump*, 847 F.3d 1151, 1159
28    (9th Cir. 2017).

when they were injured by Defendants.[11]  *Id.*  Indeed, as the Ninth Circuit noted in its decision and as is undisputedly applicable here, such conduct "persisted for weeks and was ongoing," with the latest instance a mere week before Plaintiffs filed the instant motion.  *Id.*

Defendants cavil that Plaintiffs rely on nonparty declarations to establish more recent occurrences.  Opposition at 13–14.  But Defendants have injured three members of LA Press Club and NewsGuild since the denial of the TRO.  *See* Marantos Decl. ¶¶ 4, 14–17; R.R. Decl. ¶¶ 3, 7–10; Berg Decl. ¶¶ 2, 3, 10.  At any rate, the experience of other journalists, legal observers, and protestors bears directly on the operative question of whether Plaintiffs "will again be wronged in a similar way."  *Villa*, 865 F.3d at 1229 (citation omitted).

Immigration raids in Southern California will undoubtedly continue.[12]  And Plaintiffs attest that they intend to continue their activities as reporters, legal observers, and protestors.  *See* Beckner-Carmitchel Decl. ¶ 19; Climer Decl. ¶ 19; Ray Decl. ¶ 37; Mena Decl. ¶ 38; Olmeda Decl. ¶ 24.  Plaintiffs also have proffered evidence showing that Defendants injured other journalists, legal observers, and protestors engaged in similar protected activity.[13]  Defendants aver that, on each of these occasions, federal officers acted in accordance with their respective agency policies.  *See generally* Opposition at 5–11 (contending that federal officers responded "lawfully and appropriately" on each occasion); Wang Decl.; Scharmen Decl.; Parra Decl.; Green Decl.  Unlike in *Lyons*—where plaintiff could avoid further injury by "avoid[ing] . . . illegal conduct"—Plaintiffs

---

[11] *See, e.g.*, Beckner-Carmitchel Decl. ¶¶ 10, 13 (averring that he was hit in the head with a tear gas canister while filming protestors from over twenty feet away); Mena Decl. ¶¶ 29–31, 37 (testifying that she sustained a concussion from a rubber bullet, while covering protests from 30 to 50 feet away); Ray Decl. ¶¶ 27–29 (testifying that he was hit in the back by pepper balls multiple times, while standing amidst a group of media trucks).

[12] Government's Appl. to Stay, *Noem v. Perdomo*, 2025 WL 2323447, at *iii–2 ("Given the Administration's commitment to enforcing the Nation's immigration laws - under which illegal aliens are subject to investigative stops and detention to facilitate removal - it should be no surprise that the Los Angeles area is a top enforcement priority.").

[13] *See, e.g.*, Alcorn Decl. ¶¶ 24–28; Soqui Decl. ¶¶ 6–8, 10–13; Fisher Decl. ¶¶ 12–14; R.R. Decl. ¶¶ 4–6, 10; Saillant Decl. ¶ 12; Howell-Egan Decl. ¶ 13; Petrosian Decl. ¶¶ 14–16; Barbadillo Decl. ¶¶ 11–13; Ellison Decl. ¶¶ 5–7; Carbonati Decl.  ¶¶ 5–7; Nadolishny Decl. ¶ 11; Bertrand Decl. ¶¶ 13–18; Miranda Decl. ¶¶ 11–21; Griffin Decl. ¶¶ 9–13.

1   were injured engaging in innocent activities. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041

2   (9th Cir. 1999) (citing *Spencer v. Kemna*, 523 U.S. 1, 15 (1998)). Here, "no string of contingencies

3   [is] necessary to produce an injury." *Id.* at 1041–42.[14]

4          The Ninth Circuit has also emphasized that First Amendment injuries "sharply differ[] from

5   the substantive due process injury asserted in *Lyons*." *Index Newspapers*, 977 F.3d at 826. "A

6   chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is

7   not 'based on a fear of future injury that itself [is] too speculative to confer standing.' " *Id.* (quoting

8   *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)). *See also Porter v. Martinez*, 68 F.4th 429, 437

9   (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1007 (2024) (citations omitted) (finding that "because of the

10  'chilling effect of sweeping restrictions' on speech," even a single citation was "good evidence that

11

12

13

14  [14] The Court is cognizant of the discussion of standing in Justice Kavanaugh's very recent
    concurrence in *Noem v. Vasquez Perdomo*. 606 U.S. __, 2025 WL 2585637, at *2–3 (Kavanaugh,

15  J., concurring) (discussing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). Plaintiffs' theory of
    standing here is distinguishable from that in *Vasquez Perdomo* and in *Lyons*. There, plaintiffs

16  alleged that they were stopped by law enforcement—in *Vasquez Perdomo*, without reasonable
    suspicion of unlawful presence, and in Lyons, that he was subsequently subjected to an unlawful

17  chokehold. The Court in *Lyons* and Justice Kavanaugh in *Vasquez Perdomo* found that plaintiffs
    "ha[d] no good basis to believe that law enforcement will unlawfully"—or imminently—"stop them

18  in the future." 2025 WL 2585637 at *2. There was thus not a "sufficient likelihood" that the
    plaintiffs, as opposed to "any other citizen of Los Angeles," would "again be wronged in a similar

19  way." *Id.* (quoting *Lyons*, 461 U.S. at 111).

20
    The same is not true here. Plaintiffs' injuries recurring does not depend on them happening to be in

21  the wrong place at the wrong time, such that they, as opposed to someone else, encounter law
    enforcement's unlawful actions. Instead, Plaintiffs aver that they intend to continue covering the

22  protests where these very actions are happening. See Rose Decl. ¶ 61; Chariton Decl. ¶¶ 3–4, 6;
    Berg Decl. ¶ 5. And they are well within their rights to do so—indeed, they are protected by the

23  First Amendment. *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) ("[T]he Supreme Court has
    long recognized a qualified right of access for the press and public to observe government

24  activities."); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ("The First
    Amendment protects the right to photograph and record matters of public interest.").

25

26  Because Plaintiffs intend to continue to be present at ongoing protests, protests at which Defendants
    target or fire indiscriminately upon the press, the risk of recurrence of their injuries is not speculative

27  in the way it was in *Lyons* or *Vasquez Perdomo*.

28

the threat of enforcement is not 'chimerical'").  Insofar as Plaintiffs have in fact limited their activities because of their past injuries, that too suffices to state a cognizable injury.[15]

### 2.    Associational and organizational standing

LA Press Club and NewsGuild have standing on behalf of their members, as well as for their own injuries.  An organization may sue on behalf of its members when: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  Absent a member with standing, an organization may still have standing to vindicate its own interests if it can establish an injury to itself.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).  Direct organizational standing can be satisfied if the organization alleges that a defendant's actions "affected and interfered with [a plaintiff organization's] core business activities[.]"  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  The Ninth Circuit has "further specified that an organization has direct standing to sue where a defendant's behavior has 'frustrated its mission and caused it to divert resources in response to that frustration of purpose.'"  *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025) (quoting *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021)).

As discussed above, both LA Press Club and NewsGuild have members with standing in their own right.  Rose Decl. ¶¶ 14, 19–29; Supp. Rose Decl. ¶¶ 12–17; Schleuss Decl. ¶¶ 5–9; Marantos Decl. ¶¶ 3–4; Berg Decl. ¶ 3; R.R. Decl. ¶ 3.  Indeed, "neither the First Amendment claim nor the injunctive relief requested requires the participation of [every] individual member[]" not already named in the instant action.  *Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th

---

[15] *See, e.g.*, Ray Decl. ¶ 37 (averring that because of his injuries, he is "likely to stay further back to avoid being subject to force or arrested," even if it means not getting the same coverage); Supplemental Declaration of Ryanne Mena ("Supplemental Mena Decl.") ¶ 10 [Dkt. 34-27] ("In light of my experience getting shot by DHS agents twice, I will definitely wear personal protective equipment when covering protest events in the future [even if] wearing all this gear . . . may pose a barrier to effective reporting.").

Cir. 1998). And both organizations seek to protect the right of journalists to safely "cover and report news without government interference," an interest clearly germane to their purposes. *Id.*; Rose Decl. ¶¶ 2, 5; Schleuss Decl. ¶¶ 2–4; Taha Decl. ¶¶ 1–4. The Court concludes that both organizations have associational standing.[16]

> **B.    Likelihood of Success**

Plaintiffs advance two distinct First Amendment claims. First, they contend that the record evinces DHS' intent to retaliate against them based on their protected activities. Motion at 11. Second, they aver that DHS actions violate journalist and observer Plaintiffs' right of access. *Id.*[17]

> **1.    Retaliation**

Plaintiffs contend that Defendants' statements and conduct together evince their intent to systematically retaliate against journalists, legal observers, and protestors exercising their First Amendment rights.[18] Motion at 15–23.

The First Amendment prohibits government officials from subjecting individuals to retaliation for engaging in protected activities. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To establish a retaliation claim, plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) Defendants' actions would "chill a person of ordinary firmness from

---

[16] Both the LA Press Club and NewsGuild have also established organizational standing, as DHS' activities have frustrated their core purpose of defending journalists' safety and working conditions. *See* Rose Decl. ¶¶ 6–12, 15 (describing how DHS actions have frustrated the LA Press Club's longstanding efforts to expand press rights and to fundraise to maintain its programming); Taha Decl. ¶¶ 3–4, 16 (describing how the DHS actions have frustrated NewsGuild's preexisting efforts to advance journalists' economic interests and working conditions, including by postponing National Labor Relations Act representative responsibilities); Schleuss Decl. ¶ 4 (same). Here, the causal link between Defendants' actions and the organizational Plaintiffs' alleged injuries is far from attenuated. *All. for Hippocratic Med.*, 602 U.S. at 391 (discussing the specter of allowing health care providers to challenge general safety regulations).

[17] Although Plaintiffs' Complaint also includes Fourth and Fifth Amendment claims, they limit their request for preliminary injunction to their First Amendment claims. Motion at 11 n.13.

[18] Defendants have not raised a challenge to the Court's jurisdiction to hear Plaintiffs' claims and grant their requested relief, and the Court is satisfied that it can do so. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

27

1  continuing to engage in the protected activity"; and (3) "the protected activity was a substantial or

2  motivating factor in [Defendants'] conduct." *Index Newspapers*, 977 F.3d at 827.

3      Newsgathering, observing government conduct, and protest are each considered paradigmatic

4  protected activities. *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) ("[T]he Supreme Court has

5  long recognized a qualified right of access for the press and public to observe government

6  activities."); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ("The First

7  Amendment protects the right to photograph and record matters of public interest."); *Collins v.

8  Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches,

9  and picketing are clearly protected by the First Amendment.").  The Court rejects Defendants'

10 baseless accusations that Plaintiffs themselves participated in violent riots.  Opposition at 14–15.

11 Plaintiffs each aver that they attended the protests to cover or observe federal immigration

12 enforcement actions or to peacefully protest raids in their own communities.[19]  Defendants have

13 failed to adduce a *shred* of evidence that any Plaintiff engaged in violence.

14      Neither can Defendants meaningfully dispute that being subjected to rubber bullets, tear gas,

15 pepper balls, and other crowd control weapons would deter individuals of ordinary firmness from

16 continuing to engage in the protected activity.  In some cases, the injuries inflicted by Defendants

17 have prevented journalists, legal observers, and protestors from persisting in their activities.

18 Supplemental Declaration of Ryanne Mena ("Supplemental Mena Decl.") Decl. ¶ 8 [34-27] (noting

19 that her injuries prevented her from going into work for a week); Olmeda Decl. ¶¶ 21–22 ("I was

20 completely disoriented after being shot and could not find the direction back to my car without the

21 help of my partner [after suffering a brain bruise]."); Miranda Decl. ¶¶ 22–24 ("[T]his experience

22 has taken a severe toll on my body. . . I do not know when I will fully recover from the amount of

23 stress and pain I suffered during the protest.").  But Plaintiffs need not show that their speech was

24 "actually inhibited or suppressed," as "it would be unjust to allow a defendant to escape liability for

25 a First Amendment violation merely because an unusually determined plaintiff persists in his

26

---

27 [19] Olmeda Decl. ¶ 3; Beckner-Carmitchel Decl. ¶¶ 1–2; Climer Decl. ¶¶ 3–4; Xu Decl. ¶¶ 2, 4; Ray Decl. ¶¶ 2–4; Mena Decl. ¶¶ 2–4.

28

protected activity[.]" *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). The record is littered with declarants who are disabled, traumatized, or terrified after suffering injuries at the hands of Defendants.[20] Kinetic and chemical irritant projectiles can cause respiratory distress, blunt force trauma, and even permanent disability and death, especially when deployed at close range or against children or older people. Haar Decl. ¶¶ 43, 47, 58. The risk of such injuries is certainly likely to deter a person of ordinary firmness.

The only question meaningfully in dispute is whether the protected activity was a substantial or motivating factor in Defendants' conduct. *See Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002) ("As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence."). Defendants produce ample evidence that the protests were blighted by violent actors. *See, e.g.*, Scharmen Decl. ¶¶ 11–22; Canton Decl. ¶ 5; Wang Decl. ¶ 10; Parra Decl. ¶¶ 5–14; Harvick Decl. ¶¶ 10–18; Green Decl. ¶¶ 10–14. But the presence of some violent individuals among thousands of peaceful protestors, journalists and legal observers does not give Defendants a blank check to employ unrestricted use of crowd control weapons. Having carefully reviewed each incident and Defendants' response, the Court finds that Defendants' excessive and indiscriminate response evinces strong and persuasive evidence of retaliatory intent.

---

[20] *See* Supplemental Mena Decl. ¶¶ 5–6, 11 ("Since [being shot in the head by a rubber bullet], I have experienced lingering brain fog and anxiety. . . . I have already experienced heightened anxiety since being injured on June 6 and 7 . . ."); Soqui Decl. ¶¶ 16, 19 ("I have never had to second-guess whether I could safely do my job until now. For the first time in my career [which includes documenting the 1992 riots], I find myself hesitating before covering a protest — not because of the crowd, but because of law enforcement."); Bertrand Decl. ¶¶ 24–25, 27 ("It's now almost three weeks since the injury, and I can still barely use my hand . . . I would like to go to protests and exercise my First Amendment Rights, . . . but I am very concerned about getting injured."); Fisher Decl. ¶ 19 ("I definitely want to avoid the situation I experienced at Glass House for the sake of my health. I don't want to be breathing in tear gas."); A.R. Decl. ¶ 23 (". . . I'm also scared. I feel unsafe."); Solórzano Decl. ¶ 30 (". . . [T]his was a chilling experience. I feel scared that DHS agents feel comfortable using weapons against people who are just peacefully observing their actions."); Olmeda Decl. ¶ 24 ("The force that was used against me makes me feel somewhat hesitant to speak out . . ."); Nadolishny ¶ 19 ("My experience has made me worried about participating in protests in the future. . . . The events of July 10, 2025 have made it very difficult to exercise my civic duty.").

29

The Court's conclusion on this element is based, in part, on the extensive record evidence that federal officers repeatedly targeted journalists and peaceful legal observers far from any protestors or bad actors. *See Index Newspapers*, 977 F.3d at 829 (finding that injuries to journalists and legal observer "standing nowhere near protesters" constitute "exceptionally strong evidentiary support" for retaliation). Kerlikowski convincingly opines that deploying force against individuals who are ostensibly journalists or legal observers, "standing to the side, not interfering with law enforcement," is not necessary to restrain violent protestors. *See* Kerlikowski Decl. ¶¶ 17, 28–29, 32, 47; Supplemental Kerlikowski Decl. ¶ 20. Defendants do not—and cannot—proffer any innocent explanations for these incidents, which include the following:

- Plaintiff journalist Ryanne Mena was struck by a pepper ball while covering protests in downtown Los Angeles though she stepped away to approximately 20 feet behind protestors. Mena Decl. ¶¶ 16–18, 22. The following day, Border Patrol agents hit her in the head with a rubber bullet while she was observing protestors from about 30 to 50 feet away. *Id.* ¶¶ 29–31.

- Plaintiff journalist Lexis-Olivier Ray recounts being targeted by volleys of pepper balls while taking cover near a group of media trucks about 50 feet away from the line of officers. Ray Decl. ¶¶ 26–31. *See* Kerlikowske Decl. ¶¶ 22–35 (averring that DHS' use of force in firing pepper balls directly at press was excessive and unnecessary).

- Plaintiff journalist Sean Beckner-Carmitchel was hit in the head with a tear gas canister while filming protestors from over 20 feet away. Beckner-Carmitchel Decl. ¶¶ 10, 13, Ex. 1.

- Veteran journalist Ted Soqui was repeatedly hit in the back with pepper balls on two successive days, between 15 and 100 feet from any protestors. Soqui Decl. ¶¶ 5–8, 11–13.

- Border Patrol officers hit veteran photojournalist Jonthan Alcorn (who carried professional photography equipment) with a tear gas canister, while he was retreating

and over 100 yards from federal officers.[21]  Alcorn Decl. ¶¶ 20–28, Ex. 1.  *See*

Kerlikowske Decl. ¶¶ 17–21.

The record also supports the finding that Defendants deployed crowd control weapons even when crowds were already dispersing or attempting to comply with orders to disperse.  At the Glass House Farm protests in Camarillo, CBP agents fired pepper balls on protestors who complied with orders to step back.  Nadolishny Decl. ¶¶ 7–10; Ellison Decl. ¶¶ 6–7.  Protestor Alexander Nadolishny was hit on the head as he ran away.  Nadolishny Decl. ¶ 11.[22]  After CBP agents released a smoke bomb on protestors at an immigration raid in Maywood, they proceeded to release *more* tear gas at protestors who had taken refuge in a nearby Riverside Park—across the street from the raid.  Riva Decl. ¶ 20; Guardado Decl. ¶¶ 12–16; Aguiluz Decl. ¶¶ 20, 22; Marquez Decl. ¶ 18.  It is undisputed that Defendants lack *any* justification to fire crowd control weapons at individuals who are complying with orders to disperse.[23]

Plaintiffs have also adduced evidence that Defendants repeatedly fired tear gas canisters and pepper balls directly ***at*** people.  *See Index Newspapers*, 977 F.3d at 828 (considering "misuse of crowd-control munitions" as circumstantial evidence of retaliation).  Tear gas canisters and pepper balls are intended to be shot at the ground, to disperse tear gas in the immediate vicinity, not to be used as a projectile weapon.  *See* Scharmen Decl. ¶ 9 ("Federal law enforcement officers are trained

---

[21] *See also* R.R. Decl. ¶¶ 4–6; Coven Decl. ¶ 10; Reyna Decl. ¶¶ 6–9; Xu Decl. ¶ 12.

[22] *See also* Ray Decl. ¶¶ 24–29 (firing pepper balls at reporter, hitting him in the back, even after most protestors had already dispersed); Horowicz Decl. ¶¶ 11–12 (officers continued to throw tear gas canisters even when protestors were already dispersing); Soqui Decl. ¶ 12 (reporter shot in the back three times).

[23] Kerlikowski Decl. ¶ 31 ("If people are following orders to move away from police, there is no justification to fire pepper balls toward them . . . Shooting people in the back with less-lethal weapons is contrary to how less-lethal projectile weapons are supposed to be used."); Harvey Decl. ¶ 5 ("Under CBP policy, chemical irritants may be utilized as a compliance tool on a subject offering, at a minimum, active resistance . . . [defined as] physical[] oppos[ition to] an officer's or agent's control efforts. . . . Kinetic impact can be used on a subject in response to assaultive resistance, . . . defined as resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self."); *id.* ¶ 3, Ex. 1 ("CBP Use of Force Policy") at 249 ("A compressed air launcher may be used . . . on subject(s) who, at a minimum, demonstrate assaultive resistance.").

not to intentionally strike anyone with any crowd control devices, [including] chemical irritant

canisters . . . Chemical irritants . . . are only use[d] for saturation of the general area that need to be

dispersed."); Kerlikowske Decl. ¶ 17; Haar Decl. ¶ 44 ("Direct trauma from canisters and grenades

is the number one cause of death from chemical irritants[.]").  Yet, on several occasions, declarants

report being stuck by tear gas canisters[24] and being faced with volleys of pepper balls.[25]

In a disturbing number of cases, Defendants hit declarants in the head.  The parties concur

that targeting sensitive areas, like the head, neck, spine, or groin, is inappropriate unless the use of

deadly force is justified.  Harvey Decl. ¶ 14, Ex. 1 ("CBP Use of Force Policy") at 250; Kerlikowske

Decl. ¶ 40.  When aimed at the head, crowd control weapons can—and have—caused severe trauma

and death.  *See* Haar Decl. ¶¶ 45, 58, 69 (noting that in 2018, a protestor in Portland suffered a

traumatic brain injury after being shot in the back of a head with a stung grenade).  Yet DHS agents

shot Plaintiff protestor Abigail Olmeda first on her collarbone and then in the head, leaving her

disoriented from a brain bruise.  Olmeda Decl. ¶¶ 9, 12, 18–22.  *See also* Mena Decl. ¶¶ 30–31;

Beckner-Carmitchel Decl. ¶¶ 10, 13, Ex. 1; Nadolishny Decl. ¶ 11.  The sheer frequency—and

brutality—of these events raises the inference of retaliation.

Viewed in the light most generous to Defendants, the record reveals that upon encountering

any violence—however minor—Defendants indiscriminately targeted in equal measure violent

actors ***and*** peaceful protestors, journalists, and observers.[26]  *See, e.g.*, Mena Decl. ¶¶ 11–19; Alcorn

---

[24] Beckner-Carmitchel Decl. ¶¶ 13–15 (averring that he was struck in the head by a tear gas canister, causing a large bruise above his right eye); Alcorn Decl. ¶¶ 34–35 (testifying that he suffered a large burn, consistent with being struck by a tear gas canister and not some other projectile); *id.* ¶ 18 ("I observed federal officers firing gas cannisters indiscriminately at people . . ."); Climer Decl. ¶¶ 8, 16–17 (struck by a tear gas canister on his hand, requiring sutures); *id.* ¶ 6 ("Most officers appeared to be shooting tear gas canisters directly at the protesters."); Carbonati Decl. ¶ 7 (testifying he was hit by a burning hot tear gas canister on the back of his left calf).

[25] Lopez Decl. ¶¶ 7–12; Ray Decl. ¶ 19; Soqui Decl. ¶ 7; Xu Decl. ¶ 12; Olmeda Decl. ¶¶ 8–9, 12, 18; Ortiz Decl. ¶ 14; Nadolishny Decl. ¶¶ 8–11.

[26] This approach is also evidenced by Defendants' characterization of all protestors as "rioters," when Plaintiffs' uncontradicted evidence reveals that the gathered crowds in downtown Los Angeles, Santa Ana, Paramount, Maywood, Camarillo, and Carpinteria included community leaders, families including children and elderly individuals, and other concerned community members,

Decl. ¶¶ 14–18 (firing indiscriminately in response to a few law-breakers); Guardado Decl. ¶¶ 12–16 (unleashing tear gas on mixed group of adults, teens, and seniors gathered at a bus stop and park); Griffin Decl. ¶¶ 8–10 (releasing tear gas on a nonviolent group of community members, including seniors and young children, in Carpinteria).  The presence of individual violent actors does not give *carte blanche* for Defendants to fire indiscriminately into the crowd.  *See Index Newspapers*, 977 F.3d at 834 ("The many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others."); *Collins*, 110 F.3d at 1373 ("[T]he proper response to potential and actual violence is . . . to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure.") (internal citations omitted).[27]  "The use of indiscriminate weapons against all protesters—not just the violent ones— supports the inference" that federal agents "were substantially motivated by Plaintiffs' protected First Amendment activity."  *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020).

Moreover, the avalanche of evidence before the Court—along with federal officials' statements—suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors.  Though DHS policies correctly set out the bounds for the use of less lethal munitions and crowd control weapons, Wang Decl., Ex. 1 ("DHS Policy"), Defendants may not "avoid liability by pointing to a pristine set of policies."  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (citing *City of*

---

alongside the occasional bad actor.  Opposition at 5–11; *see, e.g.*, Dransfeldt Decl.; Riva Decl.; Teran Decl.; Marquez Decl.; Solórzano Decl.; Miranda Decl.; Griffin Decl.

[27] *See also Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155 (D. Or. 2020) (finding Plaintiffs raised serious questions as to their First Amendment retaliation claim where the "evidence demonstrate[ed] that officers indiscriminately used force against peaceful protestors on multiple occasions"); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020) ("[S]ome of the aggressive conduct described in the declarations, such as shooting a reporter with a rubber bullet even though it does not appear she was engaged in illegal activity or posed a threat of any kind, raises a serious question as to whether some of the uses of force described in those declarations was in reaction to the anti-police message of the protests and aimed at intimidating protesters to deter such speech.").

*St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  A policy or custom of retaliation "may be inferred [from] 'widespread practices or evidence of repeated constitutional violations' and the absence of evidence that [] officers were discharged or reprimanded" for retaliatory actions. *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005).  The record also suggests that Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force.[28]  *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 519 (E.D. Mich. 2020), *order clarified*, No. 20-12363, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020) (considering public officials' statements in determining whether officers were acting pursuant to a policy or custom).  At this stage, that is more than sufficient to raise serious questions as to retaliation.

### 2.    Right of access

In the alternative, Plaintiffs contend that DHS has abridged journalists' and legal observers' right of access to protests.  Motion at 12–14.  In asking "whether plaintiff[ journalists] have a constitutionally protected right to access the public forum where the protests [were] staged," the Ninth Circuit applies the two-step *Press-Enterprise II* test.  *Index Newspapers*, 977 F.3d at 829 (citing *Press-Ent. Co. v. Super. Ct. of Cal.*, 478 U.S. 1 (1986)).  First, courts ask "whether the place and process has historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question."  *Id.* (quoting *Press-Ent.*, 478 U.S. at 8).  If a qualified right of access exists, the government can overcome that right if it demonstrates "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Id.* (quoting *Press-Ent.*, 478 U.S. at 9).

---

[28] *"Train Wreck Mayor": Kristi Noem Slams LA Official* (June 10, 2025), Fox News, https://www.youtube.com/watch?v=ymYIXrH9pjg ("The more that they protest and commit acts of violence against law enforcement officers, the harder ICE is going to come after them . . ."); *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, Forbes (July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is . . . videotaping them, where they're at, when they're out on operations."); Declaration of Ryan Shapiro ¶ 3, Ex. A at 3 [Dkt. 34-19] ("One of the most common methods of threatening [Law Enforcement Officers] comes from online doxing . . . Other tactics include . . . livestreaming [Law Enforcement Officer] interactions . . .").

For the most part, Plaintiffs allege incidents that took place on public streets and sidewalks, "the archetyp[ical] . . . traditional public forum." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011). *See* Olmeda Decl. ¶¶ 8, 16–18 (standing on the sidewalk when she was shot); Mena Decl. ¶¶ 13–16 (noting that she was shot while "on Alameda [Street]"); Ray Decl. ¶¶ 24–29 (shot on Alameda); Beckner-Carmitchel Decl. ¶¶ 9–10, 13, Ex. 1 (hit with tear gas canister on grassy area by sidewalk); Climer Decl. ¶¶ 4, 7–8 (hit with a tear canister on the grassy area between Alondra Boulevard and the Home Depot); Xu Decl. ¶ 7 (averring that he observed the protests from the south side of Alondra).[29]  As in *Index Newspapers*, federal officers repeatedly left federal grounds to push back protestors.  977 F.3d at 831; *see, e.g.*, Ray Decl. ¶¶ 23–25; Scharmen Decl. ¶ 15.

As the Supreme Court has recognized, the public has a strong interest in ensuring access for the press, who serve as "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).  This role is particularly critical, where, as here, the federal government is engaged in sudden and secretive immigration raids, which the public has limited opportunity to observe firsthand and so must "rel[y] necessarily upon the press to bring to [it] in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975).  Such situations are also especially vulnerable to repression of the press.  "When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900.  If the "free press is the guardian of the public interest," then "the independent judiciary is the guardian of the free press." *Id.*

The Court recognizes Defendants' strong interests in protecting federal property and in ensuring the safety of officers and the general public.  *See* 40 U.S.C. § 1315(a) (authorizing dispersal outside federal property "to the extent necessary to protect the property and persons on the

---

[29] Contra Defendants' Opposition, Plaintiffs do not seek access to "driveways that grant ingress to federal buildings" or to the site of criminal warrant operations.  Opposition at 15.  Defendants' attempt to characterize the streets of downtown Los Angeles as entryways to federal property or the rural roads of Camarillo and Carpinteria as closed areas simply because they are in "the vicinity of criminal warrant operations" would render *Press-Enterprise* a dead letter.  *Id.  See Leigh*, 677 F.3d at 900 ("Under this framework, a court cannot rubber-stamp an access restriction simply because the government says it is necessary.").

property"); 41 C.F.R. § 102-74.375 (authority to restrict access to federal property); *id.* § 102-74.385 (authority to require the public to comply with access restrictions); DHS Policy at 237 (directing officers "to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage"). To the extent that protestors have assaulted officers, Opposition at 3, these individuals should be prosecuted to the fullest extent of the law. But the Court cannot conclude from Defendants' evidence that federal officers' response was narrowly tailored to these interests. To the contrary, and as discussed *supra*, Defendants lack any valid justification for targeting journalists—standing far apart from protestors, let alone any violent actors—with rubber bullets, pepper balls, or other crowd control weapons.

Defendants attempt to flip this burden. Defendants contend in the main that members of the press and legal observers have not adequately distinguished themselves from "rioters." Opposition at 16–17. But that is not their responsibility. By Defendants' logic, any journalist seeking to inform the public of the "operations of [its] government," must be prepared to face serious physical injury if a single protestor launches a plastic water bottle. *Cox Broad. Corp.*, 420 U.S. at 491. Such a bargain does not appropriately "balance[] the vital public interest in preserving the media's ability to monitor government activities against the government's need to impose restrictions if necessary for safety[.]" *Leigh*, 677 F.3d at 900.

Neither is the Court convinced that dispersing journalists is essential to maintaining public safety. As the Ninth Circuit has recognized, 40 U.S.C. § 1315 does not "confer[] authority to take action to disperse members of the public who are neither on nor threatening federal property." *Index Newspapers*, 977 F.3d at 832. As discussed *supra*, journalist and legal observer Plaintiffs were peacefully observing protestors' interactions with law enforcement. Drawing on his experience as Chief of Police in Seattle, Kerlikowske convincingly opines that law enforcement need not disperse journalists and legal observers who are not participating in the protest to protect federal property and public safety—even when an unlawful assembly is declared. Kerlikowske Decl. ¶¶ 4, 28, 53; *Index Newspapers*, 977 F.3d at 833 (noting that the City of Portland has successfully complied with an injunction permitting journalists and authorized legal representatives to remain when crowd control

36

1    orders are issued to protestors).  Defendants adduce no evidence that any journalist or legal observer

2    interfered with law enforcement operations.

3        **C.**    **Irreparable Harm**

4        As both the Ninth Circuit and the Supreme Court have repeatedly affirmed, "[t]he loss of

5    First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

6    injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v.*

7    *Burns*, 427 U.S. 347, 373 (1976)).  "[A] party seeking preliminary injunctive relief in a First

8    Amendment context can establish irreparable injury sufficient to merit the grant of relief by

9    demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418

10   F.3d 989, 1001 (9th Cir. 2005) (citation omitted).

11       Defendants contend that the nature of the protests has changed since this Motion was filed.

12   Opposition at 28–29.  To justify injunctive relief, plaintiffs "must do more than merely allege

13   imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

14   injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d

15   1011, 1022 (9th Cir. 2016) (simplified).  The Ninth Circuit teaches that, when "predicting the

16   likelihood of future violations," courts should consider, in addition to "the commission of past illegal

17   conduct":

18       the degree of scienter involved; the isolated or recurrent nature of the infraction; the
19       defendant's recognition of the wrongful nature of his conduct; the extent to which the
         defendant's professional and personal characteristics might enable or tempt him to
20       commit future violations; and the sincerity of any assurances against future violations.

21   *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989).

22       Considering these factors, the Court finds that the events of this summer are likely to recur.

23   First, the degree of scienter required for violating the Court's order is high, as "it relates to targeting

24   of journalists and legal observers and not merely incidental harm to them during crowd control."

25   *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1153 (D. Or. 2020).  As

26   evidenced by this Court's factual findings, the infractions are anything but isolated.  And

27   Defendants' conduct does not assure the Court that DHS recognizes the wrongfulness of its actions

28

1    and will guard against future violations.  Indeed, belying Defendants' assurances that federal arrests

2    at protests had "dwindled" after the first few weeks of June, the record instead shows that

3    Defendants have used retaliatory force against journalists, legal observers, and protestors on at least

4    five occasions—including on the *same day* that the Court denied Plaintiffs' Application for a

5    Temporary Restraining Order.  Defendants' Opposition to *Ex Parte* Application for Temporary

6    Restraining Order 5 [Dkt. 11]; *see* Part II.A.4.–8.

7         In summary, the Court is satisfied that Plaintiffs have shown that they are "likely to suffer

8    irreparable harm in the absence of preliminary relief."  *See Winter*, 555 U.S. at 20.

9         **D.    Balance of Equities and Public Interest**

10        Finally, the balance of hardships "tips sharply" in favor of Plaintiffs.  *All. for the Wild*

11   *Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  Where, as here, Plaintiffs raise "serious

12   First Amendment questions, . . . the balance of hardships tips sharply in [their] favor." *Cmty. House,*

13   *Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (citation omitted).  And where Plaintiffs

14   have already suffered potentially lasting harms, including brain injuries, the harms Plaintiffs risk in

15   the absence of injunctive relief are grave indeed.  *See, e.g.*, Mena Decl. ¶ 37; Supplemental Mena

16   Decl. ¶¶ 5–6; Olmeda Decl. ¶ 22.  *See also* Haar Decl. ¶¶ 43–44, 71 (noting inappropriate use of

17   crowd control weapons can lead to severe trauma and even death).  In contrast, Plaintiffs' proposed

18   injunctive relief poses little burden to Defendants, who are already obligated to restrict their use of

19   force to objectively reasonable circumstances.  *See generally* DHS Policy; CBP Use of Force Policy.

20        "It is always in the public interest to prevent the violation of a party's constitutional rights."

21   *Index Newspapers*, 977 F.3d at 838 (citation omitted).  This is especially true where Plaintiffs

22   include journalists, whose exclusion "from public fora can have particularly deleterious effects on

23   the public interest." *Id.* at 830.  Defendants also assert an important public interest, but the record

24   does not establish that Defendants' unconstitutional use of crowd control weapons against peaceful

25   protestors, legal observers, and journalists advances their efforts to protect officers and the public.

26   At any rate, the Court's Order here does not prevent officers from apprehending, dispersing, or even

27   appropriately using crowd control weapons on those who ***do*** pose a threat of imminent harm to a law

28   enforcement officer or another person.

**E.    Scope of Relief**

Defendants contend that Plaintiffs impermissibly seek injunctive relief on behalf of nonparties and that an injunction of this breadth would endanger the public, federal personnel, and federal property.  Opposition at 23.

The Ninth Circuit has long held that injunctive relief "must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).  An injunction against state actors must not "require more of state officials than is necessary to assure their compliance with the constitution." *Gluth v. Kangas*, 951 F.2d 1504, 1509 (9th Cir. 1991) (citation omitted).  Reacting to a surge in nationwide injunctions, the Supreme Court recently clarified that district courts lack authority to issue orders "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550, 2562–63 (2025).  But *CASA* does not disturb the principle that injunctions may "incidentally" benefit nonparties. *Id.* at 2557; *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than [the] prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

Here, the requested injunction is limited to the Central District of California.  But more critically, the nature of Defendants' constitutional violations require *some* incidental benefits to third parties.  Plaintiffs allege—and have shown, for preliminary purposes—that Defendants *indiscriminately* deployed force against them, though they were not engaged in or even proximate to any violent or noncompliant actions.  Defendants—confronting the exigencies of large-scale protests—are unlikely to be able to determine whether an individual is a Plaintiff journalist, legal observer, or protestor before using force. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996).  Even if they could, Plaintiffs could not be assured of any meaningful protection if Defendants were nonetheless permitted to deploy powerful crowd control weapons at journalists, legal observers, and protestors immediately adjacent to Plaintiffs. *See* Harvey Decl. ¶ 11 (noting that crowd control devices are often "designed to impact one or more subject(s) at a time,

39

1    within the range of deployment"). Accordingly, the Court finds that an injunction applying to

2    journalists, legal observers, and protestors in this judicial district is necessary to afford Plaintiffs

3    complete relief.

4          The Court next considers workability.[30]

5          The first paragraph of Plaintiffs' proposed order mirrors the district court's injunction in

6    *Index Newspapers.* 480 F. Supp. 3d at 1155–56 (enjoining federal defendants from "arresting,

7    threatening to arrest, or using physical force directed against any person whom they know or

8    reasonably should know is a Journalist or Legal Observer" and exempting these individuals from any

9    order to disperse, provided that they do not "impede, block, or otherwise physically interfere with

10   the lawful activities of the Federal Defendants"). Proposed Order 6 [Dkt. 49-11]. The Court's Order

11   does not prevent federal officers from dispersing any individuals obstructing federal property or

12   otherwise engaging in unlawful activity.

13         The second and third paragraphs expand on existing policy. *See* CBP Use of Force Policy at

14   246, 249–51 (restricting the use of pepper spray to "subject[s] offering, at a minimum, active

15   resistance" and restricting compressed air launchers, munitions launchers, and flash-bang grenades

16   to "subject[s] offering, at a minimum assaultive resistance"); *id.* at 289 (defining assaultive

17   resistance as "a level of aggression or violence that causes or has the potential to cause physical

18   injury to the officer/agent, others, or self"). Using crowd control weapons like rubber bullets and

19   pepper balls as "compliance tools in *situations where* a person or persons are offering active

20   resistance"—including against those who are not themselves resisting—risks escalating tensions and

21   further endangering both law enforcement and the public.[31] Harvey Decl. ¶ 10 (emphasis added);

---

23   [30] As an initial matter, the Court is not bound by Judge Wilson's earlier TRO Order as, there, the
     Court did not reach the merits. TRO Order at 5 (considering the breadth of the requested relief,
24   assuming *arguendo* that Defendants' "conduct violated Plaintiffs' constitutional rights—an issue the
     Court [did] not reach"). At any rate, Plaintiffs *have* now modified their proposed injunction to
25   exempt incidental harms that result from lawful uses of force. *See* Proposed Order at 6 [Dkt. 49-11].

26   [31] The record before the Court includes multiple instances where officers' use of crowd control
27   weapons appeared to escalate tensions between law enforcement and protestors. *See, e.g.*, Marantos
     Decl. ¶¶ 14–18 (after border patrol released tear gas, a couple of people threw water bottles at a
28   government vehicle); Teran Decl. ¶ 20 ("The people I spoke to kept telling me the same narrative:

1  Kerlikowske Reply Decl. ¶¶ 10–11.  Numerous sister courts in Portland, Seattle, Los Angeles,

2  Oakland, and other major cities have issued similar restrictions on the use of crowd control

3  weapons.[32]

4      The fourth paragraph is necessary to ensure that peaceful protestors, legal observers, and

5  media are able to remove themselves from an unlawful gathering.  Defendants protest that in such

6  "dynamic and often rapidly evolving situations," prior warnings are not always "feasible."  Harvey

7  Decl. ¶ 5.  But many declarants have testified that in the same dynamic and often rapidly evolving

8  situations, they did not hear any warning or dispersal orders, even when they were given.  Insofar as

9  Defendants demand that Plaintiffs "distinguish" themselves from "rioters," they must be given a

10 realistic chance to do so.  Opposition at 16–17.  At any rate, the proposed injunction excepts

11 situations where "the threat is so serious and imminent that a warning is infeasible."  Proposed Order

12 at 6.

13     The Court agrees with Defendants that the fifth paragraph of Plaintiffs' proposed order

14 enjoining the use of projectiles with chemical irritants, except "in response to specific acts of

15 _____

16 '. . . The 'ICE agents' acted first. They crossed the line by tossing tear gas—and it escalated from
   there.").

17

18 [32] *Don't Shoot Portland*, 465 F. Supp. 3d at 1157 (limiting the use of tear gas to "situations in which
   the lives or safety of the public or the police are at risk"); *Black Lives Matter Seattle-King Cnty.*, 466
19 F. Supp. 3d at 1216 (enjoining the use of "chemical irritants or projectiles of any kind," including
   tear gas, pepper balls, and rubber bullets, against peaceful protestors, except when "taking necessary,
20 reasonable, proportional, and targeted action to protect against a specific imminent threat of physical
   harm to themselves or identifiable others or to respond to specific acts of violence or destruction of
21 property"); *Anti Police-Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2020 WL
   4346828, at *1 (N.D. Cal. July 29, 2020) (enjoining altogether the use of stinger grenades, rubber
22 bullets, and pepper balls); *Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL
   4691154, at *15 (C.D. Cal. May 28, 2021) (enjoining the use of crowd control weapons, including
23 pepper balls, tear gas canisters, and flash-bang grenades "unless reasonable, proportional, and
   targeted action is necessary to protect against a specific imminent threat of physical harm to officers
24 or identifiable others, to respond to specific acts of violence or destruction of property, or to enforce
   a declaration of unlawful assembly and dispersal"); *Alsaada v. City of Columbus*, 536 F. Supp. 3d
25 216, 275 (S.D. Ohio 2021), *modified sub nom. Alsaada v. City of Columbus, Ohio*, No. 2:20-CV-
   3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021) (enjoining the use of non-lethal force, including
26 tear gas, flash-bang grenades, and rubber bullets on nonviolent protestors to enforce dispersal orders,
   traffic laws, or misdemeanors "that were not committed with actual or imminently threatened
27 physical harm or property destruction").

28

41

1    violence that [an on-scene supervisor] personally witnessed" is too restrictive.  In the context of

2    large-scale protests in urban environments, on-scene supervisors cannot realistically view every act

3    of violence that may require an exigent response.  Harvey Decl. ¶ 13.  The second and third

4    paragraphs suffice to limit the use of kinetic impact projectiles containing chemical irritants to

5    prevent the constitutional violations present here.

6         The injunction on striking sensitive areas is necessary to prevent non-intended uses of crowd

7    control weapons, consistent with existing CBP policy.  *See* CBP Use of Force Policy at 250

8    ("Authorized Officers/Agents shall not intentionally target the head, neck, groin, spine, or female

9    breast [when using munitions launchers].").  As discussed at length, Plaintiffs have adduced

10   evidence of Defendants aiming tear gas canisters at people and aiming crowd control weapons at

11   sensitive areas of the body, including people's heads.

12        The seventh paragraph of Plaintiffs' proposed order addresses Defendants' concerns about

13   the use of force in exigent circumstances and parallels the injunction given in *Index Newspapers*.

14   *See* Harvey Decl. ¶ 15; *Index Newspapers*, 480 F. Supp. 3d at 1157.

15        Finally, the Court incorporates the definitions of "Journalist" and "Legal Observer" used in

16   *Index Newspapers*.  480 F. Supp. 3d at 1156–57.

17

18

19

20

21

22

23

24

25

26

27

28

42

## V.    CONCLUSION[33]

It is hereby ORDERED that Defendants, their officers, agents, assigns, and all persons acting in concert with them, are ENJOINED, pending final resolution of this matter, from:

1.  Dispersing, threatening, or assaulting any person whom they know or reasonably should know is a Journalist or Legal Observer (as defined below) unless Defendants have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order.  Defendants may ask press or legal observers to change location to avoid disrupting law enforcement, as long as the press or legal observers have sufficient opportunity to report and observe;

2.  Using crowd control weapons (including kinetic impact projectiles ("KIP"s), chemical irritants, batons, and flash-bang grenades) on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person;

3.  Firing kinetic impact projectiles or flash-bang grenades at identified targets, if doing so could foreseeably result in injury to the press, legal observers, or protesters who are not posing a threat of imminent harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person;

4.  Using any crowd control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individuals, unless the threat is so serious and imminent that a warning is infeasible. Such warnings shall explain that

---

[33] Federal Rule of Civil Procedure 65(c) requires that, prior to granting injunctive relief, the Court require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (quotation modified).  Accordingly, the Court waives the bond requirement here, as it is unlikely that Defendants will incur any significant cost and requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (citation omitted).

1    Defendants may employ crowd control weapons and must give the targeted individuals

2    sufficient time to avoid the use of force;

3    5.  Firing tear gas canisters or flash-bang grenades so as to strike any person, or firing KIPs or

4    other crowd control weapons at the head, neck, groin, back, or other sensitive areas, unless

5    that person poses an immediate threat of death or serious bodily injury;

6    6.  Defendants shall not be liable for violating this injunction if a protester, journalist or legal

7    observer is incidentally exposed to crowd control devices after such a device was deployed in

8    a manner that complies with this injunction.

9    7.  To facilitate the Defendants' identification of Journalists protected under this Order, the

10    following shall be considered indicia of being a Journalist: visual identification as a member

11    of the press, such as by carrying a professional or authorized press pass, carrying professional

12    gear such as professional photographic equipment, or wearing a professional or authorized

13    press badge or other official press credentials, or distinctive clothing, that identifies the

14    wearer as a member of the press.  It also shall be an indicium of being a Journalist under this

15    Order that the person is standing off to the side of a protest, not engaging in protest activities,

16    and not intermixed with persons engaged in protest activities, although these are not

17    requirements.  These indicia are not exclusive, and a person need not exhibit every indicium

18    to be considered a Journalist under this Order.  Defendants shall not be liable for

19    unintentional violations of this Order in the case of an individual who does not carry or wear

20    a press pass, badge, or other official press credential, professional gear, or distinctive

21    clothing that identifies the person as a member of the press.

22    8.  To facilitate the Defendants' identification of Legal Observers protected under this Order, the

23    following shall be considered indicia of being a Legal Observer: wearing a green National

24    Lawyers Guild-issued or authorized Legal Observer hat (typically a green hat) or wearing a

25    blue ACLU-issued or authorized Legal Observer vest.  It also shall be an indicium of being a

26    Legal Observer protected under this Order that the person is standing off to the side of a

27    protest, not engaging in protest activities, and not intermixed with persons engaged in protest

28    activities, although these are not requirements.

1    This Order shall be in place only in those counties in the coverage area of the individual

2    journalist Plaintiffs and the organizational Plaintiffs Los Angeles Press Club and NewsGuild -

3    Communications Workers of America, which are in the Central District of California.  More

4    specifically, these include the Counties of Los Angeles, Orange, Riverside, San Bernardino, San

5    Luis Obispo, Santa Barbara, and Ventura.

6    Within the next 72 hours, DHS is also hereby ORDERED to summarize this Order and

7    disseminate its contents to all DHS officers responding to a protest in the Counties referred to above.

8    The parties shall meet and confer and provide a joint status report within 30 days setting forth

9    proposals for ensuring that DHS officers present in the Central District of California while this

10   action is pending remain aware of the limitations imposed by this Order.

11

12

13   Dated: September 10, 2025                    _____

14                                               Hernán D. Vera
                                                 United States District Judge