BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

ALEXANDER K. HAAS
ANDREW I. WARDEN
KATHLEEN C. JACOBS (TX Bar No. 24091154)
Civil Division, Federal Programs Branch
        1100 L Street, NW
        Washington, DC 20005
        Telephone: (202)598-7615
        Email: kathleen.c.jacobs@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PAUL (BART) GREEN
Assistant United States Attorney

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES PRESS CLUB, *et al.*, | No. 2:25-cv-05563-HDV-E |
| Plaintiffs, | **DEFENDANTS' *EX PARTE* APPLICATION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL** |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, | *[Filed Concurrently with Memorandum in Support; Supporting Declarations; and Proposed Order]* |
| Defendants. | Hon. Hernán D. Vera |

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ***EX PARTE* APPLICATION**

PLEASE TAKE NOTICE that, in accordance with Local Rule 7-19, and this Court's Civil Standing Order Section XIII, Defendants, by and through their counsel of record, respectfully apply to the Court on an ex parte basis for a Stay of the Court's Preliminary Injunction, ECF No. 55, pending appeal.

**Good cause and urgency:** Good cause exists to grant this application. On September 10, 2025, this Court granted Plaintiffs' Motion for Preliminary Injunction. ECF No. 55. This Order made no determination on Defendants' request for Stay filed with their Opposition to Plaintiffs' Motion for Preliminary Injunction. ECF Nos. 47 at 30. In its Opposition, Defendants repeatedly produced evidence of how Plaintiffs' proposed injunction is unworkable and may put life and property at risk. *See generally* ECF No. 47. Specifically, Defendants requested "such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for seven days to allow the United States to seek emergency relief if appeal is authorized." *Id.* at 30.

The Solicitor General has authorized appeal of the Court's preliminary injunction, ECF No. 55, and to that end, Defendants have filed a notice of appeal contemporaneously herewith. In the attached Memorandum in Support of Defendants' *Ex Parte* Application, Defendants describe the numerous and compelling reasons for this Court to stay the Preliminary Injunction.

Should the Court be inclined to deny the stay, Defendants request that the Court do so by September 26, 2025, so that Defendants may seek relief from the Ninth Circuit Court of Appeals.

**Notice:** Defense counsel notified Plaintiffs' counsel of the date and substance of this motion on September 19, 2025. Plaintiffs' counsel opposes this motion. Separate from its filing notice, Defendants emailed a copy of this Application to Plaintiffs' counsel.

**Plaintiffs' counsels' contact information:** Pursuant to Local Rule 7-19, Plaintiffs' counsels' contact information is as follows:

Matthew Borden, Esq. (SBN: 214323)
borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

Carol A. Sobel, Esq. (SBN 84483)
carolsobellaw@gmail.com
Weston Rowland, Esq. (SBN 327599
rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman, Esq. (SBN: 71244)
hoffpaul@aol.com
Michael Seplow, Esq. (SBN 150183)
mseplow@sshhzlaw.com
John Washington, Esq. (SBN 315991)
jwashington@sshhzlaw.com
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone (310) 717-7373

Peter J. Eliasberg, Esq. (SBN: 189110)
peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
jreisberg@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
peter@bibringlaw.com
Law Office of Peter Bibring
2140 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

3

Dated: September 19, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

ALEXANDER K. HAAS
ANDREW I. WARDEN
KATHLEEN C. JACOBS
Federal Programs Branch

BIBAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PAUL (BART) GREEN
Assistant United States Attorney

 /s/ *Kathleen C. Jacobs*
KATHLEEN C. JACOBS (TX Bar No. 24091154)
Trial Attorney

*Attorneys for Defendants*

4

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

On September 10, 2025, this Court issued an order granting Plaintiffs' Motion for a Preliminary Injunction. *See* ECF No. 55. Before that order issued, Defendants requested that the Court stay any such order in their Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 47). The Court did not address Defendants' stay request in its order granting the preliminary injunction. *See* ECF No. 55.

To ensure this Court has every opportunity to consider staying its own decision, and in accordance with Fed. R. App. P. 8(a)(1)(A), Defendants submit this *ex parte* application for a stay pending appeal of the Court's Order granting Plaintiffs' Motion for a Preliminary Injunction. *See* Fed. R. Civ. P. 62. Defendants respectfully request that the Court rule on this application expeditiously. The Government expects to file a motion for a stay pending appeal in the Ninth Circuit no later than September 26, 2025, if the application is denied or if no action is taken on the application.

For the reasons explained below, as well as those set forth in Defendants' oppositions to Plaintiffs' motions for a temporary restraining order and a preliminary injunction (ECF Nos. 11, 47), the Court should stay its preliminary injunction pending resolution of Defendants' appeal.

**ARGUMENT**

In considering whether to grant a stay pending appeal, the Court must consider four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). All four factors favor a stay here.

**I.    DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS.**

**A.  Plaintiffs lack standing to pursue injunctive relief.**

Defendants are likely to succeed on the merits of their appeal. As Defendants explained in their Opposition to Plaintiffs' Motion for Preliminary Injunction and at oral argument, Plaintiffs have failed to show that they face a "'real and immediate threat of repeated injury" thus failing to meet their burden to establish standing for injunctive relief. *Updike v. Multnomah Cty.*, 870 F.3d 939, 947 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Plaintiffs' reliance on a scattershot collection of past alleged instances of First

1    Amendment injury are insufficient to show standing for the sweeping prospective injunction they

2    obtained. *Updike*, 870 F.3d at 947. This Court's determination that Plaintiffs had standing—after Judge

3    Wilson previously found to the contrary at the Temporary Restraining Order stage based on similar

4    evidence—was incorrect. A plaintiff lacks standing to obtain injunctive relief on the basis of past

5    injuries alone. *Updike*, 870 F.3d at 947. Here, Plaintiffs' allegations of past injuries that occurred over

6    two months ago cannot establish a "real and immediate threat" of future injury necessary to establish

7    standing. *Id*. Standing in this context must be based on more than observations that "immigration raids

8    in Southern California will undoubtedly continue" and Plaintiffs "intend to continue their activities as

9    reporters, legal observers, and protestors." ECF No. 55 at 24. Instead, Plaintiffs' basis for prospective

10    injunctive relief is the speculative assertion that they will be intentionally targeted with retaliatory

11    crowd control measures while engaged in these activities at some point in the future. And on this point,

12    their claim is indistinguishable from the plaintiff's suggestion in *Lyons* that, in the future, Los Angeles

13    police officers would again stop him for a traffic violation, or another offense, and subject him to a

14    chokehold. *Lyons*, 461 U.S. at 105.

15    As the Court noted in its Order, ECF No. 55, n.14, the Supreme Court recently issued a stay of a

16    preliminary injunction imposed against DHS for executing their law and immigration enforcement

17    duties in the Los Angeles area. *See Noem v. Vasquez Perdomo*, 606 U.S. __, 2025 WL 2585637 (2025).

18    In his concurring opinion, Justice Kavanaugh rejected plaintiffs standing theory because, like in *Lyons*

19    (and here), "[w]hat matters is the '*reality* of the threat of repeated injury,' not 'subjective

20    apprehensions.'" *Id.* (citing *Lyons*, 461 U.S. at 107) (emphasis in original). The Court reasons that

21    because Plaintiffs intend to continue to position themselves in the midst of violent riots while engaging

22    in First Amendment activity rather than "happening to be in the wrong place at the wrong time," *Lyons*

23    and *Perdomo* do not apply. ECF No. 55 at 25 n.14. However, Plaintiffs *would* have to be in the wrong

24    place at the wrong time to be injured by Defendants: Plaintiffs could attend protests and observe from a

25    distance where they are out of range of crowd control devices. In such a scenario, *even if* Defendants

26    targeted Plaintiffs for their First Amendment activity they could not be injured. But even if Plaintiffs

27    insist on being in the thick of violent riots, there is no evidence that Defendants will target individual

28    *Plaintiffs* themselves rather than anyone else. Therefore, this case is precisely analogous to *Lyons* and

6

1    *Vasquez Perdomo* where plaintiffs lacked standing because "plaintiffs have no good basis to believe

2    that law enforcement will stop *them*." *Vasquez Perdomo*, 606 U.S. __(emphasis preserved).

3        Moreover, the Court's decision does not conclusively resolve the standing issue for the course

4    of the entire litigation, because the requirements of standing "are not mere pleading requirements but

5    rather an indispensable part of the plaintiff's case," and they must be shown throughout the litigation

6    "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v.*

7    *Defs. Of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs, repeatedly relying on stale evidence, have failed

8    to establish standing at any stage in this litigation thus far, and this Court's contrary holding does not

9    bind Defendants to that contested conclusion for the life of the case. The Court's standing error is

10    especially pronounced because the findings supporting an imminent future injury were based on

11    evidence that was over two months old, despite Plaintiffs' submission of supplemental declarations just

12    three weeks ago that contained not a single additional allegation of harm over the previous two months.

13        **B. Plaintiffs' right-of-access claim is contrary to law.**

14        Under *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986), and *Leigh v.*

15    *Salazar*, 677 F.3d 892 (9th Cir. 2012), Plaintiffs have failed to make out a right-of-access claim.

16    Plaintiffs have not shown that police dispersal of a riot is a "place and process" that has "historically

17    been open to the press and general public"; that "public access" to a riot "plays a significant positive

18    role in the functioning" of dispersing a riot; or that dispersing a riot is insufficiently "narrowly tailored"

19    in any event. *See Leigh*, 677 F.3d at 898. The same is true of federal immigration enforcement

20    activities. Plaintiffs cannot show a history or tradition of open public access to the government's

21    enforcement of arrest warrants on private businesses like a car wash or marijuana farm, nor that the

22    public plays a significant role in the functioning of those law enforcement activities. Executing an arrest

23    warrant or suppressing riots resulting from violent crowd behavior are not governmental proceedings to

24    which a right of public access applies.

25        Plaintiffs respond that, as journalists and self-styled legal observers, they have a right of access

26    to cover protests on public streets and in public places. That argument elides a crucial fact: that all of

27    the protests in June and July that supplied the basis for Plaintiffs' injunction had turned violent before

28    federal officers deployed less-lethal force. *See, e.g.*, ECF No. 47 § II.D. And Plaintiffs cannot

1    reasonably dispute that, when a peaceful protest turns violent and threatens federal personnel and

2    property, federal law-enforcement officers may respond by issuing general dispersal orders and by

3    enforcing those orders with reasonable and appropriate force. *Menotti v. Seattle*, 409 F.3d 1113, 1155-

4    56 (9th Cir. 2005) (holding that, when law-enforcement officers are confronted by protesters with

5    "violent and disruptive aims," such officers may "implement[] . . . procedures necessary to restore

6    safety and security"). Such orders may be enforced even against protestors "with lawful intentions in

7    the best tradition of civic protest." *Id.* at 1156. Plaintiffs' argument thus boils down to the assertion that,

8    when a protest has turned violent, their status as journalists and legal observers gives them a special

9    right to disobey lawful dispersal orders that members of the general public must follow. That argument

10    is foreclosed by both Supreme Court and Ninth Circuit precedent recognizing that members of the press

11    lack a "constitutional right of special access to information not available to the public generally."

12    *California First Amendment Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quoting *Branzburg*

13    *v. Hayes*, 408 U.S. 665, 684 (1972)).

14        That precedent likewise forecloses this Court's injunction, which effectively grants a special

15    right of access and immunity from reasonable crowd-control measures to anyone who satisfies its vague

16    definitions of "Journalists," "Legal Observers," and "protestors." ECF No. 55 at 43. The injunction

17    goes so far as to exempt all "Journalists" and "Legal Observers" from lawful dispersal orders unless

18    "Defendants have probable cause to believe that the [Journalist or Legal Observer] has committed a

19    crime unrelated to failing to obey a dispersal order." *Id.* The Court identified no authority extending

20    analogous protection to members of the general public during a violent protest, let alone to exempt

21    "protesters" from reasonable crowd control measures during a violent situation. The injunction also

22    effectively prohibits officers from using crowd-control measures—measures which the officers may

23    indisputably deploy not only against violent rioters but also against peaceful protesters caught up in a

24    violent protest—simply because journalists and legal observers are intermingled with violent rioters or

25    are simply nearby. Plaintiffs have failed to cite any case holding that the First Amendment allows

26    violent rioters to use journalists and legal observers as shields in this manner.

27        The Ninth Circuit's decision in *Index Newspapers v. United States Marshals Serv.*, 977 F.3d

28    817 (9th Cir. 2020), does not alter the conclusion. The decision lacks precedential force because it was

1    issued during a "preliminary stage of the appellate process" and was decided on the "'probabilistic'"

2    terms established by the standard for evaluating a request to stay a preliminary injunction pending

3    appeal. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1264 (9th Cir. 2020). Such

4    "predictive analysis" would not have controlled "the merits of the parties' claims" during subsequent

5    proceedings in that case. *Id.* It follows *a fortiori* that the decision does not control the outcome of a

6    different case, which involves different facts and different parties. And the decision lacks persuasive

7    force because it relied on findings specific to those circumstances and because it concerned an

8    injunction that was in significant respects narrower than the injunction at issue here.

9                    **C.  Plaintiffs' retaliation claims are legally and factually baseless.**

10                To make out a claim of First Amendment retaliation, Plaintiffs must show that their First

11   Amendment activity was a "substantial or motivating factor" in Defendants' conduct. *Mendocino Envtl.*

12   *Ctr. v. Mendocino County*, 192 F.3d 1283, 1300–01 (9th Cir. 1999). Not only did Plaintiffs fail to

13   present evidence of retaliatory intent but the Court's basis for retaliatory intent was instances of what it

14   understood to be an "excessive and indiscriminate" response by law enforcement officers to the

15   presence of some violence in the crowd. ECF. No. 55 at 29-30 (noting Plaintiffs' evidence suggested

16   Defendants had "targeted in equal measure" violent actors," "peaceful protestors," "journalists," and

17   "observers"). But that at most suggests that officers used more excessive force than may have been

18   warranted under the circumstances—a circumstance that would be evaluated under the Fourth

19   Amendment's excessive force standards, or, where appropriate, other doctrines applicable to individual

20   officer misconduct—it does not establish a First Amendment retaliation claim. If the Court's rationale

21   stands, there would be no end to First Amendment retaliation claims arising out of any sort of

22   confrontation by a government officer and a citizen. Every garden variety Fourth

23   Amendment excessive force claim would also constitute a First Amendment retaliation claim premised

24   on the argument that the mere use of excessive force against someone also establishes

25   First Amendment retaliation.  No authority supports that sweeping proposition.

26                The evidence of retaliation in this case falls well short of *Index Newspapers*. And regardless,

27   even if Plaintiffs had shown isolated instances of past retaliation by individual officers, Plaintiffs

28   provided no evidence showing that Defendants had a policy directing or permitting First Amendment

1    retaliation, which is necessary to impose injunctive relief against Defendants. *See* Supplemental

2    Declaration of Brian Szemes ("Szemes Decl.") ¶15.  Moreover, even if Plaintiffs could establish a

3    prima facie First Amendment retaliation claim, the claim fails if the government can "show that it

4    would have taken the same action even in the absence of the protected conduct." *Bello-Reyes v.*

5    *Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (internal quotations and citations omitted). Here, there is no

6    basis to conclude that Defendants would have responded any differently to the violent situations they

7    confronted if the press was not in attendance or acting in a different capacity. The Court erred in failing

8    to address this element.  *See Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 2180674, at *4 (9th Cir.

9    Aug. 1, 2025) (reversing preliminary injunction based on retaliation claim because "the government has

10   shown that the President would have taken the same action even in the absence of the protected

11   conduct").

**D.  The Court's credibility finding is erroneous, and it misstates the record.**

13        The Court's factual findings were clearly erroneous and contrary to the record in several key

14   respects.  As a general matter, the Court blankets Plaintiffs' 50 declarants (many of which are not

15   parties, nor journalists or legal observers) with credibility, and needlessly makes an adverse finding

16   against two high-ranking law enforcement declarants. ECF No. 55 at 2 & 9 n.7. In a footnote, the Court

17   outright rejects the assertion, despite sworn declarations of high-ranking members of law enforcement

18   to the contrary, that neither ICE nor HSI deployed crowd control devices at the riot near the ICE facility

19   in Paramount on June 7, *id.*, without apparently considering, for example, that the non-law enforcement

20   declarants were mistaken or that, although HSI agents were on scene, they were not the ones deploying

21   the crowd control measures. *See* Declaration of Ernesto Santacruz, Jr., ECF No. 11-3 ¶ 7; *see also*

22   Declaration of Eddy Wang, ECF No. 47-1 ¶ 13. Moreover, evidence from three different officers is

23   consistent on this point and makes clear that it was Border Patrol agents who deployed crowd control

24   devices in response to threats from the crowd, not HSI. *See* Declaration of Daniel Parra, ECF No. 47-6

25   ¶¶9-10; Wang Decl. ECF No. 47-1 ¶12; Santacruz Decl. ECF No. 11-3 ¶¶18-20.

26        Among other examples,  the Court credited Plaintiffs' assertions that individuals did not hear

27   any warning or dispersal orders, ECF No. 55 at 41, despite the fact that senior officers in leadership

28   roles on the ground at the same locations testified that warnings were issued over a commercial-grade

1    public address speaker system positioned facing the rioters every five minutes for forty-five minutes

2    straight and that the warnings were audible. ECF 47 at 7-8; ECF No 47-3 ¶ 27.

3         The Court also found that "Plaintiffs themselves" never "participated in violent riots." ECF 55

4    at 28. But by Plaintiffs' own evidence, at least one named Plaintiff positioned herself to block the

5    egress of a law enforcement vehicle that was swarmed by a hostile mob. ECF No. 34-11 ¶¶ 15, 18 ("I

6    was close to the truck, in the center of the road. . . . I did see a couple of people flinging water bottles in

7    the air – maybe six bottles in all – towards the black pick-up truck."). Whether that is best characterized

8    as participating in "violent riots" is ultimately immaterial. The relevant point is that protesting ceases to

9    be lawful First Amendment activity when it stops being a protest or exercise of press-rights and

10   becomes obstructing a federal criminal warrant operation in unison with a violent crowd, as Plaintiffs'

11   own evidence demonstrates occurred. *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here

12   demonstrations turn violent, they lose their protected quality as expression under the First

13   Amendment."). And another declarant remained in place amid a violent crowd *after* lawful dispersal

14   orders were issued for the violent crowd to depart. ECF No. 47 at 18.

15        The Court also, while making every possible inference in Plaintiffs' favor, refuses to consider or

16   entertain "innocent explanations" for the injuries allegedly sustained by some protestors and journalists.

17   ECF No. 55 at 30. For example, Plaintiff Beckner-Carmitchel was allegedly hit in the head with a tear

18   gas cannister while standing across the street from federal law enforcement officers and behind a crowd

19   of violent rioters. ECF No. 6-6 ¶ 10; ECF No. 47-6 ¶¶ 8-10. The Court categorically rules out that this

20   incident could have been incidental to lawful use of crowd control weapons by law enforcement

21   officers aiming at violent rioters. But particularly given that tear gas cannisters are not to be shot at

22   individuals except when deadly force is reasonable, ECF No. 47-5 ¶ 14, the Court should have

23   considered, for example, whether law enforcement officers fired the tear gas cannister *away from* the

24   crowd of protestors and rioters, as policy requires, only incidentally hitting Mr. Beckner-Carmitchel

25   who was, according to him, standing aside from the main body of the crowd. ECF No. 6-6 ¶ 10. Or

26   even, as frequently occurs at such violent riots, another protestor could have kicked or threw the

27   cannister when it landed. Szemes Decl. ¶4. Although the Court failed to consider these innocent

28   explanations—and many others like them—such explanations are easily inferred from the record, and

1  the Court erred by consistently construing the facts in Plaintiffs' favor without considering alternative

2  innocent explanations for incidental alleged injuries.

3  **II.    THE REMAINING FACTORS FAVOR A STAY**

4         Defendants and the public interest will suffer irreparable harm if the injunction is not stayed.

5  The preliminary injunction sets forth intrusive, unworkable, and vague instructions to federal law

6  enforcement officers. The Court issued overly restrictive *ex ante* rules—as if it were drafting a police

7  policy manual or operational order—to micromanage the conduct of law-enforcement officers

8  responsible for crowd control in unpredictable situations involving violence.  "It is not for this Court to

9  impose its preferred police practices on either federal law enforcement officials or their state

10 counterparts." *United States v. Patane*, 542 U.S. 630, 642 (2004). Yet that is precisely what the

11 injunction does, without regard for any of the longstanding limitations on the Court's equitable

12 authority.  *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702, (1979) ("[I]njunctive relief should be no

13 more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *E. Bay*

14 *Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (stating that injunctions must

15 be "narrowly tailored to remedy the specific harm shown").  The overbreadth of the injunction—which

16 far exceeds the relief in *Index Newspapers*—is all the more apparent because the Court did not attempt

17 to connect the sweeping scope of relief to the strictures of the First Amendment.  The Court accepts

18 Plaintiffs' proposed order as a given, without regard for any consideration of what the First Amendment

19 requires in this unique context.

20        The injunction requires federal officers confronted by violent rioters in unpredictable

21 circumstances to defer actions that might protect the officers' lives and the public until they examine

22 each and every person present at the riot to determine whether any of them has a "press badge,"

23 "professional equipment," "distinctive clothing," is distant from "protest activities," or has some other

24 indicia of being a journalist or legal observer. Federal officers faced with dangerous crowds are now

25 left with the impossible choice between risking their safety and risking contempt. The injunction

26 inhibits legitimate federal law enforcement activities, deprives the public of necessary government

27 protection during these dangerous riots, and puts the public's dedicated servants and necessary

28 infrastructure at risk.

1    As the Court is aware, the various components within DHS serve a variety of functions that will

2    cause them to be in different types of operational situations each requiring various responses. The

3    preliminary injunction issued in this case is unwarranted for two main reasons (1) protests have largely

4    diminished since the initial onslaught in June and early July; and (2) should additional violent protests

5    or outbreaks occur in the future in response to Defendants' lawful law enforcement operations, the

6    preliminary injunction is unworkable and will only increase risk to life and property. Responding to

7    each unreasonable restriction in turn, as explained further in the attached declarations, Defendants

8    respectfully request that the preliminary injunction be stayed pending review by the Ninth Circuit.

9    The first restriction of the preliminary injunction, allowing Journalists and Legal Observers to

10   ignore dispersal orders, is impracticable in the context of the varying and dynamic law enforcement

11   components of DHS, the law enforcement operations in which they are involved, and the threats they

12   face. *See* Szemes Decl. ¶4. This can expose officers to someone who wishes to harm them or damage

13   federal property just by wearing fraudulent press credentials, or as required by the injunction, simply

14   waiting off to the side and then identifying themselves as a journalist before unleashing their attack. *Id.*

15   Even the time and effort it will now take for officers to identify and negotiate with journalists about

16   whether or not they will move to a more appropriate location—since this injunction allows them to

17   ignore dispersal orders—can subject officers to risk. *Id*. For example, the Court included practically

18   every allegation from the fifty declarations of the instances when protestors (and rioters) were hit with

19   less lethal munitions; noticeably absent was any mention of the lethal force attempted upon agents at

20   the Camarillo "protest" where an individual actually shot at officers with a gun. *Id.* If officers are

21   constantly distracted by attempting to identify who is and is not covered by this order, they will leave

22   themselves vulnerable to additional opportunistic, violent attacks.

23   The broad-brush restriction placed on law enforcement's ability to disperse violent protestors,

24   whether gathered in the immediate vicinity of law enforcement operations or a large-scale violent

25   protest, will only subject law enforcement and/or the public to danger. *See* Declaration of Manuel

26   Molina Jr. ("Molina Decl."), ¶7. "In an environment where offices are under assault, and the treat to

27   officer and public safety is high and constantly changing, these steps are especially burdensome,

28   impractical, and dangerous . . . and could even prove deadly to ERO officers." Szemes Decl. ¶4.

1    Allowing Journalists special access by ignoring dispersal orders, is not only contrary to law and

2    commonsense but may further disrupt lawful enforcement operations. This is especially true where the

3    Court requires so little of Journalists and Legal Observers to adequately identify themselves, that it will

4    only lead to confusion by officers on what devices they may use in the face of violence, who they may

5    clear from an area even if clearing for benefit of public safety, and potentially subject them to violence

6    (as has already occurred) by individuals who may gain access under the guise of journalist credentials

7    only to harm officers. *See* Supplemental Declaration of Roger Scharmen ("Scharmen Decl."), ¶4,

8    Exhibit 1 to Scharmen Decl.(despite identifying as a member of the press and even holding a

9    microphone, when asked to "get back" a female journalist shouted "no" and then assaulted an officer

10   striking her in the arm with a small object).

11           The second and third paragraphs of the preliminary injunction impermissibly restrict the ability

12   of law enforcement to utilize crowd control devices when faced with situations dangerous not only to

13   law enforcement officers but the public at large. It is undisputed that violent attacks have been inflicted

14   against law enforcement officers at a variety of locations and in response to differing crowds and

15   assailants. ECF No. 55 at 3 ("To be clear, the Court expresses no sympathy for those private individuals

16   who engaged in violence during this period."). When faced with violent riots, including violent

17   individuals opportunistically shielding themselves from detection while committing assaults by

18   throwing Molotov cocktails or shooting fireworks at officers and agents, crowd control devices are

19   necessary to protect both officers and the public at large. Sharmen Decl. ¶¶4-5. In situations where

20   violent opportunists use the anonymity of crowds to assault officers, crowd control devices are key to

21   preventing further assault. Szemes Decl. ¶6. Unfortunately, rioters' use of fireworks and Molotov

22   cocktails have become somewhat of a fixture throughout these protests. Scharmen Decl. ¶6 Often the

23   perpetrators of these criminal acts perpetrate their crimes from within the group of protestors and use

24   non-violent protestors to hide themselves. *Id.* Given the legitimate law enforcement action of pushing

25   back the crowd and the shielded rioters therein, restricting officers' ability to use crowd control devices

26   is impractical as officers have an interest in preventing the federal personnel or property from catching

27   fire even if Journalists or Legal Observers are present in that crowd. *Id.*

28           The preliminary injunction sweeps so broadly that it appears to include arrest tactics unrelated

14

to protest or other First Amendment activities. Specifically, oleoresin capsicum ("OC") spray may be used for purposes other than crowd control, including when dealing with an individual resisting arrest and during handcuffing. Molina Decl. ¶10. When facing an individual resisting arrest or a third party actively trying to prevent an arrest, OC spray may be required for the officer to gain compliance from the individual and prevent harm to the officer. *Id.* ¶¶10-12. For example, during an arrest in early August, an officer used a one-second burst of OC spray to subdue a woman using physical force against the officer to prevent a lawful arrest of a man actively resisting and trying to climb over a fence. *Id.* ¶12. Under the Court's Order, however, an agent involved in this type dynamically evolving action would have to consider whether the injunction applied to this situation, whether the interfering woman was a protester, whether her actions pose a threat of imminent harm, and the threat was so serious and imminent that the agent could not provide two separate warnings to the woman before using the OC Spray, in addition to dealing with a physically resistant subject of an arrest. *Id.* Such restrictions improperly limit law enforcement's ability to engage in legal enforcement operations, while increasing the potential for injuries to CBP agents, members of the public interfering with law enforcement operations, or arrested subjects. *Id.* ¶10.

The fourth requirement of the preliminary injunction fails to adequately account for the nature of the large scale and/or ad hoc protests that Defendants have been facing. As with the other blanket requirements discussed above, the two-warning requirement arbitrarily subjects Defendants to he-said-she-said disputes and invites unnecessary legal challenges over whether warnings were subjectively sufficient to individuals. Szemes Decl. ¶8. The response of officers is largely predicated on the violence before them. *Id.* Law enforcement officers already have training and operating procedures related to the deployment of crowd control devices commensurate with the threat they are facing. Scharmen Decl. ¶¶6-7. The threat of potential contempt proceedings "for decisions made under pressure in chaotic and unpredictable circumstances" may serve to do nothing more than "chill officers" ability to respond to protests that have turned violent. *Id.*

The fifth preliminary injunction requirement is unnecessary and unwarranted because all components already prohibit the use of flash-bang grenades or KIPs in this way. Szemes Decl. ¶9; Molina Decl. 13; & Scharmen Decl. ¶7. Given that this restriction is already a part of training

1    components, this "restriction" seems only to serve or promote the ability of third parties to bring legal

2    action based on disputed events, even where these types of munitions may have been thrown or kicked

3    by violent rioters injuring a third party. Szemes Decl. ¶9.

4        The sixth provision of the preliminary injunction does little to alleviate Defendants' concerns

5    "for balancing security versus personal liability since . . . officers can be held in Contempt of Court, and

6    may face monetary fines or incarceration." Szemes Decl. ¶10; *see also* Scharmen Decl. ¶¶7, 10. The

7    added personal liability this injunction requires will chill officers' ability to use crowd control devices

8    leaving officers and innocent "individuals at greater risk of harm if officers are less willing to act when

9    quick action is needed." *Id.*

10        The seventh and eighth provisions, which apply to all the previous provisions that mention

11    Journalists and Legal Observers, are simply unworkable. It is no surprise that individuals have

12    historically presented press credentials (whether real or fake) to obtain access to areas and information

13    they would typically not be afforded. Scharmen Decl. ¶¶4, 8. While Defendants do not concede that,

14    under the law, Journalists have any special access beyond that of the general public, the lack of

15    identification required in the preliminary injunction will only subject officers and the public to

16    increased risk of harm. *Id.* ¶¶7-9; Szemes Decl. ¶¶4-5, 10-14; Molina Decl. ¶¶7-10, 14-15. For

17    Journalists and Legal Observers, the injunction merely suggests that they wear identification and states

18    that merely standing off to the side could be sufficient, *although still not a requirement*. ECF No. 55 at

19    44. The lack of any requirement for individuals to visibly identify as press will cause uncertainty and

20    hesitation by officers and agents faced with making split-second decisions in chaotic and violent

21    situations. Those potential gaps in operational security create opportunities for violent opportunists to

22    gain special access which is afforded by the injunction's prohibition on enforcing dispersal orders

23    against any self-proclaimed Journalist or Legal Observer. *See* Szemes Decl. ¶¶4-5, 11-13; Scharmen

24    Decl. ¶¶4, 7-10; Molina Decl. ¶¶7, 9-11, 14-15.

## **CONCLUSION**

26        This Court should stay its preliminary injunction pending appeal.

27

28

16

Dated: September 19, 2025                  Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
ANDREW I. WARDEN
KATHLEEN C. JACOBS
Civil Division, Federal Programs Branch

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PAUL (BART) GREEN
Assistant United States Attorney

   */s/ Kathleen C. Jacobs*
KATHLEEN C. JACOBS
Trial Attorney

Attorneys for Defendants

### L.R. 11-6.2 Certificate of Compliance

The undersigned counsel of record certifies that this memorandum contains 11 pages, which complies with the page limit set by the Court's Civil Standing Order.


Dated: September 19, 2025                  */s/ Kathleen C. Jacobs*
                                           KATHLEEN C. JACOBS

17