IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendants. | Case No. 2:25-cv-05563 <br><br> **DECLARATION OF ROGER SCHARMEN** |

## SUPPLEMENTAL DECLARATION OF ROGER SCHARMEN

I, Roger Scharmen, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

This declaration is based on my personal knowledge and information made available to me in the course of my official duties and will serve as a supplement to my Declaration previously filed on August 18, 2025. Decl. of Scharmen, ECF No. 47-3.

1. I continue to serve as the Deputy Regional Director for Region 9 of the Federal Protective Service (FPS). My primary place of duty remains San Francisco, CA, but I continue to work in Los Angeles periodically and most recently have been in Los Angeles from September 7, 2025, to September 17, 2025. The FPS remains the lead law enforcement agency protecting federal facilities, property, and people therein in Los Angeles in accordance with its statutory authority provided in 40 U.S.C. § 1315.

1

2. As of the date of this Declaration, the size and frequency of the protests at Federal Buildings are smaller and less frequent than they were in the June and July 2025 time frame. The protests typically occur from Thursday through Sunday of each week and the protestors now number in the hundreds or less. There are also fewer members of the press covering the protests when they do occur. In addition, the temporary security fence erected around the Edward R. Roybal Federal Building (hereinafter "Roybal Building") has greatly reduced protestors' access to the Roybal Building. Such access is limited to circumstances when the gate is opened to allow government vehicles to enter or leave the facility. In addition to the fence, FPS added diesel powered flood lights to illuminate the parking apron and vehicle access area making it a less attractive area for protesters to congregate. The most recent protest that turned violent occurred on at the Roybal Building on September 1, 2025 (Labor Day). Early that morning, after issuing verbal warnings, FPS officers deployed their MK 9 OC foggers[1] and PepperBall in order to prevent a number of demonstrators from attempting to damage the security fence. In addition, demonstrators were throwing glass bottles over the fence, throwing rocks at vehicles, and placing cones and shopping carts in the middle of the road in order to obstruct government vehicle movement. The violence diminished during the day but arose again later that evening when demonstrators began shaking and jumping on the fence, attempting to breach the gate of the fence, and were throwing water bottles and trash over the fence. They were also shooting fireworks toward FPS officers. By 11:00 p.m., the demonstrators had left, and the area remained calm. An FPS officer also deployed PepperBall on September 7, 2025, against a single individual who was attempting to climb over the security fence.

---

[1] The MK 9 Fogger is a hand-held device that disperses oleoresin capsicum (OC) pepper spray in aerosol form. It is widely used by law enforcement in crowd control situations.

1         3.    I am aware that on September 12, 2025, the Court issued a Preliminary Injunction (PI) in this case, which prohibits the following: (1) dispersing, threatening, or assaulting any person whom federal law enforcement officers know or reasonably should know to be a Journalist or Legal Observer unless they have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order; (2) using crowd control weapons (including kinetic impact projectiles ("KIPs"), chemical irritants, batons, and flash-bang grenades) on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person; (3) firing KIPs or flash-bang grenades at identified targets, if doing so could foreseeably result in injury to the press, legal observers, or protestors who are not posing a threat of imminent harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person; (4) using any crowd control weapon without giving at least two separate warnings that crowd control devices may be employed, in a manner and at sound level where it can be heard by the targeted individuals, unless the threat is so serious and imminent that a warning is infeasible; and (5) firing tear gas canisters or flash-bang grenades so as to strike any person, or firing KIPs or other crowd control weapons at the head, neck, groin, back, or other sensitive areas, unless that person poses an immediate threat of death or serious bodily injury.

       4.    The first requirement in the PI which prohibits dispersing, threatening, or assaulting any person whom federal law enforcement officers know or reasonably should know to be a Journalist or Legal Observer unless they have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order presents a significant safety concern for FPS officers. If law enforcement officers can only disperse members of the press or legal observers when there is probable cause to believe that they have committed an offense unrelated to the failure to follow a dispersal order, situations may arise in which someone who presents a threat to law enforcement or a federal facility remains in an area that is unprotected. For example, it is possible that someone who

wishes to harm a law enforcement officer or damage a federal building could wear clothing identifying themselves as a member of the press or a legal observer and then attack an officer and/or a federal building after they are allowed to remain in place while the main line of law enforcement officers continue to push back protestors. Indeed, on June 7, 2025, while dispersing a crowd at the Los Angeles Federal Building, an FPS officer was assaulted by someone visually identifying as a news reporter. After the female reporter and male videographer were ordered to "get back" by a FPS officer, the reporter yelled "no" and shot a projectile at the officer's arm.[2] Under the PI restrictions, this officer would not have been allowed to order the videographer and the reporter to disperse since prior to the assault there would not have been any probable cause to believe that the reporter had committed a crime. Requiring law enforcement officers to wait until someone dressed as a member of the press or a legal observer threatens to engage in some criminal activity before they can be ordered to disperse places them at great risk. While the FPS officer was not injured by the assault on June 7th, the incident highlights the risk that allowing anyone, including members of the press or legal observers, to remain in place after a dispersal order poses to law enforcement.

5. The second requirement in the PI which prohibits using crowd control weapons and KIPs on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person also impairs FPS's ability to perform its mission. As written, this requirement prohibits FPS officers from using less lethal crowd control devices (*e.g.*, FN303[3], PepperBall launchers or handheld chemical irritants) on protesters unless there is an imminent threat of harm to a law enforcement officer or another person. FPS officers

---

[2] Additional details related to the assault are set forth in the Use of Force Report (Form 10), attached as exhibit 1.

[3] The FN303 uses compressed air to disperse less lethal plastic munitions. The munitions can be loaded with marking paint or PAVA (a chemical irritant similar PepperBall).

4

are authorized to use less lethal munitions to stop criminal acts violations of federal law, (*e.g.*, 8 USC 1361, 18 USC 1363 or 41 CFR 102-74.380) that have a potential impact on federal property alone. While most criminal acts directed at federal property are also inherently directed at the FPS officers protecting the property or other persons on the property, requiring FPS to wait until the criminal acts progress to the point where the threat to the officers or other person is imminent place places the officers and members of the public at greater risk than is necessary.

6. Similarly, the third requirement which prohibits firing KIPs or flash-bang grenades if doing so could foreseeably result in injury to the press, legal observers, or protestors who are not posing a threat of imminent harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person, places a significant limitation on the ability of FPS officers to safely protect federal buildings and law enforcement officers. It is not uncommon during protests at federal buildings for members of the crowd to throw Molotov cocktails and launch commercial grade fireworks and other flammable items at federal buildings in an attempt to have the building catch fire. The most effective method that FPS has to protect the federal facilities in these situations is to use less lethal munitions to push the entire crowd back away from the federal building making it harder to reach the building. Since the individuals throwing the Molotov cocktails or launching the fireworks are often intermingled with the rest of the protestors and use protestors who are behaving peacefully as shields, it is not possible for FPS officers to ensure that a less lethal munition will not inadvertently injury a member of the press, legal observer or protector who did not pose an imminent threat to law enforcement officers or other people. The practical impact of this restriction is that FPS will no longer be able to use its less lethal munitions to push a crowd containing violent individuals back to a safe distance from the federal building being attacked.

7. The fourth and fifth requirements of the PI are unnecessary and may be counterproductive. FPS policy already requires officers to provide a verbal warning, when feasible, before deploying crowd-control weapons. While the policy does not specify the number of warnings or the volume at which the warnings must be given, FPS's practice in crowd control situations is to issue at least three separate warnings using a Long Range Acoustical Device (LRAD) before deploying crowd control devices. Similarly, FPS policy already instructs officers to avoid the head, neck, groin, back, and other sensitive areas when firing KIPs or other crowd-control weapons, unless the use of deadly force is necessary. Incorporating such policies into a preliminary injunction, however, means that anyone affected by crowd-control weapons could challenge the sufficiency of officers' warnings or to the accuracy of officers' shots in court, under pain of contempt if the court ultimately determines that the officers' actions were flawed. The threat of being forced to defend against contempt charges—even those that the district court ultimately rejects—for decisions made under pressure in chaotic and unpredictable circumstances may chill officers' ability to respond to protests that have turned violent.

8. Requiring federal law enforcement officers to discern whether someone is a legitimate Journalist or Legal Observer as described in the PI is unworkable as a practical matter. As the incident where a self-identified reporter assaulted an FPS officer during a dispersal shows, just because someone has self-identified as a Journalist or a Legal Observer does not mean that they also do not intend to harm law enforcement officers or federal buildings. Adding to the challenge for FPS officers is the fact that anyone can create a press pass, wear distinctive "Press" clothing, carry professional looking photographic equipment, or simply stand off to side of a protest for a time. Likewise, anyone can wear a green hat or a blue vest to disguise themselves as someone affiliated with the National Lawyers Guild or the ACLU.

6

9. Moreover, when protests around federal buildings become violent, the atmosphere normally becomes chaotic, loud and smoke filled making it very difficult to hear or see clearly the writing on badges or the color of clothing (especially at night – when most of the violent protests occur). Moreover, it is not always possible to know who is participating in protest activities and who is "standing off to the side." Protests are dynamic events with the location of the crowd shifting rapidly and without notice. Just because a group of Journalists and/or Legal Observers are standing off to the side at a particular location does not mean that that location was "off to the side" or will remain so. These challenges are compounded by the fact that FPS officers typically wear helmets with face shields and gas masks, making even more difficult to make out fine details on badges or clothing. Moreover, some protestors are using bright handheld lights and aiming them at the eyes of officers resulting in temporary visual impairment. This places FPS officers in a very difficult situation where it may not be obvious who within a crowd of people are Journalists and/or Legal Observers, resulting in confusion and hesitation for the officers, which increases the risk of injury to both the officers and members of the public.

10. Finally, many of the terms in the PI are inherently subjective, making it impossible for FPS officers to be confident that they are in compliance. For example, in the first requirement, law enforcement officers are permitted to ask members of the press or legal observers to change location as long as the press or legal observer have sufficient opportunity to report and observe. It is impossible for FPS officers to know how close a particular member of the press or legal observer needs to be in order for them to report and observe. Likewise, while the PI states that law enforcement officers will not be liable for violating the injunction for incidental exposure to crowd control devices, it is impossible for an officer to know before the fact whether the district court could treat any given instance of exposure as "incidental" in subsequent contempt proceedings. Because anyone exposed to a crowd control device could perceive such

exposure not as incidental but as intentional or willful, officers would operate under the threat of future contempt charges whenever they decide to deploy crowd control devices to protect federal buildings and law enforcement officers.

11.  FPS fully supports the First Amendment rights of Journalists and members of the public and takes every effort to ensure that those rights are protected while ensuring that the federal buildings that FPS protects remain safe and secure places of business for the federal workforce and the public.  It is against FPS policy for officers to deliberately target individuals with crowd-control weapons in retaliation for exercising their First Amendment rights.  Any suggestion of such action on the part of an FPS officer would be referred to the FPS Office of Professional Responsibility as well as the DHS Office of the Inspector General (OIG) if appropriate.

12.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September 19, 2025, at San Francisco, California.

_____
Roger Scharmen


Exhibit 1

**U.S. Department of Homeland Security**
Federal Protective Service FPS Form 10

## Officers Use of Force Report

### INCIDENT IDENTIFICATION INFORMATION

| FPS Incident Number: | OIG Incident File Number: | Additional FPS-10's / Same Incident: | Investigating Official: |
|---|---|---|---|
| F25090134491 | | ☒ Yes  ☐ No | |

| Program: | REGION | Office / Station: | Supervisor's Name/Title: | Supervisor's Telephone/e-mail: |
|---|---|---|---|---|
| Operation Skip Jack | 9 | 255 E. Temple St., Los Angeles, CA 90012 | ▮ Area Commander | ▮ / ▮@fps.dhs.gov |

| Time of Incident: | Date of Incident: | Day of Incident: |
|---|---|---|
| 2027 hours | 7 June 2025 | ☐ S  ☐ M  ☐ T  ☐ W  ☐ T  ☐ F  ☒ S |

**Weather and / or Environment conditions:** Clear & Dry     **Lighting conditions:** Daylight

| Number of Suspects: | Number of Involved FPS Officers: | Number of Officer Witnesses: | Number of Civilian Witnesses: |
|---|---|---|---|
| 2 | Approximately 15-30 | Unknown | Unknown |

**Location/Address of Occurrence** (Include City, County, State and ZIP Code), or Describe Distance from Permanent Reference Points:
255 East Temple Street, Los Angeles CA, 90012

### INVOLVED OFFICER INFORMATION
*(Complete a Separate Form FPS-10 for Each Officer Involved)*

| Name (LAST, First MI): | Title: | Telephone: | Duty e-mail address: |
|---|---|---|---|
| ▮ | Inspector | ▮ | ▮fps.dhs.gov |

| Sex: | Hand Usage: | Height: | Weight: | Age: |
|---|---|---|---|---|
| ☐ Male  ☒ Female | ☒ Right-handed  ☐ Left-handed | ▮ | ▮ | ▮ |

| Duty Status: | If other agency in joint operation with FPS, list agency: | State: | Local: |
|---|---|---|---|
| ☒ On Duty  ☐ Off Duty | | | |

**Operational Activity** *(Check all that apply):*
- ☐ Patrol
- ☐ Surveillance
- ☐ Interviewing
- ☐ Executing Search Warrant
- ☐ Executing Criminal Arrest Warrant
- ☐ Executing Immigration Arrest Warrant
- ☐ Arrest Without Warrant
- ☐ Handcuffing
- ☐ Transporting
- ☐ Searching Place
- ☐ Searching Person
- ☒ Other *(Explain):* Protest/Crowd Dispersal/Civil Disobediance

**Distance from suspect at the time force was employed:**
- ☒ 1 – 14 feet
- ☐ 15 – 30 feet
- ☐ 31 – 50 feet
- ☐ Over 50 feet

**Officer Attire**
- ☒ Uniform
- ☐ Plain Clothes with markings (raid jacket, body armor or similar)
- ☐ Plain Clothes (no visible markings)

### ON SCENE SUPERVISOR INFORMATION

| Name (LAST, First MI): | Title: | Telephone: | Duty e-mail address: |
|---|---|---|---|
| ▮ | Area Commander | ▮ | ▮@fps.dhs.gov |

### FORCE USED BY OFFICER

**Level and Type of Force Used by Officer**
☐ Deadly  ☐ Intermediate  ☒ Intermediate Weapon  Pepperball Launcher System (PLS)

| Officer Injuries | Device Used by Officer |
|---|---|
| | |

| | | |
|---|---|---|
| ☒ Not Injured | ☐ Handgun | ☐ Chemical Spray |
| ☐ Injured, no treatment required | ☐ Rifle/Sub-gun | ☐ Chemical Canister/Munitions |
| ☐ Injured, treated | ☐ Shotgun | ☐ Impact Munitions |
| ☐ Injured, refused treatment | ☐ Baton | ☐ Empty Hand |
| ☐ Hospitalized | ☐ CEW/ Taser | ☐ Other (describe) |
| ☐ Fatal | | |

**Brief Description of Incident** (Memorandums, Reports of Investigation, Form 3155 Offense/Incident reports or similar may be attached)

See comments below

**FPS Form 10**
**INVOLVED OFFICER FIREARM INFORMATION**  *(List Additional Firearms Used by Same Officer on Supplement)*

| Manufacturer: | Model Name / Number/ SERIAL NUMBER: | Type *(Pistol, Rifle, etc.)*: | Rounds Fired: | Caliber: | Barrel Length: |
|---|---|---|---|---|---|
| Pepperball | TAC SA Pro | N/A | ½ Hopper | .68 caliber | 12-inches |
| **Bullet Type:** | **Bullet Weight:** | **Firearm Ownership:** | | **Additional Firearms Used:** List all information for any additional Firearms | |
| Pepper Balls | Unknown | ☒ FPS-issued ☐ Personal | | ☒ None ☐ See Supplement | |

**INVOLVED OFFICER CEW/ TASER INFORMATION**

| Manufacturer: | Model Name / Number/ SERIAL NUMBER: | CARTRIDGE SERIAL NUMBER (S) | Cartride TYPE , | Number of Cartridges Fired | Number of Cycles applied: |
|---|---|---|---|---|---|
| | | | | | |
| | | Firearm Ownership: ☐ FPS-issued ☐ Personal | | Additional CEWS Used: List all information for any additional Firearms ☐ None ☐ See Supplement | |
| **WAS NMI ACHIEVED** ☐ YES ☐ NO ☐ DISPLAY ONLY | **NEED FOR ADDITIONAL APPLICATIONS** ☐ YES ☐ NO | **DID TASEWR RESPOND SATIFACCTORY?** ☐ YES ☐ NO | **IF UNSUCESSFUL, WAS DRIVE STUN USED?,** ☐ YES ☐ NO | **Approximate distance between probes** | **Did Porbes penetrate subjects skin** ☐ YES ☐ NO |
| **Were PROBES REMOVED ON SCENE** ☐ YES ☐ NO BY WHO? | | Firearm Ownership: ☐ FPS-issued ☐ Personal | | Additional CEWS Used: List all information for any additional Firearms ☐ None ☐ See Supplement | |

**APPLICATION AREAS:**
(Place "X's" where probes hit suspect AND "O's" where stunned)



**SUSPECT INFORMATION**                                                                              *(Complete a Separate Form FPS-10 for Each Suspect Involved)*

| Name: | | | AKA(s): | | Sex: ☐ Male  ☐ Female |
|---|---|---|---|---|---|
| Height: | Weight: | Age: | Ethnicity: | FBI Number: | Other Information: |

**SUSPECTS ACTIONS / THREATS (what were they doing, saying. Under the influence of drugs/ alcholohol, Mental Status, any other inprotant info), ANY VERABL COMMANDS GIVEN AND SUSPECTS RESPONSE TO SAME ARTICULATE ALL GRAHAM FACTORS and FACTS**

**SUSPECTS DISCRIPTION; (clothing, attire)**
  See Additional Comments below.

**Prior Arrests** *(Show Date, Offense and Disposition):*

**SUSPECT WEAPON OR OTHER USE OF FORCE INFORMATION**                                                     *(Check all that apply)*

Weapons possessed/ used by Suspect at time of arrest

☐ Handgun  
☐ Rifle/Carbine  
☐ Submachine Gun  
☐ Knife  
☐ Other Cutting Instrument  
☐ Blunt Instrument  

☐ Empty hands  
☐ Vehicle  
☐ Animal  
☐ Chemical Device  
☐ Explosive Device  

☒ Other (Describe)

Throwing unknown objects i.e., water bottles, rocks, etc.

**WHAT Was suspect doing with any above listed weapons – ARTUCULATE ACTIONS**

**SUSPECTS INJURIES –**

| | | |
|---|---|---|
| ■ Not injured | ☐ Injured, treated | ☐ Hospitalized |
| ☐ Injured, no treatment required | ☐ Injured, refused treatment | ☐ Fatal |

**LIST NATURE OF SUSPECTS INJURIES:** Unknown injuries, if any, to suspects.

| Decontamination Required YES ☐ NO ☐ | If decontaminated, describe details (how, when, where, by whom) |
|---|---|
| MEDICALLY TREATED ON SCENE YES ☐ NO ☐ | If MEDICALLY TREATED ON SCENE (how, when, where, by whom) |
| TRANSPORTED TO HOSPITAL YES ☐ NO ☐ | If Transported (how, when, where, by whom) |

## OFFICERS INJURIES/ MEDICAL

**OFFICERS INJURIES**

| | | |
|---|---|---|
| ■ Not injured | ☐ Injured, treated | ☐ Hospitalized |
| ☐ Injured, no treatment required | ☐ Injured, refused treatment | ☐ Fatal |

**LIST NATURE OF LEOs INJURIES:**

| Decontamination Required YES ☐ NO ☐ | If decontaminated, describe details (how, when, where, by whom) |
|---|---|
| MEDICALLY TREATED ON SCENE YES ☐ NO ☐ | If MEDICALLY TREATED ON SCENE (how, when, where, by whom) |
| TRANSPORTED TO HOSPITAL YES ☐ NO ☐ | If Transported (how, when, where, by whom) |

## FINAL OUTCOME OF INCIDENT and ADDITIONAL INFORMATION

**End Result**
- ☐ Suspect arrested by FPS
- ☐ Suspect Arrested by other agency
- ☐ Suspect hospitalized/pending further treatment
- ☐ Suspect fatality
- ☐ Animal destroyed
- ☐ Property damaged (description in comments)
- ■ Other (see additional comments below)

**Officer's Misc Information**
- ☐ Site walk through  ☐ Performed  ☐ Offered  ☐ Not req'd
- ☐ 72 Hour post incident admin leave received  ☐ Not req'd

**SUSPECT CHARGES** – List any an all charges of suspect, (by who,/LE Agencey)

## EVIDENCE COLLECTED AT SCENE

Any evidence collected at scene and what was down with it?

☐ Weapons
☐ spent casing
☐ taser cartridges / probes
☐ anything else ?

List all important information about any collected and
disposition of same – stored in evidence, turned in to, ect

---

ADDITIONAL COMMNETS

Denver Mega Center event notes:  25020900

Narrative:
On Saturday, June 7,2025 at 0300 hours, I, Inspector ▮▮▮▮ (9P1570) was deployed in response to "Los Angeles Riots 2025", to support Operation Skip Jack (Los Angeles Riots 2025).

At approximately 0518 hours the Denver Mega Center (DMC) was notified of an un-lawful assembly from Los Angeles Police Department (LAPD) located at the Federal Office Building in Los Angeles, CA.

At 0644 hours, Inspectors from different Region 9 offices, began arriving to 300 North Los Angeles, CA 90012, in response to the mass protest/demonstration "LA Defend Your Rights".

From the time of their arrival, and throughout the day, protestors continued to protest on federal property and block the driveways to the federal facility. Each time a government vehicle would enter or exit the facility, FPS with supporting agencies Customs Border Protection (CBP), Custom Border Protection-Special Response Team (SRT), Immigration Customs Enforcement (ICE), BORDER PATROL, LAPD, LA Sheriff's Department (LASD), Homeland Security Investigations (HSI), and Enforcement Removal Officer (ERO) unified as one unit, would create a pathway for the vehicles by physically pushing and yelling out, "Get back!" to the protesters that were blocking the vehicle pathway and refusing to move.

By 1358 hours, there were approximately 60 protestors. At approximately 1400 hours, the crowd began to get agitated and encroach on the vehicle gates.

FPS with the unified unit armed with Less- Than lethal TAC-SA Pro Pepper ball and FN 303 projectile, began to move the crowd back to the sidewalk. No pepper balls, or projectiles were deployed at this time and the crowd relocated to the sidewalk without incident.

At this time multiple federal patrol and tactical vehicles used for the ICE operation and security escort were arriving and departing from the federal facility.

Multiple times the crowd would get more agitated and continuously block the street that led to the entrance of the vehicle gate.

Due to these continuous actions from the protestors, FPS with the unified unit would be sent out to clear the crowd from blocking the vehicle gate entrance, this continued for approximately two to three hours. With the crowd increasing to approximately 80 protestors during this time.

FPS received reports from DMC of significant violence against law enforcement, including officers sustaining injuries from cement bricks thrown at and through vehicle windows, vehicles being burned, and active Molotov cocktails being thrown at personnel conducting ICE operations. This is a violation of 18 U.S. Code § 111 - Assaulting, resisting, or impeding certain officers or employees.

FPS inspectors with assistance of CBP, SRT, ICE, BP, HSI, and ERO prepared to push out the line of protestors away from the apron area which is the federal property located at 255 Alameda Street. This area is known for federal employees to park, to include delivery services, Bureau of Prison transportation, vehicle entrance and exit. When individuals began throwing large pieces of concrete at officers. Protesters began to shout, "KILL ICE!" and got closer to the vehicle gate at the sally port.

At 1948 hours, protesters continued to throw objects, and more verbal threats were made over a loudspeaker stating, "We will send your bitch assess home in a body bag". The protesters were increasing in numbers with approximately over 300 protestors and started to get closer to the sally port.

At 2009 hours, Incident Command (IC) Area Commander ▮ 9V71 used the Long-Range Acoustic Device (LRAD) while in-side the sallyport and made the announcement warnings for disbursal. The dispersal message stated, was video recorded.

Protesters did not obey the lawful direction to disperse and refused to leave which is a violation of Code of Federal Regulations § 102-74.385 Persons in and on property must always comply with official signs of a prohibitory, regulatory, or directory nature and with the lawful direction of Federal police officers and other authorized individuals.

Protesters violated subsections a-d of the Code of Federal Regulations § 102-74.390 Disturbance: All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct or exhibiting other con-duct on property that—(a) Creates loud or unusual noise or a nuisance; (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; (c) Otherwise impedes or disrupts the performance of official duties by Government employees; or (d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner.

The situation escalated and multiple projectiles and rocks were being thrown at FPS Inspectors which did not allow for the dispersal message to be repeated three times, with approximately two to three minutes between the first warning to give those who choose not to be arrested time to leave the immediate area.

At 2011 hours FPS and CBP SRT deployed out of the sallyport as projectiles, concrete rocks, and an M-80 fireworks were being thrown towards the rolling gate where multiple agencies were located.

At 2027 hours aggressive protestors where on federal property, against and in front of the rolling gate, (has a tunnel that leads to where ICE picks up migrants, and the parking garage), I brought the LRAD for another dispersal message, however multiple projectiles and unknown liquids were being thrown at Inspectors and officers. For officer safety due to the projectiles being thrown, FPS was forced to cancel the second attempt of the dispersal message.

Due to rising threats and projectiles being thrown at FPS, and with over 200 protestors now on federal property and banging and kicking on the rolling gate, FPS was authorized the use of less-lethal munitions in accordance with FPS Directive Public Order Policing Page 6 of 16 Directive 15.5.4.7, 15.5.1.2, "Use of Force."

The protestors still refusing to leave federal property, the rolling gate was opened to disperse the protestors off federal property. Once the gate opened and protestors began running towards us. At which time I used my TAC-SA Pro Pepper ball, I used a half the "hopper" of OC Pepper ball's, which is estimated around 80-100 Pepper balls. Approximately at 2034 hours, IC Area Commander ▮ 9V71 requested LAPD assistance.

Approximately an hour later, LAPD arrived and formed a line formation on Temple Street. The protesters continued throwing fireworks, rocks and bottles with unknown liquid at us.

We had physically pushed the crowd onto Alameda Street, where we were all in a line formation. The order was given to break the formation into two sections, one pushing towards Temple Street, and the other pushing towards Alison street. I was on the unit pushing towards Temple Street.

While moving the line unit, I encountered a female news reporter with a pink shirt, blue jeans, and white shoes. She was standing with a male videographer with a white t-shirt, blue jeans, and black shoes, who was carrying the video camera with a stand connected to it. I continuously shouted out, "Get back!" as we moved forward. As I shouted out, "Get back!" The female news reporter with her left hand holding a microphone, yelled back, "No!" and with a swift rise of her right hand, she had a silver in color object in her hand, pointed at me, dispersing a small object, which contacted me on my right upper arm. The female reporter immediately dropped her right hand to her side. I deployed my pepper ball, of about 10-15 rounds, hitting the concrete ground in front of her and the camera man, saturating the area.

Continuing moving forward with the entire unit, the news reporter and camera were still standing in the same area, refusing to leave, I used my left hand, open palm, yelling out, "Get back!" pushed the news reporter and the camera man forward and away from the line unit.

Once we were in a line formation on the intersection of Alameda Street and Temple St, we stopped and stood in line formation at the intersection, where LAPD was located for approximately one to two hours, before retreating to the federal building. At which time LAPD took over crowd control.