Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
  declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
  gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice* admission)
  opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd floor
New York, NY 10016
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
  peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
  jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
  awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
  mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
  slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
  jreisberg@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
  peter@bibringlaw.com
Law Office of Peter Bibring
2210 W Sunset Blvd, # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Los Angeles Press Club, NewsGuild - Communications Workers of America, Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Abigail Olmeda,<br><br>     Plaintiffs,<br><br>     v.<br><br>Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security,<br><br>     Defendants. | Case No. 2:25-CV-05563-HDV-E<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION** |

1    Additional Counsel of Record for Plaintiffs:

2    Carol A. Sobel, Esq. (SBN: 84483)
         carolsobellaw@gmail.com
3    Weston Rowland, Esq. (SBN: 327599)
         rowland.weston@gmail.com
4    Law Office of Carol A. Sobel
     2632 Wilshire Boulevard, #552
5    Santa Monica, CA 90403
     Telephone: (310) 393-3055
6
     Paul Hoffman, Esq. (SBN: 71244)
7        hoffpaul@aol.com
     Michael Seplow, Esq. (SBN: 150183)
8        mseplow@sshhzlaw.com
     John Washington, Esq. (SBN 315991)
9        jwashington@sshhzlaw.com
     Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
10   200 Pier Avenue #226
     Hermosa Beach, CA 90254
11   Telephone: (310) 717-7373

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# **<u>TABLE OF CONTENTS</u>**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

LEGAL STANDARD .............................................................................................................. 2

ARGUMENT ............................................................................................................................ 2

I.      DEFENDANTS FAIL TO MAKE A STRONG SHOWING THAT THEY WILL
        SUCCEED ON THE MERITS ....................................................................................... 2

        A.      Defendants' Effort to Add Materials to the Record that They Could Have
                Submitted with Their Preliminary Injunction Opposition Is Improper and Does
                Not Help Them ................................................................................................... 3

        B.      Plaintiffs Have Standing .................................................................................... 4

        C.      Defendants Have Not Proven that They Are Likely to Prevail on Plaintiffs'
                Right-of-Access Claims ...................................................................................... 7

        D.      Defendants Fail to Prove that They Are Likely to Win on Plaintiffs' Retaliation
                Claims ............................................................................................................... 10

II.     THIS COURT'S FACTUAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL
        EVIDENCE ................................................................................................................. 11

III.    DEFENDANTS HAVE NOT PROVEN THAT THEY WILL BE IRREPARABLY
        HARMED BEFORE THE APPEAL IS DECIDED ABSENT A STAY ..................... 14

        A.      The Injunctive Terms from *Index* Are Workable .............................................. 15

        B.      Requiring Defendants to Comply with Their Own Use-of-Force Policy Is Workable
                ............................................................................................................................ 17

IV.     PLAINTIFFS WILL BE SUBSTANTIALLY INJURED BY A STAY ..................... 20

V.      A STAY IS CONTRARY TO THE PUBLIC INTEREST ........................................ 21

CONCLUSION ...................................................................................................................... 23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*99 Westchester Investments, L.P. v. Resort Rac Holdings, LLC,*
   No. 2:03-CV-00839-DSF (SHS), 2005 WL 8252148 (C.D. Cal. June 17, 2005) ........................ 13

*Al Otro Lado v. Wolf,*
   952 F.3d 999 (9th Cir. 2020) ................................................................................................. 15

*Alvarez v. Montgomery,*
   No. 8:15-CV-00987-DMG (KS), 2022 WL 868889 (C.D. Cal. Jan. 27, 2022) ......................... 12

*Arizona Right to Life Pol. Action Comm. v. Bayless,*
   320 F.3d 1002 (9th Cir. 2003) ................................................................................................. 5

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ................................................................................................... 5

*Associated Press v. Otter,*
   682 F.3d 821 (9th Cir. 2012) ................................................................................................. 21

*Atiyeh v. Am. Bus. Bank,*
   No. 8:25-CV-00062-AB-KES, 2025 WL 1091950 (C.D. Cal. Mar. 3, 2025)............................. 3

*Barnes v. Healy,*
   980 F.2d 572 (9th Cir. 1992) ................................................................................................... 6

*British Airways Bd. v. Boeing* Co.,
   585 F.2d 946 (9th Cir. 1978) ................................................................................................. 13

*Brown v. Entm't Merch. Ass'n,*
   564 U.S. 786 (2011)................................................................................................................ 22

*Citizens United v. Fed. Election Comm'n,*
   558 U.S. 310 (2010)................................................................................................................ 22

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983).................................................................................................................... 4

*Cmty. House, Inc v. City of Boise,*
   490 F.3d (9th Cir. 2007) ........................................................................................................ 21

*Collins v. Jordan,*
   110 F.3d 1363 (9th Cir. 1996) ................................................................................... 10, 18, 21

*Commure, Inc. v. Canopy Works, Inc.,*
   No. 5:24-CV-02592-NW, 2025 WL 2601555 (N.D. Cal. May 13, 2025)................................... 3

*Cox v. Louisiana,*
   379 U.S. 536 (1965)................................................................................................................ 18

*Doe #1 v. Trump,*
   957 F.3d 1050 (9th Cir. 2020) ............................................................................................... 15

*E. Bay Sanctuary Covenant v. Biden,*
   993 F.3d 640 (9th Cir. 2021) ................................................................................................... 9

*East Bay Sanctuary Covenant v. Trump,*
   950 F.3d 1242 (9th Cir. 2020) ................................................................................................. 9

*Estate of Casillas v. City of Fresno,*
   342 F.Supp.3d 990 (E.D. Cal 2018) ...................................................................................... 12

*Fed. Bureau of Investigation v. Fikre,*
   601 U.S. 234 (2024).................................................................................................................. 7

*Fed. Election Comm'n v. Furgatch*,
   869 F.2d 1256 (9th Cir. 1989) .................................................................................. 4

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ............................................................................................... 6

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
   457 U.S. 596 (1982) .......................................................................................... 8, 22

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) ............................................................................................. 22

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939) .............................................................................................. 7

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001) ............................................................................... 9

*Headwater Forest Defense v. County of Humboldt*,
   276 F.3d 1125 (9th Cir. 2002) ............................................................................. 19

*Index Newspapers LLC v. United States Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) ........................................................................ passim

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018) ......................................................................................... 22

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ............................................................... 8, 9, 10, 21

*Maryland v. Wilson*,
   519 U.S. 408 (1997) .............................................................................................. 5

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ............................................................................... 21

*Mills v. Alabama*,
   384 U.S. 214 (1966) ............................................................................................. 22

*Murphy v. Collier*,
   468 F. Supp. 3d 872 (S.D. Tex. 2020) .................................................................... 5

*Nelson v. City of Davis*,
   685 F.3d 867 (9th Cir. 2012) ............................................................................... 18

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ............................................................................................. 22

*Newsom v. Trump*,
   No. 25-CV-04870-CRB, 2025 WL 2250568 (N.D. Cal. July 9, 2025) .................... 11

*Newspaper, Newsprint, Mag. & Film Delivery Drivers, Helpers, & Handlers, Int'l Bhd. of Teamsters, Loc.Union No. 211 v. PG Publ'g Co.*,
   No. 2:19-CV-1472-NR, 2019 WL 9101872 (W.D. Pa. Dec. 27, 2019) ...................... 3

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................... 1, 2, 20, 21

*Noem v. Vasquez Perdomo*,
   No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025) ............................................. 5

*ODonnell v. Harris Cnty*,
   260 F. Supp. 3d 810 (S.D. Tex. 2017) .................................................................... 3

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) .............................................................................................. 4

*Porretti v. Dzurenda*,
   11 F.4th 1037 (9th Cir. 2021) ............................................................................. 14

*Porter v. Martinez*,
   68 F.4th  (9th Cir. 2023) ....................................................................................... 6

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

*Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*,
  478 U.S. 1 (1986) ........................................................................................................ 7, 8

*Pub. Watchdogs v. S. California Edison Co.*,
  984 F.3d 744 (9th Cir. 2020) ............................................................................................ 5

*Sanderlin v. Dwyer*,
  116 F.4th 905 (9th Cir. 2024) ........................................................................................ 18

*Santa Monica Food Not Bombs v. City of Santa Monica*,
  450 F.3d 1022 (9th Cir. 2006) .......................................................................................... 6

*Scott v. Harris*,
  550 U.S. 372 (2007) ........................................................................................................ 14

*Trading Bay Energy Corp. v. Union Oil Co. of California*,
  225 F.App'x. 428 (9th Cir. 2006) ...................................................................................... 3

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) .......................................................................................... 22

*United States v. Mitchell*,
  971 F.3d 993 (9th Cir. 2020) ............................................................................................ 2

*United States v. Ramirez-Chilel*,
  289 F.3d 744 (11th Cir. 2002) ........................................................................................ 12

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021) .......................................................................................................... 6

*Villa v. Maricopa Cnty.*,
  865 F.3d 1224 (9th Cir. 2017) .......................................................................................... 4

*Virginian Ry. Co. v. United States*,
  272 U.S. 658 (1926) .......................................................................................................... 2

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) .......................................................................................... 20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

# **INTRODUCTION**

After giving Defendants many weeks to respond and considering lengthy oral argument on a substantial record, this Court properly enjoined the Department of Homeland Security ("DHS") from retaliating against people who are protesting against, observing, and reporting on DHS's violent immigration raids in Southern California. The Court's 45-page Preliminary Injunction Order contains extensive factual findings and is grounded in Ninth Circuit and Supreme Court law. The injunction combines the same injunction against DHS that the Ninth Circuit affirmed in *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020), with terms that track DHS's own policies on the use of force. Such relief is appropriate to stop DHS from violently punishing and deterring Plaintiffs from exercising their First Amendment rights at the ongoing protests over DHS raids and is necessary to protect against a pattern of retaliation that has run through numerous protest events DHS has policed—more than 12—since June.

Defendants seek to stay the injunction pending appeal so that they can continue their unlawful and chilling conduct. But they do not come close to meeting the high bar for such extraordinary relief. Instead, they mainly repeat arguments that this Court and the Ninth Circuit already have rejected and attempt to improperly lard the record with declarations that they could have submitted with their opposition to Plaintiffs' motion for a preliminary injunction. This showing does not satisfy any of the four factors for staying an injunction under *Nken v. Holder*, 556 U.S. 418, 433-34 (2009).

The only truly new argument Defendants make is that the Court's factual findings are clear error. (Dkt. 58 at 10-12, § I.D-II.) Nothing could be further from the truth. The record comprises (1) a mountain of unrefuted percipient testimony and video evidence supporting Plaintiffs' claims, including a number of declarations of journalists who have been struck by projectile weapons shot by DHS officers on multiple occasions, (2) unrefuted expert declarations by Customs and Border Protection's former commanding officer showing that Defendants are engaged in a pattern of using excessive, indiscriminate, and unnecessary force in violation of their own policies at protests against DHS raids, and (3) a handful of self-serving hearsay declarations by DHS employees that conflict with one another and with sworn testimony Defendants have provided in other cases, and

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

which speak in hypotheticals and generalities that do not refute any of the declarations or video
evidence Plaintiffs submit. Not only was the Court's weighing of this evidence unassailable, but the
Court would also be free to give no weight to any of Defendants' testimony under these
circumstances because their sworn testimony is inconsistent with itself and with the video proof the
Court relied on in issuing the injunction and does not refute the evidence Plaintiffs submitted.

In light of the foregoing, Defendants cannot meet any of the *Nken* factors. They have not
proven that they are likely to prevail on any of the claims at issue. They have not proven that they
will suffer irreparable harm. They have not proven that Plaintiffs will be safe and their First
Amendment exercise un-chilled if a stay is issued. And Defendants have certainly not proven that
the public interest favors a stay. To the contrary, the public interest favors public debate and a free
press—not violent suppression of core First Amendment activity.

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy." *United States v. Mitchell*, 971 F.3d
993, 999 (9th Cir. 2020) (quotation omitted). Such a "stay is not a matter of right, even if
irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quotation
omitted). Rather, a stay pending appeal is an "exercise of judicial discretion," *Virginian Ry. Co. v.
United States*, 272 U.S. 658, 672 (1926), and "[t]he party requesting a stay bears the burden of
showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433-34. In
deciding whether to exercise discretion to grant a stay, courts consider: "(1) whether the stay
applicant has made a strong showing that [they are] likely to succeed on the merits; (2) whether the
applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will
substantially injure the other parties interested in the proceeding; and (4) where the public interest
lies." *Id.* at 434 (quotation omitted). "The first two factors . . . are the most critical." *Id.*

## ARGUMENT

### I.    DEFENDANTS FAIL TO MAKE A STRONG SHOWING THAT THEY WILL SUCCEED ON THE MERITS

To justify a stay, Defendants "must show a *strong* likelihood of success on the merits."
*Index,* 977 F.3d at 824 (emphasis in original). Far from meeting this burden, Defendants fail to

rebut any of the evidence that supports the preliminary injunction and simply recycle baseless

arguments already rejected by this Court and by the Ninth Circuit in *Index.* They thus fail to meet

"the high standard of showing a strong likelihood of success on the merits." *Atiyeh v. Am. Bus.*

*Bank*, No. 8:25-CV-00062-AB-KES, 2025 WL 1091950, at *2 (C.D. Cal. Mar. 3, 2025).

### A.    Defendants' Effort to Add Materials to the Record that They Could Have Submitted with Their Preliminary Injunction Opposition Is Improper and Does Not Help Them

With the exception of paragraph 2 of the new Scharmen Declaration (Dkt. 58-3 at 2, ¶ 2),

all the "evidence" Defendants submit with their motion relates to events that occurred before they

filed their opposition to the motion for a preliminary injunction, and therefore should not be

considered. A district court reviewing a motion to stay a preliminary injunction should not examine

new evidence that was available to the party proffering such evidence at the briefing stage and

before judgment was rendered. *See Commure, Inc. v. Canopy Works, Inc.*, No. 5:24-CV-02592-

NW, 2025 WL 2601555, at *1 (N.D. Cal. May 13, 2025) (explaining that "a motion to stay is not

an opportunity to relitigate matters, submit new evidence, or raise new arguments") (citing *Trading*

*Bay Energy Corp. v. Union Oil Co. of California*, 225 F.App'x. 428, 430 (9th Cir. 2006)). In

declining to consider such new evidence, federal courts have analogized a motion to stay with the

standards governing a motion for reconsideration. *See, e.g.*, *Newspaper, Newsprint, Mag. & Film*

*Delivery Drivers, Helpers, & Handlers, Int'l Bhd. of Teamsters, Loc.Union No. 211 v. PG Publ'g*

*Co.*, No. 2:19-CV-1472-NR, 2019 WL 9101872, at *2 (W.D. Pa. Dec. 27, 2019); *ODonnell v.*

*Harris Cnty*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017). The two events post-dating August 18,

2025 (when Defendants filed their opposition to the preliminary injunction motion) Mr. Scharmen

referred to and the other materials submitted by Defendants do not move the needle anyway for the

reasons detailed below.[1]

---

[1] In conjunction with this motion, Plaintiffs have submitted two declarations, which all pertain to
events post-dating their briefing. Because that evidence was not available for Plaintiffs to present
earlier and goes to directly rebut Defendants' only new evidence that post-dates August 18, 2025
(Dkt. 58-3 at 2, ¶ 2), the Court should consider those materials.

**B.    Plaintiffs Have Standing**

Contrary to Defendants' mischaracterization of the preliminary injunction order, this Court correctly held that plaintiffs establish standing not by simply pointing to past injuries, but by showing "either 'continuing, present adverse effects' of a defendant's past illegal conduct, 'or a sufficient likelihood that [they] will be wronged again in a similar way.'" (Dkt. 55 at 23, § IV.A.1 (quoting *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017); *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).) The Court properly assessed the extensive evidence in the record to determine that Plaintiffs established standing on both bases.[2] (Dkt. 55 at 25-26, § IV.A.1-2 (discussing evidence of Plaintiffs limiting their First Amendment activities based on chilling effects of past injuries and acknowledging such "continuing, present adverse effects" constitute "cognizable injury")*; id.* at 23-24 (discussing evidence establishing realistic likelihood that Plaintiffs will be injured again—including evidence showing "ongoing, sustained pattern of conduct" resulting in some Plaintiffs' being injured multiple times, citing *Index,* 977 F.3d at 826); *see also id.* at 37-38 (discussing evidence establishing likelihood that Defendants will violate Plaintiffs' rights again under *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989)).) Defendants fail to rebut any of this evidence, so they "have not made a strong showing that their standing argument is likely to succeed." *Index*, 977 F.3d at 827.

As the Court found, the evidence shows not only that raids are continuing and that Plaintiffs generally intend to continue their activities as reporters, legal observers, and protesters, but also that the specific protests against DHS "at which Defendants target or fire indiscriminately" at

---

[2] Defendants' assertion that the Court determined Plaintiffs' standing "based on similar evidence" as considered at the temporary restraining order stage mischaracterizes the record and this Court's detailed order. In support of the motion for preliminary injunction, Plaintiffs added 36 more declarations, 40 more photographs, and more than a dozen video recordings to the record. This evidence captures several subsequent days on which DHS continued to deploy excessive, retaliatory force against protests (including on the very day the Court denied a temporary restraining order)—tripling the number of locations at which DHS repeated its sustained pattern of conduct and documenting more repeated violations of Plaintiffs' rights. (*See* Dkt. 55 at 11-17, §§ II.4-8.) The Court also considered new evidence of Plaintiffs' continuing, present injuries and evidence showing Defendants' pattern of conduct is "officially sanctioned," so therefore likely to recur. (Dkt. 55 at 23, § IV.A.1; *id.* at 33-34, §§ IV.B.1-2; Dkt. 49 at 10, § II.D.6.)

reporters, legal observers, and protesters are ongoing, and that Plaintiffs "intend to continue to be present" at those very protests. (Dkt. 55 at 25 n.14; *see also id.* at 32 (discussing evidence establishing pattern of DHS "indiscriminately target[ing] in equal measure . . . peaceful protestors, journalists, and observers" attending protests against raids).) The Court's findings thus establish that this case is unlike *Lyons*, where the future harm was predicated on law enforcement's happening to encounter the individual plaintiff somewhere in the city at "the wrong place at the wrong time," then conducting an individualized determination that he had violated the law to stop him.[3] *Id* at 25 n.14.

Defendants fail to acknowledge that this case—and the preliminary injunction—are based on First Amendment claims, which "sharply differ[ ]" from the claim at issue in *Lyons* and present "unique standing considerations."[4] *Index*, 977 F.3d at 826; *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Indeed, Defendants' argument that Plaintiffs could avoid injury by "attend[ing] protests and observ[ing] from a distance where they are out of range of crowd control devices" itself points to a basis for Plaintiffs' standing. (Dkt. 58 at 6, § I.A.) As the Court recognized, the very fact that Plaintiffs are limiting their First Amendment activities due to the chilling effects of their past injuries establishes an ongoing constitutional injury. (Dkt. 55 at 26,

---

[3] Though Defendants repeat their "baseless accusations" that Plaintiffs inserted themselves into "violent riots," they still fail to point to "a shred of evidence" rebutting the video, photographs, and testimonial evidence that prove their claims are false. (Dkt. 55 at 28, § IV.B.1; *see also* Dkt. 49 at 2-4, §§ I.A-B.) The Court correctly found there is no evidence Plaintiffs engaged in criminal conduct. (*Id.*) Because Plaintiffs are subject to constitutional injury based on innocent behavior, *Lyons* is inapposite. (Dkt. 55 at 24-25, § IV.A.1; *Armstrong v. Davis*, 275 F.3d 849, 866 (9th Cir. 2001).)

[4] For the same reason, this case differs from *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025). It is odd, indeed, that Defendants argue the Ninth Circuit's *Index* decision is not precedential, while they rely heavily on a single justice opinion concurring in the emergency docket stay decision in *Vasquez Perdomo*, which was also decided on the "'probabilistic'" standard for evaluating a request to stay preliminary relief pending appeal. (Dkt. 58 at 6, 9, § I.A; *id.* at 6 § I.C.) In contrast to the Ninth Circuit's majority merits panel opinion in *Index*, Justice Kavanaugh's concurring opinion has no binding effect whatsoever. *See, e.g., Maryland v. Wilson,* 519 U.S. 408, 412–413 (1997) (explaining that statements made in a concurring opinion, like dictum, are not binding); *Pub. Watchdogs v. S. California Edison Co.*, 984 F.3d 744, 757 n.7 (9th Cir. 2020) ("concurring opinions [of Supreme Court justices] have no binding precedential value"); *see also Murphy v. Collier*, 468 F. Supp. 3d 872, 878 (S.D. Tex. 2020).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

1    § IV.A.2 (citing Dkt. 6-17 at 9, ¶ 37 (averring that because of his injuries, he is "likely to stay

2    further back to avoid being subject to force," but that means he will not get the same coverage and

3    will not be able to see what is really happening)); *Index*, 977 F.3d at 826; *Porter v. Martinez*, 68

4    F.4th 492, 437 (9th Cir. 2023)); *see also Santa Monica Food Not Bombs v. City of Santa Monica*,

5    450 F.3d 1022, 1034 (9th Cir. 2006) (fact that plaintiff modified its behavior by choosing different

6    locations for demonstrations established standing for First Amendment challenge)).

7         Though Defendants inaccurately accuse Plaintiffs of relying on stale evidence, the record

8    demonstrates that each time DHS claims the threat to Plaintiffs' rights has dissipated, it repeats the

9    same conduct to injure Plaintiffs again. (*See* Dkt. 55 at 38, § IV.C.) Defendants' assertion that

10   Plaintiffs' motion papers failed to present evidence of DHS conduct from the prior two months is

11   simply false; Plaintiffs' rebuttal evidence contained multiple declarations and video recordings

12   showing the agency using projectile and chemical weapons against crowds of protesters, concerned

13   family members, and press—including a member of Plaintiff press organizations—the month

14   before, just one week before Plaintiffs filed their motion for a preliminary injunction. (Dkt. 55 at

15   12-17, §§ II.A.4-8.) By their own admission, Defendants continued to target protests with the

16   chemical weapons addressed by the preliminary injunction through the week before the Court

17   issued the injunction—injuring multiple members of Plaintiff LA Press Club, including Plaintiff

18   Beckner-Carmitchel *a third time.* (Dkt. 58-3 at 2, ¶ 2, (describing agents firing pepper balls and

19   chemical spray against protesters on September 1 and September 7); Second Supp. Decl. of Sean

20   Beckner-Carmitchel at 5-6, ¶¶ 23-24 (hit "straight on" with chemical spray); Decl. of Jill Connelly

21   at 3, ¶ 12 (journalist shot in the back with chemical irritant as she was walking away).) That the

22   preliminary injunction has since served its intended effect is not a justification for now staying it.

23   *Cf. Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992) ("The court's power to grant injunctive

24   relief survives discontinuance of the illegal conduct.").[5]

---

25   [5] Defendants appear to confuse standing, which a party must establish at the beginning of the case,

26   with mootness—claiming that Plaintiffs may lose standing to pursue their claims at a later stage of the case. "At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The

27   doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Uzuegbunam v. Preczewski*,

28   592 U.S. 279, 282 (2021); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*.,

**C.    Defendants Have Not Proven that They Are Likely to Prevail on Plaintiffs'
Right-of-Access Claims**

Defendants have not proven that they are likely to prevail on Plaintiffs' right-of-access

claims under *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1 (1986)

("*Press-Enterprise II*"), which are exactly the same as the right-of-access claims in *Index

Newspapers*. Not only are Defendants' arguments a redux of the ones the Ninth Circuit rejected in

*Index Newspapers*, but they also rehash the same arguments this Court correctly rejected in issuing

the preliminary injunction.

First, Defendants argue that "[e]xecuting an arrest warrant or suppressing riots resulting

from violent crowd behavior are not governmental proceedings to which a right of public access

applies." (Dkt. 58 at 7, § I.B.) This is the same argument they made in opposition to the

preliminary injunction (Dkt. 47 at 14-16, §I.B), and in *Index Newspapers*,[6] and it remains incorrect.

As the Ninth Circuit explained in *Index*, when it upheld an injunction that prohibited DHS from

dispersing journalists and legal observers after the police had declared an unlawful assembly,

"Portland's streets and sidewalks—and the process—public protests and law enforcement's

response to them—have historically been open to the public." 977 F.3d at 830 (citing *Hague v.

Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may

rest, they have immemorially been held in trust for the use of the public and, time out of mind, have

been used for purposes of assembly, communicating thoughts between citizens, and discussing

public questions.")). This Court's finding that the first part of the *Press-Enterprise II* test was met

because "Plaintiffs allege incidents that took place on public streets and sidewalks, 'the

---

528 U.S. 167, 189-192 (2000) (distinguishing standing and mootness). However, it is the defendant
asserting mootness that "bears the formidable burden" to show "it cannot reasonably be expected to
resume its challenged conduct—whether the suit happens to be new or long lingering, and whether
the challenged conduct might recur immediately or later at some more propitious moment." *Fed.
Bureau of Investigation v. Fikre*, 601 U.S. 234, 243 (2024).

[6] *See*, *e.g.*, Borden Decl., Ex. 1 (Opp. to Mot. for PI in Index, Dkt. 138 at 18) ("Plaintiffs cannot
show that an unlawful gathering subjected to a legitimate dispersal order is a 'place or process' that
has 'historically been open to the general public.'"); Ex. 2 (Ninth Circuit Appeal Dkt. 35 at 20
("But law-enforcement efforts to control a violent protest do not constitute a 'government
proceeding or activity' that has 'historically been open to the press and general public.'")).

1   archetyp[ical] . . . traditional public forum'" (Dkt. 55 at 35, § IV.B.2 (alteration in original)),

2   likewise tracks the analysis from *Index Newspapers*.

3          Defendants' circular argument is that by unilaterally declaring an event to be a riot, they can

4   transform a public forum or process into something else and thereby eliminate Plaintiffs' right of

5   access.[7] But that is not how the analysis under *Press-Enterprise II* works. For example, in *Index*,

6   the Ninth Circuit did not look at whether Plaintiffs had a right to access an unlawful assembly; it

7   looked to the more general activity of a protest. 977 F.3d at 830. Similarly, in *Leigh v. Salazar*, the

8   Ninth Circuit did not look at the right to access federal property that the government had closed off

9   to conduct roundups; it looked more generally at the right to monitor the government's

10  enforcement actions. 677 F.3d 892 (9th Cir. 2012) (examining "the vital public interest in

11  preserving the media's ability to monitor government activities"); In *Press-Enterprise II*, the

12  Supreme Court did not look at the right to attend closed hearings, it looked at the right to attend

13  preliminary hearings. 478 U.S. at 10. In *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,

14  the Supreme Court looked at the right to attend trials, not the right to attend closed trials. 457 U.S.

15  596, 605 (1982). No case applying *Press-Enterprise II* has adopted Defendants' approach, under

16  which all the cases cited in this paragraph would have come out the opposite way, or as this Court

17  put it, "would render *Press-Enterprise* a dead letter." (Dkt. 55 at 35 n.29.)

18         Under *Press-Enterprise II*, the inquiry does not end at the government's decision to close a

19  proceeding or process—as Defendants argue—but rather requires the government to prove that the

20  access restriction it has imposed is "essential to preserve higher values and is narrowly tailored to

21  serve that interest." 478 U.S. at 830 (quotation omitted). The Court correctly found that the

22  government had not adduced evidence to meet its burden under this second prong of the *Press-*

23  *Enterprise II* analysis, whereas Plaintiffs offered "convincing[]" evidence showing that DHS's use

24  of violence to disperse journalists and legal observers was *not* essential or narrowly tailored. (Dkt.

25  55 at 36-37, § IV.B.2 (citing *Index*, 977 F.3d at 832-33).)

26  ─────────────

27  [7] Though Defendants accuse Plaintiffs of ignoring the "crucial fact" that "all of the protests . . . that
    supplied the basis for Plaintiffs' injunction had turned violent before federal officers deployed less-
28  lethal force," this assertion is contrary to the Court's well-founded factual findings (*see, e.g.,* Dkt.
    55 at 15-16) and directly contradicted by video evidence. (*See* Dkt. 49 at 2-3.)

Defendants also argue that the Court's injunction "effectively grants a special right of access and immunity from reasonable crowd-control measures to anyone who satisfies its vague definitions of 'Journalists,' 'Legal Observers,' and 'protestors.'" (Dkt. 58 at 8, § I.B.) This is the same mischaracterization that the Ninth Circuit rejected in *Index Newspapers*, where it explained: "To begin, the Federal Defendants reframe the issue and mischaracterize the preliminary injunction as recognizing a special, across-the-board exemption for members of the press and legal observers." 977 F.3d at 829. In rejecting this contention, the Ninth Circuit held, "the threshold issue presented is whether plaintiffs have a constitutionally protected right to access the public forum where the protests are staged, and as the district court observed, the preliminary injunction does not afford plaintiffs any special rights beyond those enjoyed by the general public pursuant to the First Amendment." *Id*. That is because the press's right of access to report on the protests is independent of protesters' rights to assemble and speak. *See Leigh*, 677 F.3d at 900 ("The district court focused mostly on its conclusion that Leigh was not treated differently than other members of the public, a consideration that is not part of the *Press–Enterprise II* balancing test.").

Finally, Defendants argue that *Index Newspapers* is not binding. (Dkt. 58 at 8-9, §§ I.B-C.) This argument is incorrect for multiple reasons. First, Defendants quote language from a portion of an opinion that was later stricken by the panel that issued the decision. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 656 (9th Cir. 2021) ("*Biden*") (amending and superseding *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) (cited by Defendants as controlling authority on page 9 of their motion)). Second, in the part of *Biden* that superseded the language Defendants cite, the panel held that a "published motions panel order may be binding as precedent for other panels deciding the same issue," *id*., which on this motion is whether to stay the preliminary injunction pending appeal—the precise issue decided in *Index*. Third, the amended *Biden* opinion stated that questions of law decided by a published motions panel decision are binding on a merits panel. 993 F.3d at 657. Finally, the portion of the superseded *Biden* opinion that Defendants rely on addressed whether a decision by a motions panel is *law of the case* for a later merits panel considering an appeal in the same case— neither that opinion nor the amended opinion negates that published motions panel decisions are "binding circuit authority," especially

70-page ones decided after robust briefing and argument, such as *Index. Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001) ("a court confronted with [such] controlling authority must parse the precedent in light of the facts presented and the rule announced"); *see also id.* at 1170 ("caselaw on point *is* the law") (emphasis in original).

In any event, the right-of-access claim in *Index* was predicated on numerous Ninth Circuit and Supreme Court cases. *See* 977 F.3d at 830-34 (discussing, *inter alia*, *Press-Enterprise II* and *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996); *Leigh*, 677 F.3d at 900). Defendants offer no evidence or argument to contest the body of precedent giving rise to *Index*, nor do they meaningfully assail the Ninth Circuit's analysis in *Index*.

### D. Defendants Fail to Prove that They Are Likely to Win on Plaintiffs' Retaliation Claims

Defendants do not make any new arguments about Plaintiffs' First Amendment retaliation claim. Their failure to make new arguments cannot meet their burden of proving that the Court somehow is overwhelmingly likely to have been wrong in its analysis of this claim. This is especially true when the Court carefully analyzed more than 50 declarations (Plaintiffs' and Defendants') and multiple videos and photos and wrote a 45-page Order replete with findings— seven pages of which detailed Defendants' pattern of retaliation. (Dkt. 55 at 27-34, §IV.A.2.)

Defendants argue that their excessive force violates the Fourth Amendment, not the First Amendment. (Dkt. 58 at 9, § I.C.) But as the Court recognized, in the context of a protest, excessive and indiscriminate use of force becomes a way to punish and deter protected speech. (Dkt. 55 at 33, § IV.B.1; *see also Index*, 977 F.3d at 827-29.) As in *Index*, and for the reasons the Court already gave, DHS's repeated use of excessive force on people who were non-violently protesting or reporting on DHS's conduct is strong circumstantial evidence of retaliation. Defendants also mischaracterize the record and this Court's Order by asserting that the Court's sole basis for finding retaliatory intent was DHS's pattern of excessive and indiscriminate force at protests of the agency's raids. The record is also replete with direct evidence of retaliatory animus in the form of official statements *and* evidence of an officially sanctioned policy or practice of

1  retaliation against First Amendment exercise, none of which Defendants rebut. (Dkt. 55 at 34, §

2  IV.B.1; *see also* Dkt. 49 at 5, § I.B.)

3  **II.    THIS COURT'S FACTUAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL
        EVIDENCE**

4
           The Court issued a detailed, 45-page order to support its preliminary injunction ruling,

5  based on a record comprising "dozens of declarations, many of which[,]" on Plaintiffs' side,

6  "include photographs and links to video files." *Index*, 977 F.3d at 822. As in *Index*, the Court's

7  order included "extensive and thorough factual findings" that "detailed . . . declarations, photos,

8  and video clips[.]" *Id.* at 823, 827. Defendants do not attempt to argue that the Court's findings

9  lack basis in evidence but simply fault the Court for drawing inferences that favor Plaintiffs after

10  weighing the extensive record, including the mountain of unrefuted percipient testimony and video

11  evidence supporting Plaintiffs' claims. Defendants' quibbling over the Court's fact-finding

12  misapprehends the standard of review they will face on appeal, *see id.* at 834, and fails to show any

13  likelihood that they will succeed on the merits.

14
           This Court had ample basis to draw a credibility inference against Defendants' declarants.

15  The "high-ranking law enforcement declarants" in question contradict themselves and other DHS

16  officers in significant ways. (*Compare* Dkt. 47-1 at 4, ¶ 15 ("No HSI agent deployed any less-lethal

17  devices, chemical munitions, and/or diversionary devices on June 9, 2025 . . . in Santa Ana"), and

18  Dkt. 11-3 at 4, ¶ 7 ("While some ICE special agents were present [at the Santa Ana Federal

19  Building on June 9], they did not deploy any less lethal munitions and/or crowd control devices"),

20  *with* Dkt. 47-3 at 110-111, Ex. 5 ("On 06/09/2025 . . . in the city of Santa Ana . . . FPS, ERO, and

21  HSI all deployed less lethal munitions. FPS deployed pepper ball and . . . direct impact munitions,

22  while [ICE] ERO and HSI deployed pepper ball and hand thrown CS gas, flash bangs, and 40 MM

23  sponge rounds and tear gas").) To argue that Plaintiffs lack standing, they made representations to

24  the Court stating the opposite of what they declared to another federal court to justify deployment

25  of the National Guard. (*Compare* Dkt. 11-3 at 3, ¶ 5 (stating in this case, on June 19, "the violence

26  at protests and operations in the Los Angeles area ha[d] greatly diminished" since June 8), *with id.*

27  at 3, Ex. 2, ¶ 6  (stating, in *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2250568 (N.D.

28

Cal. July 9, 2025), "that federal facilities in Westwood, Santa Ana, Long Beach, and other locations in California ha[d] been the site of continuing violent protests during the [same] week").) The Court would therefore be justified in rejecting their declarations outright. *See* Ninth Circuit Model Jury Instruction 3.9 ("if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said").

Defendants also fail to show how the Court's order rests on the specific credibility determination they dispute. Defendants admit that DHS agents fired on a crowd of protesters in Paramount on June 7 while both CBP and ICE agents were on scene, but they contest which DHS subcomponents' officers actually "pulled the trigger" as they worked together in concert.[8] They do not explain why the answer matters, when the uncontroverted evidence shows DHS officers across subcomponents, including both CBP and ICE, have repeatedly engaged in the same officially sanctioned pattern of retaliatory force and denial of press access at protests. (Dkt. 55 at 4-17, § II.A.1.a)  Moreover, Plaintiffs have sued the Secretary of DHS and the agency itself, not just some of the subcomponents – so whether it was ICE or CBP officer who engaged in retaliatory actions at a certain protest is irrelevant.

Defendants criticize the Court for crediting the testimony of "many declarants" who consistently swear they did not hear warnings, when "senior [DHS] officers" say DHS did provide such warnings. (Dkt. 58 at 10-11, § I.C.) But the Court was not required to credit the officers' self-serving statements simply because they are DHS officials—especially when they do not even claim to be percipient witnesses and base their declarations on hearsay. *See Alvarez v. Montgomery,* No. 8:15-CV-00987-DMG (KS), 2022 WL 868889 at *19 (C.D. Cal. Jan. 27, 2022), *report and recommendation adopted by* No. 8:15-CV-00987-DMG (KS),  2022 WL 860804 (C.D. Cal. Mar. 23, 2022) ("A fact-finder is not required to credit 'law enforcement officers with the truth simply because they were government agents.'") (quoting *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002); *see also Estate of Casillas v. City of Fresno*, 342 F.Supp.3d 990, 999 (E.D.

---

[8] Contrary to Defendants' assertion (Dkt. 58 at 10, § I.C), Daniel Parra's declaration never states HSI did not use force at the Paramount protest. (*See* Dkt. 47-6.) Parra's declaration states that "agents" used force and makes clear that ICE agents *and* CBP agents comprised the phalanx outside the business park who fired their weapons against the protest. (*Id.* at 3-5, ¶¶ 8, 10.)

1    Cal 2018). More importantly, the Court actually accepted the officers' representations that DHS

2    gave the warnings described in their declarations, while recognizing that such warnings may not

3    always be heard in "dynamic and often rapidly evolving situations." (Dkt. 55 at 41, § IV.E.)

4    Defendants do not show a strong likelihood of success on the merits by mischaracterizing the

5    Court's order to fabricate an immaterial factual dispute.

6         Defendants similarly misrepresent the record by inventing a narrative about Ms. Marantos's

7    actions while she was covering the eastside protest in Camarillo on July 10. Though Defendants

8    cite to Ms. Marantos's declaration to assert that she "positioned herself to block the egress of a law

9    enforcement vehicle that was swarmed by a hostile mob," her declaration says nothing of the sort.

10   Rather, Ms. Marantos, a *Los Angeles Times* reporter, states that she observed that the "law

11   enforcement vehicle," which "had the word 'warden' written on the side," was "stopped" in the

12   road when she arrived and was still in that position "ten to fifteen minutes" later when she was

13   teargassed without warning while standing "close to the truck" "trying to identify what agent [sic]

14   it was from[]." (Dkt. 34-11 at 14-16, ¶¶ 9.) Ms. Marantos never says she blocked the truck nor

15   mentions any "hostile mob" swarming, and the record—including photos of the scene—establishes

16   no "violent crowd" existed. (*See id.* at 2, ¶ 13 (photos); Dkt. 34-24 at 2-3, ¶¶ 9-14; Dkt. 49-4 at 3,

17   ¶¶ 14-15; Dkt. 55 at 16, § II.A.8.b (summarizing other consistent evidence).)

18        Video similarly proves Defendants' accusations against LA Press Club member R.R. are

19   false. (*Compare* Dkt. 58 at 11, § I.D, *with* Dkt. 34-18 at 3, ¶ 8 (showing DHS agents pushing R.R.

20   and a few other journalists and observers from area with no "violent crowd," as he backed up on

21   public city street).) Defendants' persistent recitation of baseless accusations in their briefs does not

22   convert those accusations into evidence undermining the Court's finding that Plaintiffs did not

23   participate in violent riots. *See British Airways Bd. v. Boeing* Co., 585 F.2d 946, 952 (9th Cir.

24   1978) (argument in briefs is not evidence); *see also 99 Westchester Investments, L.P. v. Resort Rac*

25   *Holdings, LLC*, No. 2:03-CV-00839-DSF (SHS), 2005 WL 8252148 at *4 (C.D. Cal. June 17,

26   2005) (court "cannot rely on factual assertions made in briefs").

27        Though Defendants fault the Court for failing to consider "innocent explanations" as to why

28   one of DHS's trained marksmen shot Mr. Beckner-Carmitchel in the head with a teargas canister in

violation of CBP policy (*see* Dkt. 6-3 at 8-9, ¶ 17), they offered no such explanation in their preliminary injunction papers and provide no statement that they conducted any investigation concluding an innocent explanation exists. Mr. Beckner-Carmitchel's photograph of his severe head injury (Dkt. 6-6 at 3, ¶ 15); his testimony about his experience (*id.* at 2-3, ¶¶ 10, 13 (describing "slam" to the head and explosion when he was "at least 20 feet away to the east of where protesters were")); Mr. Kerlikowske's declaration (Dkt. 6-3 at 8-9, ¶ 17 (DHS agents are trained to hit their marks)); and corroborating declarations of seven other witnesses who saw DHS shoot tear gas canisters directly at people at the same protest, including journalists set apart from the crowd (Dkt. 55 at 9-10, § II.A.2; at 32, n.24), all support the Court's finding that DHS shot Mr. Beckner-Carmitchel in the face, nearly blinding him and sending him to the emergency room. Further, as the Court explained, it "appears clear from the video" that DHS officers shot tear gas at clearly-marked press at that protest (*id.* at 9, § II.A.2 (citing Dkt. 6-21 at 1-2, ¶¶ 6–10)), so it was not wrong to infer that they shot at Mr. Beckner-Carmitchel too. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (court should "view[ ] the facts in the light depicted by the videotape," not rely on "fiction"). In light of all the evidence, it is Defendants' baseless attempts to smear Plaintiffs and invent "innocent explanations" for the injuries DHS caused—not the Court's factual findings— that are "illogical, implausible, and without support from the record." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (defining "clear error").

## III.  DEFENDANTS HAVE NOT PROVEN THAT THEY WILL BE IRREPARABLY HARMED BEFORE THE APPEAL IS DECIDED ABSENT A STAY

To justify a stay, Defendants must show that they are likely to suffer irreparable injury "during the period before the appeal is decided." *Index*, 977 F.3d at 824. "Simply showing some possibility of irreparable injury fails to satisfy … [t]he demanding standard applicable here." *Id.* Defendants attempt to meet their heavy burden by reiterating the same workability arguments that the Ninth Circuit rejected in *Index*, and this Court rejected in issuing the preliminary injunction. They ignore that the injunction merely requires them to (1) follow the same terms that the Ninth Circuit upheld in *Index* and (2) comply with their own use-of-force policies. Their arguments are based entirely on unsupported speculation by their own employees. That does not somehow show

1    that the terms of the injunction in *Index*—which now has a lengthy track record of safety—or

2    following their own policies has ever injured them, much less is likely to injure them during the

3    pendency of the appeal. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020)

4    (government's failure to submit evidence of actual injury it experienced since injunction issued and

5    reliance on "only estimates, assumptions, and projections" made for "weak" showing of irreparable

6    harm that did not justify stay).

7          **A.**     **The Injunctive Terms from *Index* Are Workable**

8         As the Court recognized, the first paragraph of its injunction "mirrors the district court's

9    injunction in *Index Newspapers*." (Dkt. 55 at 40, § IV.E.) Defendants first attack this provision by

10   repeating the argument that the Ninth Circuit rejected in *Index Newspapers*[9] and this Court rejected

11   in issuing the preliminary injunction (Dkt. 47 at 25-27, § IV.B.4.a) that in the heat of a protest, law

12   enforcement will be endangered by taking the time to figure out who qualifies as a journalist or

13   legal observer. (Dkt. 58 at 12, § II.) They attempt to support this argument with speculation by

14   federal agents, who lack experience in policing urban unrest. Their speculation fails to undermine

15   the unrefuted testimony from Plaintiffs' expert, Mr. Kerlikowske, and for the same reasons this

16   Court already has given (Dkt. 55 at 40-42, § IV.E; Dkt. 60 at 1), this argument fails. *See Doe #1 v.*

17   *Trump*, 957 F.3d 1050, 1059-60 (9th Cir. 2020) (government cannot meet its burden to show

18   injunction will irreparably harm it "by submitting conclusory factual assertions and speculative

19   arguments that are unsupported in the record").

20        Foremost, as this Court observed in denying Defendants' motion for ex parte relief, the

21   various declarations they have submitted "identify no instance (postdating the Court's injunction)

22   where Defendants have suffered any harm as a result of the injunction." (Dkt. 60 at 1.) That fact,

23   alone, defeats their entire stay motion.

24

25   [9] *See Index*, 977 F.3d at 834-35 ("The Federal Defendants contend the district court abused its
     discretion because the scope of the injunction is unworkable. Specifically, they argue the injunction
26   will force federal officers to make snap judgments to distinguish journalists and legal observers
     from protesters. They argue federal officers will face irreparable injury absent a stay pending
27   appeal because the preliminary injunction will hinder their ability to safely protect federal property
     and people on federal property, and will generally place them in the untenable position of having to
28   choose between risking their safety and violating the preliminary injunction.").

Moreover, the Court was correct to reject Defendants' recycled workability theories. None

of their prior declarations or "new" ones identifies any incident where this injunction caused any

injury to law enforcement or presented actual workability concerns.

First, Mr. Kerlikowske's unrebutted expert testimony shows that he repeatedly oversaw

protests in Seattle that exceeded 50,000 people, and that in those protests, the police did not

disperse reporters or legal observers, and this practice did not endanger his officers. (Dkt. 49-1 ¶ 4;

Dkt. 34-26 ¶ 31.) He further opines that complying with the injunction should be safe for properly

trained personnel. (Dkt. 34-36 ¶ 4.) This unrefuted expert testimony defeats Defendants'

speculation about what might happen to DHS employees whom Mr. Kerlikowske used to

command, who lack such experience. (Dkt. 49-1 ¶¶ 6-9.)

Second, it is also unrefuted that City of Portland followed the same injunction for more than

a year—including during 100 days in a row of large, volatile, and chaotic Black Lives Matter

protests in 2020—before changing its police directives to adopt the terms of the injunction as the

City's permanent policy. (Dkt. 6-3 ¶ 28; Dkt. 34-36 ¶ 31.) They ignore that California law imposes

similar requirements on police, as have other courts. (Dkt. 49 at 13, § IV.) These facts, too, refute

Defendants' unsupported speculation.

Third, Defendants ignore that in *Index Newspapers*, DHS, itself, operated safely under the

same injunctive terms applying to reporters and legal observers. It did so between July 23, 2020,

when the district court in *Index* issued the same TRO, and August 27, 2020, when the district

court's preliminary injunction was temporarily stayed by the Ninth Circuit, and after October 29,

2020, when the Ninth Circuit denied DHS's stay motion.

As the Ninth Circuit explained in rejecting DHS's same arguments:

> Plaintiffs' expert, Gil Kerlikowske, also seriously undermined the
> Federal Defendants' argument that they faced irreparable injury.
> Relying on Kerlikowske's expert opinion, the district court concluded
> that the Federal Defendants' concerns regarding the workability of
> the injunction were exaggerated. The district court noted
> Kerlikowske's statement that "during his tenure in Seattle, law
> enforcement did not target or disperse journalists and there were no
> adverse consequences." Kerlikowske opined that the prohibitions
> contained in the July 23 temporary restraining order, which the
> district court incorporated into the preliminary injunction, were both

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

1   safe and workable for law enforcement. Kerlikowske stated that
2   dispersing press and legal observers is not necessary to protect public
    safety, and further explained that trained and experienced law
3   enforcement personnel can differentiate press from protesters in the
    heat of crowd control.

4   *Index*, 977 F.3d at 836. The same facts remain true here.

5       Defendants offer no meaningful proof to the contrary; they only postulate about

6   hypothetical situations that have never occurred. For example, they argue that someone *might* use

7   false press credentials or simply wait off to the side "identifying themselves as a journalist before

8   unleashing their attack." (Dkt. 58 at 13, § II.) But they offer no proof that anyone has actually done

9   anything like this at any time this injunction has been in effect. Moreover, the express terms of the

10  injunction would enable Defendants to arrest such a person. (Dkt. 55 at 43, ¶ 1.)[10] They claim that

11  before the injunction was issued, a female journalist supposedly "dispers[ed] a small object" that

12  contacted a DHS officer's arm in a non-harmful way. (Dkt. 47-3 at 3, ¶ 4 & Ex. 1; Dkt. 58 at 14, §

13  II.) But nothing in the injunction facilitated such alleged conduct. Nor would it prevent DHS from

14  using less lethal weapons against a journalist (or a person pretending to be one) if they pose an

15  imminent threat of injury under provisions 2 and 3 of the Preliminary Injunction. Nor would the

16  injunction have prevented DHS from arresting the person described by the unknown agent in Mr.

17  Scharmen's hearsay declaration or from using force within the reasonable bounds set out in the

18  injunction (which are consistent with DHS policy) if it actually had a legitimate reason to do so.

19  **B.    Requiring Defendants to Comply with Their Own Use-of-Force Policy Is Workable**

20      Defendants similarly fail to prove that they will be injured by complying with their own use

21  of force policies.

22      **Paragraphs 2 and 3**. The second and third paragraphs of the injunction prohibit using less

23  lethal weapons on people who "are not themselves posing a threat of imminent threat of harm to a

24

25  _____

26  [10] As explained by Mr. Kerlikowske: "It appears that there were a few incidents where someone at
    the protest was engaged in a crime, but there is nothing in the proposed preliminary injunction to
27  prevent such an individual from being arrested and charged. It is quite common in some protests
    for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, but
28  those are just the general nature of some protests. They do not have anything to do with the
    proposed preliminary injunction." (Dkt. 34-26 at 22, ¶ 59.)

law enforcement officer or another person" (¶ 2), and firing such weapons at identified targets if doing so would result in harm to people who are not posing an imminent threat to law enforcement or others, "unless such force is necessary to stop an immediate and serious threat of physical harm to a person." (¶ 3.) Defendants argue that "Given the legitimate law enforcement action of pushing back the crowd and the shielded rioters therein, restricting officers' ability to use crowd control devices is impractical." (Dkt. 58 at 14, § 2.)

Defendants' position that they will use crowd control weapons to disperse or push back crowds of people engaged in speech they want to suppress or as "compliance tools" against such individuals (Harvey Decl. ¶ 10), explains why injunctive relief is appropriate. *See Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (qualified immunity does not protect officer for shooting plaintiff with pepper ball after plaintiff allegedly failed to heed dispersal order); *Sanderlin v. Dwyer*, 116 F.4th 905, 915 (9th Cir. 2024) (firing "a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors" constitutes unreasonable force) (citation omitted). As this Court correctly found, such use of less lethal weapons violates Defendants' own policies. (Dkt. 55 at 40, § 2.E, quoting CBP Use of Force Policy at 246, 249–51 (restricting the use of pepper spray to "subject[s] offering, at a minimum, active resistance" and restricting compressed air launchers, munitions launchers, and flash-bang grenades to "subject[s] offering, at a minimum assaultive resistance"); id. at 289 (defining assaultive resistance as "a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self").)[11]

"The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Collins*, *v. Jordan*, 110 F.3d 1363, 110 F.3d at 1371-72 (9th Cir. 1996)."The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to

---

[11] The Ninth Circuit has recognized that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson*, 685 F.3d at 881.

1    arrest those who actually engage in such conduct, rather than to suppress legitimate First

2    Amendment conduct as a prophylactic measure." *Id*. at 1372 (citing *Cox v. Louisiana*, 379 U.S.

3    536, 551 (1965)). As detailed in Mr. Kerlikowske's unrebutted testimony, "Less lethal weapons

4    should not be used as 'compliance tools.' Nor should they be used on someone for disobeying a

5    lawful order to disperse or stop blocking a road. Trespassing is just a minor infraction. It should not

6    be met with less-lethal force, which, as I pointed out in my original declaration, can sometimes be

7    deadly. Less-lethal force should only be used on aggressive individuals who pose an immediate

8    threat to law enforcement or to prevent an assault." (Dkt. 49-1 at 2-3, ¶ 10; *see also* Dkt. 34-26 ¶ 14

9    ("If a specific person is doing something dangerous, such as throwing fireworks, it is not

10    permissible to fire less-lethal projectiles into a crowd to try to stop that person because it could

11    cause serious injury to people who are not engaged in unlawful activities. An individual who is a

12    threat from hurling objects, or using fireworks as a weapon, should be specifically identified. Any

13    less-lethal projectile should be directed to them and not fired generally into the crowd. Even when

14    the individual is identified, it may not be possible to fire the less-lethal projectile because of that

15    person's use of the general crowd as cover.").)

16        In paragraph 12 of the Molina Declaration, Defendants recount an alleged incident they

17    decided not to bring to the Court's attention in the preliminary injunction briefing where one

18    person was allegedly actively resisting arrest by holding on to a fence and another person was

19    trying to help him by striking an officer. (Dkt. 58-4 at 5-6, ¶ 12.) As noted above, there is nothing

20    in the injunction that would prevent them from arresting someone—which is the appropriate thing

21    to do when someone is breaking the law—or to use targeted force against someone assaulting them

22    (Kerlikowske Supp. Decl. (Dkt. 49-1 at 3, ¶ 12), and without understanding more about the

23    incident, pepper spraying someone for simply holding a fence may not be a necessary or lawful use

24    of force. *See Headwater Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002).

25        Paragraph 2 of the new Scharmen Declaration offers vague descriptions of two alleged

26    incidents on September 1 and 7, 2025. Neither of these incidents is described with any detail or

27    show that the injunction is somehow unworkable. For example, it says that on September 7, a DHS

28    agent "deployed PepperBall … against a single individual who was attempting to climb over the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

security fence." (Dkt. 58-3 at 2, ¶ 2.) It is not clear if the agent shot the pepper ball near the person

or at him, in violation of DHS policy. It is also not clear whether the person posed an immediate

threat of physical harm, or whether officers could apprehend him after he finished scaling the

fence. This hardly meets their burden of showing that the injunction would irreparably harm them.

**Paragraph 4**. Paragraph four of the injunction requires Defendants to give two audible

warnings before using force and to give the targeted individuals time to avoid the use of force

"unless the threat is so serious and imminent that a warning is infeasible." (Dkt. 55 at 43 § V ¶ 4.)

Defendants do not dispute that their own policies require giving warnings when feasible, but claim

that this would invite "he-said-she-said disputes." (Dkt. 58 at 15, § II.) That is hardly an irreparable

injury and easily could be overcome through documenting such warnings. And as discussed in

Section I, E., above, whatever supposed warnings Defendants claim to have provided have been

insufficient to put the people whom DHS has been targeting on notice.

**Paragraph 5**. Defendants claim that they already comply with this provision, which comes

directly from their own policies. (Dkt. 58 at 15-16.) They claim that it is "unnecessary and

unwarranted" but fail to show that it would somehow cause them irreparable harm. They are also

incorrect that it is unwarranted given the mountain of evidence that they shot people in the head

and other sensitive areas of the body. (*See* Dkt. 55 at 31-32, 42.)

## IV.    PLAINTIFFS WILL BE SUBSTANTIALLY INJURED BY A STAY

Defendants do not even attempt to address the third *Nken* factor: "whether issuance of the

stay will substantially injure the other parties interested in the proceeding." *Nken*, 556 U.S. at 426.

As this Court correctly held (Dkt. 55 at 37-38, § C-D), because the loss of First Amendment

freedoms, "even for minimal periods of time, unquestionably constitutes irreparable injury," a party

can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence

of a "colorable First Amendment claim." *Index Newspapers*, 977 F.3d at 837-38 (quotation marks

omitted); *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005). For the reasons stated in

Section IB., above, Plaintiffs will be unlawfully chilled from exercising their First Amendment

rights and face repeated injury, including severe and potentially lethal harm (Dkt. 55 at 21, § I.B),

if the injunction is stayed. Plaintiffs would thus be substantially injured by a stay.

## V.   A STAY IS CONTRARY TO THE PUBLIC INTEREST

Under the fourth *Nken* factor, Defendants must prove that "issuance of the stay will [not] substantially injure" Plaintiffs or the public. *Nken*, 556 U.S. at 433-35. Defendants attempt to collapse this inquiry with their irreparable harm (Dkt. 58 at 12-16, § II)—which they also fail to prove for the reasons above (*see supra,* p. 14-19, § II)—and cannot carry their separate burden under this prong of *Nken*. Without the injunction, Plaintiffs risk injury and death, and so does any member of the public who wishes to protest or report on the ongoing ICE raids.

Further, in the context of preliminary injunctions, courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted); *Index Newspapers*, 977 F.3d at 837-38. That is why, when a plaintiff "raise[s] serious First Amendment questions," … the balance of hardships "tips sharply in [the plaintiff's'] favor." *Cmty. House, Inc v. City of Boise*, 490 F.3d at 1041, 1059 (9th Cir. 2007) (alterations in original) (quotation marks omitted). And it is "always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting injunction under Fourth Amendment).

The Ninth Circuit has repeatedly emphasized the importance of protests and the press in our constitutional democracy. *Collins*, 110 F.3d at 1372 ("Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events."); *id*. at 1371 ("A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger") (cleaned up); *Index*, 977 F.3d at 831 ("[T]he press has long been understood to play a vitally important role in holding the government accountable"); *Leigh*, 677 F.3d at 900 ("The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press.").

Not only do speakers have a right to speak and press a right to observe, but the public also has a right to know. *Grosjean v. Am. Press Co*., 297 U.S. 233, 250 (1936) (striking down tax on

1    press because it would "limit the circulation of information to which the public is entitled in virtue

2    of the constitutional guaranties") (emphasis added). Indeed, the "Constitution specifically selected

3    the press . . . to play an important role in the discussion of public affairs" to serve as "a powerful

4    antidote to any abuses of power" by "keeping officials elected by the people responsible to all the

5    people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (citation

6    omitted). "Filming the police contributes to the public's ability to hold the police accountable,

7    ensure that police officers are not abusing their power, and make informed decisions about police

8    policy." *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017). Thus, "excluding the

9    media from public fora can have particularly deleterious effects on the public interest." *Index

10   Newspapers*, 977 F.3d at 830.

11        The media's role in informing the public is especially important here, where the protests

12   and the federal responses have been issues of nationwide political debate. "The Free Speech Clause

13   exists principally to protect discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S.

14   786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public

15   issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S.

16   254, 270 (1964). It is "[p]remised on mistrust of governmental power." *Citizens United v. Fed.

17   Election Comm'n*, 558 U.S. 310, 340 (2010). "[I]t furthers the search for truth," *Janus v. Am. Fed'n

18   of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), and "ensure[s] that . . .

19   individual citizen[s] can effectively participate in and contribute to our republican system of self-

20   government." *Globe Newspaper*, 457 U.S. at 604. Unless Plaintiffs' First Amendment rights are

21   protected, the public's ability to participate meaningfully as citizens in a constitutional democracy

22   will be severely diminished.

23                                    **<u>CONCLUSION</u>**

24        For the foregoing reasons, Defendants' motion should be denied.

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION

1    Dated: September 29, 2025                    Respectfully submitted,

2                                                 BRAUNHAGEY & BORDEN LLP

3                                                 By: */s/ Matthew Borden*
                                                      Matthew Borden

4                                                 *Attorneys for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' APPLICATION TO STAY PRELIMINARY INJUNCTION