# EXHIBIT 1

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 1 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 2 of 43   Page ID
#:1579

ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS, LLC, *et al.*, | Case No. 3:20-cv-1035-SI |
| Plaintiffs. | |
| | **FEDERAL DEFENDANTS' OPPOSITION TO A PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF PORTLAND, *et al.*, | |
| Defendants. | |

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 2 of 42
Case 2:25-cv-05563-HDV-E    Document 64-4    Filed 09/29/25    Page 3 of 43   Page ID
#:1580

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................ 5

I.     PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE
MERITS. ................................................................................................................ 6

    A.   Plaintiffs lack standing to pursue injunctive relief. ..................................... 6

    B.   Plaintiffs are unlikely to succeed on their access claim. ........................... 10

    C.   Plaintiffs are unlikely to succeed on their retaliation claim. ..................... 15

II.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM. ... 21

III.   THE BALANCE OF THE EQUITIES FAVORS FEDERAL DEFENDANTS. ............. 26

IV.   THE PROPOSED INJUNCTION IS UNWORKABLE AND LAWLESS. ..................... 26

    A.   The proposed terms of the PI are unjustified. ............................................ 27

    B.   The PI would be just as unworkable as the TRO was. ............................... 30

CONCLUSION ........................................................................................................... 35

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 3 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 4 of 43   Page ID
#:1581

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................. 19

*Babbitt v. United Farm Workers,*
    442 U.S. 289 (1979) ................................................................................... 7

*Barney v. City of Eugene,*
    20 F. App'x 683 (9th Cir. 2001) ............................................................. 16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................. 19

*Blair v. Shanahan,*
    38 F.3d 1514 (9th Cir. 1994) ..................................................................... 8

*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) ........................................................... 21, 27

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ................................................................................. 13

*Cal. First Amendment Coal. v. Calderon,*
    150 F.3d 976 (9th Cir. 1998) ................................................................... 13

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ..................................................................... 5

*Capp v. City of San Diego,*
    940 F.3d 1046 (9th Cir. 2019) ........................................................... 16, 19

*Cent. Delta Water Agency v. United States,*
    306 F.3d 938 (9th Cir. 2002) ..................................................................... 6

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ........................................................................... passim

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................... 6

*Colten v. Kentucky*,
    407 U.S. 104 (1972) .................................................................................... 12, 13, 15

*Curtis v. City of New Haven*,
    726 F.2d 65 (2d Cir. 1984) ......................................................................... 9

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) ..................................................................................... 6

*Eggar v. City of Livingston*,
    40 F.3d 312 (9th Cir. 1994) ....................................................................... 9

*Feiner v. New York*,
    340 U.S. 315 (1951) .................................................................................. 26

*For The Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................. 21

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ..................................................................... 5

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .................................................................................. 11

*Hicks v. City of Portland*,
    No. CV 04-825-AS, 2006 WL 3311552 (D. Or. Nov. 8, 2006) ......................... 11, 13

*Int'l Soc. For Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) .................................................................................. 26

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ................................................................... 26

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ............................................................. 12, 14

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ................................................................... 5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................... 6

*Madsen v Women's Health Center*,
    512 U.S 753 (1994) .................................................................................. 14

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 5 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 6 of 43   Page ID
#:1583

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ........................................................................ 10

*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
    192 F.3d 1283 (9th Cir. 1999) ...................................................................... 15

*Menotti v Seattle,*
    409 F.3d 1113 (9th Cir. 2005) ................................................................ 11, 16

*Mims v. City of Eugene,*
    145 F. App'x 194 (9th Cir. 2005) ................................................................. 16

*Murphy v. Kenops,*
    99 F. Supp. 2d 1255 (D. Or. 1999) ................................................................ 9

*Nelsen v. King County,*
    895 F.2d 12448 (9th Cir. 1990) ..................................................................... 7

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................................... 25

*Olagues v. Russoniello,*
    770 F.2d 791 (9th Cir. 1985) ....................................................................... 22

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) .................................................................................... 7, 8

*Perry v. Los Angeles Police Dep't,*
    121 F.3d 1365 (9th Cir. 1997) ..................................................................... 14

*Press-Enterprise Co. v. Superior Court of California,*
    478 U.S. 1 (1986) ................................................................... 12, 14, 15, 24

*Rendish v. City of Tacoma,*
    123 F.3d 1216 (9th Cir. 1997) ..................................................................... 22

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.,*
    593 F.2d 1030 (D.C. Cir. 1978) ................................................................... 13

*Ringgold-Lockhart v. Cty. of Los Angeles,*
    761 F.3d 1057 (9th Cir. 2014) ..................................................................... 26

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ....................................................................................... 8

Case 3:20-cv-01035-SI    Document 138    Filed 08/12/20    Page 6 of 42
Case 2:25-cv-05563-HDV-E    Document 64-4    Filed 09/29/25    Page 7 of 43    Page ID
#:1584

*Rosenblum v. Does 1–10*,
    2020 WL 4253209 (D. Or. July 24, 2020) ........................................................ 7, 8, 9

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ................................................................................................. 7

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ............................................................ 26, 28, 29, 31

*Thomas v. Cty. of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992) ................................................................................ 10

*United States v. Griefen*,
    200 F.3d 1256 (9th Cir. 2000) ........................................................................ 11, 26

*United States v. Christopher*,
    700 F.2d 1253 (9th Cir. 1983) .............................................................................. 11

*Updike v. Multnomah Cty.*,
    870 F.3d 939 (9th Cir. 2017) .................................................................................. 7

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ................................................................................ 22

*Washington Mobilization Committee v. Cullinane*,
    566 F.2d 107 (D.C. Cir. 1977) ........................................................................ 14, 15

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................................ 6, 7

*Williams v. Birmingham Bd. Of Educ.*,
    904 F.3d 1248 (11th Cir. 2018) .............................................................................. 9

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................... 5, 22

**STATUTES**

18 U.S.C. § 111 ........................................................................................................... 26

40 U.S.C. § 1315(a) .................................................................................................... 11

**RULES**

Fed. R. Civ. P. 65(d)(1)(C) .................................................................................. 27, 28

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 7 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 8 of 43   Page ID
#:1585

## INTRODUCTION

Plaintiffs face an extraordinarily high burden in seeking to enjoin future law enforcement activity in this action.  They must, among other requirements, demonstrate the threat of irreparable harm, a likelihood of success on the merits, and that the injunction they seek is in the public interest.  Plaintiffs have satisfied none of these requirements.  Focusing on a few isolated instances of conflict, which they generally mischaracterize as evidence of intentional targeting of members of the media and legal observers with force, and in utter denial of the mountain of evidence that Defendant federal agencies do not have a policy of intentionally targeting members of the media when engaging in crowd control efforts, Plaintiffs extrapolate through speculation that such an intentional, institutional effort to retaliate exists.  It does not.  Nor does their claim of violation of their right of access hold water.  The truth is that Plaintiffs have been present in an incredibly chaotic environment where law enforcement and violent, agitating participants in the protests have clashed.  What is more, Plaintiffs can only speculate—wildly—about the likelihood that, notwithstanding the weeks of protests and federal efforts to achieve de-escalation, they somehow face a threat of irreparable harm by way of physical injury or impediment to their media activities at future protests.  The facts marshalled before the Court demonstrate just how speculative, and therefore without merit, that soothsaying is.  Plaintiffs have fallen well short of meeting their burden to demonstrate an entitlement to injunctive relief.  Their request for a preliminary injunction should be denied.

## BACKGROUND

For over two months, Portland witnessed daily protests in its downtown area. Declaration of Gabriel Russell ¶ 3, Federal Protective Service Regional Director, ECF No. 67-1 ("Russell July 21 Decl."); Declaration of Allen Scott Jones ¶ 3, Federal Protective Service Deputy Director

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 1

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 8 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 9 of 43   Page ID
#:1586

for Operations (Exhibit 1) ("Jones Aug. 12 Decl."). While the majority of individuals

participating in these daily protests were peaceful, the protests devolved into nightly criminal

activity, including vandalism, destruction of property, looting, arson, and assault. Russell July 21

Decl. ¶ 3. Federal buildings and property were the targets of many of these attacks. *Id.* ¶ 4.

Officers protecting these properties were subjected to threats, rocks and ball bearings fired with

wrist rockets, improvised explosives, aerial fireworks, commercial-grade mortars, high-intensity

lasers targeting officers' eyes, full and empty glass bottles, and balloons filled with paint and

other substances such as feces. *Id.* In one incident, a protester wielding a two-pound

sledgehammer struck an officer in the head and shoulder when the officer tried to prevent the

protester from breaking down a door to the Hatfield Courthouse. *Id.* As of July 29, at least 120

federal law enforcement officers had been injured during the riots. Declaration of Gabriel Russell

¶ 4, ECF No. 101-5 ("Russell July 29 Decl.").  Injuries to law enforcement officers include

broken bones, hearing damage, eye damage, puncture wounds, lacerations, a dislocated shoulder,

sprains, strains, and contusions. *Id.*

  In response to the damage to federal property and assaults on federal law enforcement

officers, DHS deployed federal officers to Portland to protect federal buildings and property;

there are law enforcement officers from the Federal Protective Service (FPS), U.S. Immigration

and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and the US

Marshals Service (USMS) protecting federal facilities. *Id.* ¶ 5. As discussed in Federal

Defendants' opposition to the TRO, federal officers frequently faced violent riots aimed against

federal officers and federal property, and federal officers frequently needed to issue orders to

disperse and use crowd-control methods to protect themselves and federal property. ECF No. 67

at 4–6.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 2

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 9 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 10 of 43   Page ID
#:1587

Prior to July 29, the lack of engagement by state and local police left federal law enforcement officers largely unsupported in defending federal property and the persons within from the nightly violent protests they faced. On July 22, the Portland City Council directed the Portland Police Bureau (PPB) not to assist federal law enforcement in their efforts to protect federal property and the people within federal property. Jones Aug. 12 Decl. ¶ 6. In response, when the violent protests plaguing the federal buildings continued, it was necessary for the federal government to deploy large numbers of federal law enforcement officers to protect against those violent protests. *Id.* After the PPB stopped assisting federal efforts to protect federal property and persons, there was a substantial increase in violent attacks on federal law enforcement and federal property during the night after peaceful daytime protests. *Id.* ¶ 7.

On July 29, senior DHS officials and the Governor of Oregon met to work out an agreement regarding the situation in Portland. *Id.* ¶ 8. Under that plan that DHS and the state agreed to, Oregon State Police would be responsible for crowd control and law enforcement in the area surrounding the federal courthouse, which would allow federal law enforcement to limit their presence to the courthouse itself and the courthouse grounds. *Id.*  Both the Department of Homeland Security and the Governor of Oregon announced that plan on July 29.[1] Although there was some public disagreement about the exact scope of the plan and its terms, both DHS and Oregon agreed that the state police would be increasing its operations and that Federal

---

[1] *See* Press Release, Chad R. Wolf, Acting Secretary Wolf's Statement on Oregon Agreeing to Cooperate in Quelling Portland Violence (July 29, 2020), https://www.dhs.gov/news/2020/07/29/acting-secretary-wolfs-statement-oregon-agreeing-cooperate-quelling-portland; Press Release, Kate Brown, Governor Kate Brown Announces Phased Withdrawal of Federal Law Enforcement from Portland (July 29, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=37043.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 3

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 10 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 11 of 43   Page ID
#:1588

Defendants would no longer have to shoulder as much of the burden in response to violent protesters.

Since the Oregon agreement, the security situation has improved dramatically, as anticipated. Beginning on July 30, state and local police took numerous actions to counter the nightly attacks on the federal courthouse. The morning of July 30, the PPB and the county sheriff's department dispersed the illegal encampment in Lownsdale Park across from the courthouse, which had been used as a logistics encampment and staging area for the nightly violent attacks on the federal courthouse.  Jones Aug. 12 Decl. ¶ 9. And beginning at approximately 4:00 pm on July 30, the Oregon State Police took over primary law enforcement responsibility for the city property around and within the temporary federal fence line surrounding the federal courthouse. *Id.* The state police also communicated to FPS that the state police would respond to any instances of criminal activity directed at the federal courthouse or at the nearby Edith Green-Wendell Wyatt Federal Building. *Id.*

In the two weeks that have followed, the conditions and security situation at the federal courthouse have dramatically improved, making a PI inappropriate. Federal officers no longer face unchecked violent protests targeting the federal courthouse every night. Quite to the contrary, as the Jones declaration sets forth, since July 30, federal officers have had only six use-of-force incidents, two deployments of the Quick Response Force, and six Task Force arrests. *Id.* ¶ 11. Federal law enforcement officers' engagement with protesters has diminished to practically nothing. DHS has reported that the only incident resulting in damage to federal property at the Hatfield Courthouse involved protesters cutting a hole in the mesh in a security fence. *Id.* ¶ 12. When DHS leadership determines that the security of federal facilities in Portland is no longer at

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 4

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 11 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 12 of 43   Page ID
#:1589

risk, FPS will begin to release the DHS component law enforcement personnel who are currently assigned to protecting those facilities. *Id.* ¶ 10.

Despite the dramatically improved situation, Plaintiffs now seek a preliminary injunction. They contend that individual law enforcement officers retaliated against Plaintiffs during the protests in mid-July for exercising their First Amendment rights to participate in the protests as journalists and legal observers. Although the federal courthouse is no longer targeted for unchecked nightly violent protests that gave rise to this complaint, Plaintiffs contend that the mere presence of federal law enforcement officers in Portland is a threat to those who seek to exercise their First Amendment rights.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important factor." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). As explained below, Plaintiffs cannot meet this demanding standard.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 5

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 12 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 13 of 43   Page ID
#:1590

# I.   PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs have not shown a likelihood of success on the merits. They cannot show that, at the time they added Federal Defendants to the lawsuit, they faced an imminently certain risk of harm sufficient to give them standing to pursue injunctive relief. And regardless, they cannot show a likelihood that they will prevail on their First Amendment claims.

## A.   Plaintiffs lack standing to pursue injunctive relief.

Plaintiffs lack standing to pursue injunctive relief, because they fail to show that they faced an imminently certain risk of harm when they added Federal Defendants to this suit. The standing inquiry asks "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Although the standing inquiry is focused on the filing of the lawsuit, Plaintiffs cannot rely on conclusory allegations in their Complaint about the risk of future harm; the requirements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

Plaintiffs have not carried their burden to show that the "threatened injury" is "*certainly impending*" and not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Because Plaintiffs have provided only bare-bones factual descriptions of a handful of isolated past incidents, paired with mere speculation about federal officials' motivations, they have failed—indeed, failed even to try—to show that future injury against any Plaintiff is "certainly impending."

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 6

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 13 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 14 of 43   Page ID
#:1591

Where, as here, a party seeks prospective equitable relief, they must make "allegations of

future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Environment,*

523 U.S. 83, 109 (1998). While allegations of past injury might support a remedy at law,

prospective equitable relief requires a claim of imminent future harm. *City of Los Angeles v.*

*Lyons,* 461 U.S. 95, 105 (1983). As the Supreme Court held in *Whitmore,* allegations of possible

future injury do not satisfy the requirements of Article III. A threatened injury must be "certainly

impending" to constitute injury in fact. 495 U.S. at 158 (quoting *Babbitt v. United Farm*

*Workers,* 442 U.S. 289, 298 (1979)). For a plaintiff to have standing, an alleged injury must be

"concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lyons,* 461 U.S. at 101–

02. Even if a plaintiff establishes that his rights were violated in past incidents, he nonetheless

lacks standing to obtain prospective injunctive relief absent a "real and immediate threat" that he

will suffer the same injury in the future. *Id.* at 105.

It is therefore well established that a plaintiff lacks standing to obtain prospective

injunctive relief for alleged future injuries based on allegations of prior harm. *Lyons,* 461 U.S. at

101–02; *Nelsen v. King County,* 895 F.2d 12448, 1251 (9th Cir. 1990); *Rosenblum v. Does 1–10,*

2020 WL 4253209, *6 (D. Or. July 24, 2020). As a result, to invoke Article III jurisdiction, a

plaintiff in search of prospective equitable relief must show a significant likelihood and

immediacy of sustaining some direct injury. *Updike v. Multnomah Cty.,* 870 F.3d 939, 947 (9th

Cir. 2017) ("[S]tanding for injunctive relief requires that a plaintiff show a 'real and immediate

threat of repeated injury.'" (quoting *O'Shea v. Littleton,* 414 U.S. 488, 496 (1974))).

Moreover, the plaintiff seeking injunctive relief must show not just that the predicted

*injury* will reoccur, but also that the plaintiff himself will suffer it. *See, e.g.,* *Updike,* 870 F.3d at

948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 7

"insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought); *Rosenblum*, 2020 WL 4253209 at *6 (plaintiff seeking injunctive relief must show "real or immediate threat that [he] will be wronged again" (alteration in original) (quoting *Lyons*, 461 U.S. at 106)). That other individuals might suffer future harm does nothing for a plaintiff's own standing.

The facts and reasoning of *Lyons* are instructive. At issue in *Lyons* was a civil rights action against the City of Los Angeles and several police officers who allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Lyons*, 461 U.S. at 104; *see also O'Shea*, 414 U.S. at 495-96; *Rizzo v. Goode*, 423 U.S. 362, 372 (1976) (holding that plaintiffs' allegations that police had engaged in widespread unconstitutional conduct aimed at minority citizens was based on speculative fears as to what an unknown minority of individual police officers might do in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that plaintiffs lack standing to pursue prospective injunctive relief where they were subject to past law enforcement practices but could only speculate as to whether those practices would recur.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 8

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 15 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 16 of 43   Page ID
#:1593

*See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994); *Rosenblum*, 2020 WL

4253209 at *6–7; *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or. 1999). *See also*

*Curtis v. City of New Haven*, 726 F.2d 65, 68 (2d Cir. 1984) (vacating an injunction that had

been entered against police use of mace, because the plaintiffs had not shown a "likelihood that

these plaintiffs will again be illegally assaulted with mace"); *Williams v. Birmingham Bd. Of*

*Educ.*, 904 F.3d 1248, 1267 (11th Cir. 2018) (plaintiff alleging that a school resource officer

employed by the police unconstitutionally used an incapacitating chemical spray on her lacked

standing to pursue injunctive relief, because she did not show that a likelihood that the resource

officer would again unconstitutionally spray her).

Plaintiffs have failed to show that they have standing to pursue injunctive relief in this

case. In their reply in support of their TRO, they claimed that the threatened future injury was

that they would suffer "unconstitutional use of targeted force to suppress their exercise of their

First Amendment rights." ECF No. 79 at 7. Plaintiffs' speculation of future harm therefore relied

on a chain of contingencies at least as uncertain as those in *Lyons*: for any named Plaintiff to

suffer a future injury of First Amendment retaliation, protests would need to break out, *and* that

Plaintiff would need to cover the protest, *and* that protest would need to turn destructive or

violent, *and* that destruction and violence would need to target federal property or federal

officers, *and* federal officers would need to use orders to disperse and crowd control tactics, *and*

individual federal officers would need to use that law enforcement response as cover to

deliberately target journalists and legal observers as retaliation for their newsgathering or

observing function, *and* one of the named Plaintiffs would need to be so targeted.

Plaintiffs have attempted to dodge this jurisdictional bar in the past by claiming that

future harm is imminently certain because Federal Defendants have "a policy" of "violently

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 9

Case 3:20-cv-01035-SI    Document 138    Filed 08/12/20    Page 16 of 42
Case 2:25-cv-05563-HDV-E    Document 64-4    Filed 09/29/25    Page 17 of 43    Page ID
#:1594

dispersing journalists and legal observers." *Id.* at 5–6. That is false, but it also misses the point;

Plaintiffs' claims of First Amendment retaliation require not just a showing that journalists and

legal observers will be harmed as part of a police response to criminal activity, but that the harm

to the journalist or legal observer will be motivated by a desire to punish that person's disfavored

First Amendment activity. Having failed to produce a shred of evidence that Federal Defendants

have a policy of directing or permitting such retaliation—and in the face of Federal Defendants'

longstanding policies protecting the First Amendment, *see infra*—Plaintiffs now admit that their

claim is based not on an official policy of retaliation, but on an assertion that "officers have

exercised their discretion in an arbitrary and retaliatory fashion to punish journalists for

recording government conduct." ECF No. 133 at 32. That claim, that individual law enforcement

officers' alleged past misconduct was ad hoc and not pursuant to policy, is an admission that

Plaintiffs cannot show a likelihood of future harm. *See Melendres v. Arpaio*, 695 F.3d 990, 997

(9th Cir. 2012) (plaintiff needs to show "a written policy" or a "pattern of officially sanctioned []

behavior"); *Lyons*, 461 U.S. at 106 (plaintiff allegedly subjected to illegal chokehold would have

to "make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke

any citizen with whom they happen to have an encounter, whether for the purpose of arrest,

issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to

act in such manner"); *Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992) (finding

injunctive standing where police misconduct was "condoned and tacitly authorized by

department policy makers").

## B.    Plaintiffs are unlikely to succeed on their access claim

Plaintiffs argue that Federal Defendants are dispersing everyone indiscriminately,

"without differentiating among protesters, rioters, journalists, and legal observers." ECF No. 133

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 10

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 17 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 18 of 43   Page ID
#:1595

at 18. But the press have no special right to remain in or access a location that has been lawfully

closed to the general public by a lawful order to disperse. Throughout this litigation Plaintiffs

have not challenged that the federal government may order violent crowds to disperse, not only

on its own property (which is clear), *see United States v. Christopher*, 700 F.2d 1253, 1259-61

(9th Cir. 1983) (upholding conviction for trespassing for soliciting signatures on government

property outside of normal business hours), but also in adjacent spaces from which those violent

crowds could attack federal property and the law enforcement officers protecting it, *see* 40

U.S.C. § 1315(a). Indeed, this Court's TRO opinion assumed that federal law enforcement

officers may lawfully issue orders to disperse.  ECF No. 84 at 18, 20. And there is no dispute that

public demonstrations must yield to a valid emergency order to prevent violence, protect

property, or for public safety concerns.  *See, e.g.*, *See, e.g.*, *Grayned v. City of Rockford*, 408

U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as

expression under the First Amendment"); *United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir.

2000) (upholding the relocation of protesters who "had already shown by their destructive

conduct that they presented a clear and present danger to the safe completion of the construction

project, both to other persons as well as to themselves"); *Menotti v Seattle,* 409 F.3d 1113, 1155

(9th Cir. 2005) (declining "to hold unconstitutional the City's implementation of procedures

necessary to restore safety and security" when confronted by protesters with "violent and

disruptive aims" that "substantially disrupt civic order"); *Hicks v. City of Portland*, No. CV 04-

825-AS, 2006 WL 3311552, at *12 (D. Or. Nov. 8, 2006) ("Plaintiff had no protected First

Amendment to enter the street in violation of a lawful order to disperse.").

     Even if this Court believes that the right-of-access precedents are applicable in this

context, which Federal Defendants dispute, Plaintiffs' claim to a special right of access under

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 11

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 18 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 19 of 43   Page ID
#:1596

*Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986) ("*Press-Enterprise II*")

and *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), is unsound. A party claiming that a right

of access for the public exists under those cases must show that "the place and process have

historically been open to the press and general public" and that "public access plays a significant

positive role in the functioning of the particular process in question." *Id.* at 898 (quoting *Press-

Enterprise II*, 478 U.S. at 8–9). If that qualified right exists, the government can overcome it by

showing "an overriding interest based on findings that closure is essential to preserve higher

values and is narrowly tailored to serve that interest." *Id.* (quoting *Press-Enterprise II*, 478 U.S.

at 9). Plaintiffs fail at every step.

      First, as discussed above, Plaintiffs cannot show that an unlawful gathering subjected to a

legitimate dispersal order is a "place and process" that has "historically been open to the press

and general public." Quite the contrary; as discussed earlier, the power of the police to disperse a

criminal gathering—even from streets and parks ordinarily open to the public—is well

established. It is inherent to such a lawful dispersal order that the assembled people in the

unlawful gathering are not welcome to stay. Plaintiffs do not dispute that the issuance of a

dispersal order is lawful, nor do they claim that Federal Defendants issued dispersal orders

without justification in the past alleged incidents they identify. Instead, they ask for an expansion

of *Press-Enterprise II* and *Leigh*, seemingly under the theory that those cases should recognize a

special right of access for press even if the place and process have not historically been open. But

not only would that ignore the first part of the *Press-Enterprise II* test, it would also contradict

Supreme Court precedent rejecting the claim of special First Amendment rights to ignore

dispersal orders. *See Colten v. Kentucky*, 407 U.S. 104, 106–09 (1972) ("no constitutional right

to observe the issuance of a traffic ticket or to engage the issuing officer in conversation" after

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 12

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 19 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 20 of 43   Page ID
#:1597

being ordered to disperse); *see also Hicks*, 2006 WL 3311552, at *12 (holding that plaintiff who

"stepped into the street to see 'what was going on'" had "no protected First Amendment to enter

the street in violation of a lawful order to disperse" (citing *Colten*, 407 U.S at 109)).

Moreover, a person's membership in the press confers no special rights over and above

what they have as members of the general public. *See, e.g.*, *Cal. First Amendment Coal. v.

Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (collecting Supreme Court cases and quoting

*Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("[T]he First Amendment does not guarantee the

press a constitutional right of special access to information not available to the public

generally.")); *Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030,

1051 (D.C. Cir. 1978) (collecting cases and noting that "the freedom to gather information

guaranteed by the First Amendment is . . . [s]ubject to the general and incidental burdens that

arise from good faith enforcement of otherwise valid criminal and civil laws"). Members of the

press thus have no special right to ignore lawful orders to disperse.

Plaintiffs likewise would fail the second requirement of *Press-Enterprise II*—that "public

access plays a significant positive role of the functioning of the particular process in question"—

because such a finding is inherently inconsistent with an order to disperse. Plaintiffs' argument

requires finding that there is a general right of the public not just to witness dispersal, but to be

within the dispersed crowd (or between officers and the dispersed crowd) without themselves

being dispersed. That is an argument that officers cannot order violent or unlawful crowds to

disperse. Plaintiffs appear to assert that the *Press-Enterprise II* inquiry requires the government

to justify not just the dispersal order generally but also its application to each member of an

unlawful gathering, but that is neither the law of dispersal orders nor the law of *Press-Enterprise

II*.  While the press may descriptively serve as "surrogates for the public" and "guardian[s] of the

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 13

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 20 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 21 of 43   Page ID
#:1598

public interest," they have only the same right to "public access" that the general public has.

*Leigh*, 677 F.3d at 900. There is no basis in law for allowing an unlimited number of individuals

acting as journalists to ignore an order to disperse because of their desire to observe.

Even assuming that the right-of-access inquiry were appropriate, it would still be

appropriate to allow dispersal of press along with members of the public.  *See Press Enterprise

II*, 478 U.S. at 9 (affirming that the qualified right of access may be overcome where "closure is

essential to preserve higher values and is narrowly tailored to serve that interest."). The interest

being vindicated is not "in shooting people clearly marked as press or legal observers," as

Plaintiffs misstate it. ECF No. 133 at 20. Rather, as they acknowledge, the interest is "in

protecting federal property or protecting [federal agents]." *Id.*; *accord Madsen v Women's Health

Center,* 512 U.S 753, 768 (1994) (finding the government "has a strong interest in ensuring the

public safety and order, in promoting the free flow of traffic on public streets and sidewalks.");

*Perry v. Los Angeles Police Dep't,* 121 F.3d 1365, 1369 (9th Cir. 1997) ("A government interest

in protecting the safety and convenience of persons using a public forum is a valid government

objective."); *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 119 (D.C. Cir.

1977) (stating that it is "axiomatic" that "the police may, in conformance with the First

Amendment, impose reasonable restraints upon demonstrations to assure that they be peaceful

and not obstructive"). And in this case, officers know that individuals are falsely certifying

themselves as press to avoid law enforcement, Russell July 29 Decl. ¶ 8, making it even more

appropriate for dispersal to apply even to people marked as press.

That leaves Plaintiffs' argument that the dispersal is not narrowly tailored. ECF No. 133

at 21–23. But an order to disperse is already as narrowly tailored as is practicable. Tear gas, for

example, cannot be aimed at protesters but not the adjacent press representatives. More

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 14

importantly, as Federal Defendants have repeatedly emphasized, there are serious problems with

simply allowing people claiming to be press to remain while federal officers must attempt to

examine whether they are press and maneuver around them while making split-second decisions

associated with use-of-force decisions. In their latest motion, Plaintiffs offer nothing to solve

these problems. They simply suggest, without elaboration, that "[p]olice have several options for

doing so safely." *Id.* at 22. They call these options "obvious," *id.*, but cannot identify one.

      **C.**      **Plaintiffs are unlikely to succeed on their retaliation claim**

Plaintiffs assert that the numerous alleged instances of force against journalists add up to

a clear showing of retaliation against the journalists and legal observers for conducting the

protected First Amendment activities of newsgathering and recording federal agents at protests.

Plaintiffs must show that (1) they were engaged in a constitutionally protected speech; (2) that

the protected activity was a substantial or motivating factor in the officers' conduct; and (3) that

the officers' actions would chill a person of ordinary firmness from continuing to engage in that

activity. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).

Preliminarily, Plaintiffs have not established that a First Amendment inquiry is even

appropriate for their allegations. Without a lawful right of access, Plaintiffs are lawfully subject

to orders to disperse. Their obligation at such times would be to vacate the area. The First

Amendment does not entitle Plaintiffs to ignore such lawful orders. *See Colten*, 407 U.S. at 109.

There is thus no First Amendment inquiry to be made.

Even if Plaintiffs' conduct were protected by the First Amendment during an order to

disperse, the next question would be whether the plaintiff has established that "by his actions the

defendant deterred or chilled the plaintiff's political speech and such deterrence was a substantial

or motivating factor in the defendant's conduct." *Mendocino Envtl. Ctr.*, 192 F.3d at 1300.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 15

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 22 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 23 of 43   Page ID
#:1600

Plaintiffs cannot succeed on their claim if they cannot establish that the use of force was

"anything other than the unintended consequence of an otherwise constitutional use of force

under the circumstances." *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001)

(rejecting First Amendment retaliation claim where "protesters were warned repeatedly to clear

the street or tear gas would be deployed, and there is no dispute that a small group of the crowd

became violent"); *see also Mims v. City of Eugene*, 145 F. App'x 194, 196 (9th Cir. 2005)

(holding that use of a crowd control team "in full riot gear was not a disproportionate response

and does not indicate preexisting hostility toward the protestors' views"). As the Ninth Circuit

has recognized, the unlawful actions of a few may impair the ability of others to exercise their

rights:

> In balancing desired freedom of expression and the need for civic
> order, to accommodate both of these essential values, a measure of
> discretion necessarily must be permitted to a city, on the scene with
> direct knowledge, to fashion remedies to restore order once lost. It
> may be that a violent subset of protesters who disrupt civic order
> will by their actions impair the scope and manner of how law-
> abiding protesters are able to present their views.

*Menotti v Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005) (declining "to hold unconstitutional the

City's implementation of procedures necessary to restore safety and security" when confronted

by protesters with "violent and disruptive aims" that "substantially disrupt civic order").

## 1. Plaintiffs are unlikely to establish that any harm was motivated by retaliatory animus.

Plaintiffs have failed to provide evidence or allegations showing that retaliatory animus

was a substantial or motivating factor in Federal Defendants' actions. *Capp v. City of San Diego*,

940 F.3d 1046, 1058 n.6 (9th Cir. 2019) (collecting cases). Federal Defendants will prevail if

they "were motivated primarily by their legal obligation" to protect others, themselves, and

federal property. *Id.* at 1057.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 16

Plaintiffs' case is entirely circumstantial; they have mustered no direct evidence that agents' use of crowd-control methods was motivated by a desire to punish Plaintiffs for their newsgathering or observing. And their argument depends on pairing circumstantial evidence with either of two false premises: (1) that there was "no conceivable alternative target" when the journalists/observers were struck with munitions from federal agents; and (2) no munition fired by a federal agent could conceivably strike anything unless specifically intended to do so. Federal Defendants address these premises in turn.[2]

Plaintiffs argue that a retaliatory motivation can be inferred because there was "no conceivable alternative target" for the "dozens of incidents where the federal agents shot, beat, or intimidated someone clearly marked as a reporter or legal observer." ECF No. 133 at 16 n.6 (citing *id.* at 14 n.4 (citing *id.* at 13 n.2)). But Plaintiffs' declarations prove the opposite: that the declarant journalists and observers were embedded among, and immediately adjacent to, the non-journalist protesters.  Indeed, in *every* video Plaintiffs submitted with their motion for contempt in which a journalist or observer was alleged to be hit by projectiles or spray fired by federal officers, the journalist was standing between federal officers and protestors, and in some cases was also immediately next to or behind protestors resisting being dispersed.[3] Moreover, some of

---

[2] There is also circumstantial evidence cutting against Plaintiffs' claims of a policy of targeting the press. *See, e.g.*, Conley Decl. ¶ 23, ECF No. 87 ("As federal agents retreated, one camouflaged agent stopped to shine his light on me. I told him I was press. He was apologetic and told me he had to double check.").

[3] *See* Ellis Decl. ¶ 4, ECF No. 88 (video shows protestors only a few yard behind her, individuals without press indicia walk in front of her); Mahoney Decl. ¶ 9, ECF No. 94 (video shows protestors immediately behind her and to her right, no view of her left; mace or pepper spray stream goes above her); Knivila Decl. ¶ 4, ECF No. 92 (protestors immediately behind at, *e.g.*, 6:46, 8:25); Conley Decl. ¶¶ 8, 10, ECF No. 87 (audio demonstrates a substantial crowd behind him; video shows that he is at some times behind protestors and then next to protestors with shields); *id.* ¶ 21 (video shows that he is immediately behind and then next to several protestors

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 17

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 24 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 25 of 43   Page ID
#:1602

those same videos show *other* press and individuals recording standing off to the side, next to

federal officers, and safe,[4] while other clips from the same press members show that federal

officers moved around them and let those press members walk behind them as they dispersed

crowds.[5] Moreover, that was precisely the same situation with Lewis-Rolland in the only

incident analyzed by Plaintiffs in their first motion for a TRO, ECF No. 54 at 11—when he was

allegedly shot by federal officers, he was between them and a crowd that he was running toward.

Lewis-Rolland Decl. ¶ 5, ECF No. 44.  While Federal Defendants do not concede that the facts

are established for any of these alleged instances of retaliation, the evidence shows the situations

are nothing like the incidents Plaintiffs relied on at the first TRO hearing and which the Court

relied upon in entering that TRO, ECF No. 84, such as the alleged incident where a journalist

was standing with only a crowd of journalists, was told by one federal officer near him to stay

where he was, and was then shot by another officer right next to the first, Howard Decl. ¶¶ 4-7,

ECF No. 58.

　　　　The situations suggest an obvious, plausible, and non-retaliatory explanation for any

journalist(s) struck by federal agents' munitions: *it was inadvertent*. For instance, many of the

---

on his right at the start, some remain at his left, and there is a large crowd a block behind him);
Nicholson Decl. ¶¶ 3, 7, ECF No. 95 (video shows she mixes with and then is at the front of a
large crowd all around her, including someone blinding the federal officer with a strobe light);
Hollis Decl. ¶ 7, ECF No. 91 (video shows a large crowd behind him).

[4] *See, e.g.*, Conley Decl. ¶ 21, ECF No. 87 (video shows press standing next to federal officers
on right side of video, recording officers shooting); Hollis Decl. ¶ 7, ECF No. 91 (video shows
reporters recording on the left).

[5] *See, e.g.*, Conley Decl. ¶ 13, ECF No. 87 (video shows federal officers maneuvering around
him and other press, advancing past them and then shooting); *id.* ¶ 15 (he and other press walk
alongside and behind advancing federal officers who are shooting, though he repeatedly tries to
move in front of those officers); Grinnell Decl. ¶ 6, ECF No. 90 (video shows federal officers
moving press a few feet to ensure they could use their crowd control devices safely; he and other
press then are left in place as federal officers advance past them).

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 18

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 25 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 26 of 43   Page ID
#:1603

same videos show journalists obscured by tear gas, too far from federal officers to observe press passes or even lettering, or blinded by lasers, strobe lights, or exploding fireworks. [6] To a law-enforcement officer beset for weeks by violence, fires, projectiles, and lasers, peering through the lens of a gas mask in the dead of night, small indicia might easily go unnoticed. *See* CBP NZ-1 Decl. ¶ 14, ECF No. 101-6. That federal agents would misperceive a journalist/observer as a protester, or would expose that journalist/observer to a crowd-control method only incidentally, is far more plausible in these circumstances than Plaintiffs' conjectural hypothesis. The Supreme Court has admonished that an allegation is not plausible where there is an "obvious alternative explanation" for alleged misconduct. *Capp*, 940 F.3d at 1055 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). At a minimum, that alternative plausible explanation makes clear that Plaintiffs have not carried their burden of showing a likelihood of success on the merits.

Plaintiffs also argue that "federal agents are highly skilled marksmen with accurate weapons," and infer from that that if a federal agent "hit[s] a journalist or legal observer, it is because they intend[ed] to do so." ECF No. 133 at 17. But by their own admission, many of the munitions at issue—particularly tear gas (including multiple projectile versions) and pepper balls—are designed to be fired at group and area targets. The impacts cannot be confined to

---

[6] *See, e.g.*, Ellis Decl. ¶ 4, ECF No. 88 (although only wearing a press pass, video shows she was at least 30 yards from federal officers and only yards from the crowd); Knivila Decl. ¶ 4, ECF No. 92 (video shows officers attacked by lasers, gas canisters thrown or gas blown back at them, and mortars; also shows officer using spray had to have his gas mask lens wiped down because covered with unknown substance); Conley Decl. ¶¶ 8, 10, ECF No. 87 (video shows he was occluded by tear gas cloud, federal officers were assaulted by lasers); *id.* ¶ 21 (video shows he was occluded by tear gas or smoke); Nicholson Decl. ¶¶ 3, 7, ECF No. 95 (although she was wearing only an NLG hat, video shows federal officer was being blinded with bright strobe light); Hollis Decl. ¶ 7, ECF No. 91 (video shows officers being assaulted by lasers).

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 19

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 26 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 27 of 43   Page ID
#:1604

*certain* members of the group targeted. *See, e.g.* Knivilia Decl. ¶ 7, ECF No. 92 ("He may or may not have intended to aim at me, but I was in his line of fire and suffered the effects of the tear gas.").

Ultimately, Plaintiffs have no direct evidence of retaliatory animus. The circumstantial evidence that they muster depends on two false premises, both dispelled above. They are unlikely to succeed on this claim.

Not satisfied merely to opine that threadbare declarations regarding discrete police uses of crowd-control tactics show a hidden retaliatory motivation, Plaintiffs delegate that task to Gil Kerlikowske, ECF No. 135. Plaintiffs do not purport to present Kerlikowske as an expert witness, so his speculation about the declarations in this case is not appropriate or helpful. And on the subject of retaliation, his analysis consists of nothing more than reading the declarations and opining that it sounds like retaliation to him. The methods applied in reaching those conclusions are not disclosed, and Kerlikowske provides no explanation for how he has any special ability to infer retaliation from the same declarations that are before this Court. His declaration should be ignored as improper, unhelpful, and inadequate.

## 2. Federal Defendants have shown that there is no policy permitting retaliation.

As discussed in response to Plaintiffs' lack of standing, they cannot pursue injunctive relief against Federal Defendants for ad hoc alleged unconstitutional actions by individual officers. Plaintiffs must show that officers' application of DHS or USMS policy ensures retaliation will happen in the future. Yet the evidence produced so far in this case shows that Federal Defendants expressly prohibit such behavior and take great pains to ensure that First Amendment rights are protected.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 20

As discussed Federal Defendants' opposition to the TRO, both DHS and USMS have formal use-of-force policies that prohibit using force in retaliation for First Amendment activities. ECF No. 67 at 7–9; ECF No. 67-5 (DHS use-of-force policy); ECF No. 67-6 (DHS First Amendment policy); ECF No. 67-07 (USMS use-of-force policy).  Contrary to Plaintiffs' assertions, the record reflects that Federal Defendants' policies and practices relating to the First Amendment are the opposite of what Plaintiffs presume. Federal law enforcement officers are highly trained and Defendants' policies are carefully crafted to comport with the law and best practices for law enforcement.[7]  Even if they somehow were not, and even if they could reflect some room for improvement as a matter of public policy—which Plaintiffs have failed to show—they clearly refute the notion that Defendants engage in First Amendment retaliation as it pertains to Plaintiffs' claims.

## II.  PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To establish a likelihood of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). Separate from any Article III standing concerns, where "there is no showing of any real or immediate threat that the plaintiff will be wronged again,"

---

[7] Plaintiffs' declarant Gil Kerlikowske repeatedly accuses federal law enforcement officers of being poorly trained. He provides no basis for that conclusion, and it is belied further by materials already produced to Plaintiffs during discovery showing the extensive training requirements for federal law enforcement officers. *See* Exhibit 2.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 21

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 28 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 29 of 43   Page ID
#:1606

there is no irreparable injury supporting equitable relief. *Lyons*, 461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985).

Plaintiffs have two theories of irreparable harm, both fatally deficient. First, Plaintiffs contend that even a "colorable claim" that they have suffered a past infringement of the First Amendment means "they have satisfied the irreparable-injury requirement." ECF No. 133 at 23. That is incorrect for multiple reasons. A likelihood of irreparable injury is prospective, not retrospective; a plaintiff must show that he "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 374. Also, there is no presumption of irreparable injury for a First Amendment retaliation claim. *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) ("[N]o presumption of irreparable harm arises in a First Amendment retaliation claim."). And finally, Plaintiffs rely on a misreading of *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). There, a prison inmate had demonstrated a likelihood of irreparable injury by showing "that the exercise of his religious beliefs has been infringed," which sufficed for a showing of future harm because the infringement was the he was experiencing "continual punishment" for violating a grooming policy that "his religion forbids him" from complying with. *Id.* His claim of irreparable injury therefore did not rely on a past injury, but on the certainty in the record that his religious beliefs and the policy would continue to be in conflict. Plaintiffs have not shown that Federal Defendants have a policy directing or permitting the retaliatory targeting of journalists, so that case is no help to them.

Plaintiffs' second theory of irreparable injury is that they will suffer First Amendment violations at the hands of federal law enforcement officers in future protests. In light of the factual developments discussed *supra*, it is apparent that Plaintiffs face no likelihood of irreparable injury. It is undisputed that, since July 30, Federal Defendants have had to make only

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 22

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 29 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 30 of 43   Page ID
#:1607

extremely limited responses to lawless activity aimed at federal property. Jones Aug. 12 Decl.

¶¶ 11–12. It is Plaintiffs' obligation to present facts showing a likelihood, not merely a remote

possibility, that the alleged behavior they complain of will reoccur. They have not done so.

Every indicator is that Plaintiffs' chances of encountering Federal Defendants at a violent protest

outside of the Hatfield Courthouse have reached a low point—certainly, Plaintiffs have presented

no evidence to show that the chance of encountering a federal agent at a violent protest is

markedly higher on August 20, 2020, as it would have been on any given August day in 2019 or

2018. And Plaintiffs could not possibly believe that, if the situation remained exactly as it is for

the next year, they could obtain an injunction in August 2021 on the basis of the alleged events

that ended in July 2020.

      Yet Plaintiffs are indeed advancing a theory that the mere presence of federal officers

shows a likelihood of irreparable harm because of speculation that individual officers will

someday commit ad hoc violations of people's rights at future protests and that one of the named

plaintiffs will be targeted in that fashion. The Supreme Court in *Lyons* expressly rejected the idea

that an individual citizen faces a likelihood of irreparable harm just because there's a generalized

risk that law enforcement officers may one day act unconstitutionally. *Lyons*, 461 U.S. at 111

("[A] federal court may not entertain a claim by any or all citizens who no more than assert that

certain practices of law enforcement officers are unconstitutional."). Plaintiffs therefore miss the

mark in attempting to disprove an assertion that was never made; Federal Defendants' argument

has never been that Portland will one day be empty of federal officers, but only that the changed

circumstances since July 30, including the abatement of unchecked violent protests targeting the

courthouse, has made future irreparable injury less and less likely.


FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 23

Case 3:20-cv-01035-SL    Document 138    Filed 08/12/20    Page 30 of 42
Case 2:25-cv-05563-HDV-E    Document 64-4    Filed 09/29/25    Page 31 of 43    Page ID
#:1608

Finally, in an effort to muddy the waters around the clear picture in Portland, Plaintiffs

lob accusations of mendacity at Federal Defendants' declarants. It would be impossible in a

single motion to address all of Plaintiffs' misrepresentations regarding the factual record, but a

few accusations bear mentioning as examples of Plaintiffs' unfounded and retaliatory swings at

federal law enforcement officers. As discussed at the August 6 hearing, Plaintiffs' reply brief

supporting the TRO extension contained myriad misrepresentations of Mr. Russell's deposition

testimony and his declarations. Plaintiffs repeat them now. For example, Plaintiffs accused Mr.

Russell of falsely attesting in a past declaration that he had "personally observed" certain

incidents, but then admitting in deposition that "he had 'personally observed' only videos that

others had taken." ECF No. 123 at 11; *see also* ECF No. 133 at 28. What Plaintiffs willfully omit

is that, in Mr. Russell's declaration, he expressly identified and describes the exact videos that he

observed, with hyperlinks. Russell July 29 Decl. ¶ 8. Likewise, Plaintiffs accused Mr. Russell of

having "curious gaps" regarding those videos, ECF No. 123 at 11–12—saying that Mr. Russell

"knew nothing about many of the videos he claimed he had watched," *id.* at 5—but they present

only evidence that, when questioned from memory about a series of videos he had viewed days

prior, Mr. Russell wasn't immediately able to recall minor collateral details such as which videos

were compilations, or which hyperlink led to a YouTube channel homepage instead of a

particular video within that channel. *See* Russell Dep. Trans. 108–11, ECF No. 124-2. As

evidence of dishonesty, those examples say nothing about Mr. Russell.

Another example discussed at the August 6 hearing bears mention, because it is another

unfounded accusation that Federal Defendants addressed yet Plaintiffs now repeat. Plaintiffs

asserted in their reply supporting the TRO extension that officer NZ-1 had advanced "a

fabrication" in his sworn declaration regarding a self-identified member of the press "getting

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 24

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 31 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 32 of 43   Page ID
#:1609

behind BORTAC lines" with a firearm. ECF No. 123 at 5. The NZ-1 declaration stated clearly

that the BORTAC SOG officers—law enforcement officers within DHS—"moved past the

individual" while pushing back the rest of the crowd "[a]fter seeing the word 'PRESS'" on the

individual's shield. NZ-1 Decl. at 2, ECF No. 101-6. The BORTAC SOG officers later saw

"U.S. Marshal Service employees taking the subject into custody." *Id.* Plaintiffs declare that the

arrest record for that individual showed that "the USMS tactical team established a perimeter"

and that the arrested person "never breached that perimeter." ECF No. 123 at 10. That story is in

fact completely consistent with NZ-1's declaration—the armed protester was allowed past DHS

officers because he was marked as press, and he was then arrested by USMS officers who were

defending the courthouse. In light of Plaintiffs' repeated unfounded accusations of mendacity,

this Court should be skeptical of further accusations of dishonesty.

It is Plaintiffs' burden to show a likelihood of irreparable harm absent an injunction, but

the only evidence on future harm is Federal Defendants' voluminous evidence showing that any

potential future harm is contingent, speculative, and ultimately unlikely. Plaintiffs' theory of

irreparable harm is that the mere presence of law enforcement officers within the state is enough

to give this Court carte blanche to govern all operations of federal law enforcement operations

through judicial diktat.

## III.     THE BALANCE OF THE EQUITIES FAVORS FEDERAL DEFENDANTS.

Plaintiffs have not shown that the public interest or the balance of the equities[8] justifies

imposing another layer of restrictions on Federal Defendants' lawful efforts to protect federal

---

[8] The balance of the equities and the public interest are analyzed together here because, when the
government is a party, these last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).
FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 25

property. Federal agents have deployed to protect various federal properties, including the

Hatfield Federal Courthouse and the Edith Green Federal Building, in response to violent rioting.

Rioters have vandalized and threatened to severely damage those buildings, and they have

assaulted the responding federal officers. The government has a comprehensive interest in

maintaining public order on public property. *Feiner v. New York*, 340 U.S. 315, 320 (1951).

There is an even more pointed public interest when disorder threatens the integrity of that public

property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000). Congress has

recognized such interests, including by making the destruction of federal property and the assault

of federal officers felonies punishable by lengthy sentences of up to ten and twenty years of

imprisonment respectively. 18 U.S.C. §§ 111, 1361. Additionally, there is a fundamental First

Amendment right of access to the courts, *see, e.g.*, *Ringgold-Lockhart v. Cty. of Los Angeles*, 761

F.3d 1057, 1061 (9th Cir. 2014), which is jeopardized by the breach and destruction of a federal

court building; it is in the public interest to prevent the violation of *these* rights, too. Moreover,

the federal government, just as any other property owner, has an interest in "preserv[ing] the

property under its control for the use to which it is lawfully dedicated." *Int'l Soc. For Krishna

Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992). On balance, it is clearly in the public

interest to ensure federal officers can disperse violent opportunists near courthouses and federal

buildings when those events have turned and may continue to turn violent.

## IV.      THE PROPOSED INJUNCTION IS UNWORKABLE AND LAWLESS.

Plaintiffs' requested preliminary injunction does not satisfy the requirements from

granting equitable relief. Injunctive relief "must be tailored to remedy the specific harm alleged."

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (quoting *Lamb-Weston, Inc. v.

McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)). A preliminary injunction must be

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 26

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 33 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 34 of 43   Page ID
#:1611

designed "to preserve the status quo ante litem"—that is, "the last uncontested status which

preceded the pending controversy"—"pending a determination of the action on the merits."

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016). A preliminary injunction

also must "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P.

65(d)(1)(C). Those conditions are not satisfied here.

### A.     The proposed terms of the PI are unjustified.

The first paragraph contends that journalists and legal observers should be exempt from

an order to disperse, but Plaintiffs have not shown that journalists have a legal right to disobey

orders to disperse, nor have Plaintiffs shown that federal law enforcement officers ever issued an

order to disperse as a means of targeting journalists' and legal observers' First Amendment

rights. They therefore cannot show that the requested relief would preserve the status quo or be

tailored to the harm alleged. The same is true for the second paragraph, which states that federal

law enforcement officers should be prohibited from seizing photographic equipment, recording

equipment, or press passes. Plaintiffs have not shown that federal law enforcement officers have

been seizing such equipment without justification. That same deficiency makes the fourth

paragraph improper; Plaintiffs have not shown that federal officers have wrongfully arrested a

journalist or legal observer, so it would be premature for the PI to mandate any special new

procedures for that situation. The third paragraph suffers from the same problems and is also

overbroad, because it does not permit federal officers to order a journalist to move even for

safety or security reasons—as written, this provision would prohibit officers from requiring

journalists to clear a street even to make way for an ambulance.

The fifth and sixth paragraphs of Plaintiffs' suggested PI—listing the means of

identifying a journalist or a legal observer—are improper for numerous reasons. Not only are

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 27

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 34 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 35 of 43   Page ID
#:1612

they based on the flawed legal premise that journalists and legal observers have special rights in

protests, but those terms do not "describe in reasonable detail … the act or acts restrained or

required." Fed. R. Civ. P. 65(d)(1)(C). Federal officers cannot be put at the risk of contempt for

failing to anticipate what this Court might consider sufficient indicia of being a journalist,

especially if one of those indicia is "some degree of physical separation from protesters." Federal

officers would be put to the choice of either risking contempt or ignoring any protester who is an

undefined distance from other protesters, or who has a lanyard or a badge.

The seventh paragraph of the proposed PI—that federal officers be tagged with

identifying numbers—has myriad problems that Federal Defendants outlined in detail in their

opposition to extending the TRO. ECF No. 113 at 18–20. First and most importantly, it is not

"tailored to the specific harm alleged." *Stormans*, 586 F.3d at 1140. Plaintiffs have never

asserted that it is unlawful for federal officers not to have large visible unique identifiers, nor

have Plaintiffs ever explained how the lack of those identifiers creates a cognizable harm; their

basic assertion is that such identifiers would be good, which is not enough. Furthermore,

Plaintiffs have not rebutted the evidence showing that officers' uniforms could not accommodate

these new large identifiers without interfering with access to operational gear, exposing officers

to retaliation, and allowing violent mobs to estimate the size of the police force. ECF No. 113 at

19 (collecting declarations). Plaintiffs have not come forward with any proposal that addresses

those problems, instead criticizing Federal Defendants for not offering up a solution to a problem

that is inherent to Plaintiffs' proposals. Finally, federal law enforcement officers in Portland are

generally already marked with unique identifiers for operational purposes; magnifying and

relocating those numbers would thus serve even less of a purpose. *Id.*; Declaration of CBP SOG-

1 ¶¶ 5, 7, 9 (Exhibit 3); Declaration of Brian S. Acuna ¶¶ 6–9 (Exhibit 4); Declaration of David

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 28

Case 3:20-cv-01035-SI    Document 138    Filed 08/12/20    Page 35 of 42
Case 2:25-cv-05563-HDV-E    Document 64-4    Filed 09/29/25    Page 36 of 43    Page ID
#:1613

L. Olson ¶¶ 7–10 (Exhibit 5); Declaration of Jeffrey C. Perry ¶¶ 6–7 (Exhibit 6); Declaration of

CBP SOD-1 ¶¶ 4, 6 (Exhibit 7).

The eighth paragraph of the proposal, that Federal Defendants be restricted to federal

property while carrying or using a crowd-control device, is not tailored to the harms alleged in

this case, nor does it secure some status quo in which federal officers were not permitted to leave

federal property. If Plaintiffs want a declaration that federal officers lack the authority to leave

federal property as part of their law-enforcement duties, or that federal officers cannot use

crowd-control devices in response to violent protests, Plaintiffs should bring that case; they

cannot shoehorn those new and wild theories into this one.

The ninth paragraph of Plaintiffs' desired PI presents itself as a safe harbor, but it is a

false one. Even though that paragraph purports to protect federal officers when a member of the

press or a legal observer is "incidentally exposed" to a crowd-control device, Plaintiffs'

interpretation of the TRO in their contempt motion shows that they believe any exposure to a

crowd-control device is inherently deliberate and retaliatory. Without an unambiguous statement

in the PI stating that officers can use crowd-control methods on unlawful assemblies regardless

of what color hat or vest the participants wear, this term does not mitigate the PI's problems.

Finally, the tenth paragraph of the proposed PI—which purports to prospectively deny

qualified immunity in future *Bivens* actions—has no basis in law. As explained more fully in

Federal Defendants' TRO opposition, ECF No. 113 at 24–26, a single district court lacks the

ability to clearly determine law for purposes of qualified immunity, and any discussion of

qualified immunity would be an advisory opinion in this case because no *Bivens* action is

present. Federal Defendants hereby incorporate by reference the fuller discussion of the

infirmities presented in that filing. *Id.*

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 29

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 36 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 37 of 43   Page ID
#:1614

**B.** **The PI would be just as unworkable as the TRO was.**

Although Plaintiffs request even more unjustified additions to the PI, they are building on

the foundation of the fundamentally unworkable TRO. Throughout this litigation, Federal

Defendants have amassed a great deal of evidence showing that the terms of the TRO were

unmanageable when federal law enforcement officers were required to respond to unchecked

violent protests. Plaintiffs' request for a preliminary injunction rests on speculating that Federal

Defendants will once again find themselves responsible for responding to unchecked violent

protests, yet Plaintiffs have not produced any evidence showing that the terms of the TRO would

now be manageable were such a situation to arise.

As Federal Defendants' motion for reconsideration, ECF No. 101, and opposition to the

extension of the TRO, ECF No. 113, make plain, the special privileges granted to press and legal

observers created substantial operational difficulties for officers responding to mass lawlessness.

And seeing the special privileges available to the press, some lawbreakers donned press

markings to insulate themselves from law-enforcement activities.

This Court's TRO was premised on two assumptions: First, that law enforcement officers

would not be impeded in their duties by the special treatment mandated for people self-

identifying as press. And second, that people would mark themselves as "press" only if they

were engaged in bona fide press activities and were not engaged in lawless behavior. The

evidence supplied by Federal Defendants shows that neither assumption was borne out. It would

therefore be improper to impose a PI that repeats the mistakes of the TRO.

**1.** **Special privileges for self-designated members of the press inhibit law**
**enforcement operations.**

If Federal Defendants are once again faced with violent attacks on the federal

courthouse—an unlikely event, given the recent quiet surrounding the federal courthouse—

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 30

Case 3:20-cv-01035-SL   Document 138   Filed 08/12/20   Page 37 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 38 of 43   Page ID
#:1615

attempting to comply with the TRO will hamstring federal officers in their duties and endanger the safety of both officers and purported members of the press. When federal officers were responding to the violent protests that targeted the federal courthouse before July 30, individuals identifying as members of the press repeatedly placed themselves between federal officers and protesters posing an imminent threat. Declaration of CBP NZ-1 ¶ 11, ECF No. 101-6; Russell July 29 Decl. ¶ 8(a); Declaration of FPS Badge # 824 ¶ 5(a), ECF No. 101-3. Such individuals were also often in the middle of crowds of violent protesters, not physically separated, impeding dispersal and endangering officers who were attempting to determine whether individuals refusing lawful orders were covered by the TRO. CBP NZ-1 Decl. ¶¶ 12-13; Russell July 29 Decl. ¶ 8(a), (g); Declaration of FPS Badge # 882 ¶ 5(c), ECF No. 101-4; FPS Badge # 824 Decl. ¶ 5(c). Indeed, officers were assaulted by some of these individuals while attempting to determine if they were in fact journalists, impeding the officers' ability to accomplish their duties and putting them in danger. CBP NZ-1 Decl. ¶ 13. Finally, under the chaotic circumstances of the protests, it was difficult for officers, who are often wearing gas masks and laser protective goggles, to verify small indicia of press membership that may have been present on certain members of crowds. *Id.* ¶ 14. It was particularly difficult for officers to make these determinations while remaining a safe distance away from crowds to employ crowd control devices in a manner that was safe for both the crowd and the officers. *Id.*

Even though these problems were laid out in Plaintiffs' opposition to extending the TRO, ECF No. 113 at 10–13, Plaintiffs have failed to rebut that evidence. They have only two responses in their motion now. First, they contend that the TRO currently in place "does not prohibit law enforcement from going after wrongdoers, even if they are standing near or behind press." ECF No. 133 at 29. But that is not responsive to the concern that officers who are making

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 31

Case 3:20-cv-01035-SL    Document 138    Filed 08/12/20    Page 38 of 42
Case 2:25-cv-05563-HDV-E    Document 64-4    Filed 09/29/25    Page 39 of 43    Page ID
#:1616

split-second decisions about crowd control cannot effectively respond to unlawful protesters if
the mere proximity of a self-identified member of the press makes any crowd-control action a
contempt risk. Plaintiffs' own interpretation of the TRO shows this to be true—Plaintiffs have
argued that federal officers cannot deploy tear gas in response to a group of shield-wielding
protesters gathering at the courthouse fence (ECF No. 87 at ¶¶ 9–10), so long as there is a
journalist or legal observer in the vicinity. Although Federal Defendants believe that Plaintiffs
have grossly distorted the meaning of the TRO, they are the party with the burden of
demonstrating an entitlement to a preliminary injunction, so their understanding of the relief they
are requesting is relevant in judging their claim.

Plaintiffs' second piece of "evidence" regarding the PI's workability on this point comes
from Gil Kerlikowske. As discussed earlier, Kerlikowske's declaration—submitted late on
Sunday—is not proper evidence; Plaintiffs do not denote him as an expert witness, and he
provides no explanation for the conclusions he reaches. Plaintiffs have given no reason to credit
a retired police chief's speculation about proper policing over the unrefuted evidence from the
people actually administering the TRO. And that difficulty is inherent in the terms of the TRO,
not the result of lack of effort. Federal Defendants submitted numerous declarations to this Court
in response to Plaintiffs' now-tabled motion for contempt. They document Defendants' robust
efforts to ensure compliance with the TRO by Federal Defendants. ECF No. 113 at 11–13
(discussing Federal Defendants' compliance with the TRO).

### 2.   Lawbreakers are masquerading as press and legal observers.

Federal officers have also observed two tactics adopted by protesters that further
undermine their ability to safely and accurately comply with the TRO while still accomplishing
their duties. Federal officers have identified (1) individuals pretending to be press or legal

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 32

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 39 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 40 of 43   Page ID
#:1617

observers, and, relatedly, (2) individuals presenting indicia of press affiliation but who themselves have engaged in unlawful actions. By way of example, reporter Sergio Olmos publicly posted video to Twitter of a protester admitting that, although he is not a member of the press, he is wearing press credentials identified as sufficient by the TRO in order to evade Defendant's crowd control tactics. Russell July 29 Decl. ¶ 8(e). Another reporter posted a photo of a man marked as "press" and holding a protest sign while standing against the fence, who had told the reporter that he wore the attire to avoid police action.[9] Similarly, an individual was filmed at the protests apparently planning to distribute press passes to protesters who are not journalists. Russell July 29 Decl. ¶ 8(c). Officers have also observed numerous individuals wearing hand-written press markings or verbally claiming to be press while displaying no visible indicia of press membership, making it impossible for officers to verify their claims. FPS Badge # 882 Decl. ¶ 5(a)-(b), (d); FPS Badge # 824 Decl. ¶ 5(c). Other individuals purporting to be press or legal observers have been engaged directly in illegal activity. For example, a protestor carrying a shield that identified him as press was taken into custody for impeding federal officers who were attempting to control the crowd, and was found to be in possession of a gun. CBP SOG-1 Decl. ¶ 10, ECF No. 101-7; CBP NZ-1 Decl. ¶ 9; Smith July 30 Decl. ¶ 8.[10] Another individual who self-identified as a reporter entered federal property and, after refusing to leave, resisted arrest. CBP SOG-1 Decl. ¶ 11. A third individual wearing indicia of press membership and self-reporting as press, was arrested for failing to comply with lawful direction and was

---

[9] https://twitter.com/Julio_Rosas11/status/1289547507819675648.
[10] This incident occurred on July 22, 2020, before the TRO was granted, but because of the very limited time available to the government to prepare for the hearing the information was not presented to the Court.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 33

discovered to be carrying commercial grade fireworks, CBP NZ-1 Decl. ¶ 10, Russell July 29 Decl. ¶ 8(b), which, throughout the protests, have been used as a tactic to harass and endanger federal officers, CBP NZ-1 Decl. ¶ 8, and which are illegal in Oregon, Russell July 29 Decl. ¶ 8(b). On July 28, 2020, an officer observed an individual wearing a helmet bearing the word "PRESS" and using a power tool to attempt to breach the fence around the Courthouse. Smith July 30 Decl. ¶ 10. Most recently, on July 29, 2020, an individual wearing "press" identification on his helmet breached the security barrier around the courthouse by jumping over the perimeter fence. Smith July 30 Decl. ¶ 11. And the Portland Police, who are bound by preliminary injunction of a similar nature, publicly reported in regard to an August 1st violent protest that "[p]eople with 'press' written on their outer garments repeatedly threw objects at officers."[11]

Again, Plaintiffs are unable to show that false self-designation isn't happening, so they merely assert that it isn't hurting anybody. That ignores numerous problems created by false self-designation. First, as discussed above, the presence of journalists and legal observers within lawless crowds, or between officers and lawless crowds, inhibits the ability of law enforcement officers to respond effectively to that lawbreaking if police risk contempt every time they use a crowd-control method against such a crowd. A proliferation of false journalists exacerbates that problem, putting federal law enforcement officers, peaceful protesters, and real journalists at risk. Second, under the TRO, a self-designation does in fact permit lawbreaking—a person who claims to be a member of the press or a legal observer can disobey a lawful order to disperse, and a law enforcement officer cannot use force or crowd-control methods directed at that person. The

_____

[11] Press Release, Portland Police Bureau, Two Arrests Made After Unlawful Assembly, But Second March Peaceful (Aug. 2, 2020), https://www.portlandoregon.gov/police/news/read.cfm?id=251060.

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 34

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 41 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 42 of 43   Page ID
#:1619

harm there is not just the very real risk that a fake journalist will use his privileged position to then attack police, it is also the risk that fake journalists will use their credentials to remain in a location that police are lawfully clearing.

One final point bears mentioning. When this Court issued its TRO, that opinion stated that workability concerns were overstated because "this precise remedy has been working for 21 days with the Portland Police Bureau." ECF No. 84 at 15. But Plaintiffs have not pressed any argument that they are satisfied that the stipulated injunction with the city is working. Nor could they in good faith; several of the named Plaintiffs have publicly stated or implied in recent days that the city of Portland is violating its obligations under the preliminary injunction.[12] It is not Federal Defendants' place to speculate why Plaintiffs have not brought their complaints to this Court's attention thus far, but the Court should at least be aware of Plaintiffs' public accusations.

In sum, the TRO gives individual protestors special privileges, including an exemption from lawful orders to disperse. It is no surprise that protestors who seek to violate the law will take advantage of that opportunity. If protesters who want an easier time breaking the law can easily designate themselves as press, and can do so falsely with no repercussions, it remains unclear what incentive there is for those criminal actors not to falsely label themselves. That license for lawbreaking is dangerous and should not be extended.

## CONCLUSION

This Court should deny the request for the preliminary injunction.

--------

[12] https://twitter.com/kmahoneylaw/status/1291286540652441603;
https://twitter.com/BaghdadBrian/status/1292533725595500544;
https://twitter.com/MathieuLRolland/status/1292418441618415616;
https://twitter.com/suzettesmith/status/1291615275775938561 (retweeted by Douglas Brown);
https://twitter.com/AthulKAcharya/status/1293077701041913856 (quoting Sergio Olmos).

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 35

Case 3:20-cv-01035-SI   Document 138   Filed 08/12/20   Page 42 of 42
Case 2:25-cv-05563-HDV-E   Document 64-4   Filed 09/29/25   Page 43 of 43   Page ID
#:1620

Dated:  August 12, 2020

ETHAN P. DAVIS
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

ANDREW I. WARDEN
Senior Trial Counsel

JEFFREY A. HALL
/s/ Jordan L. Von Bokern
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

FEDERAL DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION – 36