# EXHIBIT 2

No. 20-35739

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

INDEX NEWSPAPERS LLC, a Washington limited-liability company, dba
PORTLAND MERCURY; DOUG BROWN; BRIAN CONLEY; SAM GEHRKE;
MATHIEU LEWIS-ROLLAND; KAT MAHONEY; SERGIO OLMOS; JOHN
RUDOFF; ALEX MILAN TRACY; TUCK WOODSTOCK; JUSTIN YAU; and
those similarly situated;

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY and
U.S. MARSHALS SERVICE,

*Defendants-Appellants*,

and

CITY OF PORTLAND; JOHN DOES 1-60,

*Defendants.*

_____

On Appeal from the United States District Court for the District of Oregon

_____

## BRIEF FOR APPELLANTS

_____

JEFFREY BOSSERT CLARK
   *Acting Assistant Attorney General*

BILLY J. WILLIAMS
   *United States Attorney*

SOPAN JOSHI
   *Senior Counsel to the Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
MICHAEL SHIH
   *Attorneys, Appellate Staff, Civil Division*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., NW*
   *Washington, DC 20530*
   *202-353-6880*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION ........................................................3

STATEMENT OF THE ISSUE.................................................................3

STATEMENT OF THE CASE...................................................................3

    A.    Statutory and Regulatory Background..........................................3

    B.    Factual Background ......................................................................5

    C.    The Challenged Injunction...........................................................9

    D.    Prior Proceedings.......................................................................10

SUMMARY OF ARGUMENT................................................................ 12

STANDARD OF REVIEW .................................................................... 14

ARGUMENT ......................................................................................... 15

I.    Plaintiffs Are Unlikely To Prevail On The Merits Of Their First Amendment Claims............................................................................ 15

    A.    The First Amendment does not give journalists and legal observers a special right to disobey lawful dispersal orders.....................15

    B.    Plaintiffs lack standing to bring their claim of retaliation, which is both meritless and incapable of supporting the injunction......................21

II.    The Remaining Preliminary-Injunction Factors Strongly Favor The Government. ...................................................................................... 27

    A.    Plaintiffs have failed to establish that, in the absence of an injunction, they will be irreparably harmed....................................28

    B.    The injunction irreparably injures the government and the public interest..........................................................................29

CONCLUSION ................................................................................................................ 37

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................25

*Boardman v. Pacific Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) ......................................................... 28, 33

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ....................................................................12, 16, 18

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ..................................................................27

*California First Amendment Coal. v. Calderon,*
    150 F.3d 976 (9th Cir. 1998) ....................................................12, 16, 19

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ............................................................................ 22, 23

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ......................................................................... 22, 24

*Clark v. Community for Creative Non-Violence,*
    468 U.S. 288 (1984) ................................................................................15

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ................................................................................30

*Curtis v. City of New Haven,*
    726 F.2d 65 (2d Cir. 1984) .....................................................................23

*East Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) ...............................................................14

*Federal Trade Comm'n v. Enforma Nat. Prods., Inc.,*
    362 F.3d 1204 (9th Cir. 2004) ...............................................................14

*Gannett Co. v. DePasquale,*
443 U.S. 368 (1979) ...........................................................................18

*Globe Newspaper Co. v. Superior Court for Norfolk County,*
457 U.S. 596 (1982) ...........................................................................18

*Graham v. Connor,*
490 U.S. 386 (1989) ...........................................................................30

*Laird v. Tatum,*
408 U.S. 1 (1972) ...............................................................................24

*Leigh v. Salazar,*
677 F.3d 892 (9th Cir. 2012) ........................................................19, 20

*Lewis v. Casey,*
518 U.S. 343 (1996) ...........................................................................26

*Mendocino Envt'l Ctr. v. Mendocino County,*
192 F.3d 1283 (9th Cir. 1999) ...........................................................25

*Menotti v. Seattle,*
409 F.3d 1113 (9th Cir. 2005) ...............................................12, 15, 21

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.,*
636 F.3d 1150 (9th Cir. 2011) ...........................................................28

*Press-Enterprise Co. v. Superior Court of Cal. for Riverside County,*
478 U.S. 1 (1986) .....................................................................18, 19, 20

*Reed v. Lieurance,*
863 F.3d 1196 (9th Cir. 2017) ...........................................................19

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980) ...........................................................................18

*Ryburn v. Huff,*
565 U.S. 469 (2012) ...........................................................................30

*Saxbe v. Washington Post Co.,*
417 U.S. 843 (1974) ...........................................................................18

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ................................................................................22

*Trevino v. Gates,*
  99 F.3d 911 (9th Cir. 1996) .........................................................................26

*United States v. Armstrong,*
  517 U.S. 456 (1996) ....................................................................................24

*United States v. Christopher,*
  700 F.2d 1253 (9th Cir. 1983) .....................................................................15

*United States v. Evans,*
  581 F.3d 333 (6th Cir. 2009) .......................................................................18

*Updike v. Multnomah County,*
  870 F.3d 939 (9th Cir. 2017) ................................................................. 22, 23

*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) .......................................................................28

*Whitley v. Albers,*
  475 U.S. 312 (1986) ....................................................................................30

*Williams v. Birmingham Bd. of Educ.,*
  904 F.3d 1248 (11th Cir. 2018) ...................................................................23

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................15

*Wise v. City of Portland,*
  No. 3:20-cv-1193, 2020 WL 5231486 (D. Or. Sept. 2, 2020) .....................35

**Statutes:**

28 U.S.C. § 566(a) ............................................................................................4

28 U.S.C. § 566(i) ........................................................................................ 4, 18

28 U.S.C. § 1292(a)(1) ......................................................................................3

28 U.S.C. § 1331 ...................................................................................................3

40 U.S.C. § 1315 .................................................................................................12

40 U.S.C. § 1315(a) ..............................................................................................3

40 U.S.C. § 1315(b)(1)................................................................................... 4, 17

40 U.S.C. § 1315(b)(2)(A)............................................................................. 4, 17

40 U.S.C. § 1315(b)(2)(E)............................................................................. 4, 17

40 U.S.C. § 1315(b)(2)(F)............................................................................. 4, 17

40 U.S.C. § 1315(c) ...............................................................................................3

**Regulations**

28 C.F.R. § 0.111(f) ..............................................................................................4

41 C.F.R. § 102-74.375 .......................................................................................17

41 C.F.R. § 102-74.375(c) ....................................................................................4

41 C.F.R. § 102-74.380(d) ....................................................................................4

41 C.F.R. § 102-74.385 ................................................................................. 4, 17

41 C.F.R. § 102-74.390 .........................................................................................4

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ....................................................................................3

# INTRODUCTION

Federal law-enforcement officers in Portland, like officers in other parts of the country, are confronting novel and sophisticated forms of mob violence. In some cases, violent opportunists have hijacked demonstrations to conduct direct assaults on federal personnel and property. Rioters in Portland have attacked federal officers with explosives, lasers, projectiles, and other dangerous devices. These attacks have injured well over one hundred federal officers.

Plaintiffs are self-identified journalists and legal observers who have at various times covered or observed the Portland protests. The district court issued an injunction that requires federal officers to exempt all journalists and legal observers from obeying valid orders to disperse. The exemption appears to cover anyone carrying professional gear or photographic equipment, bearing an official press pass, or wearing sufficiently distinctive clothing (although what clothing would qualify is unclear). Officers must exempt all such individuals from dispersal orders and crowd-control tactics. This requirement applies even if those individuals are intermingling with protesters or actively participating in protests that have turned violent.

The district court's injunction is flawed in all respects. The premise of the injunction is that the First Amendment exempts journalists and legal observers from lawful dispersal orders. But there is no dispute that the general public must comply with such orders, and the First Amendment does not grant journalists—much less

legal observers—special rights beyond those guaranteed to the public.  Alternatively, plaintiffs contend that defendants, the Department of Homeland Security (DHS) and the U.S. Marshals Service, have deliberately targeted them in retaliation for exercising their First Amendment rights.  But both agencies unambiguously prohibit officers from singling out anyone, including journalists, for exercising those rights; train their officers in the lawful use of crowd-control tactics; require that every use of force against a person be documented and investigated; and investigate and appropriately discipline officers who violate these terms.  Allegations that some plaintiffs were subjected to crowd-control measures in response to violent protests over several months provides no basis for the assertion that the agencies deliberately singled out plaintiffs in the past, much less for the assertion that the agencies will deliberately single out plaintiffs in the future.  In any event, such claims could not support an injunction that exempts plaintiffs from crowd-control measures validly undertaken with regard to all persons present.

The remaining preliminary-injunction factors likewise militate against injunctive relief.  The injunction significantly impedes officers' ability to effect safe and orderly crowd control in violent situations.  It also unacceptably increases the risk of serious injury to the officers themselves.  By contrast, plaintiffs' assertions of irreparable harm in the absence of an injunction lack merit, not least because they have failed to show how their ability to gather news depends on the existence of a novel exception to lawful dispersal orders.  And any such harms would not outweigh those engendered

by the injunction's interference with federal officers attempting to protect federal
property and personnel from violent opportunists.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C.
§ 1331. Dkt. No. 53, at 9. Plaintiffs' standing is contested in part. *Infra* pp. 22-24.
The district court entered a preliminary injunction on August 20, 2020. Excerpts of
Record (ER) 10-70. The government filed a timely notice of appeal on August 21,
2020. ER 9; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28
U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether plaintiffs are entitled to a preliminary injunction that, among other
things, exempts self-identified journalists and legal observers from lawful dispersal
orders issued by federal law-enforcement officers to control violent protests.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

Congress has charged the Secretary of Homeland Security with responsibility
for "protect[ing] the buildings, grounds, and property that are owned, occupied, or
secured by the Federal Government . . . and the persons on the property." 40 U.S.C.
§ 1315(a). To fulfill this responsibility, the Secretary can designate DHS employees
for "duty in connection with the protection of property owned or occupied by the
Federal Government and persons on the property, including duty in areas outside the

3

property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1). These officers and agents possess a wide range of law-enforcement powers. For example, they can "enforce Federal laws and regulations for the protection of persons and property," *id.* § 1315(b)(2)(A); "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property," *id.* § 1315(b)(2)(E); and "carry out such other activities for the promotion of homeland security as the Secretary may prescribe," *id.* § 1315(b)(2)(F).

Congress also gave DHS authority to issue regulations "necessary for the protection and administration" of federal property and personnel. 40 U.S.C. § 1315(c). Using this authority, DHS has prohibited engaging in disorderly conduct on federal property, 41 C.F.R. § 102-74.390; failing to abide by "the lawful direction of Federal police officers and other authorized individuals," *id.* § 102-74.385; creating a hazard on federal property, *id.* § 102-74.380(d); and failing to comply with restrictions on admission to federal property, *id.* § 102-74.375(c).

Congress created the Marshals Service to "provide for the security . . . of the United States District Courts, the United States Courts of Appeals," and other federal courts. 28 U.S.C. § 566(a). The Marshals Service "retains final authority regarding security requirements for the judicial branch of the Federal Government." *Id.* § 566(i). By regulation, its officers have power to "assist[] in the protection of Federal property and buildings." 28 C.F.R. § 0.111(f).

4

### B. Factual Background

1.      The City of Portland has experienced near-daily protests for over four

and a half months.  Most of the protesters have remained peaceful.  At night,

however, some violent opportunists have taken advantage of the protests to commit

crimes such as arson, assault, property destruction, looting, and vandalism.  ER 175

¶ 3.  Many of these crimes have targeted federal property, including the Mark O.

Hatfield Federal Courthouse and the office building nearby.  *Id.* ¶ 4.  DHS and the

Marshals Service responded to these attacks by deploying additional federal

law-enforcement officers to Portland.  *Id.* ¶ 5.

Until the end of July, federal officers faced nightly attacks from violent

opportunists armed with improvised explosives, aerial fireworks, commercial-grade

mortars, high-intensity lasers, glass bottles, projectiles fired from wrist rockets, and

balloons filled with paint or feces.  ER 175 ¶ 4.  From May 26 to July 29, protesters

injured over 120 officers.  ER 160 ¶ 4.  Their injuries include broken bones, hearing

damage, eye damage, puncture wounds, lacerations, sprains, strains, and contusions.

*Id.*  In one case, a protester significantly injured an officer by striking the officer in the

head and shoulder with a sledgehammer when the officer tried to stop him from

breaking into the Hatfield Courthouse.  *Id.*  To protect federal property and

themselves, federal officers have issued dispersal orders to protesters on federal

property, and have enforced those orders with crowd-control tactics when protesters

failed to comply.

5

Until the end of July, the State of Oregon and the City of Portland generally declined to support federal law-enforcement efforts on and around federal property. Indeed, on July 22, the Portland City Council prohibited the Portland Police Bureau from working with federal law-enforcement officers. ER 108 ¶ 6. Their inaction resulted in a substantial increase in violent attacks on federal property and personnel. *Id.* ¶ 7.

The situation changed on July 29, when DHS and the State of Oregon entered into an agreement. For a short time, the Oregon State Police "took the lead in enforcing crowd control in Portland." ER 40. "That appears to have ended, and the Portland Police have now resumed performing that role." *Id.* When DHS and the Marshals Service determine that federal buildings in Portland are no longer at risk, they will withdraw the additional federal officers deployed to Portland from the city.

**2.** Plaintiffs are journalists and so-called legal observers who have covered or observed some of the Portland protests. On June 28, they sued the City of Portland and sixty unnamed Portland police officers, alleging that local police had violated their First Amendment rights. Dkt. No. 1. The City and plaintiffs stipulated to a preliminary injunction against the city. ER 177-80; *see* ER 95-98.

Plaintiffs then amended their complaint to add DHS and the Marshals Service as defendants. Dkt. No. 53. The amended complaint alleged that, by issuing generally applicable dispersal orders, federal officers had denied plaintiffs' access to protests in violation of the First Amendment. *Id.* at 45. The complaint further alleged that the

6

agencies had intentionally "targeted journalists and legal observers" in retaliation for exercising their First Amendment rights. *Id.*[1]

On July 23—at the height of the violence against federal property and personnel—the district court entered a temporary restraining order against the federal defendants. The order allowed all self-identified journalists and legal observers to ignore lawful dispersal orders, and forbade federal officers from arresting any journalist or observer who refused to comply with such an order. ER 91. The order further prohibited federal officers from "arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer," absent probable cause that the person has committed a crime. *Id.* The order defined "Journalist" using several nonexclusive criteria: that is, as any person bearing a "professional or authorized press pass" or "badge" or "other official press credentials," or wearing "distinctive clothing that identifies the wearer as a member of the press." ER 91-92. The order defined "Legal Observer" as any person wearing a green National Lawyers' Guild hat or a blue American Civil Liberties Union vest. ER 92. Finally, the order declared all intentional violations of the temporary restraining order to be "violation[s] of a clearly established constitutional right . . . not subject to qualified immunity" in damages lawsuits that might be brought against individual officers in the future. ER 93.

---

[1] Plaintiffs' Fourth Amendment and state-law claims are not at issue in the preliminary injunction. ER 42 n.7.

7

The government moved for reconsideration, explaining that, after the order was issued, thousands of protesters had continued to gather around the Hatfield Courthouse each evening.  ER 147-49 ¶¶ 6, 9, 10.  Violent opportunists among those protesters had fired incendiary devices, projectiles, and lasers at federal officers, and had attempted to penetrate federal defenses with power tools.  ER 148 ¶ 9.  Others had pretended to be journalists to avoid complying with lawful dispersal orders.  ER 161-62.  Federal officers also observed other individuals engaging in illegal activity while wearing clothing that would qualify them as journalists or legal observers under the order.  For example, one protester—who was arrested for trespassing and who was later charged with assault—was "wearing press indicia at the time of his arrest." ER 161.

The court denied reconsideration, ER 72-73, and *sua sponte* invited the parties to brief the question whether the court should require any officer "who leaves the interior of the federal courthouse during a protest" to "wear a clearly visible unique identifying code" "with white numbers or letters not less than eight inches in height against a dark background," and "a further requirement that [defendants maintain] a list matching each" code to an officer, ER 71.

The government objected to the court's proposal because it would impede the officers' ability to perform law-enforcement activities and because officers already wear unique identifying numbers.  Dkt. No. 113, at 19-20 & n.6; Dkt. No. 138, at 28-29.  The government also opposed any extension of the temporary restraining

8

order.  On August 6, the court extended the order without modification for another
fourteen days.  ER 72-73.

### C.      The Challenged Injunction

On August 20, the district court entered a preliminary injunction against DHS
and the Marshals Service.  ER 10-70.  The injunction differed from the temporary
restraining order in two significant respects.

First, the injunction expanded the nonexclusive criteria sufficient to qualify an
individual as a "Journalist" or "Legal Observer" protected by the injunction.  In
addition to assessing the color of a person's clothing and the nature of any
identification that person may present, federal officers must consider whether the
person's "gear" and "equipment" are sufficiently "professional," ER 68-69, and
whether the person is standing "off to the side of a protest" or is "engaging in protest
activities," ER 69.  "These indicia are not exclusive, and a person need not exhibit
every indicium to be considered a Journalist [or Legal Observer]" under the
injunction.  ER 68; *see* ER 69.  Even someone who actively participates in protests
that have turned violent can qualify as a journalist or legal observer if he bears one of
the other specified "indicia" in the injunction.  ER 68-69.

Second, the injunction instructed DHS and the Marshals Service to confer with
plaintiffs on "how the Federal Defendants can place unique identifying markings
(using numbers and/or letters) on the uniforms and/or helmets" of federal officers
"so that they can be identified at a reasonable distance."  ER 69.  The court stated

9

that, if plaintiffs and defendants could not agree on how officers' helmets and uniforms should be altered within fourteen days, the court would itself decide what alterations must be made, and "modify th[e] preliminary injunction appropriately." ER 70.[2]

### D.    Prior Proceedings

The government appealed the injunction, and sought both an administrative stay and a stay pending appeal from this Court.  On August 27, 2020, a divided panel of this Court granted the government's motion for an administrative stay.  The panel majority held that, "[b]ased on [its] preliminary review," the government is likely to succeed on the merits of its argument that the injunction "is without adequate legal basis."  ER 99-100.  The panel majority further held that, "[g]iven the order's breadth and lack of clarity, particularly in its non-exclusive indicia of who qualifies as 'Journalists' and 'Legal Observers,'" the government has "also demonstrated that, in the absence of a stay, the order will cause irreparable harm to law enforcement efforts and personnel."  ER 100.  Finally, the panel majority barred the district court from "issu[ing] a final order" requiring alterations to officer uniforms until this government's stay motion was resolved.  *Id.*  Judge McKeown dissented.  ER 101.

On October 9, a divided panel of this Court dissolved the administrative stay and denied the government's motion for a stay pending appeal.  The panel majority

---

[2] Unlike the temporary restraining order, the injunction does not attempt to strip individual officers' qualified-immunity defenses in hypothetical future lawsuits.

held that the government was unlikely to succeed on the merits of plaintiffs' First Amendment claims. The majority agreed with the district court that the First Amendment permits journalists and legal observers to disobey lawful dispersal orders issued by federal law-enforcement officers in response to violent protests, notwithstanding the fact that members of the public indisputably cannot disobey those same orders. Oct. 9 Order 22-24. The majority also held that plaintiffs had standing to bring, and were likely to prevail on, their claim that DHS and the Marshals Service—that is, the agencies themselves—intentionally retaliated against them for exercising their First Amendment rights. *Id.* at 11-20. Finally, the majority held, relying principally on the district court's factual findings, that the injunction's terms were safe and workable. *Id.* at 37-40.

Judge O'Scannlain dissented. The dissent recognized that the injunction "constitutes a significant and unwarranted departure from the traditional, qualified 'right of public access' to criminal judicial proceedings that has been carefully delineated by the Supreme Court." Oct. 9 Order 45-46 (O'Scannlain, J., dissenting). The dissent also recognized that, "[e]ven if plaintiffs' retaliation claim were viable, . . . that claim alone cannot justify" the injunction. *Id.* at 73. "General dispersal orders were not among the acts alleged to be retaliatory, nor did the district court make any findings to support such a conclusion." *Id.* Accordingly, the injunction is "overbroad and an abuse of discretion." *Id.* at 74. Finally, the dissent explained that the district

11

court's mistaken factual findings with respect to the injunction's workability did not warrant any deference. *Id.* at 69-72.

## SUMMARY OF ARGUMENT

The preliminary injunction should be reversed because it rests on legal error, and because it imposes unworkable conditions on federal law-enforcement officers responding to violent protests in Portland that jeopardize both their safety and their ability to perform their duties.

The injunction depends on the mistaken premise that the First Amendment gives journalists and legal observers the right to disregard lawful dispersal orders issued by officers engaged in riot control. No such exception exists. The Supreme Court and this Court have repeatedly held that the press lacks a "constitutional right of special access to information not available to the public generally." *California First Amendment Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quotation marks omitted); *see, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972). When confronted by "a violent subset of protesters who disrupt civic order," law-enforcement officers indisputably have power to enforce dispersal orders against the general public, *Menotti v. Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005), including under the primary authorizing statute here, 40 U.S.C. § 1315. Journalists and legal observers are subject to valid dispersal orders in the same way as ordinary citizens exercising their First Amendment rights.

12

Plaintiffs alternatively argue that DHS and the Marshals Service have intentionally targeted them in retaliation for exercising their First Amendment rights. They do not dispute, however, that both agencies unambiguously forbid their officers from targeting *anyone* for exercising their First Amendment rights. Nor do they dispute that any officer who targets a journalist, or any other peaceful protester, would be acting in direct contravention of the agencies' policies. Plaintiffs' allegations that they were subjected to such targeting on fewer than 50 occasions are thus insufficient to support their standing to seek injunctive relief on this basis. And they certainly supply no ground for inferring a practice of retaliation against journalists on the part of DHS and the Marshals Service—particularly when their allegations are considered against the backdrop of federal officers' many thousands of interactions with individuals exercising their First Amendment rights over several months of near-daily protests. Finally, even if plaintiffs could show a pattern of retaliation, the injunction exempting journalists from lawful dispersal orders bears no relation to that claim.

The remaining preliminary-injunction factors weigh heavily in the government's favor as well. Plaintiffs have offered no basis for concluding that they cannot conduct newsgathering absent a unique exemption from general dispersal orders. Their allegations of past retaliation would be insufficient even to provide a basis for standing, much less prove that any plaintiff is likely to be subjected to retaliation in the imminent future. In any event, their allegations do not outweigh the palpable harm to officers' safety and their ability to carry out their responsibilities created by

13

the injunction's unworkable requirements—namely, that officers attempting to control a chaotic situation first identify journalists and legal observers on the basis of their dress or equipment or demeanor, and then exempt such individuals from crowd-control measures regardless of the feasibility of doing so. The improper breadth of these requirements is underscored by the court's directive that officers apply the exemption even if journalists and legal observers are actively participating in protests that have turned violent.

In sum, the preliminary injunction has no legal basis; redresses no irreparable harm; and threatens the safety of law-enforcement officers responsible for crowd control in difficult, dynamic, and dangerous circumstances. The injunction should therefore be vacated.

## STANDARD OF REVIEW

"[T]he legal premises underlying a preliminary injunction" are reviewed de novo. *Federal Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004). The court's factual findings are reviewed for clear error. *Id.* at 1211-12. In other respects, the district court's entry of the preliminary injunction is reviewed for abuse of discretion. *Id.* at 1211. "Given the preliminary stage of the appellate process" at which a motions panel considers a stay motion, a subsequent merits panel should "treat the motions panel's decision as persuasive, but not binding." *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1264-65 (9th Cir. 2020).

14

# ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have failed to satisfy any of these factors.

## I.   Plaintiffs Are Unlikely To Prevail On The Merits Of Their First Amendment Claims.

### A.   The First Amendment does not give journalists and legal observers a special right to disobey lawful dispersal orders.

**1.**     The First Amendment does not bar the government from prohibiting the public from entering or remaining on its property outside ordinary hours of operation, or from threatening its property at any time. *United States v. Christopher*, 700 F.2d 1253, 1259-61 (9th Cir. 1983). This principle applies even if the property functions as a public forum for lawful activities when it is open. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 299 (1984). And when federal officers are forced to respond to "a violent subset of protesters who disrupt civic order," such officers indisputably have power to enforce dispersal orders against the general public. *Menotti v. Seattle*, 409 F.3d 1113, 1155-56 (9th Cir. 2005) (holding that, when law-enforcement officers are confronted by protesters with "violent and disruptive aims," such officers may "implement[] . . . procedures necessary to restore safety and security"). As even

15

the district court acknowledged, federal officers can issue "crowd-dispersal orders for a variety of lawful reasons." ER 69.

The premise of the injunction is that the First Amendment makes these principles inapplicable to journalists and legal observers. ER 67-68. That premise is mistaken. The Supreme Court and this Court have repeatedly held that the press lacks a "constitutional right of special access to information not available to the public generally." *California First Amendment Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972), and discussing other cases). Like ordinary citizens exercising First Amendment rights, journalists are not constitutionally entitled to disobey a lawful dispersal order issued to protect federal property and personnel from violent protests. The district court's order that self-identified journalists and legal observers "shall not be required to disperse following the issuance of an order to disperse," ER 67, has no basis in the First Amendment.

2.      The district court appeared to recognize that the First Amendment does not grant special rights to the press in this context. ER 14 & n.1. Instead, and notwithstanding the plain terms of the injunction, the court suggested that its order does not grant any special rights to the press for two reasons, neither of which is availing.

a.      First, the district court erroneously believed that the injunction does not grant special rights to the press because the government lacks power to issue dispersal

16

orders to anyone on streets abutting federal property. ER 14-15 & n.2. But the injunction applies *both* to dispersal orders issued off federal property *and* to dispersal orders issued on federal property. As a result, the injunction even prohibits federal officers from enforcing dispersal orders against self-identified journalists and legal observers when attempting to repel violent protests that have reached the courthouse steps. Accordingly, the injunction grants special rights to such individuals, the court's contrary assertions notwithstanding. ER 67 (stating that journalists "shall not be required to disperse following the issuance of an order to disperse").

The district court was in any event mistaken in concluding that federal law prohibits law-enforcement officers from taking appropriate measures to protect federal property and personnel until violent protesters have moved onto federal property. There is no reasonable dispute that DHS officers have authority to issue dispersal orders on federal property. *See, e.g.*, 41 C.F.R. § 102-74.375 (authority to restrict access to federal property); *id.* § 102-74.385 (authority to require the public to comply with access restrictions). This authority extends to "areas outside the property to the extent necessary to protect the property and persons on the property." 40 U.S.C. § 1315(b)(1). Thus, DHS officers can "enforce Federal laws and regulations for the protection of persons and property," *id.* § 1315(b)(2)(A); "conduct investigations, on and off the property in question, of offenses that may have been committed against" federal property and personnel, *id.* § 1315(b)(2)(E); and "carry out such other activities for the promotion of homeland security" as DHS may prescribe,

17

*id.* § 1315(b)(2)(F). Congress has similarly vested the Marshals Service with "final authority regarding security requirements for the judicial branch," including "the security of buildings housing the judiciary." 28 U.S.C. § 566(i).

These statutes make clear that, at a minimum, federal officers who have issued dispersal orders on federal property can effectuate those orders off federal property when necessary to discharge their protective duties—for example, by establishing a secured perimeter in the streets abutting federal property. *See United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009).

      **b.**     Second, the district court suggested that the injunction does not give the press special rights because the press is exercising different rights from the public, and is therefore subject to different First Amendment protections. *See* ER 51 ("[T]he point of a journalist observing and documenting government action is to record whether [governmental conduct] is lawful[]."). That is mistaken, as is clear from the treatment accorded by the Supreme Court and this Court to similar claims brought by journalists and media companies. *E.g.*, *Press-Enterprise Co. v. Superior Court of Cal. for Riverside County*, 478 U.S. 1, 8 (1986) (right of access to preliminary hearings); *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 603-04 (1982) (right of access to criminal trials involving victims who were minors at the time of trial); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564 (1980) (right of access to criminal trials in general); *Gannett Co. v. DePasquale*, 443 U.S. 368, 370-71 (1979) (right of access to pretrial judicial proceedings); *Saxbe v. Washington Post Co.*, 417 U.S. 843,

844 (1974) (right of access to in-person interviews of federal inmates); *Branzburg*, 408

U.S. at 682 (right to disobey grand-jury subpoenas); *Reed v. Lieurance*, 863 F.3d 1196,

1200 (9th Cir. 2017) (right to access buffalo-herding operations); *Leigh v. Salazar*, 677

F.3d 892, 893 (9th Cir. 2012) (right to access horse roundups); *California First*

*Amendment Coal.*, 150 F.3d at 981 (right to access executions).

In each of these cases, plaintiffs asserted a First Amendment right to provide

the public with information on the governmental activity at issue.  Yet the decision in

each case turned exclusively on the question whether the government could lawfully

restrict access to a member of the public at large.  Such analysis would be inexplicable

if, as the district court maintained, plaintiffs' journalistic status meant that plaintiffs

were exercising a different right from the public.  It follows that plaintiffs' journalistic

motivations do not alter the nature of their First Amendment claim: that the First

Amendment entitles them to disobey lawful dispersal orders with which the general

public must comply.

**3.**     The district court's reliance on *Press-Enterprise*, *supra*, underscores the

error of its analysis.  In that case, the Supreme Court held that the government cannot

close judicial proceedings that were historically open to the press and public unless

"closure is essential to preserve higher values and is narrowly tailored to serve that

interest."  478 U.S. at 8-9.  As this Court has explained, a right of access "attaches to

[a] government proceeding or activity" only if "the place and process have historically

been open to the press and general public."  *Leigh*, 677 F.3d at 898 (discussing

19

*Press-Enterprise Co.*, 478 U.S. at 8-9)). But law-enforcement efforts to control a violent protest do not constitute a "government proceeding or activity" that has "historically been open to the press and general public." *Id.*; *see supra* pp. 15-18. Accordingly, *Press-Enterprise* does not support plaintiffs' claim that the First Amendment confers special privileges on the press in this context.

The district court also emphasized that at least some violent protests in Portland are occurring on public streets and parks. ER 52 n.10. But this uncontroversial principle is irrelevant to the question whether the *Press-Enterprise* framework applies. Plaintiffs are not asserting a right of access to public streets and parks in general, or a right of access to peaceful protests on public streets and parks in particular. They are asserting a right of access to such areas after the protests have turned violent, and after officers have responded by issuing lawful dispersal orders. Despite the fact that the general public must comply with such orders, plaintiffs insist that the First Amendment affords journalists and legal observers an exception to the rule. No authority supports that novel proposition, which this Court has generally rejected.

Because neither journalists nor the public more generally have a right of access to the enforcement of dispersal orders, this Court need not consider whether such orders are narrowly tailored. *Press-Enterprise Co.*, 478 U.S. at 8-9 (explaining that a court considers whether restrictions on public access are narrowly tailored only if that particular "place and process" have traditionally been open to the public). But if the

20

Court reaches the question, it should conclude that requiring compliance with dispersal orders is the narrowest means of protecting federal property and personnel from unpredictable and violent protests.

The purpose of a dispersal order is to remove *all* individuals from the area where a riot is occurring, not merely those individuals whom law-enforcement officers have reason to stop or to arrest. Such orders do not violate the First Amendment because, "once a pattern of chaotic violence ha[s] been established, it [i]s unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. In circumstances where "law-breaking and law-abiding protestors [are] often indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly with enforcement against violent protestors," dispersing everyone from the scene of a riot is narrowly tailored to serve a significant government interest. *Id.* at 1135. Officers need not tailor their orders to exclude peaceful protesters or innocent bystanders, *see id.* at 1126-28, whose lawful activities are being disrupted by "a small group of violent protestors . . . determined to cause chaos," *id.* at 1134. It follows that officers need not tailor their orders to exclude members of the press as well.

### B. Plaintiffs lack standing to bring their claim of retaliation, which is both meritless and incapable of supporting the injunction

The district court further erred in concluding that the injunction could be justified on the basis of plaintiffs' claim that DHS and the Marshals Service

intentionally used force against them to deter them from exercising their First Amendment rights.

1.      At the threshold, plaintiffs lack Article III standing to seek injunctive relief on the basis of their retaliation claim.  Standing to obtain forward-looking remedies cannot rest simply on allegations of past harm.  *Updike v. Multnomah County*, 870 F.3d 939, 947 (9th Cir. 2017).  Plaintiffs must instead demonstrate a "real and immediate threat of repeated injury."  *Id.* (quotation marks omitted).  Although the "risk of real harm" can satisfy this requirement, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), such risk cannot be premised on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  The threat of a future injury "must be *certainly impending*"; "[a]llegations of *possible* future injury are not sufficient." *Id.* at 409 (emphases in original) (quotation marks omitted).

The Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), illustrates the point.  The Court accepted that law-enforcement officers were likely to apply chokeholds routinely.  But the Court nevertheless held that it was speculative that plaintiff "himself will again be involved in one of those unfortunate instances, or that [plaintiff] will be arrested in the future and provoke the use of [the] chokehold" technique.  *Id.* at 108.  Similarly, in *Updike, supra*, this Court rejected a plaintiff's argument that, because law-enforcement officers had denied him interpretive services during his five previous arrests, plaintiff was at risk of being denied interpretive services in the future.  870 F.3d at 948.  "[P]ast wrongs," the Court explained, "do not

22

in themselves amount to [a] real and immediate threat of injury necessary to make out

a case or controversy." *Id.* (quoting *Lyons*, 461 U.S. at 103).  A plaintiff must instead

"identif[y] specific . . . policies and practices that would subject him to . . . injurious

acts in the future." *Id.*  This, of course, plaintiffs have failed to do.  Indeed, it is

undisputed that governmental policy expressly *prohibits* targeting journalists.

Together, these principles foreclose plaintiffs' standing to enjoin purported

retaliatory behavior that law-enforcement agencies affirmatively reject.  Plaintiffs'

retaliation claim turns exclusively on allegations of past injuries over an extended

period, which were perpetrated by individual officers whose actions—if they occurred

as alleged—are in defiance of express government policy.  ER 41, 45.  Such

allegations do not prove the "real and immediate threat" of future injury necessary to

establish standing.  *Updike*, 870 F.3d at 947.  Other courts of appeals have rejected

similar claims on this basis.  *See Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248,

1267 (11th Cir. 2018) (holding that plaintiff, who had previously been targeted by a

chemical spray, lacked standing to obtain injunctive relief because she had not shown

a likelihood that she would again be illegally targeted); *Curtis v. City of New Haven*, 726

F.2d 65, 68 (2d Cir. 1984) (vacating injunction prohibiting use of mace because

plaintiffs had not shown a "likelihood that [they] will again be illegally assaulted with

mace").

The district court determined that plaintiffs have standing by speculating that,

in the future, federal officers are likely to deliberately target plaintiffs by virtue of their

23

status as journalists or legal observers.  ER 41, 45.  But that suggestion is indistinguishable from the *Lyons* plaintiff's suggestion that, because he had been subjected to a chokehold in the past, he was likely to be subjected to a chokehold in the future.  It is likewise indistinguishable from the *Updike* plaintiff's suggestion that, because he had been denied interpretive services on five previous occasions, he was likely to be denied interpretive services in the future.

The district court also asserted that "the professional and personal characteristics of the Federal Defendants show that they are likely to be enabled or tempted to engage in future violations."  ER 64.  That extraordinary and unfounded accusation cannot substitute for Article III's requirement that a plaintiff demonstrate a threat of future injury that is "*certainly impending*"; "[a]llegations of possible future injury are not sufficient."  *Clapper*, 568 U.S. at 409 (emphasis in original); *cf. United States v. Armstrong*, 517 U.S. 456, 464 (1996) (holding that Executive Branch actions are entitled to a presumption of regularity).

Finally, the district court credited plaintiffs' allegations that individual officers' past conduct has chilled their speech.  ER 59.  But plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm."  *Clapper*, 568 U.S. at 416.  This principle applies even when plaintiffs characterize their harm as a chilling effect engendered by alleged First Amendment violations.  *Id.* at 417-18 (citing *Laird v. Tatum*, 408 U.S. 1, 10-15 (1972)).

24

**2.**     Setting standing to one side, plaintiffs' retaliation claim also fails on the merits.   To prevail, plaintiffs must demonstrate that their First Amendment activity was a "substantial or motivating factor" in the conduct of DHS or the Marshals Service.  *See Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) (quotation marks omitted).  But both agencies explicitly prohibit retaliation against anyone—protesters, journalists, and legal observers alike—for exercising First Amendment rights.  *E.g.*, ER 168 (forbidding officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights"); ER 173 (prohibiting officers from using crowd-control tactics to "punish, harass, taunt, or abuse a subject").  Officers must undergo extensive training in permissible uses of force, ER 110-19, and all uses of force against a person must be "documented and investigated," ER 117.  Indeed, DHS is currently reviewing several use-of-force incidents arising from the Portland protests.

Plaintiffs' allegations of around fifty instances of improper conduct do not support the district court's inference of a prevalent practice among federal law-enforcement officers that is directly contrary to the rules under which they operate.  To begin with, the district court improperly discounted an alternative and more than plausible explanation for the alleged misconduct: that officers' split-second decisions, made at night in the midst of chaotic circumstances, were intended not to retaliate against plaintiffs but to help control a situation that had turned violent.  *See generally* Dkt. No. 138, at 16-20; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007)

25

("[N]othing in the complaint intimates that the [allegedly wrongful collusion] was anything more than [a] natural, unilateral reaction."). Indeed, plaintiffs themselves admit that some of these incidents occurred while they were "def[ying] law enforcement's orders to disperse." Stay Opp. 5.

Moreover, plaintiffs' allegations of misconduct by individual officers occurred in the context of thousands of interactions between federal officers and crowds in the months after May 26, 2020. Their allegations thus do not supply "substantial circumstantial evidence of retaliatory intent," ER 49, on the part of DHS and the Marshals Service. As this Court has made clear in the related context of § 1983 claims against municipalities, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiffs must instead identify "practices of sufficient duration, frequency[,] and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Plaintiffs have not made the requisite showing here. That failure precludes plaintiffs from obtaining injunctive relief against the entirety of DHS and the Marshals Service—from line-level employees all the way up to the agencies' leadership—on the basis of the *ultra vires* misconduct of a small number of agency employees. *Cf. Lewis v. Casey*, 518 U.S. 343, 359 (1996) (holding that proof of isolated instances of misconduct was "a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief").

26

**3.** Even if plaintiffs were likely to prevail on their claim of retaliation, their claim cannot support the broad injunction that the district court entered. The injunction does not bar officers from singling out journalists and legal observers for retaliatory treatment. Instead, the injunction requires the government to single out journalists and legal observers for *preferential* treatment, in order to exempt them from lawful orders that are properly issued to all other persons present. Those requirements are far "broader . . . than necessary to redress" the government's alleged intentional targeting of journalists and legal observers. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *accord* Oct. 9 Order 73 (O'Scannlain, J., dissenting) ("The district court's factual findings regarding retaliation . . . bear no relation to the injunctive relief actually entered."). They are instead designed to vindicate plaintiffs' claim that the First Amendment right of access requires officers to exclude journalists and legal observers from lawful dispersal orders—a separate claim and one that lacks merit, for the reasons explained above.

## II. The Remaining Preliminary-Injunction Factors Strongly Favor The Government.

The remaining preliminary-injunction factors strongly favor the government as well. Plaintiffs have failed to demonstrate any irreparable injury necessitating injunctive relief. And any such harms are in any event outweighed by the harms that the injunction will inflict on the government and the public interest. "[I]t is unworkable for federal officers to distinguish journalists and 'legal observers' in the

27

midst of a riot . . . based on the nebulous criteria established by the district court,

particularly in light of the incidents of press and 'legal observer' involvement in

violent unrest." Oct. 9 Order 74-75 (O'Scannlain, J., dissenting). Plaintiffs' inability

to satisfy these factors independently warrants reversal.

### A. Plaintiffs have failed to establish that, in the absence of an injunction, they will be irreparably harmed.

The district court presumed that plaintiffs were likely to suffer irreparable harm

because they had pleaded a "colorable First Amendment claim." ER 58 n.12 (citing

*Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005)). That merits assessment is

incorrect. The First Amendment does not give self-identified journalists and legal

observers the right to disobey lawful dispersal orders issued to control a violent

protest. *Supra* pp. 15-21; *accord* Oct. 9 Order 56-72 (O'Scannlain, J., dissenting). And

plaintiffs have failed to prove that DHS and the Marshals Service intentionally

targeted them in response to their exercise of First Amendment rights. *Supra* pp.

25-27.

The district court relied on plaintiffs' allegations that, because they were

subjected to retaliation on several past occasions, their "First Amendment rights

[would] be[] chilled" in the absence of an injunction. ER 58-59. But to demonstrate

irreparable injury sufficient to support prospective injunctive relief, "plaintiff[s] must

do more than merely allege imminent harm sufficient to establish standing." *Boardman*

*v. Pacific Seafood Grp.,* 822 F.3d 1011, 1022 (9th Cir. 2016). They must instead

"*demonstrate* immediate threatened injury," *id.* (emphasis in original); a "mere possibility of some remote future injury" does not suffice, *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quotation marks omitted). Far from demonstrating imminent injury, these allegations are insufficient even to support plaintiffs' standing to obtain injunctive relief on the basis of their claim of retaliation. *Supra* pp. 22-24.

**B.** **The injunction irreparably injures the government and the public interest.**

**1.** Plaintiffs' alleged harms are in any event outweighed by the harms the injunction would inflict on the government and the public interest. Courts are properly reluctant to micromanage law enforcement officers responding to unpredictable and violent demonstrations. But the district court showed no such restraint. The injunction imposes unmanageable constraints on federal officers' ability to respond to violent protests. It does so by issuing instructions to federal officers engaged in riot control that are at once detailed and unworkable. The injunction requires officers confronted with rioters to quickly determine whether any of them is displaying a "professional or authorized press badge" or "other official press credentials"; is carrying sufficiently "professional gear" or "photographic equipment"; is sufficiently distant from "protest activities"; or is wearing sufficiently "distinctive clothing" (in the case of a journalist) or a qualifying green hat or blue vest (in the case of a legal observer). ER 68-69. The injunction forbids officers from enforcing

29

dispersal orders against a person bearing these "indicia," without specifying which or how many are necessary.  ER 68.  The injunction further states that such protected journalists and legal observers need not refrain from intermingling with protesters or from participating in protests that have turned violent.  *Id.*

There are good reasons why courts should not issue orders of this kind.  As the Supreme Court has repeatedly admonished, courts are ill-positioned to second-guess the decisions of officers seeking to disperse a protest that has turned violent.  Such occasions present "tense, uncertain, and rapidly evolving" circumstances that force officers "to make split-second judgments."  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).  Officers must "restore and maintain lawful order, while not exacerbating disorder more than necessary."  *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).  They must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'"  *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).

The district court improperly disregarded these principles.  The injunction privileges the court's *ex ante* view of appropriate law-enforcement conduct over officers' judgments in the moment.  Indeed, the court saw no difficulty with requiring officers to determine—at night, while wearing masks and other protective gear, and while being violently attacked—whether every individual affected by crowd-control tactics bears any indicia of journalist or legal-observer status.  In so finding, the court

30

wrongly discounted evidence indicating that, a practical matter, officers cannot assess each protester's clothing and equipment during "chaotic" and "violent" protests to determine whether that person is covered by the injunction. ER 147 ¶ 6.

The district court also gave short shrift to the ways in which the injunction will undermine officers' ability to protect public property and themselves. The government's unrebutted declarations describe:

- assaults on officers while the officer was attempting to ascertain whether a protester was a journalist, ER 164 ¶ 13;

- "individuals wearing press markings who were shielding or obscuring other individuals who were throwing heavy projectiles toward federal officers," ER 158 ¶ 5(c);

- a self-identified journalist encouraging protesters to tamper with government barricade, and stating that she has "a bunch more press passes to give out to people," ER 162 ¶ 8(c); and

- a protester who was arrested while wearing "insignia indicating he was a journalist" and carrying commercial-grade fireworks, ER 164 ¶ 10.

These examples illustrate the dangers of applying the injunction's terms in the midst of violent protests. And they confirm that protesters have taken advantage of the court's orders to avoid complying with lawful directives from federal officers.

Finally, the district court ignored evidence that the injunction will undermine officer safety regardless of the workability of its terms. Federal officers have adopted a defensive posture by creating a security perimeter around the Hatfield Courthouse and the nearby federal building. ER 104 ¶ 17. The officers operating between the perimeter and the courthouse are in "a cage-like environment." *Id.* Their static position "allow[s]" violent opportunists to "plan[] and execute[e] . . . elaborate attacks against" them, which can "only be thwarted" by keeping the area "fully cleared" of non-law-enforcement personnel. *Id.* Allowing self-identified journalists and legal observers—some of whom may be imposters seeking to exploit the court's injunction—to remain within the perimeter while officers are being attacked by violent protesters "further decreas[es]" officers' "already limited ability to avoid serious bodily injury." *Id.*

**2.** The injunction compounds these harms by instructing the government and plaintiffs to agree on placement of "unique identifying markings (using numbers and/or letters) on the uniforms and/or helmets" of federal officers "so that they can be identified at a reasonable distance." ER 69. If the parties cannot agree, the district court will itself decide what markings are sufficient. ER 69-70. This provision is expressly intended to enable contempt proceedings against individual officers for asserted violations of the court's orders. *See* ER 139, 143-45.

The district court identified no authority permitting the judiciary—much less plaintiffs—to design the uniforms of federal officers. In addition, the court dismissed

32

evidence that such identifiers could interfere with officers' access to operational gear, expose them to retaliation, and threaten their safety by making it possible to estimate the police force's size.  ER 55; Dkt. No. 113, at 19 (citing sources).  Those harms alone counsel against the court's improper attempt to superintend federal law-enforcement operations in Portland.  But the provision also threatens individual officers—even those who have not done anything wrong—with grave consequences for violating the injunction's unworkable terms.  These concerns are not hypothetical. Just five days after the court entered its temporary restraining order, plaintiffs filed a contempt motion against an array of federal officials, from line-level officers to the Acting Secretary of Homeland Security.  Dkt. No. 85, at 17-18.  Although that motion is currently in abeyance, the court has already expressed "serious concerns" that defendants "have not fully complied" with its orders, and has already impugned the "professional and personal" character of DHS and Marshals Service officials.  ER 60, 64.  The court has even suggested appointing an independent prosecutor to pursue criminal contempt charges against federal officers.  ER 139.

The district court did not cite, and the government is unaware of, any precedent for a preliminary injunction that binds hundreds of officers—who have not violated the law and are not parties to this litigation—in this manner.  Such provisions are antithetical to the purpose of a preliminary injunction: to maintain the status quo "pending a determination of the action on the merits."  *Boardman*, 822 F.3d at 1024 (quotation marks omitted).

**3.**     In disregarding the government's evidence, the district court relied principally on the declaration of Mr. Gil Kerlikowske, a retired law-enforcement officer, who opined that the terms of the temporary restraining order were "safe for law enforcement" and "workable." ER 121-22; *see* ER 33. But as the declaration makes clear, Mr. Kerlikowske's opinions derive from his personal experience with protests that occurred a decade ago or earlier. ER 121. The declaration does not say whether Mr. Kerlikowske has ever been faced with the novel tactics adopted by certain Portland protesters in the wake of the temporary restraining order, or whether Mr. Kerlikowske was ever required to apply anything resembling the vague criteria in the temporary restraining order. The declaration does not confront the fact that, unlike the temporary restraining order, the preliminary injunction allows people to claim "journalist" or "legal observer" status even if they actively participate in the protests, and that in fact violent opportunists with press indicia have been hiding in the protest crowds. The declaration does not even address any of the practical concerns identified by federal law-enforcement officers currently deployed to Portland, except to assert without any factual basis that those difficulties can only be explained by a lack of training. ER 123. For these reasons, the district court clearly erred by crediting Mr. Kerlikowske's opinions—offered without any firsthand knowledge of, or experience with, the current situation in Portland—over unrebutted facts that prove the injunction's unworkability.

34

The district court also found that the federal government is unlikely to be harmed by the injunction because the City of Portland consented to an injunction with similar terms. ER 53. But the City's willingness to accept those terms reveals only that the City has a "divergent assessment of the severity of the threat posed to federal personnel and property by protest events that degenerate into riots." Oct. 9 Order 71 (O'Scannlain, J., dissenting). Indeed, in this litigation, the City "has been explicitly adverse to the presence of federal officers in Portland, leveling serious allegations of unlawful conduct against them, and even going so far as to prohibit the [Portland Police Bureau] from cooperating with federal agents." *Id.*

The City's own experiences cast significant doubt on its assertion that the injunction is workable. The City has itself reported "issues with persons with 'press' markings intermingling with protesters and interfering with law enforcement." ER 53 n.11. Several named plaintiffs have accused the City of violating the terms of the stipulated injunction. Dkt. No. 138, at 41 & n.12 (citing social-media posts accusing the City of violating the terms of the stipulated injunction). And in a similar lawsuit brought by self-identified "protest medics" demanding an exemption from lawful dispersal orders issued by the Portland Police Bureau, the City vigorously opposed those plaintiffs' request for injunctive relief because the injunction was "unworkable." *Wise v. City of Portland*, No. 3:20-cv-1193, 2020 WL 5231486, at *10 (D. Or. Sept. 2, 2020). "Why the City expects the [Portland Police Bureau] to identify and to exempt"

35

journalists and legal observers, "but not 'protest medics,' is difficult to understand."
Oct. 9 Order 67 n.8 (O'Scannlain, J., dissenting).

In any event, the injunction against the federal government is both materially
different and more onerous than the injunction against the City. *Compare* ER 68-70
(DHS and Marshals Service injunction), *with* ER 95-98, 178-79 (City of Portland
injunction). For example, the injunction governing the City does not require the
Portland Police Bureau to redesign its uniforms in consultation with plaintiffs and the
district court. The injunction governing the City also does not extend special
protection to journalists or legal observers who are engaged in protest activity or are
intermingled with violent protesters.

The district court mistakenly believed that it had addressed the harms of its
injunction by forbidding journalists and legal observers from "physically interfer[ing]"
with crowd-control activities, and by permitting officers to arrest journalists and legal
observers with probable cause. ER 67. This misperceives the injury the government
will sustain. The injunction is problematic because it imposes an entirely unworkable
scheme in which officers must make snap judgments—on pain of contempt—to
exempt self-identified journalists and legal observers from general crowd-control
measures. The court also purported to create a safe harbor for officers who
"incidentally expose[]" journalists or legal observers to crowd-control tactics. ER 69.
But given the difficulty of identifying persons protected by the injunction under the
court's vague definitions, and the fact that the injunction permits journalists and legal

36

observers to mingle with protesters and participate in protests that have turned violent, ER 68-69, this safe harbor affords officers little real protection.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

JEFFREY BOSSERT CLARK
 *Acting Assistant Attorney General*

BILLY J. WILLIAMS
 *United States Attorney*

SOPAN JOSHI
 *Senior Counsel to the Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
MICHAEL SHIH
 *Attorneys, Appellate Staff*
 *Civil Division*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., NW*
 *Washington, DC 20530*
 *202-353-6880*
 michael.shih@usdoj.gov

OCTOBER 2020

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Michael Shih*
MICHAEL SHIH

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 32(a)(7)(B) because it contains 8,842 words.  This brief also complies with

the typeface and type-style requirements of Federal Rule of Appellate Procedure

32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond

14-point font, a proportionally spaced typeface.

*s/ Michael Shih*
MICHAEL SHIH