Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Kory J. DeClark, Esq. (SBN: 310571)
    declark@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
    gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Kevin Opoku-Gyamfi, Esq.
(*pro hac vice*)
    opokugyamfi@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403

[Additional counsel on next page]

*Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
    peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
    jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
    awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
    mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
    slacey@aclusocal.org
Jacob Reisberg, Esq. (SBN: 329310)
    jreisberg@aclusocal.org
Mohammad Tajsar, Esq. (SBN: 280152)
    mtajsar@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 W 8th Street, Ste 200
Los Angeles, CA 90017
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
    peter@bibringlaw.com
Law Office of Peter Bibring
2210 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, NEWSGUILD - COMMUNICATIONS WORKERS OF AMERICA, SEAN BECKNER-CARMITCHEL, RYANNE MENA, LEXIS-OLIVIER RAY, CHARLES XU, BENJAMIN ADAM CLIMER, ABIGAIL OLMEDA, and MARIA ALEJANDRA-PAZ, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary, Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; GREGORY BOVINO, in his official capacity as Chief Patrol Agent for the El Centro Sector of the U.S. Border Patrol; ERNESTO SANTACRUZ JR., in his official capacity as Acting Field Office Director for the Los Angeles Field Office, U.S. Immigration and Customs Enforcement; EDDY WANG, in his official capacity as | Case No. 2:25-CV-05563-HDV-E <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **CLASS ACTION** <br><br> Judge:      Hon. Hernán D. Vera <br> Location:   Courtroom 5B, 5th Floor |

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1   Special Agent in Charge for the Los Angeles
    Field Office of Homeland Security
2   Investigations; MARIO CANTON, in his
    official capacity as Regional Director for
3   Region 9 of the Federal Protective Service;
    KEVIN GREEN, in his official capacity as
4   Commander of the U.S. Customs and Border
    Protection, Office of Field Operations, Special
5   Response Team; and U.S. DEPARTMENT OF
    HOMELAND SECURITY,

6                    Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Additional Counsel of Record for Plaintiffs:

2    Carol A. Sobel, Esq. (SBN: 84483)
         carolsobellaw@gmail.com
3    Weston Rowland, Esq. (SBN: 327599)
         rowland.weston@gmail.com
4    Law Office of Carol A. Sobel
     2632 Wilshire Boulevard, #552
5    Santa Monica, CA 90403
     Telephone: (310) 393-3055
6
     Paul Hoffman, Esq. (SBN: 71244)
7        hoffpaul@aol.com
     Michael Seplow, Esq. (SBN: 150183)
8        mseplow@sshhzlaw.com
     John Washington, Esq. (SBN 315991)
9        jwashington@sshhzlaw.com
     Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
10   200 Pier Avenue #226
     Hermosa Beach, CA 90254
11   Telephone: (310) 396-0731

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..............................................................................................i-iv

**INTRODUCTION** ................................................................................................. 1

**THE PARTIES** .................................................................................................... 3

    A.    Plaintiffs ................................................................................................. 3

    B.    Defendants ............................................................................................. 7

**JURISDICTION AND VENUE** ........................................................................ 10

**FACTUAL ALLEGATIONS** ............................................................................ 11

**I.**    **OPERATION AT LARGE & DHS'S ONGOING RAIDS IN SOUTHERN CALIFORNIA** ................................................................. 11

**II.**    **THE LOCAL COMMUNITY RALLIES IN PROTEST AND DHS RESPONDS WITH A PATTERN, POLICY, AND PRACTICE OF UNCONSTITUTIONAL VIOLENCE** .................................................... 13

**III.**    **DHS IS CARRYING OUT A SUSTAINED PATTERN OF UNCONSTITUTIONAL FORCE AT PROTESTS THAT IS OFFICIALLY SANCTIONED** ................................................................. 17

**IV.**    **DHS'S UNCONSTITUTIONAL POLICY, PATTERN, AND PRACTICE OF RETALIATING AGAINST FIRST AMENDED PROTECTED RECORDING AND REPORTING ACTIVITY** .............................. 29

**V.**    **DHS'S ATTACKS ON THE NAMED PLAINTIFFS/CLASS REPRESENTATIVES AND MEMBERS OF THE PLAINTIFF PRESS ORGANIZATIONS** ................................................................................... 34

    A.    DHS Agents Repeatedly Assault Plaintiff/Class Representative Sean Beckner-Carmitchel While He Reports on Protests Against DHS ...................................... 34

        1.    On June 7, 2025, a DHS Agent Shot Mr. Beckner-Carmitchel in the Head with a Tear Gas Canister at a Protest Against a Reported ICE Raid ........ 34

        2.    On June 8, 2025, a DHS Agent Shot Mr. Beckner-Carmitchel in His Press Pass with a Pepper Ball at a Protest Against DHS Raids.. ...................... 36

        3.    On September 1, 2025, DHS Sprayed Mr. Beckner-Carmitchel with Pepper Spray and Assaulted Him When He Tried to Report on a Protest Against DHS    36

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

B.  On June 6 and 7, 2025, DHS Agents Shot Plaintiff/Class Representative Ryanne Mena with Projectiles While She Covered Los Angeles Area Protests Against Ice Raids for the Southern California News Group ...................................................... 38

1.  On June 6, 2025, a DHS Agent Shot Ms. Mena in the Thigh with a Kinetic Impact Projectile while She was Covering Protests of ICE Raids in Downtown Los Angeles .......................................................................... 38

2.  On June 7, 2025, a DHS Agent Shot Ms. Mena in the Head While She Covered a Protest of a Reported ICE Raid in Paramount......................... 40

C.  On June 7, 2025, DHS Agents Shot Plaintiff/Class Representative Lexis-Olivier Ray Multiple Times in the Hand and Back While He Covered Protests of ICE Raids for L.A. TACO ................................................................................................ 42

D.  On June 7, 2025, DHS Agents Shot Plaintiff/Class Representative Maria-Alejandra Paz with Projectiles, Tear Gas, and Flash-Bang Grenades.................................... 45

E.  On June 7, 2025, a DHS Agent Shot Plaintiff/Class Representative Benjamin Climer in the Hand with a Tear Gas Canister While He Protested ICE Raids in Paramount ................................................................................................................... 46

F.  On June 9, 2025, DHS Agents Shot Plaintiff Abigail Olmeda in the Head and Body with Kinetic Impact Projectiles While She Protested ICE Raids in Santa Ana.... 48

G.  On June 7, 2025, DHS Agents Shot Plaintiff/Class Representative Charles Xu in the Calf with Pepper Balls While He Videorecorded Protests in Paramount.............. 51

H.  On July 7, 2025, DHS Agents Threatened Multiple Members of LA Press Club During ICE Raids at MacArthur Park in Los Angeles ......................................... 52

I.  On July 10, 2025, DHS Repeatedly Teargassed a Journalist Member of Both CWA and LA Press Club Who Was Covering a Protest of ICE Raids for the Los Angeles Times ....................................................................................................................... 53

J.  On August 30, 2025, DHS Repeatedly Shot Chemical Weapons and Pepper Balls at a Member of LAPC and CWA Who Was Reporting on a Protest Against ICE Raids in Los Angeles ......................................................................................................... 53

K.  On September 1, 2025, DHS Sprayed Pepper Spray and Shot Pepper Balls at Multiple LA Press Club Members Reporting on a Protest of ICE Raids ............. 54

VI.  USE OF "LESS-LETHAL" MILITARIZED WEAPONS POSES SIGNIFICANT DANGERS, INCLUDING SERIOUS INJURY OR DEATH ..................................................................................................... 56

L.  Use of Chemical Weapons Can Limit Basic Human Functions and Lead to Permanent Injuries ................................................................................................. 57

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

M.    Use of Kinetic Impact Projectiles Can Cause Physical Trama, Including Serious
Bodily Injury and Death ........................................................................................ 58

**CLASS ACTION ALLEGATIONS** ........................................................................ 60

A.    Plaintiff Class ........................................................................................ 60

B.    Subclass ................................................................................................. 62

**CAUSES OF ACTION** ...................................................................................... 65

**PRAYER FOR RELIEF** .................................................................................... 70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin Adam Climer, and Maria-Alejandra Paz, on behalf of themselves and those similarly situated, and Plaintiffs Los Angeles Press Club, NewsGuild - Communications Workers of America, and Abigail Olmeda, bring this action for injunctive relief against Defendant Kristi Noem, in her official capacity; Defendant Todd Lyons, in his official capacity; Defendant Gregory Bovino, in his official capacity; Defendant Ernesto Santacruz Jr., in his official capacity; Defendant Eddy Wang, in his official capacity; Defendant Mario Canton, in his official capacity; Defendant Kevin Green, in his official capacity; and the United States Department of Homeland Security ("Defendants") and allege as follows:

**INTRODUCTION**

1.      Plaintiffs are protesters, journalists, and legal observers. They bring this class action on behalf of themselves and all people reporting on, recording, observing, or protesting the Department of Homeland Security ("DHS") immigration operations in this District that have been ongoing since June 6, 2025. In these coordinated operations, DHS is conducting terrifying immigration raids; punishing people who speak out against, document, or expose them; and is further retaliating against people who are trying to report on, record or observe DHS's violence against those who protest against, and monitor DHS's activities. Plaintiffs seek injunctive and declaratory relief to stop Defendants from using unnecessary and excessive violence to punish and deter Plaintiffs and Class members from exercising their First Amendment rights.

2.      From Thomas Paine handing out pamphlets, to the Boston Tea Party, the Women's Suffrage Movement, the Civil Rights Movement, and the Black Lives Matter Movement, the cornerstone of this country's public discourse has been the right to protest, to report on it, to challenge the government's portrayal of events, and to publicly debate those issues. Without the right to engage in that discourse, the United States loses critical checks on government power that are essential to our constitutional democracy. Suppressing the rights of the free press and protesters is the calling card of cowardly dictators and threatens to destroy our nation.

3.      In June 2025, the Trump administration began an ongoing series of indiscriminate and terrifying immigration raids across Southern California. DHS agents have come in masks,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1  wearing heavy paramilitary gear and without visible identifying information, brandishing rifles,

2  and other weapons and abducting community members from churches, local businesses, and

3  courthouses where they seek their constitutionally protected right to due process.

4      4.    Protests began almost immediately. Californians concerned about their families,

5  congregation members, fellow workers, and neighbors showed up at sites of reported raids to

6  peacefully protest the federal government's invasion of their neighborhoods and violent separation

7  of their families, to remind targeted individuals of their legal rights, and to document the

8  government's mistreatment of community members.

9      5.    Since the beginning of June 2025, and at no fewer than twelve different protest

10  events, DHS agents have engaged in a pattern, policy, and practice of unnecessarily and

11  indiscriminately assaulting, teargassing, pepper-spraying, and shooting protesters exercising their

12  rights to assemble and to voice their disagreement with DHS, reporters covering these events, and

13  legal observers seeking to document DHS's conduct. In the process, DHS has shown a pattern,

14  policy, and practice of abusing chemical and projectile weapons and flash-bang grenades in ways

15  that violate its own written policies and that needlessly imperil Plaintiffs and Class members to

16  punish them for exercising their First Amendment rights to report, observe, and protest.

17      6.    As promised by Defendant Kristi Noem and President Trump, DHS has used the

18  violent spectacle it is creating to fuel the administration's false narrative that Los Angeles is

19  "lawless" and "chaotic" and requires violent intervention by federal forces—the same misleading

20  propaganda that they are pushing in other cities whose people and elected officials have dared

21  speak out against the administration's actions.

22      7.    While trying to suppress protected speech about DHS's unnecessary and excessive

23  use of force, the government is broadcasting its own messages about the protests and immigration

24  raids. Its ongoing effort to monopolize the marketplace of ideas through brute force violates the

25  First, Fourth, and Fifth Amendments; chills people from exercising their rights to peacefully report,

26  observe, and protest; needlessly causes violence; harms the public; and irreparably injures Plaintiffs

27  and Class members.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

# THE PARTIES

**A.    Plaintiffs**

8.    Plaintiff Los Angeles Press Club ("LA Press Club") is a nonprofit organization dedicated to supporting, promoting, and defending quality journalism in Southern California. Its core mission is to encourage journalists and involve the public in recognizing outstanding journalism, based on the belief that a free press is crucial to a free society. The LA Press Club has more than 1,000 journalist members throughout Southern California, including in Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, Kern, and Ventura counties. Since June 6, 2025, DHS has violently injured and/or violated the press rights of multiple LA Press Club members while they covered protests of DHS raids in Southern California. As a result, the LA Press Club has had to divert significant staff and volunteer hours and resources from its other activities, such as working on its annual awards program, to track and address press rights violations by DHS officials and to aid and advise members—including by checking on the wellbeing of members brutalized by DHS, ensuring members have access to emergency funds or mental health services, providing information on available legal support hotlines, providing personal protective equipment to journalists exposed to hazardous environments created by DHS, expediting processing of press passes, and providing tips on safety and access for covering protests. The LA Press Club's headquarters is in Los Angeles.

9.    Plaintiff NewsGuild - Communications Workers of America ("CWA") is the largest labor union representing journalists and media professionals in North America. CWA members work for national publications including The New York Times, Reuters, The Washington Post, and The Wall Street Journal, and for Southern California publications like the Los Angeles Times, Los Angeles Public Press, Southern California News Group papers, CalMatters, and The Desert Sun among other publications. CWA members report on newsworthy events across Southern California, including Los Angeles, Orange, Ventura, San Bernardino, and Riverside counties. CWA is dedicated to supporting quality journalism, defending democracy, and improving workplace conditions for workers in the news industry. CWA bargains collectively for and represents, organizes, and supports the National Labor Relations Act rights, safety, and occupational wellbeing

of its members. Since June 6, 2025, DHS has injured multiple members of CWA covering the protests of immigration raids in Southern California. DHS's conduct has impacted CWA's ability to perform regular organizational duties, including by forcing CWA staff and members to cancel scheduled meetings, postponing National Labor Relations Act representative responsibilities, and curtailing administrative operations to prioritize emergency response and proactive safety efforts. CWA staff and executive committee time has been diverted towards checking on the wellbeing of member journalists brutalized by DHS; collecting information about instances where DHS has injured journalists; meeting with individual member journalists to discuss their rights to safety measures and to receive safety gear from their respective employers for protection against violent actions by DHS agents and how best to advocate for such protection; and advising member leaders on how to best support journalists covering immigration raid protests and the information and resources that they should be providing to journalists at risk of injury or retaliatory action by DHS. CWA's headquarters is in Washington, DC.

10.     Plaintiff Sean Beckner-Carmitchel is a California resident who lives in Los Angeles. He is a freelance journalist who has produced video news stories in international, national, and local media outlets, including The New York Times, CNN, Good Morning America, and Al Jazeera. Mr. Beckner-Carmitchel has also authored stories for a variety of media outlets, including CalMatters and The Beverly Hills Courier. Mr. Beckner-Carmitchel primarily covers news in Los Angeles County but also travels to other regions of Southern California—including Orange County, Riverside County, and Ventura County—to cover stories. In his six-year career, Mr. Beckner-Carmitchel has covered many protests. He is a member of the LA Press Club. On June 7, 2025, DHS teargassed, shot and injured Mr. Beckner-Carmitchel while he was covering a protest of a reported ICE raid near the Home Depot in Paramount, California. On June 8, 2025, DHS shot Mr. Beckner-Carmitchel while he was covering a protest against recent immigration raids on the street outside the Edward R. Roybal Federal Building ("Roybal") and Metropolitan Detention Center ("MDC") in downtown Los Angeles.[1] And on September 1, 2025, DHS agents directly sprayed Mr.

---

[1] The Edward R. Roybal Federal Building is adjacent to the Metropolitan Detention Center on Alameda Street in downtown Los Angeles. Both buildings are part of a larger complex of federal buildings that is bordered by Aliso Street, Temple Street, Alameda Street, and Los Angeles Street. The area where the Edward R. Roybal Federal Building

1  Beckner-Carmitchel with pepper spray while he was covering a protest of ongoing immigration

2  raids in downtown Los Angeles, then violently shoved him into a parked car while he was trying to

3  photograph agents arresting a protester.

4      11.     Plaintiff Ryanne Mena is a California resident who lives in Los Angeles. She is a

5  reporter covering crime and public safety for the Southern California News Group, which includes

6  the Orange County Register, Riverside Press-Enterprise, San Bernardino Sun, Los Angeles Daily

7  News, and other publications covering events throughout the Central District of California. Ms.

8  Mena is a member of CWA. As a professional and student journalist, Ms. Mena has attended many

9  protests. On June 6, 2025, DHS shot and injured Ms. Mena while she was covering a protest on the

10 streets near Roybal/MDC in downtown Los Angeles. And, on June 7, 2025, DHS shot and injured

11 Ms. Mena while she was covering a protest of a reported ICE raid near the Home Depot in

12 Paramount. As a result of being shot by DHS officers, Ms. Mena suffered a concussion, which kept

13 her out of work for a number of days. Even after she returned, she was not assigned to cover

14 protests for weeks because of concerns that she might be injured again.

15      12.     Plaintiff Lexis-Olivier Ray is a California resident who lives in Los Angeles. He is a

16 staff investigative reporter for L.A. TACO, an independent media platform founded in 2006, where

17 he focuses on crime, homelessness, and the Los Angeles Police Department. He covers Los

18 Angeles County and anticipates traveling to the immediate neighboring counties – Ventura County,

19 Orange County, and San Bernardino County – for his reporting. He was named a "distinguished

20 journalist" by the Society of Professional Journalists' Los Angeles chapter in 2022. Mr. Ray has

21 been a reporter since 2018. His work has appeared in The Los Angeles Times, Men's Health

22 Magazine, KCET, and SFGATE. Mr. Ray is a photographer who records events with a large

23 camera that he wears around his neck. Mr. Ray also videorecords events he is reporting on with his

24 phone. He is a member of the LA Press Club. On June 7, 2025, DHS agents shot at Mr. Ray with

25 pepper balls multiple times, striking him several times in the back and hand while he was covering

26 a protest on the street near Roybal/MDC in downtown Los Angeles.

27

28  and the Metropolitan Detention Center stand next to each other on Alameda Street will be referred to as
    "Roybal/MDC" to avoid confusion with other federal buildings in the District.

13. Plaintiff Charles Xu is a California resident who lives in Los Angeles County. Mr. Xu is a Legal Observer on behalf of the National Lawyers Guild of Los Angeles. As a legal observer, Mr. Xu helps to observe and document the behavior of law enforcement officials, including their weaponry, arrest tactics, and use of force at various protests and direct actions. He sometimes videorecords the actions of law enforcement officials while he is legal observing. He started legal observing in early November of 2020 and has observed more than 200 protests in Southern California. He is an active legal observer and intends to continue observing at protests against DHS raids or smaller scale responses to raids whenever possible. On June 6, 2025, Mr. Xu observed an ICE raid where federal agents deployed tear gas and detonated flash-bang grenades against protesters; Mr. Xu was personally affected by the tear gas there. On June 7, 2025, DHS launched pepper balls and tear gas at Mr. Xu while he was observing at a protest near the Home Depot in Paramount. DHS agents shot Mr. Xu in the leg with a pepper ball when he started videorecording their arrest of a protester with his phone.

14. Plaintiff Benjamin Adam Climer is a California resident who lives in Los Angeles County. Mr. Climer is a trained Emergency Medical Technician and is the training director for the Unarmed Model of Crisis Response, which is an alternative to law enforcement crisis response program within the City of Los Angeles. He has participated in numerous protests and continues to protest against and document DHS's ongoing immigration raids. On June 7, 2025, DHS shot and injured Mr. Climer while he was peacefully protesting against DHS near the Home Depot in Paramount. Mr. Climer has historically participated in numerous protests but has never previously experienced the kind of force DHS has been directing towards protesters. As a result of his experience at Paramount, he is concerned about how federal agents will act towards him and other protesters, but he still plans to attend protests in the future.

15. Plaintiff Abigail Olmeda is a California resident who lives in Orange County. Ms. Olmeda was born and raised in Anaheim, is the mother of two children, previously worked for the City of Santa Ana, and is currently a student at Cypress College. On June 9, 2025, she attended a protest against DHS raids in front of the Federal Building in Santa Ana at 34 Civic Center Plaza, motivated by concerns over ICE actions in her community. DHS shot Ms. Olmeda in the head,

1    severely injuring her, while she was peacefully standing holding a protest sign. Though DHS's

2    actions against Ms. Olmeda have made her more hesitant to speak out, she remains committed to

3    her belief in peaceful protest to protect people's rights.

4         16.    Plaintiff Maria-Alejandra Paz is resident of Los Angeles. She is a social media

5    manager for a non-profit organization. She engages in social justice advocacy in her personal and

6    professional life. On June 7, 2025, she attended a protest against DHS raids on the street outside

7    Roybal/MDC in downtown Los Angeles with her friends to express support for the immigrant

8    community of Los Angeles. DHS agents showered Ms. Paz with tear gas, pepper balls, and flash-

9    bang grenades while she was peacefully protesting. DHS shot her with a projectile weapon multiple

10   times on her arm and legs while she was running away. Since this incident, Ms. Paz has decided to

11   express herself through digital advocacy rather than by engaging in protests on the streets because

12   the harm she experienced on June 7, 2025, made her afraid to engage in traditional forms of protest.

13   If Ms. Paz felt it was safer to protest without risking the kind of injury she suffered while protesting

14   outside Roybal/MDC, she would physically participate in protests on the streets more often.

15        **B.    Defendants**

16        17.    Defendant U.S. Department of Homeland Security ("DHS") is a department of the

17   executive branch of the United States government, responsible for coordinating immigration

18   enforcement actions. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border

19   Protection ("CBP"), and the DHS Management Directorate are component agencies within the

20   Department of Homeland Security. Homeland Security Investigations ("HSI") and Enforcement

21   and Removal Operations ("ERO"), including their respective Special Response Teams, are

22   component subagencies within ICE. Border Patrol and the Office of Field Operations (including its

23   Special Response Team ("CBP-SRT")) are components of CBP. The Federal Protective Service

24   ("FPS") is a subordinate agency housed within the DHS Management Directorate. Since the

25   beginning of June 2025, DHS has coordinated a multi-agency operation that integrates various

26   DHS components, including ERO, HSI, Border Patrol, CBP-SRT, and FPS, to carry out

27   immigration raids, arrests, and roving patrols targeting Southern California—and to respond to

28   protests of those activities.

18.    Defendant Kristi Noem is the Secretary of Homeland Security and head of DHS. Since the beginning of June 2025, Noem has directed ICE, CBP, FPS, and their subordinate agencies and subcomponents, to collectively carry out or support the ongoing DHS operation in its Los Angeles Area of Responsibility, which DHS defines as the Los Angeles Metropolitan Area (Counties of Los Angeles, Orange, Riverside, San Bernardino), and Central Coast (Counties of Ventura, Santa Barbara and San Luis Obispo). Noem has sanctioned, ratified, and encouraged DHS agents' sweeping use of chemical and projectile weapons and flash-bang grenades against peaceful protesters, journalists, and legal observers assembled at protests against this operation—including methods of using those weapons that violate the agency's own written policies and established law. Noem has also established, sanctioned, and ratified an agency policy of treating videorecording of DHS agents in public as a threat that may be responded to with force and addressed as a crime. Defendant Noem is sued in her official capacity.

19.    Defendant Gregory Bovino is Border Patrol's "Commander-at-Large," the Commander of DHS's Operation At Large in California and in Los Angeles, and the Chief Patrol Agent for the El Centro Sector of CBP. Bovino manages CBP operations for the El Centro Sector, which covers inland areas of California extending to the Oregon state line. Since the beginning of June 2025, Bovino has served as the Lead Field Coordinator for Border Patrol operations in Los Angeles. Bovino has sanctioned and ratified CBP's sweeping use of chemical and projectile weapons and flash-bang grenades against peaceful protesters, journalists, and legal observers assembled at protests against DHS's ongoing operations in this District—including methods of using those weapons that violate DHS's own written policies and established law. Defendant Bovino is sued in his official capacity.

20.    Defendant Todd Lyons is the Acting Director of ICE. In that capacity, Lyons oversees ICE activities nationwide, including those in the Central District of California, which has the same geographic boundaries as ICE's Los Angeles Field Office. Lyons has sanctioned and ratified ICE agents' sweeping use of chemical and projectile weapons and flash-bang grenades against peaceful protesters, journalists, and legal observers assembled at protests of DHS operations ongoing in the Los Angeles Area of Responsibility since the beginning of June 2025—

including methods of using those weapons that violate DHS's own written policies and established law. Defendant Lyons is sued in his official capacity.

21.    Defendant Ernesto Santacruz Jr. is the Acting Field Office Director for the Los Angeles Field Office of ICE ERO. In that capacity, Santacruz Jr. supervises ICE's Enforcement and Removal Operations personnel, including ERO's Special Response Team, in the geographic area covered by the Los Angeles Field Office, which covers the seven counties of the Central District of California. Santacruz has sanctioned and ratified ERO agents' sweeping use of chemical and projectile weapons and flash-bang grenades against peaceful protesters, journalists, and legal observers assembled at protests of DHS operations ongoing in the Los Angeles Area of Responsibility since the beginning of June 2025—including methods of using those weapons that violate DHS's own written policies and established law. Defendant Santacruz is sued in his official capacity.

22.    Defendant Eddy Wang is the HSI Special Agent in Charge for Los Angeles. In that capacity, Wang supervises the HSI agents in the Los Angeles Area of Responsibility, including HSI's Special Response Team. Wang has sanctioned and ratified HSI agents' sweeping use of chemical and projectile weapons and flash-bang grenades against peaceful protesters, journalists, and legal observers assembled at protests of DHS operations ongoing in the Los Angeles Area of Responsibility since the beginning of June 2025—including methods of using those weapons that violate DHS's own written policies and established law. Defendant Wang is sued in his official capacity.

23.    Defendant Mario Canton is Regional Director for Region 9 of the Federal Protective Service. In that capacity, Canton supervises FPS officers and oversees security measures for federal properties across California, including at the U.S. Courthouse located at 300 N. Los Angeles St. in Los Angeles, the Edward R. Roybal Federal Building located at 255 E. Temple Street, the HSI/DHS training facility near the Home Depot in Paramount, CA, and the federal building located at 34 Civic Center Plaza in Santa Ana, CA. Under Canton's supervision, FPS has deployed inspectors to support DHS's multi-agency operations in this District, including Operation At Large and Operation Skipjack. Under Canton's supervision, FPS leads and coordinates the unified DHS

response to protests against the ongoing DHS immigration operation at federal properties in this
District, which, since the beginning of June 2025, has included CBP-SRT, Border Patrol, HSI, and
ERO. Canton has sanctioned and ratified FPS inspectors' sweeping use of chemical and projectile
weapons and flash-bang grenades against peaceful protesters, journalists, and legal observers
assembled at protests of DHS operations at these federal properties since the beginning of June
2025—including methods of using those weapons that violate the agency's own written policies
and established law. Defendant Canton is sued in his official capacity.

24.    Defendant Kevin Green is the Office of Field Operations Special Response Team
Commander. In that capacity, he is responsible for the training, deployment, and supervision of
CBP-SRT officers nationwide. From June 29th to July 26th, 2025, he served as the Office of Field
Operations Incident Commander in Los Angeles for Operation At Large. In that capacity, he was
directly responsible for oversight of CBP-SRT and Task Force Officers participating in the
operation and tasked them with providing "quick reaction force" at the request of FPS. Green has
sanctioned and ratified CBP-SRT officers' sweeping use of chemical and projectile weapons and
flash-bang grenades against peaceful protesters, journalists, and legal observers assembled at
protests against DHS's ongoing operations in this District—including methods of using those
weapons that violate the agency's own written policies and established law. Defendant Green is
sued in his official capacity.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §
1331, 5 U.S.C. §§ 702 and 706, and 28 U.S.C. §§ 2201 and 2202.

26.    Venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b)(2)
and (e)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims
occurred in the Central District of California and because Defendants are officers or employees of a
U.S. agency acting in their official capacities or under color of the legal authority of those agencies.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

**FACTUAL ALLEGATIONS**

I.    **OPERATION AT LARGE & DHS'S ONGOING RAIDS IN SOUTHERN CALIFORNIA**

27.    Donald Trump's second presidential term has seen a dramatic and unprecedented escalation in interior immigration arrests and detention efforts. Upon returning to power, the Trump Administration began to intensify and expand its domestic immigration enforcement, setting new sky-high targets for daily immigration arrests and expanding the scope of its operations far beyond immigrants with criminal histories.

28.    In May 2025, the Trump Administration began dispatching federal officers to major urban centers to conduct "roving patrols," "collateral" stops, and other indiscriminate immigration enforcement actions. Under orders not to limit immigration actions to lists of specific individuals targeted for apprehension, administration brass ordered officers and agents to "turn the creativity knob up to 11" to meet new arrest quotas, with instructions to round people up at 7-Eleven stores, Home Depots, and anywhere else they assumed they would find Latine people or other undocumented individuals.

29.    Broadly dubbed "Operation At Large," this national immigration operation has been primarily led by DHS, specifically ICE and CBP, with support from other agencies within DHS and outside of it. The Administration deputized personnel from across the federal government to effectuate the new program of mass arrests, including agents from the Department of Justice, Federal Bureau of Investigation, Drug Enforcement Administration, and Bureau of Alcohol, Tobacco, Firearms and Explosives, among others.

30.    This new dragnet enforcement program—untethered by target lists and unchained from legal constraints—began in full force in Southern California. The Trump Administration's vitriol against immigrants and its vows to target sanctuary cities made the Los Angeles area the perfect proving ground for this operation of community terror, mass arrest, and street violence.

31.    Starting on June 3, 2025, ICE began arresting immigrants who were lawfully appearing for routine check-in appointments with the agency at the Federal Building in downtown Los Angeles. The individuals were taken to the adjacent Edward R. Roybal Federal Building,

where they were locked in the basement, conference rooms, and outdoor tents. There, ICE detained

people—asylum seekers, young children, and pregnant people—in rooms without beds, with

limited access to food and water, and in complete darkness overnight.

32.    Then, on June 6, 2025, DHS agents began launching a series of raids and arrests

throughout Southern California, invading homes, schools, churches, workplaces, hospitals, and

courthouses. They did so not based on individualized suspicion, but in reliance on broad

demographic profiles targeting individuals who appear Latine in predominantly working class,

Latine neighborhoods. DHS sent CBP officers and agents to Los Angeles and called in additional

support from ERO and FPS for this operation.

33.    In the first few days of this operation targeting Southern California, DHS agents

descended on a series of locations, hitting multiple sites on the same day throughout this District:

a.    On June 6, 2025, immigration agents began raiding local businesses,

including a clothing wholesaler called Ambiance Apparel, a doughnut shop in the Fashion District

of downtown Los Angeles, and two Home Depot stores in the Westlake District in Los Angeles.

b.    On June 7, 2025, agents raided a Best Buy in Thousand Oaks, a supermarket

in Inglewood, and a Target parking lot in Rosemead.

c.    On June 8, 2025, agents raided a Chase Bank in Santa Maria, a

neighborhood in Hawthorne, a 99 Cents Store in Hawthorne, and various locations in Fontana,

Westchester, and Culver City.

d.    On June 9, 2025, agents expanded the operation to neighboring Orange

County, conducting raids in Santa Ana, Fountain Valley, and Whittier.

e.    On June 10, 2025, DHS expanded its operation north of Los Angeles, in

Ventura County, where agents detained farm workers as they labored in fields.

f.    On June 11, 2025, immigration raids continued with multiple raids

throughout Ventura County. The raids also targeted a car wash, Home Depot, and LA Fitness in the

City of Downey.

34.    Since then, immigration agents have continued to target car washes, farms, street

corners, bus stops, parks, recycling centers, parking lots, tow yards, churches, packing houses, a

1  swap meet, a gym—and anywhere else they believe they can snatch people who appear to be low

2  income and of Latine descent—throughout this District.

3       35.    In total, agents have arrested more than 4,000 people since the Los Angeles area

4  raids began. Countless others have been stopped temporarily or arrested and released, including

5  many who enjoy lawful status within the United States but were simply ensnared in DHS's racial

6  profile-based dragnet.

7       36.    At a news conference on June 12, 2025, Secretary Noem pledged to continue these

8  immigration raids in Los Angeles, stating: "We are not going away. We are staying here to liberate

9  this city from the socialist and burdensome leadership that this Governor Newsom and this mayor

10  placed on this country and what they have tried to insert into this city."

11       37.    Consistent with this directive, immigration raids and arrests in Southern California

12  are ongoing, with ICE, CBP, and supporting agents from other entities taking temporary residence

13  in the region to carry out Operation At Large. DHS has established a unified Incident Command

14  Post in Los Angeles for the operation, which reports directly to the DHS National Incident

15  Command Center. DHS raids and arrests in this District continue to date.

16  **II.    THE LOCAL COMMUNITY RALLIES IN PROTEST AND DHS RESPONDS
17        WITH A PATTERN, POLICY, AND PRACTICE OF UNCONSTITUTIONAL
        VIOLENCE**

18       38.    On Sunday, June 1, 2025, Defendant Eddy Wang, the Special Agent in Charge of

19  the Los Angeles Field Office of Homeland Security Investigations, notified the Federal Protective

20  Service that DHS would soon commence an immigration operation in the area that would generate

21  protests. He recommended that FPS maximize personnel staffing in the coming week.

22       39.    As anticipated, Operation At Large immediately sparked outrage among impacted

23  family members, concerned citizens, immigrant rights advocates, local officials, and the broader

24  community. Accounts of indiscriminate arrests and deplorable detention conditions for the people

25  arrested rapidly spread online and in the traditional press.

26       40.    Since the first raids began, demonstrations and protests have grown organically as

27  local community members assemble in the locations throughout Southern California where

28  immigration arrests take place to protest the actions of DHS, document the abuses carried out by

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

DHS officials, and call for an end to immigration raids. At these protests, community members gather to express solidarity with those DHS is detaining, concern about the violent tactics DHS is using, and opposition to the way DHS agents threaten and intimidate the community in executing its immigration raids. Community members also videorecord DHS's raids, arrests, and response to protests to help hold the agency accountable.

41.    In addition to the sites of immigration raids and arrests, protesters are also assembling in downtown Los Angeles as a particularly important site for their demonstrations. Community members, horrified by reports of people being detained in the dark basement rooms inside the federal buildings in downtown Los Angeles, regularly gather in the streets outside to demand the release of the people locked inside, to protest their unjust detentions, and to demand an end to the mass immigration arrests.

42.    From the beginning, DHS has incorporated protest response into Operation At Large and related immigration operations in this District, anticipating that these operations would generate public outcry. DHS has specifically tasked HSI SRT, ERO SRT, and CBP-SRT (the DHS components armed with crowd control weapons) with establishing "perimeter security" and clearing streets around immigration raids for Operation At Large. It has tasked CBP-SRT with providing "quick reaction force" as requested by FPS to respond to protests of its immigration operations at federal properties. And DHS sent a large contingent of Border Patrol from San Diego to Los Angeles specifically to provide additional force for Operation At Large in response to the protests that assembled in the first days of the operation. According to DHS, "maintaining tactical control while operating in a confined, civilian-heavy environment" is a key part of Operation At Large.

43.    Since the beginning of June 2025, FPS, CBP, CBP-SRT, ICE, Border Patrol, HSI, and ERO have also acted as unified enforcement units to respond to and disperse protests against Operation At Large taking place near federal properties.

44.    Through the command and components of Operation At Large, DHS established and maintains a policy, pattern, and practice of using significant force to disperse protesters, journalists, and observers from public streets and sidewalks around DHS activities associated with Operation

At Large, without regard for whether there is a clear and present danger of violence or serious lawlessness. Specifically, Defendants have a policy, pattern, and practice of using chemical and projectile weapons and flash-bang grenades against protests on sidewalks and in public roadways around where immigration arrests are occurring, when there is no imminent threat of harm to any person. Defendants have a policy, pattern, and practice of treating not dispersing from a protest of their immigration operations as a threat to officers that by itself justifies significant force, including, but not limited to, shooting people with chemical spray and projectile munitions.

45.    Defendants also maintain a policy, pattern, and practice of indiscriminately deploying sweeping force at protests against DHS's immigration operations—attacking protesters, journalists, and legal observers alike with significant force, without regard for whether they pose any threat or are attempting to disperse. Defendants have a policy, pattern, and practice of using chemical and projectile weapons and flash-bang grenades at protests of immigration operations without regard for whether their use of such weapons will injure members of the press, legal observers, and/or protesters who do not pose any threat to law enforcement officers or other people. Defendants have a specific policy, pattern, and practice of shooting chemical and kinetic impact munitions and deploying flash-bang grenades against entire protest crowds, if any one individual in the crowd throws any item, regardless of whether the throwing of the item poses a real threat. Defendants have a specific policy, pattern, and practice of using chemical weapons, compressed air launchers, and munitions launchers against non-violent protest crowds.

46.    The Director of the Less-Lethal Training Branch of the Law Enforcement Safety and Compliance Directorate of CBP stated in a sworn declaration that current CBP policy authorizes the practices alleged above.

47.    Since the beginning of June 2025, DHS has maintained policies, patterns, and practices of using force at protests against its immigration operations in ways that violate the agency's own policies, regulations, and requirements to follow the Fourth Amendment. For example, Defendants have a policy, pattern, and practice of:

a. Using force without considering if there is a serious or imminent threat or whether it would be feasible to give a warning before using such force;

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

b.  Using force without considering whether the targeted individuals' actions pose a threat
of imminent harm;

c.  Using force without giving people a reasonable opportunity to voluntarily comply with
any orders—including, specifically, by using force without giving audible warnings or
considering whether sufficient time may be provided for people to voluntarily comply
with any orders to avoid the use of force;

d.  Using significant force against people who do not pose an imminent threat of harm to an
officer or another person—including, but not limited to, directly firing pepper spray at
people who do not pose a threat to officers or others; and

e.  Using chemical and projectile weapons and flash-bang grenades against groups that
include small children, elderly persons, and individuals who lack the ability to quickly
disperse from the area, without reasonably considering their presence.

48.    DHS maintains policies, patterns, and practices that violate the access rights of press
and legal observers, denying them access when doing so is not essential or narrowly tailored to
serve a legitimate government interest. For example, DHS has a policy, pattern, and practice of:

a.  Dispersing press and legal observers when there is no probable cause to believe that
they have committed any crime;

b.  Using force against press and legal observers to compel compliance with its agents'
general demands for people present at protests to disperse; and

c.  Firing chemical and projectile weapons at journalists and legal observers standing off to
the side or otherwise physically removed from crowds at protests.

49.    DHS also maintains a policy, pattern, and practice of misusing chemical and
projectile weapons at protests against its immigration operations in highly dangerous ways that
place protesters, journalists, and legal observers present at protests at risk of death or serious injury.
Specifically, DHS agents fire tear gas canisters, pepper balls, kinetic impact projectiles, and other
projectiles at people's bodies and at a dangerous height that can cause traumatic injury or death.
Defendants specifically have a policy, pattern, and practice of firing tear gas canisters, flash-bang
grenades, pepper balls, kinetic impact projectiles, and other projectile munitions at the heads,

necks, groins, and spines of persons who do not pose an immediate threat of death or serious bodily injury.

### III. DHS IS CARRYING OUT A SUSTAINED PATTERN OF UNCONSTITUTIONAL FORCE AT PROTESTS THAT IS OFFICIALLY SANCTIONED

50.     At no fewer than twelve different protest events since the beginning of June 2025, DHS has repeatedly deployed chemical agents, flash-bang grenades, and projectiles against protesters, journalists, and/or legal observers while they are documenting and protesting against DHS's conduct. In these attacks, DHS continually violates its own written use-of-force policies by using these weapons improperly; using significant force against Plaintiffs and Class members for not dispersing from protests on public streets and sidewalks; attacking Plaintiffs and Class members without warning and without giving them a reasonable opportunity to avoid DHS's violent attacks; misusing weapons in ways that risk inflicting deadly injury; and inflicting violence on Plaintiffs and Class members without regard for whether they pose a threat or are even situated near someone who poses a threat. DHS has assaulted Plaintiffs and Class members in highly dangerous ways that place all of them at risk of death or serious injury. DHS agents have consistently used weapons to suppress First Amendment protected activity when they faced no imminent threat of violence, or any threat at all.

51.     As DHS officials' statements make clear, this sustained pattern of misconduct is officially sanctioned and ratified to retaliate against Plaintiffs and Class members' First Amendment exercise.

52.     On June 6, 2025, federal agents brutalized and arrested a union leader protesting an immigration raid at Ambiance Apparel, and used tear gas, batons, and flash-bang grenades against a group of concerned community members protesting the raid, injuring people in the neighborhood.

53.     Later that day, DHS agents from a combined line of CBP and ICE agents fired pepper balls and tear gas canisters into a crowd of protesters, journalists, legal observers, and elected officials who had gathered near Roybal/MDC in downtown Los Angeles for a press conference and demonstration against immigration raids. Protesters participated in chants like "Let them go!" and were holding signs with statement like "ICE out of LA." DHS agents wearing riot

1  gear shot pepper balls and chemical weapons directly at protesters. This use of force was

2  retaliatory, indiscriminate, and needless. DHS faced no threat when it launched its violent assault,

3  nor did DHS agents give any audible warning or instruction to disperse in advance.

4        54.     On the morning of June 7, 2025, in the area around the federal building located at

5  300 North Los Angeles Street in downtown Los Angeles, DHS repeatedly deployed chemical

6  weapons against protesters, concerned family members of people detained in the basement of the

7  building, and advocates chanting legal advice towards detained people whom ICE was moving

8  from the building into unmarked vans. U.S. Congress members Jimmy Gomez and Norma

9  Torres—who were present to raise concerns about ICE detaining people in the building's basement

10  holding cells without food, water, or sunlight—were also subjected to this chemical weapon

11  multiple times. The chemical weapon DHS sprayed into the air made people cough and experience

12  a burning sensation. DHS faced no threat from the people gathered when it deployed this weapon,

13  nor did DHS agents give any audible warning or instruction to disperse in advance. On the

14  contrary, federal agents instructed the Congress members to wait in the area where DHS released

15  the chemical agent. In a livestream from the area, Representative Torres began to state: "If this is

16  how violently they are pushing against members of Congress who are wanting to have some

17  oversight as to how many people are detained . . ."—then was stopped by a coughing fit brought on

18  by exposure to DHS's chemical agent. Video of this event is at

19  https://www.instagram.com/reel/DKm_YT7P2Ph/?igsh=MWg2ejZvcTFja3lrdQ==

20        55.     Also on June 7, 2025, in the Los Angeles County city of Paramount, CBP and ICE

21  agents shot volleys of kinetic impact projectiles and tear gas canisters at peaceful protesters,

22  journalists, and legal observers who had gathered in response to reports of immigration

23  enforcement activity in the area. DHS agents formed a phalanx near the gate of a business park at

24  6401 Alondra Boulevard. From there they launched a sweeping, violent attack on protesters who

25  mostly gathered in a grassy area across the wide thoroughfare. The community members there had

26  been playing music and chanting at immigration enforcement to get out of their community; they

27  included local families and people of all ages, including children and elders.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

56.     DHS agents repeatedly shot hot tear gas canisters and projectile weapons directly at people, hitting people in the head with projectiles and causing gashes and burns to people's limbs:



Photo: Jonathan Alcorn

57.     DHS agents did not target their assault towards people who posed any kind of threat. Instead, DHS agents fired their weapons in the direction of peaceful protesters, journalists, and legal observers. For example, DHS agents fired a tear gas canister at a photojournalist who was taking cover behind an SUV, hundreds of yards from the line of DHS officers. Another DHS agent shot a tear gas cannister that hit journalist Plaintiff Sean-Beckner Carmitchel in the head while he was trying to cover the protest and was standing well away from any protesters.

58.     One agent shot a weapon directly at a pile of mulch, causing it to set fire. Agents shot tear gas canisters at a woman who was about 200 feet away from them who was holding a U.S. flag.

1
2
3
4
5
6
7
8
9
10



11

Photo: Jonathan Alcorn

12    59.    DHS agents launched so much tear gas that they created a thick and inescapable fog

13  of harmful chemicals covering a broad swath of the area. People were struggling to breathe,

14  coughing, weeping in pain, and pouring water into their eyes. Some people vomited.

15
16
17
18
19
20
21
22
23



24

Photo: Charles Xu

25    60.    By DHS's own account, more than 100 agents shot hundreds of weapons at the

26  community members gathered in protest in Paramount. They used so many weapons that they

27  requested – and received – a resupply of munitions that was delivered by helicopter. After this

28  barrage of attacks, the assembled DHS agents departed from the area.

61.     On the afternoon of June 7, 2025, Kristi Noem addressed the non-violent protesters, legal observers, and journalists in a post on X, stating: "A message to the LA rioters: you will not stop us or slow us down."

62.     On the evening of June 7, 2025, President Trump authorized the deployment of 2,000 National Guard troops to Los Angeles. In a Truth Social post that same evening, he stated: "These Radical Left protests, by instigators and often paid troublemakers, will NOT BE TOLERATED."

63.     That night, in the area around Roybal/MDC, DHS agents repeatedly fired a barrage of chemical weapons and projectiles at journalists and protesters, even after they were already dispersing. At one point DHS agents poured out of the gate of Roybal, on Alameda Street near MDC, firing multiple rounds of pepper balls and tear gas canisters. After most protesters had already left the area, officers continued to fire on a group of journalists gathered across the street, including Plaintiff Ray and LA Press Club member R.R.—striking both with pepper balls multiple times.

64.     On June 8, 2025, President Donald Trump stated in a post on Truth Social:



Donald J. Trump
@realDonaldTrump

A once great American City, Los Angeles, has been invaded and occupied by Illegal Aliens and Criminals.  Now violent, insurrectionist mobs are swarming and attacking our Federal Agents to try and stop our deportation operations — But these lawless riots only strengthen our resolve. I am directing Secretary of Homeland Security Kristi Noem, Secretary of Defense Pete Hegseth, and Attorney General Pam Bondi, in coordination with all other relevant Departments and Agencies, to take all such action necessary to liberate Los Angeles from the Migrant Invasion, and put an end to these Migrant riots. Order will be restored, the Illegals will be expelled, and Los Angeles will be set free. Thank you for your attention to this matter!

**19.9k** ReTruths   **84.6k** Likes                    Jun 08, 2025, 2:06 PM

65.     The June 8, 2025, post echoes President Trump's prior statements expressing animus against protesters, including that "[i]n the good old days" protesters were treated "very, very rough. And when they protested once, you know, they would not do it again so easily."

66.    In an interview that same day on "Face the Nation," Defendant Noem stated "[w]e're not going to let a repeat of 2020 happen," referencing the groundswell of protests against police brutality following the killing of George Floyd in 2020.

67.    On the same day, Defendant Noem asked Secretary of Defense Pete Hegseth to support ICE, CBP, and FPS agents with military weaponry; to direct the military to help arrest "rioters;" and to deploy military drone surveillance at protests.

68.    On June 8, 2025, the National Guard joined DHS agents to confront a group of demonstrators participating in an organized march from the neighborhood of Boyle Heights towards Roybal/MDC to protest immigration raids tearing apart families in the Boyle Heights community. From behind a line of National Guard shields, DHS agents continuously launched volleys of tear gas, pepper balls, chemical spray, and kinetic impact projectiles at the protest. Members of the press and a ten-year-old boy holding a protest sign were among those that DHS agents teargassed. The demonstrators had not yet reached the intended destination for their protest when they were forced to turn around by DHS's attack.



Photo: Sean Beckner-Carmitchel

69.    Later that afternoon, photojournalist Ted Soqui was photographing a protest on the streets near Roybal/MDC at a distance of about fifteen feet away when, without warning, DHS agents shot him with a pepper ball in the face and then shot him in the right shin with a kinetic impact projectile in quick succession.



Photo: Graham Coven

70.    On June 9, 2025, Secretary of Defense Pete Hegseth authorized the deployment of 700 Marines to Los Angeles.

71.    Solidarity protests of the federal government's militarized aggression against Los Angeles were held in cities across the country, including San Francisco, New York, Atlanta, Philadelphia, Cleveland, Dallas, San Jose, and Santa Ana.

72.    At the Santa Ana protest on June 9, 2025, DHS agents deployed tear gas, pepper balls, and kinetic impact projectiles against peaceful protesters holding signs. As a Santa Ana councilmember described: "Everything was peaceful and then the federal agents started shooting at the crowd." DHS agents did not provide any warning before they started firing projectiles at protesters who were standing at a distance. The agents shot pepper balls at protesters, with some people being shot in the head with kinetic impact projectiles, causing dangerous and traumatic injuries.



Photo: The Santanero (with permission)

73.     Also on June 9, photojournalist Ted Soqui returned to cover the protests at near Roybal/MDC. He wore personal protective equipment and remained fifty feet away from protesters and federal agents. Nonetheless, as he was preparing to leave, DHS agents shot him *again,* this time striking him in the back three times with kinetic impact projectiles.

74.     On June 10, 2025, Donald Trump told reporters at the White House that Los Angeles protesters "were met with very strong force." He stated that the federal actions in Southern California were "the first, perhaps, of many" federal efforts to suppress protesters and that future protests were "going to be met with equal or greater force."

75.     In an interview with Fox News on June 10, 2025, Defendant Noem stated, about DHS's response to the ongoing protests in this District, "We're going to hit them back and hit them back harder than we have before . . . The more that they protest . . . the harder ICE is going to come after them."

76.     At a press conference on June 12, 2025, Defendant Bovino, commander of Operation at Large, addressed the DHS response to the Paramount protest and stated: "the . . .

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1  demonstrators . . . will not deter us, the CBP mission here in Los Angeles. I believe we saw that

2  last Sunday night at Paramount. We continued to conduct our patrols as we saw necessary in the

3  middle of that riot and we'll continue to do that from here on out."

4      77.    At the same press conference on June 12, 2025, Defendant Lyons stated: "No

5  protesters are gonna block our way because the brave men and women of ICE . . . are going to

6  ensure that we handle these protesters."

7      78.    On June 20, 2025, the mayor of the City of Maywood, several Maywood City

8  Council members, and community members gathered near the Xpress Wash on Slauson Avenue in

9  Maywood to gather document, observe, and protest DHS agents detaining a young a man in front

10  of the car wash. While protesters were chanting and videorecording the incident with their phones,

11  DHS detonated tear gas canisters and smoke bombs and shot pepper balls at the crowd, which

12  included middle school and high school-age students. DHS agents also threw tear gas canisters in a

13  park across the street from the car wash, which was also full of young students.

14      79.    On July 10, 2025, DHS agents conducted immigration raids at two separate Glass

15  House Farms locations, one in Camarillo, California and the other in Carpinteria, California.

16  Protesters, journalists, and elected officials gathered at both locations to gather information about

17  what was happening in their communities and to demonstrate against DHS.

18      80.    In Camarillo, people assembled at two distinct protests sites, one to the east side of

19  the Glass House facility and the other to the west side of the facility. Protesters gathered in the

20  eastside and westside sites with signs and participated in chants like, "We don't want you" and

21  "We are not the enemy." DHS agents fired kinetic impact projectiles, pepper balls, and multiple

22  rounds of tear gas without warning at protesters and journalists gathered at both protest sites,

23  injuring a member of Plaintiff CWA. People who were injured there were covered in welts and

24  bruises from being hit with projectiles, described feeling like their limbs were on fire from the

25  pepper balls, and were so incapacitated by chemical weapons other protesters had to render medical

26  aid to help them see and breathe. DHS hit one protester, a professional guitarist, in the hand with a

27  projectile weapon. As a result, he had surgery to insert a screw in his finger causing him to be

28  unable to play the guitar.

81.    In Carpinteria, journalists, protesters, and public officials gathered at the roadblock DHS agents set up near the Glass House facility. The crowd included a mother and her daughter, elderly people, and families with three- and four-year-old toddlers. The crowd yelled and chanted, "You are tearing apart families!" DHS agents detonated a flash-bang grenade, a smoke bomb, and a tear gas canister at the gathering of protesters. The weapons made people – including the children and seniors – cough violently, struggle to breathe, and dry heave. When the weapons detonated, people started screaming and attempted to run to safety. Some people, including an elected official, fell to the ground and were injured.



Photo: Mónica Solórzano

82.    On July 12, 2025, addressing DHS's response to the recent protests in Carpinteria and Camarillo, Defendant Noem stated at a press conference, "Thanks to the courage of [DHS agents], we know that the rioters won't win."

83.    On August 30, 2025, in front of Roybal/MDC, DHS officers repeatedly fired chemical weapons at journalists and protesters, including at least one member of LA Press Club

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

and CWA, who were standing on the other side of a chain link fence from the officers. Neither the

protesters nor the journalists, who were clearly identifiable as journalists, posed any threat to the

officers.

84.    The same evening DHS officers standing behind the fence repeatedly shot pepper

balls indiscriminately at both journalists and protesters standing on the other side of the fence who

posed no threat to the officers or to anyone else. The indiscriminate firing of pepper balls resulted

in both protesters and journalists being hit with the covering of the pepper balls, shrapnel from

pepper balls that broke up when hitting links in the fence, or full pepper balls that went through

holes in the chain link fence. At different times officers fired the pepper balls at head height, and

other times about knee height.

85.    On the evening of Labor Day, September 1, 2025, DHS officers standing behind at

temporary chain link fence in front of Roybal/MDC again repeatedly fired chemical weapons and

pepper balls at protesters and journalists on the other side of the fence when the protesters posed no

threat, and the journalists were clearly doing their jobs.



Photo: Kayjel Mareina

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

86.     Later that night a large group of DHS agents came out from behind the fence, picked out a protester and chased him to the intersection of Aliso and Commercial Streets, where they tackled and arrested him. While the protester was on the ground, DHS officers indiscriminately fired pepper balls at numerous journalists and other protesters who were five to ten feet away and doing nothing to interfere with the arrest. Shortly thereafter, shrapnel from a pepper ball hit a journalist under her left eye.

87.     Then DHS officers stood the arrested man up and led him down Alameda Street back towards Roybal/MDC walking on the west side of Alameda. As they escorted the arrested man, one DHS officer raised his pepper ball gun and shot directly at a student journalist for a LA Press Club member publication who was in the middle of Alameda Street about twenty to thirty feet away from the officer, with a camera up to his face. The officer hit him directly on the head with a pepper ball. Immediately upon being hit the journalist buckled from the impact of being hit in the head by the pepper ball.

88.     On September 16, 2025, Defendants Noem, Lyons, Bovino launched Operation At Large in the city of Chicago, stating "Operation At Large is here to continue the mission we started in Los Angeles—to make the city safer by targeting and arresting criminal illegal aliens."

89.     On September 25, 2025, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies and actions because such actions were "anti-American."

90.     October 3, 2025, Defendants Noem and Bovino exhorted ICE and CBP agents engaged in Operation at Large in Chicago to continue their brutality by "going hard" at protesters for the way they were "talking" and "speaking."

91.     Defendants are engaging in viewpoint discrimination by targeting force against protests, including legal observers and journalists covering those protests, based on the presumed content and viewpoint of their speech. In their internal communications about the protests against DHS operations in this District, Defendants note repeatedly that the protests are "anti-ICE." While Defendants have described journalists as "violent rioters" for engaging in on-the-ground reporting

on protests around federal properties, they have granted social media "influencers" who support the administration special access to an ICE facility to create media content that is supportive of DHS and its operations and critical of the protests against DHS taking place outside.

92.     Defendants' animus against the ongoing protests encompasses members of the news media reporting on them. President Trump has long denigrated journalists and media organizations that express views he does not agree with, repeatedly referring to journalists as "disgusting," "crooked," "dangerous," and, most significantly, as "the enemy of the American people." President Trump has suggested that critical media coverage of his administration is "illegal" and "no longer free speech. In line with this sentiment, in the June 2025 issue of a series of DHS press releases titled "DHS Debunks Fake News Media Narratives," DHS purported to "hold[] the media accountable for spreading disinformation to the American people," asserting "the media have falsely claimed the riots in Los Angeles are 'peaceful.'" And on June 10, 2025, DHS issued an official press release that makes clear the agency views journalists reporting on the protests in this District as political opponents, stating: "Politicians, media attempt to gaslight Americans, call lawless riots in the sanctuary state of California peaceful. . . . Sanctuary politicians and the media have falsely claimed these are 'peaceful' riots." DHS Assistant Secretary for Public Affairs Tricia McLaughlin said, in an official statement, "mainstream media and far-left politicians have lied point-blank to Americans that these riots in Los Angeles have not been violent."

## IV.   DHS'S UNCONSTITUTIONAL POLICY, PATTERN, AND PRACTICE OF RETALIATING AGAINST FIRST AMENDED PROTECTED RECORDING AND REPORTING ACTIVITY

93.     Since June 2025, DHS has maintained a policy, pattern, and practice of treating photography and videorecording that documents the conduct of DHS officers in public as threats or "doxxing" that DHS officers may appropriately respond to with force and that they may address as crimes.

94.     On June 14, 2025, DHS issued an internal bulletin titled, "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest." That official bulletin identified "use of cameras", "livestreaming . . . interactions [with officers]", and videorecording at protests as "unlawful civil unrest" tactics and "threats."

95.    At a DHS press conference on July 12, Defendant Noem stated, "videotaping [ICE agents] . . . when they're out on operations" is "violence."

96.    In July and August 2025, DHS asserted in four filings in an immigration case that a journalist was a danger to the community, such that he should not be released pursuant to an immigration judge's bond order, because of his recording and livestreaming of law enforcement activity.

97.    On September 9, 2025, DHS Assistant Secretary for Public Affairs Tricia McLaughlin said, in an official statement, that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents," adding, "[w]e will prosecute those who illegally harass ICE agents to the fullest extent of the law."

98.    On August 15, 2025, ICE violently arrested a popular social media livestreamer, who used her platform to record and report ICE activity, while she was parked at her apartment building in Los Angeles. On information and belief, the arresting agents told her that they were arresting her because she had been recording ICE activities.

99.    On information and belief, ICE directly told Orange County activists who regularly record the agency's ongoing operation in the region that the agency is watching their content on social media and building a case to accuse them of doxxing.

100.    Consistent with these statements by DHS officials, DHS agents are engaged in an ongoing pattern and practice of using force and wielding their weapons—flash-bang grenades, tear gas, less lethal rifles, and even firearms—against people for observing, photographing, or videorecording DHS raids and arrests in Southern California:

a.    On June 14, 2025, in Downey, California, multiple DHS agents took a man from the parking of the Downey Memorial Christian Church. The church pastor approached the agents in the parking lot and told them they did not have permission to be on church property. She asked to see their warrant and for their identifying information. They refused to provide her with any information. As she was holding up her phone, attempting to videorecord while yelling information about legal rights to the man being detained, a DHS agent pointed a gun at her.

b.      On June 17, 2025, in Pasadena, California, DHS agents carried out an immigration raid at a bus stop near a shopping center. Community members and advocates gathered at the shopping plaza when they heard the news about the raid. Shortly thereafter a federal agent drove through the parking lot of the shopping plaza. When a community member went up to the car to photograph the license plate, a masked federal agent pulled a gun on the man taking the photograph.

c.      On June 19, 2025, Job Garcia was videorecording DHS agents during a raid in the parking lot of the Home Depot in Hollywood, California when agents tackled him to the ground. DHS agents arrested him and held him in detention for more than twenty-four hours.

d.      The same day, in Santa Ana, California, a person driving past a market saw four masked federal agents detaining a group of men. When the onlooker rolled down their window and began to record video, one of the masked agents raised a handgun and pointed it the person recording while another agent yelled, "You better get out of here."

e.      On June 20, 2025, agents fired tear gas at about half a dozen people videorecording and observing a DHS arrest in Pico Rivera.

f.      On June 23, 2025, DHS agents detained a young woman working as street food vendor outside of the Home Depot in Marina Del Rey. Several community members gathered where the raid was taking place. They videorecorded the agents, asked the agents to provide their warrant and identification numbers, and provided information about legal rights to the young woman. After the agents put the woman in their unmarked car, the agents fired at least two rounds of tear gas near where the community members who had been videorecording were standing before speeding off.

g.      On June 27, 2025, in downtown Los Angeles, DHS agents fired tear gas at a crowd of bystanders who were videorecording them arresting a fruit seller during a DHS immigration operation.

h.      On July 7, 2025, in MacArthur Park, in Los Angeles, California, DHS agents pointed guns at people who were standing on the sidewalk videorecording them as they conducted a show of force operation.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

i.    On August 14, 2025, Defendant Gregory Bovino held an impromptu press conference in the plaza of the Japanese American National History Museum to discuss a raid that DHS agents had conducted in the area earlier that day. After Defendant Bovino stopped speaking to the press, a DHS agent forcefully pushed a woman who was videorecording them in the public plaza, while wearing a t-shirt that said "ICE out of LA" on the front and had immigration "know-your-rights" information on the back.

j.    On August 20, 2025, in Huntington Beach, DHS agents reportedly injured a man while detaining him at the Russell Fischer Car Wash. He was transported to the hospital for treatment. A crowd of concerned community members gathered in the hospital parking lot to await information. While they were there, DHS agents drove through the parking lot. As a community member was videorecording the DHS agents in their car, the agent sitting in the passenger seat pulled out a gun and pointed it at the person who was videorecording.

k.    On August 28, 2025, dozens of DHS agents violently detained people in front of the CARACEN Day Labor Center next to the entrance to the Westlake Home Depot. Agents threw tear gas canisters and shot pepper balls at community members who were videorecording them during the raid.

101.    At multiple protests against DHS since June 6, 2025, DHS agents have pointed or fired their weapons directly at members of the press and legal observers, including Plaintiffs and members of the Plaintiff press organizations, who were standing apart from protesters, holding cameras or phones, and obviously videorecording or photographing the agents. DHS agents used force against multiple Plaintiffs at the precise moment that Plaintiffs began videorecording the agents arresting a protester.

102.    DHS associates photography and videorecording of DHS agents by members of the public and the press, and social media publication of such recordings, with a viewpoint that is critical of the agency. In its June 14, 2025, bulletin characterizing livestreaming and use of cameras as threats, DHS warned that "[s]ocial media is also being utilized as a format for individuals to share videos to get more people involved in their ideological movements," in addition to being used to identify officers and their activities. And on August 13, 2025, Defendant Lyons stated, on a

podcast: "It's extremely frustrating. When we have to sit there and we see a lot of these social media outlets or news outlets that just totally paint the wrong picture of what the men and women [of ICE] are doing. And that's what's leading to the increase [in] assaults on ICE officers and agents since last year. It's because of this rhetoric, painting ICE to be doing something illegal."

103.    In contrast, DHS has given its political allies broad leeway to videorecord DHS agents out on operations. DHS allowed television personality Dr. Phil, a vocal supporter of the Trump administration and its immigration operations, to videorecord his ride-alongs with ICE and celebrate the agency's actions on his show. As Dr. Phil told California Governor Gavin Newsom on Newsom's podcast in June 2025, "We're embedded with ICE, and they've allowed us full access at Merit TV. And when I say full access, there are no guidelines[.]" Later in June 2025, DHS similarly allowed a FOX News correspondent to ride-along with ICE and videorecord agents arresting someone; at the beginning of the segment that aired, the correspondent stated: "Only FOX News was with ICE in Los Angeles." In July, DHS allowed the same FOX correspondent to videorecord and broadcast Border Patrol agents chasing and detaining people in a Home Depot parking lot, along with commentary by Defendant Bovino, who was present at the raid. Border Patrol agents maced and arrested a member of the public who was recording the same scene.

104.    At the same time that DHS is retaliating against members of the public and the news media for recording DHS agents, DHS is itself recording highly produced videos of its agents and publishing them on social media to broadcast its own messages about its immigration operations and the protests against them. DHS was engaged in such video production at MacArthur Park on July 7 and at the Japanese American History Museum on August 14, 2025, where DHS agents wielded force against members of the public who were video recording. While Defendant Noem has stated that videotaping ICE agents when they're out on operations is "violence," she has directed DHS personnel to film videos of her accompanying ICE agents on operations—for example, during a raid of a family's home in Huntington Park, California, on June 12, 2025. DHS's ongoing effort to monopolize the marketplace of ideas in these ways is unlawful viewpoint discrimination.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

## V.    DHS'S ATTACKS ON THE NAMED PLAINTIFFS/CLASS REPRESENTATIVES AND MEMBERS OF THE PLAINTIFF PRESS ORGANIZATIONS

105.    DHS's excessive and indiscriminate use of force against protesters, journalists, and legal observers has prevented Plaintiffs from exercising their constitutional rights, is chilling their First Amendment exercise, has caused significant injuries to Plaintiffs/Class Representatives, and is continuing to cause irreparable injury to Plaintiffs/Class Representatives and others who want to attend or report on protests. Plaintiffs/Class Representatives intend to continue attending protests and exercising their rights to videorecord, observe, speak, and assemble.

### A.    DHS Agents Repeatedly Assault Plaintiff/Class Representative Sean Beckner-Carmitchel While He Reports on Protests Against DHS

#### 1.    On June 7, 2025, a DHS Agent Shot Mr. Beckner-Carmitchel in the Head with a Tear Gas Canister at a Protest Against a Reported ICE Raid

106.    On Saturday, June 7, 2025, Mr. Beckner-Carmitchel received a tip about a potential immigration raid at the Home Depot in Paramount. At the time, he was on assignment for the LA Public Press, which is an online news outlet.

107.    To prepare to cover the story, Mr. Beckner-Carmitchel brought a helmet, respirator, and a lanyard with his press credential that he wore around his neck. He also brought his camera to take photographs and his phone to videorecord, as is his practice.

108.    During his coverage of the protest at the location of the reported raid, Mr. Beckner-Carmitchel was able to access an area near the Home Depot that the Los Angeles Sheriff's Department had closed to the public by showing local officers his press pass. Mr. Beckner-Carmitchel spent several hours on the scene.

109.    Towards the end of the day, Mr. Beckner-Carmitchel walked down a public sidewalk towards the Home Depot with another reporter when he observed Department of Homeland Security Investigators, who were identifiable by the HSI letters on their attire, deploy flash-bang grenades, tear gas canisters, and kinetic munitions at protesters.

110.    To observe and better capture photographs of the use of force on the protesters, Mr. Beckner-Carmitchel positioned himself at least twenty feet away from the main group of protesters, alongside another reporter, to safely document the situation.

111.    While videorecording the encounter between federal agents and protesters from along a public street, Beckner-Carmitchel was struck in the head by a tear gas canister, which he believes was shot by an HSI officer given the force of impact and his distance from DHS agents. The canister caused a large hematoma above Mr. Beckner-Carmitchel's right eye, which caused significant pain.

 

Photos: Ryanne Mena

112.    Because Mr. Beckner-Carmitchel was twenty or more feet away from the protesters and canisters are not intended to be used as a projectile weapon, DHS agents—who undergo extensive marksmanship training—either deliberately aimed at him as a member of the press or were engaged in indiscriminate acts of violence against everyone present.

113.    In addition to being shot in the head, Mr. Beckner-Carmitchel's exposure to tear gas was the worst he had ever experienced and caused severe eye pain and coughing.

114.    Despite his pain, Mr. Beckner-Carmitchel assisted a fellow reporter who could not open her eyes because of gas exposure.

115.    When they had retreated to a safer area, Mr. Beckner-Carmitchel was treated by a street medic and then went to the Emergency Room at St. Francis Hospital to treat his head injury.

116.    Shooting Mr. Beckner-Carmitchel in the head with a tear gas canister was a clear misuse of that weapon, which is not supposed to be used as a projectile weapon at all and is

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1  supposed to be shot at the ground. The way DHS shot tear gas canisters at people, including Mr.

2  Beckner-Carmitchel, at the protest in Paramount is known to cause serious, potentially-lethal harm.

3      **2.    On June 8, 2025, a DHS Agent Shot Mr. Beckner-Carmitchel in His
         Press Pass with a Pepper Ball at a Protest Against DHS Raids**

4

5      117.    On June 8, 2025, Mr. Beckner-Carmitchel was on assignment for LA Public Press to

6  cover a protest against immigration raids in the Boyle Heights community of Los Angeles.

7      118.    Mr. Beckner-Carmitchel observed approximately 100 protesters march from Boyle

8  Heights toward Roybal/MDC, where immigrant detainees are held.

9      119.    As the march approached the detention center, DHS agents, accompanied by

10  National Guard personnel, shot tear gas, pepper spray, and pepper balls into the crowd that was in

11  and along the public street, which included both demonstrators and the press standing in the public

12  street. Among those affected by the tear gas was a ten-year-old child holding a protest sign.

13      120.    Mr. Beckner-Carmitchel documented this incident on video, noting that journalists

14  and news media were targeted by DHS agents while being clearly identifiable by their bright vests

15  labeled "News Media" or "PRESS" and by their professional camera equipment. The video of the

16  event is accessible at: https://bsky.app/profile/acatwithnews.bsky.social/post/3lr4pqjfdks22.

17      121.    Despite being clearly identified as a member of the press, DHS shot Mr. Beckner-

18  Carmitchel with a pepper ball in his press pass. Mr. Beckner-Carmitchel's press pass was destroyed

19  as a result, and he had to urgently seek the assistance of LA Press Club staff to obtain a

20  replacement so that he could continue covering the ongoing protests.

21      122.    By shooting Mr. Beckner-Carmitchel in the upper body with a pepper ball, DHS

22  misused that projectile weapon, which is supposed to be shot towards the ground, not directly at

23  people's upper bodies. The way federal agents used pepper balls here can cause serious,

24  potentially-lethal harm.

25      **3.    On September 1, 2025, DHS Sprayed Mr. Beckner-Carmitchel with
         Pepper Spray and Assaulted Him When He Tried to Report on a Protest
         Against DHS**

26

27      123.    On September 1, 2025, Mr. Beckner-Carmitchel covered a protest on the streets near

28  Roybal/MDC for the LA Public Press. When he arrived, he saw a calm protest of between ten to

1  twenty people, which eventually grew to between fifty and seventy-five people. Mr. Beckner-

2  Carmitchel observed about two dozen DHS agents.

3      124.   At Roybal/MDC, DHS erected a temporary black metal fence between three to five

4  feet from where the sidewalk ends and the street begins. The fence was approximately ten feet high

5  and had an approximately two-foot-wide footing that sat on the sidewalk.

6      125.   Around 7:00 p.m., DHS agents began shooting pepper balls. Despite being separated

7  from the group of protesters at the fence, Mr. Beckner-Carmitchel was hit in the neck with pepper

8  ball shrapnel. DHS agents provided no warning before they started shooting pepper balls.

9      126.   Shortly thereafter, Mr. Beckner-Carmichel saw that part of the fence had opened,

10  but no protester tried to enter the area behind the fence. A group of DHS agents then sprayed

11  pepper spray through the opening in the fence.

12      127.   DHS sprayed Mr. Beckner-Carmitchel straight on with pepper spray as he was

13  standing on the public sidewalk, reporting on the protest. DHS agents made no effort to target the

14  spray at people shaking the fence. Instead, the agents sprayed everyone in attendance at the protest,

15  including about ten clearly identifiable photojournalists separate from the body of protesters. DHS

16  agents continued spraying multiple three-to-five second intermittent bursts of OC spray at everyone

17  near the fence for fifteen to thirty minutes. After the OC spray was deployed, the protest thinned to

18  between twenty-five and fifty people.

19      128.   As a result of the OC spray, Mr. Beckner-Carmitchel felt an intense burn in his eyes

20  and could not see. He coughed intensely and the spray caused a burning sensation on his hands.

21      129.   Later in the evening, DHS began making arrests. When a large group of DHS agents

22  began chasing a man down the street, Mr. Beckner-Carmitchel ran after the agents to photograph

23  the arrest. He remained about fifteen feet away from the agents while photographing the arrest from

24  the public street.

25      130.   While photographing the arrest, a DHS agent shoved Mr. Beckner-Carmitchel from

26  behind toward a parked car. The assault aggravated Mr. Beckner-Carmitchel's already-broken ribs,

27  which led to him being unable to report on the events for the next ten minutes.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

131.    Although he believes that DHS agents are targeting the press, and being injured by DHS repeatedly at protests has made him concerned for his safety, Mr. Beckner-Carmitchel is continuing to cover the protests of immigration raids, including by photographing and videorecording agents with his camera and phone, in Southern California because he believes what is going on is an important story.

**B.    On June 6 and 7, 2025, DHS Agents Shot Plaintiff/Class Representative Ryanne Mena with Projectiles While She Covered Los Angeles Area Protests Against Ice Raids for the Southern California News Group**

**1.    On June 6, 2025, a DHS Agent Shot Ms. Mena in the Thigh with a Kinetic Impact Projectile while She was Covering Protests of ICE Raids in Downtown Los Angeles**

132.    On June 6, 2025, Ms. Mena covered an ICE raid at a clothing shop before moving to Roybal/MDC to cover protests of the ICE raids—both locations were in downtown Los Angeles. While covering the events in Los Angeles, Ms. Mena wore two different press credentials around her neck, which clearly identified her as a journalist: one was from Southern California News Group and the other was from the Los Angeles County Sheriff's Department. Ms. Mena was also carrying a pen and notepad that she used to routinely take notes during the day's events.

133.    When Ms. Mena arrived at the area around Roybal/MDC, there were about two dozen protesters scattered on the surrounding streets. No violence of any kind was taking place.

134.    At around 4:00 p.m., Ms. Mena observed about 200 people attending a press conference and protesting peacefully outside the Federal Building in downtown Los Angeles. The protesters were not violent in any way.

135.    Ms. Mena then walked down the street to the area around Roybal/MDC where there was a growing crowd of approximately fifty non-violent protesters.

136.    After observing the peaceful protest for a while, Ms. Mena saw a single protester, who was clearly identifiable among the crowd, throw a desk chair toward the driveway next to the building. The chair hit no one and landed a few yards away from the DHS agents guarding the building.

137. Approximately one to two minutes after the protester threw the chair, about twelve DHS agents in riot gear with DHS and HSI patches emerged and began firing pepper balls at the protesters, who were approximately six to twenty feet away from agents.

138. After the agents fired at protesters for about five seconds, Ms. Mena backed further away from the group to avoid getting hit and to get a different vantage point of the evolving events and was approximately twenty feet to the north and behind the main group of protesters on Alameda Street, a public street. While Ms. Mena was observing agents engage the protesters from that location, DHS agents shot her in the left thigh with a pepper ball.

139. Ms. Mena did not hear any direction from DHS telling people to disperse or warning them that the agents would use force if they did not move before the DHS agents started shooting at the protesters and shot her.

140. When DHS agents shot her, Ms. Mena screamed, experienced significant pain, and observed a white residue on her pants, which she later documented with a photograph:



Photo: Ryanne Mena

141. Although she was in pain, Ms. Mena called her editor and was determined to stay at the scene because she felt it was an important story to cover. She remained at the scene until about 9:00 p.m. despite her injury.

142.    Later that evening, Ms. Mena witnessed DHS agents detonate flash-bang grenades, including one that landed near her. She observed no threats or other provocation from protesters preceding the use of flash-bang grenades.

143.    A few days later, Ms. Mena photographed the wound caused by the pepper ball.



Photo: Ryanne Mena

144.    Because she was clearly identifiable as a journalist and not close to a concentration of protesters, Ms. Mena was either targeted by DHS for her reporting or subjected to sweeping, indiscriminate violence aimed at everyone in the vicinity of the protest.

145.    DHS agents misused their weapons by shooting at Ms. Mena with pepper balls; pepper balls are supposed to be shot at the ground, not directly at people. The way DHS agents are using pepper balls can cause serious harm.

**2.    On June 7, 2025, a DHS Agent Shot Ms. Mena in the Head While She Covered a Protest of a Reported ICE Raid in Paramount**

146.    On June 7, 2025, Ms. Mena was assigned to the 2:00 p.m. shift to cover protests in Paramount related to a reported ICE raid. She arrived at the scene at about 3:30 p.m.

147.    Once on the scene, Ms. Mena talked to a series of protesters over the course of forty five minutes. Because the scene was relatively calm, Ms. Mena considered leaving the area but decided to walk towards the Home Depot where ICE presence had been reported to look around.

148.    As she walked down the street toward the Home Depot, Ms. Mena saw a line of three to four dozen HSI agents.

149.    A group of about a dozen protesters yelling and carrying signs were fifty to seventy feet away and across the street from the agents. She did not witness any of the protesters do anything to assault the agents or throw anything, yet the agents began firing kinetic impact projectiles and tear gas canisters directly at the protesters for approximately ten seconds. Ms. Mena saw agents shoot multiple volleys of both projectile rounds and tear gas canisters at the protesters for almost eight to ten seconds. The agents shot both projectile rounds and tear gas canisters directly at the protesters' bodies rather than at the ground.

150.    While Ms. Mena was observing the agents firing at onlookers from her location on a public street thirty to fifty feet away from the protesters, DHS shot her in the head with a projectile round.

151.    Ms. Mena was hit about an inch above her right ear with the projectile round, causing significant pain. Shortly after shooting her with the projectile, DHS teargassed Ms. Mena, which aggravated her asthma and caused her severe difficulty breathing. Ms. Mena also experienced intense eye pain and took a photo of her bloodshot eyes:



Photo: Ryanne Mena

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

152.    Ms. Mena later experienced vomiting, a severe headache, and neck pain, which led her to seek treatment at an urgent care where she was diagnosed with a concussion.

153.    As a result of her injuries, Ms. Mena was required to take time off work, and her supervisors did not permit her to go back into the field for a week. Even after she returned to the field, she was not assigned to cover protests for a number of weeks because of concerns that she might be injured again. Since the concussion, Ms. Mena has experienced lingering brain fog and anxiety, which has made doing her day-to-day job as a journalist more difficult.

154.    The way the DHS agents shot Ms. Mena in the head with projectile round was a misuse of their weapons; such projectile rounds are not supposed to be shot above waist-level absent an imminent threat of death or serious bodily injury. The way federal agents fired projectiles against Ms. Mena and other people at the same protest can cause significant and potentially-lethal harm.

155.    Since DHS shot and injured Ms. Mena on June 6 and June 7, she has taken time from reporting to attend additional trainings on covering civil unrest. Ms. Mena felt it was important to attend such training in light of her experiences on June 6 and 7.

156.    Ms. Mena intends to continue covering important events like the protests on June 6 and 7 in the Southern California region. However, knowing what she knows now about how DHS agents use force, and in light of her experience getting shot by DHS agents twice, Ms. Mena plans to wear personal protective equipment when covering protest events in the future and to ask for additional protective equipment from her employer to protect against projectile weapons like those DHS shot at her. Ms. Mena anticipates that wearing all this equipment, while clearly necessary, may pose a barrier to effective reporting, including by impeding her sense of her surroundings and ability to communicate with people.

**C.    On June 7, 2025, DHS Agents Shot Plaintiff/Class Representative Lexis-Olivier Ray Multiple Times in the Hand and Back While He Covered Protests of ICE Raids for L.A. TACO**

157.    On June 7, 2025, Mr. Ray covered a protest in response to DHS immigration operations outside Roybal/MDC. At the time, Mr. Ray was wearing his camera and press pass. He also believes that he was wearing both an L.A. TACO shirt with "PRESS" on the back and a

1  baseball hat with an L.A. TACO logo in front and "PRESS" on the back in letters designed to be

2  visible from a distance.

3      158.    The group of about 100 protesters present was peaceful, with families present, with

4  music playing, and protesters cheering for vehicles that honked in support.

5      159.    Federal officers, who wore uniforms identifying them as DHS and ICE agents,

6  including Special Response Team members, in tactical gear emerged from the gate of Roybal, on

7  Alameda Street near MDC. On one occasion, Mr. Ray heard an agent order people to leave the

8  area.

9      160.    Sometime later, someone threw a firework at the gate. Within a few seconds, Mr.

10  Ray observed that most of the protesters were at least fifty feet or so away from the gate, and none

11  of the protesters seemed to pose any threat to DHS agents.

12     161.    At approximately 8:33 p.m., without any audible warning, DHS agents stormed out

13  of the garage, firing pepper balls, tear gas, and flash-bang grenades. The video that Mr. Ray took of

14  agent exiting the gate can be found here:

15  https://bsky.app/profile/shoton35mm.bsky.social/post/3lr2zgrr6oc2p

16     162.    While agents fired some tear gas canisters at the ground, they fired others higher

17  over the heads of protesters. Mr. Ray saw protesters quickly flee the area as the street became thick

18  with tear gas.

19     163.    When the agents came out of the garage, Mr. Ray was standing to the side trying to

20  videorecord. Though Mr. Ray was not blocking the garage entrance, the officers shot pepper balls

21  at him. As Mr. Ray took cover behind a parked car on Alameda Street, a public street, the agents

22  continued to fire at him and others in the street for minutes.

23     164.    After the shots paused, Mr. Ray walked across the street to stand near a group of

24  other journalists and press vans parked on the opposite side of the street from Roybal/MDC.

25  Although most protesters had already left the area and were several hundred feet away, Mr. Ray

26  saw the agents form a skirmish line. The few remaining protesters, approximately twenty in total,

27  were spread across the street and approximately fifty feet away.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

165.     At about 8:53 p.m., the agents in the skirmish line advanced, but Mr. Ray did not hear them provide any clear orders or instructions. At the time, Mr. Ray was standing at least fifty feet away from the skirmish line by the television trucks along with about half a dozen other journalists, some of whom were television crews with large cameras and bright film lights.

166.     Almost as soon as agents began to move, they targeted an enormous volley of pepper balls and tear gas at the journalists and remaining protesters. Television news crew members stayed for a brief period to film, but they ran to take cover behind press vans as the DHS agents advanced. A video of the skirmish line beginning to move down the street can be found here: https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dkkvqak2p

167.     Within a few seconds, agents came around to the side of the van to shoot at the journalists—despite Mr. Ray's shouting "Press! We're all press!" One officer shot Mr. Ray in his left hand from approximately ten feet away, which caused him extreme pain.

168.     As Mr. Ray retreated from the scene, agents shot him with multiple pepper balls that hit his finger along with his upper and lower back. Based on where he was hit and the position of the agents at the time, they must have shot him directly.

169.     Mr. Ray observed agents continue to target protesters and other journalists, including a Univision television crew, as they attempted to move away from the advancing agents. A video of this encounter can be found here:

https://bsky.app/profile/shoton35mm.bsky.social/post/3lr3dvqv4j22p

170.     Although Mr. Ray plans to continue reporting on protests as part of his job, he is concerned that agents appear to use force for no reason and target people who are obviously journalists. He noted that this was the first time in his career he had been struck by less-lethal munitions, despite covering numerous tense and high-conflict events.

171.     The incident has caused Mr. Ray to reconsider his proximity to protests policed by DHS agents, and he will likely stay further back when covering future events, which he worries will impact the quality and immediacy of his reporting.

172.     DHS agents shooting at Mr. Ray with pepper balls was a misuse of those weapons, which are supposed to be used only against someone who poses a threat, and even then, only shot

at the ground. The way federal agents used pepper balls against Mr. Ray can cause significant harm.

**D.     On June 7, 2025, DHS Agents Shot Plaintiff/Class Representative Maria-Alejandra Paz with Projectiles, Tear Gas, and Flash-Bang Grenades**

173.     On June 7, 2025, Maria-Alejandra Paz attended a protest against DHS immigration operations on the streets near Roybal/MDC in downtown Los Angeles along with her friends.

174.     She arrived in the area of Roybal/MDC at about 8:45 p.m. As soon as she arrived, she and her friends experienced symptoms from the chemical agents in the air.

175.     Ms. Paz observed DHS agents in tactical uniforms who were heavily armed standing outside the Federal Building.

176.     At approximately 9:30 p.m., Ms. Paz and her friends were part of a group of about fifty protesters gathered in front of the Roybal/MDC.

177.     At approximately 11:00 p.m., Ms. Paz noticed that there more DHS agents had come to join those who were already at the building. The protesters yelled for them to "get out of our city." The DHS retreated behind the gate of Roybal, on Alameda Street near MDC.

178.     Shortly thereafter, the gate suddenly lifted, and the DHS came out. They showered the crowd with tear gas, pepper balls, and flash-bang grenades. Ms. Paz was standing 150 feet from the gate. The agents did not provide a verbal warning that they were going to start shooting. They did not give an order to disperse.

179.     Ms. Paz heard loud flash-bang grenades detonate in quick succession.

180.     Ms. Paz saw canisters on the ground. She initially thought they were smoke bombs, so she hid behind a nearby sign to block the smoke from hitting her.

181.     A tear gas canister landed at Ms. Paz's feet. She struggled to breathe from the gas. Her face burned, her nose ran, and her eyes watered even though she was wearing goggles.

182.     Ms. Paz ran away. As she ran away, she was hit with projectile weapons. The next day she had four round bruises on the back of her legs and another bruise on her forearm.

183.     Ms. Paz has experienced nightmares since being injured by DHS.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

184.    Since this incident, Ms. Paz has decided to express herself through digital advocacy rather than by engaging in protests on the streets because the harm she experienced on June 7 made her afraid to engage in traditional forms of protest. If Ms. Paz felt it was safer to protest without risking the kind of injury she suffered while protesting near Roybal/MDC, she would physically participate in protests on the streets more often.

**E.    On June 7, 2025, a DHS Agent Shot Plaintiff/Class Representative Benjamin Climer in the Hand with a Tear Gas Canister While He Protested ICE Raids in Paramount**

185.    On June 7, 2025, Benjamin Climer attended a protest against DHS at the Home Depot near the intersection of Alondra Boulevard and Atlantic Place in Paramount. At about 2:00 p.m., Mr. Climer arrived at the protest. He estimates that there were 100 to 150 other protesters, who were chanting and behaving peacefully.

186.    Mr. Climer observed agents dressed in camouflage and olive-green uniforms, later identified as DHS agents based on video footage showing "Border Patrol" and "HSI" on their uniforms across the street from the protest.

187.    Approximately every five to six minutes, Mr. Climer observed DHS agents advancing toward the protesters and firing tear gas canisters.

188.    Over the course of an hour and twenty minutes, Mr. Climer estimates that DHS agents advanced toward protesters fifteen to twenty times. Mr. Climer heard no warnings, dispersal orders, or announcements of unlawful assembly from these agents.

189.    On more than fifteen occasions, Mr. Climer witnessed DHS agents firing tear gas canisters and other projectiles directly at protesters' bodies.

190.    To protect himself from the tear gas, Mr. Climer would hide behind trees to shield himself from the fumes. And, when not under fire, Mr. Climer would resume chanting and peacefully protesting.

191.    On one occasion, Mr. Climer provided medical assistance to a protester who was spitting up mucus and believed he had been shot in the head with a kinetic impact projectile. After helping the injured protester, Mr. Climer retreated to shield himself from the next round of tear gas.

192.    As he retreated from the area, Mr. Climer was struck by a tear gas canister, which tore the skin of his left index finger and caused significant bleeding and extreme pain in his left hand. Mr. Climer estimates that the agents who fired the canister were approximately fifty to seventy-five feet away at the time.

193.    Mr. Climer continued to retreat from the main group of protesters to treat his wound by covering his hand with a clean nitrile glove that he brought to the protest to stop the bleeding.



Photo: Benjamin Adam Climer

194.    Despite his injury, Mr. Climer remained in the area for about another hour and continued to chant and protest peacefully. He also provided medical assistance to another protester who had been hit in the abdomen by a tear gas canister.

195.    In addition to tear gas canisters, Mr. Climer observed several types of projectiles and casings on the ground, including black foam tops and large canisters that released multiple smaller, hot gas canisters that burned the grass when they landed.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

196.    At around 4:30 p.m., Mr. Climer left the protest and drove to Kaiser Permanente

Urgent Care in Pasadena, where his wound was x-rayed, cleaned, and closed with three sutures.



Photo: Benjamin Adam Climer

197.    Mr. Climer has participated in numerous protests but has never experienced such

targeted misuse of force from law enforcement.

198.    Because Mr. Climer was peacefully protesting, rendering aid to fellow protesters,

and retreating from the protests when struck with the tear gas canister, he was likely targeted by

federal agents.

199.    Federal agents shooting Mr. Climer in the hand with a tear gas canister is a clear

misuse of this weapon, which is supposed to be shot at the ground. The manner in which federal

agents used tear gas canisters here can cause significant and serious harm.

**F.**      **On June 9, 2025, DHS Agents Shot Plaintiff Abigail Olmeda in the Head and
Body with Kinetic Impact Projectiles While She Protested ICE Raids in Santa
Ana**

200.    On June 9, 2025, Abigail Olmeda attended a protest at the Federal Building in Santa

Ana. Ms. Olmeda estimates that there were about one hundred protesters in the area around the

building when she arrived. At the protest, Ms. Olmeda noted that the Santa Ana Police Department

and Homeland Security Investigators, with "HSI" across the chest of certain agents, stood around

the Federal Building.

201.    Ms. Olmeda was at least forty to fifty feet from the agents and took a picture shortly after arriving at the protest.



Photo: Abigail Olmeda

202.    Within fifteen minutes of her arrival, DHS shot Ms. Olmeda with a pepper ball near her collar bone without any warning or audible order from law enforcement.

203.    After moving away from the area where she was shot, Ms. Olmeda's sister went to retrieve an umbrella and water bottle from Ms. Olmeda's backpack.

204.    At that point, an officer with "HSI" insignia on his uniform pointed at Ms. Olmeda and appeared to direct others toward her. In response Ms. Olmeda raised her empty hands and verbally indicated that she was unarmed.

205.    A few minutes later, Ms. Olmeda raised a protest sign that read: "Raids don't teach Justice – they teach fear. Education thrives on inclusion, not intimidation." She yelled at the officers that they were on the wrong side of history.

206.    Without warning, DHS shot Ms. Olmeda again, this time with multiple pepper balls. While she was able to block some of the shots with a cardboard sign and yelled that she was there peacefully, one of the pepper balls hit her knee.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

207.    DHS then shot a tear gas canister at Ms. Olmeda's feet. Ms. Olmeda fled across the street with her sister.

208.    After the gas cleared, Ms. Olmeda returned to the same area around the Federal Building with other protesters.

209.    Upon returning to the area, DHS agents began firing on the group. DHS shot Ms. Olmeda's partner multiple times with kinetic impact projectiles in the stomach and back as he fled from agents. At that point, Ms. Olmeda was struck in the temple with a kinetic impact projectile, which caused intense pain.

210.    Once the group was safely away from the firing agents, Ms. Olmeda took a picture of her head where she was hit with the projectile:



Photo: Abigail Olmeda

211.    After being shot in the head, Ms. Olmeda was disoriented and could not find her car without the help of her spouse.

212.    Two days later, Ms. Olmeda sought medical attention because she was suffering from disorientation, memory lapses, tingling, and extreme sharp pains.

213.    At the hospital, Ms. Olmeda found visible injuries to her head, collar bone, upper side, right arm, underarm/rib area, and right knee. Ms. Olmeda was referred to orthopedics and a neurologist, who suspected that she had a brain bruise.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

214.    Although the use of force by federal agents against Ms. Olmeda has made her hesitant to speak out, she remains committed to protesting for a greater purpose and believes such force should never be used against peaceful protesters again.

215.    DHS agents shooting Ms. Olmeda in the head and body with kinetic impact projectiles and pepper balls is a misuse of those weapons, which are supposed to be shot at the ground and only at people who pose a threat. The way federal agents used kinetic impact projectiles and pepper balls here can cause significant and potentially lethal harm.

**G.    On June 7, 2025, DHS Agents Shot Plaintiff/Class Representative Charles Xu in the Calf with Pepper Balls While He Videorecorded Protests in Paramount**

216.    On June 7, 2025, Charles Xu observed protests near the Home Depot parking lot in Paramount as a legal observer.

217.    On three separate occasions thereafter, Mr. Xu observed DHS agents unleash at least twenty rounds of weapons, including tear gas, flash-bang grenades and pepper balls, at protesters. Mr. Xu saw no protesters attack or throw projectiles at DHS agents before the agents deployed their weapons. Mr. Xu did not hear DHS agents give any warnings before they deployed their weapons.

218.    Mr. Xu witnessed DHS agents shoot a protester in the stomach with a kinetic weapon.

219.    DHS agents fired tear gas canisters indiscriminately into the open intersection of public streets. This obstructed Mr. Xu's ability to observe their conduct, because he was not able to safely document how people were hit with the munitions shot by DHS or collect spent munitions, according to his typical practice as a legal observer. Mr. Xu tried to be very careful not to be in the immediate vicinity of the tear gas canisters or downwind of the tear gas. Despite his efforts and the fact that he was wearing goggles and a well-fitted N95 mask, Mr. Xu felt stinging from all the tear gas.

220.    Approximately two hours after he arrived, Mr. Xu observed federal agents attack a protester who was pushing a shopping cart. Having not witnessed any provocation by the protester

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1  before the attack, Mr. Xu started using his phone to videorecord the interaction between DHS and

2  the protester.

3     221.    While Mr. Xu videorecorded DHS agents detaining the protester from a distance,

4  roughly twenty to thirty feet away, and while he was on a public street, Mr. Xu heard DHS agents

5  shoot pepper balls all around him; one pepper ball hit Mr. Xu in the leg. Mr. Xu was not standing

6  near anyone else when DHS shot him, and he was obviously videorecording the agents. DHS

7  agents did not warn him before shooting him.

8     222.    DHS agents shooting Mr. Xu with pepper balls while he was acting as a legal

9  observer and videorecording the detention of a protester is a misuse of their weapons. Pepper balls

10 are supposed to be shot at the ground and only at people who pose a threat. The way DHS agents

11 used pepper balls against Mr. Xu can cause serious harm.

**H.    On July 7, 2025, DHS Agents Threatened Multiple Members of LA Press Club
During ICE Raids at MacArthur Park in Los Angeles**

13    223.    On July 7, 2025, DHS Agents deployed a massive show of force in MacArthur Park

14 with numerous military vehicles, about fifteen white transport vans, and other agents on horseback.

15 In total, there were approximately one hundred DHS agents conducting an operation in MacArthur

16 Park. The show of force prompted a protest of seventy-five to one hundred people.

17    224.    Multiple journalists arrived at MacArthur Park to cover the DHS's actions and the

18 protests that arose in response.

19    225.    Journalists Tina-Desiree Berg and R.R., both LA Press Club members, were among

20 the journalists who went to MacArthur Park to cover the events unfolding there. They both were

21 carrying reporting equipment and wearing press lanyards around their necks. At one point, when

22 R.R. moved to record an interaction between a protester and some CBP agents with his camera, an

23 agent pointed a gun-like weapon at him for about thirty seconds even as he yelled that he was

24 "press." Another agent threatened to pull the pin on a flash-bang grenade while standing near R.R.

25 and Ms. Berg.

26

27

28

I.    **On July 10, 2025, DHS Repeatedly Teargassed a Journalist Member of Both CWA and LA Press Club Who Was Covering a Protest of ICE Raids for the Los Angeles Times**

226.    On July 10, 2025, DHS agents carried out two more assaults on protesters and reporters assembled at three separate protest sites near two distinct DHS raids in Camarillo and Carpinteria as part of Operation At Large. DHS agents specifically tasked with "perimeter security" and clearing public roadways around the two raids sites repeatedly teargassed Jeanette Marantos, a features reporter for the Los Angeles Times and a CWA individual member and journalist for an LA Press Club member organization, while she was on assignment at the eastside protest in Camarillo. Ms. Marantos saw several other members of the press who were also there to cover the protest when DHS launched the tear gas. She wore a vest with "MEDIA" written in large letters on the back and her press badge. She was teargassed three times. One of the tear gas attacks was so potent it made her feel panicky and she struggled to breathe. As a result, she was unable to assess what was going on around her or to do her job for about ten minutes.

J.    **On August 30, 2025, DHS Repeatedly Shot Chemical Weapons and Pepper Balls at a Member of LAPC and CWA Who Was Reporting on a Protest Against ICE Raids in Los Angeles**

227.    On multiple occasions during the evening and night of August 30, 2025, DHS officers fired a chemical agent at both protesters and journalists on the sidewalk outside Roybal/MDC. The officers fired the chemical agent either through a temporary chain link fence that has been erected on the sidewalk on Aliso Street in front of Roybal/MDC, or through a portion of the fence that opens. Sometimes the officers firing the weapons seemed to be directing it at one or more specific protesters, but they would spray from far enough away and the spray would spread out as it traveled so it would hit large groups of people on the other side of the fence, including Mel Buer, a journalist who is a member of LA Press Club and CWA. Other times, the officers would spray indiscriminately at the crowd, hitting both protesters and journalists on the other side of the fence. A number of different officers fired chemical agents multiple times even though they faced no threat from protesters or journalists on the other side of the fence.

228.    Ms. Buer was hit with a chemical agent causing pain and burning on her skin and lips. Ms. Buer was wearing a press pass around her neck, which was plainly visible, was carrying

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

and routinely using a Sony SLR camera with a medium length zoom lens, and was clearly identifiable as a journalist at the time.

229.    On multiple occasions the same evening, DHS officers also fired pepper balls from the inside of the fence at groups of protesters on the other side of the fence who posed no threat to the officers, as well as people who were clearly identifiable as journalists, including Ms. Buer. The officers shot the pepper balls at both knee and head height. Some of the balls broke upon hitting the fence, sending white pepper ball powder and "shrapnel" into the crowd. Other balls passed through holes in the fence.

**K.    On September 1, 2025, DHS Sprayed Pepper Spray and Shot Pepper Balls at Multiple LA Press Club Members Reporting on a Protest of ICE Raids**

230.    In addition to injuring Plaintiff Sean Beckner-Carmitchel on September 1, 2025, DHS officers shot other journalists, including LA Press Club member Jill Connelly, LA Press Club and CWA member Mel Buer, and Kayjel Mareina, a photographer for an LA Press Club member publication, with chemical weapons and pepper balls on the same day.

231.    Ms. Connelly was hit in the back with chemical spray as she was walking away from the fence on the sidewalk outside of Roybal/MDC. She was clearly identifiable as a journalist from the press pass on a lanyard around her neck, her helmet with a patch saying PRESS, and the two professional SLR cameras she was carrying and regularly using to record the protest. The same evening Ms. Connelly photographed a DHS officer putting his arm through a gap in the fence and firing and hitting numerous journalists who were shooting pictures and wearing very visible press identification. At no time when Ms. Connelly was hit, or observed other journalists hit, did she hear any dispersal order or warning that DHS was about to shoot chemical weapons.

232.    The same evening, DHS officers shot pepper balls from behind the fence at individual protesters or groups of protesters. They also shot pepper balls at journalists on the other side of the fence. In some cases, they shot at people even when they had backed away from the fence and were ten to fifteen feet into the street on Aliso Street.

233.    Ms. Buer got hit not only with powder from the pepper balls, which stings, but also with "shrapnel" from an exploding pepper ball.

234.    Later that evening a large group of DHS officers, including members of a Strategic

Response Team, came out from behind the fence, lined up, and pushed protesters off the sidewalk.

Shortly after, they identified a protester in the crowd and chased him to the intersection of Aliso

and Commercial Streets where they tackled and arrested him.

235.    Shortly thereafter they fired multiple rounds of pepper balls into the ground that

bounced up and hit journalists and protesters who were observing the arrest five to ten feet away

but not interfering with it.

236.    Ms. Buer also observed them fire another bunch of pepper balls in her direction

when she was twenty feet or so away from the arrest, one of which hit close to her and threw up a

plastic shard that hit right below her left eye. The exploding pepper ball burned, and she later

developed hives under her eye and had to take steroids to reduce the inflammation.

237.    Shortly thereafter a DHS officer fired a pepper ball directly at journalist Kayjel

Mareina, who was photographing a group of DHS officers lead a man they had arrested back to the

federal buildings. Mr. Mareina was clearly identifiable as a working photographer who posed no

threat to any DHS officer or other person. He was in the middle of Alameda Street, twenty to thirty

feet away from the officer who shot him, who was on the west side of Alameda. The pepper ball hit

Mr. Mareina in the temple, causing his knees to buckle and almost fall to the ground.



Photo: Mel Buer

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION



Photo: Mel Buer

## VI. USE OF "LESS-LETHAL" MILITARIZED WEAPONS POSES SIGNIFICANT DANGERS, INCLUDING SERIOUS INJURY OR DEATH

238.    There are significant risks in using chemical agents and kinetic impact projectile weapons and flash-bang grenades for alleged "crowd control," including serious bodily harm, permanent injury, death, environmental damage, and the violation of residents' rights—especially for vulnerable populations like children, the elderly, and those with pre-existing medical conditions.

239.    These so-called "less-lethal" weapons pose the real risk of causing permanent injury or death, both to intended targets and bystanders, as a result of misplaced or ricocheting shots, indiscriminate use, pre-existing medical conditions, inadequate user training, repetitive applications, intentional misuse, and panic and chaos caused by frightened crowds, raising significant doubts that these weapons can be used in a manner that is simultaneously safe and effective.

240.    When using chemical agents, kinetic impact projectiles, or flash-bang grenades against any group of more than ten people engaged in a protest, there is an incredibly high chance of harming peaceful participants and bystanders.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

**L.    Use of Chemical Weapons Can Limit Basic Human Functions and Lead to Permanent Injuries**

241.    Chemical control agents cause irritation to the eyes, mouth, throat, lungs, or skin, including tear gas, pepper spray, and related substances. Exposure, especially prolonged, to a large dose of such chemical weapons can cause permanent injuries, including blindness, glaucoma, or death from chemical burns to the throat and lungs or from respiratory failure.

242.    Chemical control agents are also dangerous because they are designed to indiscriminately affect crowds. Indeed, chemical control agents are meant to be used against groups, which makes it difficult to limit the exposure of specific individuals or small groups, increasing the risk of affecting bystanders and individuals other than the intended targets.

243.    Moreover, the use of such weapons for alleged crowd control poses an increased risk to children, the elderly, and people with certain preexisting medical conditions, including chronic lung disease and certain eye conditions.

244.    Specifically, chemical control agents can damage critical human functions, such as:

- Eyes: Causes irritation, blurry vision, pain, temporary or permanent blindness, and direct trauma leading to corneal burns or lacerations.

- Respiratory System: Induces coughing, difficulty breathing, and can trigger severe respiratory distress, especially in individuals with preexisting conditions like asthma, potentially leading to hypoxia or death.

- Skin: Causes burning, redness, itching, allergic reactions, and sometimes blistering or burns.

- Psychological Effects: Exposure can result in disorientation, fear, anxiety, panic, and symptoms of post-traumatic stress disorder (PTSD) after prolonged or repeated exposure.

- Cardiovascular System: Increases heart rate and blood pressure, which can precipitate heart attacks in those with preexisting heart conditions.

- Other Effects: Irritates the nose, throat, and gastrointestinal system, leading to pain, nausea, vomiting, and in severe cases, ruptured blood vessels.

- Physical Trauma: Canisters and grenades can cause blunt trauma, fractures, internal injuries, and death, especially when fired at close range.

245.    The use of chemical weapons is often not proportional to the needs of crowd control during civilian protests because the effects of using these devices indiscriminately impact peaceful participants and bystanders even when carefully targeted at others.

246.    Research has shown that people exposed to chemical weapons are much more likely to contract acute respiratory illnesses such as the flu, leading to concerns, following the COVID-19 pandemic, that the use of tear gas and pepper spray on large groups of people at protests may precipitate or exacerbate public health crises.

**M.    Use of Kinetic Impact Projectiles Can Cause Physical Trama, Including Serious Bodily Injury and Death**

247.    Kinetic impact projectile weapons, like rubber bullets, sponge and foam rounds, and pepper balls (when used as projectile weapons) are specifically designed to cause trauma and incapacitate individuals.

248.    These weapons are generally intended to be aimed at an individual's lower body, because they can cause severe injury or disability if they hit particularly vulnerable areas of the upper body or be lethal if they hit an individual's head.

249.    Research has shown that kinetic impact projectile weapons have caused significant injuries and deaths when used in crowd-control settings, most resulting from penetrative injuries and head, neck, and torso trauma.

250.    Specifically, kinetic impact projectile weapons can damage critical human functions, such as:

- Brain and Head: Blunt trauma can cause concussions, internal bleeding, skull fractures, and irreversible damage.
- Eyes: Direct hits almost always cause blindness and can result in brain injury if the projectile penetrates the eye socket.
- Cardiorespiratory System: Can cause bruising, bleeding, lung deflation, and heart attacks if aimed at the chest.

- <u>Musculoskeletal System</u>: May result in sprains, bruises, fractures, and permanent neurovascular damage.
- <u>Abdomen</u>: Can cause internal bleeding and organ damage.
- <u>Skin and Soft Tissue</u>: Bruising, lacerations, muscle or nerve damage, and bleeding are common, with increased severity at close range.

251. The use of these kinetic impact projectiles is often not proportional to the needs of crowd control during civilian protests because they can easily harm unintended targets and are particularly dangerous when hitting the upper body, which could lead to serious bodily harm or death.

252. Despite common perceptions that alleged "crowd control" weapons are harmless, each of these weapons—including, and especially, chemical weapons and projectiles—can cause significant and long-lasting health harms. When launched or fired from afar, these weapons are inaccurate and strike vulnerable body parts, as well as cause unintended injuries to bystanders. There are significant doubts that these weapons can be used in a manner that is simultaneously safe and effective.

253. Specific law enforcement practices significantly increase the risk and severity of injuries. Research consistently shows that misuse of chemical and kinetic impact projectile weapons and flash-bang grenades—including firing projectiles directly at individuals, targeting peaceful demonstrators, deploying chemical agents in confined spaces, using excessive quantities, and deploying such weapons in the presence of vulnerable individuals, can dramatically escalate both the frequency and severity of harm.

254. Misuse of chemical and kinetic impact projectile weapons and flash-bang grenades can result in increased injury severity and greater frequency of injuries. Research has documented five critical misuse categories of such weapons, each contributing to increased morbidity and mortality and violating international standards. These categories of misuse include directly firing canisters at individuals or dense crowds, which can cause severe injury or death. The inappropriate use of chemical and kinetic impact projectile weapons and flash-bang grenades against peaceful demonstrators violates the principle that force may only be deployed when necessary and can

expose greater numbers of people to the weapons. Deployment in confined spaces exacerbates harmful effects by increasing the chemical's concentration. Using excessive quantities constitutes a disproportionate use of force, increasing exposure and injuries. Finally, using chemical and kinetic impact projectile weapons in the presence of vulnerable individuals, such as children and the elderly, amplifies harm due to the weapon's indiscriminate nature and these individuals' greater injury risk.

255.    By misusing these weapons at protests, DHS intimidates journalists and legal observers and reduces the number of media members and legal observers who are willing or physically able to observe and document the protests. Likewise, this conduct intimidates protesters, impeding their free exercise of the constitutional right to protest against government action. Thus, through physical assault and threats of violence, DHS limits dissenting viewpoints against its actions while simultaneously impeding the press and legal observers from effectively informing the public about its violent, retaliatory pattern of conduct.

## CLASS ACTION ALLEGATIONS

256.    Plaintiffs Sean Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Maria-Alejandra Paz, and Benjamin Adam Climer seek to represent a class of all persons reporting on, recording, observing, or protesting against the DHS immigration operations that have been ongoing in this District since June 6, 2025.

257.    Plaintiffs Sean Beckner-Carmitchel, Lexis-Olivier Ray, and Charles Xu additionally seek to represent a subclass of all persons reporting on, observing, or recording DHS agents and their official conduct at the DHS immigration operations that have been ongoing in this District since June 6, 2025.

**A.    Plaintiff Class**

258.    Plaintiffs seek to represent the Class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

> All persons who do or will in the future report on, record, observe or
> protest against the DHS immigration operations that have been
> ongoing in this District since June 6, 2025.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

259.   **Numerosity**: The number of Class members is so large that the joinder of all its members is impracticable. The exact number of Class members is unknown, but based on public reports and videos, the number of class members is at least in the thousands. In addition, the inclusion of future members in the class makes a joinder impracticable.

260.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Individual Plaintiffs have no interests separate from those of the Class and seek no relief other than the relief sought on behalf of the Class.

261.   **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as Class representatives. They seek to enjoin common practices, policies and procedures that are injuring them and Class members.

262.   Plaintiffs' counsel are experienced in prosecuting class actions, civil rights, journalist rights, and protester rights litigation and are committed to protecting First Amendment rights, and have prosecuted and intend to prosecute this action vigorously and fairly represent the interests of the Class.

263.   **Commonality**: The proposed class meets the commonality requirements of Rule 23(a)(2) because all Class members have at least one issue of law or fact in common with one another. For example, whether Defendants have a policy, pattern or practice of retaliating against those present at the DHS immigration operations that have been ongoing in this District since June 6, 2025, is a common question for the entire Class. Similarly, all members of the Class are subject to DHS's policies, patterns, and/or practices regarding the use of chemical and kinetic impact weapons around the DHS immigration operations that have been ongoing in this District since June 6, 2025. There are other common questions of law and fact to the Class, including without limitation: whether Defendants' admitted practice of using crowd control weapons to assault non-threatening individuals for not dispersing violates the First Amendment; whether Defendants maintain an ongoing policy, pattern, or practice of misusing chemical and kinetic impact weapons; whether Defendants maintain a policy, pattern, or practice of unnecessary, indiscriminate and/or excessive force against Class members; whether Defendants have a pattern, practice or policy of

using crowd control weapons without adequate warning against Class members; whether Defendants' violent conduct to suppress the First Amendment rights of Class members constitutes viewpoint discrimination in violation of the First Amendment; whether attacking someone with crowd control weapons would deter a person of ordinary resolve from engaging in constitutionally protected activities; whether First Amendment-protected activities are a motivating factor in Defendants' conduct; whether Defendants have a policy, pattern, or practice of retaliation in violation of the First Amendment; and whether the public interest favors enjoining Defendants' First Amendment violations.

264. Plaintiffs and the Class have been directly injured by Defendants' constitutional violations and are at risk of future harm from continuation of their acts and omissions by Defendants failing to adhere to their obligations under the First Amendment. Plaintiffs and Plaintiff Class seek declaratory relief and a permanent injunction common to all Class members to stop Defendants' unlawful pattern of First Amendment violations that includes, without limitation, the terms of the Preliminary Injunction that the Court has already implemented. Defendants have acted and intend to act in a manner adverse to the rights of members of the Class, making final injunctive relief appropriate for the Class.

265. **Defendants have acted on grounds generally applicable to the class**: As noted above, Defendants' ongoing policy, pattern, and/or practice of misuse of crowd control weapons and unnecessary, indiscriminate and excessive force is injuring and chilling Plaintiffs and all Class members.

**B.     Subclass**

266. Plaintiffs Sean Beckner-Carmithcel, Lexis-Olivier Ray, and Charles Xu seek to represent the following subclass:

> All people who do or will in the future report on, legally observe or record the DHS immigration operations that have been ongoing in this district since June 6, 2025.

267. **Numerosity**: The number of subclass members is so large that the joinder of all its members is impracticable. The exact number of subclass members is unknown, but based on public reports, videos, and number of reporters and legal observers in this District, the number of subclass

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1    members is at least in the hundreds. In addition, the inclusion of future members of the proposed

2    subclass makes a joinder impracticable.

3       268.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the

4    subclass. Each of them faces the threat of Defendants' ongoing attacks on persons attempting to

5    report on, observe, or record their actions related to DHS's immigration operations. Individual

6    Plaintiffs have no interests separate from those of the subclass and seek no relief other than the

7    relief sought on behalf of the subclass.

8       269.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the subclass.

9    Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as

10    Class representatives. They seek to enjoin common practices, policies and procedures that are

11    injuring them and all subclass members.

12       270.    Plaintiffs' counsel are experienced in prosecuting class actions, civil rights,

13    journalist rights, and protester rights litigation and are committed to protecting First Amendment

14    rights, and have prosecuted and intend to prosecute this action vigorously and fairly represent the

15    interests of the subclass.

16       271.    **Commonality**: The proposed subclass meets the commonality requirements of Rule

17    23(a)(2) because there is at least one common question of law or fact to each of the subclass

18    members. All members of the subclass are subject to DHS policies, patterns, and/or practices

19    regarding unlawfully dispersing people reporting on, legal observing, and recording DHS's

20    activities around DHS enforcement operations and treating such activities as wrongful. There are

21    other common questions of law and fact to the subclass, including without limitation whether DHS

22    has a policy, pattern, or practice of treating photo and videorecording of DHS agents in public as a

23    threat that may be appropriately responded to with force and otherwise addressed as a crime;

24    whether the First Amendment protects the right to record DHS agents and the DHS immigration

25    operations that have been ongoing in this District since June 6, 2025, including DHS's response to

26    its immigration raids, patrols, and arrests in public; whether DHS's policy, pattern, or practice of

27    treating photo and videorecording of DHS agents as a threat that may be appropriately responded to

28    with force and otherwise addressed as a crime violates the First Amendment; whether DHS's

1  policy, pattern, or practice regarding how it treats people recording its immigration operations is

2  viewpoint discrimination; whether Defendants' stated policy of enforcing general dispersal orders

3  against subclass members, regardless of whether they pose any immediate threat to law

4  enforcement, violates the First Amendment rights of subclass members; whether reporting on,

5  observing and recording the DHS immigration operations that have been ongoing in this District

6  since June 6, 2025 is beneficial to the public; whether Defendants' policy, pattern, or practice of

7  attacking subclass members for not dispersing is essential and narrowly tailored to preserve an

8  overriding government interest; whether subclass members have a right of access to report on,

9  record and observe DHS immigration operations in this District; whether DHS has policy, pattern,

10  or practice of interfering with the Plaintiffs' and subclass members' rights of access to the DHS

11  immigration operations that have been ongoing in this District since June 6, 2025; whether

12  Defendants can issue dispersal orders outside of federal property; whether Defendants' policy,

13  pattern, or practice causes irreparable injury under the First Amendment; whether the balance of

14  equities favors Plaintiffs and subclass members; and whether enjoining Defendants from violating

15  Plaintiffs' and subclass members' right of access is in the public interest.

16       272.    Plaintiffs and the Class are at risk of future harm from continuation of their acts and

17  omissions by Defendants failing to adhere to their obligations under the First Amendment.

18  Plaintiffs and Plaintiff Class seek a permanent injunction common to all Class members to stop

19  Defendants' unlawful pattern of retaliation that includes, without limitation, the terms of the

20  Preliminary Injunction that the Court already has implemented. DHS has acted and intends to act in

21  a manner adverse to the rights of members of the subclass and has even made representations to the

22  Court that it intentionally uses munitions to disperse people who are trying to report on and monitor

23  law enforcement activities, making final injunctive relief appropriate for the subclass.

24       273.    **Defendants' actions and omissions are generally applicable to the class**: As

25  noted above, Defendants' ongoing policy, pattern, or practice of using force to disperse people

26  reporting on, legal observing, and recording DHS's activities around DHS enforcement operations,

27  consistent with their own statements to the Court, is injuring and chilling Plaintiffs and all Class

28  members.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

1    274.    Plaintiffs Sean Beckner-Carmitchel, Lexis-Olivier Ray, and Charles Xu and the

2  subclass have been directly injured by DHS's constitutional violations and are at risk of future

3  harm from continuation of Defendants' acts and omissions by Defendants failing to adhere to their

4  obligations under the First Amendment.

5                                   **CAUSES OF ACTION**

6                      **First Cause of Action – Violation of First Amendment**

7    275.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

8    276.    Plaintiffs are engaged in constitutionally protected acts of assembly, speech, and

9  expressive conduct, including without limitation the right to protest, report on, observe, and record

10 the activities of government officials and events of public interest.

11   277.    As alleged above, Defendants maintain policies, patterns, and practices that violate

12 Plaintiffs' First Amendment rights.

13   278.    As alleged above, Defendants deny Plaintiffs' access to protests in public in

14 violation of the First Amendment.

15   279.    As alleged above, Defendants use force to disperse protests even when there is no

16 clear and present danger of violence.

17   280.    As alleged above, Defendants retaliate against Plaintiffs' First Amendment

18 activities.

19   281.    As alleged above, Defendants' policies, patterns, practices, and conduct would chill

20 a person of ordinary firmness and are chilling Plaintiffs' exercise of their First Amendment rights.

21   282.    As alleged above, Defendants are engaged in illegal viewpoint discrimination.

22   283.    Defendants' conduct is causing Plaintiffs irreparable injury.

23 **Second Cause of Action – Excessive Force – Violation of Fourth and Fifth Amendments**

24   284.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

25   285.    Plaintiffs have Fourth and Fifth Amendment rights to bodily integrity and to be free

26 from unreasonable force.

27   286.    As alleged above, Defendants maintain policies, patterns, and/or practices of

28 unreasonable force that violate the Fourth and Fifth Amendments.

287.    As alleged above, Defendants maintain a policy, pattern, and practice of using significant force—including, without limitation, tear gas canisters, pepper balls, pepper spray, exploding grenades, kinetic impact projectiles, 40mm projectiles, and other impact munitions—against people who are not committing a serious crime, are not posing a threat to officers, and are not actively resisting or evading arrest.

288.    As alleged above, Defendants use force for the purpose of retaliating against First Amendment activity and causing harm.

289.    As alleged above, Defendants' sweeping, indiscriminate violence—including, without limitation, their use of chemical weapons— shocks the conscience and is so gratuitous as to give rise to a reasonable inference that it was applied to cause harm rather than for a legitimate purpose.

290.    As alleged above, Defendants use sweeping, indiscriminate, and dangerous force with "deliberate indifference" toward the resulting harm.

291.    Defendants' conduct threatens Plaintiffs with irreparable injury.

**Third Cause of Action – Violation of the Administrative Procedure Act**

292.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

293.    Federal law provides for the publication of regulations that "prescribe the categories of officers and employees . . . who may use force (including deadly force) and the circumstances under which such force may be used." 8 U.S.C. § 1357(a).

294.    Federal regulation provides that "[n]on-deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary." 8 C.F.R. § 287.8(a)(1)(ii).

295.    Federal regulation further provides that "[a] designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant." 8 C.F.R. § 287.8(a)(1)(iii).

296.     Defendants have a policy, pattern, and practice of using significant force at protests against their immigration operations without reasonable grounds to believe that such force is necessary; when the high level of force used—including, without limitation, chemical spray and projectile weapons—is unreasonable and not warranted by the actions, apparent intentions, and apparent capabilities of the persons against whom the force is used; and against people who are not suspects, prisoners, or assailants. Defendants' policy, pattern, and practice of using force against journalists, legal observers, and peaceful protesters fails to take into consideration the risk of harm associated with each weapon used, and permits uses of force that, in violation of 8 C.F.R. § 287.8(a): (1) do not further any legitimate mission assigned to Defendants by law; (2) target the general public; (3) are not based on reasonable grounds to believe such force is necessary; and/or (4) deploy gratuitous violence exceeding the minimum necessary to accomplish any legitimate aims. This policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(a)(1)(ii)-(iii), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right[s]" under the Fourth Amendment. 5 U.S.C. §§ 704, 706(2)(A- C).

297.     Federal regulation provides that "[d]eadly force may be used only when a designated immigration officer . . .  has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(ii).

298.     Defendants have a policy, pattern, and practice of using deadly force at protests against their immigration operations without reasonable grounds to believe that such force is necessary to protect against an imminent danger of death or serious physical injury—including, without limitation, by firing tear gas canisters, grenades, and projectile rounds at the heads, necks, and spines of persons who do not pose any imminent threat of death or serious physical injury, and by using such deadly force without considering if there is an imminent danger of death or serious physical injury. This policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(a)(2)(ii), "arbitrary,

1  capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to

2  constitutional right[s]" under the Fourth Amendment. 5 U.S.C. §§ 704, 706(2)(A-C).

3      299.    Defendants have a policy, pattern, and practice of using force to suppress the

4  reporting, observation, speech, and other protected First Amendment activities of Plaintiffs and

5  other similarly situated peaceful protesters, journalists, and legal observers. This policy, pattern,

6  and practice is "final agency action" that is in excess of statutory jurisdiction, authority, or

7  limitations" under 8 C.F.R. § 287.8(a), "arbitrary, capricious, an abuse of discretion, or otherwise

8  not in accordance with law," and "contrary to constitutional right[s]" under the First Amendment. 5

9  U.S.C. §§ 704, 706(2)(A)-(C).

10     300.    Defendants have a policy, pattern, and practice of treating photography and

11 videorecording that documents the conduct of DHS officers in public as threats or "doxxing" that

12 DHS officers may respond to with force and address as crimes. This policy, pattern, and practice is

13 a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8

14 C.F.R. § 287.8(a), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

15 with law," and "contrary to constitutional right[s]" under the First Amendment. 5 U.S.C. §§ 704,

16 706(2)(A)-(C).

17     301.    As alleged above, Defendants and the federal agents discussed herein are operating

18 pursuant to final agency action, approved by responsible federal agency heads with final

19 policymaking authority. Defendants and responsible agency heads have stated that the patterns and

20 practices alleged herein are authorized under current agency policy.

21     302.    This Court has authority under the Administrative Procedure Act to "hold unlawful

22 and set aside" such agency action. 5 U.S.C. § 706(2).

23     303.    Defendants' unlawful policies and practices against Plaintiffs and class members,

24 described herein, have caused and are causing them irreparable harm

25              **Fourth Cause of Action – Declaratory Relief**

26     304.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

27     305.    An actual controversy has arisen between Plaintiffs and Defendants over

28 Defendants' practices and policies regarding the DHS immigration operations that have been

1    ongoing in this District since June 6, 2025. Such controversies include, by way of example, and

2    without limitation:

3              a.    Defendants have a policy of using crowd control weapons at protests on

4    individuals who do not pose any immediate threat to law enforcement to disperse them or as a way

5    to obtain compliance with a directive from law enforcement at Defendants' immigration operations

6    that have been ongoing in this District since June 6, 2025. Plaintiffs maintain that Defendants'

7    policy violates the First and Fourth Amendments and federal regulations. Defendants claim that

8    doing so does not violate relevant regulations or Plaintiffs' constitutional rights. An ongoing actual

9    controversy about this therefore exists.

10             b.    Defendants have a policy of enforcing general dispersal orders against

11   people who are reporting on, recording or observing Defendants' immigration operations that have

12   been ongoing in this District since June 6, 2025. Plaintiffs claim that this policy is not essential and

13   narrowly tailored to achieve an overriding government interest. Defendants maintain that this

14   policy does not violate Plaintiffs' constitutional rights. An actual controversy about this therefore

15   exists.

16             c.    Defendants claim that they have the authority to issue dispersal orders when

17   they are operating off federal property. Plaintiffs deny that Defendants have the lawful authority to

18   do so. An actual controversy about this therefore exists.

19             d.    Defendants have a policy, pattern, or practice of using crowd control

20   weapons at Defendants' immigration operations that have been ongoing in this District since June

21   6, 2025, in such a manner that endangers non-threatening individuals. Plaintiffs maintain that this

22   conduct violates the First and Fourth Amendments and federal regulations. Defendants assert that

23   their conduct does not violate relevant regulations or Plaintiffs' constitutional rights. An actual

24   controversy about this therefore exists.

25             e.    Defendants have a policy of treating recording DHS agents performing their

26   official duties in public and publishing such recordings as threats that may be appropriately

27   responded to with force and otherwise addressed as crimes. Plaintiffs maintain this policy violates

28

69                    Case No. 2:25-cv-05563-HDV-E

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION

the First and Fourth Amendments. Defendants maintain that this policy does not violate Plaintiffs' constitutional rights. An actual controversy about this therefore exists.

306.    A declaration by this Court would be useful to resolve these and the numerous other actual controversies identified above.

## **<u>PRAYER FOR RELIEF</u>**

Plaintiffs respectfully request the Court grant the following relief:

A.  Injunctive relief;

B.  Declaratory relief;

C.  An order vacating and setting aside Defendants' unlawful policies and agency actions;

D.  An award of attorneys' fees and costs;

E.  Any other relief the Court deems proper.

Dated: October 16, 2025                  Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   __/s/ Matthew Borden_____
         Matthew Borden

*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CLASS ACTION