UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM et al.,<br><br>Defendants. | Case No. 2:25-cv-05563-HDV-E<br><br>**ORDER DENYING DEFENDANTS' EX PARTE APPLICATION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL [58]** |

1

## I. INTRODUCTION

This summer, officers from the Federal Protective Services, Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP") unleashed crowd control weapons[1] on journalists, legal observers, and protestors at immigration-related demonstrations across Southern California. Plaintiffs—the Los Angeles Press Club ("LA Press Club"), NewsGuild-Communications Workers of America ("NewsGuild"), and individual journalists, legal observers, and protestors—initiated the present action against Secretary Kristi Noem and the U.S. Department of Homeland Security ("DHS") seeking to enjoin Defendants' excessive use of force.

The Court carefully reviewed all of the evidence presented by both sides in this action, including detailed and credible declarations from nearly 50 journalists, legal observers, and protestors; declarations from experts Gil Kerlikowske, former CBP Commissioner and former Seattle Chief of Police, Matthew S. Harvey, Director of the Less-Lethal Training Branch of the Law Enforcement Safety and Compliance Directorate of the CBP, and Dr. Rohini Haar, an emergency medicine physician and professor of public health; and declarations from top law enforcement officials. On the basis of the Court's extensive credibility determinations and factual findings, the Court issued a preliminary injunction. Order Granting Plaintiffs' Motion for Preliminary Injunction ("PI Order") [Dkt. 55]. Defendants appealed that injunction, and now ask this Court to enter a stay of that order pending appeal. Notice of Appeal [Dkt. 57]; Ex Parte Application to Stay Preliminary Injunction Pending Appeal ("Application") [Dkt. 58].

For the reasons discussed below, Defendants' Application is denied.

---

[1] CBP officers use oleoresin capsicum spray (commonly referred to as "pepper spray"), collapsible straight batons, electronic control weapons (commonly referred to as "TASERs"), compressed air launchers including the Pepperball Launching System, munitions launchers, and controlled noise and light distraction devices (commonly referred to as flash-bangs). Declaration of Matthew Harvey ("Harvey Decl.") ¶ 8, Ex. 2 ("CBP Use of Force Policy") at 244–45 [Dkt. 47-5]. Pepper balls are filled with pulverized oleoresin capsicum powder, which causes irritation to mucus membranes. Harvey Decl. ¶ 8. The Court refers to these devices collectively as "crowd control weapons."

2

## II. BACKGROUND

LA Press Club and NewsGuild; journalists Sean Beckner-Carmitchel, Ryanne Mena, and Lexis-Olivier Ray; legal observer Charles Xu; and protestors Benjamin Adam Climer and Abigail Olmeda initiated this action on June 18, 2025. Complaint ¶¶ 6–13 [Dkt. 1]. Plaintiffs assert claims for First Amendment right of access and retaliation and Fourth and Fifth Amendment excessive force against Defendants Kristi Noem and DHS. *Id.* ¶¶ 239–51.[2]

On the same day, Plaintiffs filed an *ex parte* application for a temporary restraining order, which Defendants opposed. Ex Parte Application for Temporary Restraining Order ("TRO Application") [Dkt. 6]; Opposition re TRO Application [Dkt. 11]. On June 20, Judge Stephen V. Wilson denied Plaintiffs' TRO Application without prejudice to a subsequent preliminary injunction motion, finding that, based on alleged constitutional violations between June 6 and June 9, Plaintiffs "fail[ed] to establish the 'substantial risk' of future harm" required for Article III standing. Order Denying Plaintiffs' Ex Parte Application for Temporary Restraining Order ("TRO Order") at 4–5 [Dkt. 19]. The matter was then transferred to this Court. [Dkt. 29].

On July 18, 2025, Plaintiffs moved for a preliminary injunction, contending that they are likely to succeed on their First Amendment right of access and retaliation claims. Motion for Preliminary Injunction ("PI Motion") [Dkt. 34]. Defendants filed an opposition and Plaintiffs filed a reply. Opposition to PI Motion ("PI Opposition") [Dkt. 47]; Reply in Support of PI Motion ("PI Reply") [Dkt. 49]. The Court heard oral argument on August 25, 2025. [Dkt. 50].

The Court, relying on declarations submitted by Plaintiffs and Defendants, and photos, videos, maps, and reports contained therein, carefully reconstructed events at protests in downtown Los Angeles between June 6 and 9, at Paramount on June 7, at the Federal Building in Santa Ana on June 9, at Xpress Wash in Maywood on June 20, at a Home Depot in Ladera Heights on June 23, outside the Metropolitan Detention Center in downtown Los Angeles on July 4, at MacArthur Park

---

[2] Plaintiffs have since filed a First Amended Complaint. ("FAC") [Dkt. 67]. The FAC adds class action allegations and a cause of action for violation of the Administrative Procedure Act. FAC ¶¶ 256–74, 292–303.

3

on July 7, and at Glass House Farms in Carpinteria and Camarillo on July 10. PI Order at 4–18. The Court does not repeat its fourteen pages of factual findings here. On the basis of these factual findings, the Court granted the PI Motion and issued a modified version of Plaintiffs' proposed preliminary injunction on September 10, 2025. PI Order [Dkt. 55].

On September 19, 2025, Defendants appealed that order. Notice of Appeal. That same day, they also filed the present Application to stay the preliminary injunction. Application. Plaintiffs opposed Defendants' attempt to seek such relief on an *ex parte* basis, and the Court agreed. Opposition to Application to Have Stay Motion Heard on an Ex Parte Basis [Dkt. 59]; Order Denying Application [Dkt. 60]. The Court set a slightly longer, but still expedited, briefing schedule. Order Denying Application at 2. The merits of the Application were fully briefed, and the Court has taken the matter under submission. Opposition to Application ("Opposition") [Dkt. 64]; Reply in Support of Application ("Reply") [Dkt. 65].

## III.    LEGAL STANDARD

To assess whether an injunction should be stayed pending appeal, a court must consider: "(1) whether the Federal Defendants have made a strong showing that they are likely to succeed on the merits [of the appeal]; (2) whether the Federal Defendants will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817, 824 (2020) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021) ("In deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the [court] is predicting the likelihood of success of the appeal."). The party seeking a stay of a preliminary injunction bears a higher burden than a party seeking a preliminary injunction in the first instance. *Index Newspapers*, 977 F.3d at 824 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Rather than a mere likelihood of success, they must show a *strong* likelihood of success; rather than "some possibility of irreparable injury," they must show "that irreparable injury is likely to occur during the period before the appeal is decided." *Id.* (citing *Doe #1 v. Trump*, 957 F.3d 1050, 1059, 1062 (9th Cir. 2020); *Nken*, 556 U.S. at 434–35).

4

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

Defendants contend that they are likely to succeed on the merits of their appeal, arguing that a stay of the PI Order is warranted because Plaintiffs: lack standing to pursue injunctive relief; have not established a right-of-access claim; fail to present sufficient evidence supporting their retaliation claim; and have not presented sufficient evidence to support the Court's other factual findings. Application at 5–12. The Court addresses each argument in turn.

#### 1. Standing

To establish standing, a plaintiff must have suffered an "actual or imminent" injury in fact, such that the injury is "fairly trace[able]" to the defendant's challenged conduct and likely to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). Plaintiffs may establish standing for prospective injunctive relief by alleging "either 'continuing, present adverse effects'" of a defendant's past illegal conduct, "or 'a sufficient likelihood that [they] will again be wronged in a similar way.'" *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (first quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); and then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). This Court found that Plaintiffs established standing on both bases. PI Order at 23–26.[3]

Defendants argue that *Lyons* and *Noem v. Vasquez Perdomo*, 606 U.S. __, 2025 WL 2585637 (2025),[4] compel a finding that Plaintiffs do not have standing to seek injunctive relief. Application

---

[3] Defendants first argue that this was incorrect because it was based on evidence similar to that which Judge Wilson found insufficient for standing at the temporary restraining order stage. Application at 6. The Court has already explained that Judge Wilson's TRO Order was without prejudice to a subsequent preliminary injunction motion. PI Order at 22 n.9; TRO Order at 5. And Plaintiffs' preliminary injunction papers included dozens of declarations detailing several **additional** incidents (at Maywood on June 20, at Ladera Heights on June 23, in downtown Los Angeles on July 4, at MacArthur Park on July 7, and at Carpinteria and Camarillo on July 10) post-dating the TRO Order. *See generally* PI Motion; PI Reply. Stated differently, Judge Wilson and this Court were not in fact considering the same evidence.

[4] The Court is certainly cognizant of its duty to follow the decisions of the Supreme Court. But the Supreme Court in *Vasquez Perdomo* did not elucidate which of several potentially independently

5

at 6–7. But the Ninth Circuit unequivocally rejected a similar *Lyons*-based argument in *Index Newspapers*, finding that—in the context of government violence against journalists—the "risk of future injury [was] not speculative," where an ongoing, sustained pattern of conduct over several weeks resulted in numerous injuries to members of the press, including some repeated injuries to the same plaintiffs since the action was filed. 977 F.3d at 826.[5]

The Court has already explained why *Lyons* and *Vasquez Perdomo* are distinguishable from and therefore do not control the standing analysis here. PI Order at 25 n.14. In *Lyons*, plaintiff alleged that he was stopped by law enforcement and subsequently subjected to an unlawful

---

sufficient bases justified the stay, and Justice Kavanaugh's concurrence is not itself binding. *See Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (statement "contained in a concurrence" does not constitute binding precedent). In any case, and as explained below, *Vasquez Perdomo* is wholly distinguishable from the facts presented here.

[5] The parties dispute the precedential value of the opinion in *Index Newspapers*, which, though reasoned and published, was issued by a motions panel denying a stay of the preliminary injunction pending appeal. *See* Application at 8–9; Opposition at 9–10; Reply at 5–6. The Ninth Circuit has recently discussed the precedential status of such opinions in *East Bay Sanctuary Covenant v. Biden*, but the question remains somewhat murky. *See* 993 F.3d at 660–62; *id.* at 701 (VanDyke, J., dissenting) ("[T]he *East Bay* majority's new standard is indeterminate at best, retreating to the truism that two things are different, except when they're not: 'The published motions panel order may be binding as precedent for other panels deciding the same issue, but it is not binding here.' This nebulous standard is completely unhelpful to future panels"—or lower courts—"attempting to apply our precedent.").

The Court is convinced that the opinion in *Index Newspapers* remains (at the very least) strongly persuasive authority given the factual parallels and discrete issues of law presented. First, the *East Bay* Court suggested the motions opinion may be binding precedent for other panels (and presumably lower courts) deciding the same issue—whether a preliminary injunction should be stayed pending appeal—but was not binding on the issue the merits panel was considering—whether the preliminary injunction was proper. *Id.* at 660–61. Here, the Court is asked to stay its preliminary injunction pending appeal, so it falls in the former category. Second, the *East Bay* Court suggested that a motions panel's opinion may still be binding with respect to "pure question[s] of law" dictated by preexisting binding precedent. *Id.* at 661 n.3. To the extent some of Defendants' disagreements with this Court's analysis rest on such questions, *Index Newspapers* remains binding. And finally, the *East Bay* Court recognized that even preliminary motions orders like those in *Index Newspapers* can be persuasive, even if not binding, precedent. *Id.* at 662 ("To the extent the issues share predictive similarity, the motions panel may be persuasive but not binding."). Given the close similarity between the facts and legal arguments advanced in *Index Newspapers* and the present case, the Court finds *Index Newspapers* persuasive precedent on these points.

chokehold; in *Vasquez Perdomo*, plaintiffs alleged that they were stopped by law enforcement without reasonable suspicion of unlawful presence.  The Court in *Lyons* and Justice Kavanaugh in *Vasquez Perdomo* found that plaintiffs "ha[d] no good basis to believe that law enforcement will unlawfully"—or imminently—"stop *them* in the future," as opposed to "any other citizen of Los Angeles."  2025 WL 2585637 at *2 (emphasis added) (Kavanaugh, J., concurring) (quoting *Lyons*, 461 U.S. at 111).  Here, Plaintiffs aver that they intend to continue attending and covering the very protests where Defendants target or fire indiscriminately upon peaceful protestors, legal observers, and journalists.[6]  Unlike in *Lyons* or *Vasquez Perdomo*, where plaintiffs gave the courts no reason to think *they*, as opposed to anyone else, would be subject to the alleged unlawful activity again, Plaintiffs here have made clear that they will be at the events where that activity is alleged to occur.  And Plaintiffs cannot simply, as Defendants suggest, "attend protests and observe from a distance where they are out of range of crowd control devices," Application at 6, because Defendants have fired on Plaintiffs even when they were far from the center of protest activity.[7]

Further, unlike in *Lyons* and *Vasquez Perdomo*—which largely involved Fourth, Eighth, and Fourteenth Amendment injuries—Plaintiffs here allege a First Amendment injury.  Both the Ninth Circuit and Supreme Court have made clear that the standing analysis differs for First Amendment

---

[6] *See* Declaration of Lexis Olivier Ray ("Ray Decl.") [Dkt. 6-17] ¶ 37; Declaration of Ryanne Mena ("Mena Decl.") [Dkt. 6-22] ¶ 38; Supplemental Declaration of Ryanne Mena [Dkt. 34-27] ¶¶ 10–11; Declaration of Abigail Olmeda ("Olmeda Decl.") [Dkt. 6-4] ¶ 24; Declaration of Sean Beckner-Carmitchel ("Beckner-Carmitchel Decl.") [Dkt. 6-6] ¶ 19; Supplemental Declaration of Sean Beckner-Carmitchel [Dkt. 6-25] ¶ 13; Declaration of Benjamin Adam Climer ("Climer Decl.") [Dkt. 6-7] ¶ 19; Declaration of Jeanette Marantos ("Marantos Decl.") [Dkt. 34-11] ¶ 33; Declaration of R.R. ("R.R. Decl.") [Dkt. 34-18] ¶ 11.

[7] *See, e.g.*, Beckner-Carmitchel Decl. ¶¶ 10, 13 (averring that he was hit in the head with a tear gas canister while filming protestors from over twenty feet away); Mena Decl. ¶¶ 29–31 (testifying that she was hit in the head with a rubber bullet while covering protests from 30 to 50 feet away); Ray Decl. ¶¶ 27–29 (testifying that he was hit in the back by pepper balls multiple times, while standing amidst a group of media trucks); Declaration of Ted Soqui ("Soqui Decl.") [Dkt. 6-23] ¶¶ 11–13, 17 (declaring that he was hit in the back with three rubber bullets while 50 to 100 feet from both officers and protestors); Declaration of Jonathan Alcorn ("Alcorn Decl.") [Dkt. 6-15] ¶¶ 20, 24–28, 34–35 (declaring that he was hit in the arm, likely with a tear gas cannister when he was over 100 yards from officers and moving away from them).

7

injuries. *See Index Newspapers*, 977 F.3d at 826 (First Amendment injuries "sharply differ[] from the substantive due process injury asserted in *Lyons*"); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 154–55, 158–67 (2014) (explaining that a plaintiff can bring a pre-enforcement First Amendment challenge to a statute when he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest," proscribed by the statute, and there exists a "credible threat" of prosecution). That is because, "as the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). And Plaintiffs aver that, absent injunctive relief, they will limit their First Amendment activities because of their past injuries. *See, e.g.*, Declaration of Lexis-Olivier Ray ("Ray Decl.") ¶ 37 [Dkt. 6-17] (averring that because of his injuries, he is "likely to stay further back to avoid being subject to force or arrested," even if it means not getting the same coverage); Supplemental Declaration of Ryanne Mena ¶ 10 [Dkt. 34-27] ("In light of my experience getting shot by DHS agents twice, I will definitely wear personal protective equipment when covering protest events in the future [even if] wearing all this gear . . . may pose a barrier to effective reporting.").

Finally, Defendants cavil that the alleged injuries "occurred over two months ago." Application at 6; *see also id.* at 7. As the Court explained, however, Plaintiffs introduced evidence of additional injuries to themselves and other similarly-situated journalists, legal observers, and protestors "between the date the complaint was filed" and the TRO denied "and the date the district court entered its preliminary injunction." *Index Newspapers*, 977 F.3d at 826; *see* PI Order at 24; *supra* note 3. The Ninth Circuit did not require fresher evidence of plaintiffs' standing when considering whether to stay the preliminary injunction in *Index Newspapers*, 977 F.3d at 826,[8] and Defendants have not cited (and this Court has not found) any case requiring plaintiffs to produce evidence of injury post-dating the preliminary injunction in order to oppose its stay. Indeed, it seems

---

[8] Indeed, in *Index Newspapers*, the Ninth Circuit declined, on October 9, 2020, to stay an injunction that was based on incidents that occurred "between July 15 and July 30." 977 F.3d at 817, 824, 828.

8

absurd to require such evidence when such fresh injuries are precisely what this Court's PI Order were designed to *prevent*. Staying the PI Order "when it has worked and is continuing to work to stop" such injuries "is like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cnty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).

To the extent Defendants claim that, even if Plaintiffs had standing at the PI Order stage, they have since or may still lose it, *see* Application at 7, they confuse standing with mootness. A plaintiff must have "standing at the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (emphasis added). Defendants' observation that Plaintiffs must prove the elements of standing "with the manner and degree of evidence required at the successive stages of litigation" is correct, but it goes to *how* Plaintiffs must prove the facts, not *when* the facts must exist. *Lujan*, 504 U.S. at 561, 569 & n.4 (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.")). If Defendants seek to argue that their recent compliance with the law means that Plaintiffs are no longer likely to be injured and thus no longer have the personal interest necessary to maintain this suit, they "bear[] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190; *see also FBI v. Fikre*, 601 U.S. 234, 241 (2024). Defendants have not met this high burden to show mootness.

### 2. Right of access

Next, Defendants argue that Plaintiffs' right-of-access claim is contrary to law. Application at 7–9; Reply at 4–6. In evaluating right-of-access claims, courts ask "whether the place and process has historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Index Newspapers*, 977 F.3d at 829 (quoting *Press-Ent. Co. v. Super. Ct. of Cal.* ("*Press-Enterprise II*"), 478 U.S. 1, 8 (1986)). If a qualified right of access exists, the government can overcome that right if it demonstrates "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *Press-Ent.*, 478 U.S. at 9).

9

Defendants argue that Plaintiffs improperly focus only on the *place* part of this test[9] without recognizing that the *process* Plaintiffs seek to access has not been historically open to the press and general public. Application at 7–8; Reply at 4–5. The process in question is properly understood as "public protests and law enforcement's response to them." *Index Newspapers*, 977 F.3d at 830. Defendants attempt to avoid this conclusion by "refram[ing] all of the protests as" "violent riots," *id.* at 834; Reply at 4, but this characterization is belied by the record and approaches the *Press-Enterprise II* question at too narrow a level of generality. This Court has already found that most of the protests were peaceful, and that even if there were some acts of violence by some protestors at some points, Defendants' forceful response was frequently not precipitated by those acts or limited to those individuals. *See* PI Order at 4–17, 28–29, 32–33 & n.26, 39.[10] And "the First Amendment question cannot be resolved solely on the label we give the event"—especially when that label is given by the government. *Press-Ent.*, 478 U.S. at 7; *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) ("[A] court cannot rubber-stamp an access restriction simply because the government says it is necessary."). Indeed, in *Press-Enterprise II*, for example, the Supreme Court understood the question of whether the process has historically been open to the public as asking about "preliminary hearings" generally, not closed preliminary hearings, or preliminary hearings in cases attracting a lot of publicity, or preliminary hearings with any of the other particular facts that the government tried to rely on in justifying the closure. 478 U.S. at 3–5, 10. Similarly here, the proper question is about

---

[9] Of course, public streets and sidewalks are the archetypical public forum. PI Order at 35.

[10] *See also* Declaration of Dolores Ortiz ("Ortiz Decl.") ¶¶ 11, 14, 31 [Dkt. 49-5]; Declaration of Sarah Wilezewski ¶¶ 7–9 [Dkt. 34-20]; Declaration of Alexandra Nadolishny ("Nadolishny Decl.") ¶ 9 [Dkt. 34-4]; Declaration of Gabriel Teran ¶¶ 17, 20 [Dkt. 34-8]; Declaration of Alec Bertrand ¶¶ 9–10 [Dkt. 49-2]; Declaration of Diane Alvarez ¶ 7 [Dkt. 49-4]; Declaration of Catherine Saillant ¶¶ 9, 13 [Dkt. 49-3]; Declaration of A.R. ¶ 8 [Dkt. 34-2]; Supplemental Declaration of A.R. ¶¶ 2–4 [Dkt. 49-9]; Declaration of Veronica Miranda ¶ 10 [Dkt. 34-23]; Marantos Decl. ¶ 21; Declaration of Kimberly Fisher ¶¶ 8–9 [Dkt. 34-12]; Declaration of Lynn Griffin ¶¶ 8–10 [Dkt. 49-7]; Supplemental Declaration of Mónica Solórzano ¶ 3 [Dkt. 49-10]); Mena Decl. ¶¶ 11–19; Alcorn Decl. ¶¶ 14–18; Declaration of Maritza Guardado ("Guardado Decl.") ¶¶ 12–16 [Dkt. 34-14].

historical access to protests and the attendant law enforcement response, not about access to "violent riots."

Defendants have thus not demonstrated a likelihood of success on their argument that Plaintiffs' right-of-access claim is "contrary to law."

### 3. Retaliation

Defendants also maintain that Plaintiffs' First Amendment retaliation claims are legally and factually baseless. Application at 9–10; Reply at 6–7. To establish such a retaliation claim, plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) Defendants' actions would "chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) "the protected activity was a substantial or motivating factor in [Defendants'] conduct." *Index Newspapers*, 977 F.3d at 827. Once that showing is made, "the burden shifts to the government to show that it would have taken the same action even in the absence of the protected conduct." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021).

The first two prongs are not meaningfully contested. Instead, Defendants argue that Plaintiffs' protected activity was not a substantial or motivating factor in their conduct and that they would have taken the same action in its absence. Application at 9–10.

That the protected activity was a substantial or motivating factor in Defendants' conduct can be proven by "either direct or circumstantial evidence." *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). "[C]ircumstantial evidence showing motive" includes: "(1) proximity in time between the protected speech and the alleged retaliation; (2) . . . expressed opposition to the speech; and (3) other evidence that the reasons proffered . . . were false and pretextual." *Id.* at 980. The Court found that Defendants' excessive and indiscriminate response to a few violent individuals among thousands of peaceful protestors, journalists, and legal observers was strong and persuasive evidence of retaliatory intent. PI Order at 29. But contrary to Defendants' characterization, Reply at 6, the Court's finding of retaliatory intent was not based solely on Defendants' "indiscriminate" use of force.

11

1  Instead, the Court found that federal officers repeatedly targeted journalists and peaceful
2  legal observers far from any protestors or bad actors, *id.* at 30–31,[11] deployed crowd control
3  weapons on crowds already attempting to disperse, *id.* at 31,[12] and fired directly *at* people instead of
4  at the ground, *id.* at 31–32.[13] All of these actions—taken contemporaneously with Plaintiffs'
5  protected First Amendment activity, and for which there is no justification[14]—constitute
6  circumstantial evidence of retaliation. *Ulrich*, 308 F.3d at 980; *Black Lives Matter Seattle-King*
7  *Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020) ("The use of indiscriminate
8  weapons against all protesters—not just the violent ones—supports the inference" that federal agents
9  "were substantially motivated by Plaintiffs' protected First Amendment activity.").

Defendants now proffer "innocent explanations" for some of these acts—arguing, for example, that Plaintiff journalist Sean Beckner-Carmitchel might have been hit in the head with a tear gas canister while filming protestors from over 20 feet away precisely because Defendants were trying to aim away from the larger crowd or because a protestor kicked or threw the cannister when it landed. Application at 11. But many of Defendants' actions are susceptible to no such innocent explanation, including instances in which Plaintiffs were specifically targeted with pepper balls and

---

[11] *See* Mena Decl. ¶¶ 16–18, 22, 29–31; Ray Decl. ¶¶ 26–31; Beckner-Carmitchel Decl. ¶¶ 10, 13, Ex. 1; Soqui Decl. ¶¶ 5–8, 11–13; Alcorn Decl. ¶¶ 20–28, Ex. 1; R.R. Decl. ¶¶ 4–6; Declaration of Graham Coven ¶ 10 [Dkt. 34-9]; Declaration of N. Reyna ¶¶ 6–9 [Dkt. 6-21]; Declaration of Charles Xu ("Xu Decl.") ¶ 12 [Dkt. 6-8].

[12] Nadolishny Decl. ¶¶ 7–11; Declaration of Kristin Ellison ¶¶ 6–7 [Dkt. 34-13]; Ray Decl. ¶¶ 24–29; Declaration of Michael Horowicz ¶¶ 11–12 [Dkt. 6-19]; Soqui Decl. ¶ 12; Declaration of Eduardo De La Riva ¶ 20 [Dkt. 34-7]; Guardado Decl. ¶¶ 12–16; Declaration of Mayra Aguiluz ¶¶ 20, 22 [Dkt. 34-15]; Declaration of Heber Marquez ¶ 18 [Dkt. 34-10].

[13] Beckner-Carmitchel Decl. ¶¶ 13–15; Alcorn Decl. ¶¶ 18, 34–35; Climer Decl. ¶¶ 6, 8, 16–17 Declaration of Chase Carbonati ¶ 7 [Dkt. 6-9]; Declaration of Emiliano Lopez ¶¶ 7–12 [Dkt. 6-14]; Ray Decl. ¶ 19; Soqui Decl. ¶ 7; Xu Decl. ¶ 12; Olmeda Decl. ¶¶ 8–9, 12, 18; Ortiz Decl. ¶ 14; Nadolishny Decl. ¶¶ 8–11.

[14] *See* Declaration of Gil Kerlikowske ¶¶ 17–35, 47 [Dkt. 6-3]; Supplemental Declaration of Gil Kerlikowske ¶ 20 [Dkt. 34-26]; Harvey Decl. ¶¶ 3, 5; CBP Use of Force Policy at 249; Declaration of Roger Scharmen ¶ 9 [Dkt. 47-3]; Declaration of Dr. Rohini Haar ¶ 44 [Dkt. 6-12].

rubber bullets (which cannot be picked up and refired by protestors). *See, e.g.*, Ray Decl. ¶¶ 26–31 (recounting being targeted by volleys of pepper balls while taking cover near a group of media trucks about 50 feet away from the action). And it was in part the *pattern* of repeated instances that led the Court to find retaliatory intent. *See* PI Order at 33–34 (citing *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005)); *see also Index Newspapers*, 977 F.3d 817 at 829 ("[S]o many instances" that constitute a "shocking pattern of misconduct" "provide exceptionally strong evidentiary support for the . . . finding that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights.").

Moreover, Defendants' "expressed opposition" to Plaintiffs' speech also provides support for an inference of retaliatory intent. *Ulrich*, 308 F.3d at 980. *See "Train Wreck Mayor": Kristi Noem Slams LA Official* (June 10, 2025), Fox News, www.youtube.com/watch?v=ymYIXrH9pjg ("The more that they protest and commit acts of violence against law enforcement officers, the harder ICE is going to come after them . . ."); *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, Forbes (July 12, 2025), www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is . . . videotaping them, where they're at, when they're out on operations."); Declaration of Ryan Shapiro ¶ 3, Ex. A at 3 [Dkt. 34-19] ("One of the most common methods of threatening [Law Enforcement Officers] comes from online doxing . . . Other tactics include . . . livestreaming [Law Enforcement Officer] interactions . . .").

Finally, the burden to show that they "would have taken the same action even in the absence of the protected conduct" is on Defendants. *Bello-Reyes*, 985 F.3d at 702. On a stay posture, they must make a "*strong* showing" of this. *Nken*, 556 U.S. at 434 (emphasis added). Defendants' cursory argument that "there is no basis to conclude that Defendants would have responded any differently to the violent situations they confronted if the press was not in attendance or acting in a different capacity," Application at 10; *see also* PI Opposition at 23, impermissibly flips this burden and fails utterly to show how or why Defendants have met it here. Defendants have thus not established a likelihood of success on the retaliation claim.

13

### B. Irreparable Harm to Defendants

This Court must also consider whether Defendants have shown that they are likely to suffer irreparable injury during the period before the appeal is decided. *Index Newspapers*, 977 F.3d at 824 (citing *Nken*, 556 U.S. at 426, 434–35; *Doe #1*, 957 F.3d at 1059).

Defendants argue that they will suffer irreparable harm from the "unworkability" of the preliminary injunction—whose terms largely mirror the terms of the injunction in *Index Newspapers* and Defendants' own use-of-force policies—because they will face the "impossible choice" between risking their and the public's safety (as well as the success of legitimate law enforcement activities) if they comply, and risking contempt if they do not. Application at 12–16. Many of these arguments are identical to those raised by the Defendants at the preliminary injunction stage, and the Court does not find them persuasive for the same reasons. *See* PI Order at 40–42. However, the Court uses this opportunity to clarify some elements of its PI Order in response to some of the Defendants' concerns.

As to the first, seventh, and eighth paragraphs of the Court's injunction, Defendants argue that the Court's definitions of journalists and legal observers are overbroad, hard to apply quickly in the field, and risk allowing violent actors to fraudulently disguise themselves as press. Application at 13, 16; Supplemental Declaration of Brian Szemes ("Supp. Szemes Decl.") [Dkt. 58-2] ¶¶ 4–5, 11–12; Supplemental Declaration of Roger Scharmen [Dkt. 58-3] ¶¶ 4, 8–9; Declaration of Manuel Molina Jr. ("Molina Decl.") [Dkt. 58-4] ¶¶ 9, 14–15, 17. Defendants raise a concern that a smartphone might count as "professional gear such as professional photographic equipment," and thus qualify someone as a Journalist protected by the Order. Supp. Szemes Decl. ¶ 11; Molina Decl. ¶ 14. The Court clarifies that a smartphone *alone*, without any of the other indicia discussed, cannot establish an individual as a Journalist. To that end, Defendants shall not be liable for unintentional violations of the PI Order in the case of an individual who carries a smartphone but does not carry or wear any *other* press pass, badge, or other official press credential, professional gear, or distinctive clothing that identifies the person as a member of the press.

Defendants also point out that, although the PI Order provides a safe harbor for unintentional violations when there is ambiguity about a person's status as a member of the press, it does not

14

provide a similar safe harbor for ambiguity surrounding legal observers. Molina Decl. ¶ 15. The Court agrees with Defendants and modifies its PI Order to add, at the end of paragraph 8: "Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not wear a green National Lawyers Guild-issued or authorized legal Observer hat or a blue ACLU-issued or authorized Legal Observer vest."

Defendants also appear concerned that violent actors will be able to disguise themselves as press or legal observers or shield themselves behind same and thereby get away with violence. But the PI Order does not prohibit Defendants from otherwise lawfully arresting anyone and using otherwise lawful force in effectuating that arrest if they have probable cause to believe a crime[15] is being committed. *See Index Newspapers*, 977 F.3d at 823, 835; *Collins v. Jordan*, 110 F.3d 1363, 1373 (9th Cir. 1996) ("[T]he proper response to potential and actual violence is . . . to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure."). The Court also notes in this respect that the second through fifth paragraphs of the PI Order do not outright *forbid* the use of crowd control weapons; they permit them to be deployed under certain circumstances and against certain individuals. PI Order at 43–44. When such deployment is permitted under the injunction, as when an individual poses a threat of imminent harm to a person, the sixth paragraph of the PI Order provides that Defendants "shall not be liable for violating this injunction if a protestor, journalist or legal observer is incidentally exposed." PI Order at 44.

The remaining workability concerns are speculation that Defendants could have or did raise at the preliminary injunction stage, and which Kerlikowske and the Ninth Circuit have already rejected as overblown. *Index Newspapers*, 977 F.3d at 836; Declaration of Gil Kerlikowske [Dkt. 6-3]; Supplemental Declaration of Gil Kerlikowske [Dkt. 34-26]; Reply Declaration of Gil Kerlikowske [Dkt. 49-1]. Defendants point to no instance post-dating the issuance of the PI Order in

---

[15] As to journalists and legal observers, a crime unrelated to merely failing to obey a dispersal order. PI Order at 43.

15

which it actually proved unworkable and resulted in harm to Defendants. They have thus not established a likelihood of irreparable injury pending appeal. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (government's failure to submit evidence of actual injury "it has experienced since the injunction issued," relying only on "estimates, assumptions, and projections" instead, "made a weak showing that it [would] suffer harm over the requisite interim period").

### C. Harm to Other Parties, Including Plaintiffs

The third *Nken* factor asks whether the other parties to the litigation will be substantially injured if the preliminary injunction is stayed pending appeal. As this Court already explained, Defendants' conduct physically injures and chills Plaintiffs, likely violates the First Amendment, and is likely to recur. PI Order at 22–38. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 37 (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009); *supra* Part IV.A. Plaintiffs thus established that they were likely to suffer irreparable harm in the absence of preliminary relief. PI Order at 38. Nothing in Defendants' stay briefing changes this analysis.

### D. Public Interest

As the Court has also already explained, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." PI Order at 38 (quoting *Index Newspapers*, 977 F.3d at 838). Defendants also assert an important public interest, but the record does not establish that Defendants' unconstitutional use of crowd control weapons against peaceful protestors, legal observers, and journalists advances their efforts to protect officers and the public. *Id.* Defendants' citations to other instances in which "law enforcement officers and agents involved in immigration enforcement" "have been under attack since early this summer," Reply at 11, are either entirely unrelated to the events in the Los Angeles area that are the subject of this case or else reveal that violent, bad actors can be identified, arrested, and prosecuted. They come nowhere close to

establishing that the public interest weighs in favor of staying the PI Order restraining Defendants from unlawful use of force against peaceful protestors, legal observers, and journalists.[16]

## V.  CONCLUSION

Defendants' Application to stay the Court's PI Order is therefore denied.  All prior orders remain in full force and effect.

Dated: October 21, 2025

Hernán D. Vera
United States District Judge

---

[16] Were this Court to engage in the analysis Defendants suggest is proper here—*i.e.*, by considering other incidents against DHS officers around the country—the Court would then be required to also analyze the recent force used by DHS against journalists and protestors in cities such as Chicago and Washington, D.C.  That is plainly beyond the scope of this dispute and this PI Order.

17