UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | | |
|---|---|---|
| LOS ANGELES PRESS CLUB, et al., | ) | Case No.  LA CV 25-05563-HDV -E |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Thursday, December 4, 2025 |
| KRISTI NOEM, et al., | ) | |
| | ) | (10:32 a.m. to 11:16 a.m.) |
| Defendants. | ) | |
| _____ | ) | |

TRANSCRIPT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT [81]
BEFORE THE HONORABLE HERNAN D. VERA
UNITED STATES DISTRICT JUDGE

Appearances:                    See next page.

Court Reporter:                 Recorded; CourtSmart

Courtroom Deputy:               Wendy Hernandez

Transcribed by:                 Chinago Okonta
                                Echo Reporting, Inc.
                                9711 Cactus Street, Suite B
                                Lakeside, California 92040
                                (858) 453-7590

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:

For the Plaintiffs:              ADRIENNA WONG, ESQ.
                                 ACLU Foundation of Southern
                                   California
                                 225 West Hospitality Lane
                                 Suite 302
                                 San Bernardino, California
                                   92408
                                 (909) 380-7505

                                 MATTHEW B. BORDEN, ESQ.
                                 BraunHagey and Borden LLP
                                 747 Front Street
                                 Floor 4
                                 San Francisco, California
                                   94111
                                 (415) 276-1808

For the Defendants:              SEAN SKEDZIELEWSKI, ESQ.
                                 U.S. Department of Justice,
                                   Civil Division
                                 950 Pennsylvania Avenue NW
                                 Washington, DC 20530
                                 (202) 307-1697

                                 PAUL B. GREEN, ESQ.
                                 AUSA - Office of United States
                                   Attorney
                                 300 North Los Angeles Street
                                 Suite 7516
                                 Los Angeles, California 90012
                                 (213) 894-0805

3

Los Angeles, California; Thursday, December 4, 2025 10:32 am

--o0o--

(Call to order.)

THE CLERK:  Calling item two, Civil 25-5563, LA Press Club versus Kristi Noem.

Counsel, please state your appearances.

MS. WONG:  I'm Adrienna Wong with the ACLU for the Plaintiffs.  And here with us today also, Plaintiffs Ms. Mena and Mr. Rose for the LA Press.

THE COURT:  All right.  Good morning.

MR. BORDEN:  Good morning, your Honor.  Matt Borden, also on behalf of Plaintiffs.

THE COURT:  All right.  Good morning.

MR. SKEDZIELEWSKI:  Good morning, your Honor.  Sean Skedzielewski on behalf of Defendants.

THE COURT:  Good morning.

MR. GREEN:  Good morning, your Honor.  Paul Bar (phonetic) Green on behalf of Defendants.

THE COURT:  Good morning to you.

All right.  We are here on Defendants' motion to dismiss a first amended complaint.  I'm obviously familiar -- very familiar with this case, given all the activity on it.

I want to start by asking Plaintiffs' counsel about the APA claim.  I think that -- to cut right to the

4

point, although I'll give Defendants' counsel full time to argue everything, I think this is the only one that's really close, and I am leaning towards dismissing that claim, and just that claim.  I don't exactly see what the final agency action is.  The test also requires that the action "must mark the consummation of the agent's decision-making process."  How is that met here?  I didn't see exactly how you meet that here, so if you could address that.

MS. WONG:  Certainly, your Honor.

So we allege a couple of different agency decisions here.  With respect to the use of force, we allege that the agency has made the decision to set aside or stop following its own regulations in the CFR and its own written policies with respect to the use of crowd control weapons specifically as it -- they pertain to responding to protests of the agency's immigration -- ongoing immigration operation in this district.

THE COURT:  Well, let me stop you and drill down because I saw that in the briefs.  But aren't they -- isn't the response essentially that, "No, we're not walking away from the regs.  We're interpreting them because we believe that" -- and I'm not saying I agree with this, but this is their argument, I would think, that they believe that there is imminent harm to law enforcement, and so they're following the regs in using the less lethal weapons,

5

although, obviously, this Court has disagreed in terms of the orders that it has already issued.  But that, I think, has been their argument, that their actions have been consistent with the regs.  So I see an APA case as sort of, "Well, regs are here."  Now you have a different -- have, through a decision-making process, an agency saying, "We are going in a different direction" and making that very clear. So how do you -- how do you respond to that?

MS. WONG:  Yes, your Honor.  I understand Defendants' argument the same way.  Our response I think would be that we are here on a motion to dismiss where the allegations of the complaint should be taken as true.  And we are alleging that there was a deliberate decision made that -- and to put it colloquially -- they would do this immigration operation by all means necessary without regard for their use of force regulations and their written policies.  And we are not -- to clarify, we are not challenging, under the APA, the agency official's statements about how they are going to respond to protests, but those statements do make our allegation that there was a deliberate decision made plausible.  And it's that decision that we are asserting is a violation of the APA, much as the decision to stop following detention standards in the <u>Torres</u> case that we cite was treated as a final agency action.

THE COURT:  Okay.  All right.  Then with that, let

6

me call up Defendants' counsel.  I'll come back to you and let you rebut their arguments, but let me hear from them first on standing and the Fourth and Fifth Amendment claims and anything else you would like to highlight.

MR. SKEDZIELEWSKI:  Certainly.  Thank you, your Honor, and may it please the Court.

If I may, I'll start with the APA claims --

THE COURT:  Sure.

MR. SKEDZIELEWSKI:  -- since that's fresh in everyone's mind.  We agree with your Honor's inclination here.  We were sort of perplexed to see this claim added to the complaint.  And just to sort of take a step back and sort of a 3,000 foot view of APA claims, I think it's -- can maybe be helpful to the Court.  I mean, the district court typically functions the way the courts of appeal function to the district court.  So an agency goes through a rulemaking or an adjudication, comes to a determination about either a rule or a judgment, and then the party that's affected or the parties affected don't like it, they come to the district court looking for relief from that judgment or rulemaking.  And the benefit of that type of a process is that, at the agency, a certified administrative record will have been made.  There's no discovery on that issue.  And so when the -- and the case comes before the district court, the defendant, the agency, will submit that record.  The

7

court has a sort of easier task than in other civil litigation where they just look at the administrative record and follow -- and then apply the Administrative Procedure Act to that record to see whether any of the actions taken were arbitrary and capricious or outside the scope of the -- you know, enabling statute for that agency.  And then the relief, which I don't take Plaintiffs to even be seeking here, would just be remand to the agency for them to then issue a new rule or, you know, vacate a rule or issue a different judgment that is not arbitrary and capricious or that does, you know, fall within the guidelines of the statute.  So the APA claim is just really sort of -- it doesn't fit the facts here.  And your Honor hit the nail on the head, it's -- there's just no final agency action that would be the subject of an APA claim.  Plaintiffs attempt to say that there's a policy, a policy essentially of not following our formal policies, but they allege that in a conclusory way, and then the facts that they muster to try to support that claim don't get the job done.  Tweets from the President, you know, answers to a reporter by the Secretary of DHS.  None of this indicates -- even if those statements indicated a change in policy, which they don't, but even if they did, that would not be the consummation of the agency's decision-making process.  I mean, if -- even if we imagined a scenario where DHS was engaged in a rulemaking

8

or a policy -- you know, they were going to change the use of force policy, and in that process, Secretary Noem said, "Yeah, we need to go harder."  She didn't say that, but, you know, if she had said that in that -- in this hypothetical, that would not be the consummation of the agency's decision. The consummation would be a new policy document is issued that agents in the field are instructed to follow.  And then that document would be what your -- this Court would have to evaluate as being, you know, within or outside the scope of the Administrative Procedure Act.

So because there's no final agency action -- I mean, there's no consummation of the agency's decision-making process -- and the second prong is relevant, too.  I mean, I don't think you need to get there, your Honor, but the second prong of that test is that the action must be one by which rights or obligations have been determined.  And so with the rulemaking, we see -- you know, it's easy to understand, right?  You know, companies will now follow such and such regulation and do this reporting requirement or something like that.  They now have an obligation.  They got to start, you know, reporting to an agency on some of their, you know, conduct or something to that effect.  But there's nothing like that here.  The Plaintiffs' legal rights and obligations have not been affected by a policy decision by the department.

9

THE COURT:  Well, there I think Plaintiffs may have the stronger of the argument, to the extent that they say, "Well, it's clear that the policy is now, 'We're not treating journalists any different.  We're not going to let them not follow a dispersal order.  We're going to treat them the same way as anyone else.'"  And to that extent, it does affect their rights and obligations because they have greater rights, so -- but I don't know that I get there because I still need to follow -- I still need to satisfy the first prong, which I'm having a lot of trouble with.

MR. SKEDZIELEWSKI:  Yeah -- your Honor, I don't -- you know, not to be too cute or anything, but I don't even see how we would -- what administrative record we would submit to the Court to make this into an Administrative Procedure Act claim because the Plaintiffs rely on, you know, public statements to the media principally in support of their claim that there's a policy change here.  That seems to be the extent of the record.  It's just sort of mystifying to me how we could even sort of tee this up for the Court to decide, if that makes sense.

THE COURT:  All right.  Let's move on to your other arguments.

MR. SKEDZIELEWSKI:  Sure.  Certainly.  So, your Honor, on standing, which I think, you know, we discussed this before at the preliminary injunction hearing, but

10

different standard applies here.  And I think the <u>Clapper</u> case from the Supreme Court is instructive and really controls.  In the same way that in <u>Clapper</u>, the plaintiffs relied on a hypothetical chain of possibilities to get them to an injury -- a prospective injury, the Plaintiffs have the same trouble here.  All of the incidents that they allege were wrongful stem from last summer.  They haven't, you know, come to the Court since the preliminary injunction was entered seeking relief from further violations.  And they need to essentially establish a couple of things that are certainly impending, certainly going to happen in the near future, in order to get standing for this prospective relief that they're seeking, that there's going to be continued protests.  They haven't alleged that there's -- are going to be continued protests against DHS, which sort of is the first hurdle that they would need to clear.  And they really can't, right?  Because how would they know? These Plaintiffs, as far as I'm aware, are not, you know, sort of, protest organizers.  They're just -- they're journalists who are showing up at protests to cover them. They would also then need to claim that LLMs -- you know, excuse me, less lethal means are going to be used at these protests.  But that wouldn't be enough, because less lethal means aren't per se unlawful.  They might be used lawfully. They need to further allege that those less lethal means

11

will be used, you know, in a targeted way, you know, wrongfully violating the Constitution.  But that's not enough.  They need to also plead that those -- that wrongful use of less lethal means at a future protest will be specifically targeted at the Plaintiffs.  And they haven't alleged -- they haven't even pled all those hypotheticals, let alone established a probability that that's going to happen, and even some of the named Plaintiffs sort of undermine the likelihood of that happening.  In particular -- and this has sort of been Defendants' position all along -- DHS is not interested in using force against journalists, your Honor.  We've maintained that if journalists are staying outside of the fray, that they would be, you know, free from uses of force.  Mr. Ray in the first amended complaint, paragraph 171, says he's going to stay further back when covering future events.  From our point of view, he doesn't have standing to bring a claim for prospective relief because if he's doing that, he's not going to be subject to uses of force in the future.

THE COURT:  But what -- the other cases that you cite, though, the majority of them at least that try to wrestle with this concept of standing don't do so in the First Amendment context, even Vasquez Perdomo and, you know, the Kavanaugh concurrence.  So I'm trying to look at more analogous situations where -- I mean, even what you said

12

just now is example of chilling.  If there's a policy of shooting on sight and the Plaintiff said, "Yes, I've been shot before, but I'm not going to get shot again," you're saying just because of that, he or she doesn't have standing to ask for injunctive relief.  That's just ludicrous.  I don't think any decision has held that.  So what are the most analogous cases on that where, in the First Amendment context, individuals who have been repeatedly affected and who allege and have shown in the -- and for purposes of where we are now -- that there's been continuous conduct?  What more do they need to do?

MR. SKEDZIELEWSKI:  So, first point, your Honor, I think the arguments that I made on standing certainly apply in the Fourth Amendment, you know, context, but to take your Honor's question on the First Amendment, which -- and you're raising this question of a chill -- chilling effect.  The court has been clear on that, that Plaintiffs can't manufacture standing by inflicting harm on themselves as in this case by, you know, no longer attending a protest or --

THE COURT:  By doing their jobs.  Really?  The --

MR. SKEDZIELEWSKI:  Well, no, based on fears of hypothetical future harm.  So a chilling effect has to be rooted in a concrete, you know, imminent and certainly impending injury, not fears of a hypothetical future harm.  So, yes, your Honor is correct, these incidents, you know,

13

that Plaintiffs allege, there is a string of them from the summer, but to suppose that because there were a few incidents over the summer, that Plaintiffs now have a -- in perpetuity a legitimate fear that this is going to continue to happen to them in particular is hypothetical.  And the cases say that because of that, there's no standing.

THE COURT:  All right.  But I haven't heard a closely analogous case in the First Amendment context.

MR. SKEDZIELEWSKI:  So Laird.  Maybe Laird is, I think, the closest one that we have in our briefing along with, I think, Clapper as well.  They're different because they're not use -- they're not uses of force, but they do have that First Amendment kernel to them.  There's sort of another angle to this, though, on the standing piece, your Honor, so -- because they rest their warrant for fears of future force on this idea that there's been a policy change.  But allegations of a secret, you know, policy of retaliation fail the Twombly requirements because there -- here there's obvious alternative explanations for why force was used, so thinking in particular about the retaliation claim.  It's not enough that there was force used, there has to be some evidence -- excuse me, some pleading, some allegation that that force was used specifically because of the viewpoint being expressed or to deter First Amendment activity.  But in all of these incidents, even according to Plaintiffs' own

14

complaint, there's violence that's being used at these protests towards officers. You know, they specifically reference, you know, fireworks that are being hurled at and, you know, then exploding towards officers. So the Court does not have to, at this stage of the litigation, assume that or give Plaintiffs the benefit of the doubt that officers were retaliating when there's evidence on Plaintiffs' own pleadings that officers had legitimate law enforcement purposes for using the force that they used, both the protection of themselves, of property, and of the public at large. It's not good for fireworks to go off in the middle of big crowds, right?

THE COURT: Oh, but, Counsel, I don't know that I need to go there, but why should this Court be compelled to put its head in the sand essentially and ignore everything that's happened in Chicago, Judge Ellis and the reams of evidence by the same agency. Now, obviously, it's in a different district, but it's the same types of allegations. And I know that the injunction has been put on hold. I'm aware of that. But in terms of your argument, "Look, nothing to see here. It's all in the past," we're talking about just weeks ago, days ago, this activity continues. So why can't I take note of that and say, "No, the problem still exists. There hasn't been any change," right? If there was a press conference, if there's something saying,

15

"Look, we're -- we have new policies, here they are," I could see your argument, "Look, we've changed -- we've made a decision to change our policies," but I don't see that at all.

MR. SKEDZIELEWSKI:  I think the Court should consider the Chicago case.  I think it's relevant here.  The Court may not be aware that the Plaintiffs in that case earlier this week filed a motion to dismiss their own complaint for precisely the reasons that I'm now stating, namely that they no longer feel that there's any threat to their clients in Chicago because, as they see it, there hasn't been any -- I'm not quoting exactly but paraphrasing their motion, your Honor, that, as they see it, there has not been any further violations of the preliminary injunction that was issued there since it was initially put into the record in early November.  And that was enough for them to say, "We don't need this anymore.  We can move on." So I think it's been a much longer period of time in this case where the last allegation of wrongful use of force in the complaint I believe stems from early September.  So we're, you know, three months later than that now, with no, you know, word from the Plaintiffs to this Court of any ongoing, you know, violations.  So I think actually the Chicago case strongly supports these -- this argument that, you know, whatever happened last summer, whether we think

16

everything was above board and done professionally, but even if the Court disagrees, none of that has been ongoing since then.

THE COURT:  Okay.  So you're essentially inviting me to look at the --

MR. SKEDZIELEWSKI:  Yes.

THE COURT:  -- the Seventh Circuit record.

MR. SKEDZIELEWSKI:  Yes, your Honor.  I think -- I don't think that the facts in that case are very helpful here because, you know, that operation -- it's a different operation, different Plaintiffs, right?  So it -- it's not dispositive on the merits.  But as far as standing goes, I think it's helpful.  Yeah.

THE COURT:  Okay.  All right.  I'll let you make all these arguments, and I'll come back to Ms. Wong or Mr. Borden, so please continue.

MR. SKEDZIELEWSKI:  Yes.  Yes, your Honor.

So we -- we've been over the First Amendment, you know, last time, and we've sort of touched on some of the themes this time, so I'll just make the point that on the retaliation claim, Plaintiffs need to plead that the -- it's not just that force was used, but that it was, as the cases hold it, that First Amendment activity was a substantial motivating factor in Defendants' conduct.  And I just think by Plaintiffs' own papers, fireworks were being shot at

17

officers, you know, chairs -- rocks being thrown at them -- there's an obvious alternative explanation that does not fall under that retaliation test.  And so I think the Court should dismiss that claim.

And similarly with the right of access, the Plaintiffs just have not satisfied the elements of that test, that they've been denied access to a process or proceeding to which they have a right.  By their own complaint, many of these protests occurred at, you know -- not at, you know, traditional types of protests, but they're out at criminal warrant operations out in the field that's sort of spontaneous, not planned.  And there's just -- you know, in the same way that police and federal officials have -- must have the ability to close down a crime scene for the purposes of an investigation, federal agents have the authority to close down a criminal warrant operation to secure that perimeter and make sure that they can conduct law enforcement operations in a safe and secure manner. Plaintiffs have not pled that they have a right to access that type of process.

And I just want to emphasize then on the -- I'll move on -- unless your Honor has questions on the First Amendment, I think --

THE COURT:  No.

MR. SKEDZIELEWSKI:  -- we've touched on that

18

enough.  The Fourth Amendment claims I actually think are sort of equally as weak as the administrative procedure claims.  So Plaintiffs have not plausibly alleged a seizure within the meaning of the Fourth Amendment.  So the key distinction is, DHS dispersed rather than restrained the Plaintiffs in this case.  So the first amended complaint does not contain really any plausible allegation that Defendants have manifested an objective intent to restrain the Plaintiffs.  In fact, many of the Plaintiffs allege in the complaint that they went about their journalistic duties immediately after force was used upon them.  And just an example, look at paragraphs 114.

THE COURT:  But hasn't the Ninth Circuit, at least implicitly, made a distinction between sort of airborne sprays, for example, and the types of LLMs like -- that will actually cause impact.  And here we have lots of evidence of rubber bullets, of tear gas canisters being shot, which created an impact, that those can be considered seizures essentially because they restrict movement by, you know, incapacitating the person hit, right, or the person shot. Isn't there room within the Ninth Circuit for that type of analysis?

MR. SKEDZIELEWSKI:  That -- that's the key language, your Honor, that it's incapacitation.  It's not just that there's a contact, but that the contact has to

19

incapacitate.  So in the Nelson case, there an individual was hit with a pepper ball, but it incapacitated him for 10 to 15 minutes because it struck him in the eye causing serious injury, so that he's writhing on the ground in pain for a prolonged period of time and unable to leave the location.  Contrast that with the Puente vs. City of Phoenix case where, you know, tear gas is used I think rather extensively, and the court found there that there was no seizure.  So what we're dealing with here, though, is a kind of middle case, right, where, yes, pepper balls are used, yes, they were used kinetically to strike individuals, but by Plaintiffs' own statements, none of them were incapacitated.

So I'll direct your Honor to some of the paragraphs in the complaint that I think decide this issue for the Court.  Plaintiff Ray, he retreats immediately after getting hit.  That's their complaint.  Paragraph 168.  The fact that he retreats immediate -- that's his own words. The fact that he retreats immediately after getting hit indicates he wasn't incapacitated.  Plaintiff Paz, P-A-Z, she runs while being hit, and then it's not totally clear, but it seems that she continues running and doesn't stop. That's paragraph 182.  Plaintiff Climer, he continues protesting after being struck with a pepper ball.  So these pepper balls that -- you know, as the cases make clear --

20

this is not my own knowledge about these devices, but just based on the cases.  They can incapacitate someone if they strike them in the eye or a very sensitive part of the body.  But as the Plaintiffs' own statements make clear, they can also, if they strike a person in a nonsensitive part, fail to incapacitate them, and I think that's what we're looking at here.  So -- what we haven't seen -- like in the Sanderlin case that Plaintiffs rely on, there the Plaintiff was struck by a 40 millimeter foam baton at close range in the groin, and he was immediately incapacitated.  He's writhing on the ground in pain for a period of time.  We don't have anything like that here.  I don't believe, in fact, that Plaintiffs allege anyone was struck by a 40 millimeter foam baton.  It's mostly -- the largest, you know, amount of force that they describe is non-kinetic, non-impact.  It's pepper spray and tear gas.  But when there is kinetic impact, it's not these more severe types of devices like the 40 millimeter baton, it's these pepper balls fire -- fired at a responsible range that, well, you know, any one of them could have potentially incapacitated had they been fired at a sensitive area.  In this case did not.  And so since Plaintiffs were free to move about, they were never seized.

Now that doesn't mean that they have no force claim.  It just changes the standard, right?  So the

21

standard when there's no seizure is the shocks the conscience test, and that has sort of two different applications. And the case law is helpful here. There's -- the court describes -- the Supreme Court describes the two different contexts using prisons as an example. So in planning out how to manage the prison, the deliberate indifference test applies because there, the prison officials have time to deliberate, to make informed choices. They're not pushed by urgency to decide what policies and procedures to put into place to keep the prison secure. But when there's a prison riot and there's chaos afoot and there's competing, you know, concerns tugging at the decision makers, officer safety, prisoner safety, public safety, security of the -- of the building, then it's the purpose to harm test that applies, which is a much higher standard there. And so in other words, you apply that purpose to harm standard when officers are confronted with a situation that escalates so quickly that the officer had to make a snap judgment. And when that's the standard, the officer's use of force shocks the conscience only if the officer acted with a purpose to harm the Plaintiff for reasons unrelated to legitimate law enforcement objectives. All of these incidents that Plaintiffs allege here easily fall within that purpose to harm standard because officers are responding to exigent circumstances that are chaotic,

22

you know, unpredictable, where they have to make snap judgements about how to protect the officers, how to protect the buildings that they're defending, how to protect detainees either inside the buildings or, in some cases, vehicles that are passing by, and how to keep the public safe.  They have to make all those balancing judgments in a split second, and so that's why the purpose to harm test makes more sense here.

And there's nothing in the pleadings suggesting that the officers' reason for using force, their purpose in using force was to injure the Plaintiffs.  Even if we take all the facts in the most favorable light to the Plaintiffs and taking this Court's findings, you know, in the preliminary injunction hearing seriously, there -- there's no pleadings in the complaint that say, you know, officer so and so looked at Beckner-Carmitchel and said, "He's really making me angry.  I'm going to go after him."  There was -- there's just nothing like that.  And given the chaotic situation that these officers faced, the inference is -- I think the only justified inference is officers -- even if they used too much force, that's not the -- that doesn't meet the shocks the conscience test.  Even if they used too much force and they were still pursuing a legitimate law enforcement purpose, then they fall well within that test.  So given that that test applies here, Plaintiffs failed to

23

state a claim under that standard.

And for really the same reason, the Fifth Amendment claims fail, but also they really fail for a sort of separate reason as we lay out in the papers, because there's a more specific amendment, namely the Fourth Amendment, that applies.  They don't need to move -- this Court doesn't need to move on to a due process analysis when they have the much more concrete and well-developed Fourth Amendment test to apply.  And that's the, sort of, City of Sacramento case.  And there, there was a police chase, and the -- you know, the case law on that is not -- you know, there's no police chase here, but police chases aren't seizures is what the case law says, and so since there weren't seizures here, it's that same test of shocks the conscience.  So even if the Court disagrees with us and thinks that Plaintiffs can plead both the Fifth and Fourth Amendment, all the reasons I gave for why the Fourth Amendment claim fails apply to the Fifth Amendment because we're dealing with the same test, the shocks the conscience test.

And, your Honor, we touched on the APA, just briefly on the declaratory relief claim, the Declaratory Judgment Act doesn't provide an independent jurisdictional basis for suits in federal court.  And so if this Court agrees with us that the other claims should be dismissed,

24

then the declaratory relief claim has to go as well.

And I'll also just note for the Court's -- I'm sure the Court is aware, but just to remind the Court, the stay hearing in the Ninth Circuit appeal from this case is being held next week, and we think that this Court would conserve its resources and possibly make its job easier if it withholds judgment on the motion to dismiss until it sees what the stay panel does in the Ninth Circuit.  And -- well, I'll answer any other questions --

THE COURT:  I understand the argument, yeah.

MR. SKEDZIELEWSKI:  -- the Court has, yeah.

THE COURT:  All right.  Very good.  Thank you.

Ms. Wong.

MS. WONG:  Thank you, your Honor.

I'm thinking I'll focus primarily on the APA claims because I gather that's what's giving the Court the most pause unless your Honor has questions about --

THE COURT:  Well, I would appreciate some rebuttal on the other points as well.

MS. WONG:  Absolutely, your Honor.

Preliminarily, to start, I did want to respond to Counsel's arguments about Twombly.  Respectfully, the motion to dismiss standard does require giving Plaintiffs the benefit of the doubt as to their factual allegations.  They need to be taken as true.  All reasonable inferences need to

25

be drawn in our favor.  So the existence of alternative explanations, which this Court has already ruled aren't really supported by the facts that are in the record and that we've incorporated into the complaint, doesn't preclude our stating a claim here under the applicable 12(b)(1) or 12(b)(6) standard.  So that's just something that applies to all of our claims.

THE COURT:  But you have to incorporate it by including the language.  You can't --

MS. WONG:  Absolutely.

THE COURT:  -- just say, "We incorporate by reference all the briefing."

MS. WONG:  Absolutely, your Honor.

THE COURT:  You could do that in a motion perhaps, but not -- certainly not for Rule 12 purposes and Twombly analysis, so --

MS. WONG:  I agree completely, and I appreciate the opportunity to clarify that.  When we have stated that we have incorporated the factual findings from the Court's prior orders that we're -- we are saying that we have endeavored to plead those factual findings as factual allegations in our complaint.  We are not trying to incorporate by reference in any of our motion papers prior orders or pleadings.

But to start with the APA claim, I don't at all

26

take issue with Mr. Skedzielewski's characterization of the typical administrative process and the fact that we are outside of that here.  I would simply argue that it is the agency's conduct that has exceeded the normal APA process and not our claim that is outside of its bounds.  Here we have federal regulations, we have written policies by the agency.  If the agency really wanted to depart from them, really wanted to change its conduct, the appropriate thing to do under the APA, under administrative law, would be to go through the rulemaking process and amend those regulations or somehow set them aside.  And it hasn't done that here, which was arbitrary and capricious.  It just made the unilateral decision that, with respect to protests of the immigration operation in this district, those rules would not apply, and they would get the job done, whatever it took.  I think we plead some statements by Secretary Noem and by Defendant Bovino that say as much.

Your Honor noted that our APA claim is not just about the use of force decision or the use of force action, but also about the policy of how to treat protests, and also we have alleged a decision to treat filming DHS agents on operations as a form of unlawful violence.  We have alleged that the agency has stated in official statements that that is the case.

And to respond to the Government's argument that

27

that decision hasn't been fully consummated, I would simply point the Court to the avalanche of evidence of force that is outside the bounds of its use of force regulations and policies, as well as the substantial allegations about DHS agents pulling guns repeatedly on people who are filming them, all of the conduct specifically factually alleged in the complaint that demonstrates that this decision wasn't just made and then put on Truth Social, this decision was implemented through the chain of command for the operation in this district, it was communicated to agents, and it has actually been implemented.  It has had concrete consequences already for our Plaintiffs and our class members.  And under the Ninth Circuit's practical standard for determining whether something is final agency action, that means it's final, it's been consummated, it has had practical implications for the day-to-day operations of DHS agents in the field as we see every day and as we have alleged in the complaint.

So turning back to the arguments that the Government just raised on standing, First Amendment, and the other claims, I won't dwell too long on standing and the First Amendment, just because the Court has thoroughly canvassed the relevant law already and made its rulings. And as I mentioned, we believe we have incorporated the factual findings from the Court's prior orders as

28

allegations in the complaint.  But just to respond to some of the Government's arguments here today, Laird and Clapper are simply inapposite.  Those are cases where the challenged government policy had not been applied to the plaintiffs.  They hadn't suffered any injury.  So they really were basing their claims based on fears that it might one day be applied to them.  That's different from our case here, where each of our Plaintiffs has already been harmed by the challenged policies, some of them multiple times.  Their fears -- the chilling effects on them don't derive from some sort of subjective fear.  Their chilling effect derives from the fact that they've been shot repeatedly and injured very seriously, and so it cannot be fairly said that their chilling is self-inflicted.

          The Government argued that there cannot be standing for a Plaintiff that is chilled and has retreated from their First Amendment exercise.  Your Honor asked for a case on point, and the Government wasn't able to provide one.  And I will submit that there are actually cases holding the opposite.  The Ninth Circuit has repeatedly held that where a plaintiff adjusts their behavior, changes their behavior, takes themself out of the line of fire, so to speak, because of the chilling effect of the government's prior actions, that that gives them standing.  That is a basis for standing.  And that's the Food Not Bombs case and

other cases that we've cited in our preliminary injunction papers.

THE COURT:  Give me that cite again that you said so quickly.

MS. WONG:  There is a case, the Food Not Bombs case.  I believe we cited it in our preliminary injunction papers.  But there -- it's a long line of Ninth Circuit precedent, to be honest, your Honor, and we've cited several of those cases.  I'm not recollecting exactly which at this moment.

THE COURT:  That's fine.  Go ahead.

MS. WONG:  Responding to your Honor's conversation with the Government about the Chicago case, I'll just note that in Chicago, DHS has left the city, and that has not happened here.  And we have no evidence that has happened here.  Plaintiffs may be submitting something to the Court soon that indicates that there are continuing protests -- continuing uses of force against protests sometime soon.  But for the purposes of the motion hearing today, within the four corners of the complaint, we have alleged that there's an ongoing immigration operation and that Plaintiffs intend to continue covering protests of those operations and that protests are continuously organically springing up around those immigration operations.

To briefly respond to the Government's arguments

30

about our Fourth Amendment and substantive due process claims, I do want to clarify something that Defendants argued for the first time on reply.  They argue that we concede that our Fifth Amendment claim is adequately covered by our Fourth Amendment claim and we're seeking permission to plead the Fifth Amendment claim only in the alternative, and that's not correct.  So, to clarify, your Honor, we plead a variety of uses of force.  Some of those are clearly seizures under established Ninth Circuit law.  So shooting someone in the head with a less lethal baton round or with a pepper ball, which is something that's happened to our Plaintiffs, clearly a seizure.  Brandishing a weapon at someone to get them to stop doing something, clearly a seizure under Ninth Circuit law.  And then there's some uses of force, as your Honor mentioned, that under Puente most likely analyzed under the substantive due process standard, like the airborne effects of tear gas.  And then there are some, quite frankly, that we need some more factual development to figure out which side of the line they fall on.  And for that set of uses of force where we have to look more -- in more factual detail at the effects of the use of force or the intent of the officers, that's the set of uses of force for which we are pleading in the alternative at this moment, which, as Jones points out, under Federal Rule of Civil Procedure 8, a Ninth Circuit precedent is expressly

31

authorized.

I also do want to correct something the Government said here today, which is that the shocks of conscience standard applies regardless of whether it's a Fourth Amendment or a substantive due process claim.  That's not true.  Under the Fourth Amendment, the Graham standard applies, including how that standard has been applied by the Ninth Circuit in cases like Sanderlin and Nelson.  The shocks the conscience standard applies to substantive due process claims as the Puente case lays out pretty clearly.

And I will also clarify that the standard for whether something counts as a seizure is not whether someone is completely incapacitated.  The standard is whether someone's freedom of movement has been restrained.  And we have alleged that our Plaintiffs' freedom of movement was restrained by several different types of projectiles mostly being shot at them.  Defendants assert that we don't allege that DHS shot any of our Plaintiffs with baton rounds, as was the case in Sanderlin.  That's just not true.  We have alleged specifically that Ms. Mena was shot with a baton round, that Ms. Olmeda was shot with baton round, that both were so severely incapacitated and restrained that they couldn't move without assistance.  They couldn't -- Ms. Olmeda couldn't find her car.  Ms. Mena had to be assisted -- led by the hand out of the scene.  So we do allege that --

32

those facts here, in addition to alleging that most of our Plaintiffs were shot with pepper balls, which is a form of projectile weapon the Ninth Circuit in <u>Nelson</u> established effects a seizure.

With respect to the substantive due process claim, we do allege purpose to harm, your Honor.  Many of the facts that support that I think are the same sorts of facts that support your Honor's conclusion on retaliatory motive from its prior orders.  But for the moment, we are pleading that in the alternative, but we also plead deliberate indifference.  Here, we are challenging not individual agents' decisions to pull the trigger.  We're challenging an agency-wide decision to use force in violation of constitutional standards, and so the deliberate indifference standards should apply, but to clarify, we have alleged both deliberate indifference to harm inflicted through indiscriminate uses of force and a purpose to harm here, specifically a purpose to harm people who would dare stand up and protest the agency's immigration operations in this district or report the truth about them.

And, finally, your Honor, we would ask the Court to issue an order on this motion expeditiously.  We are very eager to get to discovery and fact development because we want to protect our Plaintiffs and our class members as soon as possible.  If for any reason the Court is inclined to

33

grant in any part the motion to dismiss, we ask for leave to amend, which should be freely given under Rule 15 at this stage of proceedings.  But for the reasons stated, we don't think that's necessary and ask that the Court deny the motion entirely.

THE COURT:  All right.  Thank you.

MS. WONG:  Thank you.

MR. SKEDZIELEWSKI:  Your Honor, just two sentences.

THE COURT:  Very briefly.

MR. SKEDZIELEWSKI:  -- very quickly.

So just to be perfectly clear, DHS' use of force policy, the published one that's official, that's in the record, is the policy that's in effect that officers have to abide by on pain of being fired.  And, secondly, DHS has not left Chicago, and operations for immigration enforcement continue there.

THE COURT:  Okay.

MR. SKEDZIELEWSKI:  Okay.  Thank you.

THE COURT:  All right.  Thank you.  I will work on an order promptly.

MR. SKEDZIELEWSKI:  Thank you.

THE COURT:  Have a good day.

(Proceedings concluded.)

34

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Chinago Okonta                          12/18/2025
Transcriber                                Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*