1   Matthew Borden, Esq. (SBN: 214323)
        borden@braunhagey.com
2   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
3   Kory J. DeClark, Esq. (SBN: 310571)
        declark@braunhagey.com
4   Greg Washington, Esq. (SBN: 318796)
        gwashington@braunhagey.com
5   BRAUNHAGEY & BORDEN LLP
    747 Front Street, 4th Floor
6   San Francisco, CA 94111
    Telephone: (415) 599-0210
7
    Lily (Haeun) Kim, Esq.
8   (*pro hac vice* forthcoming)
        kim@braunhagey.com
9   BRAUNHAGEY & BORDEN LLP
    200 Madison Avenue, 23rd Floor
10  New York, NY 10016
    Telephone: (646) 829-9403
11
    [Additional counsel on next page]
12
    *Attorneys for Plaintiffs*

Peter J. Eliasberg, Esq. (SBN: 189110)
    peliasberg@aclusocal.org
Jonathan Markovitz, Esq. (SBN: 301767)
    jmarkovitz@aclusocal.org
Adrienna Wong, Esq. (SBN: 282026)
    awong@aclusocal.org
Meredith Gallen, Esq. (SBN: 291606)
    mgallen@aclusocal.org
Summer Lacey, Esq. (SBN: 308614)
    slacey@aclusocal.org
Mohammad Tajsar, Esq. (SBN: 280152)
    mtajsar@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
Telephone: (213) 977-9500

Peter Bibring, Esq. (SBN: 223981)
    peter@bibringlaw.com
Law Office of Peter Bibring
2210 W Sunset Blvd # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022

13

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15<br>16   LOS ANGELES PRESS CLUB,<br>NEWSGUILD - COMMUNICATIONS<br>17   WORKERS OF AMERICA, ABIGAIL<br>OLMEDA, individually; and SEAN<br>18   BECKNER-CARMITCHEL, RYANNE<br>MENA, LEXIS-OLIVIER RAY, CHARLES<br>19   XU, BENJAMIN ADAM CLIMER, and<br>MARIA ALEJANDRA-PAZ, individually and<br>20   on behalf of others similarly situated,<br>21                    Plaintiffs,<br>22            v.<br>23   KRISTI NOEM, in her official capacity as<br>Secretary, Department of Homeland Security;<br>24   TODD LYONS, in his official capacity as<br>Acting Director, U.S. Immigration and<br>25   Customs Enforcement; GREGORY BOVINO,<br>in his official capacity as Chief Patrol Agent<br>26   for the El Centro Sector of the U.S. Border<br>Patrol; JAIME RIOS, in his official capacity as<br>27   Acting Field Office Director for the Los<br>Angeles Field Office, U.S. Immigration and<br>28   Customs Enforcement; EDDY WANG, in his<br>official capacity as Special Agent in Charge | Case No. 2:25-CV-05563-HDV-E<br><br>**MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF<br>PLAINTIFFS' MOTION FOR CLASS<br>CERTIFICATION**<br><br>Date:          April 30, 2026<br>Time:          10:00 a.m.<br>Judge:        Hon. Hernán D. Vera<br>Location:    Courtroom 5B, 5th Floor |

for the Los Angeles Field Office of Homeland
Security Investigations; MARIO CANTON, in
his official capacity as Regional Director for
Region 9 of the Federal Protective Service;
KEVIN GREEN, in his official capacity as
Commander of the U.S. Customs and Border
Protection, Office of Field Operations, Special
Response Team; and U.S. DEPARTMENT OF
HOMELAND SECURITY,

　　　　Defendants.

Additional Counsel of Record for Plaintiffs:

Carol A. Sobel, Esq. (SBN: 84483)
   carolsobellaw@gmail.com
Weston Rowland, Esq. (SBN: 327599)
   rowland.weston@gmail.com
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055

Paul Hoffman, Esq. (SBN: 71244)
   hoffpaul@aol.com
Michael Seplow, Esq. (SBN: 150183)
   mseplow@sshhzlaw.com
John Washington, Esq. (SBN 315991)
   jwashington@sshhzlaw.com
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 396-0731

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

    A.    The Class Representative Plaintiffs ................................................... 3

    B.    Defendants' Official Statements and Written Guidance on People Recording DHS Agents ......................................................................... 5

    C.    This Court's Prior Orders and Related Evidence of Defendants' Policy on Treatment of People Recording Their Agents .......................... 6

    D.    Evidence From Other Districts ........................................................... 7

          1.    The District of Minnesota ....................................................... 7

          2.    The Northern District of Illinois ............................................ 9

    E.    Defendants Continue to Carry Out Their Policy Against People Filming as Their Violence Escalates in This District.................................................. 11

ARGUMENT ............................................................................................................... 12

I.    THE PROPOSED CLASS SATISFIES RULE 23(A) ............................................ 12

    A.    The Class Is Numerous, and Joinder Would Be Impracticable ............ 13

    B.    The Proposed Class Shares Common Questions of Law and Fact ......... 14

          1.    Defendants' Public Statements Reveal an Agency Policy of Treating Videorecording of DHS Agents in Public as an Unlawful Threat............ 15

          2.    Defendants' Behavior Confirms Their Policy .......................... 16

               a.    Defendants' Conduct Within This District Evidences a Policy.... 16

               b.    Defendants' Consistent Conduct Outside this District Further Establishes a Policy ......................................................... 18

          3.    DHS Has Ratified and Adopted the Conduct by Its Line Agents............ 19

          4.    Common Questions of Law Permeate the Class's Claims ....................... 21

    C.    Typicality Is Satisfied ........................................................................ 22

    D.    Plaintiffs and Their Counsel Are Adequate......................................... 23

II.    THE PROPOSED CLASS SATISFIES RULE 23(B)(2) ................................................. 25

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) .................................................................. 14

*Al Otro Lado, Inc. v. McAleenan*,
  394 F. Supp. 3d 1168 (S.D. Cal. 2019) ................................................... 16

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) .................................................................. 14

*Askins v. U.S. Dep't of Homeland Sec.*,
  899 F.3d 1035 (9th Cir. 2018) ................................................................ 21

*Baby Neal for & by Kanter v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ...................................................................... 22

*Breathe v. City of Detroit*,
  484 F. Supp. 3d 511 (E.D. Mich. 2020) ................................................. 15

*Chicago Headline Club, et al. v. Noem, et al.*,
  2025 WL 3240782 (N.D. Ill. Nov. 20, 2025) ................................. 9, 10, 11

*Cnty. of Riverside v. McLaughlin*,
  500 U.S. 44 (1991) ................................................................................ 15

*Doe v. Wolf*,
  424 F. Supp. 3d 1028 (S.D. Cal. 2020) .................................................. 13

*Does 1-10 v. Univ. of Wash.*,
  326 F.R.D. 669 (W.D. Wash. 2018) ....................................................... 22

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................ 21, 22

*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) .................................................................... 21

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ............................................................................... 22

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) ................................................................ 19

*Gonzalez v. GEO Grp., Inc.*,
  2025 WL 2633102 (C.D. Cal. July 31, 2025) ......................................... 13

*Gonzalez v. United States Immigr. & Customs Enf't*,
  975 F.3d 788 (9th Cir. 2020) ............................................................ 14, 15

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................ 14

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008) ............................................................................ 16

*Hernandez v. Cnty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015)............................................................ 14, 22, 23

*In re Whirlpool Corp. Front–Loading Washer Products Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) .............................................................................. 21

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ............................................................................ 21

*Johnson v. California*,
    543 U.S. 499 (2005)............................................................................................ 14

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ............................................................................ 22

*Keegan v. Am. Honda Motor Co.*,
    284 F.R.D. 504 (C.D. Cal. 2012).......................................................................... 14

*Kidd v. Mayorkas*,
    343 F.R.D. 428 (C.D. Cal. 2023).......................................................................... 13

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985) ...................................................................... 15, 22

LaDuke v. Nelson,
    796 F.2d 309 (9th Cir. 1986) .............................................................................. 15

*Lerwill v. Inflight Motion Pictures*,
    582 F.2d 507 (9th Cir. 1978) .............................................................................. 23

*Lozano v. AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) .............................................................................. 22

*Lynch v. Rank*,
    604 F. Supp. 30 (N.D. Cal. 1984) ........................................................................ 24

*Lyon v. ICE*,
    308 F.R.D. 203 (N.D. Cal. 2015).......................................................................... 25

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005) ...................................................................... 16, 19

*Mirabelli v. Olson*,
    350 F.R.D. 138 (S.D. Cal. 2025) .......................................................................... 22

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*,
    246 F.R.D. 621 (C.D. Cal. 2007)..................................................................... 23, 25

*Tincher, et al. v. Noem, et al.*,
    *2026 WL 125375 (D. Minn. Jan. 16, 2026)* ................................................... 7, 8

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)........................................................................... 12, 23

*Orantes-Hernandez v. Smith,*
    541 F. Supp. 351 (C.D. Cal. 1982) ............................................................... 13

*Owino v. CoreCivic, Inc.,*
    60 F.4th 437 (9th Cir. 2022) ........................................................................ 14

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ........................................................... 14, 23, 25

*Ries v. Arizona Beverages USA LLC,*
    287 F.R.D. 523 (N.D. Cal. 2012) .................................................................. 13

*Rodriguez v. Bostock,*
    349 F.R.D. 333 (W.D. Wash. 2025) .............................................................. 24

*Sali v. Corona Reg'l Med. Ctr.,*
    909 F.3d 996 (9th Cir. 2018) .......................................................................... 7

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010) ...................................................................................... 12

*Spann v. J.C. Penney Corp.,*
    307 F.R.D. 508 (C.D. Cal. 2015) .................................................................... 7

*Tait v. BSH Home Appliances Corp.,*
    289 F.R.D. 466 (C.D. Cal. 2012) .................................................................. 21

*Thakur v. Trump,*
    787 F. Supp. 3d 955 (N.D. Cal. 2025) .......................................................... 25

*United Farm Workers v. Noem,*
    785 F. Supp. 3d 672 (E.D. Cal. 2025) ........................................................... 16

*Walker v. Life Ins. Co. of the Sw.,*
    953 F.3d 624 (9th Cir. 2020) ........................................................................ 12

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .................................................................... 2, 14, 16, 25

*Zinser v. Accufix Rsch. Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ...................................................................... 25

**Rules**

Fed. R. Civ. P. 23(a) ....................................................................................... 12
Fed. R. Civ. P. 23(a)(1) ................................................................................... 13
Fed. R. Civ. P. 23(a)(2) ................................................................................... 14
Fed. R. Civ. P. 23(a)(3) ................................................................................... 23
Fed. R. Civ. P. 23(a)(4) ................................................................................... 23
Fed. R. Civ. P. 23(b) ....................................................................................... 12
Fed. R. Civ. P. 23(b)(2) ............................................................................. 23, 25
Fed. R. Civ. P. 23(g) ....................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Regulations**

28 C.F.R. § 23.20 .................................................................................................................. 2

**Other Authorities**

39 F.R.D. (1966) ................................................................................................................ 25

7A Fed. Prac. & Proc. Civ. § 1763 (3d ed. 2022) ........................................................... 14

*Newberg on Class Actions* (6th ed.) ......................................................................... 12, 22

MPA ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## **INTRODUCTION**

From Rodney King to George Floyd, to Renee Good and Alex Pretti, civilians' ability to record government activities has become increasingly important to public debate and government accountability. Now, this First Amendment right is critical because the federal government has deployed militarized forces across the Central District that are instigating violence in city streets and other public fora, and the Department of Homeland Security ("DHS") has repeatedly lied about its uses of force—including deadly force—and what people are supposedly doing to prompt them.[1] In this Motion, Plaintiffs respectfully seek to certify a class under Rule 23(b)(2) of "All people who do or will, without using force or threat of force, record[2] DHS immigration enforcement and removal operations or protests of those operations in this District since June 6, 2025" and to have their counsel appointed as class counsel.

This proposed class is a subset of the class that Plaintiffs will seek to certify after they are able to take discovery. No discovery is needed, however, to certify the class above. The facts already in the record establish the requirements for certification of this injunctive relief class.

Based on the First Amended Complaint's allegations about Defendants' public statements, internal written documents, pattern of conduct, and ratification, the Court held that Plaintiffs had plausibly alleged that DHS has "established, sanctioned, and ratified an agency policy" with regard to treatment of these class members. (ECF 89 at 16.) Those allegations are established as fact by the same evidence that this Court relied on in its Order granting Plaintiffs' motion for a preliminary injunction. (ECF 55 at 34; *see also* ECF 74 at 13.) The additional evidence Plaintiffs now submit with this Motion only cements this conclusion.

---

[1] *See, e.g.*, Declaration of Matthew Borden ("Borden Decl."), Ex. 1, S. Levin, *DoJ cases against protesters keep collapsing as officers' lies are exposed in court*, The Guardian (Feb. 21, 2026), https://perma.cc/3FGS-BPWM; Ex. 2, N. Santana Jr., *Santa Ana Police Dispute Federal Account of ICE Protest*, Voice of OC (Feb. 18, 2026), https://perma.cc/F9CV-TBQ3 (reporting Santa Ana Police did not respond to DHS requests for assistance at protest based on DHS claims that protesters were attacking them because drone surveillance showed they were "not under attack"); Ex. 3, A. Garcia, *ICE says 2 of its officers may have lied under oath about shooting migrant in Minnesota*, ABC News (Feb. 13, 2026), https://perma.cc/JHS7-E3ZQ; Ex. 4, A. Gillies, *Police body cameras capture federal agents fabricating attack by local activist in October*, News Channel (Feb. 13, 2026), https://archive.is/24ZoW; Ex. 5, A. Berzon & A. McCann, *When Trump Officials' Claims About Shootings Unravel in Court*, N.Y. TIMES (Feb. 10, 2026), https://archive.ph/WeSP0; Ex. 6, J. Queally & B. Mejia, *Trump officials' loss of credibility in ICE cases seen in court defeats*, L.A. TIMES (Jan. 31, 2026), https://perma.cc/2C9W-MAM9.

[2] Plaintiffs use the term "record" throughout to refer to videorecording and still photography.

Since the preliminary injunction, more evidence of DHS's policy of treating recording of its activities as an unlawful threat has come to light. DHS has made more official statements confirming its position that recording its agents is "obstruction," and indicating that it will "hunt … down" people who record them.[3] Such statements further establish that the injury that members of the putative class face does not result from discretionary decisions made by individual officers, but instead from a broader policy, which provides the "glue holding together the alleged reasons for those decisions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 341 (2011). Extensive evidence from Illinois and Minnesota also shows that Defendants are engaging in a pattern of attacking or threatening force against non-threatening people who are trying to document Defendants' actions. DHS agents have even stated that Defendants are putting together a database of people who record their activities, in violation of federal law. 28 C.F.R. § 23.20.[4]

The harms that flow from the challenged policy are illustrated by the pattern of Defendants' escalating violence against people who are engaging in the protected right to record DHS agents. DHS recently killed Alex Pretti after violently confronting and pepper spraying him for filming them.[5] Defendant Bovino stated that his agents "did a good job."[6] Defendants have increased their violent tactics here, too. In Santa Ana, a few days after killing Renee Good in Minnesota (and lying about the reasons[7]), DHS shot pepper balls "at the back of the head and neck of a man trying to record" agents' treatment of protester Kaden Rummler, who was lying on the ground bleeding after DHS shot him in the eye with a projectile weapon at a demonstration against DHS's killing of

---

[3] Borden Decl., Ex. 7, C.J. Ciaramella, *DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice'*, Reason (Dec. 22, 2025), https://perma.cc/EV54-2QYC.
[4] Borden Decl., Ex. 8, K. Klippenstein, *ICE Making List of Anyone Who Films Them*, (Jan. 23, 2026), https://perma.cc/9FNP-32KP; Ex. 9, C.J. Ciaramella, *ICE Tells Legal Observer, 'We Have a Nice Little Database, and Now You're Considered a Domestic Terrorist,'* (Jan. 23, 2026), https://archive.ph/6ZNwZ; Ex. 10, M. Torres & I. Ramirez, *DAILY MEMO: ICE Continues to Use CHP and Local Police Resources Despite California's Sanctuary State Policy*, L.A. Taco (Jan. 26, 2026), https://perma.cc/FHU6-BE2M (reporting that in Los Angeles, Border Patrol agents threatened people recording them by saying, "We'll make you famous.").
[5] Borden Decl., Ex. 11, M. Scheffler, *How We Determined That Minneapolis Videos Contradicted Federal Officials*, N.Y. Times (Jan. 26, 2026), https://archive.ph/4oNla; Ex. 12, A. Lukpat, *Two Federal Immigration Officials Fired Shots at Alex Pretti, DHS Report Says*, Wall Street Journal (Jan. 28, 2026), https://www.wsj.com/us-news/two-federal-immigration-officials-fired-shots-at-alex-pretti-dhs-report-says-fc1b3a91.
[6] Borden Decl., Ex. 13, CNN, *Minneapolis: Bash presses Gregory Bovino on Alex Pretti shooting*, YouTube (Jan. 25, 2026), https://www.youtube.com/watch?v=-VBJx116hqk.
[7] Borden Decl., Ex. 14, R. Stein, D. Lum, D. Khavin, A. Cardia, A. Toler, & J. Bernier, *Video Analysis of ICE Shooting Sheds Light on Contested Moments*, N.Y. Times (Jan. 15, 2026), https://www.nytimes.com/video/us/100000010648638/ice-shooting-renee-good-minneapolis-videos-analysis.html.

Good.[8] DHS agents also fired projectile weapons at media and a community observer who filmed DHS agents dragging Mr. Rummler across a brick patio. (Garcia-Leys Decl. ¶¶ 16, 22, 25, 27-28.) These apparent violations of the Court's existing injunction underscore the breadth of this policy and the need for class certification.

Plaintiffs meet all the requirements for certification of a class under Rule 23(b)(2):

**Numerosity**: The number of declarants in this case and members of Los Angeles Press Club or NewsGuild who do or will record DHS operations in this District alone meets this requirement.

**Commonality**: Significant proof shows that Defendants have a policy on people who record DHS agents that applies to the class as a whole. Whether that policy exists and whether it violates the First Amendment are questions common to all class members.

**Typicality**: Plaintiffs' claims are typical of those of the class—Plaintiffs do and will record DHS operations and claim Defendants' policy infringes on their constitutional rights to do so. Any minor variations among class members do not overcome this core feature of all their claims.

**Adequacy**: Plaintiffs and their counsel have already shown a strong commitment to vigorously prosecuting the class's claims, and there is no conflict among class members. Plaintiffs' counsel also have substantial experience litigating civil rights and class action cases.

**Rule 23(b)(2)**: In implementing their policy about people recording DHS operations, Defendants have acted on grounds that apply generally to class members, *i.e.*, on the basis of their recording, and the injunctive and declaratory relief Plaintiffs seek is the same for each class member. These facts make this a paradigmatic case for a Rule 23(b)(2) class.

## FACTUAL BACKGROUND

### A.    The Class Representative Plaintiffs[9]

Plaintiffs Charles Xu, Lexis Olivier-Ray, and Sean Beckner-Carmitchel are individuals who film DHS agents. Each has been attacked by DHS agents while recording agents' actions at DHS's ongoing operations in the Central District of California.

---

[8] Borden Decl., Ex. 15, R. Vives & I. Luna, *Anti-ICE protester blinded by federal agent during demonstration in Santa Ana, family says*, L.A. TIMES (Jan. 13, 2026), https://perma.cc/3ECY-782B.

[9] The case has additional class representatives, but just these Plaintiffs seek to represent the class now at issue.

Plaintiff Charles Xu is a legal observer, who helps to observe and document the behavior of DHS agents, including their weaponry, arrest tactics, and use of force at various protests and direct actions. (Xu Decl. (ECF 6-8) ¶ 2.) Defendants shot him with pepper balls when he started peacefully filming their arrest of another individual. (*Id.* ¶ 12.)

Plaintiff Lexis-Olivier Ray is a journalist and photographer. When he is reporting in the field, his priority is reporting and recording videos, but he always keeps his camera on him as well. (Ray Decl. (ECF 6-17) ¶ 4.) He often shoots video with his phone to cover events like protests policed by DHS agents. (*Id.* ¶ 37.) Defendants repeatedly shot at him with pepper balls while he peacefully filmed their violent conduct at a protest of their immigration operations in this District on June 7, 2025. (*Id.* ¶ 31.) On January 31, 2026, DHS agents shot him again as he was filming them—this time hitting him about six times in the leg with pepper balls while he was about 40 feet away from them and posing no threat whatsoever. (Supp. Ray Decl. ¶¶ 20-28.)

Plaintiff Sean Beckner-Carmitchel is a journalist. It is his practice to use his phone to videorecord and to use his camera to take photographs when he is reporting. (Third Supp. Beckner-Carmitchel Decl. ¶ 7.) When Mr. Beckner-Carmitchel began peacefully videorecording an encounter between federal agents and protesters, Defendants shot him in the head with a teargas cannister. (Beckner-Carmitchel Decl. (ECF 6-6) ¶¶ 9-13.) A few months later, while he was trying to peacefully photograph DHS agents arresting a protester, a DHS agent violently shoved him into a parked car. (Second Supp. Beckner-Carmitchel Decl. (ECF 64-1) ¶¶ 33-35.) Most recently, on January 24, 2026, DHS agents directly sprayed his camera**,** face, and body with a chemical irritant while he was photographing them using chemical irritants against people peacefully protesting the killing of Alex Pretti in Minneapolis. (Third Supp. Beckner-Carmitchel Decl. ¶¶ 18-21.)

Plaintiff Los Angeles Press Club ("LAPC") is a nonprofit organization dedicated to supporting, promoting, and defending quality journalism in Southern California. (Rose Decl. (ECF 6-5) ¶ 2.) LAPC has more than 1,000 member journalists in Southern California. (*Id.*) Since June 6, 2025, DHS has attacked or threatened to attack multiple LAPC members at the precise moment when they started filming or photographing DHS agents. (R.R. Decl. (ECF 34-18) ¶ 10; Berg Decl. (ECF 34-22) ¶¶ 7, 9; Mairena Decl. ¶¶ 10, 18-20; Buer Decl. ¶¶ 43, 48-52; Connelly Decl. (ECF

64-2) ¶¶ 17-18.) Numerous members of LAPC record DHS agents as they cover DHS immigration raids and protests against them in the District. (Second Supp. Rose Decl. ¶ 19.)

Plaintiff NewsGuild - Communications Workers of America ("CWA") is the largest labor union representing journalists and media professionals in North America. (Schleuss Decl. (ECF 6-16) ¶ 2.) CWA represents more than 500 journalists and media workers in the Central District of California. (*Id.* ¶ 3.) Numerous members of CWA record DHS agents as they cover DHS immigration raids and protests against them in the Central District. (Supp. Schleuss Decl. ¶ 4.)

**B.    Defendants' Official Statements and Written Guidance on People Recording DHS Agents**

Defendants have repeatedly made official statements demonstrating that the agency treats filming DHS agents as unlawful violent or threatening conduct:

- Defendant Noem stated at a DHS press conference on July 12, 2025, that "videotaping [ICE] agents … when they're out on operations" is "violence."[10]

- On September 9, 2025, DHS Assistant Secretary for Public Affairs Tricia McLaughlin said, in an official statement, that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents."[11]

- In response to a media inquiry asking if DHS considers recording its agents to be obstruction of justice, the DHS Office of Public Affairs said in an emailed statement: "That sure sounds like obstruction of justice. Our brave ICE law enforcement face a more than 1150% increase in assaults against them." The statement also said that DHS would "hunt … down" people who "obstruct or assault our law enforcement."[12]

- Just over a month ago, DHS Assistant Secretary McLaughlin said, "videoing our officers in an effort to dox them and reveal their identities that is a federal crime and a felony."[13]

Additionally, a June 14, 2025 official DHS bulletin titled, "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Unrest" identifies the "use of cameras," "livestreaming …

---

[10] Borden Decl., Ex. 16, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raid*s, Forbes Breaking News (Jul. 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

[11] Borden Decl., Ex. 17, M. Cunningham-Cook, *DHS Says Making and Posting Videos of ICE Agents is "Violence,"* The Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/ZYU9-FAP6.

[12] Borden Decl., Ex. 7, Ciaramella, *supra* n.2.

[13] Borden Decl., Ex. 18, *How to Film ICE*, WIRED Magazine (Jan. 31, 2026), https://perma.cc/2B35-L55K.

interactions [with officers]," and video recording at protests as "unlawful civil unrest" tactics and "threats." (Shapiro Decl., (ECF 34-19) Ex. A.)

### C. This Court's Prior Orders and Related Evidence of Defendants' Policy on Treatment of People Recording Their Agents

On September 10, 2025, the Court issued a preliminary injunction protecting journalists, legal observers, and protesters throughout the Central District of California. (ECF 55 at 43-45.) The Court made multiple findings that Defendants had unjustifiably attacked people filming their activities. (*Id.* at 5, 6-7, 10, 12-13, 24 n.11; ECF 74 at 7 n.7, 12.) The Court also found that the record suggested "Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force," citing her statement that videotaping ICE agents is "violence" and the DHS bulletin equating livestreaming DHS agents with threatening them. (ECF 55 at 34.) The Court held that an "avalanche of evidence before the Court—along with federal officials' statements—suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." (*Id.* at 33.)

In denying Defendants' motion to dismiss Plaintiffs' Administrative Procedure Act claim, the Court held that Plaintiffs "*have* plausibly alleged … a policy with respect to how Defendants treat the recording of their agents." (ECF 89 at 2 (emphasis in original).) The Court reasoned that "[t]he statements by government officials in support of this alleged policy" were "official and … concrete." (*Id.*) Referring to the DHS bulletin from June 14, 2025, the Court noted that DHS classified the "'use of cameras,' 'livestreaming … interactions [with officers],' and video recording at protests as 'unlawful civil unrest' tactics and 'threats.'" (*Id.* at 17 (citing ECF 67 ¶ 94).) The Court also noted that there were "extensive allegations" of DHS agents using force against Plaintiffs and others "at the precise moment that [they] began videorecording the agents arresting a protester." (*Id.* at 17-18 (citing ECF 67 ¶¶ 100-01).) The specific allegations the Court cited are supported by the numerous declarations Plaintiffs are submitting with this Motion and those they previously submitted in support of their motion for preliminary injunction. (*Id.*; T. Lopez Decl. ¶ 14; F.C. Decl. ¶¶ 10-13; Herrera Decl., Ex. A; LeBlanc Decl. (ECF 34-3) ¶¶ 13-16; Carrasco Decl. ¶¶ 7-10; Lin Decl. ¶¶ 13-14; Meyer Decl. ¶¶ 9-14; Ares Decl. ¶¶ 15-21; Supp. Alvarez Decl. ¶¶ 10-

1  11; Frost Decl. ¶¶ 14, 33-36; R.R. Decl. (ECF 34-18) ¶ 10; Berg Decl. (ECF 34-22) ¶¶ 7, 9;

2  Mairena Decl. ¶¶ 10, 18-20; Buer Decl. ¶¶ 43, 48-52; Connelly Decl. (ECF 64-2) ¶¶ 17-18; Garcia-

3  Leys Decl. ¶¶ 25-28; Rebecchi Decl. ¶¶ 12-16; Shapiro Decl. (ECF 34-19) Ex. A; Xu Decl. (ECF

4  6-8) ¶¶ 12-13; Ray Decl. (ECF 6-17) ¶ 31; Beckner-Carmitchel Decl. (ECF 6-6) ¶¶ 9-14; Second

5  Supp. Beckner-Carmitchel Decl. (ECF 64-1) ¶¶ 3-35; Third Supp. Beckner-Carmitchel Decl. ¶¶ 18-

6  22.)[14] In a further indication that DHS treats recording as a threat, it has opened investigations into

7  social media accounts that post recordings of its operations, including recordings of its agents

8  attacking and threatening people peacefully recording them.[15]

9           **D.    Evidence From Other Districts**

10       Substantial evidence filed in two other judicial districts further demonstrates Defendants

11  have a policy of retaliation against those who record DHS agents.

12           **1.    The District of Minnesota**

13       In an 83-page opinion, Judge Katherine Menendez of the District of Minnesota found that

14  "Plaintiffs have established an ongoing, persistent pattern of Defendants' chilling conduct."

15  *Tincher, et al. v. Noem, et al.*, 2026 WL 125375, at *19 (D. Minn. Jan. 16, 2026). The court cited

16  extensive evidence demonstrating that ICE agents had routinely acted in a violent, retaliatory

17  manner against people who were peacefully videorecording their activity, including "the drawing

18  and pointing of weapons; the use of pepper spray and other non-lethal munitions; actual and

19  threatened arrest and detainment of protesters and observers; and other intimidation tactics." *Id.* at

20

---

[14] *See also* Borden Decl., Ex. 19, J. Valdez, *A Pattern of Violence: Documenting ICE Agents' Brutal Use of Force in LA Immigration Raids*, The Intercept (July 7, 2025), https://theintercept.com/2025/07/07/ice-raids-la-violence-video-bystanders/; Ex. 20, CBS LA, *Crowd confronts immigration agents at Pico Rivera shopping center*, YouTube (June 20, 2025), https://www.youtube.com/watch?v=mx0XxB7y4oA; Ex. 22, video posted by ocactive_ (@ocactive_), INSTAGRAM, ICE pointed gun at civilian (Aug. 20, 2025), https://www.instagram.com/DNmcJX3R9_l/?hl=en; Ex. 23, video posted by stopicenet (@stopicenet), INSTAGRAM, ICE deploying tear gas (June 27, 2025), https://www.instagram.com/p/DLa-JYQBj8K/?img_index=1.

[15] *Id.*, Ex. 23; Ex. 24, R. Mena, *DHS probe of Long Beach activist who posted video of Border Patrol agent raises free-speech questions*, Press Telegram (Sept. 19, 2025), https://perma.cc/2W29-4KTY; *see also* Ex. 21, J. Deng, *These sites help communities avoid ICE—and now they're under attack*, LA Public Press (Sept. 15, 2025), https://lapublicpress.org/2025/09/dhs-wants-ice-raid-warning-group-data/ (reporting ICE told community observers who record and post videos of its arrests that the agency is building a doxxing case against them). Though the Court may grant this Motion based solely on the admissible evidence cited herein, it also "may consider evidence that may not be admissible at trial," because "[o]n a motion for class certification, evidentiary rules unrelated to expert testimony are not applied with rigor." *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 515 (C.D. Cal. 2015) (internal quotation marks omitted); *see also Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (holding inadmissibility not a proper basis to reject evidence submitted in support of class certification).

1    *24. For example, the court cited a declarant who "witnessed a [] woman who had been recording

2    with her phone having her arm grabbed and held by an ICE agent and then shoved roughly into a

3    snowbank even though the woman 'had not been doing anything violent or aggressive toward' the

4    agent." *Id*. at *14 (quoting Kreitman Decl. (ECF 66) ¶¶ 8-10).[16] The court also noted a declarant

5    who "describes having her phone seized from her hands while recording agents; being choked by

6    the collar of her shirt; fainting twice from being lifted off the ground too quickly; and being

7    threatened with 'a fucking bullet in [her] skull.'" *Id*. at *9 n.15 (quoting Salm Decl. (ECF 69) ¶¶ 9–

8    23).

9            Following Judge Menendez's Order (but after it was stayed by the Eighth Circuit), on

10   January 24, 2026, DHS agents killed Alex Pretti, after violently confronting him when he was

11   recording them with his cell phone. Video of the incident shows DHS agents pepper sprayed Mr.

12   Pretti and pushed him to the ground while he was videorecording them with only his phone in his

13   hands. (Redacted Witness No. 1 Decl. (ECF 107)). After multiple officers beat his prone body and

14   kicked him in the face, they shot him multiple times as he lay on the ground. *Id.*

15           On February 13, 2026, the *Tincher* Plaintiffs submitted more than one hundred declarations

16   in support of their First Amended Complaint, including many declarations that further demonstrate

17   that DHS has a policy and practice of retaliating against individuals who photograph and/or

18   videorecord DHS agents conducting immigration enforcement and removal operation activities.

19   (Lipo Zovic Decl. (ECF 136-47) ¶¶ 7-13, 18, 26-30 (peaceful protester struck in the head with a

20   tear gas cannister while filming DHS agents near Nicollet Ave. shortly after Alex Pretti was killed

21   there); O'Brien Decl. (ECF 136-55) ¶¶ 4-17 (pepper sprayed by DHS agent while recording DHS

22   agents detaining a community member); Linet Decl. (ECF 136-45) ¶¶ 3-6 (same).)

23            The brazenness of Defendants' conduct is underscored by declarations and photographs

24   showing that Defendant Bovino himself shoved two people who were filming DHS agents who had

25   exited their vehicles to teargas a group of peaceful protesters gathered near a park in Minneapolis,

26   slapping the phone out of the hands of one of the observers as he shoved them. (Lockhart Decl.

27   (ECF 136-48) ¶¶ 8-12.)

28

---

[16] The declarations from *Tincher* are attached to the Declaration of Peter Eliasberg as Exhibits O-Q and S-V.

 

Photos: Lockhart Decl. (ECF 136-48) ¶¶ 11-12

## 2.    The Northern District of Illinois

Evidence filed in the Northern District of Illinois similarly shows DHS agents repeatedly attacked people who were videorecording their activities. *Chicago Headline Club, et al. v. Noem, et al.*, 2025 WL 3240782, *33 (N.D. Ill. Nov. 20, 2025) ("Agents shot him with a rubber bullet or foam ball while he stood on Harvard Street and filmed an arrest.") (citing Mulcahy Decl. ECF 22-22)[17]; *id.* ("he also saw agents target members of the press who tried to record the arrest, shooting tear gas in their direction") (Goyette Decl. ECF 22-21); *id.* at *32 ("a federal agent directly fired a pepper ball at Thrush, despite his standing away from protesters on a public street with his press pass visible. . . . At that time, Thrush was filming officers firing on two protesters") (citing Thrush Decl. ECF 22-16); *id.* at *35 ("While Decker photographed this, an agent shot a pepper bullet towards Decker's face from about thirty feet away, striking his camera") (citing Decker Decl. ECF 22-23); *id.* at *52 ("At one point, an agent 'appeared to throw a cannister directly toward the sidewalk' where Rodriguez was recording, even though there 'were no protesters in the vicinity let alone anyone doing anything violent.'") (citing Rodriguez Decl. ECF 73-17); *id.* at *61 ("Jessi Olazaba … witnessed the assault on Morales. . . . She filmed, blew a whistle, and shouted for the agents to leave. . . . As she tried to record the license plates of the vehicle into which agents placed Morales, an agent approached Olazaba with pepper spray in his hand. . . . Without any apparent provocation or warning, the agent knocked off Olazaba's glasses, pepper sprayed her, and pushed

---

[17] All the declarations referred to in this brief that were filed in *Chicago Headline Club* are attached as Exhibits C-N to the Eliasberg Declaration. Today, the Seventh Circuit vacated the preliminary injunction order in that case and dismissed the government's appeal of the order upon motion of the government. *Chicago Headline Club v. Noem*, No. 25-3023 (7th Cir. Mar. 5, 2026), slip op at 15.  However, Plaintiffs cite to the district court's order only to bring this Court's attention to the sworn declarations referenced, which Plaintiffs submit as evidence in support of this Motion.

1  her backwards so that she hit her head on the curb.") (citing Notice of Violations of TRO, ECF

2  174); *id.* at *61 ("As Squires attempted to record the scene [of DHS detaining two men], prompted

3  by his faith to do so, an agent threatened to pepper spray Squires.") (citing Squires Decl. ECF 190-

4  9).

5      DHS agents also repeatedly brandished weapons

6  at people who were filming them. *Id.* at *33 ("An agent

7  also pointed his long gun directly at Decker's camera as

8  he documented the protests that day") (citing Decker

9  Decl. ECF 22-23); *id*. at *62 ("David Brooks . . .

10  observed an unmasked CBP agent wearing sunglasses

11  violently shove a woman into the federal vehicle,

12  prompting him to start recording and yelling at the CBP

13  agents . . . The CBP agent pulled his gun and pointed it

14  directly at Brooks") (citing Brooks Decl. ECF 188-3);



Photo: Decker Decl. (ECF 22-23) ¶ 10

15  *id.* at *65 ("On October 1, 2025, Leslie Cortez learned that agents were targeting day laborers at a

16  Home Depot in Cicero, so she traveled there to observe, record the immigration actions, and

17  monitor for harassment . . . She parked in the parking lot, recorded agents arresting two men, and

18  informed the men of their rights in Spanish. . . . As she stood outside her parked car, a vehicle

19  pulled up near her and a CBP agent got out and aimed a gun at Cortez so that she 'could see inside

20  the barrel.'") (citing Cortez Decl. ECF 73-13); *id*. at *65 ("Jo-Elle Munchak, an attorney . . . , was

21  driving north . . . around 9 a.m. when she noticed two unmarked SUVs parked in front of and

22  behind a vehicle with landscaping equipment. . . . She pulled over to videotape, parking several feet

23  in front of the front SUV but leaving enough room for that SUV to pull out if needed. . . . After the

24  agents left, she continued home, turning on to her street. . . . One of the federal vehicles stopped in

25  the middle of the block, and the other one pulled behind her, blocking her in. . . . Agents

26  surrounded her car, banging on her windows, trying to open her car doors, and demanding that she

27  get out. . . . One agent stood in front of her front bumper and aimed a long gun at [her] head.")

28

(citing Munchak Decl. ECF 77-1); *id*. at *52 ("Kaplan also witnessed an agent point a gun at an older man with a phone, captured in the following photo:") (citing Kaplan Decl. ECF 73-11).



Photo: Kaplan Decl. (ECF 73-11) ¶ 14

### E.    Defendants Continue to Carry Out Their Policy Against People Filming as Their Violence Escalates in This District

Since the Court's preliminary injunction, there have been continuing and increasingly severe instances of DHS violence towards those who observe and record agent conduct in this District. For example, on January 9, 2026, protesters gathered outside the Santa Ana Federal Building to protest DHS's murder of Renee Good. During the protests, "Homeland Security officers shot two anti-ICE protesters [Kaden Rummler and Britain Rodriguez] in the face with less-lethal rounds in Santa Ana, causing severe eye injuries and permanent vision damage[.]"[18] (*See also* Garcia-Leys Decl. ¶¶ 20-22.) DHS then shot pepper balls "at the back of the head and neck of a man trying to record" agents' treatment of Mr. Rummler, who was lying on the ground bleeding after being shot in the eye.[19] DHS agents also fired projectile weapons at media and a legal observer filming DHS agents dragging Mr. Rummler several yards across a brick patio. (*Id*. ¶¶ 16, 20-28.)[20]

There have been numerous other incidents of DHS recently retaliating against people recording their activities. (Rebecchi Decl. ¶¶ 11-16 (DHS agent pepper sprayed community observer who filmed the agent violently throw another observer to the ground in Ventura,

---

[18] Borden Decl., Ex. 25, R. Vives, *Second man shares horrific story of being blinded by officers at anti-ICE rally in Santa Ana*, L.A. TIMES (Jan. 16, 2026), https://perma.cc/5NZB-KZT8.
[19] Borden Decl., Ex. 15, R. Vives & I. Luna, *Anti-ICE protester blinded by federal agent during demonstration in Santa Ana, family says*, L.A. TIMES (Jan. 13, 2026), https://perma.cc/3ECY-782B.
[20] *See also* Borden Decl., Ex. 17, I. Luna, *supra* n.7.

California on February 2, 2026); Alvarez Supp. Decl. ¶ 10 (DHS agent used baton to strike protester who was filming him at a DHS operation in Oxnard, California on October 29, 2025); Frost Decl. ¶¶ 33-36 (DHS agent inside moving vehicle directly sprayed chemical irritants at protesters who were filming the DHS vehicle as it left an operation in Oxnard, California on October 29, 2025); Supp. Ray Decl ¶¶ 7, 23 (DHS agents shot journalist recording them six times with pepper balls on January 31, 2026 at MDC).[21]

## <u>ARGUMENT</u>

A plaintiff whose suit satisfies the requirements of Federal Rule of Civil Procedure ("Rule") 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). To obtain certification, a proposed class must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and must fall within one of the three categories described in Rule 23(b). *Id.*; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022) (en banc). A party seeking class certification must show compliance with Rule 23 by a preponderance of the evidence. *Id.* at 664. If the proposed class should not be certified as defined, but could be certified with modifications, the Court "should alter the class definition in lieu of rejecting class certification, if possible"). *Newberg on Class Actions* §7:27 (6th ed.) (collecting cases); *see also Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 633–34 (9th Cir. 2020) (discussing precedent on district court's authority to tailor or adjust scope of class).

## I.    THE PROPOSED CLASS SATISFIES RULE 23(A)

Plaintiffs have met all four requirements articulated in Rule 23(a), which requires a showing that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative

---

[21] *See also* Borden Decl., Ex. 26, I. Ramirez, *ICE Agent Pulls Gun on Santa Ana Observer, As Police Watch and Do Nothing*, L.A. Taco (Nov. 10, 2025), https://perma.cc/5C8Y-JU4U; Ex. 27, R. Cruz, *ICE Officer Pepper-Sprays Community Observers in Eastside Santa Barbara*, Santa Barbara Independent (Jan. 28, 2026), https://perma.cc/5FUG-EHM9; Ex. 28, CBS LA, *Pregnant Woman Says She Was Hit by Rubber Bullet While Observing Protest in Downtown LA*, YouTube (Feb. 3, 2026), https://www.youtube.com/watch?v=yJ7xJWOIbyk; Ex. 29, L. Perez, *Video shows federal agent ramming immigration activist's truck in Ventura County*, CBS News (Oct. 18, 2025), https://perma.cc/3PC6-U4NM (reporting DHS's official explanation that during the collision, "agitator[s]" were "engaged in . . . recording . . . of the officers on scene"); *see also* Ex. 4, Gillies, *supra* n.1.

1  parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly

2  and adequately protect the interests of the class." *Gonzalez v. GEO Grp., Inc.*, 2025 WL 2633102,

3  at *2 (C.D. Cal. July 31, 2025).

4      **A.    The Class Is Numerous, and Joinder Would Be Impracticable**

5      The proposed class meets Rule 23(a)(1)'s numerosity requirement that a class be "so

6  numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is

7  generally satisfied when a proposed class includes more than forty members. *Ries v. Arizona*

8  *Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012). Even "[w]here the exact size of the

9  class is unknown but general knowledge and common sense indicate that it is large, the numerosity

10  requirement is satisfied." *Kidd v. Mayorkas*, 343 F.R.D. 428, 437 (C.D. Cal. 2023) (quoting

11  *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982)).

12      Here, the proposed class exceeds that threshold. Plaintiff LAPC alone has more than 1,000

13  member journalists in Southern California, at least 40 of whom do or will record DHS agents in the

14  Central District course of their reporting. (Rose Decl. ECF 6-5 ¶ 2; Second Supp. Rose Decl. ¶ 19.)

15  Plaintiff CWA represents more than 500 journalists and media workers in the Central District of

16  California, at least 50 of whom do or will record DHS agents in the Central District in the course of

17  their reporting. (Supp. Schleuss Decl. ¶¶ 2-4.) The record establishes there are numerous other

18  individuals in the Central District who do and will record DHS operations to report on them or to

19  hold the government accountable.[22]

20      Moreover, the class also includes unknown and future members who will be subjected to

21  Defendant's challenged policy, making joinder even more impracticable. *See Doe v. Wolf*, 424 F.

22  Supp. 3d 1028, 1040 (S.D. Cal. 2020) ("'[W]here the class includes unnamed, unknown future

23  members, joinder of such unknown individuals is impracticable and the numerosity requirement is

24  therefore met, regardless of class size.'") (citation omitted); *see also* Eliasberg Decl. ¶ 12 (official

25  programs encouraging and training public to engage in safe recording of federal agents).

26

27  ---

[22] *See, e.g.,* Garcia-Leys Decl. ¶¶ 13, 23, 25, 31; Ares Decl. ¶¶ 7-9, 12-13, 29; Frost Decl. ¶¶ 3-7, 11-13, 34-36, 48; Soqui Decl. (ECF 6-23) ¶¶ 4, 19; Coven Decl. (ECF 34-9) ¶¶ 5, 11-12, 15; Guardado Decl. (ECF 34-14) ¶¶ 5, 7, 13;

28  *see also* Lin Decl. ¶¶ 9-13; Bell Decl. (ECF 6-10) ¶¶ 4-5; Alcorn Decl. (ECF 6-15) ¶¶ 2-8, 36; E. Lopez Decl. (ECF 6-14) ¶¶ 12, 16; Horowicz Decl. (ECF 6-19) ¶¶ 6, 16; A.R. Decl. (ECF 34-2) ¶ 5; LeBlanc Decl. (ECF 34-3) ¶¶ 13-15.

### B.    The Proposed Class Shares Common Questions of Law and Fact

Commonality is satisfied if a case presents "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is "construed permissively." *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 522 (C.D. Cal. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Indeed, "class suits for injunctive or declaratory relief" like this case, "by their very nature often present common questions satisfying Rule 23(a)(2)." Charles Alan Wright & Arthur R. Miller, 7A Fed. Prac. & Proc. Civ. § 1763 (3d ed. 2022).

Commonality requires only a single significant issue of law or fact common to a class. *Wal-Mart Stores*, 564 U.S. at 359  ("[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do.") (quotation marks and citation omitted)); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) ("[A]ll that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'") (quotation omitted). Commonality is satisfied where class members' claims all "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient[.]" *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 807-09 (9th Cir. 2020) (citation omitted).

"In civil rights cases, 'commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.' When such a policy exists, 'individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality.'" *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 153 n.126 (N.D. Cal. 2015) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005); *accord Owino v. CoreCivic, Inc.*, 60 F.4th 437, 444 (9th Cir. 2022) ("Commonality is necessarily established where there is a class-wide policy to which all class members are subjected."). In such cases, the "policies and practices" to which all members of the class are subject "are the 'glue' that holds together the . . . class." *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014). Accordingly, courts have consistently held that

claims concerning the legality of "government policies, practices or procedures … are plainly suitable for classwide resolution." *Gonzalez*, 975 F.3d at 808 (citing *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47, 58-59 (1991); *see also LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985) (concluding that "[p]lainly, the constitutionality of the INS ranch check technique as it affects the defined class is a 'question of law or fact common to the class'"), *as amended*, 796 F.2d 309 (9th Cir. 1986).

Here, substantial evidence shows that DHS has an agency-wide policy to which all class members are subject, that DHS spokespeople have articulated, which DHS components follow, and DHS has ratified. The existence, legality and chilling effect of that policy present questions of fact and law common to all class members that Plaintiffs will prove through common evidence. As the Court already recognized, Plaintiffs have alleged facts showing an "agency *policy* of treating videorecording of DHS agents in public as a threat that may be responded to with force." Order Denying Mot. to Dismiss (ECF 89) at 17. The allegations referenced in the Court's Order are based on the facts Plaintiffs already put in the record in support of their motion for a preliminary injunction and are bolstered by the additional evidence supplied with this Motion. Taken together, the preponderance of the evidence establishes the existence of a policy that applies to the class because it shows: (1) Defendants have publicly stated that they will treat recording DHS agents as criminal acts of violence, (2) Defendants' agents have repeatedly acted like this is their policy, and (3) DHS has ratified and adopted its agents' actions.

### 1. Defendants' Public Statements Reveal an Agency Policy of Treating Videorecording of DHS Agents in Public as an Unlawful Threat

As the Court has already noted, Defendants have repeatedly stated that filming them constitutes unlawful violent and threatening conduct, and that they will treat recording DHS agents as a crime. (ECF 55 at 34 n.28; ECF 89 at 2; *see also supra*, Factual Background, Section B, 5.) Any one of these statements, alone, and especially taken together, and even more so in combination with the evidence below, is sufficient evidence to find a policy. *See, e.g.*, *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 519 (E.D. Mich. 2020), *order clarified*, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020) (considering public officials' statements in determining whether officers were acting

pursuant to a policy or custom) (cited in Order Granting Prelim. Inj., ECF 55 at 34); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1025 (9th Cir. 2008) (police chief's statements expressing confidence in individual officer were "indicative of an official policy whereby the city 'impliedly or tacitly authorized, approved, or encouraged illegal conduct by its police officers'"); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1208 (S.D. Cal. 2019) (finding that alleged "instances of [] government officials' acknowledgement of a policy," including statements from President Trump, then-DHS Secretary, and then-Commissioner, combined with "extensive [anecdotal] allegations" support the existence of an unwritten agency policy).

### 2. Defendants' Behavior Confirms Their Policy

Defendants' policy is also evidenced by their repeated unjustified attacks on people who record them both in this District and throughout the country—in accordance with the policy publicly stated by Defendants. As this Court has acknowledged, "[a] policy or custom . . . 'may be inferred [from] "widespread practices or evidence of repeated constitutional violations" and the absence of evidence that [] officers were discharged or reprimanded'" for retaliatory actions. (ECF 55 at 34 (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005) (reversing denial of class certification)).) And "[a]necdotal evidence from class members that bridges the gap between the claims of the representatives and the claims of the class members may constitute a sufficient form of proof" of commonality. *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 719 (E.D. Cal. 2025) (citing *Wal-Mart*, 564 U.S. at 358) (granting class certification after finding commonality satisfied where Plaintiffs presented anecdotal evidence from class members).

### a. Defendants' Conduct Within This District Evidences a Policy

The record is replete with evidence of Defendants assaulting people in this District at the precise moment that they film or photograph DHS agents. The Court's preliminary injunction recounts "the avalanche of evidence before the Court—along with federal officials' statements—suggest[ing]" that DHS is shooting directly at journalists, observers, and protesters who pose no threat to federal agents. (ECF 55 at 33.) Much of the mountain of evidence comprised declarations and photo and video evidence from people who were targeted by federal agents while they were filming. For example, Defendants shot Class Representative Charles Xu while he was filming an

arrest. (Xu Decl. (ECF 6-8) ¶ 12.) DHS agents shot Class Representative Sean Beckner-Carmitchel in the head with a tear gas canister while he was filming DHS agents' interactions with protesters—from almost 20 feet away. (Beckner-Carmitchel Decl. (ECF 6-6) ¶¶ 10, 13, Ex. 1.) DHS agents shot documentary filmmaker R.R. with a pepper ball on the leg and then a projectile in the back while he was filming protests. (R.R. Decl. (ECF 34-18) ¶¶ 3-6.) DHS agents shot veteran photojournalist Ted Soqui on the left cheekbone with a pepper ball and then in the right shin with a rubber bullet in quick succession while he was photographing the protest from about fifteen feet away using a long lens camera. (Soqui Decl. (ECF 6-23) ¶¶ 3-9; *see also* Alcorn Decl. (ECF 6-15) ¶¶ 8, 25-26 (photojournalist shot by DHS agents while covering their operation); Reyna Decl. (ECF 6-21) ¶¶ 9-10 (videos of DHS agents shooting directly at reporters trying to photograph or film them).)

Additional evidence shows DHS agents consistently using force against people peacefully recording them in this District. (*See* Garcia-Leys Decl. ¶¶ 21-28 (shooting less-lethal projectiles at people filming DHS agent's attack on protesters); Lin Decl. ¶¶ 13-14 (shoving person filming a DHS show of force); Second Supp. Beckner-Carmitchel Decl. (ECF 64-01) ¶¶ 21, 32-34 (shooting photographers directly in the face with pepper spray and violently shoving Plaintiff into car when he was photographing DHS arrest of protester); Herrera Decl., Ex. A (violently arresting person filming agents arresting someone else in a Home Depot parking lot); Mairena Decl. ¶¶ 18-20 (shooting photographer in the head with pepper ball the moment he attempted to record DHS agents escorting a protester they had arrested); Buer Decl. ¶¶ 45-52 (same); Frost Decl. ¶¶ 33-36 (pepper-spraying people filming DHS agents); Alvarez Decl. ¶ 10 (using baton to beat person recording agents); Rebecchi Decl. ¶¶ 14-16 (pepper spraying people filming agents).)[23]

The evidence also shows DHS agents consistently threaten people recording them in this District, including by brandishing weapons at them. DHS agents threatened filmmaker R.R. by pointing a less-lethal rifle at him when he started filming them arresting a protester. (R.R. Decl. (ECF 34-18) ¶ 10.) DHS agents threatened another journalist with a stun grenade when she filmed

---

[23] *See also* Borden Decl., Ex. 19, J. Valdez, *supra* n.13 (documenting how DHS agents knocked the phone out of the hands of bystander Oscar Preciado when he tried to film ICE agents arresting a U.S. citizen, and on another occasion, when Arturo Hermosillo filmed DHS agents making an arrest, agents told him to leave, then pulled him out of his car and beat him); *supra* n.22.

1  their interaction with protesters. (*Id.*; Berg Decl. (ECF 34-22) ¶ 10.) Agents pointed a gun at Pastor

2  Tanya Lopez when she started filming them arresting someone in the parking lot of her church. (T.

3  Lopez Decl. ¶¶ 13-14). Similarly, a DHS agent pointed a gun at a concerned citizen photographing

4  the license plate of the agent's car (F.C. Decl. ¶¶ 10-13), and multiple DHS agents verbally

5  threatened and pointed guns at people who were standing on the sidewalk and in the park

6  videorecording them as they conducted a show of force operation in MacArthur Park in Los

7  Angeles. (Carrasco Decl. ¶¶ 7-10; Ares Decl. ¶¶ 13, 16-23.)

8          **b.**    **Defendants' Consistent Conduct Outside this District Further Establishes a Policy**

9          Defendants admit that the Court should also consider events outside this District in

10 determining whether Defendants have an agency policy of retaliating against people who try to

11 visually record Defendants' immigration operations.[24] As detailed *supra* (Factual Background,

12 Section D.2, 9-11), evidence filed in *Chicago Headline Club, et al. v. Noem, et al.*, No. 25-cv-

13 12173 (N.D. Ill.), supported by unrefuted video evidence, shows Defendants had repeatedly,

14 without justification, targeted, shot, threatened, and beaten people who were recording their

15 activities, and Judge Menendez in Minnesota found that Defendants had engaged in a pattern of

16 attacking people who recorded them. (Factual Background, Section D.1, 7-9.)[25] Then, on January

17 24, 2026, Defendants killed Alex Pretti, a nurse who was filming them. As documented by video

18 and eyewitness testimony, Mr. Pretti was filming agents, holding nothing but a phone in his hands,

19 when DHS agents shoved him, pepper sprayed him, tackled him, shot him, then shot him several

20 more times while he lay on the ground, helpless and not moving. (Eliasberg Decl., Ex. Q (*Tincher*,

21 ECF 107).)[26]

22

23

---

24 [24] Borden Decl., Ex. 33, MTD Tr. at 14-15 ("THE COURT: … but why should this Court be compelled to put its head in the sand essentially and ignore everything that's happened in Chicago, Judge Ellis and the reams of evidence by the

25 same agency. . . . MR. SKEDZIELEWSKI: I think the Court should consider the Chicago case. I think it's relevant here.").

26 [25] Some of the same units, agents, and commanding officers have carried out the operations addressed by these courts and the operations in this District (*See* Eliasberg Decl., Ex. R, Testimony of CBP Commander Kevin Harvick, *Chicago Headline Club* 10/20/25 Hr'g Tr., ECF 76 at 18:15-17 (testifying that a "good number" of CBP agents carrying out

27 Operation Midway Blitz came from responding to protests in Los Angeles).)

28 [26] *See also* Borden Decl., Ex. 30, D. Lum & H. Willis, *Videos Show Moments in Which Agents Killed a Man in Minneapolis*, N.Y. TIMES (Jan. 24, 2026), https://www.nytimes.com/2026/01/24/us/minneapolis-shooting-federal-agents-video.html [https://archive.ph/jAFyD].



In Minnesota, Defendants once again attacked Plaintiff Beckner-Carmitchel, who had traveled there to cover the protests, pepper spraying him in the face, along with his camera, at the precise moment when he started recording their attack on a peaceful protester. (Third Supp. Beckner-Carmitchel Decl. ¶¶ 19-20, 25.) This is significant evidence of an agency policy because DHS agents have now targeted Mr. Beckner-Carmitchel for recording them on multiple occasions in different locations within this District and also in a different district far from home.

Photo: Third Supp. Beckner-Carmitchel Decl. ¶ 25

The common thread running through all these incidents is Defendants' policy of treating filming their activities as an unlawful threat and retaliating against people for it. *See* Borden Decl., Ex. 31, David J. Bier, *The Government Unconstitutionally Labels ICE Observers as Domestic Terrorists*, CATO Institute (Dec. 15, 2025), https://archive.ph/gO5sw (compiling evidence of many more incidents where DHS agents have threatened or attacked people recording them).

### 3.    DHS Has Ratified and Adopted the Conduct by Its Line Agents

Courts also find a policy where a pattern of conduct has been adopted by an agency. A policy or custom of retaliation "may be inferred [from] 'widespread practices or evidence of repeated constitutional violations' and the absence of evidence that [] officers were discharged or reprimanded" for retaliatory actions. *Menotti*, 409 F.3d at 1148; *see also Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (failure to take remedial steps to acknowledge or correct violations supported finding of a policy or custom of retaliation). Here, DHS has ratified and adopted its agents' conduct towards people recording their activities by praising it, condoning it, failing to investigate it, failing to disclaim it and, at times, claiming that it is lawful.

As the Court already found, the record "suggests that Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force." (ECF 55 at 34.) The Court further acknowledged a variety of facts support Plaintiffs' allegation that Defendant Noem "*established*, sanctioned, and ratified an agency *policy* of treating videorecording of DHS agents in public as a threat that may be responded to with force and addressed as a crime." (ECF 89 at 17

1  (citing allegations proven by evidence summarized *supra*, Factual Background, Sections B and C,

2  5-7).) Testimony by high level DHS officials indicates that no DHS agents have been discharged or

3  reprimanded for any of their conduct in this District, including their repeated, targeted attacks and

4  threats against people recording their operations. (*See* Eliasberg Decl., Ex. R, Testimony of CBP

5  Commander Kevin Harvick, *Chicago Headline Club* 10/20/25 Hr'g Tr., ECF 76 at 49:2-6.)

6       Instead, after Plaintiffs filed this action and the evidence documenting Defendants' attacks

7  on people recording federal agents in this District, Defendants continued and escalated their

8  mistreatment of people recording DHS operations in Chicago. (*See id.* at 44:24-45:18 (testifying

9  agents received no specific training between Los Angeles and Chicago).) Confronted with

10  numerous documented incidents of DHS agents assaulting people peacefully filming in Chicago,

11  (*see supra*, Factual Background, Section D.2, 9-11), Defendant Bovino approved and ratified this

12  conduct, stating in both sworn testimony and public statements that all of the conduct of DHS

13  agents in Chicago was "exemplary."[27]

14       Defendants have continued to ratify, praise, and defend their line agents' acts of violence

15  against people recording, including the killing of Alex Pretti, by resorting to public and brazen

16  falsehoods accusing those recording of threatening agents. Following Mr. Pretti's killing,

17  Defendant Noem stated at a press briefing on behalf of the agency that Mr. Pretti acted "violently"

18  and that agents "fired defensive shots" against him.[28] Defendant Bovino similarly defended his

19  agents, asserting that Mr. Pretti was "actively impeding and assaulting" DHS agents at the time he

20  was filming them, that he was "perpetrat[ing] violence", and that "the consequences had to be paid

21  because he injected himself into the crime scene."[29] Bovino also asserted that the DHS agents

22  involved in shooting Mr. Pretti were still on the job, would remain Border Patrol agents, and would

23

24

25  [27] Nicole Sganga, *Border Patrol Chief Gregory Bovino says agents' use of force in Chicago "has been exemplary,"* CBS News, https://www.cbsnews.com/news/border-patrol-chief-gregory-bovino-agents-use-of-force-in-chicago; Chris

26  Tye, *Transcripts reveal Border Patrol Cmdr. Gregory Bovino's heated deposition on agents' use of force*, CBS News, https://www.cbsnews.com/news/border-patrol-commander-gregory-bovino-deposition-transcript.

27  [28] Borden Decl., Ex. 32, *Kristi Noem Claims Federal Agent Who Killed Alex Pretti Fired 'Defensive Shots'*, Forbes Breaking News (Jan. 24, 2026), https://www.youtube.com/watch?v=59UL4vLBLVI (recording of DHS press briefing).

28  [29] Borden Decl., Ex. 13, *supra* n.5 (recording Bovino stating, "The problem is … he injected himself – he put himself where he did not to be – he put himself and law enforcement officers in jeopardy through his actions").

1    be "off the streets for a bit" "only in Minneapolis," implying they would return to the "streets" in a

2    different location, such as in the Central District of California.

3        Taken as a whole, the evidence presents significant proof of a general policy about people

4    who record DHS agents that establishes commonality. *See Jimenez v. Allstate Ins. Co*., 765 F.3d

5    1161, 1165 (9th Cir. 2014) (holding that whether an employer had an unofficial policy of

6    discouraging reporting overtime was one of the common questions that would "drive the answer to

7    plaintiffs' claims" of violations of labor law); *id*. at 1166 n.5 (noting that the employer's claim that

8    the informal policy did not exist would be "appropriately made at trial or at the summary judgment

9    stage, as it goes to the merits of the plaintiffs' claim); *see also In re Whirlpool Corp. Front–*

10   *Loading Washer Products Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) (noting that if a defendant

11   has a strong argument against classwide liability, it 'should welcome class certification' as that

12   allows it the opportunity to resolve claims of all class members at once.)

13       **4.    Common Questions of Law Permeate the Class's Claims**

14       The class's claims present a common issue of law. Recording and livestreaming law

15   enforcement activity is protected by the First Amendment. *Fordyce v. City of Seattle*, 55 F.3d 436,

16   439 (9th Cir. 1995); *Askins v. U.S. Dep't of Homeland Sec*., 899 F.3d 1035, 1044 (9th Cir. 2018)

17   ("The First Amendment protects the right to photograph and record matters of public interest.").

18   Defendants' policy of treating recording of its agents as unlawful threatening conduct presents a

19   single, classwide question capable of resolution for all class members in one stroke: whether DHS

20   has a policy of violating the First Amendment right to record DHS agents and the DHS operations

21   that have been ongoing in this District since June 6, 2025.

22       This question alone satisfies the commonality requirement, which is "construed

23   permissively." *Tait v. BSH Home Appliances Corp*., 289 F.R.D. 466, 474 (C.D. Cal. 2012) ("The

24   requirements of Rule 23(a)(2) have 'been construed permissively,' and just one common question

25   of law or fact will satisfy the rule.") (quoting *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 981

26   (9th Cir. 2011)). Resolution of this question and the common questions of fact is "apt to drive the

27   resolution of the litigation" because it determines whether Defendants' policy violates Plaintiffs'

28

1    constitutional rights "and whether an injunction directing Defendants to remedy the constitutional

2    violations is appropriate." *Hernandez*, 305 F.R.D. at 155.

3                    **C.      Typicality Is Satisfied**

4           Typicality is a "permissive" standard; "representative claims are 'typical' if they are

5    reasonably coextensive with those of absent class members; they need not be substantially

6    identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017); *Lozano v. AT&T Wireless

7    Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007) (same). "Commentators have noted that cases

8    challenging the same unlawful conduct which affects both the named plaintiffs and the putative

9    class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying

10   the individual claims." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (citing 1

11   NEWBERG ON CLASS ACTIONS § 3.10, at 3–50 (1992)).

12          "Considerations underlying commonality and typicality often overlap considerably, such

13   that they 'tend to merge.'" *Mirabelli v. Olson*, 350 F.R.D. 138, 145 (S.D. Cal. 2025) (quoting *Gen.

14   Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) ("The commonality and typicality

15   requirements of Rule 23(a) tend to merge."). "For Rule 23(b)(2) classes, typicality requires little

16   more than that the main relief sought is declaratory or injunctive." *Id.* (citing *Does 1-10 v. Univ. of

17   Wash.*, 326 F.R.D. 669, 683 (W.D. Wash. 2018)). As with commonality, factual differences among

18   class members do not defeat typicality provided there are legal questions common to all class

19   members. *See LaDuke*, 762 F.2d at 1332 ("The minor differences in the manner in which the

20   representative's Fourth Amendment rights were violated does not render their claims atypical of

21   those of the class.") (footnote omitted)); *Ellis*, 657 F.3d at 985 n.9 ("Differing factual scenarios

22   resulting in a claim of the same nature as other class members does not defeat typicality.")

23          Here, the Class Representative Plaintiffs, and all class members seek the same relief: a

24   declaration that Defendants' policy violates the First Amendment and an injunction barring its

25   enforcement. (ECF 67 at 76.) That remains true regardless of whether a class member is a journalist

26   like Mr. Ray or Mr. Beckner-Carmitchel, a legal observer like Mr. Xu, or a concerned citizen

27   recording a violent arrest on their phone. Thus, as with commonality, such factual variations do not

28   defeat typicality. Although the Class Representative Plaintiffs and class members may record in

varied contexts, Defendants' challenged policy, which concerns the act of recording in and of itself, commonly applies across those scenarios, exposing all class members to the same constitutional injury.

The court's decision in *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles* ("*MIWON*") is on point. There, the court certified an injunctive class of protesters alleging First Amendment violations and held that "one's status as participant, observer or bystander does not defeat typicality as to their First Amendment claim," because all class members shared the same underlying First Amendment right. Fed. R. Civ. P. 23(b)(2); *MIWON*, 246 F.R.D. 621, 632 (C.D. Cal. 2007). That principle governs here. Just as in *MIWON*, class members' differing reasons or methods for recording do not alter the First Amendment right at stake or the relief sought.

And as in *Hernandez v. County of Monterey*, where the court certified an injunctive class even though plaintiffs had "different health care needs" and made different medical inquiries at different times, typicality is satisfied because all class members face the same "exposure to a substantial risk of serious [] harm." 305 F.R.D. at 157. It is immaterial whether that exposure and risk produces the same injuries for all class members. It "does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently [be harmed in different ways by the challenged policies and practices]; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each [] other or to every class member." *Parsons*, 754 F.3d at 686*; see also Olean*, 31 F.4th at 669 (rejecting argument "that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members"). Typicality is therefore satisfied.

### D.    Plaintiffs and Their Counsel Are Adequate

Adequacy requires that the representative parties will "fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4). This factor has two components. First, the named representatives must be able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the Class. *Lerwill v. Inflight Motion Pictures*, 582 F.2d 507, 512 (9th Cir. 1978).

The Class Representative Plaintiffs will fairly and adequately represent the classes because their interests are consistent with, and not adverse to, the interests of the class. They are motivated to pursue this action on behalf of others like themselves who do and will record DHS operations. (Third Supp. Beckner-Carmitchel Decl. ¶ 4; Supp. Ray Decl. ¶ 31; Xu Decl. (ECF 6-8) ¶ 2; Supp. Schleuss Decl. ¶ 2-4; Second Supp. Rose Decl. ¶ 18-19.) There is no actual or potential conflict between their interests and those of members of the proposed class. They bring claims for injunctive relief and declaratory relief that would benefit the whole class. *See Rodriguez v. Bostock*, 349 F.R.D. 333, 362 (W.D. Wash. 2025) (finding no conflict of interest where class representative "has a 'mutual goal' with the other class members to challenge the allegedly unlawful practices and to 'obtain declaratory … relief that would not only cure this illegality but remedy the injury suffered by all current and future class members'") (quotation omitted). Accordingly, the Class Representative Plaintiffs are adequate class representatives.

Plaintiffs' counsel are qualified and adequate. Counsel are qualified when they can establish experience in previous class actions and cases involving the same area of law. *See Lynch v. Rank*, 604 F. Supp. 30, 37 (N.D. Cal. 1984), *aff'd*, 747 F.2d 528 (9th Cir. 1984), *amended on reh'g*, 763 F.2d 1098 (9th Cir. 1985). Plaintiffs are represented by experienced counsel from BraunHagey & Borden LLP, the ACLU Foundation of Southern California, Law Office of Carol A. Sobel, and the Law Office of Peter Bibring.[30] Counsel have substantial expertise in civil rights, journalist rights, and protester rights, and constitutional law and extensive experience litigating class actions, having served as class counsel multiple times. (Borden Decl. ¶¶ 4-8; Eliasberg Decl. ¶¶ 4-8; Sobel Decl. ¶¶ 4-21; Bibring Decl. ¶¶ 2, 5-9). Counsel also have the necessary resources, expertise, and commitment to adequately prosecute this case on behalf of the proposed class and have worked cooperatively since before the case was filed to represent the interests of members of the putative class. (Borden Decl. ¶¶ 2-3; Eliasberg Decl. ¶¶ 2-3, 9; Sobel Decl. ¶ 22; Bibring Decl. ¶ 12.)

---

[30] Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP will continue as co-counsel but is not seeking designation as Class Counsel under Rule 23(g).

## II.    THE PROPOSED CLASS SATISFIES RULE 23(B)(2)

Under Rule 23(b)(2), class certification is proper where "the opposing party 'has acted or refused to act on grounds [that apply generally] to the [C]lass" so that "final injunctive relief or corresponding declaratory relief" is appropriate respecting the Class as a whole. *MIWON*, 246 F.R.D. at 632 (citing Fed. R. Civ. P. 23(b)(2)).

Rule 23(b)(2) is "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688; *see also Zinser v. Accufix Rsch. Inst., Inc*., 253 F.3d 1180, 1195 (9th Cir. 2001) ("Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive."); *Lyon v. ICE*, 308 F.R.D. 203, 213 (N.D. Cal. 2015) ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the Class or as to none of them.") (quoting *Wal-Mart*, 564 U.S. at 360).

That is precisely the case here. Defendants' policy of treating recording as an unlawful threat to agents applies equally to all class members, and a "single injunction or declaratory judgment"—a declaratory judgment establishing that this policy violates the First Amendment and an injunction of the government's policy—"would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Courts have routinely certified classes in similar cases where class members sought injunctive or declaratory relief challenging an agency's policies and practices violating the First Amendment. *See, e.g.*, *MIWON*, 246 F.R.D. 621 (granting certification of injunctive class challenging police department's forceful dispersal of immigration rally); *Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025) (certifying Rule 23(b)(2) class of university researchers challenging termination of grants under First Amendment); *see also* Advisory Committee Note to Subdivision (b)(2), 39 F.R.D. 102 (1966) ("Illustrative [of the purpose of Rule 23(b)(2)] are" civil rights actions, usually those "whose members are incapable of specific enumeration.").

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: March 5, 2026

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:    */s/ Matthew Borden*
         Matthew Borden

*Attorneys for Plaintiffs*