UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB et al., | Case No. 2:25-cv-05563-HDV-E |
| Plaintiffs, | **ORDER GRANTING CLASS CERTIFICATION [100]** |
| v. | |
| KRISTI NOEM et al., | |
| Defendants. | |

## I.    INTRODUCTION

Last summer, the Department of Homeland Security ("DHS")[1] began a campaign of aggressive immigration enforcement in this District.  The community protested, and journalists and regular citizens alike began documenting what unfolded throughout Southern California.  This putative class action arises out of federal agents' violent response to those demonstrations, and what happened when those matters of public importance were recorded.  The operative complaint states claims for violations of the First, Fourth, and Fifth Amendments and the Administrative Procedure Act ("APA").  First Amended Complaint ("FAC") [Dkt. 67] ¶¶ 275–306.

Plaintiffs' Motion to Certify Class ("Motion") [Dkt. 100] asks the Court to certify a class comprising "[a]ll people who do or will, without using force or threat of force, record [or photograph] DHS immigration enforcement and removal operations or protests of those operations in this District since June 6, 2025."

---

[1] The Defendants named in the First Amended Complaint are DHS; Kristi Noem, Secretary of Homeland Security; Gregory Bovino, Border Patrol's "Commander-at-Large," Commander of DHS's Operation at Large in California and Los Angeles, and Chief Patrol Agent for the El Centro Sector of Customs and Border Patrol ("CBP"); Todd Lyons, Acting Director of Immigration and Customs Enforcement ("ICE"); Ernesto Santacruz Jr., Acting Field Office Director for the Los Angeles ICE Enforcement and Removal Operations ("ERO") Field Office; Eddy Wang, Homeland Security Investigations ("HSI") Special Agent in Charge for Los Angeles; Mario Canton, Regional Director for Region 9 of the Federal Protective Service ("FPS"); and Kevin Green, Office of Field Operations Special Response Team ("SRT") Commander.  ("FAC") [Dkt. 67] ¶¶ 17–24.  ICE, CBP, HSI, ERO, SRT, and FPS are all within DHS.  *Id.* ¶ 17.

All of the individual Defendants are sued in their official capacity.  *Id.* ¶¶ 18–24.  Such a suit is treated as an action against the governmental entity of which the named official is an agent.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  As a result, when officials sued in this capacity leave office, "their successors automatically assume their roles in the litigation."  *Id.*; *see also* Fed. R. Civ. P. 25(d).  Markwayne Mullin is thus substituted for Kristi Noem as Secretary of Homeland Security, Opposition [Dkt. 103] at 2 n.1; Daniel Parra for Gregory Bovino as Acting Chief Patrol Agent for the El Centro Sector of CBP, Declaration of Daniel Parra ("Second Parra Decl.") [Dkt. 114-2] ¶ 1; David Venturella for Todd Lyons as Acting Director of ICE, Heather Hollingsworth & Mike Catalini, *Former Private Prison Executive David Venturella Will Become ICE's Acting Leader*, Associated Press (May 13, 2026), https://apnews.com/article/trump-ice-leader-lyons-venturella-immigration-4996875a8d3296ccc1735798e2428d98; Andre Quinones for Ernesto Santacruz Jr. as Acting Field Office Director for the Los Angeles ICE ERO Field Office, *see* Opposition at 2 n.1; etc.

After careful consideration of the requirements of Rule 23, the Court finds class certification appropriate. Plaintiffs have sufficiently shown for present purposes that Defendants have a policy of treating the recording of their agents as an unlawful threat that may be responded to with force. Plaintiffs' challenge to that policy, seeking declaratory and injunctive relief, satisfies commonality, typicality, and the requirements of Rule 23(b)(2). The class is undoubtedly numerous, and the proposed class representatives and class counsel are more than adequate. The Motion is granted.

## II.    PROCEDURAL BACKGROUND

Plaintiffs initiated this action in June 2025. Complaint [Dkt. 1].

After a temporary restraining order was denied, they moved for a preliminary injunction in July, contending that they were likely to succeed on the merits of their First Amendment right of access and retaliation claims. Motion for Preliminary Injunction ("PI Motion") [Dkt. 34]. This Court agreed, and issued a preliminary injunction in September. Order Granting Plaintiffs' Motion for Preliminary Injunction ("PI Order") [Dkt. 55]. Defendants promptly appealed. Notice of Appeal [Dkt. 57].[2]

On October 16, Plaintiffs amended their complaint. FAC. The FAC asserts claims on behalf of several putative classes for First Amendment right of access and retaliation, Fourth and Fifth Amendment excessive force, and violation of the APA. *Id.* ¶¶ 256–306. This Court substantially denied Defendants' motion to dismiss the FAC. Order Denying Defendants' Motion to Dismiss ("MTD Order") [Dkt. 89]. It rejected Defendants' standing and First Amendment arguments for reasons similar to those articulated in its prior orders. *Id.* at 2, 5–10. The Court likewise rejected Defendants' arguments regarding Plaintiffs' excessive force claims, finding that Plaintiffs had plausibly alleged at least some physically-incapacitating uses of force that may constitute unreasonable seizures under applicable Fourth Amendment jurisprudence, and others that "shock the

---

[2] Defendants also sought a stay pending appeal. This Court denied Defendants' stay request. Order Denying Defendants' Ex Parte Application to Stay Preliminary Injunction Pending Appeal ("Stay Order") [Dkt. 74]. The Ninth Circuit granted it as to certain "injunctive provisions that by their terms apply to protesters who are not parties to this litigation" and "only to the extent that they apply to" such non-party protesters. *L.A. Press Club v. Noem*, No. 25-5975 (9th Cir. Dec. 18, 2025) [Dkt. 66.1] ("9th Cir. Stay Order") at 1.

3

conscience" under the substantive due process test. *Id.* at 2, 10–14. As to Plaintiffs' third cause of action under the APA, the Court concluded that Plaintiffs had not plausibly alleged final agency policies regarding uses of force, but had plausibly alleged such a policy with respect to how Defendants treat the recording of their agents. *Id.* at 2, 14–18. Finally, the Court declined to dismiss Plaintiffs' claim for declaratory relief. *Id.* at 2–3, 18.

On March 5, Plaintiffs Charles Xu, Lexis Olivier-Ray, Sean Beckner-Carmitchel, Los Angeles Press Club ("L.A. Press Club"), and NewsGuild – Communications Workers of America ("NewsGuild")[3] filed the present Motion. They seek to represent "All people who do or will, without using force or threat of force, record [or photograph] DHS immigration enforcement and removal operations or protests of those operations in this District since June 6, 2025." Motion at 1 & n.2.[4]

On April 1, the Ninth Circuit published its opinion in the appeal from the PI Order. *L.A. Press Club v. Noem*, 171 F.4th 1179 (9th Cir. 2026). The panel affirmed this Court's grant of the preliminary injunction, finding that it did not abuse its discretion in its analysis of the *Winter* factors. *Id.* at 1187–90. But the panel held that the specific injunction issued was overbroad, vacated it, and remanded the case to this Court to fashion a narrower injunction. *Id.* at 1190–92.

On May 7, the Court heard oral argument on both class certification and the remand of the preliminary injunction. Minutes [Dkt. 115].

### III. FACTUAL BACKGROUND

The Court's previous orders, especially its PI Order, laid out much of the factual background of this case. *See* PI Order at 4–18; *see also* Stay Order at 3–4; MTD Order at 4 & n.2.[5] The Court

---

[3] There are other named Plaintiffs (and potential future class representatives) in this case. The full list of Plaintiffs is: organizations L.A. Press Club and NewsGuild; journalists Sean Beckner-Carmitchel, Ryanne Mena, and Lexis-Olivier Ray; legal observer Charles Xu; and protesters Benjamin Adam Climer, Abigail Olmeda, and Maria-Alejandra Paz. FAC ¶¶ 8–16.

[4] The Motion and Opposition [Dkt. 103] were both filed before the Ninth Circuit's opinion on the preliminary injunction was issued. The Reply [Dkt. 107] was filed afterwards.

[5] Several of the new declarations submitted with the present Motion either add additional color and detail to events already described in the earlier declarations, or provide sworn testimony supporting

4

incorporates its previous factual findings and does not repeat them here, but will discuss particular facts as relevant in the analysis *infra* Part V.

### A.    Recent Incidents

With the present Motion, Plaintiffs introduce additional evidence of injuries that they and other similarly-situated individuals suffered at the hands of DHS agents after the filing of the First Amended Complaint and the stay briefing.  Defendants do not rebut these.  The Court discusses them briefly.

On the morning of October 29, 2025, ICE conducted an enforcement operation in Oxnard. Supplemental Declaration of Diane Alvarez ("Second Alvarez Decl.") [Dkt. 100-12] ¶¶ 4–8; Declaration of Noah Frost ("Frost Decl.") [Dkt. 100-16] ¶¶ 23–25.  DHS agents[6] taped-off an area, with around 25 agents deep inside this area, 5–6 at each of the northern and southern boundaries, and 50 peaceful protestors outside.  Second Alvarez Decl. ¶¶ 5–8; Frost Decl. ¶¶ 25, 27.  Sometime between 8:30 and 9:00 a.m., the agents prepared to leave and headed north.  Second Alvarez Decl. ¶¶ 4, 8–9; Frost Decl. ¶ 28.  On the north side of the taped-off area, roughly ten agents formed an informal skirmish line opposite protestors.  Frost Decl. ¶ 28.  A government vehicle attempted to

---

the allegations in the FAC.  *See, e.g.*, Declaration of Reverend Tanya Lopez ("T. Lopez Decl.") [Dkt. 100-10] ¶¶ 5–14 (agents pointing a gun at a pastor who filmed them arresting someone in the parking lot of her church in Downey on June 11, 2025); Declaration of F.C. ("F.C. Decl.") [Dkt. 100-9] ¶¶ 4, 10–13 (agent pointing a gun at someone photographing the license plate of the agent's car in Pasadena on June 17, 2025); Declaration of Ernest Herrera ("Herrera Decl.") [Dkt. 100-17], Ex. A (agents arresting a person filming agents arrest someone else in Hollywood on June 19, 2025); Declaration of Vladimir Carrasco ("Carrasco Decl.") [Dkt. 100-11] ¶¶ 2, 4, 6–10 (agents threatening and pointing guns at people recording them in MacArthur Park on July 7); Declaration of Eric Ares ("Ares Decl.") [Dkt. 100-14] ¶¶ 2, 15–23 (similar); Declaration of Cindy Lin ("Lin Decl.") [Dkt. 100-8] ¶¶ 6, 13–14 (agents shoving person filming in Little Tokyo on August 14); Declaration of Philip Meyer ("Meyer Decl.") [Dkt. 100-23] ¶¶ 2, 9–19 (agents brandishing and then deploying chemical irritants on people filming them in Westlake on August 28); Declaration of Mel Buer ("Buer Decl.") [Dkt. 100-13] ¶¶ 7–8, 14–23, 26, 43, 48–52 (events in downtown L.A. on August 30 and September 1); Declaration of Kayjel Mairena ("Mairena Decl.") [Dkt. 100-15] ¶¶ 2, 10, 18–20 (agents shooting photographer in the head with a pepper ball while he was recording agents escorting a protestor they had arrested in downtown L.A. on September 1).

[6] Two witnesses declare that there were agents wearing badges from ERO, ICE, HSI, and the Internal Revenue Service ("IRS").  Second Alvarez Decl. ¶ 7; Frost Decl. ¶ 26.  The IRS is not a DHS component or a Defendant here.

make an announcement, and agents started pulling down the caution tape and gesturing for people to move to the sidewalk. *Id.* ¶¶ 29–30.  The protestors slowly moved off to the side of the road to clear a path for the agents, and DHS vehicles started to leave. *Id.* ¶¶ 31–32.  At that point, a person in an unmarked Dodge Durango drove from the previously taped off area and directly pepper sprayed—at close range—two protestors who were recording with phones in their hand. *Id.* ¶¶ 33–36.  Another agent on foot also deployed pepper spray on the same group. *Id.* ¶ 37.  None of them had engaged in any violent conduct or confronted DHS officers before they were sprayed. *Id.* ¶¶ 35, 38.

Meanwhile, on the south side of the taped-off area, the caution tape came down and people started following and recording the DHS officers and vehicles moving northbound.  Second Alvarez Decl. ¶ 9.  An ICE agent used a baton to strike a protester who was recording the agent with his phone. *Id.* ¶ 10.  The protestor had not done anything violent or threatening; he was simply recording the officer. *Id.*  Other protestors rushed to help him; they, too, were hit with the baton. *Id.* ¶¶ 10–11.  Another DHS agent stepped out of a car and pepper sprayed that same group from "just over an arm[']s length away." *Id.* ¶ 11.  "The spraying was crazy and indiscriminate," and struck people on the sidewalk. *Id.* ¶¶ 12–13, 15.  DHS agents ultimately deployed several flash bang grenades on both the north and south ends of the area, and left. *Id.* ¶¶ 16–17, 22; Frost Decl. ¶¶ 39–41, 43, 45.

In another troubling incident, protesters gathered on January 9, 2026 outside the Santa Ana Federal Building to protest the killing of Renee Good.[7]  Declaration of Sean Garcia-Leys ("Garcia-Leys Decl.") [Dkt. 100-18] ¶¶ 5, 10.  Officers shot at least two anti-ICE protesters in the face with less lethal rounds. *Id.* ¶¶ 20–22, 24, 26.  DHS then fired projectile weapons at media and a legal observer who were using their phones and/or professional-looking cameras to record, photograph, and take notes. *Id.* ¶¶ 21–28.  These individuals were shot from approximately 50 feet away, even though they—and the people near them—were not doing anything violent or making any threats. *Id.* ¶¶ 27–28.

---

[7] *See also* Declaration of Matthew Borden in Support of Plaintiffs' Motion ("Borden Decl.") [Dkt. 100-3], Exs. 15, 17, 25.

Several weeks later, on the evening of January 31, 2026, protestors met across from the Metropolitan Detention Center ("MDC") in downtown Los Angeles. Supplemental Declaration of Lexis-Olivier Ray ("Second Ray Decl.") [Dkt. 100-19] ¶¶ 2, 7. Around 8:45 p.m., someone threw a firework over a line of DHS agents who were standing in front of the entrance to MDC. *Id.* ¶ 16. That firework did not hit or land near the DHS agents. *Id.* ¶ 17. Nevertheless, the DHS agents started shooting pepper balls, throwing tear gas cannisters, and throwing or shooting flash bangs into the crowd. *Id.* ¶ 19. The crowd began to disperse and scatter to the south on Alameda Street. *Id.* ¶ 21. Plaintiff Lexis Olivier-Ray, who was there as a journalist to cover the protest, followed. *Id.* ¶¶ 2–8, 21. While he was using his phone to film the line of agents who were shooting the LLMs, he was shot six times in the leg with pepper balls. *Id.* ¶¶ 21, 23. This was despite the fact that he was more than 40 feet away from the agents, identified himself as press, was clearly filming, and was not near anyone else. *Id.* ¶¶ 7, 21–24, 27.

On the afternoon of February 2, 2026, DHS officers arrested a man in the Ventura County Pre-Trial Detention Facility. Declaration of Tomás Rebecchi ("Rebecchi Decl.") [Dkt. 100-20] ¶¶ 4, 6. A group of community members and demonstrators had gathered there to document and protest DHS activities. *Id.* ¶ 4. As four agents—two holding the handcuffed man and two trailing behind—walked out of the lobby of the jail and towards the parking lot, some of these community members followed. *Id.* ¶¶ 6–7, 10. Many were filming with their phones. *Id.* ¶¶ 8–9. One agent pepper sprayed a woman at the front of the group, and then threw her to the ground. *Id.* ¶ 11. He then pepper sprayed a different community member who had filmed that interaction and was trying to help the woman. *Id.* ¶¶ 12–16.[8]

---

[8] Plaintiffs also introduce evidence of similar events in Chicago and Minnesota. *See* Third Supplemental Declaration of Sean Beckner-Carmitchel ("Fourth Beckner-Carmitchel Decl.") [Dkt. 100-21] ¶¶ 5, 18–22 (Minneapolis, January 24); *Tincher v. Noem*, 2026 WL 125375 (D. Minn. Jan. 16, 2026); *Chicago Headline Club v. Noem*, 2025 WL 3240782 (N.D. Ill. Nov. 20, 2025); Eliasberg Decl., Exs. C–V; Borden Decl., Exs. 1, 3, 5–6, 11, 13–14, 30, 32.

**B.      Official DHS Positions**

In addition to these recent declarations, Plaintiffs have introduced evidence of official DHS positions vis-à-vis the recording of its agents' actions.  Multiple news outlets have reported that DHS appears to have opened investigations into social media accounts and websites that post photos, recordings, and other information about its agents and operations.  *See* Declaration of Matthew Borden in Support of Plaintiffs' Motion ("Borden Decl.") [Dkt. 100-3], Exs. 21 (Jireh Deng, *These sites help communities avoid ICE—and now they're under attack*, Los Angeles Public Press (Sept. 11, 2025), https://lapublicpress.org/2025/09/dhs-wants-ice-raid-warning-group data/), 24 (Ryanne Mena, *DHS probe of Long Beach activist who posed video of Border Patrol agent raises free-speech questions*, Press-Telegram (Sept. 19, 2025), https://www.presstelegram.com/2025/09/19/free-speech-or-doxing-long-beach-activists-instagram-post-under-dhs-investigation/).

On October 20, 2025, CBP Commander Kevin Harvick testified that no DHS agents had been discharged or reprimanded for conduct in this District, and that agents received no additional training between their deployment in this District and in Chicago.  Declaration of Peter J. Eliasberg in Support of Plaintiffs' Motion ("Eliasberg Decl.") [Dkt. 100-4], Ex. R at 4, 18, 44–45, 49.

In December, DHS's Office of Public Affairs indicated in an email that "following or recording a federal law enforcement officer" "sure sounds like obstruction of justice."  Borden Decl., Ex. 7 (C.J. Ciaramella, *DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice,'* Reason (Dec. 22, 2025), https://reason.com/2025/12/22/dhs-says-recording-or following-law-enforcement-sure-sounds-like-obstruction-of-justice/).

And in January, DHS agents indicated that DHS was putting together a database of people who record their activities.  *See* Borden Decl., Exs. 8 (Ken Klippenstein, *ICE Making List of Anyone Who Films Them*, (Jan. 23, 2026), https://perma.cc/9FNP-32KP); 9 (C.J. Ciaramella, *ICE Tells Legal Observer, 'We Have a Nice Little Database, and Now You're Considered a Domestic Terrorist,'* Yahoo (Jan. 23, 2026), https://archive.ph/6ZNwZ); *but see id.* (Tricia McLaughlin, DHS assistant secretary for public affairs, denying that such a database exists).

8

## IV.    LEGAL STANDARDS

"The decision to grant or deny class certification is within the trial court's discretion." *Evon v. L. Offs. of Sidney Mickell*, 688 F.3d 1015, 1028 (9th Cir. 2012).  Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  To justify departure from the rule, "a class representative must be part of the class and possess the same interest and suffer the same injury" as fellow class members.  *Id*. at 348–49 (citation omitted).

More specifically, a motion for class certification involves a two-part analysis.  First, the plaintiffs must demonstrate that the proposed class satisfies Rule 23(a): (1) the members of the proposed class must be so **numerous** that joinder of all members would be impracticable; (2) there must be questions of law or fact **common** to the class; (3) the claims or defenses of the representative parties must be **typical** of the claims or defenses of absent class members; and (4) the representative parties must fairly and **adequately** protect the interests of the class.  Fed. R. Civ. P. 23(a).

Second, the plaintiffs must meet the requirements for at least one of the three subsections of Rule 23(b), which define three different types of classes.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc).  Here, Plaintiffs seek certification under Rule 23(b)(2).  Motion at 1, 3, 25.  That subsection allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final **injunctive** relief or corresponding **declaratory** relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2) (emphasis added).

The plaintiffs bear the burden of demonstrating, by a preponderance of the evidence, that Rule 23 is satisfied.  *Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."); *Olean*, 31 F.4th at 664–65 ("[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23" and can do so "us[ing] any admissible evidence.").  The court must

9

rigorously analyze whether the plaintiffs have met the prerequisites of Rule 23. *Dukes*, 564 U.S. at 350 (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)). The court must consider the merits only to the extent that they overlap with Rule 23(a)'s requirements. *Olean*, 31 F.4th at 667 (plaintiffs need not "show at certification that they will prevail on the merits"); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66, 476–77 (2013).

## V. DISCUSSION

### A. Standing

Defendants repeat their arguments that the named Plaintiffs do not have standing. Opposition at 22–23. This Court has rejected this argument multiple times already. PI Order at 22–26; Stay Order at 5–9; MTD Order at 5–8. So, too, did the Ninth Circuit. *L.A. Press Club*, 171 F.4th at 1187–88. Although Defendants are correct that the standard is slightly different at this stage of the proceeding, *see* Opposition at 22, the argument still fails.

"There are two ways for plaintiffs seeking prospective injunctive relief to establish standing. First, they can show that defendants' past conduct is having 'continuing, present adverse effects,' that is to say, plaintiffs continue to suffer ongoing, concrete harm. Second, plaintiffs can show there is 'a sufficient likelihood that [they] will again be wronged in a similar way.'" *L.A. Press Club*, 171 F.4th at 1187 (quoting *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017)). Under the first prong, "'a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.'" *Id.* (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)). "Government conduct that induces reporters to modify their coverage or protesters to alter or limit their methods of protest chills First Amendment expression when based on a reasonable fear that government reprisals are likely to occur. Stated another way, adverse changes to First Amendment activities, when adopted because of fear of government punishment, demonstrate chilled and diminished First Amendment speech. That reduction of speech to the public establishes continuing, present adverse effects sufficient to confer standing." *Id.* at 1188 (citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020)).

"Here, some Plaintiffs have been injured more than once and have sworn under oath that the physical injuries inflicted upon them by Defendants will cause them to stand further away from

future protests or to wear restrictive protective equipment—to the detriment of their news coverage and other First Amendment activities.  Others have attested that the injuries they sustained have made them hesitant to participate in or cover future protests." *Id.*  "Against this backdrop, Plaintiffs' fear of reprisal and physical injury is reasonable because Defendants have inflicted such injuries on Plaintiffs as they engaged in First Amendment activities at varied locations on different days." *Id.*[9]

To the extent Defendants are understood to argue that Plaintiffs no longer have standing because the past injuries are now a few months old, *see* Opposition at 22, the position is not well-taken.  First, plaintiffs must have "standing at the *outset* of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 180 (2000) (emphasis added).  Second, Plaintiffs in fact continue to introduce, with every new brief, additional evidence of recent injuries to themselves and other similarly-situated individuals.[10]  Finally, to the extent the recent incidents are (ostensibly) not as physically harmful as the earlier ones, that makes perfect sense—the Court's PI Order enjoined Defendants from much of the worst conduct.  If Defendants seek to argue that their recent compliance with the law and the PI Order means that Plaintiffs are no longer likely to be injured and thus no longer have the personal interest necessary to maintain this suit, they "bear[] the formidable burden of showing" mootness by voluntary cessation, which they have not met. *Laidlaw*, 528 U.S. at 190; *see also FBI v. Fikre*, 601 U.S. 234, 241 (2024).

Defendants also contend that, even if the named Plaintiffs have standing, not every class member does.  Opposition at 23–24.  Even if Defendants were right, it would not interpose a hurdle

---

[9] The Ninth Circuit also found that this Court "correctly held that [the] Organizational Plaintiffs had made their requisite showing on standing." *L.A. Press Club*, 171 F.4th at 1188.

[10] *See, e.g.*, Declaration of Maritza Guardado ("Guardado Decl.") [Dkt. 34-14] ¶ 13 (filed July 2025, describing events in June); Declaration of Tina-Desiree Berg ("Berg Decl.") [Dkt. 34-22] ¶ 7 (filed July 2025, describing events in July); Second Supplemental Declaration of Sean Beckner-Carmitchel ("Third Beckner-Carmitchel Decl.") [Dkt. 64-1] ¶¶ 27, 33 (filed Sept. 2025, describing events in Sept.); Declaration of Jill Connelly ("First Connelly Decl.") [Dkt. 64-2] ¶¶ 16–18 (filed Sept. 2025, describing events in Sept.); Frost Decl. ¶¶ 2, 14, 18, 34–35 (filed March 2026, describing events in Oct. 2025); Garcia-Leys Decl. ¶¶ 2, 25, 27–28 (filed March 2026, describing events in Jan.); Declaration of Tucker Collins ("Collins Decl.") [Dkt. 107-1] ¶¶ 2, 8, 11 (filed April 2026, describing events in March); Fourth Supplemental Declaration of Sean Beckner-Carmitchel ("Fifth Beckner-Carmitchel Decl.") [Dkt. 107-2] ¶¶ 2, 11–13 (filed April 2026, describing events in March).

at this stage. "In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the suit to proceed." *L.A. Press Club*, 171 F.4th at 1187 (quoting *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022)). At the class certification stage, only "at least one named plaintiff"—not the entire class—must "demonstrate evidence of standing." *Healy v. Milliman, Inc.*, 164 F.4th 701, 706 (9th Cir. 2026) (collecting cases); *see, e.g.*, *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1239–41 (9th Cir. 2024) (examining the standing of the named Plaintiffs only). And in a class action seeking only equitable relief, as opposed to damages, the named plaintiffs' standing is sufficient "even at the final stage of a case when relief is awarded." *See Healy*, 164 F.4th at 706; *see also Olean*, 31 F.4th at 682 n.32.

Standing thus does not pose a bar to class certification here.

### B.    Rule 23(a) Prerequisites

#### 1.    Numerosity

Rule 23(a)(1) requires that a class be sufficiently numerous such that it would be impracticable to join all members individually. There is no set number required to satisfy the numerosity requirement; the court must examine the specific facts of each case. *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). Broadly, however, "courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (citation omitted).

Numerosity is easily satisfied here. At least 41 different people have already submitted declarations testifying that they or others have recorded DHS immigration enforcement and removal operations or protests of those operations in this District since June 6, 2025.[11] L.A. Press Club and

---

[11] *See* Declaration of Sean Beckner-Carmitchel ("First Beckner-Carmitchel Decl.") [Dkt. 6-6] ¶¶ 13, 16; Declaration of Charles Xu ("First Xu Decl.") [Dkt. 6-8] ¶¶ 7–8, 12; Declaration of Emiliano Lopez ("E. Lopez Decl.") [Dkt. 6-14] ¶¶ 4, 7, 10, 12; Declaration of Lexis-Olivier Ray ("First Ray Decl.") [Dkt. 6-17] ¶¶ 16, 22; Declaration of Michael Horowicz ("Horowicz Decl.") [Dkt. 6-19] ¶¶ 5, 6, 9–10; Declaration of N. Reyna ("Reyna Decl.") [Dkt. 6-21] ¶¶ 9–10; Declaration of Ted Soqui ("Soqui Decl.") [Dkt. 6-23] ¶¶ 4–5, 7, 10–11, 14; Declaration of A.R. ("First A.R. Decl.") [Dkt. 34-2] ¶¶ 4–5, 13; Declaration of Aleca Le Blanc ("Le Blanc Decl.") [Dkt. 34-3] ¶¶ 14–15; Declaration of Alexander Nadolishny ("Nadolishny Decl.") [Dkt. 34-4] ¶ 12; Declaration of Beverly Dransfeldt ("Dransfeldt Decl.") [Dkt. 34-5] ¶¶ 8, 10, 16, 25; Declaration of Eduardo De La Riva ("De La Riva Decl.") [Dkt. 34-7] ¶¶ 18–19, 21; Declaration of Graham Coven ("Coven Decl.")

NewsGuild each have *hundreds* of members, many if not most of whom may be in the class. Second Supplemental Declaration of Adam Rose ("Third Rose Decl.") [Dkt. 100-22] ¶¶ 3, 19 (1,000 L.A. Press Club members across Southern California, the vast majority of which are in the Central District, who could all end up recording DHS); Supplemental Declaration of Jonathan Schleuss ("Second Schleuss Decl.") [Dkt. 100-24] ¶¶ 2–4 (500 NewsGuild members in the Central District, who could all end up recording DHS). More conservatively, leadership in these organizations estimate that at least 40 L.A. Press Club members and 50 NewsGuild members are in the class. Third Rose Decl. ¶ 19; Second Schleuss Decl. ¶ 4. This alone satisfies the rough 40-member threshold for impracticability of joinder and therefore numerosity. *See Rannis*, 280 F. App'x at 651. And there are obviously many more people (not affiliated with the L.A. Press Club or NewsGuild or already declarants in this action) who do or will record and thus fall into the class. *See* Third Rose Decl. ¶¶ 16–18 (discussing use of phones to record by non-press); *id.* ¶¶ 8, 10–11 (explaining that use of phones, traditional cameras, and high-end electronic news gathering systems are routine and critical to journalism); Second Schleuss Decl. ¶ 3 (similar). Indeed, although Defendants challenge numerosity, they appear to admit that the class likely contains many members. *See* Opposition at 1 ("Plaintiffs . . . seek[] to represent all people in this District—which includes more than 19.3 *million* people . . .—who take video or photos . . . ." (emphasis added)); *id.* at 2 (describing class definition

---

[Dkt. 34-9] ¶¶ 5, 11–12, 14–15; Declaration of Heber Marquez ("Marquez Decl.") [Dkt. 34-10] ¶¶ 15, 18; Declaration of Jeanette Marantos ("Marantos Decl.") [Dkt. 34-11] ¶¶ 13, 22; Declaration of Kimberly Fisher ("Fisher Decl.") [Dkt. 34-12] ¶¶ 4, 7, 10, 12, 16–17; Guardado Decl. ¶¶ 5, 15–16; Declaration of Mayra Aguiluz ("Aguiluz Decl.") [Dkt. 34-15] ¶ 13; Declaration of Mónica Solórzano ("First Solórzano Decl.") [Dkt. 34-16] ¶¶ 11, 14; Declaration of R.R. ("R.R. Decl.") [Dkt. 34-18] ¶¶ 6–8; Declaration of Sarah Wilczewski ("Wilczewski Decl.") [Dkt. 34-20] ¶ 13; Berg Decl. ¶¶ 7, 9–10; Declaration of Catherine Saillant ("Saillant Decl.") [Dkt. 49-3] ¶¶ 6–7, 10, 12, 14; Declaration of Diane Alvarez ("First Alvarez Decl.") [Dkt. 49-4] ¶¶ 10, 13; Declaration of Dolores Ortiz ("Ortiz Decl.") [Dkt. 49-5] ¶¶ 8–9, 15–17, 22, 30; Declaration of F.F. ("F.F. Decl.") [Dkt. 49-6] ¶ 3; Declaration of Nathan Tran ("Tran Decl.") [Dkt. 49-8] ¶ 3; First Connelly Decl. ¶¶ 2, 10, 12–13, 16–18, 20; Lin Decl. ¶¶ 2, 9–13; F.C. Decl. ¶¶ 2, 4, 10, 12–13; T. Lopez Decl. ¶¶ 8, 12–17; Carrasco Decl. ¶¶ 2, 7–8, 10–11; Buer Decl. ¶¶ 3, 15, 35, 38, 43, 48–50; Ares Decl. ¶¶ 2, 9, 13, 15–16, 18–20, 22–23, 25; Mairena Decl. ¶¶ 2, 5, 8–10, 12–13, 16, 18–20; Frost Decl. ¶¶ 2, 10–11, 13–15, 18, 20, 24, 34, 36; Herrera Decl., Ex. A at 2–3; Garcia-Leys Decl. ¶¶ 2, 8, 15, 18, 21–22, 25, 28; Rebecchi Decl. ¶¶ 2, 8–10, 12–17, 19, 22; Meyer Decl. ¶¶ 2, 9, 11, 13–14, 16–20, 22; Collins Decl. ¶¶ 2, 5–8, 18.

as "sweeping" and "overbroad"); *id.* at 5 (arguing that the "putative class casts too wide a net"); *id.* at 7 (speculating as to "an indeterminate number of *millions* of potential class members" (emphasis added)).

Defendant's argument against numerosity, then, is that Plaintiffs have not proven the actual size of the class with any precision. Opposition at 6–7. But Plaintiffs have provided a non-speculative estimate of a lower bound of the class's size. And that the class contains unknown and future members makes joinder even more impracticable and cuts in favor of class certification, not against it. *See* Karen L. Stevenson & James E. Fitzgerald, Rutter Group Practice Guide, Federal Civil Procedure Before Trial (Calif. and 9th Cir. Edition) (2026 ed.) ("Rutter") ¶ 10:262; *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1040 (S.D. Cal. 2020) (collecting cases from district courts in this circuit finding the numerosity requirement satisfied where the class includes unnamed, unknown future members); *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles* ("*MIWON*"), 246 F.R.D. 621, 631 (C.D. Cal. 2007) (citing Advisory Committee Note for the proposition that certification under Rule 23(b)(2) is permissible even when the members cannot be specifically enumerated).

The Court finds that the proposed class satisfies the numerosity requirement of Rule 23(a)(1).

### 2.    Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. A common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke" such that "common *answers* [will] drive the resolution of the litigation." *Dukes*, 564 U.S. at 350; *see also DZ Reserve*, 96 F.4th at 1233. The commonality requirement does not "mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013); *accord Dukes*, 564 U.S. at 359.

The commonality analysis is less demanding than the predominance analysis, *DZ Reserve*, 96 F.4th at 1233 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)); *Gonzalez v. USCIS*, 975 F.3d 788, 808 (9th Cir. 2020), but it is not trivial, *Dukes*, 564 U.S. at 359 ("We consider

14

dissimilarities not in order to determine . . . whether common questions *predominate*, but in order to determine . . . whether there *is* even a single common question." (cleaned up)).  The question is "whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."  *Olean*, 31 F.4th at 667.  A court "cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue."  *Id.*; *see also id.* (plaintiffs need not "show at certification that they will prevail on the merits"); *Amgen*, 568 U.S. at 459, 465–66, 476–77; *Gonzalez*, 975 F.3d at 807.

Plaintiffs argue that Defendants have a policy of treating the recording of their agents as an unlawful threat that may be treated as criminal and responded to with force.  *See* Motion at 2, 15, 19, 21, 25.  They further allege that this amounts to a policy of retaliation against recording, in violation of their First Amendment rights.  *See id.* at 7–8, 18–19, 21.  Plaintiffs thus identify the existence, legality, and chilling effect of this alleged policy as questions common to the class.  *Id.* at 15.  The Court analyzes these potential common questions below.

### a.  Plaintiffs have sufficiently shown the existence of a policy.

Plaintiffs submit extensive and persuasive evidence of Defendants' alleged policy in the form of (1) Defendants' public statements, (2) Defendants' agents' widespread practice, and (3) DHS's adoption and ratification of its agents' actions.  *See* Motion at 5–12, 15–21; *supra* Part III.

This Court's PI Order found that similar evidence before the Court at that stage suggested a policy or custom of First Amendment retaliation.  PI Order at 33–34 (citing *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005); *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 519 (E.D. Mich. 2020), *order clarified*, No. 20-12363, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020)).  That evidence included federal officials' statements, evidence of how federal officers behaved on numerous occasions, and the absence of evidence that officers were discharged or reprimanded.  This Court's conclusion was based on "well-supported factual findings" made after "carefully review[ing] each incident" and "reject[ing] Defendants' alternative explanations for their use of force."  *L.A. Press Club*, 171 F.4th at 1189.  And the Ninth Circuit affirmed, finding "no clear error in the district court's finding that Defendants acted with retaliatory intent."  *Id.*

This Court similarly found, in its MTD Order, that Plaintiffs had sufficiently alleged a policy regarding how DHS treats the recording of its agents.  MTD Order at 16.  The Court based that conclusion on allegations regarding internal bulletins and statements by government officials, as well as factual allegations of DHS agents using force against individuals at the precise moment that they began recording the agents.  *Id.* (citing FAC ¶¶ 94–95, 97, 100–01).

All of the evidence and allegations the Court relied on in its previous decisions finding the existence of a policy are still before the Court and equally relevant to the certification analysis.[12] And Plaintiffs have submitted additional evidence with this Motion that only reinforces this same conclusion.[13]  Defendants, on the other hand, do not submit any new evidence or proffer alternative explanations for any of the more recent incidents that Plaintiffs and other declarants describe.[14] Instead, they cite to their written official policies that expressly forbid retaliation for protected First Amendment activity.  Opposition at 11.  But this Court and the Ninth Circuit have already rejected that argument: "Defendants cannot avoid potential liability by pointing to DHS policies that correctly set out the bounds for the use of less lethal munitions, when their actions were inconsistent with those policies." *L.A. Press Club*, 171 F.4th at 1189 (citing *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016)).

Plaintiffs have thus sufficiently established, for purposes of this Motion, the existence of a policy within DHS that treats the mere public recording of its agents as a threat that may be viewed as criminal in nature and responded to with force at the scene.

---

[12] Plaintiffs have submitted declarations or requests for judicial notice including all of the relevant allegations in the FAC.  *See supra* note 5.

[13] *See* e.g., Supplemental Declaration of Jill Connelly ("Second Connelly Decl.") [Dkt. 100-7] ¶¶ 16–18; Lin Decl. ¶¶ 2, 13–14; F.C. Decl. ¶¶ 2, 10; T. Lopez Decl. ¶¶ 12–14; Carrasco Decl. ¶¶ 7–8; Second Alvarez Decl. ¶¶ 9–10; Buer Decl. ¶¶ 3, 48–50; Ares Decl. ¶¶ 2, 15–16, 18–19; Mairena Decl. ¶¶ 2, 10, 18–19; Frost Decl. ¶¶ 2, 14, 18, 34–35; Herrera Decl., Ex. A, at 3; Garcia-Leys Decl. ¶¶ 2, 25, 27; Second Ray Decl. ¶¶ 21–23; Meyer Decl. ¶¶ 2, 13–14; Collins Decl. ¶¶ 2, 8, 11; Fifth Beckner-Carmitchel Decl. ¶¶ 2, 11–13.

[14] *See generally* Opposition at 2–3; Declaration of Javier Larios ("Larios Decl.") [Dkt. 114-1]; Second Parra Decl.; Third Supplemental Declaration of Roger Scharmen ("Fourth Scharmen Decl.") [Dkt. 114-3]; Declaration of Brian Szemes ("Third Szemes Decl.") [Dkt. 114-4].

**b.    Because Plaintiffs challenge a common policy, commonality is satisfied.**

Plaintiffs here challenge that system-wide policy. *See* FAC ¶¶ 275–83, 300–03; Motion at 2, 22–23; Minutes (Plaintiffs' counsel indicated that the present class definition was tethered to the First Amendment retaliation claim). When a lawsuit challenges a system-wide policy that affects all of the putative class members, commonality is satisfied. *See Owino v. CoreCivic, Inc.*, 60 F.4th 437, 444 (9th Cir. 2022) ("Commonality is necessarily established where there is a class-wide policy to which all class members are subjected."); *Gonzalez*, 975 F.3d at 808–09 ("[C]laims concerning government policies, practices or procedures . . . are plainly suitable for classwide resolution."); *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("The putative class . . . members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected . . . expose them to a substantial risk of harm."). The authorities Defendants cite, such as *Dickinson v. Trump*, 174 F.4th 634, 646–47 (9th Cir. 2026) and *Black Lives Matter L.A. v. City of Los Angeles* ("*BLM*"), 113 F.4th 1249, 1258–66 (9th Cir. 2024)[15] are distinguishable.

Most importantly, the commonality analysis by the Ninth Circuit in *Dickinson* was predicated on its conclusion (after independently reviewing the record) that there was in fact *no such policy*. 174 F.4th at 642 ("The district court erred in ruling that there was . . . an unwritten governmental policy of retaliation."); *see also id.* at 646–47. And in *BLM*, the relevant point was simply that class-wide *proof*—as opposed to mere pleading—is necessary to show commonality. 113 F.4th at 1264 ("[T]he plaintiffs cannot simply allege that a policy applies class-wide—they have to present evidence that it does."); *see also id.* at 1265 ("The Injunctive Relief Class does not bring a *Monell* claim, so" the district court's findings involving those policies "do not apply.").

---

[15] Defendants' Opposition also relies heavily on *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026). That case is an out-of-circuit motions panel decision that does not bind this Court. And it was not actually at the class certification stage. The opinion's discussion of the considerations at class certification was a breezy two paragraphs that concluded that the broader class there "ha[d] *no* chance of getting certified." *Id.* at 1089–99. For these reasons, the Court does not find it especially persuasive here.

17

That is not the case here.  Plaintiffs do not proffer the *inference* of a policy from disparate incidents of excessive force.  The policy in question here is based on *direct statements* from responsible agency heads about the unlawfulness of recording DHS agents.[16]  That is precisely the class-wide proof that was missing in *Dickinson* and *BLM.*

As a result, the fact that First and Fourth Amendment claims may involve some fact-specific inquiries, and that the class covers all kinds of "different conduct, by different officers, at different times, in different places, in response to different behavior," does not defeat commonality.  *See* Opposition at 8–10, 12–15; *see also Dickinson*, 174 F.4th at 647; *BLM*, 113 F.4th at 1258–60; *Tincher*, 164 F.4th at 1099.  *Gonzalez* and *Parsons* are instructive.  Gonzalez challenged, on behalf of a class, ICE's policy of issuing immigration detainers based solely on searches of electronic databases.  975 F.3d at 797, 801.  Even though "probable cause is a highly fact specific inquiry" which "depends on the totality of the circumstances," the Ninth Circuit nonetheless found that commonality was satisfied.  *Id.* at 809.  It did so because it recognized that the relevant question was not whether there was probable cause in a particular case, but instead involved the "adequacy of the procedures" on which the government relied to make detention decisions.  *Id.  Parsons* involved policies governing medical care and conditions of confinement in a prison system.  754 F.3d at 662. There, too, the Ninth Circuit found commonality satisfied, because "[t]he Complaint does not allege that the care provided on any particular occasion to any particular inmate (or group of inmates) was insufficient, but rather that ADC [Arizona Department of Corrections] policies and practices of statewide and systemic application expose all inmates in ADC custody to a substantial risk of serious harm."  *Id.* at 676.  "[A]lthough a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm."  *Id.* at 678.  A similar point applies here.  Even if First Amendment retaliation and Fourth Amendment excessive force are generally fact-specific, totality-of-the-circumstances inquiries, Plaintiffs here are not trying to prove that any particular past act

---

[16] *See supra* Section III.B; *see also* PI Order at 33–34 & n.28; MTD Order at 17.

18

against someone recording DHS was retaliatory or excessive. *See* Reply at 5. Instead, they argue that the *policy* of treating recording as a threat is itself unlawful, and that it chills all people who might record. Whether Plaintiffs are right or wrong about that question can be determined with common proof across the class.

That Plaintiffs seek only forward-looking declaratory and injunctive relief, not damages, further underscores the point that no fact-intensive, backwards-looking inquiry about what happened to certain individuals on certain dates is necessary to proving Plaintiffs' entitlement to relief. And it means Plaintiffs need only prove commonality, not predominance. *Compare* Fed. R. Civ. P. 23(b)(2) *with id.* 23(b)(3). Indeed, because the discussion of predominance in *BLM* arose in the discussion of Rule 23(b)(3) classes, *see* 113 F.4th at 1258–63, that portion of the decision is not relevant here.

### 3.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The inquiry "focuses on *the nature of the claim* . . . of the class representative, and not . . . the specific facts from which it arose." *Gonzalez*, 975 F.3d at 809 (alteration in original) (citation omitted). The analysis is informed by considering "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (citation omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *DZ Reserve*, 96 F.4th at 1238 (citation omitted).

The requirements of typicality and commonality "occasionally merge: 'Both serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Parsons*, 754 F.3d at 685 (quoting *Duke*, 564 U.S. at 349 n.5). Typicality is satisfied here for much the same reason that commonality is met. Plaintiffs seek injunctive relief against a policy that they allege is unlawful, and the Court has found that they have sufficiently shown the existence of such a policy. "Where the challenged conduct is a

19

policy or practice that affects all class members . . . the typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class. We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Id.* (quoting *Armstrong v. Davis*, 275 F.3d 849, 868–69 (9th Cir. 2001)); *see also Just Film, Inc. v. Buono*, 847 F.3d 1108, 1117–18 (9th Cir. 2017).

As a result, factual variations in how each named Plaintiffs' physical injuries arose or their specific role at an event do not defeat typicality. Neither does the fact that some putative class members "may have suffered no injury or different injuries." Opposition at 18. On Plaintiffs' theory, all putative class members experience First Amendment chill as a result of Defendants' policy, regardless of their role and whether they have in fact already been injured. And injunctive relief would alleviate that chilling effect for the entire class. Defendants have not identified any defenses they have that are unique to the named Plaintiffs here. All class members have thus suffered a "similar injury," as a result of the "same course of conduct," "which is not unique to the named plaintiffs," and typicality is met. *Gonzalez*, 975 F.3d at 809.

### 4.    Adequacy

Rule 23(a)(4) requires that the representative party "fairly and adequately protect the interests of the class." This requirement is grounded in due process concerns—absent class members must be afforded adequate representation before they are bound by a judgment. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 959 (9th Cir. 2009); *Hansberry v. Lee*, 311 U.S. 32, 37, 42–43 (1940). A named plaintiff satisfies the adequacy test if she (and her counsel) has no conflict of interest with other class members and if they will prosecute the action vigorously on behalf of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

There is no suggestion of a conflict of interest between the proposed class representatives (or their counsel) and absent class members here. *See* Motion at 24; Opposition at 19; Reply at 7.

Plaintiffs and their counsel have prosecuted this action vigorously thus far, devoting substantial resources and skill, developing a very thick record,[17] and securing several rulings in their favor.[18]  Counsel are experienced in civil rights litigation, class actions, and disputes involving journalist and protestor rights.  Borden Decl. ¶¶ 5–7, 10–15; Eliasberg Decl. ¶¶ 5–8; Declaration of Carol A. Sobel ("Sobel Decl.") [Dkt. 100-5] ¶¶ 2–21; Declaration of Peter Bibring ("Bibring Decl.") [Dkt. 100-6] ¶¶ 2–9.

Defendants' only argument regarding adequacy is that Plaintiffs' declarations do not establish that they are aware they are class representatives or know about their responsibilities.  Opposition at 19.  Supplemental declarations submitted with the Reply address any such concerns.  *See* Fifth Beckner-Carmitchel Decl. ¶¶ 3–9; Second Supplemental Declaration of Lexis Olivier-Ray ("Third Ray Decl.") [Dkt. 107-4] ¶¶ 3–9; Supplemental Declaration of Charles Xu ("Second Xu Decl.") [Dkt. 107-5] ¶¶ 3–10; Second Supplemental Declaration of Jonathan Schleuss ("Third Schleuss Decl.") [Dkt. 107-3] ¶¶ 3–9; Third Supplemental Declaration of Adam Rose ("Fourth Rose Decl.") [Dkt. 107-6] ¶¶ 4–10.

The Court thus finds that the proposed class representatives and their counsel are adequate.

**C.       Rule 23(b)(2)**

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

"These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole."  *Parsons*, 754 F.3d at 688.  That is exactly the case here.  A declaratory judgment

---

[17] *See* Application for Temporary Restraining Order [Dkt. 6] (submitting 23 expert and fact declarations); PI Motion (25 non-counsel declarations); Preliminary Injunction Reply [Dkt. 49] (10 non-counsel declarations); Opposition to Stay Application [Dkt. 64] (2 fact declarations); Motion (18 non-counsel declarations); Reply (6 non-counsel declarations).

[18] *See* PI Order (granting preliminary injunction); Stay Order (denying stay of preliminary injunction pending appeal); *L.A. Press Club*, 171 F.4th at 1187–90 (affirming issuance of preliminary injunction).

that Defendants' policy violates the First Amendment, and an injunction against it, would provide relief to every class member.  It is not true, as Defendants assert, that each individual class member would be entitled to a *different* injunction or declaratory judgment.  *See* Opposition at 20–21.  That argument assumes that there is no common policy, and discounts chill as a First Amendment injury.[19]

## VI.    CONCLUSION

For the reasons stated herein, Plaintiffs' Motion to Certify Class is granted.

Dated: June 25, 2026

_____
Hernán D. Vera
United States District Judge

---

[19] Defendants also argue that "[t]he equitable principles laid out in" *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), "support denying class certification here."  Opposition at 6.  Not so.  *CASA* involved the propriety of universal injunctive relief in the absence of a certified class, not the standard for class certification.  606 U.S. at 837.  The Supreme Court majority expressed concern that universal injunctions were a "shortcut" or "workaround" that circumvented Rule 23's procedural limits on class actions.  *Id.* at 849–50.  That is not happening here.  This Court has engaged in the "rigorous" analysis required by Rule 23, and found that its requirements are satisfied.  And this Order does not issue any injunctive relief.  Even if it did, "*CASA* did not affect district courts' ability to issue class-wide injunctive relief."  *Pacito v. Trump*, 169 F.4th 895, 939 (9th Cir. 2026).