UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES PRESS CLUB; *et al.,*

      Plaintiffs,

      v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.,*

      Defendants.

Case No. 2:25-cv-05563-HDV-E

**DECLARATION OF JAVIER LARIOS**

## DECLARATION OF JAVIER LARIOS

I, Javier Larios, declare and affirm as follows:

1.     I am employed by U.S. Customs and Border Protection (CBP) in the Office of Field Operations (OFO), an operational component of CBP within the Department of Homeland Security (DHS). OFO's criminal and immigration enforcement operations are in addition to the U.S. Border Patrol's operations at or near the land borders. OFO areas of responsibility or field offices are not the same as Border Patrol sectors. OFO's field offices are organized around ports of entry, including ones at the land borders, seaports, and airports that have international flights, that functionally provide people with access to the United States, although CBP officers of the OFO may enforce federal laws outside of the ports of entry under applicable circumstances.

2.     I am the Deputy Assistant Director of the Border Security Division of OFO's Los Angeles Field Office. I report to the Assistant Director for Border Security of OFO's Los Angeles Field Office. As the Deputy Assistant Director of the Border Security Division, I oversee the Los Angeles Field Office's Special Response Team (SRT), oversee the detail of in-the-field CBP officers conducting immigration enforcement operations, coordinate the provision of CBP officers with Mobile Field Force (MFF)

1

certification to support Federal Protective Services, and organize MFF training for CBP officers, among other duties.

3.      I have been employed by CBP and its predecessor, the U.S. Customs Service, for more than thirty years.  I entered on duty at the Los Angeles International Airport as a Customs Inspector with the U.S. Customs Service in June 1991 after completing training at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have been promoted through various positions at the airport and seaport in the Los Angeles Field Office since 1991, including Senior Customs Inspector, Supervisory Customs Inspector, Chief Inspector and Chief Officer after the 2003 reorganization establishing CBP, and Section Chief.  I have a Bachelor of Science degree in criminal justice from California State University, Long Beach.

4.      This declaration is based on my personal knowledge and information made available to me in the course of my official duties.  The purpose of this declaration is to support Defendants' Motion for Clarification of the Revised Preliminary Injunction (Revised PI) issued in this case on July 10, 2026.  This declaration supplements the information in my May 15, 2026 declaration previously filed in this case.

5.      CBP officers of the Los Angeles Field Office of OFO no longer participate in Operation at Large operations with Immigration and Customs Enforcement (ICE). However, CBP officers of the Los Angeles Field Office of OFO regularly conducted targeted interior immigration enforcement prior to the beginning of Operation at Large in 2025 and have continued to do so approximately a few times per week.  Currently, a detail at the Los Angeles Field Office, consisting of ten CBP officers, up to 13 CBP task force officers, depending on availability, and up to 16 SRT officers, depending on availability, from the Los Angeles Field Office are conducting immigrant enforcement operations against targeted individuals who have already been identified as being in the United States illegally.  For these operations, the individual targets of these immigration enforcement actions are generated by CBP's National Targeting Center and the

2

intelligence operations of the Los Angeles Field Office.  OFO determines which individual targets to arrest based on its own information, intelligence, and surveillance.  It does not coordinate the enforcement actions against these targets with ICE, although these individuals are delivered to ICE facilities for detention and processing after they are arrested by OFO's officers.

6.     The Los Angeles Field Office has provided and continues to provide Los Angeles OFO SRT officers and CBP officers that are MFF-certified to assist FPS with federal building protection when requested by FPS.  FPS generally requests assistance from CBP in advance of large-scale anticipated demonstrations where additional personnel may be required, and OFO has provided officers for federal building protection in 2026.  The most recent time when OFO provided officers to assist FPS was July 4, 2026, although no OFO SRT or CBP officers engaged in any reportable use of force that day.

7.     Uniformed OFO SRT and CBP officers are required to carry a firearm and at least one of the following less-lethal devices – (1) Oleoresin Capsicum (OC) spray, (2) a collapsible straight baton, or (3) an electronic control weapon, such as a Taser – when they are on duty, whether they are in the field, in airports, at seaports, or at the land border stations.  Many officers will carry more than one type of less-lethal device, especially when they are on crowd control duty.  They receive training and certification on the use of OC spray in the OFO Academy, including a required exposure to OC spray, before being authorized to carry OC spray, as set forth in CBP's Use of Force – Administrative Guidelines and Procedure Handbook.

8.     OC spray is used in a hand-held aerosol less-lethal device that disperses the inflammatory agent Capsaicin in a conical mist, stream, gel, or foam.  All CBP officers are trained in the OC spray that is contained in a 1-2 fl. oz. canister that they carry in their duty gear belts.  This size is for close proximity up to 10 feet, although the recommended effective range is 4 to 6 feet.  Some CBP officers and all SRT officers are additionally trained and certified in the use of the MK-9 OC spray, which is larger than

3

the standard OC spray and can be used in close proximity, but it is primarily used at a distance of 6 to 20 feet.  The MK-9 OC spray is intended for use in crowd control situations.

9.      Oleoresin is a natural product consisting of a mixture of resin and oil from various plants.  Capsaicin is a family of plants that includes peppers such as cayenne, chili, and jalapeno.  The active ingredient in the OC spray used by CBP is cayenne pepper.  OC spray is classified as an inflammatory agent.  Its effects are temporary, although the effects may vary from person to person.  OC spray exposure may affect one or more of the following areas: (1) eye irritation, such as involuntary tearing, rapid or complete eye closure, or a burning sensation; (2) skin and facial reactions, such as a burning sensation or inflammation or swelling of the skin, particularly around the lips, mouth, and nose, often turning red, although these effects typically resolve within 10 to 15 minutes; (3) loss of motor control because exposure may temporarily impair muscle coordination; or (4) temporary disorientation.  These effects may assist an officer with disrupting a person's focus and encouraging compliance with an officer's orders.  Decontamination from the effects of OC spray is usually accomplished by moving to an area of fresh air and rinsing the affected body parts with water.  Non-oil-based soaps also assist with decontamination.

10.      Under CBP's Use of Force Policy, OC spray may be utilized as a compliance tool on a subject offering, at a minimum, active resistance or otherwise physically resistant to compliance with a lawful law enforcement order.  CBP considers the use of OC spray as a reportable use of force.

11.      In paragraph 2 of the Revised PI, the Court defines "crowd control weapons" as kinetic impact projectiles (KIPs), chemical irritants, and flash bangs.  Additionally, paragraph 2 specifies that it prohibits use of crowd control weapons "when Plaintiffs are not posing a threat of immediate harm to a law enforcement officer or another person, physically impeding federal operations, vandalizing property, or actively resisting

4

arrest."  Paragraph 4 of the Revised PI, however, prohibits "*[f]iring* tear gas canisters or flash-bang grenades so as to strike any Plaintiff," or "*firing* KIPs or other crowd control weapons at the head, neck, groin, back, or other sensitive areas, unless that person poses an immediate threat of death or serious bodily injury."

12.    It is unclear whether OC spray was intended to be included in the paragraph 4 prohibition even though it does not pose the same risk of serious injury if directed at the sensitive areas of the body as the other items listed in paragraph 4.  While paragraph 2 appears to permit the use of OC spray where persons are "posing a threat of immediate harm to a law enforcement officer or another person, physically impeding federal operations, vandalizing property, or actively resisting arrest," paragraph 4 appears to completely restrict of the use of OC spray to only those situations where there is an immediate threat of death or serious bodily injury.

13.    As I previously explained in my declaration dated May 15, 2026, CBP's Use of Force Policy already prohibits the intentional targeting of the head, neck, spine, or groin of the intended subject by compressed air launchers or munition launchers for kinetic impact, unless the use of deadly force is reasonable.  These munition launchers can be used to fire chemical irritants, known as less-lethal specialty impact-chemical munitions (LLSI-CM) in the air, at the ground, or at people as long as the head, neck, spine, groin, or female breasts are not intentionally targeted, unless the use of deadly force is reasonable to avoid serious bodily injury or death to an officer or another person.

14.    However, OC spray is treated differently in the field than compressed air launchers and munition launchers and listed as a separate classification under CBP's Use of Force Policy, because it is not considered a form of less-lethal force that is launched or fired at people.  CBP officers, including SRT officers, are trained to target a person's head as necessary for OC spray to be used effectively, and a restriction on its use toward the head and neck would completely prevent CBP officers from being able to effectively use this form of less-lethal force.

15.    OC spray is an intermediate force option that allows CBP officers to gain control of a subject offering active resistance to protect themselves or others.  It can permit an officer to deescalate a situation quickly without causing a lasting injury and before needing to apply hands-on techniques or a higher level of force.  The use of OC spray also affords CBP officers the ability to create distance, disengage, and/or gain compliance.  CBP's inability to use OC spray as a crowd control device would expose its officers and the public to an increased risk of harm and require officers to utilize more aggressive hands-on techniques or batons or risk being held in contempt with the Court's PI.  The use of these techniques would expose CBP's officers and the public to an increased risk of harm, because, on one hand, CBP officers would have to get closer to any person engaging in unlawful conduct and, on the other hand, CBP officers would have to use physical force more likely to cause injury.  These techniques would especially place officers at greater risk of harm when dealing with large or violent crowds actively resisting dispersal orders, vandalizing federal property, or engaging in other unlawful conduct, because they require closer proximity than the use of OC spray

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 29th day of July, 2026, at Long Beach, California.

JAVIER LARIOS

Digitally signed by JAVIER LARIOS
Date: 2026.07.30 07:53:20 -07'00'

JAVIER LARIOS